1



2005 WL 758193
--- B.R. ---
(Cite as: 2005 WL 758193 (Bankr.D.N.J.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. New Jersey.
In Re: **G-I HOLDINGS, INC.** f/k/a GAF
CORPORATION, et al. Debtors.
No. 01-30135(RG), 01-38790(RG).

Feb. 1, 2005.

**Background:** Chapter 11 debtor and asbestos claimants committee filed independent motions proposing methodologies for estimating asbestos personal injury claims pursuant to Bankruptcy Code.

**Holdings:** The Bankruptcy Court, Gambardella, Chief Judge, held that:
(1) some form of claim estimation proceeding was required in debtor's case;
(2) claimants with asbestos-related personal injury claims possessed jury trial rights for purposes of liquidating their respective claims against bankruptcy estate;
(3) claim liquidation procedures proposed by debtor, which did not provide claimants with right to jury trial, could not be approved;
(4) bankruptcy court lacked authority to appoint special, non-judicial entity for liquidating asbestos-related personal injury and wrongful death claims prior to confirmation of reorganization plan, as proposed by debtor; and
(5) competing interests warranted that claim estimation be done in the aggregate.
Ordered accordingly.

[1] Bankruptcy 3548.1

51k3548.1 Most Cited Cases
Once debtor files for bankruptcy in an effort to shed or affect its asbestos-related liabilities, future demand holders must be addressed in the reorganization process.

[2] Bankruptcy 2829
51k2829 Most Cited Cases
In general, bankruptcy court has discretion to determine the appropriate method of claim estimation in light of the particular circumstances of bankruptcy case before it. Bankr.Code, 11 U.S.C.A. § 502(c).

[3] Bankruptcy 2829
51k2829 Most Cited Cases
Principal consideration in selecting claim estimation procedure must be an accommodation to the underlying purposes of Bankruptcy Code; thus, to the greatest extent possible, selected estimation procedure should not run counter to the efficient and expeditious administration of the bankruptcy estate. Bankr.Code, 11 U.S.C.A. § 502(c).

[4] Bankruptcy 2829
51k2829 Most Cited Cases
In estimating claims pursuant to Bankruptcy Code, bankruptcy court is bound by the legal rules which may govern the ultimate value of the claim; however, there are no other limitations on court's authority to evaluate claim save those general principles which should inform all decisions made pursuant to Code. Bankr.Code, 11 U.S.C.A. § 502(c).

[5] Bankruptcy 2829
51k2829 Most Cited Cases
Before bankruptcy court orders an estimation proceeding, an initial determination must be made that liquidating the claim or claims would unduly delay the bankruptcy case. Bankr.Code, 11 U.S.C.A. § 502(c).

[6] Bankruptcy 2829
51k2829 Most Cited Cases
Some form of claim estimation proceeding was required in Chapter 11 case, given that debtor had more than 150,000 asbestos claims pending against it and faced prospect of having several hundred thousand more claims filed in the future, such that requiring liquidation of every asbestos-related personal injury claim outside bankruptcy context would undoubtedly cause undue delay in administration of case and could possibly be death knell for debtor's successful reorganization. Bankr.Code, 11 U.S.C.A. § 502(c).

[7] Jury 13(3)
230k13(3) Most Cited Cases
Generally, the notion of legal rights within the meaning of the Seventh Amendment pertains to actions seeking monetary damages against defendant. U.S.C.A. Const.Amend. 7.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0001

2005 WL 758193                                                                     Page 2
--- B.R. ---
(Cite as: 2005 WL 758193 (Bankr.D.N.J.))

**[8] Bankruptcy** ⚷2130
51k2130 Most Cited Cases
Claims held against Chapter 11 debtor by asbestos personal injury claimants were legal in nature, and thus each carried with it the Seventh Amendment's guarantee of a jury trial. U.S.C.A. Const.Amend. 7.

**[8] Jury** ⚷19(9)
230k19(9) Most Cited Cases
Claims held against Chapter 11 debtor by asbestos personal injury claimants were legal in nature, and thus each carried with it the Seventh Amendment's guarantee of a jury trial. U.S.C.A. Const.Amend. 7.

**[9] Jury** ⚷31.1
230k31.1 Most Cited Cases
Although Congress may devise novel causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders, Congress lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury. U.S.C.A. Const.Amend. 7.

**[10] Jury** ⚷13(3)
230k13(3) Most Cited Cases
For purposes of constitutional jury trial right, legal claims are not magically converted into equitable issues by their presentation to a court of equity. U.S.C.A. Const.Amend. 7.

**[11] Bankruptcy** ⚷2130
51k2130 Most Cited Cases
Personal injury claims asserted by asbestos injury claimants against Chapter 11 debtor did not fall within public rights exception to Seventh Amendment's guarantee to jury trial, given that federal regulatory program was not implicated by claims, and claims were not being asserted against federal government. U.S.C.A. Const.Amend. 7.

**[11] Jury** ⚷19(9)
230k19(9) Most Cited Cases
Personal injury claims asserted by asbestos injury claimants against Chapter 11 debtor did not fall within public rights exception to Seventh Amendment's guarantee to jury trial, given that federal regulatory program was not implicated by claims, and claims were not being asserted against federal government. U.S.C.A. Const.Amend. 7.

**[12] Bankruptcy** ⚷2130
51k2130 Most Cited Cases
Claimants with asbestos-related personal injury claims against Chapter 11 debtor possessed jury trial rights under Seventh Amendment for purposes of liquidating their respective claims against bankruptcy estate, notwithstanding debtor's contentions that equity jurisdiction applied. U.S.C.A. Const.Amend. 7.

**[12] Jury** ⚷19(9)
230k19(9) Most Cited Cases
Claimants with asbestos-related personal injury claims against Chapter 11 debtor possessed jury trial rights under Seventh Amendment for purposes of liquidating their respective claims against bankruptcy estate, notwithstanding debtor's contentions that equity jurisdiction applied. U.S.C.A. Const.Amend. 7.

**[13] Bankruptcy** ⚷2052
51k2052 Most Cited Cases
Bankruptcy court jurisdiction over the claims allowance process is distinct from liquidation for purposes of distribution.

**[14] Bankruptcy** ⚷2921
51k2921 Most Cited Cases

**[14] Bankruptcy** ⚷3442.1
51k3442.1 Most Cited Cases
The allowance or disallowance of a claim is not identical to the liquidation of a claim for purposes of distribution.

**[15] Bankruptcy** ⚷2130
51k2130 Most Cited Cases
Jury trial is not required for an action at law if it is closely intertwined with claims allowance proceedings unique to bankruptcy law; thus, while creditors of bankruptcy estate cannot be divested of their right to jury trial for determining the ultimate extent and value of their personal injuries for purposes of distribution, creditors are not entitled to a jury trial in an estimation proceeding under Bankruptcy Code when the purpose of the proceeding is to determine the allowance or disallowance of claims against the bankruptcy estate. Bankr.Code, 11 U.S.C.A. § 502(c).

**[15] Jury** ⚷19(9)
230k19(9) Most Cited Cases
Jury trial is not required for an action at law if it is closely intertwined with claims allowance proceedings unique to bankruptcy law; thus, while creditors of bankruptcy estate cannot be divested of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0002

their right to jury trial for determining the ultimate extent and value of their personal injuries for purposes of distribution, creditors are not entitled to a jury trial in an estimation proceeding under Bankruptcy Code when the purpose of the proceeding is to determine the allowance or disallowance of claims against the bankruptcy estate. Bankr.Code, 11 U.S.C.A. § 502(c).

[16] Bankruptcy ⚖═2052
51k2052 Most Cited Cases
The claims allowance process, which is governed by the Bankruptcy Code, is
unique to the bankruptcy forum and constitutes a "core proceeding." Bankr.Code, 11 U.S.C.A. § 502(c); 28 U.S.C.A. § 157(b)(2)(B).

[17] Bankruptcy ⚖═2045
51k2045 Most Cited Cases

[17] Bankruptcy ⚖═2061
51k2061 Most Cited Cases

[17] Bankruptcy ⚖═2104
51k2104 Most Cited Cases
If bankruptcy court approves an estimation proceeding with the aim of determining voting shares in Chapter 11 plan confirmation process, such a proceeding falls within court's core jurisdiction, but if court approves an estimation proceeding with the intended goal of liquidating contingent or unliquidated personal injury tort or wrongful death claims against the estate for distributional purposes, proceeding falls within court's non-core "related to" jurisdiction; in latter circumstance, bankruptcy court would conduct estimation proceeding in the first instance and then submit proposed findings of fact and conclusions of law to district court for entry of final order. 28 U.S.C.A. § 157(b)(2)(B), (c).

