**4**

Case 1:04-cv-01559-JFC    Document 12-6    Filed 05/26/2005    Page 1 of 15

```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

IN RE:                              .    Case No.  01-01139
                                    .
                                    .
  W. R. GRACE & CO., et al,         .    5490 USX Tower
                                    .    600 Grant Street
                                    .    Pittsburgh, PA 15219
          Debtors.                  .
                                    .    January 21, 2005
. . . . . . . . . . . . . . . .     .    9:00 a.m.

                   TRANSCRIPT OF AGENDA MATTERS
              BEFORE HONORABLE JUDITH K. FITZGERALD
                UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Kirkland & Ellis, LLP
                           By:  DAVID M. BERNICK, ESQ.
                                THEODORE L. FREEDMAN, ESQ.
                                JANET S. BAER, ESQ.
                           200 Randolph Drive
                           Chicago, IL  60601

                           Pachulski, Stang, Ziehl, Young,
                             Jones, & Weintraub, PC
                           By:  DAVID W. CARICKHOFF, ESQ.
                           919 N. Market Street
                           16th Floor
                           P. O. Box 8705
                           Wilmington, DE  19899-8705

For the Official Committee Kramer, Levin, Naftalis,
of Equity Security Holders:  & Frankel, LLP
                           By:  PHILIP BENTLEY, ESQ.
                           919 Third Avenue
                           New York, NY  10022


Audio Operator:            Janet Kozloski

Proceedings recorded by electronic sound recording, transcript
           produced by transcription service.
```

---

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net
(609) 586-2311   Fax No.  (609) 587-3599

USG B 0084

132

1 that can be done.

2     But, by and large, the big difference is that we
3 don't want to pay people that we're not legally obliged to pay,
4 because of the fact that -- have to pay them simply because
5 they would have gotten paid before. That is the problem that
6 we have to solve in this case.

7     THE COURT: Well, Mr. Lockwood, it seems to me that I
8 can sort of compromise between these two approaches and get to
9 a legitimate estimation hearing.

10     It seems to me that if the debtor thinks that it has
11 some value to do a questionnaire, and you know, the form of
12 discovery, I think, is somewhat within the discretion of the
13 Court and we could treat it as though it's a series of
14 interrogatories.

15     It's not going to be any 50 pages, I assure you.
16 But, coming down to a reasonable type of questionnaire to get
17 some information, so that the debtor's experts can decide what
18 the debtor thinks is a proper valuation, it may have relevance
19 to the committee. The committee may choose to use it for
20 different purposes, I don't know. But, I'm not sure that it
21 hurts to get that step done.

22     But, I do agree with you, that the appropriate way to
23 do this is through a battle of experts. So, whatever spin the
24 experts put on the questionnaire, maybe they'll be the same
25 spin. Maybe it won't be the same spin. I don't know. But, I

USG B 0085

                                                                    133

1 think that should be an expert analysis function that goes
2 forward.
3           MR. LOCKWOOD:  Well, we can certainly try and work
4 with the debtor on the questionnaire, in terms of -- to sample
5 118,000 people, you don't need to have 118,000 questionnaires.
6 I mean, Mr. Bernick has been tossing around statistical
7 references for extrapolating things, and you don't need 100
8 percent of the presents, to extrapolate to the futures.
9           You need whatever the experts would tell you would be
10 a sufficient sample to get -- have it be representative --
11          THE COURT:  Well, maybe --
12          MR. LOCKWOOD:  -- but the one thing I --
13          THE COURT:  I'm not sure it hurts to send it out to
14 all 118,000.
15          MR. LOCKWOOD:  Well, it depends --
16          THE COURT:  In fact --
17          MR. LOCKWOOD:  -- on what the sanctions are for not
18 responding to it.
19          THE COURT:  Well, if there's a bar date, it'll be a
20 --
21          MR. LOCKWOOD:  Well, that's --
22          THE COURT:  -- disallowance of claim.
23          MR. LOCKWOOD:  -- the point.
24          THE COURT:  I mean --
25          MR. LOCKWOOD:  So, then you're basically putting us

                        J&J COURT TRANSCRIBERS, INC.

1  in an allowance disallowance position.

2  And let me just address something on Mr. Bernick's
3  chart, if I might, Your Honor, so that we understand exactly
4  what's going on here.

