**9**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re: | ) | CIVIL ACTION |
|  | ) |  |
| THE BABCOCK & WILCOX | ) | No.:   00-0558 |
| COMPANY, ET AL. | ) | Bankruptcy Case |
|  | ) | No.   00-10992 |
|  | ) |  |
|  | ) | SECTION: "R" (5) |

**B&W's REPORT TO THE COURT REGARDING
ASBESTOS DEVELOPMENTS GENERALLY
AND THE PROOFS OF CLAIM FILED HERE**

KIRKLAND & ELLIS
David M. Bernick
John Donley
Theodore L. Freedman
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

HELLER, DRAPER, HAYDEN, PATRICK &
HORN, L.L.C.
Jan M. Hayden (#6672)
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6103
(504) 568-1888

Dated: October 18, 2001                    Counsel for Debtors

USG B 0124

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................. 1

I.   ASBESTOS CLAIM FILINGS HAVE QUADRUPLED SINCE EARLY 2000. ...... 5

     A.   TAKING ADVANTAGE OF LOOSE CRITERIA FOR PAYMENT, PLAINTIFFS'
          COUNSEL HAVE DOUBLED THE VOLUME OF CLAIMS FILED AGAINST
          ASBESTOS TRUSTS EACH OF THE PAST TWO YEARS ...................... 6

     B.   ASBESTOS CLAIMS IN THE TORT SYSTEM HAVE LIKEWISE SURGED,
          DRIVING TEN COMPANIES INTO CHAPTER 11 SINCE EARLY 2000. .......... 20

II.  B&W's HISTORICAL SETTLEMENT PROGRAM WAS DESIGNED TO
     MINIMIZE OVERALL CLAIM RESOLUTION COSTS AND THUS DID NOT
     REFLECT B&W's ACTUAL LIABILITY ................................... 26

     A.   B&W SETTLED HUGE NUMBERS OF CLAIMS WHILE AVOIDING LITIGATION
          AND KEEPING COSTS LOW. ........................................ 27

     B.   PLAINTIFFS' LAWYERS TOOK ADVANTAGE OF B&W'S MINIMAL CLAIM
          CRITERIA BY SUBMITTING UNSUPPORTABLE CLAIMS. .................. 31

III. AS THE RESULT OF STEPS TAKEN IN THIS CASE TO-DATE, THE THRESHOLD
     TORT LIABILITY ISSUES CAN NOW BE LITIGATED. ..................... 40

     A.   THE BAR DATE PROCESS SERVED TO GATHER THE ASBESTOS PERSONAL-
          INJURY CLAIMS. ................................................ 40

     B.   THE FILING OF TENS OF THOUSANDS OF INVALID "SETTLED" PROOFS OF
          CLAIM FORESHADOWED DEFICIENCIES IN THE PERSONAL-INJURY CLAIMS. ... 45

IV.  PRELIMINARY ANALYSES OF THE PERSONAL-INJURY PROOFS OF
     CLAIM SHOW THAT MOST ARE DEFICIENT, UNDERSCORING THE
     NEED TO SEPARATE VALID FROM INVALID CLAIMS. .................. 49

CONCLUSION ............................................................. 54

i

USG B 0125

## INTRODUCTION

At the start of this case, Babcock & Wilcox described how breakdowns in the asbestos litigation system and B&W's asbestos claim settlement program drove the company into Chapter 11.[1] The problems have since grown markedly worse, with regard to both asbestos claims generally and claims against B&W. The worsening problems underscore the importance of the claim determination process that this Court set in place last year for the purpose of separating valid asbestos personal-injury claims from invalid ones.

As described in Section I below, since early last year asbestos claim facilities and courts have been flooded with surging claim volumes, unrelated to any change in the facts, science, or medical condition of asbestos victims. The system is being manipulated as droves of unimpaired asbestosis and pleural claimants are sought out by sophisticated law firms and "diagnosed" with vague and subjective symptoms by a handful of assembly-line doctors. As a result, both the raw numbers of unimpaired claims, and their proportion relative to claims brought by truly sick people, have soared. The surge in unimpaired claims has forced nine more companies into Chapter 11 since B&W filed, and more are undoubtedly on the way.

As shown by the detailed review of B&W's pre-petition claims history in Section II below, B&W's liability was always disputed, as confirmed by recent court filings showing that plaintiff's counsel knew B&W's liability was "doubtful" and "at best, minimal." But B&W settled more than 300,000 claims because it was cheaper to resolve claims consensually before the start of litigation than it would have been to make a comprehensive liability assessment of each claim and pay the costs of defense – especially when the per-claim cost was modest and the

---

[1] *See* B&W's 2/22/00 Informational Brief at 12-32.

USG B 0126

overall cost was substantially within B&W's ample insurance coverage. Given the high cost of investigating, analyzing and defending multitudes of claims, B&W had little choice but to pursue the consensual settlement strategy. The only alternative – to allow the company to be subjected to mass trial settings in a broken tort system plagued by runaway costs, *de facto* enterprise liability and arbitrary verdicts unrelated to anyone's actual liability – was unacceptable.

Ignoring these realities, the Asbestos Claimants' Committee repeatedly incants that "the past is prologue" and seeks to use B&W's historical claim program against it. Asserting that B&W's history "is no different . . . in any way from any other asbestos defendant in the tort system,"[2] the ACC makes clear its view that this Chapter 11 should operate like the tort system in which, under the weight of mass filings, the merits of asbestos claims are simply presumed.

But nothing about B&W's true liability going forward can be presumed from B&W's claim history. The past is *not* prologue, but rather is an amalgam of events in the asbestos tort system – including crushing claim volumes, mass production of unimpaired claims, aggregation of claims, forum shopping, state-court dockets that were overwhelmed and/or influenced by plaintiffs' counsel, witness coaching, and lack of evidentiary standards mandating good science – that forced B&W to carry out a settlement program that did not reflect its true liability. Only now, with the claim allowance proceedings underway in this case, can that liability be defined for the first time.

---

[2] Mr. Inselbuch, 10/11/00 Exclusivity Hrg. Tr. at 94.

2

USG B 0127

The ACC has twice tried without success to derail these proceedings. Last year, the ACC opposed the entire concept of a Bar Date and claim allowance process, arguing that litigating the disputed tort claims would be a waste of time because "[t]his company is hopelessly insolvent and they know it and all of this is an exercise at trying to move the burden to somebody else."[3] Having failed to persuade this Court, the ACC made a similar pitch last winter to Judge Brown, moving to initiate summary estimation procedures[4] that would, if allowed, subvert the Bar Date claim determination procedures this Court had previously adopted. The ACC asserted that its proposed summary estimation, based on mechanistic projections from B&W's historical claims database, would clearly establish B&W's insolvency and entitle the tort creditors to all of B&W's equity. After taking the ACC's motion under advisement for several months, Judge Brown denied the motion in a September 21, 2001 order, stating: "Because . . . progress is being made on the case, the court is not inclined to grant the motion by the Asbestos Claimants' Committee to initiate claims estimation procedure at this time."

Most recently, the asbestos claimants have tried to make their "past is prologue" incantation a self-fulfilling prophecy by filing such staggering numbers of invalid Proofs of Claim that, they presumably hope, the claim allowance process will become overloaded and shut down. As discussed in Section III below, the mass dumping of claims began with the March 29, 2001 Settled Claims Bar Date, when the asbestos claimants submitted more than 49,000 allegedly "settled" claims, even though only 50,000 claims were even *pending* with B&W to be

---

[3] Mr. Inselbuch, 8/16/00 Bar Date Hrg. Tr. at 40-41

[4] *See* ACC 12/27/00 Motion to Initiate Claims Estimation Procedure & FCR 2/6/01 Joinder.

3

USG B 0128

*considered* for settlement as of the Petition Date. This volume left Judge Brown "somewhat shocked," especially since claimants' counsel had told him they would file only a "small handful of claims, relatively speaking."[5] The effort to overwhelm the courts continued with the July 30, 2001 Asbestos Personal-Injury Claim Bar Date when a whopping 221,375 claims were filed. This number far exceeds any reasonable projection of legitimate claim volume and amounts to more than half the total number of claims *ever* submitted to B&W during the more than two decades the company was paying claims prior to filing for Chapter 11 relief.

The quality of the Personal-Injury Proofs of Claim is inversely proportional to their volume. As shown in Section IV below, preliminary reviews of the Proofs of Claim (POC's) reflect that the majority are deficient. Two-thirds of the POC's sampled to-date cannot even show any connection to a B&W worksite. Well over half of the POC's are asbestosis claims brought by claimants with no physical impairment or injury – precisely the kind of improper claims that have been flooding the tort system and quadrupling the filing rate against asbestos trusts since the start of last year.

It is apparent that the massive problems plaguing asbestos claims generally have infected this Chapter 11 case, confirming the need for the claim determination process previously adopted by this Court. Debtors believe that process can work effectively and efficiently, pursuant to the specific proposals set forth in the accompanying Motion for a Case Management Order Establishing a Protocol for Litigating Asbestos Personal-Injury Claims and the legal arguments set forth in detail in a reference companion to that motion, the Road Map to B&W's Defenses to Asbestos Personal-Injury Claims.

---

[5] *See* discussion at pp. 45-46 below.

4

USG B 0129

## I.    ASBESTOS CLAIM FILINGS HAVE QUADRUPLED SINCE EARLY 2000.

Legitimate asbestos disease claims should be *declining*, since most significant asbestos exposures occurred 30 to 70 years ago and the incidence of disease is waning. Indeed, leading medical researchers have described asbestosis as a "disappearing disease"[6] and in a study of asbestos-exposed workers reported that "we have not seen a *single case* of significant asbestosis with first exposure during the past 30 yr."[7] Medical students being trained today in unbiased clinical settings – as opposed to mobile x-ray trailers set up by plaintiffs' lawyers – question their professors as to why asbestosis is even a part of their curriculum, since it is virtually never seen in patients.[8]

Despite this, asbestos personal-injury claims have exploded since B&W filed for Chapter 11, with most of the increase coming from unimpaired asbestos claims of dubious

---

[6]  K. Browne, *Asbestos-related disorders*, OCCUPATIONAL LUNG DISORDERS, 3rd, 411-504, 410 (1994).

NOTE: BECAUSE THEY ARE VOLUMINOUS, SOURCES IDENTIFIED IN FOOTNOTES AND UNPUBLISHED CASES ARE NOT FILED HEREWITH, BUT ARE AVAILABLE AT HELLER, DRAPER, HAYDEN, PATRICK & HORN, AND ANY CITES REQUESTED, OR AN ENTIRE COPY SET IF DESIRED, WILL BE SUPPLIED IMMEDIATELY TO THE COURT. UNPUBLISHED CASES CITED HEREIN ARE MAINTAINED IN ALPHABETICAL ORDER. OTHER CITED MATERIALS ARE MAINTAINED IN FOLDERS CORRESPONDING TO THE NUMBER OF THE FOOTNOTE IN WHICH THEY APPEAR.

[7]  Gaensler, Jederlinic & Churg, *Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers*, AM. REV. RESP. DIS. 144(3): 689-696, 695 (1991) (emph. added); Gaensler, et al., *Radiographic Progression of Asbestosis With and Without Continued Exposure*, in VIITH INT'L PNEUMOCONIOSIS CONF. (NIOSH-ILO), DHHS (NIOSH) Pub. No. 90-108, Part 1, 386-92 (1988) (study of all workers in 4 paper or asbestos product plants and all workers in certain occupational categories in 2 shipyards).

[8]  Source: Interview with Dr. Peter Barrett, Harvard Medical School. *See also* Gaensler, et al. *Radiographic Progression of Asbestosis With and Without Continued Exposure*, in VIITH INT'L PNEUMOCONIOSIS CONF. (NIOSH-ILO), DHHS (NIOSH) Pub. No. 90-108, Part 1, 386-92 (1988) at 387 & 391 ("Asbestosis appears to be a disappearing disease in that the prevalence has decreased from 47.6 percent with exposure prior to 1950 to 2.0 percent among those first exposed since 1960.")

