**10**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

*FILED*
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2001 OCT 18 PH 4:58
LORETTA G. WHYTE
CLERK

In re:

THE BABCOCK & WILCOX
COMPANY, ET AL.

)  CIVIL ACTION
)
)  No.:    00-0558
)  Bankruptcy Case
)  No.    00-10992
)
)  SECTION: "R" (5)

**DEBTORS' MOTION FOR A CASE MANAGEMENT ORDER
ESTABLISHING A PROTOCOL FOR LITIGATING
ASBESTOS PERSONAL-INJURY CLAIMS**

KIRKLAND & ELLIS
David M. Bernick
John Donley
Theodore L. Freedman
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

HELLER, DRAPER, HAYDEN, PATRICK &
HORN, L.L.C.
Jan M. Hayden (#6672)
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6103
(504) 568-1888

Dated:  October 18, 2001

Counsel for Debtors

Fee_____
___Process_____
X   Dktd
___CtRmDep
Doc.No._____

USG B 0181

## INTRODUCTION

As of the Bar Date of July 30, 2001, 221,375 claims were timely filed against the Debtors. The vast majority of these claims should be disallowed pursuant to one or more basic legal defenses that this Court can rule upon in an efficient and fair manner. This motion and the accompanying documents set forth proposals for how the Debtors believe the claim determination process should be done, and the reasons why the claim determination process is imperative in this case.

Since B&W filed its Chapter 11 petition, the importance of "separating the wheat from the chaff" – that is, determining which claims are valid and which claims are not – has become increasingly manifest. As described in the accompanying *B&W's Report to The Court Regarding Asbestos Developments Generally and the Proofs of Claim Filed Here*, unsupportable claims brought predominantly by unimpaired asbestosis claimants have inundated claim facilities and courts since early last year, while prospects for legislative relief outside Chapter 11 have dimmed. With regard to B&W claims specifically, further analysis of the company's historical settlement program and preliminary analyses of the asbestos personal-injury proofs of claim filed by the Bar Date reflect that B&W has been and continues to be subject to massive numbers of unsupported claims. For example, two-thirds of the claims sampled to date cannot even establish that the claimant worked at a site where there was a B&W boiler. Even worse, the vast majority of claimants – more than 176,000 – purport to have asbestosis, even though more than 130,000 asbestosis claimants have no physical impairment whatsoever.

Even certain claimants' counsel in this Chapter 11 have come to agree with B&W's core contention that unworthy claims must be filtered out. As Elizabeth Magner, counsel

1

to the Unofficial Committee of Select Asbestos Claimants, told Judge Brown last spring, her

group wants to "ensure that those seriously impaired are compensated for their disease" and,

while they are not sure whether the "aggressive program" proposed by the Debtors will succeed,

"we do support the effort to try." Ms. Magner further stated, in a comment B&W endorses, that

there needs to be a "new way" to compensate asbestos victims: "[W]e support a new day, a new

way to compensate victims which will ensure that those seriously hurt can look to the future, can

be paid in the future." (4/20/01 Hrg. Tr. 36)

        B&W's specific proposal for this "new way" of compensating asbestos victims is

set forth in the three documents filed today.

- The accompanying *Report to The Court Regarding Asbestos Developments Generally and the Proofs of Claim Filed Here* provides an update about the worsening tort system crisis and underscores the need to litigate B&W's threshold tort liability defenses here. It also illustrates why it is not meaningful to harken back to B&W's historical claim settlement data – as the Asbestos Claimants' Committee still urges – as a basis for rationally determining B&W's true tort liability. Finally, the document provides an update on developments with the claim processes set in place by the Court around this time last year, including the surprising mass filing of 49,000 "settled" claims in March 2001, and a preliminary summary of data from the Asbestos Personal-Injury Proofs of Claim filed by the July 30 Bar Date.

- This *Motion for a Case Management Order Establishing a Protocol for Litigating Asbestos Personal-Injury Claims* summarizes the defenses B&W will assert and sets forth workable procedures for determining those defenses.

- The accompanying *Road Map to B&W's Defenses* provides a detailed review of the defenses that B&W will assert in the summary judgment motions to be filed. B&W is mindful that this Road Map is quite long and asks the Court's indulgence for its length. In debating whether to provide merely a skeletal summary or a full discourse, Debtors erred on the side of being thorough so the Court can, if it

2

USG B 0183

desires, examine in detail (1) the merits, (2) the feasibility of litigating, and (3) the expected impact of each of B&W's defenses.[1]

## I.     DEFENSES B&W WILL ASSERT

Historically, there was no fair and rational way to litigate Babcock & Wilcox's defenses in a tort system where state-court dockets were overwhelmed, "junk science" was not excluded, and results were arbitrary. In contrast, B&W's defenses can be rationally and efficiently litigated here because the claims are collected in one place, the docket is controlled, and the Federal Rules of Evidence apply.

