IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | **Chapter 11** |
| **USG CORPORATION,** | : | |
| a Delaware corporation, et al., | : | Jointly Administered |
| | : | Case No. 01-2094 (JKF) |
| Debtors. | : | |
| _____ | : | |
| **USG CORPORATION, et al.,** | : | |
| | : | |
| Movant | : | |
| | : | |
| v. | : | |
| | : | |
| **OFFICIAL COMMITTEE OF ASBESTOS** | : | Civil Action No. 04-1559 (JFC) |
| **PERSONAL INJURY CLAIMANTS,** | : | Civil Action No. 04-1560 (JFC) |
| **OFFICIAL COMMITTEE OF** | : | |
| **UNSECURED CREDITORS, OFFICIAL** | : | |
| **COMMITTEE OF ASBESTOS** | : | |
| **PROPERTY DAMAGE CLAIMANTS AND** | : | |
| **LEGAL REPRESENTATIVE FOR** | : | |
| **FUTURE CLAIMANTS,** | : | |
| | : | |
| Respondents. | : | |

**MOTION FOR APPROVAL OF DEBTORS' SAMPLING PLAN AND CLAIMANT QUESTIONNAIRE**

| | |
|---|---|
| COOLEY GODWARD LLP | RICHARDS, LAYTON, & FINGER, P.A. |
| Stephen C. Neal (CA 170085) | Daniel J. DeFranceschi (DE No. 2732) |
| Scott D. Devereaux (CA 146050) | Paul N. Heath (DE No. 3704) |
| Five Palo Alto Square | One Rodney Square |
| 3000 El Camino Real | P.O. Box 551 |
| Palo Alto, CA 94306 | Wilmington, Delaware 19899 |
| Tel: (650) 843-5000 | Tel: (302) 651-7700 |

JONES DAY
David G. Heiman (OH 0038271)
Brad B. Erens (IL 6206864)
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Tel: (216) 586-3939

*Counsel for Debtors*

961622 v1/SF
RLF1-2913030-1

TABLE OF CONTENTS

PAGE

I. INTRODUCTION ................................................................................................................ 1

II. SUMMARY OF DEBTORS' CLAIMANT DISCOVERY PLAN .................................... 3

III. ARGUMENT ....................................................................................................................... 6

    A. Debtors Have the Right to Take Discovery in this Proceeding, and the Court Has Indicated Its Intention to Broadly Construe that Right ........................ 6

    B. The Proposed Claimant Discovery is Not Only Relevant to the Estimation, it is Essential to It ............................................................................................. 7

    C. The Proposed Claimant Discovery is Not Unduly Burdensome and Seeks Basic Information that Claimants Routinely Provide ........................................... 9

        1. Debtors' Sampling Plan Limits Discovery to a Fraction of the Present Claimants ...................................................................................... 10

        2. Debtors' Questionnaire Seeks Only the Key Information That Claimants Would Have to Have in Order to File and Prosecute Their Claims ................................................................................................ 10

    D. The ACC's Opposition to Statistical Sampling is Contrary to Precedent and to the ACC's Own Statements .................................................................... 11

IV. CONCLUSION .................................................................................................................. 13

## TABLE OF AUTHORITIES

PAGE

**CASES**

*In re Decker*
  199 B.R. 684 (B.A.P. 9th Cir. 1996) ............................................................................. 6

*In re Symington*
  209 B.R. 678 (Bankr. D. Md. 1997) .............................................................................. 6

*Miller v. Air Line Pilots Ass'n*.
  108 F.3d 1415 (D.C. Cir. 1997) ................................................................................... 12

**STATUTES**

Federal Rules of Bankruptcy Procedure 9014(a), (c) ......................................................... 6

Federal Rules of Bankruptcy Procedure 7026 .................................................................... 6

Federal Rules of Bankruptcy Procedure 7028-7037 .......................................................... 6

**OTHER AUTHORITIES**

Joseph N. Gitlin, et al.,
  *Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos-Related Changes*,
  11 Academic Radiology 843 (2004) ............................................................................. 8

