UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | Case No. 01-2094 (JKF) |
| USG CORPORATION, | : | Chapter 11 |
| a Delaware corporation, et al., | : | (Jointly Administered) |
| | : | |
| Debtors-in-possession. | : | |
| | : | |
| USG CORPORATION, et al., | : | |
| | : | |
| Movant, | : | |
| | : | |
| vs. | : | |
| | : | |
| OFFICIAL COMMITTEE OF ASBESTOS | : | Civil Action No. 04-1559 (JFC) |
| CLAIMANTS | : | Civil Action No. 04-1560 (JFC) |
| | : | |
| and | : | |
| | : | |
| LEGAL REPRESENTATIVE FOR FUTURE | : | |
| CLAIMANTS, et al., | : | |
| | : | |
| Respondents. | : | |

**THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS
RESPONSE IN OPPOSITION TO DEBTORS' MOTION FOR
<u>APPROVAL OF SAMPLING PLAN AND CLAIMANT QUESTIONNAIRE</u>**

The Official Committee of Asbestos Claimants (the "Committee" or "ACC"), by counsel, hereby submits its opposition to the Motion for Approval of Debtors' Sampling Plan and Claimant Questionnaire ("Motion"), which was filed by USG Corporation and its debtor affiliates (collectively, "Debtors" or "USG") on August 19, 2005.  The grounds for denying the Motion are as follows:

## PRELIMINARY STATEMENT

To truly understand the unfairness, irrelevancy, and burdensomeness of the Debtors' proposed Sampling Plan and Questionnaire, one must consider the wider context of this bankruptcy proceeding and USG's own experience in the tort system. From the early 1900s through the 1970s, USG and other asbestos defendants knowingly sold asbestos-containing products without adequate warning, exposing tens of millions of Americans to asbestos fibers that USG knew could injure and even kill them. See Barry I. Castleman, Asbestos: Medical and Legal Aspects, 491-92 (2d ed. 1986). As a result, a steadily increasing number of the persons exposed to the asbestos in USG products began to get sick and die from asbestos-related diseases such as mesothelioma, lung cancer, and asbestosis. Due to the long latency periods (up to 40 years or more) between exposure and manifestation of asbestos-related diseases, the full impact of asbestos exposures caused by USG's operations in the 1950s, 1960s, and 1970s did not manifest in claims until decades later. According to any reliable epidemiological projection, the injuries and deaths caused by exposure to the asbestos in USG's products will result in claims for at least the next 40 years.

By the early 1990s, plaintiffs had achieved a pattern of success in asbestos tort litigation, such that "most workers exposed to asbestos recover substantial sums through settlement or jury awards." In re Joint E. and S. Dist. Asbestos Litig., 129 B.R. 710, 749 (E. & S.D.N.Y. 1991), vacated, 982 F.2d 721 (2d Cir. 1993). That success has only increased over the following decade, as both the average jury awards and the average settlement amounts in asbestos personal injury cases have continued to climb – both for cancer claims and for those alleging non-malignant asbestos diseases. Over the decades, from the 1970s until it filed for bankruptcy protection, USG and its lawyers devised litigation strategies and evidentiary requirements for

paying claims which in all instances were designed to – and did – minimize its liability costs. Consistent with elementary tort defense tactics, USG's basic strategy was to attempt to settle any case where the plaintiff had sufficient evidence of liability and damages which, in USG and its lawyers' and claims handlers' view, presented enough of a risk of an adverse jury verdict that USG decided it was more cost-effective to settle the case rather than try it.[1]  As part of its overall strategy, in the vast majority of settlements, USG and other defendants took advantage of the delays in the court system caused by tens of thousands of claims pending at any one time.  Due to the plaintiffs' consequent inability to obtain a trial date, USG settled cases at prices far lower than the plaintiffs could achieve if they were guaranteed a speedy trial date.

To achieve its goal of minimizing its overall asbestos liability, beginning in 1988 USG became an original member of, and remained a member through the functional dissolution in January 2001, of the Center for Claims Resolution ("CCR").  CCR was a claims settlement and cost-sharing consortium of 20 of the most commonly named asbestos defendants who acted jointly to defend, evaluate, resolve, and pay asbestos personal injury claims.  Before paying a claim, CCR required evidence of asbestos-related disease and proof of exposure to the asbestos-containing product for at least one CCR member named in the plaintiff's complaint.  The evidence requirements for settlement varied by jurisdiction and settlement agreement, but in general the disease and exposure requirements remained constant.

Once claimants provided CCR with the requisite evidence of exposure to the product of at least one CCR member, the CCR member defendants did not require additional proof of exposure to each and every member defendants' products before CCR attempted to settle the

---

[1]    Like almost all forms of civil litigation, the vast majority of cases settle before trial.  USG settled (i.e. resolved a case with a payment to the plaintiff) over 80 percent of the claims filed against it.

case with the plaintiff.  Instead, CCR would attempt to settle with the claimant for an aggregate

dollar figure that represented the total liability of all CCR members named in the case (the "CCR

Settlement Payment").  If the parties reached a settlement, then each CCR member named in the

lawsuit would contribute its share allocation of the CCR Settlement Payment for that claim.

Under the cost-sharing rules in place during the late 1990s until the CCR's demise in early 2001,

the cost for each settled claim was divided among the CCR members named in the lawsuit based

on "share allocations," which were assigned to each member based upon the alleged

occupational category or jobsite.  The share allocations were calculated based upon the past

settlement averages of each member, as well as the production and sales history of each member,

including the types of asbestos-containing products sold by a particular member, where the

products were sold, and how the products were used. The underlying purpose of the share

allocations was to provide a fair sharing of costs for each asbestos personal injury complaint that

reflected the relative liability of each CCR member.  See In re Federal Mogul, 1:05-cv-00059,

___ B.R. ____, 2005 WL 2218360 *6-7, slip op. at 15-17 (D. Del. Sept. 13, 2005) (describing

CCR generally and the claims resolution history of from CCR member Turner & Newall, who

filed for bankruptcy protection in 2001) (a copy of the decision is attached as Exhibit 7).

It was widely recognized by the CCR members that this policy of "cross-subsidization" –

in which all CCR members that were named in a lawsuit paid into the settlement of that claim

regardless of whether the plaintiff had provided evidence of exposure to that member's

products – was designed to allocate the overall costs of claims in proportion to the CCR

defendants' liability.  As a result of this policy, USG probably paid some claimants it would not

have paid if it had remained outside the CCR, i.e. claims in which USG was named in a lawsuit

but the plaintiff may not have had sufficient evidence of USG's liability.  But in turn, USG paid

far less on average toward each settled claim because (1) other members contributed to the settlement of primarily USG claims including where those other members might have paid nothing if they were outside of the CCR; and (2) the cost savings and reduced settlement amounts more than offset the cost of paying claims USG would not have paid outside the CCR. See Federal Mogul, 1:05-cv-00059, 2005 WL 2218360 *6-7, slip op. at 15-17.

Indeed, once USG lost the protections of the CCR and had to revert to defending claims as a "stand-alone" defendant, it suffered several multi-million dollar jury verdicts and its average indemnity costs to resolve asbestos personal injury claims more than tripled in less than six months following the dissolution of the CCR. USG quickly resorted to bankruptcy protection.

It is against this factual backdrop that the Court must consider the propriety and appropriateness of USG's proposal to use "sampling" and "individualized discovery" to litigate the "defenses" USG says it has to litigate for asbestos personal injury claims. The proper purpose of estimating tort liabilities in the aggregate is to foster plan confirmation by gauging "the total amount which the claimants, as a group, could legitimately have claimed as compensation, as of the petition date." Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 722 (D. Del. 2005) (Fullam, J.), appeal docketed, No. 05-2578 (3d Cir. May 20, 2005). Estimation for plan confirmation purposes is not designed to litigate the merits of individual claims or groups of claims – that is for the post-confirmation section 524(g) Trust to determine. And, as this Court has previously recognized at the June 13 conference, a court cannot issue categorical rulings disallowing liability or valuing individual clams (or groups of claims) at zero in the estimation process without giving each affected claimant the right to appear, prosecute his claim, and have the claim heard by a jury. 28 U.S.C. §§ 157(b)(5), 1411. Categorical rulings which disallow claims or value claims at zero for estimation purposes violate basic principles of

due process and the right to a jury trial.  <u>See</u> <u>Cimino v. Raymark Industries, Inc.</u>, 151 F.3d 297, 311-21 (5th Cir. 1998).

