accomplish this examination, the Banks' experts must be able to review the Medical Records, including X-rays, of a random sample of the nonmalignant claimants that are included in the Debtors' claims history.

It is well within the Court's power to order this review: the Supreme Court has commanded that a bankruptcy court "has the power [in the exercise of its equitable jurisdiction] to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 309 (1939). Moreover, the process of estimation is subject to procedural and substantive due process requirements and the Court must utilize appropriate procedural safeguards to protect the value of the Banks' claims against Owens Corning. The process of estimation is subject to the procedural and substantive requirements of due process. *See, e.g., In re Baldwin-United Corp.*, 55 B.R. 885 (Bankr. S.D. Ohio 1985). Due process requires that a claimant be given "an opportunity . . . granted at a meaningful time and in a meaningful manner for [a] hearing appropriate to the nature of the case." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982).

Thus, the Court should make its estimation based upon a sample of valid medical reports, rather than blindly extrapolating from a history riddled with fraud. Courts have specifically approved the use of random sampling of claims in connection with estimation proceedings in mass tort cases. *In re Dow Corning Corp.*, 211 B.R. 545, 596-598 (Bankr. E.D. Mich. 1997).

Accordingly, the Motion seeks the following:

    1.    An order establishing procedures for the prompt production of a random sampling of Medical Records, including X-rays, from asbestos personal injury claimants who have claims alleging nonmalignant asbestos personal injuries against Owens Corning; and procedures to establish a document depository for inspection by experts retained by CSFB; and

    2.    modification of the Court's August 19, 2004 order to allow the parties sufficient time to conduct the aforementioned study. Such modification is necessary for the Banks to prepare their case in light of the recent disclosure of the Friedman, Vasquez and Mayer Reports that the Debtors concealed, as well as the recent Johns Hopkins study.

This relief will permit the parties and the Court to estimate the Debtors' asbestos liability by only taking account of medically and legally valid claims so that all legitimate stakeholders of these Debtors will be treated in a fair and equitable manner.

## II. STATEMENT OF FACTS

1. <u>The Debtors Delayed Estimation Proceedings and Concealed Their Internal Valuation Reports Until Now</u>

The Debtors long ignored their responsibility to commence an estimation proceeding even after their own experts completed studies projecting their current and future asbestos liabilities. As far back as August 2001, the Banks and the Official Committee of Unsecured Creditors (the "OCUC") made clear that asbestos estimation was a "principal driving force to the resolution of these cases." (Reply in Further Support of Motion of Unsecured Creditors Committee For Appointment of Chapter 11 Trustee at 6, attached hereto as Exhibit "F"). In January 2002, the Debtors represented that they were already discussing with other parties scheduling an estimation proceeding, and in May of that year, the Debtors recognized the need for quick resolution of this issue. *Id.* The District Court advised the parties that it would set an estimation trial date if rapid progress was not made between the parties on scheduling, although no such proceedings were scheduled. *Id.* In November 2002, the Banks wrote to the district court to express their strong desire to establish estimation procedures for valuation of tort claims in order to facilitate resolution of those issues. *Id.* Even then, the Debtors refused to commence estimation proceedings.

Despite this, the Banks and the OCUC repeatedly sought discovery of documents relating to the Debtors' estimation of their asbestos liability. (*See* First Set of Interrogatories Propounded By the Official Committee of Unsecured Creditors to Owens Corning, Inc., at Interrogatory Number 3 (Oct. 24, 2003) (requesting that the Debtors "[i]dentify any consultant employed by Owens Corning with knowledge of Owens Corning's actual and/or estimated asbestos liability.") (attached hereto as Exhibit "G");[8] *see also* Letter from Steven H. Case to Norman L. Pernick and Charles O. Monk, Dec. 10, 2003 (seeking production of "all information in the Debtors' possession, custody, or control . . . bearing on any matter relating to the validity and value of [asbestos] claims," and seeking "[a]ll documents relating to estimation of asbestos-related personal injury liability made by Owens Corning or on its behalf from 1997 to the present.") (attached hereto as Exhibit "H.")). These efforts yielded no results. Thereafter, the OCUC formally requested documents reflecting "any attempt (completed or not) made between January 1, 1997 and the present to estimate or value OC's present and/or future incidence of asbestos litigation or asbestos-related liability." (Memorandum of Support of Application of the Official Committee of Unsecured Creditors to Compel Production of Documents at 3-4 (the "Motion to Compel" attached hereto as Exhibit "J")).

