# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------x
                                               :
OWENS CORNING, et al.,                         :
                                               :
                                               :   Civil Action
             v.                                :
                                               :   No. 04-905
CREDIT SUISSE FIRST BOSTON                     :
                                               :
                                               :
-----------------------------------------------x
```

## MOTION OF CREDIT SUISSE FIRST BOSTON, AS AGENT, FOR RECONSIDERATION OF THE COURT'S MARCH 31, 2005 MEMORANDUM AND ORDER

TO THE HONORABLE JOHN P. FULLAM
UNITED STATES DISTRICT JUDGE:

Credit Suisse First Boston ("CSFB"), as agent for the prepetition institutional lenders to Owens Corning and certain of its affiliates, respectfully submits this Motion for Reconsideration, pursuant to Federal Rule of Bankruptcy Procedure 9023 and Federal Rule of Civil Procedure 59, requesting the Court to reconsider its March 31, 2005 Memorandum and Order in the above captioned proceeding regarding estimation of Owens Corning's asbestos liabilities. The grounds for this motion are set forth fully in an accompanying memorandum.

DKT. NO. 107
DT. FILED 4/11/05

DC1:\201582\01\4BJ$01!.DOC\39593.0112

WHEREFORE CSFB, as agent for the Banks, respectfully requests entry of an order granting the relief requested herein.

Dated: April 11, 2004

LANDIS RATH & COBB LLP

*/s/ signatures/*

Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, DE 19801
Telephone: (302) 467-4400

-and-

WEIL, GOTSHAL & MANGES LLP

Martin J. Bienenstock
Richard Rothman
Ralph Miller
David Hickerson
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000

-and-

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Ellen R. Nadler
919 Third Avenue
New York, New York 10022
Telephone: (212) 715-9100

ATTORNEYS FOR CREDIT SUISSE FIRST BOSTON, AS AGENT FOR THE BANKS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x
                                                   :
OWENS CORNING, *et al.*,                           :
                                                   :   Civil Action
           v.                                      :
                                                   :   No. 04-905
CREDIT SUISSE FIRST BOSTON                         :
                                                   :
---------------------------------------------------x

## ORDER GRANTING RECONSIDERATION OF THE COURT'S MARCH 31 2005 MEMORANDUM AND ORDER ESTIMATING OWENS CORNING'S TOTAL ASBESTOS LIABILITY.

The Court, having reviewed the motion and memorandum (the "Motion") of Credit Suisse First Boston ("CSFB"), as Agent for the pre-petition bank lenders (the "Banks"), seeking reconsideration of this Court's Order dated March 31, 2005 estimating Owens Corning's total asbestos liability, for good and sufficient cause appearing therefor, it is hereby

ORDERED that the Motion be GRANTED, and it is further

ORDERED the total amount for contingent unliquidated claims against Owens Corning for personal injury or death caused by exposure to asbestos (including contingent unliquidated pending claims, contingent unliquidated future claims, and contract claims) is estimated to total $4.8 billion.

Dated: _____, 2005

                                        BY THE COURT:

                                        _____
                                        The Honorable John P. Fullam
                                        Senior United States District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------x
                                       :
OWENS CORNING, et al.,                 :
                                       :     Civil Action
        v.                             :
                                       :     No. 04-905
CREDIT SUISSE FIRST BOSTON             :
                                       :
---------------------------------------x

### MEMORANDUM IN SUPPORT OF CREDIT SUISSE FIRST BOSTON'S MOTION FOR RECONSIDERATION OF THE COURT'S MARCH 31, 2005 MEMORANDUM AND ORDER

I.   PRELIMINARY STATEMENT

Credit Suisse First Boston ("CSFB"), as agent for the pre-petition institutional lenders to Owens Corning and certain of its affiliates (the "Banks"), respectfully submits this memorandum of law in support of CSFB's Motion for Reconsideration of the Court's Memorandum and Order on estimation ("Memorandum"), dated March 31, 2005. This is a narrow motion which does not seek to challenge the Court's legal conclusions, methodology, or resolution of any dispute as to the facts. Rather, in making this motion, the Banks seek to align the Court's estimate with the Court's legal rulings and the undisputed evidence pertinent to the estimate in light of those rulings. Specifically, the grounds for this motion are:

- Although the Court ruled that punitive damages should be excluded from the estimate, the two estimates the Court used as goal posts both include punitive damages; and

- Similarly, both of the estimates the Court used in reaching its estimate fail to make any adjustment for over-payment to unimpaired non-malignant claimants, despite the Court's ruling that this was one of the factors that is unlikely to be replicated and skewed the Debtors' settlement history.