[18] Bankruptcy ⚖═2061
51k2061 Most Cited Cases
Narrow reading of exclusionary clause in statute defining "core proceedings" to preclude bankruptcy courts from liquidating or estimating contingent or unliquidated personal injury tort or wrongful death claims against bankruptcy estate for distribution purposes was warranted with respect to motions in which Chapter 11 debtor and asbestos claimants committee proposed different methodologies for estimating asbestos personal injury claims against estate, in that narrow interpretation, which removed from bankruptcy court's jurisdiction disputes over claim valuations but not disputes over claims' legal

validity, advanced efficient resolution of claims and avoided unnecessary burdens on district court, and was consistent with other related jurisdictional statutes. Bankr.Code, 11 U.S.C.A. § 502(c); 28 U.S.C.A. §§ 157(b)(2)(B), (b)(5), 1411(a).

[19] Bankruptcy ⚖═2130
51k2130 Most Cited Cases
Statute that defined "core proceedings" so as to preclude bankruptcy courts from liquidating or estimating contingent or unliquidated personal injury tort or wrongful death claims against bankruptcy estate for distribution purposes did not deprive asbestos personal injury claimants of Seventh Amendment right to jury trial with respect to estimating their claims for purposes of distribution. U.S.C.A. Const.Amend. 7; Bankr.Code, 11 U.S.C.A. § 502(c); 28 U.S.C.A. §§ 157(b)(2)(B), (b)(5), 1411(a).

[19] Jury ⚖═19(9)
230k19(9) Most Cited Cases
Statute that defined "core proceedings" so as to preclude bankruptcy courts from liquidating or estimating contingent or unliquidated personal injury tort or wrongful death claims against bankruptcy estate for distribution purposes did not deprive asbestos personal injury claimants of Seventh Amendment right to jury trial with respect to estimating their claims for purposes of distribution. U.S.C.A. Const.Amend. 7; Bankr.Code, 11 U.S.C.A. § 502(c); 28 U.S.C.A. §§ 157(b)(2)(B), (b)(5), 1411(a).

[20] Bankruptcy ⚖═2061
51k2061 Most Cited Cases
Statute defining "core proceedings" so as to preclude bankruptcy courts from liquidating or estimating contingent or unliquidated personal injury tort or wrongful death claims against bankruptcy estate for distribution purposes prevents bankruptcy court from addressing only certain aspects of the claims allowance process, namely, fixing the value of a claim for purposes of distribution, and does not limit court's ability to address substantive issues regarding the validity of claims against the estate as a matter of law. Bankr.Code, 11 U.S.C.A. § 502(c); 28 U.S.C.A. § 157(b)(2)(B).

[21] Bankruptcy ⚖═2061
51k2061 Most Cited Cases
Although statute required that district court order personal injury tort and wrongful death claims to be tried in that court, it did not affect pretrial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proceedings, and therefore bankruptcy court had jurisdiction to determine any claims objections asserted by Chapter 11 debtor during course of proceedings to estimate asbestos-related personal injury claims against debtor; the only question at that time would be whether bankruptcy court could enter a final order or was required to propose findings of fact and conclusions of law to district court. Bankr.Code, 11 U.S.C.A. § 502(c); 28 U.S.C.A. § 157(b)(2)(B).

[22] Bankruptcy ⇒2061
51k2061 Most Cited Cases
If bankruptcy court determines that a personal injury tort or wrongful death claim against debtor is allowable as a matter of law, statute prevents bankruptcy court from valuing that claim; rather, such valuation is to be done
via jury trial in district court. Bankr.Code, 11 U.S.C.A. § 502(c); 28 U.S.C.A. §§ 157(b)(2)(B), (b)(5), 1411(a).

[23] Bankruptcy ⇒2130
51k2130 Most Cited Cases
Given that claimants with asbestos-related personal injury claims against Chapter 11 debtor retained their constitutional and statutory rights to jury trial, claim liquidation procedures proposed by debtor, which did not provide claimants with right to jury trial, could not be approved, particularly in light of other procedural deficiencies in proposed process. U.S.C.A. Const.Amend. 7; Bankr.Code, 11 U.S.C.A. § 502(c); 28 U.S.C.A. §§ 157(b)(2)(B), (b)(5), 1411(a).

[23] Jury ⇒19(9)
230k19(9) Most Cited Cases
Given that claimants with asbestos-related personal injury claims against Chapter 11 debtor retained their constitutional and statutory rights to jury trial, claim liquidation procedures proposed by debtor, which did not provide claimants with right to jury trial, could not be approved, particularly in light of other procedural deficiencies in proposed process. U.S.C.A. Const.Amend. 7; Bankr.Code, 11 U.S.C.A. § 502(c); 28 U.S.C.A. §§ 157(b)(2)(B), (b)(5), 1411(a).

[24] Bankruptcy ⇒2828.1
51k2828.1 Most Cited Cases
Bankruptcy court lacked authority to appoint special, non-judicial entity for liquidating asbestos-related personal injury and wrongful death claims against Chapter 11 debtor prior to confirmation of reorganization plan, as proposed by debtor, and, even if bankruptcy court had such authority, any conclusions reached by such entity were subject to de novo review by district court. 28 U.S.C.A. § 157(b)(2)(B), (c).

[25] Bankruptcy ⇒3555
51k3555 Most Cited Cases
Chapter 11 debtor that was subject to thousands of asbestos-related personal injury claims was not required to implement personal injury trust created under Bankruptcy Code as part of its reorganization plan when debtor had sufficient reason to believe that it could effectively reorganize without such a remedy, particularly if it proved successful in pending litigation addressing successor liability of its non-debtor indirect subsidiary. Bankr.Code, 11 U.S.C.A. § 524(g).

[26] Bankruptcy ⇒2829
51k2829 Most Cited Cases
Competing interests warranted pre-confirmation estimation of asbestos-related personal injury and wrongful death claims against Chapter 11 debtor via process providing for estimation in the aggregate as to all present claimants, leaving aside future demand holders for second estimation hearing, as necessary, with hearing respecting present claimants to proceed in at least two phases, including first phase involving estimation in the aggregate of all of debtor's asbestos liability solely as to claimants suffering from mesothelioma and lung cancer, and second phase estimating all remaining present claimants in the aggregate. Bankr.Code, 11 U.S.C.A. § 502(c).

Riker, Danzig, Scherer, Hyland & Perretti, LLP, by Dennis J. O'Grady, Esq., Mark E. Hall, Esq., Morristown, Co-Counsel for the Debtor, G-I Holdings, Inc.

Weil, Gotshal & Manges, LLP, by Martin J. Bienenstock, Esq., Kathryn L. Turner Esq., Philip M. Abelson, Esq., New York, NY, Co-Counsel for the Debtor, G-I Holdings, Inc.

Weil, Gotshal & Manges, LLP, by Ralph I. Miller, Esq., Debra L. Goldstein, Esq., Dallas, TX, Co-Counsel for the Debtor, G-I Holdings, Inc.

Lowenstein Sandler, P.C., by Jeffrey D. Prol, Esq., Roseland, Co-Counsel for the Official Committee of Asbestos Claimants.

Caplin & Drysdale, Chartered, by Trevor W. Swett,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0004

2005 WL 758193
--- B.R. ---
(Cite as: 2005 WL 758193 (Bankr.D.N.J.))

Page 5

III, Esq., Max C. Heerman, Esq., Washington, DC, Co-Counsel for the Official Committee of Asbestos Claimants.

Saiber, Schlesinger, Satz & Goldstein, L.L.C., by David R. Gross, Esq., Newark, Co-Counsel for C. Judson Hamlin, the Legal Representative of Present and Future Holders of Asbestos-Related Demands.

Keating, Muething & Klekamp, P.L.L., by Kevin E. Irwin, Esq., Michael L. Scheier, Esq., Daniel J. Donnellon, Esq., Cincinnati, OH, Co-Counsel for C. Judson Hamlin, the Legal Representative of Present and Future Holders of Asbestos-Related Demands.

Office of the Attorney General, State of Illinois, by Marilyn A. Kueper, Esq., Springfield, IL, Chief, Asbestos Litigation for the State of Illinois.

OPINION

Rosemary Gambardella, Chief Judge.

*1 Presently before the Court in this mass tort bankruptcy case are two independent motions filed by adverse parties proposing divergent methodologies for estimating asbestos personal injury claims pursuant to § 502(c) of the Bankruptcy Code. First is a motion filed by the Debtor, G-I Holdings, Inc. (hereinafter "G-I Holdings"), seeking an order "establishing the method to liquidate its asbestos claims" pursuant to § 502(c) of the Code; second is a motion filed by the Official Committee of Asbestos Claimants (hereinafter the "Committee") seeking an order from the Court approving a process that would estimate G-I Holdings's "asbestos liability in the aggregate." The motion filed by G-I Holdings has been objected to by the Committee as well as the Legal Representative of Present and Future Holders of Asbestos-Related Demands (hereinafter the "Legal Representative"). In turn, the motion filed by the Committee has been objected to by G-I Holdings. This Court conducted a hearing with respect to the competing motions on January 15, 2004, at which time the Court reserved its decision.