5  THE COURT: Well, there may be another way to do it,
6  Mr. Lockwood, without requiring a bar date.

7  MR. LOCKWOOD: I can't find it.

8  THE COURT: It -- I take it that most of the 118,000
9  are represented by counsel.

10  MR. LOCKWOOD: I assume so, and --

11  THE COURT: And it seems to me that what we can do,
12  perhaps, is get each counsel to contact each client and make
13  sure that, in fact, that client understands that whatever the
14  estimation numbers are, will be binding on them.

15  And if they choose to file their own questionnaire,
16  fine. And if they don't, fine. But, there will have to be
17  some representative sample.

18  Experts can probably predict what that number has to
19  be. And if we don't get it, then I will do some sort of an
20  order that imposes a bar date.

21  But, it seems to me that if the attorneys are willing
22  to go back to their clients and file something that says my
23  client understands that there is going to be an estimation
24  hearing and that they will be bound, maybe I don't need a bar
25  date.

**J&J COURT TRANSCRIBERS, INC.**

135

1    MR. LOCKWOOD: Well, let me --

2    MR. BERNICK: Anyway that we can get reliable
3 information, is fine. But, we're real skeptical of the idea
4 that you can just rely upon the claimant. There has to be
5 something issuing from this Court that does create a need for
6 them to respond. If you have dropout from this process, then
7 it starts to create bias issues.

8    THE COURT: Oh. All right. We -- I think we can
9 handle that issue, because I may not be able to impose
10 something directly on the claimant.

11   But, as I indicated about the 2019 Statements, I have
12 lots of counsel who are currently subject, as officers to this
13 Court, to my orders. So, I think I can deal through counsel,
14 if need be.

15   MR. LOCKWOOD: Your Honor --

16                    (Pause)

17   MR. LOCKWOOD: Your Honor, we should be clear about
18 what the debtor wants this estimation process to entail, from
19 the debtor's side.

20   This thing over -- this line over here, liability
21 filters, with the boxes. The debtor, without ever actually
22 presenting this to Your Honor for resolution, asserts that
23 there are various legal defenses which they will be able to
24 assert for -- across the board on cases, which will reduce the
25 number to Mr. Bernick's 25 percent.

**J&J COURT TRANSCRIBERS, INC.**

1       Some of those legal defenses we could actually tee
2  up, even in advance of an estimation hearing.  For example, the
3  proposition that in this estimation process the Bankruptcy
4  Court could determine that people that didn't have a certain
5  level of impairment did not have a State Law right to payment,
6  for example.
7       Because, what Mr. Bernick really is trying to do
8  here, at the end of the day, in violation frankly, of <u>SGL</u>
9  <u>Carbon</u>, is to use this bankruptcy case as a mechanism for
10 trying to litigate his way out of a problem that he was unable
11 to --
12      THE COURT:  No.
13      MR. LOCKWOOD:  -- litigate his way out of in the
14 torts.
15      THE COURT:  No.  Let's stop.  All I'm trying to get
16 to is an estimation process.  It seems to me that experts may
17 disagree about the appropriate methodology to use.  That will
18 be a <u>Daubert</u> issue.
19      I can determine whether the methodology was
20 appropriate in a simple -- well, I don't know that the --
21      MR. LOCKWOOD:  In --
22      THE COURT:  -- evidence will be simple, but a motion
23 will be simple with respect to <u>Daubert</u>.  We can deal with all
24 that down the road.
25      But, getting the information, at the outset, seems to

1  me to be a legitimate --
2       MR. LOCKWOOD: Daubert doesn't speak to the
3  qualifications of an expert who would take a large number of
4  claims, whether it's 118,000, or 10,000 --
5       THE COURT: No. It speaks to the methodology.
6       MR. LOCKWOOD: -- (indiscernible) who would review
7  those claims and tell a Court which ones were legally and
8  factually valid.
9       THE COURT: Right. And so you'll argue that you
10 can't --
11      MR. LOCKWOOD: There is no Daubert expert of that
12 sort. I mean, that's not --
13      THE COURT: Well, we'll see.
14      MR. LOCKWOOD: Because, it's a matter of law.
15      THE COURT: Well --
16      MR. LOCKWOOD: Typically speaking, he --
17      MR. BERNICK: With respect, I think that we're
18 talking a little bit at cross purposes.
19      We are not going to have experts who will opine as to
20 legal issues. You and I will argue legal issues to the Court.
21 We're not going to have an expert say, gee, in Alabama you can
22 recover for exposure. What we would do is we would argue the
23 legal issues, but the experts would translate our arguments
24 into what claims, or what groups of claims are picked up by the
25 arguments.