5

USG B 0130

merit. Filings against asbestos claim facilities such as the Manville Trust have quadrupled,

forcing the Trust to cut its payment level by half this summer.[9]  The number and cost of claims

for defendants litigating in the tort system have likewise spiked upward.

      With legislative and administrative solutions stalled, Chapter 11 remains the only

viable forum for resolving the "elephantine mass of cases" and asbestos litigation "crisis."[10]

Indeed, since B&W filed for Chapter 11 in February of 2000, nine more companies – ranging

from major asbestos manufacturer Owens Corning to auto-parts supplier Federal-Mogul – have

had no choice but to enter Chapter 11 as the result of the unexpected surge in claim volume and

costs.

    **A.**      **TAKING ADVANTAGE OF LOOSE CRITERIA FOR PAYMENT, PLAINTIFFS'
COUNSEL HAVE DOUBLED THE VOLUME OF CLAIMS FILED AGAINST
ASBESTOS TRUSTS EACH OF THE PAST TWO YEARS.**

      Claim filings against Manville and other asbestos trusts nearly doubled in 2000

as compared to 1999. So far in 2001, claims are streaming in at more than double the 2000 rate.

The flow of asbestos filings has thus essentially quadrupled since B&W filed its Chapter 11

petition early last year.

      The increase is unrelated to any fundamental change in disease trends or the

facts.  It is happening because sophisticated plaintiffs' counsel have taken advantage of loose

payment criteria to push ever-greater numbers of unimpaired claims – principally unimpaired

asbestosis claims characterized by vague symptoms – through the system.

---

[9] *See* D. Austern 3/26/01 Memorandum to Attorneys (available at
www.mantrust.org/legal/morator.htm); MEALEY'S LITIG. REP.: ASBESTOS (8/3/01) at 13, 14

[10] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999), *Amchem Prods. v. Windsor*, 521 U.S. 591, 597
(1997)

USG B 0131



## 1.    The Manville Trust and Other Claim Facilities Have Been Inundated.

As the above chart shows, claims filed against the Manville Trust increased

steeply beginning in early 2000.[11] The Manville Trust received 55,077 new claims in 2000, a 94

percent increase over the 28,416 claims received in 1999.[12] This was "the greatest number of

---

[11] Chart, "Total POC Filings by Month April 1998-May 2001" (D. Austern 7/2/01 Mealey's materials).

[12] Table, "Number of Claims by Year Received and Industry" (D. Austern 7/2/01 Mealey's materials).

7

USG B 0132

claims the Trust has received in one year with the sole exception of 1989, the first full year of Trust operations."[13]

So far this year, the claim filing rate is more than double the rate in 2000 (which itself represented nearly a doubling from 1999). In the first quarter of 2001, the Manville Trust received 24,500 new claims, in contrast to 10,400 new claims received in the first quarter of 2000 and 5,700 received during the first quarter of 1999.[14] As of approximately mid-year 2001, Manville received 88,848 claims, more than a 60 percent increase over the total received for the *entire year* of 2000.[15] The influx is so severe that Manville temporarily imposed a moratorium on new claims this spring, then in June cut its payout in half, from ten cents on the dollar (already a reduced percentage attributable to historical problems at the Trust) to just five cents.[16]

Other asbestos trusts have likewise been inundated. In October 2000, the Eagle-Picher Trust had to reduce its payout from 31.9 percent to 25.7 percent. The reduction took place "largely because of a significant increase in claim filings over and above what our expert consultants had predicted two years ago. The consultants now project an additional 100,000 future claims over the life of the Trust as compared to the projections two years ago."[17]

The UNR Trust also experienced a sharp and unexpected jump in claim filings. As recently as the spring of 2000, the UNR Trust believed its filing trend was stable and

---

[13]  D. Austern 3/26/01 Memorandum.

[14]  MEALEY'S LITIG. REP.: ASBESTOS (5/4/01) at 15.

[15]  Table, "Number of Claims by Year Received and Industry" (D. Austern 7/2/01 Mealey's materials).

[16]  MEALEY'S LITIG. REP.: ASBESTOS (8/3/01) at 14.

[17]  10/9/00 Nurre letter.

USG B 0133

declining, stating that the 1999 filings "represent[ed] a continuing decline as was forecast by the Trust's actuarial experts in 1995 following their investigation of the factors causing the upsurge in 1994 and 1995."[18] By the fall of 2000, however, claims against the UNR Trust had jumped so quickly that it was forced to lower its payout from 12.9 percent to 7.8 percent. The UNR Trust cited a 33 percent rise in asbestos claims from the year before and noted that the forecast of new claims after the year 2000 had nearly doubled from 1998 projections.[19]

### 2. The Upsurge in Claims Runs Counter to the Incidence of Real Disease, Which Is Decreasing.

The increases are not attributable to disease or exposure trends. Indeed, the incidence of disease is *decreasing* as more and more claims are brought by populations exposed to low levels of asbestos since the enactment of strict government regulations in 1971. As the following timeline shows, use of asbestos – and consequently, worker exposures – fell off dramatically after OSHA set low exposure limits in 1971.

---

[18] UNR 3/00 Trust Report for Fiscal Year ended 12/31/99, at 2. The reference to events in 1994-95 relates to a temporary surge in claim filings received by the Center for Claims Resolution and many asbestos defendants after the *Georgine* class action settlement was approved in August 1994.

[19] *See* UNR Asbestos Trust Letter, MEALEY'S LITIG. REP. 21 (12/1/00) at D-1.

USG B 0134



As reported by Dr. Andrew Churg, a leading pathologist of asbestos diseases, this "progressive lowering of standards for permitted occupational exposure to asbestos has markedly decreased the incidence and severity of asbestosis."[20] This is because, as Drs. Doll and Peto have reported: "With reduction in the amount of exposure, the development of incapacitating

---

[20] *Neoplastic Asbestos-Induced Disease*, in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE (Churg & Green, ed., 2nd 1998) at 339. Asbestosis is interstitial lung fibrosis, or scarring, caused by asbestos. The vast majority of asbestos claims filed today are brought on behalf of people with no physical impairment: either unimpaired asbestosis or unimpaired pleural claims (calcifications of the membrane surrounding the lung tissue or pleura). Pleural disease "is still seen with considerable frequency, but it generally has little or no functional import." *Id. See* discussion in Section VII of accompanying Road Map to B&W's Defenses.

USG B 0135

fibrosis slows down and the reaction becomes so slight and its spread so slow that no person with otherwise healthy lungs would develop significant disability before reaching an age when he was likely to die of other causes."[21]

Data for malignancies reflect the same downward trend in disease. For example, National Cancer Institute data show that the number of annual mesothelioma deaths declined in the 1990s. (*See* bar graph below)[22]



**National Mesothelioma Death Rate**

---

[21] R. Doll & J. Peto, *Asbestos: Effects on Health of Exposure to Asbestos*, HMS, at 2 (1984).

[22] SEER data from the National Cancer Institute available at www-seer.ims.nci.nih.gov.

11

USG B 0136


**3.    Rather, the Upsurge Results from Manipulation of the System by the Asbestos Litigation Industry.**

In the last two years, sophisticated plaintiffs' counsel have succeeded in locating and filing increasingly weak claims against increasingly peripheral defendants. Most of the new claims are for unimpaired asbestosis, which can be asserted based on subjective and vague factors. Since many asbestosis claims are supported by nothing more than a doctor's assertion that the patient has symptoms *"consistent with"* asbestosis, the system is ripe for abuse. Many healthy people who never worked around asbestos can have coughs, shortness of breath and other symptoms "consistent with" – though not necessarily diagnostic of – asbestosis.[23]

Both the number of non-malignant claims and their proportion relative to malignant claims (which generally can be diagnosed objectively) have jumped in recent years.[24] As shown by a Rand Institute report issued last month, non-malignant claims have shot steeply upward since the start of 1999. (*See* chart at top of next page)[25]

---

[23] Claims supported only by "consistent with" language are now viewed as so suspect that London insurance carriers will no longer cover them. *See* 4/30/01 R. Milazzo letter attaching London Market Insurers' Documentation Requirements. D McLeod, *Asbestos Claims Fought*, 35 BUS. INS. 20 (5/14/01); *London Insurers Get Tough on Asbestos Claims*, BEST'S INS. NEWS (5/10/01); 105 NATIONAL UNDERWRITER PROP. & CASUALTY-RISK & BENEFITS MGT. (5/14/01) at 20.

[24] For example, claims asserted against companies belonging to the Center for Claims Resolution were brought in a ratio of 9.4 non-malignant claims to 1 malignant claim for the period 1990-1994, increasing to a 12.2-to-1 ratio in 1995-1999. *See also* 1994-2000 Manville "Change in Disease Mix" chart; Tillinghast - Towers Perrin 5/30/01 presentation at 10.

[25] RAND INST., ASBESTOS LITIGATION IN THE U.S.: A NEW LOOK AT AN OLD ISSUE (Aug. 2001) (hereafter RAND REPT. 8/01) at 6-7 ("in the early 1990s, the number of mesothelioma claims, which most view as the most serious asbestos injury claims, drifted downward. During that period, non-malignant claims continued to rise"). Note that the mesothelioma filing rate is increasing slightly in the late 1990s, notwithstanding decreasing incidence of mesothelioma as a disease (*see* SEER/NCI bar graph on p. 11 above), most likely attributable to increased solicitation of claimants by plaintiffs' lawyers or acceleration of claim filings.

USG B 0137



In jurisdictions known to be favorable toward asbestos plaintiffs, the ratio of unimpaired, non-malignant claims to malignant claims is dramatically higher than in other jurisdictions, with no rational explanation attributable to medical or biological factors. The ratio of non-malignant to malignant claims brought against the Manville Trust is 3-to-1 for claims from relatively inactive states but 12-to-1 for claims from states with the most active plaintiffs' bar and the most claims.[26] A recent actuarial study graphically shows this wide variability among states, which is not driven by disease but rather by the ability of plaintiffs' lawyers to bring unimpaired claims in pro-plaintiff jurisdictions. (*See* chart at top of next page)[27]

---

[26]  Report of Frederick C. Dunbar, Ph.D. (9/24/01) in *In Re: The Babcock & Wilcox Co.*, No. 00-10992 through 00-10995, Adversary Proceeding 01-1155, E.D. La at 16 (hereafter "Dunbar Report").

[27]  "Settlements by Disease," Tillinghast - Towers Perrin 5/30/01 presentation at 10, showing a contrast
(continued...)

13

USG B 0138

## Settings by Disease



**Mesothelioma  Lung Cancer  Non Malignant**

There are many interrelated reasons for the recent surge in unimpaired claims.

*First*, peripheral defendants in non-traditional industries have been aggressively targeted to make up the shortfall left by asbestos manufacturers' diminished ability to pay.[28] Whereas Manville Trust filings were somewhat elevated between 1999 and 2000 for claimants who worked in traditional industries such as World War II shipyards (up 33 percent) and construction

---

[27] (...continued)
between "State 1," where total settlements paid for non-malignant claims are about one-fourth of the total settlements paid for mesothelioma claims, versus "State 3" where the total paid for non-malignant claims is about two-thirds the total paid for mesothelioma claims. (Note: Chart reflects total dollar amounts paid in settlement, not numbers of claims).

[28] A.M. Best, *Asbestos Claims Surge* (5/7/01) at 3-4 (peripheral defendants being sued for increasing sums "as the resources available from the large, more traditional defendants become exhausted"). In the early 1980s, according to a study cited by the Rand Institute, traditional defendants accounted for "about three-quarters" of asbestos expenditures. But by the late 1990s, "nontraditional defendants accounted for about 60 percent of asbestos expenditures." RAND REPT. (8/01) at 25.