When B&W outlined its defenses during last year's Bar Date briefing, this Court directed B&W to bring only those defenses that are robust, affect substantial numbers of claims, and can be litigated in a reasonable amount of time. Consistent with that directive, B&W at this juncture will only assert defenses that can resolve large numbers of claims, based on facts from the Proof of Claim forms and other readily available sources such as government records and B&W records.[2] For example, the so-called "Product ID" defense should defeat approximately two-thirds of the 221,375 Asbestos Personal-Injury Proofs of Claim (POC's) based on a

---

[1]  While fairly complete, the road map to B&W's Defenses does not contain a full statement of the facts with supporting affidavits and evidence; such materials are reserved for the actual summary judgment briefs to be filed.

[2]  B&W will not raise defenses at this juncture that affect only a few claims or that involve such highly individualized proofs that they cannot be litigated in any realistic amount of time. By way of illustration, alternative-cause defenses based on fact-intensive review of a plaintiff's medical history and life history are typically pursued in personal-injury cases, but do not appear feasible to assert in this case at this stage. B&W reserves the right to assert any valid defense in any appropriate later context, and is not waiving any litigation defenses on behalf of itself or a post-confirmation trust.

3

USG B 0184

preliminary analysis showing that 68 percent of the exposure sites sampled could not even allege

that the claimant worked at a site where a B&W boiler was present.

B&W's defenses fall into three categories:

- Defenses relating to the specialized, limited role B&W played with respect to asbestos (summarized in Section A below and treated in detail in Sections I through VI of the *Road Map to B&W's Defenses*);

- Defenses based on science and the evidentiary gatekeeping rules of *Daubert*, including lack of injury and lack of causation (summarized in Section B below and treated in detail in Sections VII through XII of the *Road Map*);

- Patent deficiencies in the Proofs of Claim (described in Section C below), such as duplicate claims and claims paid in full before the Petition Date, which must be resolved in order to identify which claims are even facially valid.

**A.    DEFENSES RELATING TO B&W'S CONDUCT OR ROLE.**

The specialized context in which B&W used asbestos decades ago provides the

predicate for a host of legal defenses, all but one of which were not feasible to raise in B&W's

pre-petition settlement program,[3] but which are ripe to be litigated in this forum.

*"Product ID."*  B&W designed or installed industrial boilers at fixed and readily

discernible locations, unlike manufacturers whose mass-produced products are widely dispersed.

Accordingly, B&W will assert the so-called "Product ID" defense and move to dismiss all Proofs

of Claim (POC's) that cannot even allege that the claimant worked at a B&W boiler site.  This

claim defect alone is currently estimated to affect as many as 150,000 claims.  (*Road Map to*

*B&W's Defenses*, Section I)

---

[3]  The sole exception is the so-called "Product ID" defense, for which B&W had a routine screen as part of its pre-petition settlement program.  (*See* Section III of the accompanying B&W's Report to the Court.)

4

USG B 0185

*Government Contractor and Sophisticated User Defenses.* B&W used asbestos because it was specified by the U.S. Navy and sophisticated industrial customers. This means that Navy claims (*Road Map*, Section II), estimated to affect more than 34,000 POC's, are barred by the government contractor defense. It also establishes the basis for the sophisticated user defense (*Road Map*, Section V), which affects an estimated 90,000 claims where B&W's customers were sophisticated and knowledgeable about the hazards of asbestos and where B&W therefore had no duty to warn.

*B&W's Lack of Negligence.* In contrast to manufacturers, B&W did not make cookie-cutter asbestos products; rather, B&W incorporated asbestos insulation into complex boiler systems it designed or erected decades ago. In its role as a custom designer (and in some cases, erector) of complex boiler systems, B&W can only be held to a negligence standard – and not to the strict-liability standard applicable to product manufacturers. B&W could not have been negligent before 1965, when Dr. Selikoff's study provided the first scientific demonstration that asbestos insulation work can cause disease. Before 1965, the medical, scientific, regulatory and industrial hygiene consensus was that asbestos was a state-of-the-art material and was safe for insulation work – in contrast to high-exposure asbestos mining and milling activities, which had long been known to be dangerous. Nor could B&W have been negligent after 1971, when OSHA regulations reduced allowable asbestos exposures to negligible levels. The negligence defense should result in the dismissal of at least 30,000 POC's that pre-date 1965 or post-date 1971. (*Road Map*, Section III)