*Manual for Complex Litigation, Third* § 21.493 .............................................................. 12

R.B. Reger, et al.,
  *Cases of Alleged Asbestos-Related Disease: a Radiologic Re-Evaluation*,
  32 Journal of Occupational Medicine, 1088 (1990) ..................................................... 8

I.   **INTRODUCTION.**

At the June 13, 2005 hearing, the Court ordered the creation of a joint discovery plan that would enable each party to gather the evidence it plans to present in the estimation of Debtors' asbestos personal injury liability (the "Estimation").[1] The Court admonished the parties to "keep in mind" that "each side is entitled to get what they believe that they need, even if you don't think they need it." (Hr'g Tr. at 77, June 13, 2005.) The Court also said it would be inclined to grant reasonable discovery with "any remote relevancy" and that the parties should work toward agreeing to discovery unless "[they are] absolutely a hundred percent certain that there is no value whatsoever." (*Id.* at 76-77.) Despite these clear instructions, the ACC remains unwilling to consent to one of Debtors' most basic requests – discovery of a representative sample of the present personal injury claimants.

As Debtors have explained previously in meet and confer sessions, in numerous filings, and in open court, they intend to take limited discovery of a statistically representative sample of 1000 of the approximately 150,000 present claimants. This discovery will determine the key characteristics of the sample claims – such as their exposure to U.S. Gypsum products, their occupational exposure to asbestos, and whether they have actual injury – to assist the Court in estimating the number of present and future claims that are likely to be valid and payable. As explained by Debtors' expert statistician, Dr. Stephen E. Fienberg, information from this representative sample may be accurately extrapolated to the entire claimant population for purposes of estimation. Debtors have provided the ACC with a detailed plan for selecting a

---

[1] The terms "Debtors" and "the ACC" will have the meanings given them in Debtors' April 26 Brief Regarding Request for Discovery in Advance of Hearing on Issues to be Considered in Estimation, D.I. 10. The April 26 Joint Statement of the Asbestos Personal Injury Creditors Committee and The Legal Representatives for Future Asbestos Claimants Regarding Discovery in Advance of Hearing on Methodology for Asbestos Personal Injury Estimation, D.I. 11, is referred to herein as the "ACC's April 26 Joint Discovery Brief." Debtors' May 26, 2005 Response to the ACC's April 26 Joint Discovery Brief, D.I. 16, is referred to herein as "Debtors' May 26 Response to the Joint Discovery Brief."

random, statistically significant sample of claimants ("Debtors' Sampling Plan," attached hereto as Exhibit A.) Debtors also have prepared a draft questionnaire to be submitted to each of the sample claimants. ("Debtors' Questionnaire," attached hereto as Exhibit B.) Debtors' Questionnaire is narrowly tailored to answer the fundamental questions of claim validity: does the claimant have reliable evidence of an asbestos-related injury and can the claimant show that U.S. Gypsum's products were a legal cause of that injury?

Despite the obvious relevance of this information, and despite this Court's June 13 directive, the ACC is not willing to consent to claimant discovery. They argue that claimant discovery would be both irrelevant and unduly burdensome and that "the entire exercise should be prohibited." (August 12, 2005 Joint Report of Parties on Proposed Discovery Schedules and Deadlines ("August 12 Joint Report on Discovery"), D.I. 34 at 11.). The ACC appears to have no interest in negotiating a claimant discovery plan that both sides agree is fair and efficient.

Claimant discovery is not only relevant, it is indispensable to the evidence Debtors will present during the estimation. Debtors expect to show that a large percentage of claimants had medically meaningless, or even zero, exposure to U.S. Gypsum's products. Indeed, many of these claimants did not work in occupations or industries where they would have had contact with U.S. Gypsum's products. But Debtors cannot demonstrate these facts to the Court if they are blockaded from learning anything about the claimants. Similarly, Debtors plan to establish that tens of thousands of claimants have no trustworthy diagnosis of an asbestos-related injury. If the ACC is permitted to keep the claimants' medical records hidden, however, this too will be impossible to show.