USG's proposed Sampling Plan and Questionnaire have nothing to do with estimating its asbestos tort liabilities in any aggregate or legitimate sense.  The Debtors' papers still contain no hint of how any expert could offer competent testimony that some types of claims would or would not likely succeed at trial (and thus have "merit"), or how they would value any surviving claims.[2]  However, USG inevitably seeks through its Sampling Motion to have the Court do what due process and the claimants' jury trial rights expressly forbid; namely, to disallow (or estimate at zero) entire classes of claims.  USG's discussion of how it plans to use the results of sampling methodology is telling:

> Assume, for example, that Debtors present credible evidence to the Court that asbestos exposures falling below a threshold of 5 fibers/cc-year are medically insignificant in the causation of non-malignant asbestos disease.  That information would be useless in the Estimation absent further information about the percentage of the claimants who likely have exposures above or below that threshold.  That proportion can be accurately estimated by looking to Debtors' sample of claimants alleging non-malignant asbestos disease and calculating what proportion of those claimants have exposures above 5 fibers/cc-year.

Motion at 4-5.  Thus USG's only basis for the Questionnaire is its stated desire to prove to the Court that USG's own liability criteria are somehow the appropriate legal and medical standards in every case in every state; and then ask the Court to disallow or estimate at zero any "similarly situated" claims which USG or its experts opine could not succeed in the tort system.  Leaving

---

[2]    Logically, if USG's experts are going to opine on whether cases are "valid" in the sense that the plaintiff could overcome each of USG's "liability defenses," the proper metric for valuing the remainder is by reference to verdicts, not to USG's overall settlement averages which take into account all the claims resolved (both strong and weak, the vast majority of which were via settlement).  Post-verdict judgments in the 40 cases tried to judgment returned against USG in the four years prior to its bankruptcy petition averaged well over $1 million, as compared to USG's average settlement payment in 2000-01 (across all types of cases) of approximately $6,000 per case.

aside the fact that its supposed exposure standards are not the law,[3] this approach is not permissible under applicable bankruptcy law.  Indeed, it is difficult to imagine how any "expert" could ever provide admissible testimony that particular claims or groups of claims (which inevitably turn on their specific individualized facts) would be "legally valid" (as opposed to testimony about how similar claims have actually been resolved over hundreds of thousands of similar resolutions which have been the basis for every asbestos bankruptcy estimation to date).

Moreover, in the tort system – which estimation must attempt to replicate – asbestos claims are rarely amenable to summary disposition.  If it were possible under the law to dispense with large numbers of asbestos claims by consolidated summary judgment motions or any other similar process, the resourceful, well-funded and aggressive community of asbestos defendants would have employed it in the tort system long before now and reported the results to this Court in these Motion papers.  However, due process, the individualized fact-intensive nature of asbestos claims, the rules of civil procedure, the Bankruptcy Code, and fundamental fairness to claimants prevent any court from giving short shrift to their claims in the manner Debtors propose.  Debtors are asking the Court to rely on a mirage that can never lead to a confirmable plan of reorganization.  See Cimino, 151 F.3d at 297 (rejecting trial plan that resolved asbestos claims through the trial of issues in representative cases).

---

[3]     As we describe in more detail infra, asbestos disease is caused by cumulative asbestos exposure and the law does not require the plaintiff to prove sole causation with respect to any particular defendant's product.  If a plaintiff has mesothelioma or asbestosis, he or she is not required to prove that the injury was caused solely by exposure to USG's asbestos containing products for USG to be liable, only that the exposure was a "substantial factor" in causing the injury, which is a subject for expert medical testimony and inevitably an individualized determination based on the facts of each individual case.  Given that medical science has established that there is no safe level of exposure to asbestos, it is not surprising that many medical experts are of the view that any identifiable exposure to asbestos fibers can be a significant factor in causing an asbestos-related disease.

It is not appropriate for a debtor to seek to obtain tactical litigation advantages in bankruptcy that are not available to it outside the bankruptcy process.  See In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) (stating that "filing a chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws").  In effect, USG is seeking, through the guise of estimation in this bankruptcy proceeding, to have the Court value claims based on standards and clams-resolution criteria that could never have existed in the tort system before USG filed for bankruptcy.

Given these fundamental flaws, the Court should reject the Debtors' proposed Sampling Plan and Questionnaire as a matter of first principles.  This questionnaire scheme is not aimed at using estimation for the statutorily intended purpose of valuing USG's asbestos liability based on what the claims would be worth in the absence of  bankruptcy, but instead at de-valuing those liabilities and salvaging undue equity for USG's shareholders.  Rather than burdening the estimation process with this improper scheme, the Court should do as other courts have done, most recently in Federal-Mogul and Owens Corning:  It should refuse to authorize any discovery questionnaire or to countenance its inherent delays and costs, and should instead go forward to a hearing on aggregate estimation based on historical data and competent expert testimony.  For all of these reasons set forth infra, the Debtors' Motion should be denied.

In the alternative, if the Court determines to allow USG to gather information that it says it needs to litigate "the five substantive issues of claim validity," Motion at 7, its proposed Sampling Plan and Questionnaire must be shortened as it is tremendously overbroad and unduly burdensome.  USG's proposed Questionnaire primarily seeks information which is solely focused on the particular facts of each sampled claim; and thus is, in large measure, irrelevant to an estimation of USG's aggregate liability.  If this Court (or some court) were to individually try

each of the cases, such broad and individualized discovery might be relevant and permissible (provided, of course, that the automatic stay was lifted and the individual claimants allowed to obtain discovery from USG and prosecute their claims to conclusion in front of a jury). However, such discovery is not the task here and the Questionnaire is hopelessly overbroad as a device for eliciting information relevant to an aggregate estimation.

The Committee has proposed an alternative questionnaire attached as Exhibit 1, which (1) seeks far less information which would be relevant only in the trial of a particular case, yet (2) will provide USG with all of the information needed to litigate each of its alleged defenses, and then extrapolate that result to the claimant population as a whole.[4]  As we show in greater detail infra, USG can litigate each of its five defenses and extrapolate the results to the claimant population in whatever method it chooses based upon the information that would be collected from the ACC's proposed questionnaire.

Finally, the Debtor also asks this Court to approve its Sampling Plan.  The Committee agrees that if the Court allows Debtors to propound discovery to individual claimants, a sampling approach is a less burdensome and costly endeavor than sending a questionnaire to all pending claimants.  However, Debtors are not correct that the statistical reliability and representativeness of the sample can be determined before the Committee and its experts see exactly how the Debtor and its experts actually intend to apply the results of the sampled population to a projection of liability for present and future asbestos claims.  While there are problems with the Debtors' Sampling Plan that are facially obvious, which have been pointed out by the Representative for Future Claimants, Dr. Thomas Florence also notes in his Declaration that until one sees the way in which the sample is actually used by an expert and the conclusions that the

---

[4]     Of course, the Committee does not agree that such an approach is an appropriate methodology by which to conduct an estimation.

expert seeks to draw about the results, it is impossible to identify all of the methodological flaws

with the Sampling Plan.  <u>See</u> Declaration of Dr. B. Thomas Florence, dated September 19, 2005

¶ 5 (attached to the Futures Representative's Opposition to Debtors' Motion for Approval of

Sampling Plan and Claimant Questionnaire) (the "Florence Decl.").

      Moreover, even if it were possible to identify every conceivable flaw in the Debtors'

sampling methodology now, contrary to the Debtors' assertions, the Committee has no obligation

to provide criticisms of the Sampling Plan in a vacuum before seeing the results to which it will

be put.  The Questionnaire and Sampling Plan is not a collaborative effort or an academic

research project; it is the Debtors' proposed discovery in contested litigation.  A party has no

obligation to tell an opponent how to make its discovery more useful or effective.  The

Committee has every right (1) to reserve, until expert rebuttal reports are due, its experts'

rebuttal opinions on the uses to which sample will be put, and (2) to reserve, until the time of a

<u>Daubert</u> hearing or trial its criticisms, cross-examination of and objections to the admissibility of

any opinions based on flaws in the sampling methodology.