---

[8] These interrogatories were served in connection with the OCUC's motion to appoint a chapter 11 trustee filed on October 30, 2003. The basis for the motion, which is still pending before the Bankruptcy Court, is the Debtors' officers and directors' abdication of their fiduciary duty to all creditors while currying favor with the asbestos plaintiffs' law firms. As the OCUC stated the officers and directors "have essentially acted in this case as servants of the asbestos firms, not just failing to take steps to minimize the valuation of contested tort claims but also giving tort firms carte blanche to dictate the terms of a 'dream plan' of reorganization . . . without having to prove a single valid claim against the estate." (Motion of Unsecured Creditors Committee For Appointment of Chapter 11 Trustee at 2, dated Oct. 30, 2003.)

The Debtors consistently fought production of these documents to the Banks and the OCUC, although the Banks do not know when the Debtors shared them with the Plan Proponents. At first, the Debtors contended that they had discharged their duty to produce responsive documents by pointing to documents they had placed in a document depository consisting of investment analysts' reports commenting on Owens Corning's asbestos liability and auditor work papers relating to Owens Corning's asbestos-related reserve. (Motion to Compel at 3-4). Inexcusably, the Debtors did not produce the Friedman, Vasquez or Mayer Reports despite requests that clearly encompassed these materials, nor did the Debtors even disclose their existence. Despite repeated efforts by the Banks and the OCUC to obtain the Debtors' estimates of their asbestos liability (*see id.* at 4-6), the OCUC was ultimately forced to move to compel production of documents. Unbelievably, the Debtors responded by representing that *"the Debtors have already provided [the Committee] with all of the information [it] may reasonably require to prepare its own analysis of the Debtors' present and future asbestos liabilities."* (Objection to the Motion to Compel at 5). The Debtors' subsequent production of the Friedman Report, the Vasquez Report and the Mayer Report demonstrates the falsity of that statement.

  2. <u>The Vasquez and Mayer Reports</u>

The Vasquez Report was authored in 2002 by Thomas E. Vasquez, Ph.D., of the consulting firm ARPC, and was finally produced to the Banks two years later on August 27, 2004. Dr. Vasquez had been retained to estimate the value of future asbestos-related personal injury claims that will be filed against Owens Corning and Fibreboard. (Vasquez Report at 4). The results of his analysis showed that Owens Corning's future asbestos liability, discounted to present value, ranged from $2.0 billion to $3.2 billion. Significantly, Dr. Vasquez's estimates

10

included discounting to nuisance value the vast majority of the nonmalignant claims asserted against Owens Corning, based on the conclusion that these claimants did not assert claims that qualified on a medical basis for payment under Owens Corning's settlement agreements under the NSP. [9]

The Mayer Report, dated May 21, 2002, was only produced to the Banks on August 29, 2004. Mr. Mayer was the Controller, Vice President Restructuring for Owens Corning. Mayer Report at 2. The Mayer Report purports to summarize "the status of asbestos personal injury and wrongful death claims asserted against Owens Corning on or before October 4, 2000 ("prepetition claims")." *Id.* The results reported in the Mayer Report estimate the value of these claims between $1.414 and $1.736 billion. *Id.* at 3. However, the Mayer Report simply applied the NSP settlement values to <u>all</u> pending claims, without factoring in the discount Dr. Vasquez used -- or indeed any method at all -- to weed out bogus claims, which, as will be seen, accounted for the vast majority of the nonmalignant claims.