DKT. NO. 108
DT. FILED 7/11/05

II.     **STATEMENT OF FACTS**

    A.     <u>The Court's Opinion.</u>

The Court's Memorandum on the estimation of Owens Corning's asbestos liability is a groundbreaking and important decision. The Court properly recognized that it could not estimate the Debtors' future liability by simply assuming the replication of, and extrapolating from, the Debtors' pre-petition settlement history. Instead, the Court stated that it is not "safe to assume that these historical results can properly be extrapolated into the future." (Memorandum at 5). As the Court further found: "some of the past results have been skewed by factors which can and should be avoided in the future." (*Id.*). Accordingly, the Court ruled that the value of the claims should be adjusted to account for changed circumstances in the asbestos litigation landscape (*Id.* at 4-5), and that "the question to be resolved is the extent to which adjustments should be made to historical values to account for these probable changes." (*Id.* at 5).

The Court specifically identified a series of seven factors that impacted the pre-bankruptcy claims values that will not be replicated in the future. (*Id.* at 6-7). In that regard, the Court focused in particular on punitive damages, and concluded unequivocally that punitive damages should be excluded from the estimation. As the Court stated: "the amounts of verdicts and settlements experienced pre-bankruptcy should be reduced to account for the impact of actual or threatened punitive damage awards." (*Id.* at 7). Another factor specifically identified by the Court that is unlikely to be replicated, and therefore should be accounted for by adjusting the Debtors' historical values, is the over-payment to unimpaired claimants. (*Id.* at 5-6).

After identifying the factors that will not be replicated and for which adjustments should therefore be made to the historical claims values, the Court defined the ultimate task necessary to estimate the value of pending and future asbestos-related claims: "The Court's task

at this juncture is to decide how well the expert witnesses accorded appropriate weight to the various factors," (*Id.* at 9), which "are unlikely to be replicated." (*Id.* at 6). The Court proceeded to conclude that the opinions of Dr. Vasquez and Dr. Rabinovitz are the most "persuasive" in this regard. As to Dr. Rabinovitz, for example, the Court opined that her opinion is persuasive because she "attempted, and largely succeeded, **in adjusting historical figures to reflect changed circumstances.**" (*Id.* at 10) (emphasis added). Accordingly, after noting that Dr. Rabinovitz's estimate is slightly too high because she had neglected to adjust for age, the Court concluded that the most appropriate estimate "lies somewhere between Dr. Vasquez's high estimate [of $6.8 billion] and Dr. Rabinovitz's low estimate [of $8.15 billion]." (*Id.* at 2, 10-11). Using these two estimates as goal posts, the Court then estimated the value of pending (including contract claims) and future claims at $7 billion. (*Id.* at 11).

    B.    The Undisputed Facts With Respect To The Estimates of Drs. Vasquez and Rabinovitz.

The undisputed evidence in the record unambiguously confirms that neither the "high" estimate of Dr. Vasquez nor the "low" estimate of Dr. Rabinovitz takes into account and adjusts for the "changed circumstances" with respect to the major factors identified by the Court. Most importantly, the undisputed evidence adduced at the hearing demonstrates that neither estimate adjusts historical verdicts or settlement values to remove the punitive damages components, and neither accounts in any way for historical over-payments to unimpaired claimants. In fact, Dr. Rabinovitz testified that she did not make any adjustments for any of the factors the Court ruled should be taken into account. As Dr. Rabinovitz herself testified, "all I know is what the database tells me." (Rabinovitz, 1/18/2005 a.m. tr. at 30). We respectfully submit there is a clear disconnect between the Court's legal analysis and rulings, and its use of

the high Vasquez and low Rabinovitz opinions as the goal posts that supposedly "accorded appropriate weight to the various factors" which are unlikely to be replicated in the future.