The following constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052. See Fed. R. Bankr.P. 7052 (West 2004). Pursuant to 28 U.S.C. § 157, this matter is a core proceeding. See 28 U.S.C. § 157(b)(2)(A) (West 2004). Further, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984. See 28 U.S.C. § 1334 (West 2004). Finally, venue is proper pursuant to 28 U.S.C. § 1409(a) (West 2004).

I. Parties Involved In This Motion And Procedural History

On January 5, 2001, G-I Holdings filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On August 3, 2001, ACI, Inc., a subsidiary of G-I Holdings, filed a voluntary Chapter 11 petition. On October 10, 2001, this Court entered an Order directing the joint administration of the G-I Holdings and ACI, Inc. bankruptcy cases. Since the filing of its bankruptcy petition, G-I Holdings has been operating its business as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. See 11 U.S.C. § 1107(a) (West 2004); see also 11 U.S.C. § 1108 (West 2004). G-I Holdings is the successor-in-interest to GAF Corporation (hereinafter "GAF"), an entity named in approximately 500,000 asbestos actions. The Committee submits that as successor-in-interest to GAF, G-I Holdings remains liable for approximately 150,000 asbestos lawsuits filed, but unresolved, as of the petition date and for unknown numbers of asbestos claims that will be filed in the future. Moreover, Building Materials Corporation of America (hereinafter "BMCA"), a leading manufacturer of roofing and building products, is an indirect subsidiary of G-I Holdings, and is also the primary operating subsidiary and principal asset of G-I Holdings. [FN1] Established in 1994, BMCA received substantially all the assets of GAF's roofing products business and expressly assumed $204 million of asbestos liability, with G-I Holdings indemnifying BMCA against any additional asbestos liability. In re G-I Holdings, Inc., 313 B.R. 612, 621 (Bankr.D.N.J.2004). [FN2]

*2 The Committee is an official committee of creditors appointed on January 22, 2001 by the United States Trustee pursuant to § 1102(a) of the Bankruptcy Code to represent those individuals who allegedly suffered injuries related to the exposure to asbestos from products manufactured by the predecessors of G-I Holdings. See 11 U.S.C. § 1102(a) (West 2004). [FN3] Further, the Legal Representative, C. Judson Hamlin, is a fiduciary appointed by the Court to represent persons who hold present and future asbestos-related claims against G-I Holdings.

On June 19, 2002, G-I Holdings filed the present motion, which it describes as an application for an order "pursuant to 11 U.S.C. § 502(c) establishing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 758193
--- B.R. ---
(Cite as: 2005 WL 758193 (Bankr.D.N.J.))

Page 6

method to liquidate asbestos claims." On June 25, 2002, G-I Holdings filed a companion motion to "fix a final date for filing proofs of claim," which the parties refer to as the "Bar Date Motion." Even before G-I Holdings filed the motion seeking approval of its estimation or liquidation of claims procedure, [FN4] the Committee moved on May 23, 2002 to withdraw the reference for all proceedings relating to claims estimation in the G-I Holdings bankruptcy case. Similarly, on August 13, 2002, the Legal Representative also moved to withdraw the reference with respect to G-I Holdings's Bar Date Motion and Estimation Motion. On August 30, 2002, the Committee filed its objection to the Estimation Motion, and on September 13, 2002, the Legal Representative filed its own objection to the Estimation Motion. The United States District Court for the District of New Jersey denied the motions to withdraw the reference on May 13, 2003 in a reported decision, *Official Committee of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 295 B.R. 211 (D.N.J.2003).

Before turning to the substance of the Estimation Motion filed by G-I Holdings, it is important to reiterate the conclusions reached by the District Court in denying the motions to withdraw the reference because it frames the parameters for this Opinion. In deciding that the competing estimation proposals are better suited for this Court to address in the first instance, The Honorable William G. Bassler, U.S.D.J., concluded as follows:

> The Committee's proposal aims to estimate G-I Holdings' aggregate asbestos liability for purposes of determining voting shares in the chapter 11 plan confirmation process. This is a core proceeding that should be determined by the Bankruptcy Court. On the other hand, G-I Holdings' proposal is a novel estimation approach that attempts to estimate the value of individual asbestos claims, which results in an effective liquidation of those claims. It is unclear if the determination of whether G-I Holdings' proposal ought to be followed is a core or non-core proceeding. Initially, the core/non-core determination ought to be made by the Bankruptcy Court.
> Given its understanding of the facts and issue in this case, and knowledge of the chapter 11 reorganization process, the Bankruptcy Court should attempt the estimation proceeding in the first instance. If the Bankruptcy Court determines that the estimation is a core proceeding, then it may conduct the proceeding and enter a final order. To the extent that the determination is a non-core proceeding under 28 U.S.C. § 157(b)(2)(B), the Bankruptcy Court can recommend the estimation method to this Court pursuant to 28 U.S.C. § 157(c).
> *3 Both the Bankruptcy Court and this Court are equally qualified to conduct the estimation proceeding, however, judicial economy considerations indicate that the bankruptcy court may be more appropriate .... As indicated above, the proposal recommended by the Committee will not require this Court's final approval because the Committee is seeking a determination of G-I Holdings' total asbestos liability and not a method to liquidate claims. Only G-I Holdings' method may be non-core, requiring entry of a final order by this Court. Judicial economy is therefore better served by having the Bankruptcy Court retain jurisdiction of the estimation motions.
> >*In re G-I Holdings, Inc.,* 295 B.R. at 218-20 (internal citations omitted) ].

Accordingly, both estimation motions are properly before this Court.

As an additional aside, it should also be noted that the Bar Date Motion is not under consideration by the Court at this time. On September 10, 2004, counsel for G-I Holdings forwarded a letter to the Court proposing that an estimation hearing occur prior to the entry of any bar date in an effort to expedite the bankruptcy case and avoid unnecessary expense to the estate. This position was reiterated by counsel for G-I Holdings during a subsequent hearing before the Court on September 21, 2004, wherein the parties agreed to suspend the determination of the Bar Date Motion indefinitely. Nonetheless, the Court recognizes that G-I Holdings's Bar Date Motion remains outstanding and will be decided on a future date, as necessary. [FN5]

II. The Estimation Procedure Proposed By G-I Holdings

In support of its Estimation Motion, G-I Holdings has proposed what it describes as a "statutory, equitable, and logical approach" to addressing the current "asbestos-litigation crisis" plaguing the federal courts. More specifically, G-I Holdings has proposed a detailed and intricate scheme whereby all asbestos personal injury claims asserted against its estate be liquidated through the application of a medical matrix (hereinafter the "Matrix") which it has developed. According to G-I Holdings, the Matrix and the associated Asbestos Personal Injury Claims Liquidation Procedures (hereinafter "Claims Liquidation Procedures") "provide an expeditious method for resolving the asbestos personal injury

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0006

2005 WL 758193
--- B.R. ---
(Cite as: 2005 WL 758193 (Bankr.D.N.J.))

Page 7

claims confronting [the estate]." The following paragraphs describe the Matrix and the Claims Liquidation Procedures proposed by G-I Holdings in support of its Estimation Motion. [FN6]

At the heart of the Matrix and the Claims Liquidation Procedures is a "Claims Liquidation Committee" (hereinafter "CLC") which would be charged with the responsibility of administering the claims procedures established by G-I Holdings. According to G-I Holdings, the CLC would "consist of no less than three members, with such qualifications as the Bankruptcy Court shall deem appropriate and necessary." The members of the CLC "shall be appointed by G-I Holdings," subject to approval by the Court. [FN7] G-I Holdings has clarified, however, that while it possesses the ability to propose members of the CLC to the Court, the Court will have the power to ultimately appoint the CLC members. Based upon specific documents submitted by each asbestos claimant, the CLC would be responsible for determining whether the claimant has an allowed claim against the estate.

*4 More particularly, Section 3.1 of the Claims Liquidation Procedures states that in order to have an allowed claim based upon an asbestos-related injury, each claimant must provide the CLC with "sufficient evidence" [FN8] that the claimant:
> (a) was occupationally exposed to GAF Asbestos Products, [FN9] which occurred while the Exposed Person [FN10] was carrying out job responsibilities (or for a spouse or household member, secondary to such exposure), on a regular basis, over some period of time on a work site, plant or vessel where GAF Asbestos Products were used, in proximity to where and during the time when the exposed person actually worked; and
> (b) suffers from a medical condition which meets the criteria of at least one of the Scheduled Disease Categories defined in Section 3.3 hereof.