1          A second thing, the Daubert dimension of this, you
2 give the example of, you know, who's impaired, you know, what
3 does impairment mean under State Law. That's one dimension of
4 this, but that's not the principal dimension that will animate
5 this process.
6          The Daubert issue goes to the reliability of the
7 methodology that was used in gathering medical information. In
8 exactly the same fashion as before Judge Newsome, we litigated,
9 on Daubert grounds, whether dust sampling was an appropriate
10 methodology, and that methodology had been used for all of the
11 property claims, and he found it was not an appropriate
12 methodology.
13         We're going to litigate on Daubert grounds whether
14 the mass screening is an appropriate methodology, under the ILO
15 standards themselves --
16         THE COURT: Well, okay. We're going to get to that
17 issue when we get there, for today.
18         MR. BERNICK: Yes.
19         THE COURT: Because, I'm ready to move past this.
20 So, finish your remarks --
21         MR. LOCKWOOD: Well --
22         THE COURT: -- Mr. Lockwood.
23         MR. LOCKWOOD: The point I'm trying to make is that,
24 for example, on this methodology, in the State tort system, no
25 State has adopted the ATS Standards for determining what is

1  impairment.

2          No State has adopted the proposition that some kind
3  of "B" Reader isn't a good enough kind of "B" Reader.  They
4  cite statistics that the plaintiffs have got favored "B" Reader
5  doctors, that some other experts of theirs think over read, by
6  orders of magnitude, x-rays favorable to plaintiffs.

7          That sort of issue is decided when that expert is
8  tendered to testify in a particular case and the opposing
9  expert is tendered to testify, and the two experts testify.

10         All these doctors, for example, that they criticize
11 and that they say we need to have a bankruptcy proceeding to
12 deal with, number one, those doctors were first identified as
13 issues in Manville, in the mid-1990's, and not one of them, to
14 my knowledge, has been yet disqualified, from a Federal or a
15 State --

16         THE COURT:  But --

17         MR. LOCKWOOD:  -- Court --

18         THE COURT:  But, regardless --

19         MR. LOCKWOOD:  -- on the grounds that they don't meet
20 Daubert.

21         THE COURT:  But, regardless, the information that the
22 debtor wants, I think, is appropriate for an expert to take a
23 look at.

24         Whether I'm going to consider it, what value I'll
25 place on it, whether it meets Daubert or not, I think is an

140

1 issue down the road.

2 What the debtor intends to do seems to me, in an
3 estimation process, to be calculated to lead the relevant
4 admissible evidence.  And for a discovery on an estimation
5 process, that's all I need.

6 I am going to direct you two, you and Mr. Bernick,
7 Mr. Lockwood, to work out some mechanism, by which, if we don't
8 have a bar date, because I'm -- for other purposes, I don't
9 really see the need for a bar date.  I'm not sure I see the
10 need for one here.

11 But, I do need to make sure that we have some handle
12 on whatever the appropriate sampling of the questionnaires to
13 go out and get returned is, that we will have a legitimate
14 across the board sample, number one.

15 And number two, that counsel for all of the present
16 claimants understands that this estimation process is going
17 forward, so if they want to submit that kind of questionnaire
18 and have their own client's medical information included in it,
19 they have the opportunity to do that, because they will be
20 bound by the outcome of the estimation hearing.

21 So, that, I think, is what we need to do.

22 MR. LOCKWOOD:  Okay.  But -- let me just say one
23 thing about this questionnaire process, Your Honor.  Actually,
24 two.

25 First, one of the problems with 118,000, is timing.

141

1  While Mr. Bernick facilely suggested these law firms, if they
2  file lawsuits, have at their fingertips the information
3  necessary to answer a questionnaire, that's simply not
4  necessarily true.  You're not required --
5           THE COURT:  Look, the trusts have been able to do it,
6  and the pre -- have been able to do it --
7           MR. LOCKWOOD:  The question is --
8           THE COURT:  -- within a matter of --
9           MR. LOCKWOOD:  Yes.  The question is time.
10          THE COURT:  -- several months.
11          MR. LOCKWOOD:  How much time?
12          THE COURT:  Okay.
13          MR. LOCKWOOD:  Because --
14          THE COURT:  Well, I think you two can --
15          MR. LOCKWOOD:  -- you know, if you've got 10,000
16 claimants, or 5,000 claimants that you have to fill out a
17 multi-page questionnaire --
18          THE COURT:  Yes.
19          MR. LOCKWOOD:  -- for each one, that's a whole lot of
20 work and it doesn't get done over night.
21          THE COURT:  Yes.
22          MR. LOCKWOOD:  The second point has to do with what
23 the kinds of things that individual claimants know.
24          For example, product ID.  Typically speaking in tort
25 -- in the tort system of cases, you prove product ID not merely