14

USG B 0139

(up 49.5 percent), the increase was 106 percent in "new, non-traditional industries" such as food-and-beverage and durable goods. One non-traditional industry, textiles, shot up 445 percent in just one year. (*See* chart below)[29]



"Facing smaller recoveries from companies in bankruptcy, plaintiffs' lawyers are suing a widening array of 'non-traditional' asbestos defendants, ranging from IBM Corp. and AT&T Corp. to regional 'mom-and-pop' installers and distributors of asbestos-containing products."[30] Companies with attenuated connections to asbestos – oil refineries, steel mills, and

---

[29] Chart, "Manville Filings by Selected Industry," and Table, "Number of Claims by Year Received and Industry." (D. Austern 7/2/01 Mealey's materials) Note: This refers to the non-asbestos textile industry.

[30] BUS. INS. (1/8/01); *see also* WALL ST. J. (12/27/00) at C1 ("Plaintiffs attorneys have become more aggressive, by targeting all kinds of companies with a passing link to asbestos."). Recently, claims have even been brought against such household names as Sears and Ford Motor Company. *See* Editorial,

(continued...)

15

USG B 0140

manufacturers of products with only trace amounts of asbestos such as electrical cable and welding rods – now find themselves caught in the asbestos litigation net.[31]

_Second_, unimpaired claimants commonly obtain arbitrary jury verdicts against peripheral defendants who are swept into group trials and whose actual liability, if any, is not rationally determined. A Texas jury recently awarded 22 plaintiffs $35 million for future injuries against various defendants, including one that made only a gasket containing small amounts of asbestos encapsulated in metal.[32]

_Third_, forum shopping contributes to excessive and arbitrary awards and to inflated settlements in pro-plaintiff jurisdictions. As London reinsurer Equitas recently reported, plaintiffs' attorneys "have been able to bring many cases to trial in courts that are very unfavourable to defendants, including courts in certain counties in Texas and Mississippi."[33] Such forum shopping takes place for the simple reason that "[p]ayouts for cases with similar facts can vary dramatically by jurisdiction" – by a factor of 20 in some comparisons.[34]

---

[30] (...continued)
_Lawyers Torch the Economy_, WALL ST. J. A14 (4/6/01) ("[t]he net has spread from asbestos makers to companies far removed from the scene of any putative wrongdoing. Ford Motor has $1.7 billion in cases outstanding. . . . And Sears was just hit with a $1.5 million judgment for selling home insulation to a man 50 years ago."); _see also_ S. Warren, _Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps_, WALL ST. J. (4/12/00).

[31] Merrill Lynch, _Asbestos Panel Presentation_ (12/18/00) at 1 (newly targeted defendants include "companies who made products with only trace amounts of asbestos, such as electrical wire and cable and welding rods").

[32] ANDREWS ASB. LITIG. REP. (3/1/01) at 3.

[33] EQUITAS MARCH 31, 2001 ANN. REPORT (published Aug. 2001) (hereafter EQUITAS ANN. REPT. 8/01) at 21.

[34] _Id._ (payouts vary in some cases by a multiple of 20). In addition to shopping for favorable
(continued...)

16

USG B 0141

_Fourth,_ law firms newly attracted to asbestos litigation aggressively advertise for clients and file volumes of new claims. As Equitas recently explained: "A relatively small number of very large court judgments in favor of unimpaired claimants has caused claimants' attorneys to demand more money for these claims and has persuaded defendants to agree to those demands. This, in turn, has caused existing asbestos claimants' attorneys to recruit more unimpaired people from the large number of potential claimants, and it has also encouraged law firms that have not traditionally filed asbestos claims to begin doing so."[35]

The Manville Trust reported a wave of new filings in 1999-2000 from new law firms that "were not previously substantial filers," a trend that was being "experienced by other asbestos claim-paying facilities" as well. (_See_ Manville Trust chart, next page)[36] According to the recent Rand report, the surge in filings against Manville is at least partly attributable to new law firms "emerging that specialize in filing claims against the bankruptcy trusts."[37]

---

[34] (...continued)
jurisdictions, certain plaintiffs' counsel have attempted to steer cases to preferred judges _See_ D Opatrny, _Playing the Numbers: Firm's Odds at Counter Ran Better Than Even for Asbestos Case Pretrial Motions,_ THE RECORDER (4/9/01) ("almost all asbestos litigation filed by a San Francisco plaintiffs' firm was sent to the same judge for pretrial motions")

[35] EQUITAS ANN. REPT. (8/01) at 24.

[36] Chart, "Filings By Law Firm" showing spike in claims filed by "Late Firms" in 1999-2000 (7/2/01 D. Austern Mealey's materials). _See also_ Manville Trust Highlights of 1st Quarter 2001 Filing 2 (5/1/01) ("Ten law firms accounted for 56 percent of claims filed during the First Quarter 2001 These same ten firms were among the heaviest claim filers during 2000 but many were not previously substantial filers. Apparently, this trend is being experienced by other asbestos claim-paying facilities."); Manville Trust Highlights of 4th Quarter 2000 Filing 2 (11/2/00).

[37] RAND REPT. (8/01) at 11 The role of law firms is significant because Manville's audit revealed huge differences in the quality of claims that different firms submitted. Twenty-one of 30 firms selected in a random audit had inadequate pass rates and required corroborating medical evidence before the Trust would pay their claims. ANDREWS ASBESTOS LITIG. REP. (3/20/98) at 12

USG B 0142

Filings By Law Firm

*Privileged and Confidential*                                    March 20, 2001

*Fifth,* huge numbers of claims continue to be created by mass screenings sponsored by plaintiffs' law firms and conducted in mobile x-ray trailers. A few months before Owens Corning filed for Chapter 11, the company's former director of litigation testified that mass screening programs resulted in the filing of tens of thousands of claims that did not involve "significant asbestos-related impairment" and which "were fraudulent."[38] Other asbestos defendants, courts, commentators, and even certain plaintiffs' counsel have likewise criticized mass screenings.[39]

---

[38]  6/29/00 L. Rodewig Dep., *Owens Corning v. R.J. Reynolds Tobacco Co. et al.*, 96-0065 (Cir. Ct. Jefferson Cty. Miss.) at 76-81, 85. *See also id.* at 72 ("more than 40 percent of the claimants did not have physical impairments"); *id.* at 104 ("the plaintiffs' bar was trying to cheat Owens Corning through the way that some of them used medical screening procedures" and "coached witnesses").

[39]  *See* statement of Raytech President Craig Smith, MEALEY'S LITIG. REP.: ASBESTOS 3 (10/3/97) (mass screenings lead to claim filings that are "frivolous and without merit"). As described by one federal district court, plaintiffs' counsel working with unions arrange to take x-rays at medical trailers of thousands of workers without manifestations of disease and then file complaints for those with "any hint of pleural plaque." *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710, 748. (E. & S.D.N.Y. 1991), 982
(continued...)

18

USG B 0143

*Sixth,* the many recent bankruptcy filings, which themselves were caused by the upsurge in claims, in turn have accelerated claim filings and demands against non-bankrupt defendants.[40] Loss of cash flow has spawned a search for new defendants "as plaintiff's attorneys seek to recoup settlements 'lost' to producers now in bankruptcy."[41] The bankruptcies filed in 2000 alone represented "40-75 percent of [the] money plaintiffs have traditionally gotten from asbestos companies."[42] As the Rand Institute recently reported, both plaintiff and defense attorneys "told us that as one defendant has followed another into chapter 11, plaintiff attorneys have turned to other defendants to substitute for those in bankruptcy (against whom litigation is stayed) and have increased their financial demands on these defendants."[43] Not only have

---

[39] (...continued)

F 2d 721 (2d Cir. 1992). *See also Raymark Indus. v. Stemple*, 1990 WL 72588, at *2, *8, *22 (D. Kan. 1990) (mass-screening doctors diagnosed "asbestos-related injuries" based on clinically insignificant 1/0 ILO readings, producing a "steady flow of faulty claims" and a "fraud on the court"). As a leading plaintiffs' lawyer observed· "[W]e have untrammeled screenings of marginally exposed people and the dumping of tens of thousands of cases in our court system, which is wrong [and] should be stopped." 10/31/91 ADMIN. CONF. OF THE U.S. 15 (remarks of Ronald Motley). *See also* Prof. Brickman's articles and testimony discussed in 2/22/00 B&W Informational Brief at 20-21, 30.

[40] As an official of insurance rating service A.M. Best recently said: "When a bankruptcy occurs, plaintiffs are more likely to come forward quickly, because they worry there may not be money left to cover later claims." WALL ST. J. A4 (5/7/01). *See also* DAILY BANKR. REV 4, 11 (6/6/01) ("due to the declining number of solvent asbestos-tainted companies that lawsuits can target, attorneys are 'rushing to get claims in, because as more companies file for bankruptcy protection, the fewer there are to sue'" (quoting Omar Maja of Fitch bond rating agency)).

[41] A.M. Best, *Asbestos Claims Surge* (5/7/01) at 3 ("As increasing numbers of producers opt for federal bankruptcy protection, remaining defendants are targeted to shoulder larger shares of asbestos costs.").

[42] Merrill Lynch (12/18/00) at 1 & 20 (observing that "about 40 percent-50 percent of the money going to plaintiffs in [asbestos] cases, went into bankruptcy" when Owens Corning, Babcock & Wilcox, and Pittsburgh Corning filed).

[43] RAND REPT. (8/01) at 25. *See also id.* at 33 ("plaintiff attorneys told us that they are asking non-bankrupt defendants to pay more money on claims filed against them than previously negotiated").

19

USG B 0144

demands increased, but the number of defendants targeted has also grown "exponentially larger," with approximately 2,000 companies now facing asbestos suits.[44]

**B.    ASBESTOS CLAIMS IN THE TORT SYSTEM HAVE LIKEWISE SURGED, DRIVING TEN COMPANIES INTO CHAPTER 11 SINCE EARLY 2000.**

The experience of W.R. Grace illustrates the pressures facing companies that have attempted to remain outside Chapter 11. Asbestos claims against Grace peaked in 1996 and showed a pronounced downward trend. The downward trend continued for two more years with no sign of abating. But the trend reversed with a 28 percent increase in 1999 and an 81 percent increase in 2000. In January 2001, claims were served on Grace at a rate 374 percent higher than the year before, and in February 2001 at a rate 207 percent higher than the year before.[45] In April 2001, Grace was forced to file Chapter 11.

The increase has been driven by unimpaired asbestosis and pleural claims of dubious merit. For example, the number of claims against USG, a minor user of asbestos in certain building materials, grew "dramatically as a result of the filing of thousands upon thousands of claims by plaintiffs without any legally cognizable bodily injury." USG was deluged with claims "brought by people who did not work either with or near U.S. Gypsum

---

[44] BUS. INS. (1/8/01) (quoting Scott Gilbert, insurance counsel to the ACC in the Babcock & Wilcox Chapter 11, that number of claims is "exponentially larger" than a decade ago and that, "[t]o the extent that many defendants are in bankruptcy or post-bankruptcy . . . (claimants) will now seek recoveries from a broader base."). *See also* EQUITAS ANN. REPT. (8/01) at 23 ("nearly 2,000 U.S. companies have reportedly received asbestos claims"); R. Shmitt, *Burning Issue: How Plaintiffs' Lawyers Have Turned Asbestos Into a Court Perennial*, WALL ST. J. (3/5/01) at A1 ("The Internet has been a further engine for growth. . . . Several lawyers use the Web to refer big asbestos-injury cases to other lawyers, earning what are, in essence, brokerage fees.").

[45] *See* W.R. Grace 4/2/01 Informational Brief at 38; ANDREWS ASBESTOS LITIG. REP. 23(7) (4/12/01); AP ONLINE (4/2/01); WALL ST. J. B8 (4/3/01).