*The Statute of Repose.* As a designer of complex industrial equipment – as opposed to a seller of off-the-shelf, mass-marketed products – B&W is protected by the statute of

5

USG B 0186

repose, which bars claims made a certain number of years (varying by state) after the installation or completion of a building, factory or piece of industrial equipment such as a boiler. It is an absolute bar to an estimated 95,000 claims. (*Road Map*, Section IV)

*Punitive Damages.* Consistent with the precedents from other mass-tort Chapter 11's, punitive damages should be disallowed for all claims because awarding punitives would violate fundamental bankruptcy principles, in particular the requirement of equality of distribution among creditors. In any event, there is nothing in any of B&W's conduct that could justify punitive damages. (*Road Map*, Section VI)

As shown by the following chart, Debtors expect that substantial numbers of Proofs of Claim will be defeated by these defenses. Of course, some claims are subject to multiple defenses and, once disallowed, cannot be counted in the total for any other applicable defenses.

6

USG B 0187



## DEFENSES RELATING TO B&W's ROLE

| Defense (Sec. of Road Map) | Applies to | Estimated Impact | Facts Needed (in addition to POC's) |
|---|---|---|---|
| **PRODUCT ID**<br><br>*Section I* | Claimants who cannot show exposure to B&W boiler | Approx. 150,000 claims | • B&W boiler database |
| **GOVERNMENT CONTRACTOR**<br><br>*Section II* | Claims based on boilers built to U.S. Navy specifications requiring use of asbestos | 34,381 claims alleging naval and/or shipyard exposure | • Judicial notice of Navy specifications<br><br>• Ship records |
| **B&W NOT NEGLIGENT**<br><br>*Section III* | Claims pre-dating Selikoff's 1965 study or post-dating 1971 OSHA regulations | 13,828 claims with last exposure before 1965<br><br>*plus*<br><br>17,531 claims with first exposure after 1971 | • Affidavits re B&W's role as custom-designer of unique industrial systems (not mass-producer of products)<br><br>• 1965 Selikoff study<br><br>• Judicial notice of 1971 OSHA regulations |
| **STATUTE OF REPOSE**<br><br>*Section IV* | Claims asserted more than *x* years after boiler construction (exact no. varies by state) | Approx. 95,000 claims | • B&W records of various boilers' date of completion |
| **SOPHISTICATED USER**<br><br>*Section V* | All Navy claims (due to Navy's sophisticated knowledge of asbestos)<br><br>*plus*<br><br>Other claims after 1965 (or, alternatively, after 1971)* | 34,381 claims alleging naval exposure<br><br>*plus*<br><br>56,570 land-based claims with first exposure after 1965 *(or* 15,813 such claims with first exposure after 1971) | • Public records showing Navy's sophisticated knowledge<br><br>• Published articles and regulations |
| **PUNITIVE DAMAGES**<br><br>*Section VI* | All claims | All claims | • *Coombs v. B&W* verdict form |

* All B&W customers are deemed to be "sophisticated users" based on actual or constructive knowledge of asbestos hazards arising from either 1965 Selikoff study or 1971 government regulations.

USG B 0188

**B.    DEFENSES BASED ON SCIENCE AND *DAUBERT.***

Causation does not even become an issue unless and until the claimant establishes that he or she suffered a personal injury. Debtors will therefore move to disallow the approximately two-thirds of the Proofs of Claim – 148,751 out of 221,375 POC's – that allege conditions that are clinically harmless and do not constitute any functional impairment or physical injury whatsoever. This category comprises all POC's asserting pleural plaques, unimpaired pleural conditions and unimpaired asbestosis. As set forth in Section VII of the accompanying *Road Map to B&W's Defenses*, the great bulk of these unimpaired claims must be disallowed because they are not actionable under state law in the first place, and those few claims that may be viable in some minority jurisdiction (e.g., one that allows recovery for speculative and hypothetical claims for fear of cancer) should be disallowed pursuant to the equitable powers granted to a federal bankruptcy court to give effect to unique federal interests, including treating creditors equally and encouraging reorganizations.