In addition to being essential to this Estimation, the claimant discovery Debtors propose is designed to minimize the burden on claimants, the parties, and the Court. The 1000 individual

claimants selected for discovery need only respond to a single questionnaire and a limited document request for the pertinent medical and legal records. A small portion of the 1000 sample claimants may also be asked to submit to deposition. By limiting discovery to less than one-percent of the 150,000 claimants, Debtors have significantly lessened the burden and expense of gathering and analyzing the claimant discovery.

Given the vital nature of this information and the potentially billions of dollars at stake in these proceedings, the ACC's argument that this discovery is unduly burdensome is insupportable. The sample claimants are being asked only for the basic information that supports their claims. The remaining 99% of claimants are being asked for nothing. If, as the ACC maintains, the claims pending against U.S. Gypsum have merit, then providing the skeletal level of proof sought in Debtors' Questionnaire is certainly not too much to ask of claimants.

Accordingly, Debtors move the Court to approve Debtors' Questionnaire and to order the immediate commencement of sample claimant discovery pursuant to Debtors' Sampling Plan.

## II.   SUMMARY OF DEBTORS' CLAIMANT DISCOVERY PLAN.

Debtors propose to send a brief questionnaire and request for supporting documents (*see* Exhibit B) to a representative sample of 1000 present claimants. Where, as here, examining the entire claimant population would be very costly, discovery of the key characteristics from a representative sample of subjects can allow the Court to make reliable predictions, with known margins of error, about the overall population. This information, combined with the parties' expert testimony, will enable the Court to draw conclusions regarding the proportions of valid and invalid asbestos personal injury claims at issue and to account for those conclusions in its estimation of Debtors' total liability.

As explained in Debtors' Sampling Plan, the 1000 claimants will be chosen from two 500-claimant sub groups: (1) claimants whose primary or secondary occupations were in the

construction industry and (2) claimants whose primary and secondary occupations were not in construction.[2] These two 500-claimant sub groups will be further stratified according to the claimants' alleged injury, with 100 claimants randomly chosen[3] from each of the following categories: mesothelioma, lung cancer, other cancers, non-malignant asbestos disease, and alleged injury unknown. Thus, the total of 1000 sample claimants will be broken down as follows:

| # of Randomly Selected Claimants | Construction | Non-Construction |
|---|---|---|
| Alleged Mesothelioma | 100 | 100 |
| Alleged Lung Cancer | 100 | 100 |
| Alleged Other Cancer | 100 | 100 |
| Alleged Non-Malignant Asbestos Disease | 100 | 100 |
| Alleged Injury Unknown | 100 | 100 |

When the questionnaires from the sample claimants have been returned and analyzed, those results can be extrapolated to enable valid inferences to be drawn about the entire claimant population. Accepted mathematical formulas dictate how extrapolation is done.

Assume, for example, that Debtors present credible evidence to the Court that asbestos exposures falling below a threshold of 5 fibers/cc-year are medically insignificant in the causation of non-malignant asbestos disease. That information would be useless in the Estimation absent further information about the percentage of the claimants who likely have exposures above or below that threshold. That proportion can be accurately estimated by

---

[2] Information as to the industries in which claimants worked is available in the database of the records of the Center for Claims Resolution ("CCR"). Debtors provided the CCR database to the ACC in 2002.

[3] The method for constructing the sample is set forth in Debtors' Sampling Plan and in the declaration of Debtors' expert statistician, Dr. Steven E. Fienberg ("Fienberg Decl."), in paragraph 26.

looking to Debtors' sample of claimants alleging non-malignant asbestos disease and calculating what proportion of those claimants have exposures above 5 fibers/cc-year.