<b><u>ARGUMENT</u></b>

**I.     THERE IS AN ESTABLISHED METHOD FOR ESTIMATING AGGREGATE ASBESTOS CLAIMS THAT DOES NOT INVOLVE UNFAIR AND IRRELEVANT "DISCOVERY" OF INDIVIDUAL CLAIMANTS**

     **A.     The <u>Eagle-Picher</u>/<u>Owens Corning</u>/<u>Federal-Mogul</u> Method of Estimating Asbestos Personal Injury Tort and Wrongful Death Claims in the Aggregate is Well-Tested, Workable, and Fair**

      In asbestos bankruptcies, aggregate estimation is frequently a helpful and sometimes a

necessary step in the process of formulating and confirming a plan of reorganization.  It provides

the basis for allocating the value of the estate among the competing stakeholders in the plan

confirmation process.  It is thus integral to a determination of whether the Debtors' stockholders

will be entitled to share in any distribution from the estate.  In such an estimation, the ultimate

issue is:  "[W]hat would have been a fair resolution of the claims in the absence of bankruptcy."

Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 722 (D. Del. 2005).

Three cases, Eagle Picher, Owens Corning, and Federal-Mogul, can and should guide this

Court in how to proceed.  In each of these cases, the courts recognized that the claims history of

the debtors, coupled with analysis of expected future developments, provided ample and reliable

information for the valuation of claims, and that information gathering about specific individual

claims in those cases was unnecessary and would not assist the court in estimation.  There is no

reason for this Court to depart from the well-established approach set forth in these precedents.

Indeed, the traditional method provides the only valid starting point for deriving a reasonable

estimate.

### B.     General Estimation Principles and the Eagle-Picher Case

While courts may use "whatever [estimation] method is best suited to the particular

contingencies at issue," Bittner v. Borne Chem. Co., Inc., 691 F.2d 134, 135 (3d Cir. 1982), the

relevant legal standards for estimation of a company's aggregate asbestos personal injury

liability are set forth in In re Eagle Picher Indus., Inc., 189 B.R. 681, 690-91 (Bankr. S.D. Ohio

1995), Owens Corning, 322 B.R. at 721-25, and Federal Mogul, 1:05-cv-00059, 2005 WL

2218360 *19-21, slip op. at 43-50.  The key holdings from these three decisions are:  (1) the

estimate should seek to determine what the company's liability would have been to pending and

future claimants in the absence of bankruptcy; (2) state law governs the validity and value of the

claims; (3) the claims are to be valued as of the bankruptcy petition date; and (4) the values and

projection of future claims used in the estimate should be based upon the claims history of the

debtor/defendant at issue.  See Eagle Picher, 189 B.R. at 690-91; Owens Corning, 322 B.R. at

721-25; Federal Mogul, 1:05-cv-00059, 2005 WL 2218360 *28-29, slip op. at 60-64. However, "based upon" does not mean "mindlessly extrapolated from," and the Owens Corning, Eagle Picher and Federal Mogul courts all recognized that the estimates must take into account trends in the settlement data and the litigation environment the debtor would face absent bankruptcy. See Eagle Picher, 189 B.R. at 690-92; Owens Corning, 322 B.R. at 721-25; Federal Mogul, 1:05-cv-00059, 2005 WL 2218360 *25-27, slip op. at 55-59.

The leading case on estimating asbestos claims in the aggregate remains In re Eagle-Picher Indus., Inc., 189 B.R. 681 (Bankr. S.D. Ohio 1995). Eagle-Picher involved an estimate of a debtor's liability for purposes of formulating a plan, and the Eagle-Picher estimation was based in part on Eagle Picher's prior payment history. Id. at 684-86. Similar to here, Eagle-Picher was an asbestos bankruptcy case where a section 524(g) trust was contemplated at the time of estimation. The court in Eagle-Picher squarely rejected the argument that a debtor's claims resolution history cannot serve as a basis for estimating its "actual" asbestos liability. The court described the debtor's pre-petition record on disposal of asbestos claims as "a valuable experiential resource" for estimating the value of pending and future claims. Id. at 686. Eagle-Picher established the key considerations that should enter into a court's estimation of present and future asbestos liabilities: (1) the history of the debtor company; (2) the total number of claims expected; (3) the category of disease and occupation; and (4) settlement values for claims close to the bankruptcy filing date. See id. at 690-91. The court further established that in an estimation undertaken for plan formulation and confirmation purposes claims must be valued as of the date on which Debtors filed their bankruptcy petition. See In re Brints Cotton Mktg., Inc., 737 F.2d 1338, 1342 (5th Cir. 1984); Owens Corning, 322 B.R. at 722; Eagle-Picher, 189 B.R. at

686; cf. 11 U.S.C. § 502(b) (noting that, in case of objection to a claim, the court must determine the amount of the claim in dollars "as of the date of the filing of the petition").

More specifically, the estimation method established by Eagle-Picher calls for the expert to (1) take the total number of pending claims for each disease type; (2) discount those totals by the rate at which the particular defendant was able historically to dispose of claims for zero compensation, thus arriving at the total number of claims in each disease category that is likely to receive compensation; (3) compute for each disease category the average compensation paid per claim over a reasonable base period; and (4) multiply the claims likely to be settled in each disease category by the corresponding average settlement value, summing the products of these calculations to arrive at the aggregate liability for pending claims.  A defendant's liability to future claimants can reasonably be estimated by (1) forecasting the future incidence of asbestos-related cancers in the population based on well-known epidemiological studies;[5] (2) computing the "propensity to sue" a given defendant by multiplying the forecasted number of diagnoses by the percentage of those diagnoses that can be expected to give rise to claims against the particular defendant, based on that entity's claims history and observed trends in claiming behavior; (3) forecasting the number of nonmalignant claims as a function of the number of forecasted cancer claims, based on historical relationships between claims against that defendant for malignant and non-malignant diseases and observed trends; (4) valuing the forecasted claims within each disease category by dollar amounts derived from average settlement values computed on the basis of a reasonable base period in that defendant's actual claims history; (5) adjusting those dollar amounts to account for monetary inflation over time, thereby arriving at

---

[5]      Epidemiological studies indicate that asbestos-related malignancies will continue to manifest themselves in the United States until the year 2050.  See Nicholson, Perkel & Selikoff, Occupational Exposure to Asbestos, 3 Am. J. Indust. Med. 259 (1982) ("Nicholson et al.").

the anticipated stream of settlement payments; and (6) using a risk-free rate of return to discount that stream of payments to its present value as of the petition date.[6]

In deriving values to ascribe to pending claims, the appropriate metric is the average claim-resolution costs as they existed before bankruptcy, but at a time reasonably close to the petition date, adjusted to reflect reasonably foreseeable factors, if any, that would affect future values. Computing the average costs over large numbers of claims ensures that all varieties of resolutions (including rejections) are captured and weighted appropriately. Using broad-based averages is the logical way to replicate USG's actual experience when ascribing values to the backlog of tens of thousands of pending and likely future claims.

C.    The Owens Corning Case

The Owens Corning case illustrates that the Eagle-Picher method of estimating aggregate asbestos liability can be manageable, fair, prompt, and efficient, while considering both sides' contentions on how conditions will change in ways that affect projections. See generally Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 720-25 (D. Del. 2005). In Owens Corning, the debtor, the asbestos claimants committee, and the legal representative of future claimants were co-proponents of a plan of reorganization, filed on or about January 19, 2003. Opposition to the plan was led by Credit Suisse First Boston ("Credit Suisse"), as agent for holders of unsecured bank debt. In August 2004, the Honorable John P. Fullam, Sr., in entering an order scheduling a claims estimation hearing, ruled that "the data now available – the Debtor's claim history, the experience in other cases, etc. – viewed in light of the expert testimony at the

---

[6]    This method does not just mechanically extrapolate. It does allow, and in fact requires, consideration of ways in which conditions in the future are likely to differ from those in the past in ways that affect the result, such as increasing claiming rates or restrictive legislation.

scheduled hearing, should probably suffice for Claims Estimation purposes." In re Owens Corning, 00-3837, Order (Bankr. D. Del. Aug. 19, 2004) (attached at Exhibit 2).