The Banks set forth the conclusions of the Vasquez Report and the Mayer Report in this brief not because they agree with them. Indeed, if allowed to develop their case through adequate discovery, the Banks will show that even these valuations are substantially overstated. Nevertheless, the Vazquez and Mayer conclusions highlight both the duplicity of the

---

[9] Despite the fact that Owens Corning knew it was insolvent, it paid out approximately $660 million to law firms as part of the NSP in the eleven months immediately preceding the filing of its chapter 11 petition, often in the form of unprecedented prepayments toward settlements not yet even submitted by individuals. The payments to the NSP law firms are the subject of fraudulent transfer and preference litigation. (*See* Motion of the Official Committee of Unsecured Creditors for an Order Authorizing it to Commence Certain Avoidance Actions on Behalf of the Debtors, dated Sept. 10, 2002, attached hereto as Exhibit "K.") Ultimately, the Debtors brought these actions, but only with the great reluctance, and have, with the Bankruptcy Court's permission, refused to prosecute them.

astronomical valuations proposed by the Debtors and the ACC for approval by this Court and their continuing attempts to obfuscate and perpetuate the fraudulent conduct on which the Debtors' settlement history is based.

In any event, the combined value of Owens Corning's asbestos liabilities reported in the Vasquez Report and Mayer Report range from $3.4 to $4.9 billion. The Debtors had these estimates in their possession in January 2003 when they submitted their proposed plan of reorganization to the Bankruptcy Court with an embedded future and current asbestos liability estimate of a minimum of approximately $10.7 billion for Owens Corning, but suppressed them. They also had but suppressed these estimates when they submitted a disclosure statement in respect of their plan which included the same $10.7 billion Owens Corning estimate. Of course, the Banks never had access to any of this information in connection with their review of the proposed plan and disclosure statement.

   3.   <u>The Friedman Report</u>

The Friedman Report, entitled "Owens Corning Impaired Nonmalignant Claims Submissions 1994-1999 (approx.)" is even more revealing. It was authored by Dr. Gary K. Friedman, a board-certified pulmonologist who has testified "at trial or in deposition in asbestos related cases on more than 60 occasions at the request of plaintiff counsel." Friedman Report at 2. Although Dr. Friedman rendered his report in 2002, even its existence was concealed by the Debtors from the litigants -- and the Court -- until now. The Debtors applied to retain Dr. Friedman in December 2000, shortly after instituting these chapter 11 cases. The Debtors' retention application described Dr. Friedman as a "trustworthy expert, acceptable to both defendants and plaintiffs, for the review and analysis of asbestos-related claims." (Application for Order Under 11 U.S.C. §§ 327(a) and 329 Authorizing Employment and Retention of Texas

Occupational Medicine Institute, P.A. to Provide Expert Medical Services to Debtors Effective As Of Petition Date dated Dec. 21, 2001, attached hereto as Exhibit "L.") The Friedman Report was conducted to assist Owens Corning to "estimate the percentage of impaired nonmalignant claims under NSP criteria that can be anticipated to be included in the population of total future claims asserted against [OC]," and to "generate a reliable base of evidence of information on which the Debtors [asbestos valuation expert], Dr. Thomas Vasquez, could rely." Friedman Report at 3. Specifically, the Friedman Report was designed to give Dr. Vasquez information to estimate the percentage of "impaired nonmalignant claims under NSP criteria that can be anticipated to be included in the total population of total future claims asserted against the" Debtors. *Id.* Significantly, the Vasquez Report determined that approximately **91% of all future claims against the Debtors would allege nonmalignant diseases**. Vasquez Report at 15.