Reconsideration is warranted to correct the Court's apparent misapprehension that the estimates it relied upon contained adjustments for punitive damages, historical overpayment to unimpaired claimants, and other factors that the Court has concluded should be taken into consideration. The adjustment sought by this motion would bring the Court's estimate into alignment with its legal analysis and rulings.

### III.   ARGUMENT

The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. *Harasco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Civ. 1985); *Ciena Corp. v. Corvis Corp.*, 352 F. Supp. 526, 527 (D. Del. 2005). Thus, "a court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result." *Chase Manhattan Bank v. Iridium Africa Corp.*, No. CIV.A.00-564 JJF, 2004 WL 1588295, *1 (D. Del. July 8, 2004). As set forth below, the Court's Memorandum and Order rests upon clear factual errors that materially affected the estimate. We respectfully submit that the Court should correct them.[1]

#### A.   The Estimates Relied Upon By The Court Include Punitive Damages.

In reaching its $7 billion estimate, the Court relied upon forecasts from Drs. Rabinovitz and Vasquez that include punitive damages components, contradicting its own, correct holding that punitive damages must be excluded. The Court found Dr. Vasquez's

---

[1] This motion is made without prejudice to the Banks' right to appeal, and the Banks reserve their right to appeal on any and all appropriate grounds.

estimate – which the Memorandum stated ranged from $6.5 to $6.8 billion – to be persuasive.[2] Dr. Vasquez, however, had put forth several estimates, a fact which the Court alluded to in its opinion, and it is the oral estimate provided in Dr. Vasquez's hearing testimony – which differed from his expert reports and the two estimates they set forth – upon which the Court ultimately relied. In his expert report (CSFB Ex. 12), Dr. Vasquez controlled for punitive damages and eliminated them from his estimate. In that report, Dr. Vasquez set forth two estimates, the first in the range of $3.4 billion to $3.7 billion (Method I), and the second in the range of $4.6 billion to $4.9 billion (Method II), when combined with Mr. Mayer's analysis of the value of pending claims. By contrast, Dr. Vasquez testified at trial that he reached the increased estimate offered at the hearing and relied upon by the Court in its Memorandum by *re-inserting the punitive damages component*, solely at the request of counsel for Debtors upon cross-examination by such counsel, thus undoing the very analysis and adjustments in his expert report relating to punitive damages. (Vasquez, 1/20/2005 a.m. tr. at 79-81). It was this third and highest estimate of Dr. Vasquez – and the only one that included punitive damages – that the Court relied upon.

    Although Dr. Vasquez provided no written breakdown of the actual amount of this add-back for punitive damages, his testimony at the hearing was that it came to $600 million for just future claims. (*Id.*). Dr. Vasquez also agreed with Debtors' counsel that Mr. Mayer's estimate for pending claims would be increased by another $300 million on account of the add-backs. (*Id.* at 81). Once again, Debtors provided no analysis of how much of this increase was on account of the punitive damages add-back. Assuming conservatively that only one-third of

---

[2] Although the Court's Memorandum refers only to Dr. Vasquez, the Debtors' estimate actually is a composite of Dr. Vasquez's estimate of future claims and Mark Mayer's estimate of pending claims. Mr. Mayer is the Debtors' comptroller. (Vasquez, 1/20/2005 a.m. tr. at 80-81).

the add-back to Mr. Mayer's estimate of present claims was attributable to punitive damages, the total Vasquez estimate relied upon by the Court included approximately $700 million in punitive damages (i.e., $600 million for future claims, plus approximately $100 million for present claims), directly contradicting the Court's own holding that "the amounts of verdicts and settlements experienced pre-bankruptcy should be reduced to account for the impact of actual or threatened punitive damage awards." (Memorandum at 7).