Section 3.2 of the Claims Liquidation Procedures creates the following seven separate Scheduled Disease Categories: 1) Mesothelioma (Category I); 2) Lung Cancer I: With Non-Malignant I Disease (Category II); 3) Lung Cancer II A: Non-Smoking (Category III); 4) Lung Cancer II B: Smoking (Category IV); 5) Other Cancer With Non-Malignant I Disease (Category V); 6) Non-Malignant I: With Impairment (Category VI); and 7) Non-Malignant II: Without Impairment (Category VII). With respect to each Scheduled Disease Category, the Matrix and the Claims Liquidation Procedures set forth a pre-determined Scheduled Allowed Amount [FN11] as compensation to any individual with "sufficient evidence" of exposure to asbestos products manufactured by GAF or G-I Holdings. The Scheduled Allowed Amounts are as follows:
> Category I--Mesothelioma: $35,560
> Category II--Lung Cancer I: With Non-Malignant I Disease: $17,281
> Category III--Lung Cancer II A: Non-Smoking $11,521
> Category IV--Lung Cancer II B: Smoking: $5,760
> Category V Other Cancer With Non-Malignant I Disease: $9,148
> Category VI--Non-Malignant I: With Impairment: $2,911
> Category VII--Non-Malignant II: Without Impairment $0

According to Section 3.3 of the Claims Liquidation Procedures, in order for a claim based upon a Scheduled Disease in Categories I-VI to be allowed, it must meet the occupational exposure requirements contained within Section 3.1(a) and "must include a statement signed by a Qualified Physician [FN12] stating that the Exposed Person has been diagnosed with a Scheduled Disease meeting the criteria of one of the Scheduled Disease Categories ...." In turn, Section 3.3(a)--(g) sets forth the criteria for establishing one of the Scheduled Disease Categories, and contains very specific requirements that a particular claimant must satisfy before the claim may be allowed under the Matrix. By way of example, with respect to potential Category III (Lung Cancer II A--Non-smoking) claimants, a particular claimant must establish the following: 1) diagnosis by a Qualified Physician of a malignant primary bronchiogenic tumor of any cell type caused or contributed to by exposure to asbestos; 2) evidence of occupational exposure to asbestos as specified in Section 3.1(a) for the following minimum exposure periods: (A) five (5) exposure years for insulators, shipyard workers, workers in manufacturing plants handling raw asbestos, boilermakers, shipfitters, steamfitters, or other trades performing similar functions; or (B) ten (10) exposure years for utility and power house workers, secondary manufacturing workers, or other trades performing similar functions; (C) fifteen (15) exposure years for general construction, maintenance workers, chemical and refinery workers, marine engine room personnel and other personnel on vessels, stationery engineers and firemen, railroad engine repair workers, or other trades performing similar functions; 3) documentation that at least twelve (12) years elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis of an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0007

asbestos-related injury; and 4) has not smoked cigarettes or used any other tobacco products for at least fifteen (15) years. [FN13]

*5 In the event a particular claimant presents "sufficient evidence" of a Scheduled Disease or Condition satisfying Categories I--VI, in accordance with Section 3.2(c) the CLC will offer to liquidate each valid asbestos personal injury claim and any associated derivative claims based on the Scheduled Allowed Amount for the claimant's disease or condition. However, the Scheduled Allowed Amount for each category is subject to adjustment based upon the particular claimant's age pursuant to Section 3.2(c)(1). That is, claimants fifty-five years of age and younger receive +1% of the Scheduled Allowed Amount for each year of age under fifty-six. Claimants between fifty-six and seventy years of age receive the Scheduled Allowed Amount without any upward or downward adjustment, and claimants seventy-one years of age and older receive - 1% of the Scheduled Allowed Amount for each year of age over seventy. In addition, Section 3.2(c)(2) provides that the Scheduled Allowed Amount is also subject to adjustment based upon the particular claimant's number of dependents. Claimants with no dependents receive -5% of the Scheduled Allowed Amount, claimants with one dependent receive the Scheduled Allowed Amount with no upward or downward adjustment, claimants with two dependents receive +5% of the Scheduled Allowed Amount, and claimants with more than two dependents receive +5% of the Scheduled Allowed Amount for each additional dependent.

Further, claims falling within Category VII (Non-Malignant II: Without Impairment) have a Scheduled Allowed Amount of $0. However, Section 3.2(c) [FN14] of the Claims Liquidation Procedures expressly tolls the statute of limitations for Category VII claims "until such time as the Claimant is diagnosed with an injury meeting the criteria set forth in Categories I through V." In addition, Section 3.1(d) of the Claims Liquidation Procedures specifically provides that "[n]o more than the Scheduled Allowed Amount for each Scheduled Disease Category, as adjusted for age and number of Dependents shall be paid in aggregate for the Exposed Person's claim and any other claims (such as loss of consortium) derived therefrom."

Section 3.4(a) of the Claims Liquidation Procedures establishes a priority scheme for processing and liquidating claims. All asbestos personal injury claims will be processed and liquidated in the following order:
  (1) Claims against G-I Holdings or GAF Corporation which were due and payable under judgments or settlements entered into by the Center for Claims Resolution (CCR) or GAF Corporation but not paid as of January 5, 2001, for such Claimants who elect to file with the CLC pursuant to these procedures rather than pursue payment under the judgment or settlement;
  (2) Claims whose holders had filed claims or lawsuits against G-I Holdings or GAF Corporation prior to January 5, 2001, including those with CCR settlements which were not due and payable as of January 5, 2001, for such Claimants who elect to file with the CLC pursuant to these procedures rather than pursue payment under the judgment or settlement;
  *6 (3) Claims whose holders had not filed claims or lawsuits against G-I Holdings or GAF Corporation prior to January 5, 2001 but who filed claims with the Bankruptcy Court before [the Bar Date]; and
  (4) Claims not described in subparagraph (1), (2), or (3) above.

Moreover, Section 3.4(b) institutes the following manner of ordering particular claims within the groups established pursuant to Section 3.4(a):
  Claims within each of groups (1) through (4) shall be ordered for processing first by seriousness of disease categories, and within each category, on a first-in-first-out (FIFO) basis. A Claimant's position in the FIFO queue will be determined by the date of receipt of a fully completed proof of claim form signed by hand by the Claimant or his or her authorized representative. [FN15]

Other provisions of the Claims Liquidation Procedures are as follows. Section 4.3 provides that in order to be *eligible* for liquidation of an allowed claim, a claimant must (a) submit a fully completed proof of claim by a future bar date set by the Court; and (b) respond to any request by the CLC for additional information within ninety (90) days. If a claimant fails to meet these deadlines, the claim shall be disallowed automatically "if a claimant required to provide claims information fails to do so within these periods, unless the claimant demonstrates to the satisfaction of the CLC, in its sole and absolute discretion, that such failure should be excused." A disallowed claim, however, can be refiled, albeit with a condition. The first-in-first-out date and date of filing the claim will be determined by the date of the refiling, and not by the date of the originally filed claim. Thus, a refiled claim could arguably lose its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 758193                                                                                      Page 9
--- B.R. ---
(Cite as: 2005 WL 758193 (Bankr.D.N.J.))

priority under Section 3.4 of the Claims Liquidation Procedures. Further, Section 4.4 governs the treatment of any withdrawn claim, and provides as follows: "[a] Claimant can withdraw a claim upon written notice to the CLC and file another claim subsequently, but any such claim filed after withdrawal shall be given a FIFO date based upon such subsequent filing."

Section 5.1 of the Claims Liquidation Procedures provides that in order for a claimant to *establish* an allowable asbestos personal injury claim, the claimant must: a) be an Exposed Person who demonstrates that he or she meets the requirements of Section 3.1, and (b) submit a medical report from a Qualified Physician that (i) results from a physical examination by that physician and (ii) contains a diagnosis of an asbestos-related injury that meets the criteria of one of the Scheduled Disease categories set forth in Section 3.3. The Claims Liquidation Procedures reserve the CLC's right to audit any medical evidence, and the CLC may require submission of "x-rays, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify the Asbestos Personal Injury Claim, and shall require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable."

*7 Further, Section 5.6 of the Claims Liquidation Procedures states that the CLC "shall" conduct random audits of the medical information submitted by claimants to ensure the veracity and reliability of the information. The auditing process affords the CLC the right to independently review "x-rays, tissue samples or other laboratory tests, review of complete pulmonary function test data," and require a claimant to submit to an independent medical examination. In the event the CLC's audit reveals that invalid information [FN16] has been provided to the CLC, the CLC
> may penalize any Claimant or Claimant's attorney by disallowing the Asbestos Personal Injury Claims or seeking sanctions from the District Court including, but not limited to, requiring the source of the invalid information to pay the costs associated with the audit and any future audits, reordering the priority of liquidation of the affected Claimants' Asbestos Personal Injury Claims, raising the level of security of additional information submitted from the same source or sources, or prosecuting the Claimant or the Claimant's attorney for presenting a fraudulent Asbestos Personal Injury Claim in violation of 18 U.S.C. § 152.