142

1  by the plaintiff's own recollection of where he worked and what
2  he worked with, but co-worker depositions, invoices from the
3  manufacturer showing product was delivered to a site where the
4  worker worked, et cetera.
5        So, if a claimant is asked, you know, exactly how do
6  you know that you were exposed to Grace asbestos and where,
7  that information might be available not through the claimant,
8  but by the lawyer, when he works up the case --
9        THE COURT: Well, that can be --
10       MR. LOCKWOOD: -- and gets --
11       THE COURT: Wait.
12       MR. LOCKWOOD: -- discovery from the debtor showing
13 where its products were shipped to.
14       THE COURT: We're getting way ahead. Because, it
15 seems to me that the debtor has certain information that can go
16 onto the claim form at the outset, which is, what the debtor's
17 products were, where they were delivered, and what period of
18 time they were used in specific locations. And if a claimant
19 doesn't fit within one of those locations, that's --
20       MR. BERNICK: And Your Honor, these are exactly the
21 kinds of issues -- I actually am looking forward to this sit
22 down session. I only ask that we both have a martini
23 beforehand. And please --
24       THE COURT: Just one?
25                    (Laughter)

**J&J COURT TRANSCRIBERS, INC.**

USG B 0095

1    MR. BERNICK: And don't lock the door, because I've
2 now turned 50, and I know Mr. Lockwood's over 50, and we may
3 have to use the facilities during the course of this meeting.
4                          (Laughter)
5    MR. BERNICK: But, this is exactly the kind of thing
6 that we ought to be able to take up, in the context of that
7 conversation, rather than right now.
8    THE COURT: All right.
9    MR. BERNICK: For everything he says, I'm going to
10 have an answer, and it's just not worth it.
11    THE COURT: In terms of using the facilities, why
12 don't we take a ten-minute break and do just that.
13    And then I'll come back and we'll -- I'll hear from
14 the other parties before I make final rulings on this, and --
15 after a ten-minute recess.
16                          (Recess)
17    MR. BERNICK: Your Honor, if I could raise a -- I'm
18 sorry.
19    THE COURT: Wait just a minute, Mr. Bernick.
20    MR. BERNICK: Sure.
21    THE COURT: Gentlemen, we have a substitute court
22 reporter, since the other one is at lunch. So, when you speak,
23 would you please identify yourself --
24    MR. BERNICK: Sure.
25    THE COURT: -- since she will not know who you are.

1   THE COURT: Okay. I really think we ought to just
2 set up a phone call. I mean, you're welcome to be either here,
3 or in Delaware, but I -- you know, I don't know how reliable
4 the weather service is, but they've been talking about it for
5 two days, so --
6   MS. ESKIN: We do have a dial-in set up, already.
7   THE COURT: Okay. So, just participate in the
8 dial-in. My normal rule about the fact that you have to make
9 those arrangements in advance is abrogated. So, call in. Now,
10 go home, so you can get home.
11   UNIDENTIFIED FEMALE ATTORNEY: Thank you, Your Honor.
12   THE COURT: Okay. Thank you.
13   UNIDENTIFIED MALE ATTORNEY: Thank you.
14   UNIDENTIFIED MALE ATTORNEY: Thank you, Your Honor.
15   THE COURT: We're adjourned.
16       * * * * *
17       C E R T I F I C A T I O N
18   I, MELISSA HYNES, court approved transcriber, certify
19 that the foregoing is a correct transcript from the official
20 electronic sound recording of the proceedings, in the
21 above-entitled matter, to the best of my ability.
22
23 _____
24 MELISSA HYNES
25 J&J COURT TRANSCRIBERS, INC.        DATE: January 31, 2005

J&J COURT TRANSCRIBERS, INC.

USG B 0097