USG B 0145

products or in the construction trades at all," predominantly "unimpaired claimants." As more and more companies entered Chapter 11, USG was forced "to bear not only the unjustly inflated burden of its own limited asbestos activities but also, increasingly, the burdens of other companies that were far greater producers of asbestos-containing products."[46]

Since B&W's filing, nine other asbestos defendants have toppled into Chapter 11 like dominoes:

- *Pittsburgh Corning*: In connection with its April 2000 filing, Pittsburgh Corning stated: "These [asbestos] suits have been tremendously expensive to defend and have become increasingly difficult to settle within the traditional tort recovery system . . . . High defense costs and administrative costs, coupled with sharply increasing demands, combined to threaten PCC's long-term financial health and left it with no alternative means for resolving the claims brought against it."[47]

- *Owens Corning*: This major asbestos producer sought Chapter 11 protection in October 2000. A national settlement program pursued by Owens Corning in 1999 failed because "[p]laintiffs attorneys who didn't enter into the national settlement continued to bring suits and demand larger payments."[48]

- *Burns & Roe*: This engineering firm filed in December 2000 because "[o]ver the past 12 months, demands from plaintiffs' lawyers spiked to levels dramatically above the historic pattern."[49]

- *Armstrong*: Armstrong World Industries filed in December 2000, stating that "companies that have had involvement with asbestos-containing products have

---

[46] USG 6/27/01 Informational Brief at 1-2, 4, 10. *See also* P. Callahan, *USG Files for Chapter 11 After Referring to Senate's Power Shift as Latest Setback*, WALL ST. J. A4 (6/26/01); USG 10-Q filed 8/8/00, M. Garza, CHI. TRIB. 1 (6/26/01) ("The Chapter 11 process was the only alternative to prevent the value drain that has been occurring as U.S. Gypsum was forced to pay for the asbestos costs of other companies that already had filed for Chapter 11,'" quoting W. Foote, USG CEO).

[47] *Pittsburgh Corning Files for Bankruptcy Protection*, MEALEY'S LITIG. REP.: ASBESTOS 6 (4/21/00).

[48] WALL ST. J. (12/21/00) at B4. *See also* PR NEWSWIRE (10/5/00) (citing "a flurry of recent new filings from plaintiff lawyers not participating in the NSP").

[49] *Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief*, ENG. NEWS-REC. (12/18/00) at 22.

21

USG B 0146

seen the number of claims made each year escalate far beyond what one might expect based upon medical and scientific data" and that, as other defendants have "'dropped out' of the tort system by filing Chapter 11, plaintiffs' lawyers "have focused more of their efforts on the [remaining] companies. "[50]

- *G-I Holdings:* Having already paid $1.5 billion to settle more than 500,000 asbestos claims, G-I Holdings (formerly GAF) filed for Chapter 11 in January 2001 due to a "dramatic increase in the number of claims," which the tort system was "not equipped to handle . . . efficiently and fairly."[51]

- *W.R. Grace*: In its April 2001 filing, Grace stated: "We believe that the state court system for dealing with asbestos claims is broken, and that Grace cannot effectively defend itself against unmeritorious claims. The best forum available to Grace to achieve predictability and fairness in the claims settlement process is through a federal court-supervised Chapter 11 filing."[52]

- *USG:* In June 2001, USG sought Chapter 11 protection after legislation stalled in Congress. The filing was affected by the recent wave of asbestos bankruptcies, which caused asbestos costs to "dramatically increase to the point of being 'completely out of proportion' to the company's 'legitimate liability.'" [53]

- *U.S. Mineral:* In July 2001, U.S. Mineral filed for Chapter 11 protection due to an "overwhelming number" of asbestos claims. Between 1954 and 1972, the company sold approximately $14 million of spray-applied fire resistive material that contained asbestos. It has since spent more than $275 million litigating more

---

[50] Affidavit of W Rodraun ¶¶ 26, 33, *In re Armstrong World Indus.*, No. 00-4471 (D. Del. 12/5/00)

[51] WALL ST J (1/8/01) at B12 (G-I said "there was no ebb in the tide of personal-injury claims," indeed "there was a 'dramatic increase in the number of claims.'"); *see also* 14 ASBESTOS & LEAD ABATEMENT REP (2/1/01) (almost 70,000 claims filed against G-I in 2000, nearly double the number filed in 1996)

[52] AP ONLINE (4/2/01); *see also* ANDREWS ASBESTOS LITIG REP. (4/12/01). Note: Kirkland & Ellis is general bankruptcy counsel to W.R. Grace. K&E was also retained by Armstrong as special litigation counsel subsequent to Armstrong's Chapter 11 filing and by USG as tax counsel in its Chapter 11 proceedings.

[53] Whereas USG at one point had been named in only about 50 percent of claims asserted against the Center for Claims Resolution, more recently they were named more than 90 percent of the time. USG 6/27/01 Informational Brief at 10-11.

USG B 0147

than 40,000 asbestos claims, and now has "more than 223,000 asbestos claims filed against it with more than 165,000 claims pending."[54]

- *Federal-Mogul:* On October 1, 2001, automotive parts manufacturer Federal-Mogul filed for Chapter 11 protection after being "overwhelmed by asbestos litigation." The company and its subsidiaries faced over 365,000 asbestos claims, despite the fact that Federal-Mogul had "only limited involvement with asbestos." Among the pending claims were thousands based on alleged exposure to asbestos from industrial gaskets that contained only "a small amount of asbestos bound in a latex material and surrounded by steel."[55]

Before deciding with reluctance to file Chapter 11, USG had pursued (along with several other companies) a legislative solution that would have created a national administrative program to compensate truly sick asbestos claimants. As A.M. Best reported earlier this year: "The hoped for tort reform would apply a more streamlined, less litigious administrative process to the multitude of asbestos cases. However, any timely resolution will require the support of the members of the plaintiffs' bar which has exhibited an increased appetite for soliciting new claimants."[56] The effort failed due to opposition from plaintiffs' lawyers and others.[57] As

---

[54] MEALEY'S LITIG. REP ASBESTOS (8/3/01) at 12-13.

[55] Asbestos Primer, www federal-mogul.com/reorganization. *See also* M. Pacelle, *Federal-Mogul Plans to Seek Chapter 11 Protection*, WALL ST J. A3 (10/1/01) ("Punished by an unrelenting stream of asbestos-related lawsuits and a downturn in its core auto-parts business, Federal-Mogul Corp. plans to seek Chapter 11 bankruptcy court protection this morning . . . One reason the company's asbestos exposure proved difficult to curtail, company advisers say, is because so many other asbestos defendants had sought protection from claimants in bankruptcy court, where asbestos claims and all other litigation proceedings are stayed. The pool of defendants like Federal-Mogul available to share in settlements was growing smaller.").

[56] A.M. Best (5/7/01) at 3.

[57] *See* EQUITAS ANN. REPT. (8/01) at 21 (noting that "legislation died in Congress in the face of opposition from claimants attorneys and labour unions"); M&A REP. (6/18/01) ("hopes of any federal legislation were dashed when U.S. Senator James Jeffords (I., Vt.) tipped the Senate in favor of the Democrats"); Editorial, *The Asbestos Blob*, WALL ST J. (7/2/01) at A14 ("Legislation aimed at paying off victims without bankrupting the companies perhaps stood a chance two years ago," but plaintiffs' counsel
(continued...)

USG B 0148

Federal-Mogul stated in filing its petition earlier this month, once legislative efforts to resolve asbestos claims failed, Chapter 11 was "the only way we could effectively structure payments for claimants without financially crippling" operations.[58]

With legislative solutions stalled and unimpaired claims continuing to spike out of control, industry observers predict no end in sight to the number of companies that will be forced into Chapter 11.[59] The filings to-date have already had a severe impact, as shown by the following chart of the publicly traded entities that have filed in the last two years.

---

[57] (...continued)
"threatened to rain destruction on firms if they persisted, and most quickly folded, including USG, Owens Corning, W.R. Grace and Armstrong."). Also failing were legislative efforts of asbestos victim advocates who unsuccessfully tried to revive last year's Hyde/Ashcroft administrative plan for compensating truly sick claimants. *See The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. (1999) (statement of Prof. Christopher Edley, Jr., Harvard Law School) ("[T]he only losers under this legislation are lawyers and those individuals who are not now sick, who will never become sick in the future, and who are able to navigate the 'jury lottery' and obtain substantial compensation under the current system."). More recently, efforts to add an amendment to this year's Bankruptcy Reform Bill, which would have allowed debtors to discharge unimpaired claims as a matter of law so as to increase compensation available to patients with real impairment, did not make it out of committee. *See* CONGRESS DAILY (2/23/01) (the defeated amendment would have allowed debtors "to discharge certain claims filed by individuals who have been exposed to asbestos but, according to prescribed medical criteria, are still healthy").

[58] *Federal-Mogul Files for Chapter 11*, AP ONLINE (10/1/01).

[59] *See Asbestos Suits No End in Sight*, NAT'L L.J. (9/3/01) (citing the RAND REPT.: "all of the remaining asbestos manufacturers will be driven into bankruptcy within the next two years.").

24

USG B 0149

| COMPANY | DATE OF FILING | MARKET CAP. January 1999 | MARKET CAP. After Filing | CHANGE |
|---|---|---|---|---|
| McDermott (B&W's Parent) | February 2000 | $ 1.4 Billion | $ 550 Million | - 61 % |
| Owens Corning | October 2000 | $ 1.8 Billion | $ 75 Million | - 96 % |
| Armstrong | December 2000 | $ 1.01 Billion | $ 204 Million | - 80 % |
| W.R. Grace | April 2001 | $ 1.1 Billion | $114 Million | - 90 % |
| USG | June 2001 | $ 2.5 Billion | $ 185 Million | - 92 % |
| Federal-Mogul | October 2001 | $ 4 Billion | $ 49 Million | - 99 % |

Source: Outstanding shares x stock price as reflected in 8K's, 10Q's and NYSE records. Figures for B&W are for its publicly traded ultimate parent, McDermott International, Inc. (which includes both B&W and various non-filing entities such as J. Ray McDermott). Figures for privately held companies (G.I. Holdings and Burns & Roe) and joint ventures (Pittsburgh Corning) are not included. Market Cap. After filing is calculated on figures 1 month after date of filing except in the case of Federal-Mogul which is calculated on figures 2 weeks after filing.

25

USG B 0150

## II.   B&W's HISTORICAL SETTLEMENT PROGRAM WAS DESIGNED TO MINIMIZE OVERALL CLAIM RESOLUTION COSTS AND THUS DID NOT REFLECT B&W's ACTUAL LIABILITY.

B&W's pre-petition settlement program did not determine B&W's true tort liability because it was designed to settle large numbers of claims at minimal transaction costs. B&W did not seek to "separate the wheat from the chaff" – that is, to scrutinize closely the legal and factual basis for each claim and determine the full extent of B&W's liability, if any. Nor could it have, since any attempt to closely scrutinize each claim would have delayed the timely resolution of claims, incurred exorbitant litigation costs, and destroyed B&W's ability to resolve claims consensually on a mass basis. Faced with such high costs of defense, B&W had no real choice but to accept the settlement terms demanded by the plaintiffs' bar: to settle claims early, based on minimal medical and exposure proofs, even though B&W was a "bit player" whose liability was "at best, minimal."[60] The only alternative – to face continuous trials in a tort system marked by prohibitive costs and arbitrary outcomes unrelated to anyone's real liability – was unacceptable.

Now, with the ACC continuing to argue that "the past is prologue" and insisting that B&W's historical claim database should be used mechanistically to project B&W's future liability, B&W has gone back and conducted a thorough review of its historical claim program and claim database. It is hardly surprising that this review confirms that B&W's program did exactly what it was designed to do: pay massive numbers of claims, at the lowest feasible cost, including many marginal claims where the cost of exhaustively investigating and litigating each claim would have far exceeded the cost of settling.

---

[60]  *See* discussion at p. 30 below.

26

USG B 0151

A.    B&W SETTLED HUGE NUMBERS OF CLAIMS WHILE AVOIDING LITIGATION
      AND KEEPING COSTS LOW.

The claims were initially handled by B&W's primary insurance carrier, Travelers, whose philosophy was to avoid litigation by settling claims early and at low cost, before defense costs were incurred and before demands increased due to courthouse-step pressures and other factors.[61] After 1989, when Travelers informed B&W that its primary products liability coverage was exhausted and withdrew from claim handling, B&W took two steps that resulted in the successful resolution of its asbestos claims for many years.  First, B&W maximized its insurance assets, helping to make available more than $2.8 billion of products liability coverage, of which more than $1 billion is remaining.[62]  Second, B&W continued to carry out a consensual settlement program.