Next, Debtors will assert two basic types of causation defenses. ***First,*** Debtors will move for summary judgment in cases where there is no reliable scientific evidence of *general causation* – that is whether asbestos *can* cause the disease alleged. General causation must be established by epidemiology or other suitable evidence. Only after general causation has been established does *specific causation* – that is, whether a material actually caused the particular claimant's illness – become relevant.[4] It is known that asbestos is capable under certain conditions of causing certain diseases, such as mesothelioma and primary lung cancer; hence,

---

[4] *See Sterling v. Velsicol Chem. Corp.* 855 F.2d 1188, 1200 (6th Cir. 1988) (appropriate for trial court to first determine generic causation – whether the "particular contaminants were capable of producing injuries" of the kind suffered. "This still left the matter of individual proximate cause to be determined.")

USG B 0189

B&W will not challenge such disease claims at this juncture on general causation grounds. However, for certain types of cancer other than lung cancer – generally cancers of the gastrointestinal tract, commonly referred to in asbestos litigation as "other" cancers – there is no reliable and admissible scientific evidence to show that asbestos is capable of causing those diseases. (*Road Map to B&W's Defenses*, Section X)

*Second*, with regard to *specific causation*, the question is whether asbestos *did* cause disease (for which general causation has already been established) in a particular claimant. B&W will assert three specific causation defenses here. As set forth in Section VIII of the accompanying *Road Map*, B&W will move for summary judgment as to all claimants – particularly those in occupations known to have *de minimis* or no exposure to asbestos – who cannot show reliable scientific evidence that they were exposed to harmful levels of asbestos from a B&W boiler (for example, cumulative exposures of at least 25 fibers per cc-year are required for onset of asbestosis). Next, B&W will move to disallow all lung cancer claims that do not demonstrate both that the lung cancer is primary (*i.e.*, originated in the lung) and is accompanied by asbestosis, which is a necessary but not sufficient precursor to lung cancer being caused by asbestos exposure. (*Road Map*, Section IX) Finally, Debtors will move for to disallow all claims based upon unreliable or invalid diagnostic techniques. Certain subjective and easily-manipulated diagnostic tests have been used in "assembly-line" fashion to prop up massive numbers of purported asbestosis and pleural claims. (*Road Map*, Section XI) After the unreliable diagnostic data is excluded under *Daubert*, these disease claims cannot survive summary judgment.

9

USG B 0190

Indeed, *Daubert* is critical to all of B&W's causation defenses. As set forth in detail in the accompanying *Road Map to B&W's Defenses*, the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Fifth Circuit precedents require the claimant to show – by reliable and reproducible scientific evidence – that B&W asbestos proximately caused an actual injury.

Historically, most evidentiary rulings in asbestos personal-injury litigation have taken place in state courts where the discipline imposed by the *Daubert* gatekeeping rules for scientific evidence was lacking and, in any event, dockets were so overwhelmed that meaningful screening of scientific evidence was difficult. As a consequence, speculative plaintiffs' expert testimony and unsupported theories have often been liberally allowed. The most extreme example is the so-called "single fiber theory" – a speculative hypothesis positing that exposure to a single fiber of asbestos can cause disease – which cannot survive *Daubert* scrutiny in federal court.

The obvious problem with the single fiber "theory" is that *all* humans are exposed to millions of fibers of asbestos from background levels, yet the incidence of asbestos-caused disease from background exposures is exceedingly rare. As Dr. Andrew Churg, a leading pathologist, has stated:

> "[W]e all have a lot of asbestos in our lungs. . . Therefore the notion that any kind of exposure to asbestos is going to produce disease, and I say any kind, any time you are exposed to any amount, [ ] becomes ipso facto ridiculous because we are all [walking] around with this burden of asbestos, [and] none of us are dying of asbestos-related diseases."[5]

---

[5] A. Churg, *Nonneoplastic Disease Caused by Asbestos*, in PATHOLOGY OF OCCUPATIONAL LUNG
(continued...)

10

USG B 0191

Accordingly, people do not get asbestos-related disease simply by walking by a B&W boiler where a single microscopic fiber of asbestos may theoretically be present.

Government agencies that assess risk from asbestos exposure have debunked the notion that any level of exposure to asbestos causes disease. As the EPA has stated, "the risk of asbestos-related disease depends upon exposure to airborne asbestos fibers. . . . [A]t very low exposure levels, the risk may be negligible or zero."[6] Most recently, the EPA assured persons exposed to asbestos-containing dust from the World Trade Center attack that they are not at risk.[7]

The practical effect of allowing plaintiffs' experts to opine that any level of exposure to asbestos causes harm is to impose *de facto* enterprise liability on a wide scale, in effect shifting the burden of proof to any defendant who conceivably had a single fiber of asbestos in the facility where a plaintiff worked. *See, e.g., Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203, 1219 (Cal. 1997) (court required "only that the contribution of the individual cause be more than negligible or theoretical").