As set forth in the accompanying declaration of Dr. Feinberg, using a sample of 200 claimants alleging non-malignant disease, it can be estimated, with 95% confidence, that the proportion of such claimants in the overall population with exposures under the threshold will be within approximately +/- 7% of the proportion in the sampled population. (Fienberg Decl., ¶ 24.) As Dr. Fienberg further explains, the "error bounds" of 7% are the *maximum* error bounds that would be statistically expected from a sample of 200. (*Id.*) The maximum margin of error applies only if the sample happens to be distributed equally below and above the threshold level. (*Id.* at 25.) If either relatively low or relatively high numbers of claimants in the sample have exposures that exceed the threshold, the error bounds will tighten significantly. (*Id.*) For instance, if the sample were distributed 90% below and 10% above the threshold or 90% above and 10% below, the margin of error would be approximately ± 4%. (*Id.*)

While this exposure analysis is only an example, it illustrates the power and efficiency of using statistical sampling to gather information about a massive group of claimants. For any given binary characteristic[4] that can be determined for a sample of claimants, Debtors' expert statistician can compute, with 95% confidence, the maximum likely presence of that characteristic in all claimants.

---

[4] A binary characteristic is one that is either present or absent for each claimant. Other examples of binary characteristics that might be relevant to the Estimation are whether or not a claimant alleging non-malignant disease exceeds a particular threshold of pulmonary impairment or whether a lung-cancer claimant also has asbestosis.

**III.    ARGUMENT.**

    **A.    Debtors Have the Right to Take Discovery in this Proceeding, and the Court Has Indicated Its Intention to Broadly Construe that Right.**

Under the Bankruptcy Code, an estimation is a "contested matter" governed by Bankruptcy Rule 9014. Rule 9014 provides that, unless the court orders otherwise, the Bankruptcy Rules applicable to discovery in adversary proceedings (*i.e.*, the Federal Rules of Bankruptcy Procedure 7026 and 7028-7037, which parallel the Federal Rules of Civil Procedure 26, 28-37) apply equally to contested matters. *See* Fed. R. Bankr. P. 9014(a), (c); *In re Symington*, 209 B.R. 678, 689 (Bankr. D. Md. 1997) ("Federal Rules of Civil Procedure 26 through 37, which govern pretrial discovery in the context of Federal civil cases, apply to adversary proceedings and contested matters filed in the bankruptcy court by reason of Federal Rules of Bankruptcy Procedure 7026 and 9014 respectively"); *In re Decker*, 199 B.R. 684, 690 (B.A.P. 9th Cir. 1996) (Klein, J., concurring). Accordingly, Debtors have the right to discovery in this action.

The Court has made clear that it will construe the allowable discovery in this matter broadly. At the June 13, 2005 hearing, the Court repeatedly instructed the parties to be cooperative and to grant each other's discovery requests liberally. The Court stated that "[t]he object here would be that there's fairly broad discovery," and that the Court would be inclined to grant reasonable discovery with "any remote relevancy." (Hr'g Tr. at 76, June 13, 2005.) The Court reminded the parties that "it's a bankruptcy, so everything is open anyway -- or it should be in terms of access to information." (*Id.*) In conclusion, the Court counseled:

> I think you can keep in mind each side is entitled to get what they believe that they need, even if you don't think they need it, so if -- unless you're absolutely a hundred percent certain that there is no value whatsoever . . . I think you strive in the effort of making the discovery doable rather than not doable and try to work it out that way. Is that clear to everybody?

(*Id.* at 76-77.)  The ACC's attempts to block discovery of a sample of claimants is inconsistent with this Court's directive.

Debtors' efforts to negotiate an approach to claimant discovery that would be mutually agreeable to both sides have been fruitless.  Rather than discussing how their objections to Debtors' Questionnaire might be remedied (they have thus far stated no objection to Debtors' Sampling Plan), the ACC adheres to the absolute view that the discovery Debtors want would be irrelevant, unusable, and impossibly burdensome.  (*See* Joint Report on Discovery at 11.)

The ACC's intractability is not surprising.  From the outset of these proceedings, they have worked to ensure that the Court (both this Court and the previous one) would never be in a position to consider the merits of the claims in the Estimation.  The ACC's refusal to agree to any claimant discovery is another facet of this tactical approach to the litigation.  They maintain that the claimants are entitled to seize possession of Debtors' estate, and simultaneously refuse to permit the discovery that would prove or disprove that claim.