In a subsequent unsuccessful discovery motion, Credit Suisse requested that to the court establish a procedure "to obtain a random sampling of already-existing Medical Records, including X-rays, of asbestos personal injury Claimants who have asserted nonmalignant claims against Owens Corning" that was far more limited than what Debtors seek here. Owens Corning, Brief in Support of Motion of CFSB, dated Oct. 4, 2004 at 1 (attached as Exhibit 3).[7] The Court found that "no useful purpose would be served by further delaying matters, and running up additional legal bills, to prove what is already reasonably well known." Owens Corning, Memorandum and Order, dated Nov. 22, 2004 at 2 (attached as Exhibit 4). Judge Fullam observed:

> The relevant data have been available for analysis for many years. The conclusions drawn by experts have long been debated, and will be fully aired at the January hearing. In the unlikely event that the information now available proves insufficient to enable a reasonably correct estimate of future claims, that issue, too, will be considered at the hearing in January.

Id. at 1-2.

Following discovery, a six-day evidentiary hearing took place in January of this year.[8] Less than three months later, Judge Fullam rendered his decision on the merits and estimated Owens Corning's liability in the aggregate for pending and future asbestos-related personal injury and wrongful death claims. See Owens Corning, 322 B.R. at 721-22. The court first reiterated that "[t]he claims being valued arise under state law, hence state law determines their

---

[7]     It would have covered 1,000 claimants, involving only pending nonmalignant claims, and been limited to medical records. Exhibit 3, at 30. Credit Suisse conceded that even its relatively narrow sample would require postponing the estimation hearing by "a period of six months to a year." Exhibit 4, at 1.

[8]     Four fact witnesses and fewer than a dozen expert witnesses testified for all parties.

Case 1:04-cv-01559-JFC    Document 37    Filed 09/19/2005    Page 16 of 37

validity and value," and that "claims are to be valued as of the petition date," Id. at 721

(emphasis added) (citing Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 20 (2000); Bittner v.

Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982); In re Brints Cotton Mktg, 737 F.2d 1338

(5th Cir. 1984)).  Judge Fullam recognized that this "necessarily means that the claims are to be

appraised on the basis of what would have been a fair resolution of the claims in the absence of

bankruptcy."  322 B.R. at 722.  "The values of future claims should be estimated on the same

basis – i.e. what their claims would have been worth in the tort system as it existed on the

petition date," albeit taking into account changes likely to occur and to affect "the number of

such future claims."  Id.

       The court noted that Owens Corning "had disposed of more than 330,000 asbestos claims

pre-bankruptcy, and had compiled a voluminous, and very complete, data-bank of pertinent

information."  Id. at 722.  "As a result of this litigation history, the information available" to

guide the estimation in bankruptcy included:

              (1) how juries evaluated various categories of asbestos claims; (2) the
              percentage of claims disposed of without payment; (3) how the various
              asbestos defendants viewed their comparative liability for the universe of
              asbestos claims throughout the nation (Owens Corning's was about 20%);
              (4) what experienced asbestos litigators on both sides regarded as the
              appropriate settlement value of various types of asbestos-related claims; and
              (5) a rough approximation of the relationship between the number of
              persons affected by asbestos-related diseases and the number of persons
              who would make claims against Owens Corning (propensity to sue).

Id.

       With respect to asbestos-related malignancies, the court found that "[t]here is general

agreement that the values assigned to valid claims for mesothelioma, lung cancer, and other

cancers throughout Owens Corning's litigation history accurately reflect the values such claims

will have in the future."  Id. at 724.  Regarding nonmalignant claims, the court concluded that,

"some of the past results have been skewed by factors which can and should be avoided in the

future," presenting a question as to "the extent to which adjustments should be made to historical values to account for these probable changes."  322 B.R. at 722-23.  The court rejected the contention that an asbestosis claim can be compensated only if supported by pulmonary function tests showing at least a 20% reduction in lung function, as well as the claim that, in order to qualify for compensation, an asbestosis claim must be supported by positive x-ray findings by at least two independent B-readers.  Id. at 724.

Owens Corning's claims history and claims data formed the "mother lode" of information available for evaluation and analysis by the several experts who testified at the estimation hearing.[9]  The range of competing estimates of Owens Corning's liability as testified to by these witnesses was as follows:  $2.08 billion (Dr. Dunbar),[10] $6.5 billion to $6.8 billion (Dr. Vazquez), $8.15 billion to $10.2 billion (Dr. Rabinowitz), and $8.4 billion to $11.1 billion (Dr. Peterson).  After taking account of assumptions and factors likely to require modest adjustments in their estimates, the court opined "that the appropriate figure lies somewhere between Dr. Vazquez's high estimate [$6.8 billion] and Dr. Rabinowitz's low estimate [$8.15 billion]."  Id. at 725.  The court therefore estimated Owens Corning's total liability at $7 billion. Id.

Credit Suisse moved for reconsideration, arguing that the court should have made downward adjustments to account "for over-payments to unimpaired non-malignant claimants."

---

[9]     The asbestos claimants committee offered the testimony of Dr. Mark Peterson, who is the retained claims consultant for the corresponding Committee in this case.  The legal representative of future claimants in Owens Corning relied on Dr. Francine Rabinowitz.  Credit Suisse called as a fact witness Dr. Thomas Vazquez, who had created certain estimates in the past as a consultant to Owens Corning, and Credit Suisse's expert was Dr. Frederick Dunbar of NERA.

[10]    The court pointedly rejected Dr. Dunbar's testimony, observing that "[h]is conclusion that, in the current inventory of 128,000 claims, only about 17,000 will prove compensable cannot be accepted without totally disregarding the historical experience in asbestos litigation." 322 B.R. at 725.

<u>Owens Corning</u>, Motion of Credit Suisse First Boston, as Agent, for Reconsideration, dated

April 11, 2005 at 1 (attached as Exhibit 5).  In language that bears emphasis for purposes of this

case, the court denied the motion:

> I do not adopt the Banks' seeming assumption that to acknowledge that past
> litigation results were skewed to some extent by litigation irregularities
> (forum-selection, mass-screenings, runaway juries, etc.) is equivalent to a
> guarantee that, from now on, no such factors will be present.  <u>This Court
> does not have the authority to change state law.  All cases which can
> survive summary disposition under state law have some potential value.
> The perfect world assumed by the [Debtors'] argument — a world in which
> only persons suffering serious symptoms make claims, symptoms which
> could possibly be caused by something other than asbestos are ruled out,
> reductions in pulmonary function will be disregarded unless they exceed
> 20%, and only multiple X-ray readings will suffice — cannot realistically
> be predicted with assurance</u>.
>
> In short, I merely attempted to arrive at an estimate which
> appropriately reflected the differences between what has already occurred,
> and what is likely to happen in the future.

<u>Owens Corning</u>, Memorandum and Order, dated April 13, 2005 at 1-2 (attached as Exhibit 6)
(emphasis added).

## D.     The Recent <u>Federal-Mogul</u> Decision

Most recently, in the <u>Federal-Mogul</u> case, U.S. District Judge Rodriguez rejected

individual claimant discovery as an appropriate way to estimate aggregate asbestos liability, and

opted instead for the method that the ACC urges here, which is estimating present and future

claims based on data from the Debtors' past claims resolution history.  See <u>In re Federal Mogul</u>,

1:05-cv-00059, ___ B.R. ____, 2005 WL 2218360 *20, slip op. at 43-44 (D. Del. Sept. 13,

2005).  In his decision, in which he found the aggregate asbestos liability in the United States of

Turner & Newall, a Federal-Mogul subsidiary (and like USG, a former CCR member), to be $9

billion, Judge Rodriguez explained:

> Here, the focus is on [the debtors'] aggregate personal injury liability for the
> creation of a trust, <u>not the merits of individual or class of individual claims</u>.  To
> do the latter[] would require that each claimant be afforded the procedural

protections of the due process clause of the Fifth Amendment, thereby requiring cases that presented disputed issues of fact a trial by jury.