The Friedman Report analyzed the Medical Records of 1,691 cases of claimed nonmalignant[10] asbestosis claims. The cases were randomly selected from 22,578 nonmalignant asbestos claims submitted to the Debtors under the NSP – a program with strong financial incentives for submitting valid, properly documented claims. Friedman Report at 2. The case files reviewed by Dr. Friedman included an analysis of X-ray reports, PFT reports, and other data, with an emphasis on the X-ray reports and the PFT reports. *Id.* Dr. Friedman was not able to review actual X-rays.

Dr. Friedman concluded that only 13.3% of claims met the minimal medical standards that had been agreed to by Owens Corning and asbestos plaintiffs' law firms to establish compensable claims under the NSP. The starkness of Dr. Friedman's finding that 87.3% of a

---

[10] Dr. Friedman defined "nonmalignant" claims as having no cancer. Friedman Report at 63.

random sample of settled nonmalignant claims lacked supporting medical evidence is stunning. However, even this number is apparently too low, as Dr. Friedman wrote that "a review of the radiographic reports and ILO forms raises serious questions concerning their reliability. These factors are likely to place downward pressure on the 13.3%." *Id.* at 4.[11]

As Dr. Friedman notes, "the first step in determining impairment is predicated upon a reliable radiographic interpretation." *Id.* at 17.[12] Dr. Friedman sets forth disturbing and overwhelming evidence that the radiographic interpretations of B-readers in the selected Owens Corning cases submitted to Dr. Friedman are not reliable. He made some general observations concerning B-readers, which underscores the need for the type of discovery sought by the Banks:

> During the years that these radiographs were interpreted [1994-1999], there were over 600 [B] readers in the United States. Assuming that the 1,691 cases submitted represented a true 'national epidemic of asbestos disease as suggested by the recent onslaught of claim submissions, it would be reasonable to assume that there would be a broad representation of physicians detecting such disease. Of the 1,6971 claims submitted, 772 were submitted by Dr. H (46%), 229 by Dr. S, 212 by Dr. K, 87 by Dr. L accounting for 1300 cases or **76.8%** of all claims. If Dr. JB is

---

[11] Of the 1,691 cases Dr. Friedman reviewed, 282 lacked any PFTs, despite the requirement that these be submitted under the NSP standards. Of the remaining cases with a PFT record, Dr. Friedman found only 225 had test results which actually demonstrated impairment. He deemed over 760 cases with PFT records as unimpaired based on his review of the records. He also characterized 98 claims as "unimpaired" because of substantial technical flaws in the manner the PFTs were administered. An additional 95 cases were deemed unimpaired because of various other missing reports, illegible data and miscellaneous problems. Friedman Report at 7. Overall, Dr. Friedman found 13.3% impairment based on PFT readings alone. All of these were cases where there was a financial incentive for documentation of impairment. *Id.*

[12] While Dr. Friedman did not evaluate the underlying validity of X-rays (as the Johns Hopkins study did), he did "assess the impact the X-ray findings might have on the PFT results . . . by match[ing] impaired PFTs with X-ray [readings] showing evidence of disease." Friedman Report at 13. This review drove the impairment numbers even lower. Dr. Friedman estimated that overall, the percentage of claims which "might be attributable to asbestos in this cohort is between **8.16%** . . . and **10.46%**." *Id.* (emphasis in original).

14

> added, these five B-readers account for 1360 (**80.4%**) of claims. Dr. H alone accounted for approximately 45.6% of all claims submitted in this study.
>
> Because such a small number of physicians account for such a large percentage of the claims previously submitted, and because of the prominent role which . . . interpretation plays in the existing agreements, the need to objectively evaluate the reliability of their reports cannot be underestimated.