The $8.15 billion "low" estimate of Dr. Rabinovitz, which the Court used as the other goal post also includes, and fails to make any adjustment for punitive damages. While Dr. Rabinovitz testified that the Owens Corning settlements were affected by the threat of punitive damages, she made no adjustment to her estimate to account for this. (*See* Rabinovitz, 1/18/2005 p.m. tr. at 9-10); (Plan Proponents "PP" Ex. 70 at 15, n. 14) ("No adjustment was made in the HR&A estimates to remove punitive damages, settlements post verdict, or verdicts because this is a tort system estimate."); (Rabinovitz, 1/18/2005 a.m. tr. at 41) (included punitive damage awards in her estimate).

Because the Court expressly held that an adjustment should be made to account for the effect of punitive damages, its reliance on Dr. Rabinovitz's estimate was erroneous.[3] While Dr. Rabinovitz did not quantify the impact of punitive damages on settlements, there is evidence in the record as to the amount of the adjustment to the estimates that should be made to account for this factor. Both Dr. Vasquez and Dr. Dunbar calculated the appropriate adjustment. Dr. Vasquez discounted his Method II by 12.5% to account for punitive damages (CSFB Ex. 12

---

[3] Dr. Rabinovitz testified that she did not conduct any analysis on the effect of punitive damages on settlement values. (Rabinovitz, 1/18/2005 a.m. tr. at 64-65, 89) (admitting she did not account for the effect of punitive damages on settlement values, claiming she did not "know how to measure that effect with the data that we have").

at 20; Vasquez, 1/20/2005 p.m. tr. at 49), while Dr. Dunbar calculated the impact at 21%. (Dunbar, 1/19/2005 p.m. tr. at 51). Using the more conservative of these two, the Court should reduce Dr. Rabinovitz's estimate of $8.15 billion by a minimum of 12.5%, the percentage that Dr. Vasquez concluded was attributable to the impact of punitive damages on settlement values.[4] Thus, the lower end of the Rabinovitz range should be no higher than $7.13 billion, or approximately $1.0 billion lower than that utilized by the Court.

Accordingly, by properly reducing the estimates for the impact of punitive damages, a conservative adjustment would result in a range between the "high" Vasquez estimate of approximately $5.8 to $6.1 billion and the "low" Rabinovitz estimate of $7.13 billion. A corresponding adjustment to the Court's estimate would lower the $7.0 billion estimate by approximately $850 million, (*i.e.*, the mid-point between the $700 million reduction to the "high" Vasquez estimate and the $1.0 billion adjustment to the "low" Rabinovitz adjustment), to approximately $6.15 billion.

      B.    The Estimates Relied Upon By the Court Do Not Adjust For Over-Payment To Unimpaired Nonmalignant Claimants Despite The Court's Ruling That This Is A Factor That Should Be Taken Into Account.

Over-payment to unimpaired nonmalignant claimants was also among the seven factors the Court identified as having skewed past results and which are "unlikely to be replicated." (Memorandum at 6). The Court ruled that it should make adjustments where "past results have been skewed by factors which can and should be avoided in the future." (*Id.* at 5). The Court also noted the "general realization of asbestos litigators that inadequately supported

---

[4] Only Drs. Vasquez and Dunbar made adjustments to consider the effect of punitive damages on settlements. Using the more conservative adjustment by Dr. Vasquez is thus the most favorable approach the record will support with regard to the Asbestos Claimants for this category of adjustments.

diagnoses of asbestosis will be unlikely to establish compensability and that significant monetary awards will be unlikely in the absence of some proof of actual impairment." (*Id.* at 9). Although the Court held that over-payment to unimpaired nonmalignant claimants is a factor that should be accounted for in an appropriate estimation, the undisputed evidence shows that both of the estimates utilized by the Court fail to do so.