Pursuant to Section 5.2 of the Claims Liquidation Procedures, the CLC reserves the right to impose a "reasonable" filing fee, [FN17] refundable at the discretion of the CLC, to be paid by all claimants whose claims impose an exceptional cost, [FN18] "such as claims of exposure to GAF Asbestos Products that are inconsistent with the timing and location of claims previously paid or claims whose medical or exposure evidence is from a source that provided invalid or unreliable evidence in claims previously audited by the CLC." Section 5.3 of the Claims Liquidation Procedures disallows punitive damages to claimants in determining any entitlement to a Scheduled Allowed Amount. [FN19]

Moreover, and especially significant to the Estimation Motion is Section 5.5 of the Claims Liquidation Procedures which is captioned, "Contested Claims Decisions." Section 5.5 provides as follows in its entirety:
> *Contesting Claims Decisions.* The only issues which shall be subject to contest by holders of Asbestos Personal Injury Claims are:
> (1) Disallowance of a claim on the basis of failure to meet medical or exposure criteria, or
> (2) The categorization assigned to the claimant's Asbestos Personal Injury Claim. [FN20]
> (3) *Article III Review.* Claimants may choose review of the CLC's decisions by an Article III court. No allowed amount shall be overturned unless the CLC's decision is shown to have been arbitrary or capricious.

Consequently, by operation of Section 5.5, the Committee and the Legal Representative argue that the Matrix and the Claims Liquidation Procedures do not provide asbestos claimants with a right to a jury trial if they are dissatisfied with their allowed claim. The only mechanism for a claimant to challenge an allowed claim is through the process set forth in Section 5.5 of the Claims Liquidation Procedures. [FN21]

*8 In its application to the Court in support of the Matrix and the Claims Liquidation Procedures, G-I Holdings states that these procedures provide a process "whereby legitimate claims are identified based upon well accepted medical and occupational health criteria, and compensated at monetary levels derived from federal court experience and based on the principles ... of the non-recognition [of claims] of the 'unsick,' 'subclinical,' or 'exposure-only' plaintiffs." (*Memorandum of Law in Support of Application of G-I Holdings Inc. for Order Pursuant*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 758193
--- B.R. ---
(Cite as: 2005 WL 758193 (Bankr.D.N.J.))

Page 10

to *11 U.S.C. § 502(c) Establishing Method to Liquidate Asbestos Claims,* pg. 4)(hereinafter "*G-I Br.*"). According to G-I Holdings, the reliance upon solely federal claims figures in the liquidation of asbestos personal injury claims is because "federal court asbestos litigation, unlike state court litigation, has not permitted the massive filing and bundling of asbestos claims (sick with non-sick claims) and the associated *in terrorem* effect of multiple punitive damages awards." (*G-I Br.,* pg. 4).

That is, G-I Holdings seeks an estimation process so as to liquidate each individual claim under § 502(c) of the Bankruptcy Code. By relying upon figures from the federal tort system, G-I Holdings's methodology is attempting to circumvent two self-described "inequities" inherent in the state court tort system. First, relying on federal tort claims amounts avoids the problem described by G-I Holdings as "bundling," whereby an asbestos defendant "is compelled to agree to payments to unsick claimants as a condition to settling claims of persons with malignant diseases, including mesothelioma." (*G-I Br.,* pg. 5). Second, G-I Holdings maintains that utilizing federal tort claims figures, as opposed to state tort law figures, averts the problem it characterizes as the "law of large numbers." G-I Holdings describes the "law of large numbers" as follows:

> When confronted with batches of 1000 claims, even if most claims had no merit or were not linked to G-I [Holdings], it was economically less expensive for G-I [Holdings] to pay $x thousand per claim than to spend $x+y thousand per claim to have meritless claims dismissed. This is what makes mass tort claims a deadly force. Outside bankruptcy, defendants must pay regardless of merit. The federal courts at least partially addressed this problem by not enabling claims of unsick claimants to participate until they were sick. [FN22]
> [ (*G-I Br.,* pg. 5) ].

As a result of the "bundling" and "law of large numbers" dilemmas facing asbestos personal injury defendants, G-I Holdings asks this Court to require proof that each claimant has been exposed to, and harmed by, an asbestos product of a G-I Holdings's predecessor so as to prevent the payment of meritless claims. As articulated by counsel for G-I Holdings, it has assigned federal claim values to the Matrix and the Claims Liquidation Procedures because these values "most accurately reflect the values *that should be received by asbestos claimants.*" (*G-I Br.,* pg. 10) (emphasis added). G-I Holdings favors the use of federal tort claims values because according to G-I Holdings, "[f]ederal courts do not allow to the same extent as state courts, the bundling of claims ..., the practice of which grossly distorts the values *that should be assigned to asbestos claims.*" (*G-I Br.,* pg. 10) (emphasis added).

*9 G-I Holdings submits that the Matrix and the companion Claims Liquidation Procedures will save the Company from incurring "massive fees and expenses" associated with litigating individual claims in the state tort system. According to G-I Holdings, it incurred fees of $30 million in year 2000 alone in defending against asbestos personal injury claims in the state tort system. (*G-I Br.,* pgs. 18 and 25). G-I Holdings estimates the Company will save approximately $28.5 million per year if the Matrix and the Claims Liquidation Procedures are approved by the Court as the method of estimating claims in this case. (*G-I Application,* pg. 6). In contrast, requiring G-I Holdings to litigate every asbestos personal injury claim would create an enormous expense for the bankruptcy estate.

The Committee and the Legal Representative oppose the Matrix and the Claims Liquidation Procedures proposed by G-I Holdings. Rather than attempt to estimate each individual claim against G-I Holdings one by one, the Committee proposes a methodology that would estimate the Company's asbestos liabilities in the aggregate. Instead of utilizing a fixed period of time as a guide to estimating asbestos liabilities, as G-I Holdings suggests by using figures from federal tort cases resolved between 1997 and 1999, the Committee proposes "a statistical estimation of [G-I Holdings's] present and future asbestos liabilities based on projections from [the Company's] overall claim-resolution history." (*Response of the Official Committee of Asbestos Claimants to Debtors' (I) Application for an Order Establishing a Method for Liquidating Asbestos Claims and (II) Motion for Order Fixing Final Date for Filing Proofs of Claim,* pg. 1)(hereinafter "*Comm. Br.*"). Once this is accomplished, the Committee submits that "[a]mounts payable to individual claimants would then be determined, post-bankruptcy, by a trust established under 11 U.S.C. § 524(g)" in conjunction with a Chapter 11 plan. (*Comm. Br.,* pg. 1). In accordance with the Committee's proposed methodology, asbestos claimants who are dissatisfied with the trust's liability determinations under relevant "trust distribution procedures" (hereinafter "TDP") incorporated therein, would be entitled to jury trials in the tort system. [FN23]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0010

2005 WL 758193                                                             Page 11
--- B.R. ---
(Cite as: 2005 WL 758193 (Bankr.D.N.J.))

Moreover, rather than constituting a true "estimation" of contingent claims as provided for in § 502(c) of the Code, the Committee argues the Matrix and the Claims Liquidation Procedures actually amount to an improper liquidation of all personal injury claims for the purpose of determining actual distributions to persons whose claims are allowed. The Committee summarizes its overall objections to the Matrix and the Claims Liquidation Procedures as follows:

> On the merits, Debtors' liquidation proposal is unprecedented. Debtors cast aside established Bankruptcy Code procedure and concoct a fanciful system whereby a committee appointed by G-I [Holdings] would liquidate several hundred thousand personal injury claims according to a fixed "matrix" supposedly derived from "federal tort claim" values. Debtors' goal is to have most claims "estimated at $0" and thus disallowed, solely on the basis of the proof-of-claim form, without any evidentiary proceedings. G-I [Holdings's] proposal contains no mechanism for discharging its enormous liability to future asbestos claimants, yet it makes no effort to show that the reorganized debtor would have assets sufficient to pay future claims. The Debtors' claim-by-claim liquidation scheme would take years to carry out, and it could not possibly result in a feasible and confirmable plan. In order to adopt this scheme, this Court would have to: 1) ignore Supreme Court precedent establishing the principle that substantive state law governs individual claims determinations in bankruptcy; 2) do away with statutory provisions guaranteeing personal injury claimants a right to [a] jury trial on the merits of their claims; and 3) ignore 11 U.S.C. § 524(g), the mechanism Congress envisioned for the payment of future asbestos claims, which provides for the creation of a trust to operate post-bankruptcy and pay all asbestos personal injury claims into the future.

*10 [ (Comm. Br., pgs. 2-3) ].

The Legal Representative joins in the legal arguments asserted by the Committee against the adoption of the Matrix and the Claims Liquidation Procedures. The thrust of the Legal Representative's position "is to emphasize the indispensability of a § 524(g) channeling injunction to any confirmable plan of reorganization that will emerge from this bankruptcy case." (*The Legal Representative's Brief in Opposition to (1) Debtor's Application for Order Pursuant to 11 U.S.C. § 502(c) Establishing Method to Liquidate Claims and (2) Debtor's Motion for Order Fixing Final Bar Date for Filing Proofs of Claim and Approving Notices and Publication Procedures,* pg. 2)(hereinafter "*Legal Rep. Br.*"). Further, the Legal Representative also argues that G-I Holdings's "scheme unconstitutionally disregards claimants' jury trial rights and irrationally values claims at a fraction of historical amounts." (*Legal Rep. Br.,* pg. 2).