A key feature of B&W's program was the negotiation of a settlement protocol with each plaintiffs' law firm.  In most cases, in return for the plaintiffs' firm forbearing from pursuing litigation or imposing any significant costs, B&W generally arranged to pay claims early and pursuant to a negotiated grid for particular medical conditions.[63]

----

[61]  B&W received fewer than 15 claims per year until 1980, approximately a decade after B&W had stopped using asbestos block insulation and two years after McDermott had acquired B&W.

[62]  Through a combination of litigation and negotiations, B&W and its affiliates entered into coverage-in-place agreements with various London market and domestic insurers, allocating asbestos claims broadly across all available policies from the date of first exposure through the first of the date of diagnosis, illness or death.  B&W asbestos liabilities were covered both by policies issued to B&W and by even more substantial policies issued from 1978 forward to B&W's ultimate parent, McDermott, which were applicable to all McDermott affiliates.  Although McDermott policies were purchased in large measure to cover offshore marine construction disasters, their predominant use has been for B&W's asbestos liability

[63]  The claimant typically was required to provide three things: (1) a medical report from a doctor reflecting an asbestos-related disease or condition; (2) some showing of employment at a site where a B&W boiler was present; and (3) a release.  In general, the claimant would be paid the scheduled amount
(continued...)

27

USG B 0152

For the system to work on a mass basis, B&W could require only minimal proofs of the claimant's medical condition and purported exposure to a B&W boiler. With regard to medical condition, a doctor's note that merely identified symptoms "consistent with" asbestosis was generally sufficient. Claimants were not required to provide back-up documentation, such as x-rays, showing that they actually had asbestos-related disease. With regard to workplace exposure, it was generally sufficient for the claimant to assert, in an untested affidavit of the claimant or a co-worker, that he worked at a jobsite where a B&W boiler was present. The medical and exposure proofs were so straightforward that plaintiffs' law firms could prepare compensable claims in a matter of minutes. One plaintiffs' paralegal stated in an affidavit filed with this Court that it took "approximately 10 minutes" to prepare a B&W claim. It took another paralegal only "approximately 5 minutes."[64]

Claims that failed to satisfy the minimal proof requirements, totaling more than 22,000, were rejected. But given the volume of claims – approximately 317,000 total claims paid[65] – any attempt to strictly scrutinize and contest individual claims would have run up

---

[63] (...continued)
once all three were submitted and approved. Administration of the asbestos claim program was handled largely by a subsidiary of B&W's insurance broker known as Worldwide Services Co. *See* Worldwide Services Co. "Template" letter. The description here is a generalization and may not apply to any particular case. In connection with settled claim objections in the Bankruptcy Court, B&W has extensively briefed whether or not there was a meeting of the minds in particular cases between B&W and the individual claimant (not the law firm) regarding all essential contract elements, including fulfillment of conditions precedent, specific amount and so forth. *See, e.g.,* Debtors' 1/4/01 Motion to Establish Expedited Procedures for Omnibus Objections to Purported Settled Claims.

[64] 7/27/00 J. Valdisera Affidavit ¶ 3; 7/20/00 J. Frado Affidavit ¶ 4.

[65] In total, about 410,000 claims were submitted to B&W before the Petition Date. The balance of claims that were not paid or rejected consists principally of about 50,000 claims in-process as of the Petition Date and about 20,000 claims deemed "inactive" because plaintiffs' counsel had not done
(continued...)

28

USG B 0153

massive costs and destroyed the working relationship with plaintiff's counsel, whose consent

was essential to the successful continuation of the low-cost settlement program.

The effectiveness of B&W's settlement program was monitored by frequent audits

conducted by B&W's highly sophisticated insurance carriers – who signed onto the program

with full knowledge of all its dimensions – as well as B&W's own risk management team and

insurance broker Aon Corp., the parent of B&W's claims-handling contractor. The audits

showed that the program did exactly what it was intended to do and was run efficiently and

effectively. But the audits did not seek to go behind the claims and investigate in detail the

merits of each claim since, again, the cost of exhaustive, claim-by-claim review would have

undermined the very purpose of the program.[66]

Contemporaneously, B&W believed that its settlement costs were less than

amounts incurred by defendants who contested claims in the tort system. By paying claims

early, B&W paid less than it otherwise would have been forced to pay if it had contested claims.

In addition, B&W's transaction costs were kept low by avoiding litigation (discovery, motion

practice, etc.) and by requiring relatively simple proofs in support of submitted claims. As long

as B&W paid modest amounts for qualifying claims, plaintiffs' lawyers were not interested in

---

[65] (...continued)
anything to pursue the claim for at least three years after filing it.

[66] For example, B&W did not go behind the submitted medical records and audit or comprehensively review claims – e.g., by requiring x-ray films and sending them out to independent readers – for the purpose of rejecting claims that may have lacked medical validity. Nor did B&W generally look behind workplace exposure documentation to determine (1) if a claimant in fact worked at the particular site; (2) if so, whether the claimant worked in proximity to a boiler; (3) if so, whether the claimant was exposed to asbestos at all; or (4) if so, whether he was exposed to asbestos from a B&W boiler in sufficient amounts to cause disease. Again, to do so would have been cost-prohibitive under the circumstances.

29

USG B 0154

filing lawsuits against B&W, which – as a designer and installer of boilers, not an asbestos manufacturer – was regarded as a peripheral defendant.

Evidence filed in this Chapter 11 confirms that B&W's contemporaneous assessment was correct. Plaintiffs' lawyers who regarded B&W as a "bit player" procured settlements for droves of "doubtful" claims because such settlements provided "early money" for their clients, while saving B&W litigation costs. This is illustrated by a November 8, 1996 "Dear Client" letter from the Jaques Maritime Law Firm attached to a Settled Proof of Claim filed with the Bankruptcy Court this spring. The letter recommends that the Jaques firm's client accept a $2,250 settlement, which is described as "a very good deal for you" because *"B&W's liability is doubtful and at best, minimal."* (Ex. A, Settled POC #0055676, emph. added) This so-called "early" settlement was reached "to cut their [B&W's] defense costs and, at the same time, put some early money in your pocket." Interestingly, only $1,225 of the $2,250 settlement actually went to the claimant, who nonetheless could expect additional future recoveries because "[o]ther *'bit players'* will settle down the line."[67] This claim was not an isolated incident: the Jaques firm settled more than 32,000 claims for more than $101 million.[68]

The fact that B&W paid many claims, even though its liability was doubtful, does not mean that B&W was derelict in any way. To the contrary, at the time it made eminent good sense to settle claims early and at low cost. The average cost per claim, about $4,990, was far less than what it would have cost to fully investigate the various factual, medical and legal

---

[67] A January 6, 1997 letter (attached to Settled POC #0055676) reflects that, with a $1,225 settlement check from B&W in hand, "your case has just begun to reap the harvest of settlement from each of the parties responsible for your debilitating physical condition from shipboard exposure to asbestos."

[68] Dunbar Report at Ex. III-20.

USG B 0155

defenses for each claim, to hire counsel, to enter an appearance, and to file motions to dismiss and other appropriate motions. Only one case ever went to verdict, an intentional-tort claim by a former B&W employee in which the jury found for B&W.[69] Defense and other transaction costs were kept to a modest 5 cents of every dollar spent (including defense lawyer fees, but not plaintiff lawyer fees), in stark contrast to other asbestos litigation models where an estimated 61 cents of every dollar is spent on transaction costs (including defense and plaintiff lawyer fees).[70] And payments were well within B&W's ample insurance coverage.

The system broke down only in 1999 when the plaintiffs' bar, as B&W previously reported to the court,[71] suddenly raised settlement demands by as much as 300 percent; threatened to take B&W to trial on virtually no notice (including a voicemail message left late on the Wednesday before Thanksgiving threatening to take B&W to trial the following Monday unless 27 cases were settled on exorbitant terms); and in short, sought unilaterally to change the settlement rules so drastically that B&W had no choice but to file Chapter 11.

### B. PLAINTIFFS' LAWYERS TOOK ADVANTAGE OF B&W'S MINIMAL CLAIM CRITERIA BY SUBMITTING UNSUPPORTABLE CLAIMS.

As Professor Francis McGovern has written, the combination of "high resolution rates and low transaction costs" increases the demand for new cases for highly elastic mass torts such as asbestos. "If you build a superhighway, there will be a traffic 'jam.'"[72] Plaintiffs'

---

[69] *Coombs v. Owens-Corning Fiberglas Corp. et al.*, Dist. Ct., Travis Co., Texas (1997).

[70] *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 867 (1999) (Breyer, J., dissenting).

[71] B&W's 2/22/01 Informational Brief at 38-39.

[72] F. McGovern, *The Defensive Use of Federal Class Actions in Mass Torts*, 39 ARIZ. L. REV. 599, 606 (continued...)

31

USG B 0156



lawyers created such a traffic jam with B&W, submitting droves of claims that satisfied the minimal criteria but were nonetheless of low quality and, in many cases, unsupportable.

To evaluate the impact of B&W's minimal criteria on claim quality, B&W and its claim experts, the NERA consulting firm, have analyzed B&W's historical claim database over the last several months.[73] That analysis shows that the crush of claims against B&W caused many claims to be settled that appear unsupportable when they are subjected to a comprehensive individual review, something that was not feasible at the time. Unimpaired asbestosis and pleural claims had the greatest problems, as the result of claimants' counsel who took advantage of B&W's practice of not requiring ILO x-ray reports or evidence of lung impairment by filing numerous unsupported claims.

### 1. Certain Claims for Malignant Diseases Were Questionable.

A comparison of B&W's claim database to the Manville Trust database for claims filed with both facilities shows that some claimants' counsel tendered questionable malignant disease claims to B&W. For example, B&W settled 64 cases as mesothelioma claims, even though the Manville Trust settled the same claims for less severe diseases at a later date. B&W

---

[72] ( . continued)
(1997). *See also* BUS. INS. (1/8/01) ("Mass settlement efforts by defendants may paradoxically have contributed to the problem of attracting questionable claims" and "an increase in claims by plaintiffs claiming exposure but with no symptoms of asbestos-related disease. By their settlement strategy, defendants 'have kind of indirectly encouraged that result.'" (quoting E. Houff of the DRI mass torts task force))

[73] NERA and its principal, Dr Frederick Dunbar, are well-known experts in economics, statistics and mass-tort claim analysis including asbestos. Their 9/24/01 report was prepared for the revocatory action litigation for purposes of assessing the reasonableness of B&W management's estimate of the asbestos liability at the time the disputed corporate transfers were made in 1998, but certain parts of the report are also relevant to the claim analysis discussed herein. The data presented in this section are drawn from B&W's database, matched samples from the Manville Trust, and the ongoing analyses of both that is being performed by NERA. *See generally* Dunbar Report.

USG B 0157

also settled 104 claims as lung cancer claims even though the Manville Trust settled these same claims for non-malignant diseases at a later date.[74]

Many lung cancer claims paid by B&W did not contain sufficient documentation to demonstrate that they were primary lung cancers. This is important because lung cancer must be primary (that is, not metastasized from elsewhere in the body) if it was caused by asbestos exposure. In other litigation, a pulmonologist educated at Harvard Medical School, Dr. Goldstein, analyzed lung cancer claims submitted to the Manville Trust. He found that 34 percent of these claims could not document that the lung cancers were primary.[75] Analysis of the portion of Dr. Goldstein's Manville Trust sample that was also submitted to B&W shows that an even higher percentage of B&W claimants – 45 percent – made an insufficient showing of primary lung cancer.[76]

2.    **The Problems Were Even Worse With Unimpaired Claimants, Who Took Advantage of B&W's Practice of Not Requiring Lung Impairment Data or X-Rays.**

Manipulation of the system is apparent from the suspicious pattern of asbestosis and pleural claims filed against B&W. Beginning in the late 1980s as asbestos litigation was expanding, these non-malignant claims began to be filed against B&W at a much higher rate relative to malignant disease claims than had previously been the case. In 1989, the ratio of

---

[74] Dunbar Report at 28.