This case differs from asbestos litigation conducted in state courts because it has a controlled and orderly docket, it gathers all current claims against B&W in one forum, and it applies federal evidentiary tests including *Daubert*. Accordingly, Debtors will move to exclude

---

[5] (...continued)
DISEASE (Churg & Green, ed. 2nd 1998) at 293.

[6] *See* R. Hayley, "*Asbestos In Buildings and 'Environmental Terrorism' North of the Border: A Canadian Court Rejects Allegations of Bad Faith and Bad Product*, 8 No. 3 MEALEY'S LITIG. REP.: TOXIC PROP. DMG. 15, (11/10/95). *EPA, Managing Asbestos in Place, A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials*, 20T-2003, at vii (7/90).

[7] *See* D. Brown, *N.Y. Deaths, Dust Pose Little Threat, Health Experts Say*, WASH. POST, (9/19/01), at A.24 (EPA assured the public that "the dust generated by the collapse of the World Trade Center towers [does not] pose a risk to public health. . . . . Although the dust contains asbestos, the airborne concentrations are within permissible levels in places to which the public has access.").

USG B 0192

claimants' proffered expert causation evidence that fails to satisfy the *Daubert* criteria for reliability and reproducibility or the Federal Rules of Evidence.[8]  After the Court has determined what evidence survives, Debtors will object and file motions for summary judgment based on the science and causation defenses set forth herein. The following chart captures the science and *Daubert* defenses, which claimants are affected by each defense, and the expected impact for each.

---

[8] *E.g.*, Fed. R. Evid. 702 (governing admissibility of expert testimony).  The Advisory Committee Notes accompanying Rule 702 explain that the rule was amended in 2000 in response to *Daubert* and *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167 (1999).  "The amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony.  Consistently with *Kumho*, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful.  Consequently, the admissibility of all expert testimony is governed by principles of Rule 104(a).  Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."

USG B 0193

## DEFENSES RELATING TO LACK OF INJURY OR CAUSATION

| | | | |
|---|---|---|---|
| **UNIMPAIRED CLAIMS**<br><br>*Section VII* | Pleural and asbestosis claims failing to allege clinical impairment | 148,751 claims with either an FVC $\geq$80% or no lung impairment score whatsoever | • Expert affidavits<br>• Scientific and medical articles |
| **OCCUPATIONS W/ INSUBSTANTIAL EXPOSURES TO ASBESTOS**<br><br>*Section VIII* | Claimants who cannot establish reliable evidence of on-the-job exposure | Roughly estimated at tens of thousands of claims | • Expert affidavits<br>• Epidemiological, medical, industrial hygiene articles<br>• U.S. Dept. of Labor publications |
| **LUNG CANCER**<br><br>*Section IX* | Lung cancer claims that are (1) not primary & (2) not accompanied by asbestosis | At least 6,681 claims | • Expert affidavits<br>• Epidemiological and medical articles |
| **"OTHER" CANCERS**<br><br>*Section X* | Non-lung cancers (larynx, GI tract, colorectal) | 6,940 claims | • Expert affidavits<br>• Medical and epidemiological articles |
| **UNRELIABLE DIAGNOSTIC TECHNIQUES**<br><br>*Section XI* | Claims based on un-reproducible diagnostic techniques (ILO, PFT) unless performed in accordance with scientifically reliable procedures | At least 55,000 claims | • Expert affidavits<br>• Scientific and medical articles<br>• Independent science panel reviews (Fed. R. Evid. 706) |

C.    FACIALLY DEFICIENT CLAIMS.

Weeding out facially deficient claims at the outset will reduce clutter and identify the pool of Proofs of Claim to which B&W's defenses should be applied. Accordingly, B&W

13

USG B 0194

will file objections to claimants who either failed to complete the form or to comply with the Court-ordered instructions, or who otherwise do not belong in the pool of claims to be considered. Some of these objections – such as claims paid in full before the Petition Date – should be disallowed outright. In other cases, claimants may assert that they should have leave to amend the if POC's with regard to certain deficiencies – such as lack of signature, or failure to complete key sections regarding medical condition or exposure data – if they can satisfy the "excusable neglect" standard.[9] In either event, the deficiency needs to be dealt with promptly to ensure efficient overall resolution of the claims.