But, as the Court has now ordered the parties to proceed with gathering the evidence they require for Estimation, the ACC should no longer be permitted to obstruct these proceedings.  As shown below, the proposed sample claimant discovery is plainly relevant, not unduly burdensome, and entirely appropriate for use in the Estimation.  The ACC's objections should be overruled, and Debtors should be permitted to move forward as the Court instructed them to at the last hearing.

> B.   **The Proposed Claimant Discovery is Not Only Relevant to the Estimation, it is Essential to It.**

The Court is, by now, familiar with the five substantive issues of claim validity that Debtors plan to present for consideration.  In the absence of information about the claimant population at issue, it would be virtually impossible to address these issues in the Estimation.

Take Debtors' exposure defense, for example. Debtors experts will show that there is a scientific consensus that certain low levels of asbestos exposure do not measurably or meaningfully contribute to the risk of disease. Consequently, Debtors will argue that claimants whose exposures fall short of this threshold will be unable to establish that U.S. Gypsum's products were a legal cause of their alleged injuries. Even if the Court is persuaded that Debtors' experts are correct, however, in the absence of any information as to how much exposure to U.S. Gypsum's products the claimants experienced, the Court will be unable to apply its conclusions to the Estimation. Without information regarding the claimants' work histories and the circumstances of their alleged exposures, there will be no way to estimate how many claimants did or did not have *de minimis* (or zero) exposure to U.S. Gypsum's products.

Similarly, Debtors believe an analysis of the claimants' medical records will show that the majority of claimants have no credible evidence that they have sustained an asbestos-related injury. Recent scientific and medical studies have found that objective reevaluations of the findings of certain plaintiff B-readers reveal massive levels of misdiagnosis.[5] But, if Debtors are denied discovery of a representative sample of claimants' medical records, even rampant inaccuracies in plaintiffs' diagnoses will be impossible to identify.

The relevance of claimant discovery is undeniable. As Debtors noted in the August 12 Joint Report on Discovery, Judge Judith Fitzgerald has recently approved a claimant questionnaire very similar to the one at issue here in the *In re W.R. Grace* bankruptcy. (*In re*

---

[5] *See* Joseph N. Gitlin, *et al.*, *Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos-Related Changes*, 11 Academic Radiology 843 (2004) (Attached to Debtors' May 26 Response to Joint Discovery Brief, Appx. Vol. 2, Tab 15) (while plaintiffs' readers who found abnormalities in 95.9% of 492 radiographs, an independent panel of readers found abnormalities in only 4.5%); R.B. Reger, et al., *Cases of Alleged Asbestos-Related Disease: a Radiologic Re-Evaluation*, 32 Journal of Occupational Medicine, 1088 (1990) (Attached to Debtors' May 26 Response to Joint Discovery Brief, Appx. Vol. 2, Tab 16) (compared to plaintiffs' readers who found evidence of asbestos exposure in 439 of between 700 and 750 tire workers screened by radiograph, 3 independent radiologists found at most 2.5% to 3.6% of 439 tire workers had evidence of exposure).

*W.R. Grace & Co.*, Hr'g Tr. at 175, July 19, 2005 ("*W.R. Grace* July 19 Tr."), cited portions attached hereto as Exhibit C.)  As Judge Fitzgerald explained:

> If the debtor wants to produce its evidence based on one model, and [the ACC wants] to produce [its] evidence based on another, do it. I'll figure out which model has better credibility and makes more sense [] doing (*sic* "during") adjudication. I mean that's what my job is. Yours is to produce the evidence, the way you think it should come in, and my job is to make rulings based on the evidence you produce, and that's how we'll go.
> …
> My bottom line position is I think a questionnaire to the extent that the debtor or the other parties want to do discovery is fine.

*Id.* at 171-72, 175.