Judge Rodriguez continued:

> Thus, the Court finds persuasive the recent <u>Owens Corning v. Credit Suisse First Boston</u> (<u>In re Owens Corning</u>), 322 B.R. 719 (D. Del. 2005) case, and likewise determines that an estimation of asbestos liability for the limited purposes of plan formulation is a fruitful endeavor because it promotes the speed and efficiency goals of the Bankruptcy Code, while not implicating the procedural rights of the individual claimants.  Also similar to <u>Owens-Corning</u> is the fact that <u>this estimation did not involve the discovery of individual claims,</u> but rather an inquiry focused on [the debtors'] historical claims-handling practices. . . . <u>To do otherwise would eviscerate the purposes of the estimation process and place additional financial burdens on the very trust which the Court is trying to create</u>.

<u>Federal Mogul</u>, 1:05-cv-00059, 2005 WL 2218360 *20, slip op. at 43-44 (emphasis added).

Judge Rodriguez's recent decision in <u>Federal-Mogul</u> joins the list of established precedents that provides for an estimation based on prior claims settlement history and not based on burdensome or invasive questionnaires served on individual claimants.  <u>See</u> <u>Owens Corning</u>, 322 B.R. at 724; <u>Eagle Picher</u>, 189 B.R. at 681.  By contrast, the proposed Questionnaire propounded by USG is calculated to be nothing less than unduly burdensome and unfair to individual claimants and will not lead to evidence that is admissible or relevant to an aggregate estimate of liability.  For all of these reasons, the ACC respectfully urges the Court to follow the <u>Owens-Corning</u>, <u>Eagle-Picher</u>, and <u>Federal-Mogul</u> precedents and reject the Debtors' proposed Questionnaire and sampling scheme in its entirety.[11]

---

[11]    As precedent in support of their Questionnaire and Sampling Motion, the Debtors here point to the extensive questionnaire recently propounded by the debtors in the W.R. Grace & Company case to over 100,000 claimants over the extensive objection of the Official Committee of Asbestos Personal Injury Claimants.  For all the reasons stated here and in the arguments before the <u>Grace</u> court, we believe that the court's decision authorizing Grace's questionnaire was wrong.  We believe that the questionnaire results in <u>Grace</u> will not result in any evidence which is admissible or relevant to the estimation of Grace's liability and will likely result in substantial delays as the debtors attempt to compile the information they receive from their questionnaire process.

## II.    IF THIS COURT DECIDED TO PERMIT A QUESTIONNAIRE, DEBTORS' PROPOSED EXAMPLE SHOULD BE DRASTICALLY CONDENSED

As explained in Section I, this Court should not permit Debtors to significantly delay the Court's estimation hearing by demanding responses and various documents from a large sample of claimants but instead should follow the well-established approach to estimation set forth in the Eagle Picher, Owens Corning, and Federal Mogul cases.  However, to the extent that the Court decides to permit discovery of claimants, USG's Questionnaire is incredibly overbroad and will not lead to testimony which is admissible in an aggregate estimation hearing.  As described in the Introduction, much of the information sought by USG's Questionnaire would be relevant or useful only in the trial of an individual asbestos personal injury claim.  For example, Question 10 asks plaintiffs to "attach to this Questionnaire copies of any and all medical records that show, support, conflict with, or otherwise relate to a diagnosis or lung function analysis identified in this Part."  Other questions seek information about each and every exposure to any defendant's asbestos-containing products.  The volume of material subject to such document requests for an individual claimant is potentially staggering (particularly a cancer claimant), and the vast majority of the medical records and exposure records would be relevant only if the Court were going to try the particular case and the USG needed this information to cross-examine the plaintiff or his doctor or otherwise attempt to impeach the alleged diagnosis and exposure history.  Obviously the Court does not envision individually trying 1,000 cases, yet the vast majority of USG's discovery is relevant only to such an exercise.

USG has yet to describe exactly how any expert can opine to the Court (in admissible testimony) how many of the 1,000 claims would meet its proposed exposure and medical criteria and thus survive summary judgment and how a jury would value the remainder, much less show how the Court could use such information in the estimation a way that does not violate the

claimants' due process rights.  Presumably USG still intends to ask the Court for categorical rulings on classes of claims and extrapolate those rulings to the pending and future claimant population.  However, if such an extensive procedure occurs, the Court should drastically reduce Debtors' proposed Questionnaire to a more manageable form which would still allow it to litigate each and every one of its alleged "defenses."  The ACC has proposed an alternative questionnaire attached as Exhibit 1.

As the Court will recall, USG has stated it needs to be able to litigate its five threshold defenses to liability before any "substantive" estimate of its liability can be made.  But the claimant discovery USG seeks is far out of proportion to the evidence necessary to allow it to litigate its alleged defenses.  Two of USG's five defenses:  (1) whether "pure" chrysotile asbestos can cause mesothelioma and (2) whether various gastrointestinal tract cancers can be caused by exposure to asbestos, are issues which can be litigated solely through expert medical and mineralogist testimony.  The Debtor needs no information from the claimants to apply the results of this exercise to the claimant population as a whole other than the disease alleged (which is already shown in the claims database or which, if not shown, can be imputed using standard statistical techniques) and information about the fiber composition of its products (which is disputed but within the possession of the Debtor, not the claimants).  On these issues, discovery from claimants will add nothing of relevance to the information already available for estimation from the medical literature, USG's own claim files and product data sheets, and the database pertaining to the hundreds of thousands of claims filed against and resolved by USG prior to its bankruptcy.

Two additional issues that USG seeks to litigate:  (1) whether lung cancer can be caused by asbestos exposure in the absence of a diagnosis of underlying asbestosis and (2) whether a

non-malignant claim is compensable without evidence of PFT scores showing various lung function declines, can also be litigated without invasive discovery of claimants. To the extent that USG claims that it needs information from USG lung cancer claimants concerning an underlying diagnosis of asbestosis, the ACC's proposed questionnaire (which asks whether or not the claimant has been diagnosed with asbestosis as well as lung cancer) is all the information needed to determine what percentage of lung cancer claimants also have asbestosis. Similarly, to determine what percentage of current claimants have PFT scores showing a lung function decline, the ACC's proposed questionnaire would provide this information.[12]

The only USG defense which even arguably requires more detailed information from claimants is the defense based on "lack of sufficient exposure to cause disease." However, when one analyzes its proposed approach against the backdrop of the law as it relates to proving exposure and the inevitably individualized and fact-specific nature of the inquiry it quickly becomes apparent that what USG seeks to do here is hopelessly overbroad and will not lead to evidence which is admissible or useful in an aggregate estimation.

A.     **The Law**

The basic tort law affecting asbestos personal-injury claims is straightforward. The liability of asbestos manufacturers is based on failure to warn or strict liability. Am. L. Prod. Liab. 3d § 122:9. In most states, this liability is joint and several among the manufacturers of the products to which a plaintiff was exposed. See, e.g., Tragarz v. Keene Corp., 980 F.2d 411, 425-

---

[12]     Indeed, it is even possible for experts to opine on the percentage of claimants with lung cancer who also have asbestosis and the percentage of non-malignant claimants who also have PFT results that show a decline in lung function based on either extrapolations from the available medical literature or information publicly available from the Manville Trust. That Trust (which receives about 90 percent of all asbestos claims filed against any defendant) keeps detailed aggregate statistics on the number and percentage of both lung cancer claimants with underlying diagnoses of non-malignant diseases and the number and percentage of non-malignant claimants who have PFT scores showing a lung function decline below the lower limits of normal.

26 (7th Cir. 1992); Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1094 (5th Cir. 1973).

Regardless of whether or not liability is joint or several, because asbestos-related disease is

caused by cumulative asbestos exposure and it is impossible to prove that any particular

exposure was the sole cause of the injury, plaintiffs need not prove that a particular defendant's

product was the only cause of his or her injury, only that exposure to the product was a

"substantial factor" contributing to the injury.  See, e.g., Tragarz 980 F.2d at 420, 424-25; Borel,

493 F.2d  at 1076.  Provided a claimant can provide evidence of injury and exposure, his or her

claim will survive summary judgment.  See, e.g., Lineaweaver v. Plant Insulation Co., 37 Cal.