*Id.* at 20.[13]

None of the X-ray readings of these five B-readers withstands even cursory scrutiny. That their medical work is so deeply ingrained in the Debtors' claims history necessarily makes such claims history unreliable. Dr. Friedman concluded that as a group, these B-readers' "interpretations differ from what would be anticipated from a randomly selected panel of reliable 'B' readers nationwide," *id.* at 21, and that "the readings generated by these 'B' readers yielded

---

[13] "Dr H" identified above is Dr. Raymond Harron. Friedman Report at App. X-4. He has previously testified, in effect, that he is part of the broken system that generates mass asbestos claims. He interprets between 100-125 X-rays in a day, and gave only a few minutes to each X-ray. *See* David Setter, et al., *Why We Have to Defend Against Screened Cases -- Now is the Time For A Change* -- 18-20 Mealey's Litig. Rep.: Asbestos 23 at 2 (2003) ("*Why We Have to Defend*"). Dr. Harron brazenly confessed to sending blank presigned "B-read" forms to law firms with whom he works. *Id.* In addition to these ethical issues, Dr. Friedman identified Dr. Harron's diagnostic techniques as "atypical" and "troubling." Friedman Report at 18. Moreover, Dr. Harron was prohibited from serving as the diagnosing physician for future claims in numerous NSP agreements.

"Dr. S" is Dr. Jay Segarra. A Washington state court found that he performed examinations, rendered diagnoses, and recommended treatment in violation of state law, and relied upon radiology reports from unregistered and uncertified technicians or radiologists using unregistered and uncertified equipment. *Id.* at 7.

"Dr. K" is Dr. Keubler. Dr. Friedman noted that Dr. Keubler had a propensity to make unusual diagnoses "not usually seen in the early stages of asbestosis," and observed several other unusual facets of Keubler's diagnostic evaluations. *Id.* at 19. Moreover, in 1998, the Manville Trust announced it would not accept any claims files with Kuebler as the B-reader or diagnosing physician unless the file was accompanied by an original X-ray the Trust could evaluate for itself. Dr. Kuebler was also barred from serving as a diagnosing physician for future claims in numerous NSP agreements.

15

results which were **not consistent** with the spectrum of nonmalignant asbestos related diseases identified within the **peer review literature** authored by plaintiffs' experts or authors deemed authoritative by plaintiffs' experts." *Id.* at 22 (emphasis in original).[14]

The Friedman Report's seminal conclusion was that "the current incidence of impaired nonmalignant **cases** is significantly **less** than the incidence of nonmalignant **claims**, [and] it is from this baseline and under similar scrutiny that future 'cases' should be gauged." *Id.* at 30 (emphasis in original). Significantly, Dr. Friedman also opined that the "single greatest factor which may determine the future number of impaired nonmalignant claims rests largely *on the willingness of all parties to provide for ongoing review of the claims and underlying data including X-rays and PFTs*." *Id.* at 35 (emphasis added). He also found that "many of the current cases under study do *not* represent a diagnosis of nonmalignant disease," and that requiring a diagnosis of asbestosis based on published criteria and "*review of radiographs [also referred to as X-rays] by a random selection of reliable B readers or physicians will help focus on the truly impaired. . . .[and] reduce the number of marginal claims in the future.*" *Id.* at 31 (emphasis added). In sum, Dr. Friedman concluded that "[f]urther investigation of the cases through audit of the X-rays, review of occupational history and exclusion of other more probable

---

[14] The Friedman Report also highlights that the work and exposure history in many of the 1,691 case files was riddled with deficiencies – "[i]n many of the claims submissions determination of exposure [to asbestos] was difficult." Friedman Report at 26. The Friedman Report notes that "in some cases, occupational history suggested more probably causes other than asbestos for the X-ray findings." *Id.* More troubling, "in some cases, a word processed document appears to omit any description of occupation." *Id.* Unbelievably, another case listed "employment of chemist and worked in management" as being the relevant history for exposure. *Id.* In a dry understatement, Dr. Friedman wrote "exposures such as this would warrant more detailed explanation." *Id.* Finally, other "reports diagnosing asbestosis are drafted to allow attachment of employer and date of employment, but without detailed history of exposure by the examiner." *Id.* These deficiencies underscore the weakness of nonmalignant claims, and strengthen the case for a meaningful analysis into current claims.

causes may further reduce this number." *Id.* Based on only this portion of his evaluation (without the downward pressure), the Friedman Report concluded that "[f]uture impaired claims (2000-2049) should further decline if proper medical guidelines are enforced." *Id.* at 36.