Dr. Vasquez presented two methods for determining the appropriate future asbestos liability of Owens Corning. Dr. Vasquez's Method I determined the payment scale for each disease category by referring to the schedule of payments contained in the section of the various NSP agreements relating to future claims. (CSFB Ex. 12 at 17) In this method, Dr. Vasquez valued unimpaired nonmalignant claims at $1,000, while valuing impaired nonmalignant claims at $8,415. (*Id.* at 25). This resulted in Dr. Vasquez attributing a total value of $563.6 million to nonmalignant claims in his Method I. (*Id.*). In contrast, Dr. Vasquez did not distinguish between impaired and unimpaired nonmalignant claims in his Method II – the method underlying the increased estimate utilized by the Court. (*Id.* at 21). Dr. Vasquez's Method II values both unimpaired and impaired nonmalignant claims the same ($5,870), for a total value of $1,566.7 million. (*Id.* at 26, table 16). Thus, **Dr. Vasquez's Method II, which does not distinguish between impaired and unimpaired nonmalignant claims, values nonmalignant claims $1.031 billion higher than his Method I, which did make that distinction.**

Similarly, Dr. Rabinovitz's "low" estimate also fails to differentiate between impaired and unimpaired nonmalignant claimants. Indeed, she testified that she did nothing to distinguish between unimpaired and impaired nonmalignant claims and conducted absolutely no analysis whatsoever to determine the effect of lumping both impaired and unimpaired claims in

her estimate. Instead, Dr. Rabinovitz allotted the same amount of payment for both types of claims. (Rabinovitz, 1/18/2005 a.m. tr. at 66) (did not adjust values for impairment); (Rabinovitz, 1/18/2005 p.m. tr. at 22-23, 25-26) (did not analyze the effect of separating impaired and unimpaired claims). In light of the Court's determination that over-payment to unimpaired claimants should be taken into account, we respectfully submit that the use of the two estimates that do not distinguish between impaired and unimpaired nonmalignant claimants constitutes a manifest error that should be corrected.

    C.    The Court Incorrectly Concluded That Dr. Rabinovitz Adjusted Her Estimate To Account For Changed Circumstances.

As previously noted, the Court stated that Dr. Rabinovitz's opinion was "persuasive" because she "attempted, and largely succeeded, in adjusting historical figures to reflect changed circumstances." (Memorandum at 10). The Court further stated "I consider her estimate probably a little too high, however, because it does not adequately take into account the aging of the population, and the impact of aging upon both values and propensity to sue." (*Id.* at 10-11). As Dr. Rabinovitz's unequivocal trial testimony and report confirms, however, the Court's statement is incorrect. In fact, Dr. Rabinovitz openly acknowledged that she failed to adjust her estimate not only for the effects of age, but she also failed to account for any of the other changed circumstances that the Court found should be taken into account.

Thus, in addition to her admitted failure to adjust for punitive damages and over-payment to unimpaired claimants as discussed above, Dr. Rabinovitz's report (PP Ex. 70) reflects that she did not adjust for the effects of any of the other five factors set forth by the Court on pages 6 and 7 of the Memorandum that skewed the past results, and to which adjustments to the historical values reflected in the database are appropriate. (*See* Memorandum at 5). These

factors are (1) venue-shopping by plaintiffs, (2) mass screenings, (3) erroneous x-ray interpretations by suspect b-readers, (4) group lawsuits, and (5) global settlements. (*Id.* at 6-7). In fact, Dr. Rabinovitz admitted that she "[did not] make any direct effort to adjust for changed circumstances." (Rabinovitz, 1/18/2005 a.m. tr. at 91). Rather, she conceded that her estimate was strictly based on the historical information contained in the iCMS database and nothing more. (*See, e.g.*, Rabinovitz, 1/18/2005 p.m. tr. at 31) ("if it's not in the database, in my world, in some sense it doesn't exist"); (*Id.* at 30) ("All I know is what the database tells me"). The Court's conclusion that Dr. Rabinovitz accounted for the effects of these factors is a clear factual error that placed the Court's estimate in conflict with its legal analysis and findings. Thus, Dr. Rabinovitz's estimate of $8.15 billion constitutes an unadjusted, historical estimate, skewed by all the factors the Court concluded are not likely to be replicated in the future.[5]

       We respectfully submit that this error materially impacted the Court's opinion concerning the reliability of Dr. Rabinovitz's opinion. The Banks therefore request that the Court reconsider its decision and not rely on Dr. Rabinovitz's $8.15 billion estimate as one of the goal posts in reaching its estimation of Owens Corning's asbestos liabilities. Instead, and consistent with the conclusions of law in its March 31, 2005 Memorandum and Order, the Court should adopt the estimate of Dr. Vasquez, properly adjusted to remove the impact of punitive damages, resulting in a range of $5.8 billion to $6.1 billion. We further urge that the Court should rely on Dr. Vasquez's Method I, which differentiates between unimpaired and impaired

---

[5] (*See also* Rabinovitz, 1/18/2005 p.m. tr. at 10-11) (agreeing that venue affects value, but her estimate does not account for where the claims will be resolved); (Rabinovitz, 1/18/2005 a.m. tr. at 41) ("I'm going to stick as close to history as I possibly can.").