Against this very general background the Court will turn to its legal analysis, and detail the particular arguments and counter-arguments raised by the parties with respect to the competing estimation methodologies.

III. Discussion

[1] Although the parties have strong disagreements, they do agree that an estimation of G-I Holdings's asbestos liability is required based on the complexity and sheer volume of present and future asbestos-related personal injury claims confronting the bankruptcy estate. The starting point for the estimation of claims against a bankruptcy estate is 11 U.S.C. § 502(c) which provides as follows:

> There shall be estimated for purpose of allowance under this section-
> (1) any contingent or unliquidated claim, [FN24] the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or
> (2) any right to payment arising from a right to an equitable remedy for breach of performance.
> >11 U.S.C. § 502(c) (West 2004) ].

[2][3][4] While the Bankruptcy Code certainly envisions an estimation proceeding, the Code is "silent as to the manner in which contingent or unliquidated claims are to be estimated." *Bittner v. Borne Chem. Co.,* 691 F.2d 134, 135 (3d Cir.1982). In general, a bankruptcy court has discretion to determine the appropriate method of estimation in light of the particular circumstances of the bankruptcy case before it. *In re Trident Shipworks, Inc.,* 247 B.R. 513, 514 (Bankr.M.D.Fla.2000); *see also In re Thomson McKinnon Sec., Inc.,* 143 B.R. 612, 619 (Bankr.S.D.N.Y.1992) ("In estimating [a] claim, the bankruptcy court should use whatever method is best suited for the circumstances") (citation omitted). As articulated by the Third Circuit Court of Appeals, the principal consideration in selecting an estimation procedure "must be an accommodation to the underlying purposes of the Code." *Bittner,* 691 F.2d at 135. Thus, to the greatest extent possible, a selected estimation procedure should not run counter to the efficient and expeditious administration of the bankruptcy estate. *Id.* at 135-36. In estimating claims

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0011

2005 WL 758193
--- B.R. ---
(Cite as: 2005 WL 758193 (Bankr.D.N.J.))

Page 12

pursuant to § 502(c), a bankruptcy court "is bound by the legal rules which may govern the ultimate value of the claim. For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law." *Id.* at 135. However, "there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code." *Id.* at 136.

*11 [5][6] Section 502(c) of the Bankruptcy Code is drafted in mandatory terms. That is, any contingent or unliquidated claim "shall" be estimated so long as the "liquidation" of the particular claim would "unduly delay the administration of the case." 11 U.S.C. § 502(c) (West 2004). Consequently, before a court orders an estimation proceeding, an initial determination must be made that liquidating the claim or claims would unduly delay the bankruptcy case. *Id. See also O'Neill v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.),* 981 F.2d 1450, 1461 (5th Cir.1993) ("In order for the estimation process of § 502(c) to apply, a claim must be contingent or unliquidated and fixing the claim must entail undue delay in the administration of justice"); *Apex Oil Co. v. Stinnes Interoil, Inc. (In re Apex Oil Co.),* 107 B.R. 189, 193 (Bankr.E.D.Mo.1989) ("[T]he duty to estimate is not mandatory until the court determines that liquidation of the claim outside of the bankruptcy court would unduly delay the bankruptcy proceeding").

At present, G-I Holdings has more than 150,000 asbestos claims pending against it, with the prospect of several hundred thousand more asbestos-related personal injury claims being filed in the future. As G-I Holdings itself submits, if it "were required to litigate each and every asbestos personal injury claim asserted against it, it would take years, actually lifetimes, before these claims would be liquidated." (*G-I Br.*, pg. 3). The Committee agrees with this observation. Given this very real assessment of the enormity of litigation facing G-I Holdings, requiring the Company to first liquidate each and every asbestos-related personal injury claim outside of the bankruptcy context would undoubtedly cause undue delay in the administration of the bankruptcy case and could possibly be the death knell for the successful reorganization of this debtor. Therefore, some form of estimation proceeding is required.

Having reached this conclusion, however, the Court is next faced with the critical task of selecting an appropriate estimation process or methodology that also comports with the requirements of *Bittner;* namely, one that adheres to the legal rules that govern the ultimate value of the claim and that also promotes the efficient and expedient administration of the G-I Holdings's bankruptcy estate. Significantly, the parties agree that neither a debtor nor its personal injury claimants have a right to jury trial in an estimation proceeding conducted under § 502(c) of the Bankruptcy Code. *See, e.g., In re Standard Insulations, Inc.,* 138 B.R. 947, 951 (Bankr.W.D.Mo.1992) ("The court concludes from the statutory language [of 28 U.S.C. § 157(b)(2)(B), 28 U.S.C. § 157(b)(5), and 28 U.S.C. § 1411(a) ] that jury trials are not required for personal injury claims at the claims allowance stage"). While the parties agree on this nuanced point, the most contentious issue between the parties is whether the individual asbestos-related personal injury claimants, taken collectively, have any jury trial rights within the context of the bankruptcy proceeding.

*12 On this issue, the Committee and the Legal Representative both argue the Matrix and the Claims Liquidation Procedures, by "proposing to *liquidate* personal injury claims individually, disallowing most of them and liquidating the rest at fixed values set forth in its 'medical matrix,' " implicates and strips the asbestos-related personal injury claimants of their rights to jury trial. (*Comm. Br.*, pg. 36)(emphasis in original). In contrast, the Committee argues that its estimation process, by not disallowing any claims or fixing G-I Holdings's liability with respect to any particular claim, does not implicate the claimants' rights to jury trial. Instead, "determinations as to the validity and value of claims will be made post-bankruptcy by a § 524(g) trust, and claimants dissatisfied with the trust's determinations would ultimately [be] entitled to jury trials in the tort system." (*Comm. Br.*, pg. 37). In addressing this issue, the Court will also present the competing arguments raised by the respective parties.

A. The Arguments Of G-I Holdings With Respect To The Existence Of Jury Trial Rights

The pivotal objection lodged against the Matrix and the Claims Liquidation Procedures by the Committee and the Legal Representative is that these estimation procedures do not afford asbestos claimants any right to jury trial. The Committee and the Legal Representative submit the Company's "liquidation-by-estimation scheme" would violate asbestos claimants' rights because it would determine final values for individual claims, for purposes of distribution under the reorganization plan, without

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 758193  
--- B.R. ---  
(Cite as: 2005 WL 758193 (Bankr.D.N.J.))

Page 13

affording claimants any right to jury trial. (*Comm. Br.*, pg. 37). Indeed, G-I Holdings readily admits that its proposed estimation procedures are for purposes of setting final monetary distribution amounts to asbestos claimants. As noted, Section 5.5 of the Claims Liquidation Procedures provides that "[t]he only issues which shall be subject to contest by holders of Asbestos Personal Injury Claims" are: (1) disallowance of a claim based on the failure to meet the established medical criteria; and (2) the Scheduled Disease categorization assigned to the particular claimant's claim against the estate. [FN25]

The Committee and the Legal Representative argue that if during the discovery process disputed issues of fact arise with respect to a particular claimant's claim, for example, whether the claimant was exposed to a product containing asbestos manufactured by GAF or its predecessors, the individual personal injury claimant would be entitled to a trial by jury. (*Comm. Br.*, pg. 14). Based upon the submissions and representations made to the Court by G-I Holdings, G-I Holdings confirms that under the Matrix and the Claims Liquidation Procedures, asbestos personal injury claimants would not have any rights to jury trial. Nevertheless, G-I Holdings argues the lack of a right to jury trial does not affect the viability of the Matrix and the Claims Liquidation Procedures because asbestos-related personal injury claimants have no right to jury trial in the context of the bankruptcy proceeding. In support of this position, G-I Holdings advances two principal arguments. First, G-I Holdings submits that the asbestos claimants have no constitutionally protected rights to jury trial under the Seventh Amendment to the United States Constitution. Second, G-I Holdings argues that the asbestos claimants have no statutory rights to jury trial through the complex interplay between 28 U.S.C. § 157(b)(2)(B), 28 U.S.C. § 157(b), 28 U.S.C. § 1411(a), and § 502(c) of the Bankruptcy Code. These arguments will be discussed in turn.

i. Whether Asbestos Claimants Have Jury Trial Rights Under The Seventh Amendment To The United States Constitution

*13 The Seventh Amendment to the United States Constitution provides as follows:
> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States than according to the rules of the common law.
> [U.S. Const. amend. VII].