[75] See W. Wecker Supp. Rept. 10/7/00 in *Falise v. The American Tobacco Co.* at 3.

[76] Dunbar Report at 23.

33

USG B 0158

non-malignant to malignant claims jumped from 8.16-to-1 to 16.6-to-1, and never dipped below

a ratio of 11-to-1 throughout the 1990s.[77]

Further reflecting manipulation of the system, the ratio of non-malignant claims

to malignant claims varied wildly among the states from which B&W received claims. In

Mississippi, the ratio of non-malignant to malignant claims has been 47-to-1 since 1998. In

California, the ratio has been just 2.8-to-1.[78] Clearly, clinical disease has not been the driver of

non-malignant claims filed by law firms from Mississippi.

Among the non-malignant claims, asbestosis claims in particular appear to have

been manipulated. B&W received an immediate and dramatic increase in asbestosis claims in

1994, after approval of the *Georgine* class action settlement (which provided for compensation

of asbestosis claims), and received a simultaneous and corresponding decline in pleural claims

(which were *not* compensated under *Georgine*).[79] From 1993 to 1994, the number of asbestosis

claims received by B&W jumped from 15,353 to 21,844, and in 1995 increased to 31,399. As a

result, the ratio of asbestosis to pleural claims received by B&W increased from 1.9-to-1 in 1993

to 2.9-to-1 in 1994, to 3.7-to-1 in 1995 and 4.3-to-1 in 1996.[80] As the following B&W chart

makes clear,

---

[77]  Dunbar Report at Ex. III-1A.

[78]  Dunbar Report at Ex. III-12B.

[79]  *See* J. Tidmarsh, MASS TORT SETTLEMENT CLASS ACTIONS at 51 (Fed. Jud. Ctr. 1998)
("asymptomatic plaintiffs, as well as plaintiffs with pleural thickening that was not bilateral and
symptomatic, were unable to make any claims for compensation").

[80]  Dunbar Report at Ex. III-13.

34

USG B 0159



**Asbestos Claims Received -
By Disease Type**

| | 1990 | 91 | 92 | 93 | 94 | 1995 | 96 | 97-Est |
|---|---|---|---|---|---|---|---|---|
| Pleural | 35% | 30% | 31% | 31% | 24% | 21% | 17% | 17% |
| Asbestos | 57% | 61% | 61% | 61% | 68% | 73% | 77% | 77% |
| All Others | 8% | 9% | 8% | 8% | 8% | 6% | 6% | 6% |

claimants' counsel were reclassifying their clients' unimpaired pleural claims as "asbestosis" to defeat the *Georgine* exclusion for pleural claims.[81]

Since B&W required only minimal proof for asbestosis claims – a doctor's note saying that the claimant had symptoms "consistent with" asbestosis was enough – B&W paid many asbestosis claims where the claimant was never actually diagnosed with disease. This is confirmed by matching asbestosis claims paid by B&W to a sample of Manville Trust asbestosis claims audited in other litigation by Dr. Mendelsohn, an occupational medicine specialist.[82]

---

[81] Bates BW-ADV1155 0016832 (Note: This chart uses a different method for calculating claims received than the method used for the numbers in the two preceding sentences of the text, but both methodologies are appropriate and both show the same trend of arbitrarily increasing asbestosis claims.)

[82] *See* W. Wecker Supp. Rept. 10/7/00 in *Falise v. The American Tobacco Co.* at 3.

USG B 0160

*Sixty-nine percent* of the B&W asbestosis claims in the matched sample do not have the clinical disease asbestosis.[83]

B&W accepted the integrity and good faith of a diagnosis submitted by any medical doctor and thus did not require submission of two types of diagnostic data, lung function tests and x-ray ILO scores, that are widely used to support or refute diagnoses of asbestosis.[84]  Claimants' counsel apparently took advantage of B&W's good faith in this area by submitting, and in some cases recovering for, unsupported claims.

Pulmonary Function Tests ("PFTs") assess impairment by comparing breathing test results for the claimant to a benchmark of "normal" lung capacity.[85]  Depending on what cutoff is used, less than 70 percent of normal or less than 80 percent of normal is considered impaired.  B&W did not require PFT results to be submitted, and a sampling of historical claim files shows that only 25 percent of pleural disease claimants submitted them voluntarily.  For those who did submit PFT results, between 40 and 60 percent were normal (depending on which benchmark is used).[86]

Nor did B&W require lung x-rays, which are used to determine if an individual has an ILO reading of 1/1 or higher, a necessary but not sufficient finding to support a diagnosis

---

[83]  Dunbar Report at Ex. III-15.

[84]  A basic tutorial on these diagnostic tests is set forth in the Appendix to the accompanying Road Map to B&W's Defenses.  In addition, certain problems with the test are discussed in Section XI of the Road Map.

[85]  American Thoracic Society ("ATS"), *The Diagnosis of Non-Malignant Diseases Related to Asbestos*, AM. REV. RESPIR. DIS. 134:  363-367 (1986); *AMA Guides to the Evaluation of Permanent Impairment* (4th ed. 1998).

[86]  Dunbar Report at 24-25.

36

USG B 0161

of asbestosis.[87]  In claims matched with a sample of Manville Trust claims for which ILO information has been coded, 46 percent of the asbestosis claims paid by B&W had ILO readings of less than 1/1 and thus failed to meet a key criterion for diagnosing asbestosis.[88]

### 3.    A Small Group of Assembly-Line Doctors Account for Nearly Half of the Unsupportable Asbestosis Claims.

In assessing whether an individual who claims asbestosis actually *has* asbestosis, the Manville Trust determined in an audit that a "highly statistically significant factor" is the "identity of the doctor to whom the claimant was referred."[89]  The audit consisted of sending lung x-rays and ILO scores to two independent "b-readers" (doctors certified to interpret lung x-rays). A diagnosis failed the audit only if both of the reviewers concluded that the submitting doctor's ILO reading was too high.

---

[87]  The doctor grades the x-ray on a scale of 0/0 (no abnormality) through 3/3 (most severe) based upon criteria developed by the International Labour Organization ("ILO"). American Thoracic Society criteria specify a minimum 1/1 reading for asbestosis. *See* ATS (1986) 134: 363-367; International Labour Organization, Occupational Safety and Health Series, No 22 (Rev ) 1980; *Guidelines for the Use of ILO International Classification of Radiographs of Pneumocomosis*, MED. RADIOGR. PHOTOGR. (1972) 48: 67-76. Note that an ILO reading has limitations. *See* S. Rockoff & A. Schwartz, *Roentgenographic Underestimation of Early Asbestosis by International Labour Organization Classification*, 93(5) 1088, 1089 (1988) CHEST ("The ILO classification [originally intended for epidemiological surveys] was developed by consensus rather than by reliance on histologic criteria and gives only a semiquantitative" results. "It is purely descriptive and not interpretive . . ."). The significance of a minimum 1/1 ILO reading is reflected by, among other things, Lloyd's recent pronouncement that it will require a 1/1 reading or higher to pay an asbestosis claim. *See* 4/30/01 R. Milazzo letter.

[88]  Dunbar Report at 23-24.

[89]  2/24/98 The Manville Personal Injury Settlement Trust X-Ray Audit And Assessment of the Underlying Disease Process Implications for Medical Review By Certified B-readers (CRMC 0116759-831 at 780). *See also Manville Reports "Troubling" Rise in Claims Affected by Medical Audits*, ANDREWS ASBESTOS LITIG. REP. (3/20/98) at 12; Answer and Counterclaim, *Adkins v. Manville Personal Injury Settlement Trust*, 98 Civ. 7464, at 26 (E.D.N.Y. 1/28/98) ("the Trust had seen a clear correlation between the claimant's doctor and law firm, and the firm's pass rate").

USG B 0162

The Manville Trust audit showed that the doctors who diagnosed the most claims had the highest failure rates. The top 10 highest-volume doctors, accounting for 46 percent of all claims submitted to the Manville Trust, had an average failure rate of 63 percent. More than one-third of the claims submitted by these doctors showed no evidence of disease whatsoever. For the single most active doctor, *49 percent of his claims showed no evidence of disease whatsoever.* Not surprisingly, referrals to this doctor increased between 1983, when he submitted fewer than 1 percent of asbestosis claims received by the Manville Trust, and 1996, when this one doctor alone supported 31.8 percent of asbestosis claims received by the Trust.[90]

Incredibly, 16,267 asbestos claims paid by B&W – approximately one out of every seven asbestosis claims paid by B&W where the identity of the doctor is known – were diagnosed by this same doctor. Lloyd's recently announced that it will no longer pay claims diagnosed by this doctor and five others.[91] But because B&W accepted in good faith submissions from any properly credentialed doctor, B&W did not seek to screen claims supported by the doctors whose diagnoses are now regarded as suspect.[92]

If B&W had required ILO readings and PFT results, the number of asbestosis claims paid would have been slashed. For example, the Raymark Trust was recently set up, with the consent of plaintiffs' counsel pursuant to a negotiated Plan of Reorganization, to pay only non-malignant claimants with an ILO score of 2/1 or greater and a PFT lung-function score of

---

[90] 4/24/98 Manville Trust letter to E Inselbuch (CRMC D168905-913); Dunbar Report at 15.

[91] *See* 4/30/01 Milazzo letter.

[92] *See* Dunbar Report at Ex. III-21A

38

USG B 0163

less than 70 percent.[93]  An analysis of B&W claims demonstrates that only about 4 percent of the asbestosis claims paid by B&W would meet the Raymark criteria.[94]  Similarly, an analysis of Manville Trust data by Mark Peterson, the ACC's claim analysis expert in the B&W Chapter 11, showed that imposing a 2/1 minimum ILO requirement would eliminate all but 683 (slightly more than 2 percent) out of 30,214 claims.  If lung function impairment less than or equal to 70 percent of normal capacity were also required, only about 0.5 percent of the claims would survive.[95]

It is completely unrealistic to assume that such restrictive criteria could have been implemented in the real world in which B&W operated historically, since plaintiffs' lawyers never would have accepted such criteria and the success of B&W's settlement program was contingent on the consent of plaintiffs' counsel.  But the unique pressures brought to bear on B&W by the asbestos tort system in the pre-petition era no longer apply in this forum.  Here, the validity of the claims should be determined on the merits, and should not be presumed merely due to the large volume of claims asserted.

---

[93]  *In re Raytech Corp.* 4/19/00 2nd Amended Plan Re-org. (Bankr. Conn.) at Ex. E, Sch. A, p. 24.

[94]  This analysis was based on a match to a sample of Manville Trust claims for which ILO and PFT information have been coded.  *See* Dunbar Report at 24.

[95]  Analysis of Potential Population of "Severely Disabled" Asbestotics.