| FACIAL POC DEFICIENCIES | | |
|---|---|---|
| Deficiency | Estimated Impact | Result |
| DUPLICATE POC'S | 4,091 claims | • Disallow first-filed claim |
| CLAIMS PAID IN FULL | 5,601 claims | • Disallow all claims unless claimant shows cause that new disease is being asserted |
| EMPLOYEE CLAIMS | Est. 2,000 claims | • Disallow all claims unless claimant shows that intentional-tort claim being asserted |
| NO SIGNATURE | 25,087 claims (2,312 completely unsigned, *plus* 22,775 rubber-stamped) | • Disallow all claims unless "excusable neglect" demonstrated |
| KEY MEDICAL INFORMATION MISSING | 12,291 claims providing no medical records whatsoever _plus_ 8,804 claims providing no first year of diagnosis | • Disallow all claims unless "excusable neglect" demonstrated |

---

[9]  Bankruptcy Rule 9006(b)(1) empowers a bankruptcy court to permit a creditor to file a late claim if the failure to meet the deadline "was the result of excusable neglect." *See Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 382 (1993).

USG B 0195

| Deficiency | Estimated Impact | Result |
|------------|------------------|--------|
| KEY EXPOSURE INFORMATION MISSING/INCOMPLETE | 9,712 claims missing first or last years of exposure or both<br><br>*plus*<br><br>505 POC's that left exposure section blank | • Disallow all claims unless "excusable neglect" demonstrated |

Five deficiencies apparent from the face of the POC's will be addressed. **_First_,** more than 4,000 duplicate Proofs of Claim must be disallowed. **_Second_,** Debtors will seek to disallow 5,601 POC's which were paid in full by B&W before the Petition Date. Although it is possible that a few of these claims were paid for a low-grade injury and have recently manifested a more severe disease, such events were exceedingly rare in B&W's 20-year history of paying asbestos claims, and the claimant can so specify if that is the case here.

**_Third_,** Debtors will object to claims alleging injuries arising out of the scope of employment with one of the Debtors. During this Chapter 11, B&W has continued to pay asbestos-related employee claims through the workers compensation system, just as it did before the Petition Date. Employee claims were not intended to be part of the Bar Date process and this Court so provided in its orders establishing the Bar Date and approving the claims form. Accordingly, unless the claimant is alleging an exception to the workers compensation scheme for intentional tort – again, an exceedingly rare event in B&W's experience – claims of current and former employees do not belong in this Chapter 11. Using B&W employee, pension and retirement records, Debtors have already identified approximately 2,000 POC's submitted by or on behalf of current or former employees.

15

USG B 0196

*Fourth* , Debtors will seek to disallow claims lacking signatures (2,312 POC's) or whose signatures were literally rubber-stamped (22,775 POC's), or at least require a showing of "excusable neglect" with regard to such claims.[10]

*Fifth,* Debtors will object to Proofs of Claim that failed to provide essential medical information. 12,291 POC's did not attach any medical records, which was required.[11] More than 9,000 additional POC's failed to provide the first-year of diagnosis for their asserted medical condition (8,804 POC's) or failed to provide any medical information on the form whatsoever (886 POC's). Year of diagnosis is critical to determining whether the asserted medical condition arose after the minimum possible latency period following exposure. Claims failing to provide the required medical information, as required by the Court,[12] should be disallowed.

*Finally,* Debtors will object to at least 10,000 Proofs of Claim that failed to provide exposure data as required, including:

---

[10] The signature requirement was not clerical but was integral to the submission of a valid Proof of Claim. As ordered by this Court, Part 4 of the form requires the claimant or the claimant's authorized agent to sign, under oath and threat of perjury: "To the best of my knowledge, the information contained in this PROOF OF CLAIM is true and complete." The first page of the POC form itself states in large italics: "*IN ORDER TO BE VALID, THE PROOF OF CLAIM MUST BE SIGNED BY THE CLAIMANT OR THE CLAIMANT'S AUTHORIZED AGENT OR THE CLAIMANT'S ATTORNEY.*" If the claimant or the appropriate agent would not attest to the basic identification, medical and exposure information contained in the form, then the POC is not valid.

[11] The POC Instructions specifically require "that the injured party attach copies of any and all diagnostic reports supporting all claimed asbestos-related medical conditions referred to on the Claim Form, such as copies of x-ray reports, ILO ratings, and lung function test results."

[12] Part 2 of the POC and the court-approved Instructions (p. 3) require the claimant to provide the first year that claimant's condition was diagnosed. The Instructions further caution that: "Failure to complete any section will be interpreted to mean the injured party does not have the specified injuries, conditions, or test results addressed in that section."