Claimant discovery is not only relevant, it is an absolutely *vital* component of the evidence Debtors intend to present in the Estimation.  To deny claimant discovery is to preemptively deny Debtors the opportunity to meaningfully explore the merits of the underlying claims.  As the Court has already made clear that it intends to at least hear merits evidence in the Estimation, claimant discovery must be granted.

**C.     The Proposed Claimant Discovery is Not Unduly Burdensome and Seeks Basic Information that Claimants Routinely Provide.**

During the meet and confer process, and again in the August 12 Joint Report on Discovery, the ACC argued that Debtors' proposed claimant discovery must be denied because completing Debtors' Questionnaire and providing the requested medical and litigation records would unduly burden the claimants.  The proposed claimant discovery is not unduly burdensome, first, because Debtors' Sampling Plan limits the obligation to respond to Debtors' Questionnaire to less than 1% of claimants, and, second, because the information sought in Debtors' Questionnaire is the basic information that claimants would have to produce to pursue their claims in the tort system.

1.  **Debtors' Sampling Plan Limits Discovery to a Fraction of the Present Claimants.**

Debtors' willingness to sample 1000 claimants, rather than to collect discovery from every one of the 150,000 claimants, has reduced the burden on claimants as a whole by over 99%. Judge Fitzgerald ruled that a questionnaire very similar to Debtors' Questionnaire can be sent to *every one of the over 100,000 claimants* in the *In re W.R. Grace* bankruptcy. (*W.R. Grace* July 19 Tr. at 175.) Judge Fitzgerald is not the first Judge to authorize discovery from every claimant in an asbestos-related bankruptcy action. (*See In re Babcock & Wilcox Co.*, Debtors' July 2, 2002 Motion at 7-8, *discussed in and attached to* Debtors' May 26 Response to Joint Discovery Brief at 9, Appx. Vol. 1, Tab 8.)

Although Debtors may well be entitled to take discovery of every claimant as a matter of law, they have opted to use a statistically representative sample of claimants in order to lessen the burden on the claimants, the parties, and the Court. Given that, in the ACC's view, Debtors' entire collective worth may be at issue in this estimation, the notion that discovery of 1000 sample claimants is too much to ask cannot be accepted. Certainly, it will take time and effort to respond to and analyze the sample claimant discovery, but this burden does not remotely approach the importance of the issues to be decided and the billions of dollars at issue in this dispute.

2.  **Debtors' Questionnaire Seeks Only the Key Information That Claimants Would Have to Have in Order to File and Prosecute Their Claims.**

Another reason to reject the ACC's claim that the proposed claimant discovery is unduly burdensome is that Debtors' Questionnaire asks only for the key information and documents necessary to allow the Court to critically evaluate the claims, principally: the claimant's alleged injury and the evidence that demonstrates that injury, the claimant's exposure

to U.S. Gypsum's products, the claimant's exposure to other asbestos-containing products, the claimant's occupational history, and the claimant's litigation history. (*See* Exhibit B.) A request for such limited and basic information cannot be construed as overbroad. Debtors have asked for nothing more than the minimum information needed to assess the validity of these claims.[6]

The ACC argues that the information requested in Debtors' Questionnaire is unduly burdensome because it exceeds what would be permitted were the claims litigated in the tort system. (August 12 Joint Report on Discovery at 10.) This is simply untenable. Debtors' Questionnaire, and the medical and legal records it calls for, are equivalent to a single set of interrogatories and a very short document request. In the tort system, claimants would be subject to multiple waves of document requests and written interrogatories. In addition, these claimants, their families, their supervisors, their coworkers, their doctors, and their experts would all be subjected to lengthy depositions.

Moreover, the limited information Debtors request is fundamental to any personal injury claim and should be readily available to claimants and their counsel. Indeed, counsel's ethical obligation to ensure that a good faith claim exists before filing a complaint mandates the collection of much if not all of this information at the outset of the representation.

Debtors' Questionnaire is a narrowly tailored and efficient means to gather the relevant facts from the sample claimants.