Rptr. 2d 902, 906 (Cal. Ct. App. 1995) ("In the context of asbestos litigation, a plaintiff must

demonstrate exposure to a defendant's product and biological processes from the exposure which

result in disease.").  Contrary to USG's suggestions, no "safe" level of asbestos exposure has

been established.  See Orleans Parish Sch. Bd. v. Asbestos Corp. Ltd., 114 F.3d 66, 68-69 (5th

Cir. 1997).  And detailed evidence about "levels" of exposure is not required.  Courts permit

experts to testify in toxic tort chemical cases even if they do not know a plaintiff's exact level of

exposure.  See Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 808-09 (3d Cir. 1997);

Louderback v. Orkin Exterminating Co., Inc., 26 F. Supp. 2d 1298, 1306 (D. Kan. 1998).

     Moreover, courts have repeatedly held that "[w]here there is competent evidence that one

or a de minimis number of asbestos fibers can cause injury, a jury may conclude the fibers were

a substantial factor in causing a plaintiff's injury."  Wehmeier v. UNR Indus., Inc., 572 N.E.2d

320, 337 (Ill. App. Ct. 1992); see also Tragarz, 980 F.2d at 421.  Indeed, courts have

"specifically reject[ed]" the argument that a plaintiff "may not show substantial causation absent

proof that [the defendant's] product was more responsible for [plaintiff's] injury than other

manufacturers' products."  Verbyke v. Owens-Corning Fiberglas Corp., 616 N.E.2d 1162, 1168

n.5 (Ohio Ct. App. 1992).  "It is sufficient if it is shown that [a defendant's] products contributed to the injury.  The degree of contribution is left for apportionment of damages." Id.[13]  Because these principles apply (in one form or another) in almost every state, it is not surprising that exposure to asbestos from the products of many defendants can be a "substantial contributing factor" in causing the plaintiff's injuries.  Indeed, many doctors hold the view that any identifiable asbestos exposure from a defendant's product can be a "substantial factor" in causing an asbestos disease such as mesothelioma, lung cancer or asbestosis and such testimony is routinely admitted in asbestos personal injury trials.

## B.    USG's Proposed Discovery on Exposure is Overbroad

USG's Questionnaire seeks information about each and every exposure to any defendant's asbestos-containing products.  Almost by definition, whether a plaintiff can establish sufficient exposure to USG's asbestos-containing products turns on the facts and circumstances of each individual case, which is yet another reason why categorical claim disallowance or summary adjudication (or estimation at zero value) of groups of claims based on their supposed similarity to a group of sampled claims is Constitutionally impermissible.  USG apparently believes that based on information gleaned from a sample of cases in which no discovery from USG has been allowed for over four years and in a situation where the plaintiffs will not be able to prosecute their claims to judgment against USG, an expert can nonetheless offer an opinion about which cases could prove sufficient exposure to succeed at trial and which cases could not.

---

[13]      In Celotex Corp. v. Tate, a Texas court held that the plaintiff meets his burden of proof against a particular defendant "[i]f there was sufficient evidence presented by [the plaintiff] showing that [the defendant] supplied any of the asbestos to which [the plaintiff] was exposed." 797 S.W.2d 197, 204 (Tex. Ct. App. 1990).  Other courts have similarly held that a defendant can be held liable even if the evidence shows that its asbestos was responsible only for a tiny fraction of the total asbestos to which the plaintiff was exposed.  See, e.g., Thacker v. UNR Indus., Inc., 603 N.E.2d 449, 457 (Ill. 1992); Sholits v. American Cyanamid Co., 568 A.2d 1196, 1205 (N.J. Super. App. Div. 1989).

But such an extrapolation is patently unfair and impermissible. As a matter of evidence and common sense, the best evidence of the percentage of pending and future cases which have sufficient evidence to be compensable is based on the historical experience of USG when both sides were in the tort system and the plaintiffs had both the ability and economic incentive to prepare the cases for trial where any factual disputes could be resolved by a jury. After all, both during and after it left the CCR, USG settled tens of thousands of cases based on evidence of exposure it deemed sufficient to merit payment.

However, even if the Court is determined to allow USG to attempt to extrapolate "lack of exposure" evidence from its sample to all pending and future cases, the information sought by USG's Questionnaire is still hopelessly overbroad. As discussed below, almost all of the "exposure" discovery sought by the Questionnaire is relevant only to the particulars of each individual claim. Moreover, once a plaintiff provides some evidence of exposure to USG's products (either though an affidavit, interrogatory response or deposition), the claim will almost undoubtedly survive a motion for summary judgment. Thus discovery about the specifics of individual exposure or exposure to other defendants' products is relevant only in a trial of that particular claim as cross-examination material or to impeach that particular plaintiff's allegations that he was exposed to the fibers in USG's products (or to the apportionment of damages), and not to whether there is a basis for liability on the part of USG. The Committee's questionnaire, by contrast, which requires the plaintiff to list the USG products he alleges he was exposed to, his occupation, and the years of cumulative exposure to asbestos, is sufficiently detailed to allow USG to raise its lack of exposure defense in a manner that is relevant to an aggregate estimation without being incredibly burdensome and focused so heavily on the evidence that is relevant only to cross-examination or damages.

III.  **THE PROPOSED SAMPLING PLAN AND QUESTIONNAIRE SEEK
      DISCOVERY THAT IS IRRELEVANT TO A VALID ESTIMATION AND
      WHICH WOULD SERVE NO USEFUL PURPOSE IN ESTIMATING
      AGGREGATE ASBESTOS CLAIMS**

To be proper, discovery must be "relevant to the claim or defense" at issue.  Fed. R. Civ.

P. 26(b)(1).  When "[t]he claims being valued arise under state law . . . state law determines their

validity and value."  Owens Corning, 322 B.R. at 721.  This principle was established

unambiguously by the Supreme Court in Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 20

(2000).  See also Bittner v. Borne Chem. Co., Inc., 691 F.2d 134, 135 (3d Cir. 1982); In re USG

Corp., 290 B.R. 223, 225 (Bankr. D. Del. 2003) ("[S]tate law claims remain governed by state

law, even after the debtor invokes federal bankruptcy protection.").  USG has no basis for

seeking discovery of information that is simply irrelevant to estimating an asbestos personal-

injury claim according to state law.  The Court should also reject USG's attempts to ignore

Raleigh or to change state law for estimation purposes by imposing its own liability standards –

standards that USG euphemistically terms "binary characteristics" or "the five substantive issues

of claim validity."  See Motion at 5, 7.

As noted above, plaintiffs need not prove that a particular defendant's product was the

only cause of his or her injury, only that exposure to the product was a "substantial factor"

contributing to the injury.  See, e.g., Tragarz at 420, 424-25; Borel, 493 F.2d at 1094.  Provided a

claimant can provide evidence of injury and exposure, his or her claim will survive summary

judgment.  See, e.g., Lineaweaver v. Plant Insulation Co., 37 Cal. Rptr. 2d 902, 906 (Cal. Ct.

App. 1995) ("In the context of asbestos litigation, a plaintiff must demonstrate exposure to a

defendant's product and biological processes from the exposure which result in disease.").  In

most states, plaintiffs may win damages for non-malignant injuries that do not cause a loss of

lung function as measured on a PFT.  See Sullivan v. Combustion Eng., 590 A.2d 681, 682 (N.J.

Super. Ct. App. Div. 1991) (holding, in case in which plaintiff suffered pleural thickening but no loss of pulmonary function, that "compensatory damages can be awarded for bodily harm, although there is no impairment of a bodily function") (citations omitted). These norms obtaining in asbestos cases are not surprising. They are wholly consistent with basic tort principles.