Given the recommendation of the Debtors' Bankruptcy Court-approved medical expert, their concealment of that expert's report for more than two years and the ACC's recent attack on the Johns Hopkins study as being too small and not sufficiently representative or random, the Debtors and the ACC should be estopped from objecting to the Banks' request to expeditiously obtain the sample that Dr. Friedman urged was needed over two years ago.

    4.    <u>The Debtors' Concealed the Vasquez Report, the Mayer Report and the Friedman Report in Their Disclosure Statement</u>

In their Disclosure Statement With Respect to Fourth Amended Joint Plan of Reorganization, dated Nov. 21, 2003 ("the "Disclosure Statement"), the Debtors assert that all NSP settlements required "satisfactory evidence of a qualifying medical condition." (Disclosure Statement at 19.) The Debtors knew this representation was false when made, because the Debtors already knew from the Friedman Report that approximately 87%, and very possibly more, of the nonmalignant claims submitted to the Debtors under the NSP -- which, according to Vasquez, constituted 91% of all claims -- did not meet the specified medical criteria. Moreover, in the face of the assertion by the ACC and the Futures Representative that the $16 billion (including $10.7 billion for Owens Corning) was their "minimum acceptable valuation" for Asbestos Personal Injury Claims, the Debtors said nothing about the Friedman Report or the projections in the Vasquez and the Mayer Reports. (*Id.* at 26.)

17

5.   The Johns Hopkins Study

Dr. Friedman's findings and conclusions have now been vividly confirmed by a recent independent, controlled, peer reviewed report performed by a team at Johns Hopkins Medical Institutions, which found massive overreadings of nonmalignant asbestosis in a sample of 492 X-rays evaluated in the first instance by doctors retained by plaintiffs' attorneys. Joseph N. Gitlin, et al., *Comparison of "B" Readers Interpretations of Chest Radiographs For Asbestos Related Changes*, 11 J. Acad. Radiol. 843 n.8 (2004) (the "John Hopkins Study"). The Johns Hopkins Study was planned and conducted by Dr. Joseph N. Gitlin and his team, who engaged seven B-readers (one of whom was unable to finish participation in the study and was replaced) who reviewed 492 X-rays previously read by B-readers retained by plaintiffs' lawyers, of which 478 were deemed of readable quality. The panel of B-readers were "'blinded' as to the identities of the study sponsors, the possible litigants, the previous or initial readers, and the individuals whose examinations they interpreted." *Id.* at 846. Whereas the plaintiffs' readers had interpreted 96% of the chest X-rays deemed readable by the Hopkins panel as consistent with asbestosis, the Johns Hopkins researchers found only 4.5% of the same set of cases positive. *Id.* at 854. A Johns Hopkins researcher was 159 times more likely to conclude that an X-ray was negative than a B-reader retained in litigation operating under the economic incentives described above. *Id.* at 850. Based on a statistical analysis, the Johns Hopkins study determined that there was a probability of less than 1 in 10,000 "that the differences noted between initial and consultant readers are due to chance alone." *Id.*[15]

---

[15] An earlier study performed by Dr. R.B. Reger foreshadowed these two recent explosive studies from Dr. Friedman and Johns Hopkins. Dr. Reger re-evaluated 439 chest radiographs of individuals previously designated as having asbestos exposure. R.B. Reger, et al., *Cases of Alleged Asbestos-Related Disease: A Radiologic Re-Evaluation*, 32 J. Occup. Med. 1088 n.11

18