nonmalignant claimants,[6] and reduce the estimate by a further $1.03 billion, to a range of approximately $4.8 to $5.1 billion. An estimate in this range would be conservative in light of the fact that the Banks have not sought in this motion any adjustment based upon the other five factors identified by the Court, (Memorandum at 6-7), or for application of the proper discount rate.

## IV. CONCLUSION

This Court's ruling that it could not estimate the Debtors' future asbestos liability simply by extrapolating from the Debtors' pre-petition settlement history, and that adjustments must be made to account for the factors identified by the Court that should and will not be replicated in the future, was clearly correct and has set an important precedent. Nevertheless, there is a clear disconnect between the Court's legal analysis and rulings, and the estimation it arrived at, as the Court committed clear errors in performing its own mandate that "[t]he Court's task at this juncture is to decide how well the expert witnesses accorded appropriate weight to the various factors" which "are unlikely to be replicated." In fact, as demonstrated above, the evidence in the record is undisputed that the high estimate of Dr. Vasquez and the low estimate of Dr. Rabinovitz used by the Court as the basis for its estimate clearly disregard the very factors for which the Court specifically held that adjustments had to be made. For the foregoing reasons, the Banks respectfully submit that the Court should grant their Motion for

---

[6] We note that while the Court stated that Dr. Vasquez "may well have felt it necessary to minimize his estimate to some extent because of his earlier involvement in estimating Owens Corning's contingent liabilities for purpose of its reports to the SEC," (Memorandum at 11), the evidence in the record does not support such a conclusion. Dr. Vasquez's undisputed testimony was that he did not know why the Debtor had asked him to do a forecast of their future asbestos liabilities, (Vasquez, 1/20/2005 a.m. tr. at 13) and that he did not make any changes in his estimation methodology for SEC reporting purposes. (*Id.* at 14).

Reconsideration and issue a revised estimate in the range of $4.8 to $5.1 billion, which is entirely consistent with the Court's legal analysis and fair to all concerned.

Dated: April 11, 2005

Respectfully Submitted,

**LANDIS RATH & COBB LLP**

Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, DE 19810
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

-- and --

WEIL, GOTSHAL & MANGES LLP
Martin J. Bienenstock
Richard A. Rothman
Denise Alvarez
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

-- and --

David A. Hickerson
Adam P. Strochak
M. Jarrad Wright
1501 K Street, N.W., Suite 100
Washington, D.C. 20005
Telephone: (202) 682-7000
Facsimile: (202) 857-0940

-- and --

Ralph I. Miller
200 Crescent Court, Suite 300
Dallas, TX 75201-6950
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

-- and --

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Kenneth H. Eckstein
Ellen Nadler
914 Third Avenue
New York, NY 10022
Telephone: (212) 715-9100

## CERTIFICATE OF SERVICE

I, Rebecca L. Butcher, Esquire, do hereby certify that a true and correct copy of the foregoing **Motion of Credit Suisse First Boston, As Agent, for Reconsideration of the Court's March 31, 2005 Memorandum, Memorandum in Support of Credit Suisse First Boston's Motion for Reconsideration of the Court's March 31, 2005 Memorandum and Order and Proposed Order** were served this 11th day of April, 2005 on the attached list via hand delivery (**City of Wilmington addresses only**) and first class U.S. Mail.

In addition to the attached service list, a Chambers' copy of the Motion of Credit Suisse First Boston, As Agent, for Reconsideration of the Court's March 31, 2005 Memorandum and Order and accompanying papers was mailed out today April 11, 2005 to The Honorable John P. Fullam via Federal Express Priority Mail Overnight Delivery.

Dated: April 11, 2005

_____
Rebecca L. Butcher, Esq. (#3816)

404.002-7665.DOC