[7] The United States Supreme Court has consistently interpreted the phrase "Suits at common law" to refer to " 'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." ' *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 40-41, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (citation omitted). Generally, the notion of "legal rights" within the meaning of the Seventh Amendment pertains to actions seeking monetary damages against a defendant. *See, e.g., Curtis v. Loether*, 415 U.S. 189, 195-96, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) ("More important, the relief sought here--actual and punitive damages--is the traditional form of relief offered in the courts of law"); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 476-77, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) (noting that a complaint seeking a money judgment "presents a claim which is unquestionably legal" in nature). Further, the "thrust of the [Seventh] Amendment was to preserve the right to jury trial as it existed in 1791." *Loether*, 415 U.S. at 192-93. Nonetheless, "it has long been settled that the right [to jury trial] extends beyond the common-law forms of action recognized at that time." *Id.* at 193. *See also Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. 433, 447, 3 Pet. 433, 7 L.Ed. 732 (1830) ("In a just sense, the [Seventh] [A]mendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights").

During the hearing on both estimation motions, counsel for the Committee made clear that the asbestos claimants are seeking monetary damages against G-I Holdings. Therefore, the claims against the Company constitute lawsuits seeking the adjudication of "legal rights" under the Seventh Amendment. However, through an exhaustive account of equity jurisdiction in England during the late 1700s and early 1800s, G-I Holdings argues that "the asbestos claims in [its] Chapter 11 case *could never* have been brought before a court of law in 1791 because no adequate remedy at law existed and equity *would have* asserted jurisdiction over these claims." (*G-I Br.*, pg. 36) (emphases added). Consequently, G-I Holdings maintains the asbestos claimants have no rights to jury trial that have been preserved by the Seventh Amendment to the United States Constitution. While the Court will not recount the course of equity jurisprudence in England during this time, it is necessary to summarize, and then address, the argument of G-I Holdings in this regard.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 758193
--- B.R. ---
(Cite as: 2005 WL 758193 (Bankr.D.N.J.))

Page 14

According to G-I Holdings, "[m]ass torts, by definition, involve the claims of numerous plaintiffs against a defendant for injury caused as a result of that defendant's alleged negligent conduct." (*G-I Br.*, pg. 37). Prior to the fusion of the courts of law and equity in this country by statute in 1934, G-I Holdings notes that "it was impossible for a group of plaintiffs to have brought an action at law against a defendant for negligence." (*G-I Br.*, pg. 37). The only remedy available to address the situation, according to G-I Holdings, would be for a court of chancery to issue what was known as a "bill of peace." [FN26] Simply stated, a bill of peace provided for the consolidation of numerous actions before the Court of Chancery. *See* Zechariah Chafee, Jr., *Bills of Peace with Multiple Parties*, 45 Harv. L.Rev. 1297, 1297 (1932) (describing the utilization of a bill of peace in situations where "questions of law or fact which would otherwise be tried over and over can by this means be determined once for all in a single proceeding"). Consolidating multiple proceedings through an equitable bill of peace avoided the "multiplicity of suits" and "save[d] the parties from needless expense and vexation." *Id.*

*14 The need for an equitable bill of peace arose in situations that G-I Holdings analogizes to its present situation defending numerous asbestos-related personal injury claims. That is, the existence of several persons on one side of a controversy, and one person on the other side. [FN27] According to the author of the law review article, "[e]ach member of the multitude threatens litigation or is engaged in pending litigation with the adversary, and these parallel litigations involve one or more common questions of law or fact, or both. The multitude are not joint obligees or obligors, so that they can not join or be joined in one common-law writ." *Id.* Because the separate lawsuits could not be joined in the common law courts, G-I Holdings therefore argues that an inadequate remedy at law existed because a defendant "was remediless against the assertion of numerous actions as the courts of common law could not consolidate the actions." (*G-I Br.*, pg. 40). The argument by G-I Holdings proceeds that because an inadequate remedy at law existed to handle this multiplicity of suits, a bill of peace would have issued consolidating all of the claims in a court of chancery. G-I Holdings specifically avers as follows:

> As the above analysis makes clear, *the only tribunal available to resolve over 150,000 claims was the Court of Chancery. As the majority of asbestos personal injury actions pending against G-I [Holdings] are actions brought by a group of plaintiffs against G-I [Holdings] (and various other defendants) for damages caused by G-I Holdings's alleged negligent conduct, such actions would have to have been commenced in the Court of Chancery. Even if separate actions were brought, equity would have issued a bill of peace to avoid the need to simultaneously defend against multiple suits. As such, no jury trial right would attach to cases involving damages arising from a defendant's alleged mass tort as the common law did not recognize such a claim.*
> [ (*G-I Br.*, pg. 45)(emphases added).]

Simply put, G-I Holdings overstates its legal conclusions on this issue. Indeed, while a bill of peace was an available mechanism for a court of equity to employ to address a multiplicity of suits against a common defendant, such an exercise of jurisdiction was not a certainty or an absolute, as G-I Holdings clearly argues, but rather one option that could have been utilized. Hypothetically, while 150,000 individual lawsuits against a single defendant might have been a fit case for a court of equity to assert jurisdiction through the issuance of a bill of peace, such issuance was not predestined. *See* Chafee, *supra,* at 1331-32 ("In short, there is no automatic solution for the administrative problem presented by multiple suits involving common questions. The two considerations emphasized in this article--the strength of the jury trial policy and the relative complexity of the controversy--are not rigid principles but only standards of judgment"). Moreover, the very authorities relied upon by G-I Holdings recognize this possibility and note that disagreement existed as to the exercise of equitable jurisdiction through a bill of peace when a multiplicity of similar lawsuits were filed against a common defendant.

*15 The law review article upon which G-I Holdings heavily relies is espousing its own partial position on the exercise of equity jurisdiction through the issuance of a bill of peace. The author admits as much: "[s]ince the multiplicity of suits in all these cases confers equitable jurisdiction, *according to the view taken in this article,* the constitutional guarantee of a jury trial has no application." Chafee, *supra,* at 1324. Further, the author sets forth his central argument as follows:

> Where the remedy at law is inadequate because of limitations upon the powers of a law court to consolidate parallel suits or the powers of a jury to decide them satisfactorily as a unit, equity *should have jurisdiction* to grant a bill of peace, as the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0014

> only practical alternative to repeated trials, delay, and injustice. In such a situation, it should be immaterial that the basic issues are legal and not equitable. The fact that one such action unquestionably lies within the province of a jury is beside the point. The presence of multiple claims entirely changes the problem. The multiplicity of suits *should be enough* to create equitable jurisdiction. The equity court can then consider whether the complexity of the unified controversy is sufficiently small to bring it within the range of a jury, or sufficiently great to throw it outside the range even of equity so that the bill must be dismissed as multifarious.
> *Id.* at 1302 (emphases added) ].

Finally, the author specifically concedes as follows: "[t]his conclusion that multiplicity of suits alone is a ground of equitable jurisdiction, though recognized by considerable authority ... is rejected in other decisions ...." *Id.* at 1303.

In *Hale v. Allinson*, 188 U.S. 56, 23 S.Ct. 244, 47 L.Ed. 380 (1903), the United States Supreme Court summarized the divergence of opinion on whether equity jurisdiction was available to prevent a multiplicity of lawsuits. The Supreme Court stated as follows:

> [T]he cases are various in which the court has either taken or refused jurisdiction, but one cannot adduce from them a plain and uniform rule by which to determine the question. The application of the principles upon which jurisdiction has been suggested or denied has been various, both in England and in this country, and it is difficult, if not impossible, to reconcile the cases. The subject is discussed at length in 1 Pomeroy's Equity Jurisprudence, 2d ed. P. 318, §§ 243 et seq. [FN28] It is therein shown that the foundation of the jurisdiction, or perhaps the earliest exercise of it upon this ground, was in so-called 'bills of peace,' where in one class of such bills the suit was brought to establish a general right between a single party and numerous other persons claiming distinct and individual interests .... In any case where the facts bring it within the possible jurisdiction of the court, according to the view taken by it in regard to such facts, the decision must depend largely upon the question of the reasonable convenience of the remedy, its effectiveness, and the inadequacy of the remedy at law.
> *16 >*Id.* at 72].

The Supreme Court continued its observations by stating the following:

> Cases in sufficient number have been cited to show how divergent are the decisions on the question of jurisdiction. It is easy to say it rests upon the prevention of a multiplicity of suits, but to say whether a particular cases comes within the principle is sometimes a much more difficult task. Each case, if not brought directly within the principle of some preceding case, must, as we think, be decided upon its own merits and upon a survey of the real and substantial convenience of all parties, the adequacy of the legal remedy, the situations of the different parties, the points to be contested and the result which would follow if jurisdiction should be assumed or denied; these various matters being factors to be taken into consideration upon the question of equitable jurisdiction on this ground, and whether within reasonable and fair grounds the suit is calculated to be in truth one which will practically prevent a multiplicity of litigation, and will be an actual convenience to all parties, and will not unreasonably overlook or obstruct the material interests of any. *The single fact that a multiplicity of suits may be prevented by this assumption of jurisdiction is not in all cases enough to sustain it.*
> *Id.* at 77-78 (emphasis added) ].