USG B 0164

### III.    AS THE RESULT OF STEPS TAKEN IN THIS CASE TO-DATE, THE THRESHOLD TORT LIABILITY ISSUES CAN NOW BE LITIGATED.

From the outset, B&W has taken specific and practical steps to advance the resolution of the tort issues central to this case. At Debtors' request, this Court last year created a framework for identifying asbestos personal-injury claims and adjudicating threshold liability defenses applicable to those claims. (*See* Section A below) More recently, B&W has moved aggressively to resolve tens of thousands of invalid Proofs of Claim that were filed by the March 29, 2001 Settled Claim Bar Date, in order both to resolve the "settled" status of those claims and to keep the personal-injury claim process on track. (*See* Section B below)

#### A.    THE BAR DATE PROCESS SERVED TO GATHER THE ASBESTOS PERSONAL-INJURY CLAIMS.

On the Petition Date, B&W filed a motion to partially withdraw the reference to the district court to determine the validity of asbestos personal-injury tort claims. Partial withdrawal of the reference was needed to avoid delays that could result from uncertainty regarding the bankruptcy court's authority to decide personal-injury claims.[96] In April 2000, this Court granted B&W's motion, ordering the reference partially withdrawn for the purposes of resolving "motions related to the procedure for notifying claimants; motions regarding the form

---

[96] As this Court observed in its April 17, 2000 opinion, because "uncertainty and confusion
. presently exists among a number of courts regarding the bankruptcy court's jurisdiction to make threshold determinations as to the validity of personal injury tort claims" it was appropriate to have the tort issues addressed before a court with "undisputed jurisdiction." (2000 WL 422372 at *1, *4) Indeed, the Fifth Circuit still has not resolved the uncertainty concerning the bankruptcy court's jurisdiction to decide tort issues. In *In re Metzner*, 233 B.R. 919, 921 (E.D. La. 1999), which was on appeal at the time, the Fifth Circuit ultimately determined in an unpublished opinion vacating the lower court's ruling that resolution of "[t]his difficult question is unnecessary to the decision in this case." 213 F.3d 635 (5th Cir. 4/10/00 Order at 4). In addition, "judicial economy and efficiency factors" weighed in favor of partial withdrawal of the reference, given that "District courts are more familiar with these types of [tort] issues than bankruptcy courts." (4/17/00 Order at 11, Vance, J., 2000 WL 422372 at *4)

40

USG B 0165

of proofs of claims; and motions for summary judgment on threshold liability issues, together with all scheduling and discovery matters relating thereto." (4/17/00 Order at 12-13, 2000 WL 422372 at *5)

Next, B&W argued to the Court that the universe of current asbestos claimants needed to be identified and gathered in one place. The very reason why Chapter 11 proceedings provide the only vehicle for resolving mass asbestos claims is the federal court's power to collect all current claims in a centralized place; to identify which claims even have *prima facie* validity; to apply liability filters, pursuant to federal evidentiary rules and procedures, including *Daubert* motions;[97] and ultimately to approve a Plan of Reorganization providing for a trust with procedures and criteria for paying valid claims.

Setting a bar date for personal-injury claims was vital to making these processes work here.[98] Accordingly, on June 1, 2000 B&W asked the Court to set a bar date by which currently manifested asbestos personal-injury claimants must submit their claims. B&W's motion also asked the Court to approve a mandatory, specialized Proof of Claim form eliciting facts about the claimant's exposure and medical history. The specialized Proof of Claim has two purposes: (1) to determine, in a way that standard Form 10 cannot, whether or not a putative

---

[97] *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 592-93 (1993).

[98] *See, e.g., In re Eagle-Picher Indus.,* 137 B.R. 679, 681 (Bankr. S.D. Ohio 1992) (in asbestos mass tort bankruptcy, setting a prompt bar date "fixing the number and identity of such claimants will lend considerable assistance to the process of arriving at a value of the claims of this class"); *In re Celotex Corp.,* 204 B.R. 586, 593 (Bankr. M.D. Fla. 1996) (court established asbestos bodily injury bar date); *Jones v. Chemetron Corp.,* 212 F.3d 199, 205 (3d Cir. 2000) (toxic tort claim bar date). *See generally In re Kolstad,* 928 F.2d 171, 173 (5th Cir.), *cert. denied,* 502 U.S. 958 (1991) (bar date serves important purpose of "enabl[ing] a debtor and his creditors to know, reasonably promptly," who is making claims and in what amount); *Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente,* 125 F.3d 9, 17 (1st Cir. 1997) (bar date provides "finality" concerning universe of asserted claims).

41

USG B 0166

claimant even qualifies to be a claimant (for example, to be eligible to vote on a Plan of

Reorganization); and (2) to provide facts needed to litigate B&W's claim objections.

After extensive briefing and argument and over the strong objection of the

Asbestos Claimants' Committee, this Court in August 2000 granted B&W's motion to set a bar

date.[99]  Soon thereafter, the Court set July 30, 2001 as the Bar Date.[100]  Less than 18 months

from Petition Date to Bar Date is aggressive when compared to other asbestos Chapter 11's, in

which the time between the Petition Date and the Bar Date has ranged from 20 months to 10

years.[101]  The Court also approved the proposed bar date forms, notice program and procedures.

In particular, the Court approved the detailed four-page Proof of Claim form,[102] and found that

both the POC form and the instructions – which required the POC form to be filled out

---

[99]  The Court stated: "Ascertaining the number and identity of present claimants will assist in valuing
the claims in this class, by facilitating the claims allowance and estimation processes.  This will in turn
assist the parties in the negotiation and formulation of a viable reorganization plan."  (8/25/00 Order at 8)
The Bar Date also applies to certain other claimants, including contribution claimants and litigants in
nuclear radiation litigation in Pennsylvania, but these matters are not the subject of this pleading and will
be addressed later.  In addition, the Bar Date by definition does not apply to future personal-injury claims
not manifested as of July 30, 2001.

[100]  10/30/00 Order.

[101]  *See, e.g., In re Celotex Corp.* (Bankr. M.D. Fla. 1990) (5 years and 5 months); *In re UNR Indus.*
(Bankr. N.D. Ill. 1982) (4 years and 5 months); *In re Raytech Corp.* (Bankr. D. Conn. 1989) (10 years and
5 months); *Eagle-Picher* (Bankr. S.D. Ohio 1991) (20 months).  Note:  A bar date was set by the court but
data derived from the bar date was not actually used in most of these asbestos cases.  *Cf. In re Dow
Corning Corp.* (Bankr. E.D. Mich. 1995) (silicone breast implants – 20 months from Petition Date to Bar
Date); *A.H. Robins Corp.* (Bankr. E.D. Va. 1988) (Dalkon Shield – eight months from Petition Date to
initial bar date requiring only registration of name and address; 23 months from Petition Date to extended
deadline for questionnaire that the court made an integral part of the bar date process).

[102]  The POC form and Instructions are attached as Exhibit B hereto.  The form is substantially shorter
than the version B&W had originally proposed.

USG B 0167

completely, to provide specified medical records, and to be signed by the claimant or the claimant's authorized representative – are "fair and reasonable."[103]

Meanwhile, as various ancillary issues have arisen from time to time, B&W has actively sought to resolve them so that the critical path of adjudicating the tort claims would not be disrupted. *First*, under Judge Brown's supervision, B&W has taken a variety of steps to keep B&W profitable, stabilize customer and vendor relationships, maintain employee benefits and morale, secure Debtor-in-Possession financing, and pursue business opportunities. *Second*, Debtors have met nearly continuously with the Asbestos Claimants' Committee and the Legal Representative for Future Asbestos-Related Claimants and have provided them with voluminous documents regarding myriad aspects of B&W's business. B&W has also actively negotiated with the ACC and the Futures Representative.[104]

*Third*, B&W has managed collateral litigation to maximize estate assets and minimize the impact on the overall progress of the case, including: (a) enforcing the Section 362 automatic stay and obtaining a preliminary injunction under Section 105 blocking asbestos-related law suits against B&W's non-filing affiliates and direct actions against B&W's carriers; (b) staying nuclear radiation litigation brought against B&W in federal court in Pennsylvania and maximizing insurance coverage via a Pennsylvania state court action; and (c) moving to

---

[103]  10/30/00 Order at 4-7. This Order also approved an extensive notice program as adequate and reasonably calculated to provide notice to creditors. The notice program began on November 29, 2000 and involved direct mailings to known claimants and publication notice tailored to potential asbestos claimants  Notices were broadcast on national television, printed in national magazines and more than 900 newspapers, and communicated in various other ways including an 800 number and website

[104]  In February 2001, at B&W's request and with consent of the parties, Judge Brown appointed a mediator, Professor Francis McGovern, to assist with the negotiations. The mediator's appointment currently runs through October 31, 2001

43

USG B 0168

dismiss an action filed by London carriers seeking to disavow their obligations to pay B&W asbestos claims.[105] *Fourth,* on February 22, 2001, Debtors filed their Plan of Reorganization.[106] With a variety of critical matters actively in progress, Judge Brown has deferred consideration of the Plan and extended exclusivity until October 30, 2001. *Fifth,* in April 2001, B&W filed a complaint seeking a declaration that certain corporate transfers in 1998 did not violate the Louisiana revocatory action statute because B&W was solvent at the time. B&W initiated the action in part because unresolved disputes over the transfers were stymying negotiations and the overall progress of the case. After various jurisdictional and legal issues were resolved by the Bankruptcy and District Courts, the ACC and Futures Representative have filed a complaint in intervention. Judge Brown has set the matter on a fast track for trial on the solvency question on October 22-25, 2001.

---

[105] B&W 10/2/01 Motion for Judgment on Pleadings or Alternatively, for Summary Judgment in *Certain Underwriters At Lloyds, London Subscribing Policies in Favor of MII vs. B&W,* No. 01-1187, Adversary Proceeding No. 01-1143(B) (E.D. La., Vance, J.).

[106] The Plan proposes two alternatives: (1) a settlement approved by 75 percent of asbestos creditors pursuant to § 524(g) of the Bankruptcy Code, in which an asbestos settlement trust would be funded with $150 million and all of Debtors' asbestos insurance rights; or (2) a trust, to be confirmed by "cram down," that would defend Debtors' post-confirmation litigation and, subject to availability of funds, pay all valid asbestos claims in full, with all of Debtors' equity at risk if necessary.

44

USG B 0169

**B.     THE FILING OF TENS OF THOUSANDS OF INVALID "SETTLED" PROOFS OF CLAIM FORESHADOWED DEFICIENCIES IN THE PERSONAL-INJURY CLAIMS.**

Although B&W had received only about 50,000 pending claims which could even be *considered* for settlement before the Petition Date, a startling 49,092 "settled" Proofs of Claim were filed by the March 29, 2001 Bar Date.[107] In essence, claimants and their counsel asserted that the entire inventory of claims submitted to B&W before the Petition Date was settled, even though most were merely in-process and had not matured into contractually binding settlements. Indeed, more than 14,000 Proofs of Claim were asserted to be "settled" even though the claimant's name had never even been submitted to B&W.[108]

Judge Brown was "somewhat shocked at the number of those claims,"[109] especially since claimants' counsel had represented at a series of pre-Bar Date hearings that only a small handful would be filed:

- "[Debtors] say that they're going to have tens of thousands of claims. . . . *I don't think you're going to be flooded with a whole lot of claims* that on their face are clearly not settled claims."

---

[107] The parallel track for settled claims was created last year when this Court found that asbestos claims that allegedly had been settled by B&W before the Petition Date involved contract issues that should be resolved by the Bankruptcy Court. (8/25/00 Order at 27-28; *see also* Judge Brown's 10/6/00 Order Setting Settled Claims Bar Date).

[108] On September 12, 2001, B&W filed an omnibus objection to all such claims, which were supported by nothing more than a generic protocol negotiated with a plaintiffs' law firm – essentially an "agreement to agree" that did not mention the individual claimant's name or purport to settle any individual's claim. For other POC's asserted to be "settled," medical or exposure information was missing or incomplete; for still others, B&W did not design or supply a boiler system at the claimed exposure site. Regardless of the reason, for the majority of pre-petition claims there had been no meeting of the minds and there was no binding settlement contract.

[109] 4/20/01 Hrg. Tr. at 6.

45

USG B 0170

- "This is not an emergency, because the resolution of the *small handful of claims, relatively speaking, that might assert that they are, in fact settled,* has very little to do with, and is no substitute for what we have to ultimately decide . . . ."

- "Let's assume *1,000 claims* are filed . . . ."[110]

Judge Brown did two things to discourage invalid claims. First, he approved a specialized "Babcock & Wilcox Settled Asbestos Claims Form" (Ex. C hereto) requiring the claimant to attach all documents supporting a pre-petition settlement and requiring the claimant or his authorized agent to sign the form under penalty of perjury. Second, Judge Brown admonished counsel to submit "settled" Proofs of Claim only if they could certify in good faith that the claim had been settled before the Petition Date:

> "I want the word to go out to these lawyers that have all the claims that I really mean that certification. When they file this form, *they better have a good faith belief that they've got a settlement agreement*." [111]

Despite Judge Brown's admonitions, plaintiffs' counsel dumped more than 49,000 purportedly settled claims on Debtors by the March 29 Bar Date.