16

USG B 0197

- 3,310 POC's that failed to provide both first and last year of exposure;

- 6,157 POC's that failed to provide a last year of exposure;

- 245 POC's that failed to provide a first year of exposure; and

- 505 POC's that completely failed to complete Part 3 - Exposure as required.

Exposure is vital to determining, among other things, whether a claimants' exposure (1) was of sufficient duration to cause harm, (2) occurred in the right temporal sequence, since a claim cannot be actionable if, for example, a claimant's last exposure took place before B&W built a boiler at the site, (3) had a sufficient minimum latency period before onset of disease, or (4) took place at a time that is subject to various defenses (e.g., Debtors assert that exposures after implementation of OSHA regulations in 1971 are not actionable under a variety of defenses). That is why the Instructions approved by this Court required exposure and other data on the Proof of Claim form to be filled out completely. (Instr., p. 4) A POC failing to submit this information fails to assert a *prima facie* case against Debtors and should be disallowed.

## II. DEBTORS PROPOSE THE FOLLOWING CLAIM OBJECTION PROCEDURES, WHICH HAVE ALREADY PROVED WORKABLE FOR SETTLED CLAIM OBJECTIONS.

B&W will object to claims and move for summary judgment pursuant to procedures similar to those approved by Judge Brown for settled claims[13], which have already proved fair and workable in the claim allowance procedures for settled claims underway in the Bankruptcy Court. Specifically, B&W will file an objection and move for summary judgment with regard to one or more exemplar claimants in a particular category (*e.g.*, "Product ID,"

---

[13] *See* 5/29/01 Order, Ex. D to accompanying B&W Report to the Court.

17

USG B 0198

government contractor, "other" cancers). After notice, the claim will be determined in

connection with procedures to be determined by the Court, including briefing, *Daubert* motions

seeking to exclude scientific evidence that is not reliable or reproducible, and any hearings that

may be needed. If the Court sustains the objection and enters summary judgment, B&W will

then file omnibus objections/summary judgment motions applicable to all similarly-situated

claimants and provide notice to all affected claimants. The recipients of the omnibus objection

would then have the choice of conceding their failure of proof (as has happened with thousands

of Settled Proofs of Claim already) or contesting the objection by showing cause why their

claims should not be disallowed. The Court would then rule on any contested claims. This

procedure protects each claimant's due process rights, while still providing an effective

mechanism for resolving large numbers of claims.

　　　　To illustrate, with regard to the "Product ID" defense, B&W would object and

move for summary judgment with regard to one or more exemplar Proofs of Claim that fail to

show any nexus between the claimant and B&W. The objections will be supported by affidavits

showing, by reference to B&W boiler records, that the respective Proofs of Claim failed to

identify any connection to a B&W boiler. After receiving notice, the exemplar claimants would

have to demonstrate, by memoranda, affidavits, or any other appropriate showings, why their

claim should not be disallowed. The Court could take evidence at a hearing if necessary –

although Debtors believe hearings can be limited, since the Proof of Claim form itself provides

most of the needed information. If the objection/motion is granted, B&W would file an omnibus

objection identifying all similarly situated claimants that cannot show any connection to a B&W

boiler; any claimants contesting the omnibus objection would have to show cause why their

18

USG B 0199

claim should not be disallowed; and the Court would make rulings on contested objections after appropriate briefing and additional hearings, if necessary.

In connection with both exemplar and omnibus objections, claimants bear the burden of proof. Of course, basic tort law requires the plaintiff to bear the burden of proving every element of his or her claim.[14] This includes, obviously, proving injury and causation. *See, e.g., DiSantis v. Abex Corp.*, 1989 WL 150548 at *2 (E.D. Pa.) (defendant cannot be liable "unless it is proven the plaintiff was exposed to asbestos from a product manufactured or sold by that defendant and that such exposure was the proximate cause of the plaintiff's injury").[15] So too with tort claimants who file a Proof of Claim in bankruptcy. Not only does the claimant bear the initial burden of establishing "a *prima facie* case against the debtor's assets,"[16] but if the debtor brings forth evidence rebutting the proof of claim – as B&W will do here – the ultimate burden

---

[14] *See, e.g., Eiting v. Godding*, 214 N.W.2d 241, 243 (Neb. 1974) (plaintiff's burden to prove each essential element of negligence claim).