### D. The ACC's Opposition to Statistical Sampling is Contrary to Precedent and to the ACC's Own Statements.

The use of statistical sampling is a well-accepted alternative to impracticably costly and time-consuming discovery. As the Manual for Complex Litigation explains, "[t]he

---

[6] By contrast, the ACC and FCR have recently served a document request on Debtors seeking essentially all documents related to every one of the over 450,000 personal injury lawsuits ever brought against U.S. Gypsum, whether those suits were resolved 20 years ago or were still pending at the time of bankruptcy.

use of acceptable sampling techniques, in lieu of discovery and presentation of voluminous data from the entire population, may produce substantial savings in time and expense. In some cases, sampling techniques may provide the only practicable means to collect and present relevant data." *Manual for Complex Litigation, Third* § 21.493; *see also Miller v. Air Line Pilots Ass'n*, 108 F.3d 1415, 1425 (D.C. Cir. 1997) (explaining that sampling can provide an appropriate balance between one party's interest in the data and the opposing party's interest in a manageable discovery process). Sampling is particularly appropriate in mass tort litigation, where very large numbers of plaintiffs may be involved.

The ACC has so far refused to raise any specific objection to Debtors' Sampling Plan, taking the position that they cannot criticize the plan and its methodology without seeing how it will be applied in practice. (*See* August 12 Joint Report on Discovery at 13.) Not so. If a party knows the size of a proposed sample, as the ACC does here, the statistical reliability of the sample is calculable before the sample is taken. (Fienberg Decl. ¶¶ 7-18.) In other words, the ACC already possesses all the information required to criticize or endorse Debtors' Sampling Plan. Their apparent belief that they can withhold their criticisms until it is too late for Debtors to make changes to the Sampling Plan to answer them is gamesmanship.

If the ACC has any concerns regarding Debtors' Sampling Plan, Debtors are ready and willing to amend the Plan to address them. If the ACC has doubts that the sample will be sufficiently large or representative, Debtors have no objection to increasing the sample size in one or all of the proposed sub-categories of claimants. However, any objections the ACC opts not to raise now should be deemed waived.

Finally, although the ACC has argued, in these proceedings, that statistical sampling and extrapolation is "highly controversial," impossibly complex, and unworkable, they took a

different position in the *In re W.R. Grace* bankruptcy. In that proceeding, where the ACC is faced with the prospect of having to collect, review, and analyze over 100,000 claimant questionnaires, the ACC has become a proponent of sampling. Indeed, the very counsel for the ACC in this matter explained to Judge Fitzgerald in *W.R. Grace* that she need not require a questionnaire from every Grace claimant and that, with respect to the number of questionnaires required, "[y]ou need whatever the experts would tell you would be a sufficient sample to . . . have it be representative." (*In re W.R. Grace & Co.*, Hr'g Tr. at 133, Jan. 21, 2005, *attached to* Debtors' May 26 Response to Joint Discovery Brief, Appx. Vol. 1, Tab 4.)

The ACC cannot dispute that statistical sampling is an appropriate approach to estimation, and, when sampling is aligned with their strategic interests, they do not dispute it.

### IV. CONCLUSION.

For these reasons, Debtors urge the Court to approve both Debtors' Questionnaire and their Sampling Plan, and to order that claimant discovery commence as soon as practicable.

Dated: August 19, 2005                                         RICHARDS, LAYTON, & FINGER, P.A.

COOLEY GODWARD LLP  
Stephen C. Neal (CA 170085)  
Scott D. Devereaux (CA 146050)  
Five Palo Alto Square  
3000 El Camino Real  
Palo Alto, CA 94306  
Tel: (650) 843-5000

JONES DAY  
David G. Heiman (OH 0038271)  
Brad B. Erens (IL 6206864)  
North Point - 901 Lakeside Avenue  
Cleveland, Ohio 44114-1190  
Tel: (216) 586-3939

   /s/ *Paul N. Heath*  
Daniel J. DeFranceschi (DE No. 2732)  
Paul N. Heath (DE No. 3704)  
One Rodney Square, P.O. Box 551  
Wilmington, Delaware 19899  
Tel: (302) 651-7700