By contrast, USG's Questionnaire propounds questions that reflect not actual evidentiary or medical standards, but information that an asbestos claimant would have to adduce to establish a valid claim in USG's defendant-perfect world. In particular, USG's questions relating to product identification and degree of exposure are totally divorced from state law standards. Therefore, they cannot form the basis for disallowing claims in bankruptcy or otherwise estimating them at zero. Not only does the Questionnaire require detailed information about each and every exposure to USG's asbestos-containing products, but it also seeks the same kinds of information about possible exposure to other manufacturers' asbestos-containing products, including, inter alia, the product's brand name; the product's manufacturer; the distributor of the product,; the particular occupation of the claimant, by occupation code, while exposed; the date range of exposure; the "type" of exposure; a description of job duties while exposed; the names of products and materials attributed to USG and other manufacturers; and the frequency of exposure in hours per day and days per year. And, USG demands all of this information for each and every asbestos-containing product that the claimant was exposed to.

As shown above, the law is clear that to recover against an asbestos defendant, a claimant need only show that his exposure to a defendant's asbestos was a "substantial factor" in bringing about his disease. Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1094 (5th Cir. 1973). Because there is no "safe" level of exposure to asbestos, See Orleans Parish Sch. Bd. v. Asbestos

Corp. Ltd., 114 F.3d 66, 68-69 (5th Cir. 1997), "[w]here there is competent evidence that one or a de minimis number of asbestos fibers can cause injury, a jury may conclude the fibers were a substantial factor in causing a plaintiff's injury," Wehmeier v. UNR Indus., Inc., 572 N.E.2d 320, 337 (Ill. App. Ct. 1992); see also Tragarz, 980 F.2d at 421, and courts have "specifically reject[ed]" the argument that a plaintiff "may not show substantial causation absent proof that [the defendant's] product was more responsible for [plaintiff's] injury than other manufacturers' products." Verbyke v. Owens-Corning Fiberglas Corp., 616 N.E.2d 1162, 1168 n.5 (Ohio Ct. App. 1992).

Thus "[I]t is sufficient if it is shown that [a defendant's] products contributed to the injury. The degree of contribution is left for apportionment of damages." Id. Because these principles apply (in one form or another) in almost every state, exposure to non-USG asbestos products is simply irrelevant to USG's liability under state law for an asbestos personal-injury claim, and the Questionnaire is therefore improper because it seeks to discovery of such irrelevant facts. As noted in the Verbyke decision above, evidence of exposure to another manufacturer's product is relevant only to determine the apportionment of damages, and even then, USG does not need individual claimant discovery to determine such apportionment since information regarding the value of the claim against USG is already available in USG's claims history database or from its verdict averages. The indemnity payments made by USG to resolve past asbestos claims reflected in its database include only its several share of the liability. Thus evidence regarding exposure to other defendants' products is already taken into account in the values USG paid to resolve claims. There is no need to force individual victims and claimants to produce "other exposure" evidence when information relevant to the apportionment of damages

can be obtained just as effectively elsewhere.  Again, evidence of exposure to other defendants'

products would be relevant only to the valuation of that particular claim.

      For many of the same reasons, USG's demands for settlement information related to

settlements with other defendants are simply beside the point in an aggregate estimation.  First of

all, as with information regarding exposure involving other defendants, such information is only

relevant to that particular claim, unless the court is prepared to try 1,000 cases.  Second, as with

information pertaining to exposure to another defendant's products, such settlement information

is, at best, relevant only to USG's share of the damages, not to its liability.  The only scenario in

which settlement payments by other defendants is relevant to an estimate of USG's liability

would be if USG were going to ask the Court to have what it views as "valid" claims tried before

a jury for the purpose of establishing the plaintiff's damages for his injury as a whole.  It is only

at this point that settlements with other defendants would be relevant as a set-off against USG's

liability.  Given that the average mesothelioma verdict against asbestos defendants in recent

years is well in excess of $6 million[14], the Committee seriously doubts that USG will advocate

this approach to valuing the claims which survive its supposed "liability filters."[15]

## IV.    USG'S PROPOSED SAMPLING PLAN AND QUESTIONNAIRE WOULD CREATE BURDENSOME AND OPPRESSIVE DISCOVERY ON INDIVIDUAL CLAIMANTS, AND IS THUS IMPROPER

      Discovery under the Federal Rules may be broad, but it is not limitless.  USG's asserted

"right to discovery" cannot be unfettered.  At some point, certain discovery requests will cross

---

[14]    According to the RAND 2005 Asbestos Report at page 54, available online at
http://www.rand.org/pubs/monographs/2005/RAND_MG162.pdf.

[15]    In addition to the lack of relevance to the estimation, discovery of settlement information
with other defendants from individual claimants would also be problematic in that it would
require the individual claimants to breach confidentiality agreements that were established in
connection with the settlement.  USG itself insisted on such confidentiality when it settled claims
in the tort system.  It is improper for USG to require individual claimants to divulge confidential
settlement terms here.

the line and move into the realm of what is not permissible.  USG's proposed Sampling Plan and Questionnaire are perfect examples of what constitute impermissible discovery.  Among other limitations, discovery cannot be unduly burdensome or oppressive.  See Fed. R. Civ. P. 26(b)(2)(i) & (c).  The Court may proscribe proposed discovery if its anticipated "burden or expense . . . outweighs its likely benefit . . . ."  Fed. R. Civ. P. 26(b)(2)(iii).  For the reasons outlined infra, USG's proposed Sampling Plan and Questionnaire would impose burdensome discovery that not only require extensive costs and resources to complete, but which also would delve into private information of individual claimants that simply are not relevant to an estimation proceeding.

> **A.**  **The Questionnaire Is Improper in that It Requires Asbestos Victims To Produce an Enormous Amount of Information and Personal Documents Within a Short 30-day Period**

The proposed Questionnaire would require asbestos victims to produce an enormous amount of information – much of it going back over 30 to 40 years or even a victim's entire lifetime – within a modest time-span of only 30 days.  The detail demanded by USG is simply staggering.  Among other unreasonable and burdensome requirements, the Questionnaire requires asbestos victims to:

- List every conceivable exposure from every possible manufacturer, which for some claimants means that they will have to remember and divulge every exposure over the course of an entire career (e.g., 25 or 30 years) in the construction trade or otherwise.

- Disclose the "date range" and "frequency" of exposure for each time a worker or victim encountered asbestos or an asbestos-containing product – again, over the course of what may have been a 25 to 30 year career.

- Identify the particular brand name, manufacturer, and distributor of each asbestos-containing product that the victim was or may have been exposed to, without ever including trade symbols or logos that might help to refresh the claimant's recollection.

- Divulge <u>every residence</u> that the claimant has lived in "<u>from birth</u>," including the <u>precise address</u> of the residence and whether "any asbestos-containing products [were] installed or otherwise brought onto the residence." How could anyone be reasonably expected to recall whether asbestos was installed in a childhood home?

- Reveal <u>every job ever held</u> (for one month or more), "<u>including summer jobs</u> worked during the first twenty (20) years of life." Given the long latency period between asbestos exposure and disease manifestation (up to 40 years or more), in numerous cases the Questionnaire is requiring asbestos victims to remember and record virtually every job held over an entire career, and to include the employer's address.

- Provide up to <u>13 separate categories</u> of <u>medical documentation</u>, which could very well be located in different hospitals and doctors' offices. While claimants and their lawyers could conceivably submit written requests to hospitals and doctors' offices to obtain the required medical records, the responding hospitals and doctors' offices might not be as sensitive or inclined to provide the needed medical records to claimants within the 30 days allotted for completing the Questionnaire.

- Disclose <u>settlement information</u> when the terms of the settlement could very well be subject to a <u>confidentiality agreement</u> or protective order, thus causing the diligent respondent of the Questionnaire to violate or breach such terms of confidentiality.

- Produce <u>transcripts of depositions</u> or hearings and to <u>bear the cost</u> of providing such transcripts to USG.

With such staggering detail demanded, even the most diligent and honest of respondents will likely have a hard time remembering and providing all the information that the Questionnaire requires within 30 days. And, while the Questionnaire appears on its face to be 25 pages (excluding appendices), respondents will be required to photocopy various parts of the Questionnaire when the required information cannot fit on one page. Thus, what begins as a 25-page Questionnaire form could easily swell to 50 or perhaps even 100 pages.