[8][9][10][11] Based upon the foregoing, this Court disagrees with the position held by G-I Holdings that the only tribunal available to resolve multiple mass tort claims in 1791 England was the Court of Chancery. In this instance, the Court agrees with the Committee, joined by the Legal Representative, that the claims held by the asbestos claimants are "legal in nature," and thus, they carry "with it the Seventh Amendment's guarantee of a jury trial." *Granfinanciera*, 492 U.S. at 55. While Congress may "devise novel causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders," Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury." *Id.* at 51-52. [FN29] In short, "[l]egal claims are not magically converted into equitable issues by their presentation to a court of equity." ' *Id.* at 52 (quoting *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970)). [FN30]

As an additional argument, G-I Holdings contends the asbestos claimants also do not have jury trial rights based upon the following equitable principle: "[w]here numerous creditors are proceeding against an allegedly limited fund, equity will assert jurisdiction and require all actions against the fund be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0015

Page 16

consolidated to ensure equitable treatment among creditors and to prevent early exhaustion of the fund." (*G-I Br.*, pg. 47). This argument is equally unavailing for at least two reasons. First, no concrete showing has been made that a "limited fund" exists. Although the Committee opines that G-I Holdings is in essence an insolvent entity, counsel for G-I Holdings submits that equity will exist in the Company after all rightful claims are paid. Second, the two main cases cited by G-I Holdings in support of this position are inapposite to the matter pending before the Court. *See generally* Hornor v. Henning, 93 U.S. 228, 23 L.Ed. 879 (1876); Stone v. Chisolm, 113 U.S. 302, 5 S.Ct. 497, 28 L.Ed. 991 (1885).

*17 In *Hornor*, the United States Supreme Court was called upon to interpret a Congressional statute authorizing the formation of corporations within the District of Columbia. With respect to the liability "of the stockholders and of the trustees who manage these corporations," the statute provided as follows: " '[i]f the indebtedness of any company organized under this act shall at any time exceed the amount of its capital stock, the trustees of such company assenting thereto shall be personally and individually liable for such excess to the creditors of the company." ' *Id.* at 229 (citation omitted). The discrete issue before the Supreme Court concerned whether a single creditor of the corporation, among many, could assert a separate action at law solely for his or her own benefit and recover a judgment against the trustees. *Id.* at 230. The Supreme Court held, *inter alia*, that the trustees who agreed to "an increase of the indebtedness of the corporation beyond its capital stock are to be held guilty of a violation of their trust" and this liability "constitutes a fund for the benefit of all the creditors who are entitled to share in it, in proportion to the amount of their debts, so far as may be necessary to pay these debts." *Id.* at 232.

Based upon this dynamic, the Supreme Court concluded the "remedy for this violation of duty as trustees is in its nature appropriate to a court of chancery." *Id.* Proceeding in a court of equity, the Supreme Court opined, "avoids the injustice of many suits against defendants for the same liability, and the greater injustice of permitting one creditor to absorb all, or a very unequal portion, of the sum for which the trustees are liable." *Id. See also* Stone v. Chisolm, 113 U.S. 302, 306-09, 5 S.Ct. 497, 28 L.Ed. 991 (1885) (holding that a single action in equity is appropriate in a lawsuit against the directors of a corporation pursuant to statute when the debts of the corporation exceed the value of capital stock where the intent of the statute is that the directors' liability shall be for the "common benefit" of all interested parties).

G-I Holdings attempts to analogize these "limited fund" cases to this matter by arguing that since a limited fund of assets to pay asbestos claimants exists, equitable considerations militate in favor of consolidating the 150,000 individual actions into a single proceeding in equity, where jury trial rights did not traditionally exist. As noted, this analogy must fail for several reasons. First, unlike the *Hornor* and *Chisolm* decisions, the asbestos-related personal injury actions do not arise pursuant to an explicit statute governing the liability of trustees and directors of an insolvent company. Second, G-I Holdings does not stand in a position of trust in relation to the claimants alleging personal injuries due to asbestos exposure. Third, the numerous asbestos-related personal injury claims confronting G-I Holdings are not premised on the "same liability," that is, multiple personal liability based on a single occurrence (*i.e.*, breach of a statutory formula).

*18 [12] Consequently, this Court concludes that the asbestos claimants do in fact possess jury trial rights under the Seventh Amendment to the United States Constitution for purposes of *liquidating* their respective claims against the G-I Holdings bankruptcy estate.

[13][14][15] Nevertheless, bankruptcy court jurisdiction over the claims allowance process is distinct from liquidation for purposes of distribution. *In re Standard Insulations, Inc.*, 138 B.R. 947, 953 (Bankr.W.D.Mo.1992). The allowance or disallowance of a claim is not identical to the liquidation of a claim for purposes of distribution. *Id.* at 954. A jury trial is not required for an action at law "if it is closely intertwined with claims allowance proceedings unique to bankruptcy law." *Id.* at 952. In other words, while creditors of a bankruptcy estate cannot be divested of their jury trial right for determining the ultimate extent and value of their personal injuries for purposes of *distribution,* creditors are not entitled to a jury trial in an estimation proceeding under § 502(c) when the purpose of the proceeding is to determine the allowance or disallowance of claims against the bankruptcy estate.

ii. Whether The Asbestos Claimants Have Jury Trial Rights Arising By Statute

In a separate argument, G-I Holdings asserts that not only do the asbestos claimants not have jury trial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rights for purposes of estimation, they also do not possess jury trial rights for purposes of distribution. (*G-I Br.*, pg. 30). As previously noted, G-I Holdings argues that the asbestos claimants have no statutory rights to jury trial based upon the intricate interplay between 28 U.S.C. § 1411(a), 28 U.S.C. § 157(b)(2)(B), 28 U.S.C. § 157(b)(5), and § 502(c) of the Bankruptcy Code. Before turning to the specific arguments raised by G-I Holdings in this regard, it is first necessary to note the precise language of the statutory sections under consideration.

First, 28 U.S.C. § 1411 provides as follows:
(a) Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.
(b) The district court may order the issues arising under section 303 of title 11 to be tried without a jury. [FN31]
>28 U.S.C. § 1411 (West 2004)].

Second, 28 U.S.C. § 157(b) addresses the jurisdictional parameters of bankruptcy courts and provides in relevant part as follows:
(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.
(2) Core proceedings include, but are not limited to -
(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purpose of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11.
*19 >28 U.S.C. § 157(b)(1) and (b)(2)(B) (West 2004)]. [FN32]

Third, 28 U.S.C. § 157(b)(5) provides as follows:
The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.
>28 U.S.C. § 157(b)(5) (West 2004)].

Based on its own interpretation of these statutory provisions, G-I Holdings submits that "[e]ven if this court were to decide asbestos personal injury claimants have a right to a jury trial with respect to their claims ... 28 U.S.C. § 1411(a) does not preserve that right when a debtor seeks to estimate for purposes of distribution its asbestos personal injury claims." (*Response to Sur-reply of Official Committee of Asbestos Claimants and Legal Demand Representative to Application of G-I Holdings for Order Pursuant to 11 U.S.C. § 502(c) Establishing Method to Liquidate Asbestos Claims*, pgs. 37-38) (hereinafter "*G-I Sur-reply Br.*"). According to G-I Holdings, Congress specifically "carved out estimation for purposes of distribution" from the reach of 28 U.S.C. § 1411(a). The statutory "carve-out," G-I Holdings contends, arises by operation of 28 U.S.C. § 157(b)(2)(B). (*G-I Sur-reply Br.*, pgs. 37-38). As G-I Holdings submits, "by enacting 28 U.S.C. § 157(b)(2)(B), Congress showed it had *no* intention of allowing jury trials when courts need to estimate personal injury and wrongful death actions for distribution purposes." (*Reply to Objection of Official Committee of Asbestos Claimants and Legal Demand Representative to Application of G-I Holdings for Order Pursuant to 11 U.S.C. § 502(c) Establishing Method to Liquidate Asbestos Claims*, pg. 47)(hereinafter "*G-I Reply Br.*")(emphasis in original).

The argument advanced by G-I Holdings proceeds as follows:
28 U.S.C. § 1411, by its terms, does not have any language granting jury trials. Rather, it only prevents title 11 of the United States Code and Chapter 87 of title 28 of the United States Code from taking away any jury trial right a personal injury claimant has. 28 U.S.C. § 157(b)(2)(B) is in Chapter 6 of title 28 and expressly provides for estimation of personal injury claims for distribution purposes. Therefore, § 1411 does not negate Congress' provision in Chapter 6 of title 28 for estimation of personal injury claims for distribution purposes.
[(*G-I Br.*, pg. 7).]

Thus, because § 157(b)(2)(B) is in a separate chapter (Chapter 6) of title 28 from § 1411(a) (Chapter 87), G-I Holdings maintains that § 1411(a) "does not bar 28 U.S.C. § 157(b)(2)(B) from creating or recognizing the court's power to estimate personal injury and wrongful death claims for distribution purposes without a jury." (*G-I Br.*, pg. 30). In addition, G-I Holdings argues as follows:
Accordingly, Congress' enactment of 28 U.S.C. §

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0017