On May 29, 2001, Judge Brown entered a case-management order setting a series of hearings on settled claims, to be noticed on a rolling basis every two weeks, to determine objections to exemplar Proofs of Claim illustrative of large numbers of similar claims fitting the same fact pattern or category. After Judge Brown rules on the exemplar claims, omnibus objections to all other claims in the same category are then filed on a rolling basis. Any

---

[110]  Mr. Inselbuch, 2/7/01 Hrg. Tr. at 27-28, 31, 54 (emph. added).

[111]  9/27/00 Hrg. Tr. 52 (emph. added); *see also id.* 49.

USG B 0171

claimants who contest the omnibus objection have the opportunity and obligation to show cause why their claim should not be disallowed.  (5/29/01 Order at 3, Ex. D hereto)[112]

The exemplar/omnibus objection process has been working well.  Shortly after the Bar Date, Debtors conceded over 7,500 claims as settled.  Judge Brown has since held hearings regarding the first four categories of contested claims.[113]  After reviewing the arguments and evidence, Judge Brown disallowed 16 exemplar Proofs of Claim and authorized Debtors to file omnibus objections to all claims fitting the same categories as the exemplars – totaling about 25,000 claims in all.  Debtors expect that, after these and the remaining omnibus objections have been heard, between 30,000 and 40,000 Proofs of Claim will be disallowed as settled claims.

Already, many plaintiffs' firms are conceding that their filings lack merit.  In response to B&W's first objection, one plaintiffs' firm withdrew 1,501 of its 1,503 Settled Proofs of Claim, admitting that they had not been settled before the Petition Date.  After the first hearings were held in August, still more firms withdrew claims that they now admit were never settled in the first place.  One firm withdrew 63 claims that had been paid in full by B&W before the Petition Date; another withdrew a single claim paid-in-full before the Petition Date and is reviewing its entire inventory for other "inadvertently submitted" claims; and a third firm

---

[112]  The order adopted some of the procedures Debtors had proposed for resolving the settled claims in connection with a series of briefs and hearings earlier this year.  *See, e.g.,* Debtors' 1/4/01 Motion to Establish Expedited Procedures for Settled Claim Objections; Debtors' 3/15/01 Supplemental Brief; Debtors' 5/22/01 Bench Mem. Proposing Categories and Procedures for Resolving "Settled" Claims.

[113]  The categories are:  (1) claims paid in full before the Petition Date, (2) claims rejected by B&W before the Petition Date, (3) claims that were never even submitted to B&W, but were supported only by a generic "agreement to agree" with a plaintiffs' law firm; and (4) claims with inadequate or missing medical or exposure records.

USG B 0172

withdrew claims because the firm now realizes, having been prompted by B&W's objection, that it did not represent 17 of the claimants for whom it filed Proofs of Claim.[114]  Similar withdrawals should keep pouring in over the coming weeks and months.

Under Judge Brown's aggressive schedule, the initial round of hearings on the various exemplar objections to settled claims should be completed by November or early December.  If omnibus and miscellaneous objections can be disposed of promptly thereafter, Debtors hope that objections to all settled claims can be resolved by early next year.

Although much progress has been made in resolving the settled claims, the settled claims adversely affect the personal-injury claim process pending before the District Court in two respects.  *First*, the massive numbers of Settled Proofs of Claim submitted – many thousands of which clearly are frivolous – foreshadow major deficiencies in the Personal-Injury Proofs of Claim filed by the same law firms.  *Second*, as many as 40,000 "settled" claims will have to be re-filed with the District Court as Personal-Injury Proofs of Claim within 45 days of their disallowance by Judge Brown, pursuant to this Court's "safe harbor" order.  (4/16/01 Order at 3)  This process will continue at least through the first several months of 2002, resulting in delays in the filing of, and ultimately in the resolution of, objections to the Personal-Injury Proofs of Claim.

---

[114] *See* 7/27/01 Resp. of Robert E. Sweeney at 2; Creditor's 8/2/01 Motion to Voluntarily Withdraw Sixty-Three Claims Based On Prior Payments; 8/7/01 Response of Weitz & Luxenberg (withdrawing one claim because it had been paid in full before the Petition Date and admitting that the law firm "inadvertently submitted other such claims that it will also withdraw"); Creditor's 8/2/01 Motion to Voluntarily Withdraw Seventeen Claims Based On Lack of Representation.

USG B 0173

## IV. PRELIMINARY ANALYSES OF THE PERSONAL-INJURY PROOFS OF CLAIM SHOW THAT MOST ARE DEFICIENT, UNDERSCORING THE NEED TO SEPARATE VALID FROM INVALID CLAIMS.

By dumping in 221,375 Asbestos Personal-Injury Proofs of Claim by the July 30, 2001 Bar Date, plaintiffs' counsel failed to meaningfully discriminate between claims that are valid and those that are not. The sheer number alone is astonishing. Throughout the more than two decades B&W was paying asbestos claims before the Petition Date, a total of about 410,000 claims were submitted to B&W. It is simply not credible that more than half that many claims suddenly materialized just in the short period preceding the bar date. Although some acceleration of personal-injury claims can be expected in response to a bar date, the volume of claims filed has far surpassed any legitimate increase.[115]

Based on preliminary analyses conducted to date,[116] it is apparent that numerous personal-injury claims are deficient. The following three highlights from the preliminary

---

[115]  In the three years before the Chapter 11 filing, only about 35,000 claims per year were received by B&W (without deducting inactive and rejected claims).

[116]  To facilitate claim processing, at B&W's request Judge Brown appointed a claims agent experienced in mass-tort cases to receive and process claims. (8/17/00 Order Approving and Authorizing the Employment of Rust Consulting, Inc.) Approximately 85 percent of all POC's were filed during July 2001, with more than 140,000 claims (or about 65 percent of the total) filed in the last six business days, and more than 56,000 claims (25 percent of the total) filed on the last day, July 30. Debtors are just beginning to analyze the data, owing to processing delays occasioned by the volume and the last-minute submission of most claims. Inputting of claims was completed and the raw data transmitted to Debtors, the ACC and the Futures Representative in mid-September. Data cleanup and imaging of forms and attachments will be completed shortly. B&W and its data-analysis experts will continue to analyze claims in detail and will report further to the Court as soon as practicable. Note: In addition to the timely Personal-Injury POC's, 59,763 timely "Related Party" Proofs of Claim were submitted by relatives of personal-injury claimants, and 1,927 late Personal-Injury Proofs of Claim were filed. The exact numbers reported for all Proofs of Claim may change slightly over time as duplicates and other irregularities are taken into account.

49

USG B 0174

analyses illustrate the deficiencies, which can only be expected to worsen once Debtors complete

their ongoing, more comprehensive review.

First, the vast majority of claims are unimpaired asbestosis claims of precisely

the type that have swelled the tort system and the asbestos trusts in the last two years. Eighty

percent of the Proofs of Claim – 176,982 out of 221,375 – assert that the claimant has

asbestosis. By contrast, claims for malignant conditions account for only 9 percent of the

POC's: 3 percent for mesothelioma, and 6 percent for lung cancer.

## Lung Function Scores for Asbestosis Proofs of Claim



Total: 176,982

The vast majority of asbestosis claims are unimpaired. Specifically, 130,945

asbestosis Proofs of Claim show no clinical impairment, either because they completely lack any

lung function score for Forced Vital Capacity (FVC) (81,192 POC's) or because they scored

50

USG B 0175

normal in lung function tests (47,183 claims).[117]  The total of 128,375 unimpaired asbestosis

claims amounts to about 73 percent of all asbestosis POC's filed, and 58 percent of *all* POC's

filed against B&W by the July 30 Bar Date.

### ILO Scores for Asbestosis Proofs of Claim



Also with regard to asbestosis claims, well over 100,000 failed to show an ILO

reading of 1/1 or greater, an important criterion supportive of a diagnosis of true clinical

asbestosis, according to American Thoracic Society standards.  Specifically, as the above chart

shows, about 70 percent of asbestosis POC's either had no ILO data whatsoever (32,393 claims)

or had an ILO reading of 1/0 or below (92,174 claims).  An ILO reading of 1/0 is so suspect,

subjective and non-reproducible – for reasons discussed in Section XI of the accompanying

Road Map to B&W's Defenses – as to be meaningless.  Overall, only 9 percent of the asbestosis

---

[117]  47,183 of the claimants alleging asbestosis have Forced Vital Capacity (FVC) scores greater than 80
percent of a benchmark for "normal" – a conservative cutoff for lack of impairment.  If a more aggressive
70 percent cutoff is used, 68,160 FVC scores would be considered in the "normal" range.

USG B 0176

POC's (15,949 claims) made a showing of both a 1/1 minimum ILO score and evidence of lung impairment (at less than 80 percent of normal).

     *Second*, to investigate whether claimants were making the required showing that they were in fact exposed to B&W boilers, beginning in May of 2001 Debtors conducted a pilot study of 4,236 exposure sites identified in the first wave of Personal-Injury POC's filed.[118] The pilot study showed that about 68 percent of the alleged exposure sites did not have any connection to a B&W boiler.

### Pilot Study of 4,236 Exposure Sites Alleged on POC's



     Comparing the exposure sites identified on the Proofs of Claim to company records of where B&W sold boilers, Debtors determined that there was no B&W boiler at the claimed site in 44 percent of the cases. For example, POC No. 0000979 claimed exposure to

---

[118] Some Proof of Claim forms identify more than one exposure site; hence, the numbers used here refer to exposure sites, not POC's.

USG B 0177

B&W boilers at J&B Slagdump garage in Aliquippa, Pennsylvania, Valley Motor Transit in East Liverpool, Ohio and General Telephone in Lakeland, Florida – but B&W never built a boiler at any of those locations or for any of those customers.  In an additional 24 percent of the cases, the description of the alleged exposure site was so poor that it was impossible to establish that a B&W boiler was present.  For example, certain claimants alleged exposure sites – such as "slag shop" with no city specified; "apartment house" with no city specified; "San Diego" in San Diego, California; or "Public Bldgs." in Los Angeles, California – that fail to show that the claimant ever had any connection whatsoever with a B&W boiler.

*Third*, tens of thousands of claims are facially deficient because they are duplicates, were previously paid, or failed to comply with the Court's directive to provide information essential to the claim allowance process.  For example:

- 5,061 POC's were paid in full and released by the claimant before the Petition Date and thus appear to have been re-submitted in an attempt to collect for the same claim twice;[119]

- 4,091 POC's were duplicates of previously filed POC's;

- 25,087 POC's were not signed or were rubber-stamped; and

- 12,291 POC's failed to submit any medical records as required.

These deficiencies hinder Debtors' ability to know which claims are at issue and to analyze those claims in a systematic and orderly way.

---

[119]  It is possible, in an exceedingly rare case, that a claimant settled a claim pre-petition for a minor condition, e.g., unimpaired asbestosis, but is now claiming a more severe disease such as a malignancy. However, this type of resubmission was extremely rare in B&W's settlement program.

USG B 0178

## CONCLUSION

This document is filed in support of the accompanying Motion for a Case Management Order Establishing a Protocol for Litigating Asbestos Personal-Injury Claims. It will be supplemented as Debtors complete their full review of the Proof of Claim data currently underway. But even the preliminary analyses completed in the last few weeks reveal massive deficiencies in the Proofs of Claim, underscoring the need to separate valid from invalid claims pursuant to procedures to be established by this Court and the defenses discussed in detail in the accompanying "Road Map to B&W's Defenses to Asbestos Personal-Injury Claims." For all the reasons cited herein, Debtors urge the Court to adopt the proposed Litigation Protocol and establish procedures necessary to determining B&W's actual liability for legitimate asbestos personal-injury claims.

Dated:   October 18, 2001

Respectfully submitted.

KIRKLAND & ELLIS

David M. Bernick
John Donley
Theodore L. Freedman
200 E. Randolph Drive
Chicago, Illinois 60601
Telephone:  312-861-2000

-and-

HELLER, DRAPER, HAYDEN, PATRICK & HORN, L.L.C.
Jan M. Hayden (#6672)
650 Poydras Street, Suite 2500
New Orleans, LA  70130-6103
Telephone:  504-568-1888
Fax:  504-522-0949
Co-counsel for Debtors

USG B 0179

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED

USG B 0180