[15] *See also, e.g.,Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 69-70 (Tex. 1989) (citing cases for proposition that plaintiffs bear the burden of proving by a preponderance of the evidence that the individual defendant was a causal factor); *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482-83 (11th Cir. 1985) (Georgia law) (to satisfy proximate causation, plaintiff must "show[] that his injuries were caused by exposure to products manufactured or used by [the defendant]").

[16] *See In re Fidelity Holding Co.*, 837 F.2d 696, 698 (5th Cir. 1988); *In re FIRSTPLUS Financial, Inc.*, 248 B.R. 60, 70 (Bankr. N.D. Tex. 2000) (to be given evidentiary weight, a proof of claim alleging consumer torts must "set forth the facts to support the claim"). Indeed, if a Proof of Claim is not timely and completely filled out as required by the Court, it cannot even be considered a timely and valid claim. *See In re Standard Insulations*, 138 B.R. 947, 954 (Bankr. W.D. Mo. 1992) ("completion and timely filing of the court-approved claim form is a prerequisite to allowing personal injury and wrongful death claims"); *In re A.H. Robins Co.*, 862 F.2d 1092, 1095 (4th Cir. 1998).

USG B 0200

of proof rests with the claimant, who "must produce additional evidence to prove the validity of the claim by a preponderance of the evidence."[17]

More specifically, Debtors propose the following sequence of steps. *First*, in connection with a status conference, and/or initial hearing, the Court should enter a Case Management Order establishing (a) the sequencing and timing for its consideration of the various categories of claim objections/defenses; and (b) the procedures or "protocol" for litigating the objections/defenses.

*Second*, Debtors will file exemplar objections and summary judgment motions to the initial categories of claim objections to be considered by the Court, and subsequently will do the same for all succeeding categories, according to the calendar of exemplar objections established in the Case Management Order. The Debtors' objections and summary judgment motions would set forth Debtors' factual and legal arguments as to: choice-of-law rules governing its defenses to such exemplar claims; the proper substantive law to decide the validity of the Debtors' objections; and the facts showing why the exemplar claims should be disallowed.

Each exemplar objection would be served by first-class mail to the holders of the disputed claims to the address provided on the Proof of Claim. Holders of the disputed claims would have 30 days to file a response. Such response would have to be in writing, filed with the Court, and served on Debtors; comply with applicable Federal Rules of Civil Procedure, Bankruptcy Rules and the Local Rules of this Court; and set forth all facts, documents, affidavits, and arguments, supported by a sufficient memorandum of law, in support of the purported claim.

---

[17] *Fidelity Holding*, 837 F.2d at 698; *see also In re Express One Int., Inc.*, 243 B.R. 290, 293 (Bankr. E.D. Tex. 1999).

USG B 0201

Because the Proof of Claim form is intended to provide most of the information needed, wide-scale discovery should not be necessary. Accordingly, no discovery should be authorized unless a party shows good cause and obtains Court approval therefor.

*Third*, after the Court rules on the exemplar objections/motions in a particular category, for any category where Debtor has prevailed on the exemplar objections, Debtors will file omnibus objections and summary judgment motions as to all similarly situated claims. Each omnibus objection would identify in the body of the objection, or in an appendix made part of the motion, the specific claims objected to by Debtors. Disputed claims would be identified by claim number and by the name and address of the claimant, as provided on the Proof of Claim. Each omnibus objection would be served by first-class mail to the holders of the disputed claims to the address provided on the proof of claim.

To the extent holders of disputed claims elect to contest Debtors' objection, such claimants would have 30 days to file a response showing cause why the Court's exemplar rulings do not govern their situation. Such responses must be in writing, filed with the Court, and served on Debtors; comply with applicable Federal Rules of Civil Procedure, the Bankruptcy Rules and the Local Rules of this Court; and set forth all facts documents, affidavits, and legal arguments in support of the purported claim. Here again, discovery would be limited and would take place only upon a showing of good cause and need.

21

USG B 0202

## CONCLUSION

For all foregoing reasons, Debtors request that the Court adopt the proposed procedures for litigating asbestos personal-injury claims.

Dated:  October 18, 2001

Respectfully submitted,

KIRKLAND & ELLIS

David M. Bernick
John Donley
Theodore L. Freedman
200 E. Randolph Drive
Chicago, Illinois  60601
Telephone:  312-861-2000

-and-

HELLER, DRAPER, HAYDEN, PATRICK &
HORN, L.L.C.
Jan M. Hayden (#6672)
650 Poydras Street, Suite 2500
New Orleans, LA  70130-6103
Telephone:  504-568-1888
Fax:  504-522-0949

Co-counsel for Debtors

USG B 0203