Further, to complicate the situation, not all asbestos client files are the same, nor are all plaintiffs' law firms equivalent in their ability to retrieve information. When the Debtors filed their Chapter 11 petition, the automatic stay was triggered, thus halting any continuation of

lawsuits against the Debtors in their tracks.  <u>See</u> 11 U.S.C. § 362(a).  At the time the automatic

stay went into effect, the various asbestos cases were at different points along a continuum in

their proximity to trial.  Thus, an asbestos case filed closer to the time of USG's bankruptcy

filing will likely have little in the way of information or discovery from USG, since all asbestos

personal injury litigation against USG has been stayed.  For example, providing the information

requested by the Questionnaire will be less time consuming for claims that have already gone

through the paper discovery process in litigation against other defendants (interrogatories

answered, medical records gathered, etc.) than for claims that have been placed on an inactive

docket or which have been resolved with all other non-bankrupt defendants before discovery was

completed.  In addition, law firms having computerized record-keeping and document retrieval

processes will be able to provide the information sought by the Questionnaire more promptly

than firms that are not as technologically advanced.  Similarly, a firm representing only 10 to 50

claimants will likely be able to answer the Questionnaire (and produce the required documents)

more seasonably than a firm representing 10,000 claimants.  Nonetheless, a response period of

only 30 days, as the proposed Questionnaire allows, is too aggressive and unrealistic, no matter

how developed the case file is and no matter how technologically advanced a law firm might be.

Finally, when assessing the burden and propriety of this level of detailed inquiry, the

Court should bear in mind the fact that this sort of information sought by USG's Questionnaire

would be relevant or useful only in the trial or estimation of an individual asbestos personal

injury claim.  The proposed Questionnaire is too burdensome and unreasonable to constitute

legitimate discovery of claimants – who are not even proper parties to this estimation proceeding

– when the dispute at issue involves USG's liability in the aggregate.  Other courts have denied

discovery that would similarly impose an unreasonable burden.  <u>See, e.g.</u>, <u>Koch v. Koch</u>

Industries, Inc., 203 F.3d 1202 (10th Cir. 2000) (rejecting discovery in noting "that to require six banks and the Ryder Scott Company to produce the massive amount of documents requested, first weeding out privileged and confidential records, would impose a serious burden and expense upon these non-parties); Jones v. Goord, 2002 WL 1007614 *13 (S.D.N.Y. May 16, 2002) (rejecting a discovery request in which "plaintiffs can only be characterized as demanding a huge volume of sensitive data, in a form that may or may not be usable for any productive purpose, on the vague hope that it will prove useful when subjected to future massage by unspecified experts"). This Court should do the same here with respect to Debtors' proposed Sampling Plan and Questionnaire.

>    **B.    The Proposed Questionnaire Is also Invasive as it Demands Highly Personal Irrelevant Information**

USG's proposed Questionnaire also unjustly requests that each claimant sign multiple releases and grant Debtors unfettered access to a significant amount of personal and medical information. Indeed, it seems that by asking for such highly personal and sensitive information, USG's hidden objective is to deter asbestos victims from even returning their forms, which will allow USG, through its statistical alchemy, to argue that whole categories of claims should be disallowed or estimated at zero. Among the more egregious parts:

- The proposed Questionnaire requires claimants and personal representatives to divulge their entire social security number (rather than the last four digits), which in this era of identity theft is unreasonable and improper.

- If completed and signed, Appendix A of the Questionnaire (the form authorization to release medical information under HIPAA) would authorize, inter alia, the release of a claimant's "pharmacy/prescription records" and "records pertaining to any alcohol or drug abuse." Records of drug or alcohol abuse are not remotely relevant to a proceeding whose purpose is to estimate aggregate asbestos liability.

- Appendix A also requires claimants to acknowledge, when signing the release form, that once their sensitive medical information, such as prescription drug or history of alcohol abuse, is disclosed "it may be <u>subject to re-disclosure</u> and would <u>no longer be protected by federal privacy regulations</u>."

Debtors' demands for private or sensitive information appear to be nothing more than tools for intimidating asbestos victims, who (apparently from USG's point of view) had the temerity to ask USG to compensate them for their asbestos injuries. As such, there is a quality about this Questionnaire that is intended to punish asbestos claimants for asserting their claims, rather than pursuing discovery that is truly relevant to estimation.

### C.  The Questionnaire Should Not Request Documents

The most time-consuming and burdensome aspect to Debtors' proposed Questionnaire is the wide-ranging, all-encompassing request for various documents. The primary time-intensive task for law firms and claimants under Debtors' proposal would be the collecting, collating, and organizing of the thousands and thousands of personal, legal, and medical records. Many of these documents are located in private storage facilities and in thousands of office record rooms. Collecting the documents – those which have not been lost – and returning them to Debtors within 30 days is an extremely burdensome and almost impossible ordeal. The simple act of removing the document request aspect to the Questionnaire would shave months off the discovery schedule. Further, access to the private records of 1,000 claimants cannot provide more aid in the estimation of Debtors liability when such information is readily accessible by simple responses which can be gathered in the Questionnaire itself. As an alternative to Debtors' plan, the questionnaire proposed by the ACC does not request unnecessary documents or records from the claimants, which would greatly speed up the questionnaire completion process.

**V.    THE DEBTORS' SAMPLING APPROACH IS FLAWED, AND THE COMMITTEE WILL CHALLENGE OR REBUT ANY CONCLUSIONS TO BE DRAWN FROM THE SAMPLE AT THE APPROPRIATE TIME**

The Committee joins in the FCR's discussion of the facially obvious flaws with the Debtors' sampling methodology.  Among other flaws, for example, is the fact that the Questionnaire is only being sent to claimants with claims pending and unresolved on the bankruptcy petition date, which by definition excludes from the sample claims that were filed at the same time as those sampled, yet which were resolved prior to the Petition date.  It is typical for many plaintiffs to undertake more detailed individualized exposure discovery and to identify their testifying experts only after a case is placed on a trial calendar, and for many defendants (including USG) to wait to resolve claims until they have reached the trial docket.  Because of this fact, such trial-listed cases are usually resolved for much more money than claims settled when there is no trial date approaching.  Thus, the claims USG resolved shortly before it filed for bankruptcy as they approached trial dates are likely to be more representative of the value of the claims USG will resolve in the future than claims that were still pending because there was no approaching trial date as an incentive for USG to settle them.[16]  Yet USG's sample would completely miss the "trial ready" claims that were filed, for example, in the year 2000 and which were resolved prior to June 2001 while picking up those claims that were filed at the same time in the year 2000 but which were nowhere near a trial against USG.

Moreover, as Dr. Florence explained, until one sees the way in which the sample is actually used by an expert and the conclusions that the expert seeks to draw about the results, it is impossible to identify all of the methodological flaws in the Sampling Plan at this juncture.

---

[16]    This assumes that USG would in the future have continued its past practice of using delays in obtaining trial dates to its advantage in the negotiation process and the resolution of cases.

<u>See</u> Florence Decl. ¶ 5.  As discussed in the introduction <u>supra</u>, even if it were possible to identify every conceivable flaw in the Debtors' sampling methodology at this juncture (which it is not), the ACC, as it is entitled to do, (1) will reserve, until expert rebuttal reports are due, its experts' rebuttal opinions on the uses to which sample will be put, and (2) will reserve, until the time of a <u>Daubert</u> hearing or trial its criticisms, cross-examination of and objections to the admissibility of any opinions based on flaws in the Debtors' sampling methodology.

<b><u>CONCLUSION</u></b>

For the reasons stated above, the Committee respectfully requests that the Motion be denied in its entirety and that the Committee be granted such other and further relief as this Court deems just and appropriate.

Dated: September 19, 2005                    Respectfully submitted,

**CAMPBELL & LEVINE, LLC**


/S/ Marla Rosoff Eskin
Marla R. Eskin (No. 2989)
Kathleen Campbell Davis (No. 4229)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900
Telefax:      (302) 426-9947

-and-

**CAPLIN & DRYSDALE, CHARTERED**
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone:  (212) 319-7125
Telefax:      (212) 644-6755

-and-

Peter Van N. Lockwood
Walter B. Slocombe
Nathan D. Finch
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:  (202) 862-5000
Telefax:      (202) 429-3301

Counsel for the Official Committee of
Asbestos Personal Injury Claimants