In the realm of future claims, the Eagle Picher court set forth seven considerations
that should drive the estimate:

> 1. The estimate should be primarily based upon the history of this company,
> particularly because there was no definitive showing of another or other
> company's production of a product line identical to that of debtors. This
> consideration does not, however, rule out the desirability of considering
> trends general to the industry, *particularly regarding the rate of filing of
> claims.*
>
> 2. The total number of claims to be expected should be estimated.
>
> 3. The estimation of claims should categorize them by disease and
> occupation, as well as other factors.
>
> 4. Valuation of claims should be based upon settlement values for claims
> close to the filing date of the bankruptcy case.
>
> 5. A reasonable rate for indemnity increase with time must be determined so
> that a future value of filing date indemnity values can be comparable.
>
> 6. A lag time gleaned from the tort system must be determined in order that
> there be accuracy in projecting future values.
>
> 7. A discount rate must then be applied in order to bring the future nominal
> value of claims back to the filing date.

Id. at 690-91. Both parties cite to In re Eagle-Picher, and this Court finds its framework
persuasive.

### D.  T&N's Legal Liability for Asbestos Personal Injury Claims

Despite the significant difference in estimates, there are some areas where Dr.
Peterson and Dr. Cantor agree. Both generally agree on the number of historical claims
filed, and an approximate value of unpaid, unresolved pending claims. Also, each expert
"transitions" the data for those claims that were unspecified in the T&N Database. In

addition, the experts both derive a "nonmalignant multiplier" for projecting the number of

future nonmalignant claims as a multiple of cancer claims; namely, Dr. Peterson uses 10.2

for his Increasing model and Dr. Cantor uses 12.9. They both generally agree on the

historical dismissal rates, which they both use to determine the number of pending and

future claims that will be compensated. This Court has determined, after considering the

evidence and the testimony of the experts, that Dr. Peterson's estimate comes closest to

the criteria enumerated in In re Eagle-Picher.

      1.    Number of Pending and Future United States Claims

Dr. Peterson and Dr. Cantor both testified that the number of pending claims,

including those that have been settled but not yet paid, or resolved, total approximately

135,000 claims. This figure represents the total number of unpaid claims that were

pending as of the Petition Date. Thus, those claims that are deemed "settled but not yet

paid" or "settled but not yet documented" must be included in the overall number of

pending claims.

Pursuant to the first factor of Eagle Picher, the focus must be on T&N's actual

settlement history in determining what a claim would have been worth but for the

bankruptcy. Greater weight must be placed on the nine months of data, when T&N was a

stand-alone defendant, because that is most indicative of what a claim would have been

worth but for the bankruptcy. Understandably, it is inherently problematic to create a

long-term estimate based on a shorter period of time; however, a trend must be grounded

in legal reality, sometimes at the expense of statistical principles. Both experts provided

the Court with historical comparisons from other asbestos defendants. It is appropriate

here, especially in the case of T&N, to accord some weight, "particularly to the rate of

filing" as to other similarly situated asbestos defendants. See In re Eagle Picher, 189 B.R.

at 690. The breadth of T&N's asbestos containing products, as demonstrated by its board

membership in the CCR, would make a side-by-side comparison to other asbestos

defendants, for other purposes, less helpful.

In projecting the number of future claims, the Court finds Dr. Peterson's forecast

more reliable because it best depicts the short-term increase in overall claims filings that

T&N experienced when it left the CCR. The PD Committee's position, that the

establishment of the CCR, and the ACF, likely facilitated the process for potential

claimants to bring suit against the defendant members, and therefore, likely resulted in an

increase in the number of claims filed is well taken. The testimony of Hanly and Dr.

Peterson, however, indicated that this phenomena was nullified by the Georgine class

action litigation, which chilled claims filing.

The experience of Union Carbide, which also left the CCR in 2001, demonstrates

that when it left the CCR the claiming rate increased. In 2001, Union Carbide had 73,806

claims filed against it, then, 121,916 in 2002, and 122,586 in 2003. (Tr. at 1169

(Cantor).) The juxtaposition of these events, leaving the CCR and an increase in claim

filings, does not mean these events are causally related. Rather, and in agreement to

projections of Dr. Peterson based upon the forecasts of cancer incidence in the Nicholson

study, it means that the incidence of disease was going up. The PD Committee correctly

-51-

notes that in 2004 Union Carbide's filing dropped to 58,240; however, all of the Union

Carbide data was taken from the company's Form 10-K filing and reported in accordance

with GAAP.[14]  Therefore, Union Carbide's numbers in 2004, and the years 2001-2003,

are likely understated.

By comparison, Dr. Cantor forecasts the total number of compensable claims in

2004 for T&N at 21,970, which is on a marked downward trend from the filings in 2001.

All speculation aside, Hanly testified that T&N experienced a significant increase in the

number of claims, with a sharp rise in mesothelioma and lung cancer claims. (Tr. at 79-

82 (Hanly).)  Mr. Hanly's testimony and the Union Carbide experience supports to some

degree, but not completely, the short term increase in filings suggested by Dr. Peterson.

Further, the mesothelioma incidence peak of 2002 suggested by Dr. Cantor and Dr.

Weill is less persuasive than the Nicholson study, relied upon by Dr. Peterson.  The

Nicholson study more accurately matches the incidence of mesothelioma deaths reported

by the National Cancer Institute's SEER data, than does the alternative projections by

KPMG or NCI.  The Court gives greater weight to the SEER's projections because a

government report would likely contain less bias than a private consulting company.  Dr.

Welch and Dr. Weill testified that there are currently 2,800 new cases of mesothelioma in

men, and several hundred in women. (Tr. at 270-271 (Welch); Weill Tr. at 118-119.)  For

---

[14]  The reporting requirements under generally accepted accounting principles ("GAAP")
relating to filings to the Security and Exchange Commission have purposes that are largely
divergent from the estimation of liability for a personal injury trust.

example in the years 2000-2004, the Nicholson forecast of approximately 3,000 cases per year (men and women) conforms more closely than the approximately 2,500 new cases in the KPMG model and the approximately 1,800 new cases in the Navigant model. Plaintiff also demonstrates that if SEER's age adjusted incidence data (two cases of mesothelioma per 100,000 males) is applied to the 2003 census data (140 million males), they yield approximately 2,800 new cases of mesothelioma. (See Pl. Response at 18 n.6.)

Further, both medical experts testified that changes in mesothelioma incidence is probably the clearest measure of other asbestos related disease. Indeed, both experts use the mesothelioma incidence to compute their respective nonmalignant multipliers. Dr. Cantor's use of untransitioned data in her forecast of nonmalignant claims, which demonstrates flat or decreasing incidence for nonmalignant claims, appears in direct contradiction to both medical experts, who, are better equipped to understand the dose-response studies. Admittedly, not every asbestos-related claim in the United States can be attributable to T&N; yet, Dr. Peterson's estimated number of claims based upon all of the Nicholson industries is more reliable in light of the entire T&N product line, not just the exposures from the Limpet product. Nevertheless, the Court is reluctant to give wholesale acceptance to Dr. Peterson's increasing nonmalignant assumption-- that the ratio of nonmalignance to cancer claims will be about 11 percent greater than the base period (see Pl. Exh. 2 at 36.)--because the T&N data, and Dr. Cantor's analysis, cast some doubt about the sufficiency of this theory. Dr. Peterson states that the increasing nonmalignant assumption was based upon the general experience of asbestos defendants

-53-

in the 1990s; specifically, he relied on the filing experience of the Manville and UNR trusts. (Id.) The use of this historical data from other asbestos defendants, to predict a corresponding 11 percent increase in the nonmalignant ratio for T&N, is not persuasive; especially, since the testimony from both estimation experts characterize the ratio as being relatively stable.

Also, Dr. Peterson's method of counting the claims filed in a given year is a more appropriate method for forecasting future claims than a "death year" approach. Dr. Cantor imputed a death year to claimants in her four year calibration period by making the payment date a proxy for the date of death. Because the claim payment date is on average two years or more longer than the date of death, it is argued that Dr. Cantor's calibration period does not consider: (1) persons who made claims against T&N, but have not yet died, and (2) persons who have died before the Petition Date, yet filed claims afterward. The Court finds credible the criticism of Dr. Cantor's death year methodology because it ignores over 30 percent of the cancer claims made during the calibration period. Indicative of this was Dr. Cantor's 2002 projection of a mere 660 compensable mesothelioma claims, a 40 percent drop from the year before. This estimate is not supported by either T&N's claims history, any epidemiological model, or events after the Petition Date. Consequently, Dr. Cantor's nonmalignant claims filings, derived from the incidence of cancer claims, is understated.

Lastly, there is a fundamental disagreement about the affect that certain changes in the United States tort system will have on claims *filings*. The PD Committee asserts that

-54-

tort reform will reduce claims filings.  (PD Response at 6).  This Court cannot, and will

not, speculate about the effect these market changes will have on *settlement averages*.

What is critical is the recognition that filings and settlements are two distinct variables in

the equation.  Therefore, the safest and surest predictor of filings must be tied to an

epidemiological model that forecasts incidence of disease, and not on whether a particular

claimant makes a decision to file a complaint.  As such, the only rational theorem that can

be stated is that where there is more asbestos incidence, one can expect more filings, and

vise versa.

> 2.    Settlement Averages for United States Claims

No one can dispute that T&N's settlement averages would be higher when they

filed for bankruptcy, as a stand alone defendant, than they were as a CCR member.

According to Hanly, the CCR's share allocation process allowed T&N to pay far less in

aggregate because the cost savings and reduced claims settlements more than offset the

cost of paying those claims that T&N might not have paid outside the CCR.  (Tr. at 77-78

(Hanly).)  The mere fact that twenty of the United States's largest asbestos defendants

sought refuge in the CCR indicates that it was a cost-wise endeavor.  This is especially

true in the case of T&N, as it faced one of the largest liability exposures of all the CCR

members.  Once the CCR became less cost efficient, T&N left.  T&N's Chief Financial

Officer, Michael Lynch, testified that it became very apparent soon after they left, that the

costs were going to be greater than what they were in the CCR.  (5/25/05 Lynch Dep. at

96-97.)  Additional support for the post-CCR phenomenon, and conceded to by Dr.

Cantor, was Union Carbide's post-CCR experience whereby it saw its total indemnity

costs go from $39 million in 2001 to $155 million in 2002, $293 million in 2003, and

eventually $300 million in 2004.  (Tr. at 1168-1170 (Cantor).)  This rate of increase is

telling.

Dr. Cantor, in her analysis, uses a four year rolling average, based upon three years

of T&N's settlements as a CCR member, and one year as a stand alone defendant.  As

previously noted, using more years, rather than less, is a more accurate method for

forecasting a long-term average.  Yet, Dr. Cantor's methodology does not fully reflect the

undeniable trend that T&N was paying more to settle cases when it left the CCR.

Conversely, Dr. Peterson considered the settlements in the CCR, but largely based his

resolution amounts on T&N's nine months as a stand alone defendant, and then,

calculated settlement amounts based on a trend.  Dr. Peterson also testified that he

consulted with Hanly, plaintiff and defense attorneys, and the trends occurring in the

asbestos litigation as a whole.  Dr. Peterson testified that his experience allowed him to

recognize, and adjust for, statistical anomalies such as the 10,700 Mississippi premises

liability claims that settled for $300.00 each.  On the other hand, Dr. Cantor's estimate did

not factor out these anomalies, and it became apparent on cross-examination that her

knowledge about the United States tort system was less than ideal.

Defendant's argument that Dr. Peterson's used inflated TDP values oversimplifies

the process that Dr. Peterson used in reaching that result.  The Court will not devote as

much space to rejecting this argument as it took to summarize his four-step process in

-56-

Part II.F.2, infra. It is sufficient to say that Dr. Peterson testified that because the TDP

values were very comparable, if not lower, he erred on the side of conservatism and used

the TDP values as the settlement amounts for future claims. (Tr. at 437-438 (Peterson).)

It is from the TDP figures that Dr. Peterson derived the average resolution amounts.

Furthermore, Dr. Peterson retested his resolution amounts against the T&N Database, in

the time between his report and the trial, and testified that they were very close to the

2001 values that he used in his Increasing model. (Tr. at 433.) While the number of

claims might vary greatly from one asbestos defendant to another, it is logical to assume

that there is more of a "market rate" as it relates to settlement averages by disease. Thus,

Dr. Peterson's methodology is more convincing, and therefore, it is afforded greater

weight.

     A note must be made about problems in the United States tort system, as it relates

specifically to asbestos personal injury litigation, which purportedly have inflated *claim*

*resolutions* in the past. Many of these factors were listed by the In re Owens Corning

court, which stated that, "Some of the past results have been skewed by factors which can

and should be avoided in the future. The question to be resolved is the extent to which

adjustments should be made to historical values to account for these probable changes."

In re Owens Corning, 322 B.R. at 723. The factors mentioned by the court include: (1)

venue shopping; (2) mass screenings "which triggered thousands of claims by persons

who had never experienced adverse symptoms"; (3) erroneous x-ray interpretations by

"biased" plaintiff doctors; (4) overpayment to claimants who were "unimpaired"; (5)

grouping more serious injuries with unimpaired claimants resulting in higher verdicts; (6)

global settlement programs that overvalue less meritorious cases; and (7) settlements that

were impacted by the threat of punitive damages. Id. These are general allegations and

their truth here is not conceded. In addition, the record before us does not supply the

factual support necessary to intelligently quantify their effect.

The uncontroverted evidence at trial demonstrated that the market factors that

allegedly drove up historic claim resolutions were counterbalanced by other factors,

which Hanly testified, were considered by T&N in its settlements values. These included

the strength of exposure evidence, strength of medical evidence, identity of plaintiff's

doctor supplying the diagnosis, identity of plaintiff's counsel, jurisdiction where case was

pending, plaintiff's ability to get a trial date; plaintiff's economic damages, and the

history of asbestos defendants in the jurisdiction. (Tr. at 79-80, 92 (Hanly).)

Furthermore, after it left the CCR, T&N paid out a several share of its liability and did not

factor in what a claimant might or might not get from another asbestos defendant. (Tr. at

76-77 (Hanly).) Also, Hanly testified that the threat of punitive damages was not factored

into the equation. (Tr. at 92, 102.) In fact, T&N has only faced one punitive damages

verdict in its history (March 2001), which was bonded and paid in 2004 and not included

in the T&N database. (Tr. at 92.) Dr. Peterson convincingly concluded that factors listed

in In re Owens Corning had no impact on his forecast because based upon the

uncontradicted testimony of Hanly, and reflected in the T&N Database, they were already

considered in the T&N settlement history.

-58-

As stated above, the Court will not attempt mathematical precision in this estimate. It would be impracticable, if not impossible, to weigh all of the factors that have influenced asbestos personal injury litigation in the United States, make adjustments, and then reach a well-reasoned conclusion that differs from what the market has told us a claim is worth. The market is just that, a market; as such, it would not be prudent to second-guess the historic resolutions that were driven by factors by *both* plaintiffs and defendants, and relied upon here by competent experts in formulating an estimate. Consequently, Dr. Cantor's suggestion that pending tort reform will drive down the average settlement costs is not persuasive. Dr. Peterson's forecast is more representative of what the tort system would pay a personal injury claimant in the future.

    3.    Aggregate Liability in the United Kingdom

Dr. Peterson's report addresses the estimation in the United Kingdom, with the same reasoned approach demonstrated in his analysis of United States claims. (See PD Exh. 2 at 47-53.) There was no rebuttal expert report on these claims, nor was significant attention paid this issue in the estimation hearing. As such, for the purposes of this estimation, the £229 million is deemed the amount of T&N's aggregate asbestos-related personal injury, or death, liability in the United Kingdom.

    4.    Interest and Inflation

Because of the tremendous amount of money involved, the present value calculations should be given more than just a passing treatment. Both Dr. Cantor and Dr. Peterson understood their respective discount rates to be "risk free." The Court accepts

-59-

their testimony. There are two phenomena which impact the ultimate value of liability.

First, discounting to present value is a means of arriving at the amount of money that will

produce the lost future benefits if the lump sum award is invested at prevailing interest

rates. Second, it is well-understood that inflation means that the purchasing power of a

dollar today, will probably have a decreased purchasing power at the time of the dollar's

theoretical use in the future. In general, plaintiffs will try to project lower future interest

rates than will be suggested by defendants; here, Dr. Peterson suggests a 5.02 rate and Dr.

Cantor offers a rate of 5.5. Similarly, plaintiffs will usually testify to increasing rates of

inflation, whereas defendants can be expected to project a more stable economy; thus, Dr.

Peterson offers a 2.5 percent inflation rate and Dr. Cantor predicts a rate of 2.2.

   The United States Supreme Court has explored the extent to which the likelihood

of future inflation may be considered in calculating the present value of awards. In St.

Louis Southwestern Ry. Co. v. Dickerson, 470 U.S. 409 (1985), the Court stated that "[it

is] clear that no single method for determining present value is mandated by federal law

and that the method of calculating present value should take into account inflation and

other sources of wage increases as well as the rate of interest." The Court observed that

the best method for calculating the approximate present value of an award for loss of

future earnings could become the subject of reasonable debate in almost any case. See

Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523 (1983). There, the Court declined

to adopt any specific mathematical formula as a method for calculating lost future

earnings; yet, the Court did set forth general considerations for calculating and proving

-60-

lost earnings.  The options mentioned were:

> (1) calculate the lost income stream by excluding the effects of inflation and the "real" interest rate by fixing the difference between the market rate of interest and the anticipated rate of inflation,
> (2) calculate the size of the lost income stream by including the effects of inflation and discounting by the market interest rate, and
> (3) calculate the value of pecuniary damages by employing a zero discount rate (the total offset approach).

The last option was considered unacceptable as a uniform method to calculate damages, although it could be stipulated to by the parties, or applied by the trial court in an appropriate case.  Cf. Barnes v. United States, 516 F. Supp. 1376 (W.D. Pa. 1981) (applying offset approach) aff'd 685 F.2d 66 (3d Cir. 1982).  After examining a plethora of economic studies, the Jones & Laughlin Steel Corp. Court concluded as to the "real" interest rate option that, "Although we find the economic evidence distinctly inconclusive regarding an essential premise of those approaches, we do not believe a trial court . . . should be reversed if it adopts a rate between 1 and 3% and explains its choice."

Unlike the In re Owens Corning estimation, the parties have not presented an economic expert to opine on long-term inflation and interest rate trends.[15]  Moreover, the estimation experts that have used their respective rates in calculating total liability do not provide their calculations, and even if they did, each expert's present value calculation represents a different time period for when the discount is made-Dr. Peterson forecasts out to 2039, and Dr. Cantor forecasts to 2054.

---

[15] The Court takes note that Plaintiffs did submit a Rebuttal Report of Lorreto T. Tersigni, CPA, CFE [Docket No. 32, Civ. No. 05-59(JHR)] before trial; however, Mr. Tersigni did not testify, nor was his report moved into evidence.

As a result, the Court determines that the real interest rate approach is preferable

here because continuing inflation is an economic reality, and it will remain so in the

foreseeable future. Thus, it is a factor which cannot be ignored when assessing damages

for future claimants. While predicting future inflationary trends, or extrapolating from

present ones, may be speculative, so are most predictions courts make about future

incomes, expenses (as, for example, in the case of the wrongful death of an infant). Since

it is still more probable that there will be changes in the purchasing power of the dollar in

the future, it is better to try to predict them rather than to ignore them altogether. United

States v. English, 521 F.2d 63, 75 (9th Cir. 1975). Under the real interest rate approach

the discount rate is adjusted for inflation, and the rate is then determined by subtracting

the average annual change in the consumer price index over a period of years from the

effective annual interest on government bonds held during the same period. The

objective of the method is to determine the "real" yield of money: that portion of interest

charged on virtually risk-free investments that represents only the real cost of money and

not the additional cost the lender charges as a hedge against inflation. See Doca v.

Marina Mercante Nicaraguense, S.A., 634 F.2d 30 (2d Cir. 1980).

Here, both Dr. Cantor's and Dr. Peterson's estimates took into account inflation by

increasing the claim values by their respective inflation rate each year. Next, a risk-free

discount rate must be chosen. At first glance, the difference between a rate of 5.02

(Peterson) and 5.5 (Dr. Cantor) does not look substantial. However, Dr. Peterson

considered the discount rate effects in one of his twenty sensitivity analyses, and

concluded that a half-point increase in the discount rate decreases the net present value of

T&N's liabilities by about five percent, or approximately $500 million of his $11.1 billion

Increasing estimate.  (PD Exh. 2 at 63.)  The Court takes judicial notice that the Board of

Governors of the Federal Reserve System reported the 30 Year Treasury Constant

Maturity Rate in October 2001 at 5.32 percent.  See http://www.federalreserve.

gov/releases/H15/data/m/tcm30y.txt (last visited August 2, 2005).  Therefore, the estimate

should reflect this discount rate and also come to some middle ground as to each expert's

adjustment for inflation.

     5.    Conclusion

     The Court places more reliance on the methodology and testimony of Dr. Peterson

and concludes that Dr. Peterson's estimate more closely satisfies the criteria established in

In re Eagle Picher.  However, the reliance is tempered by the Court's consideration of the

criticisms levied by the PD Committee of Dr. Peterson's Increasing model.  In addition,

the Court cannot ignore the lack of funding that has befallen numerous asbestos personal

injury trusts, and was persuaded by the testimony that indicated that the asbestos

containing products manufactured, distributed, marketed, and mined by T&N reached

countless United States' job sites and affected hundreds of thousands of persons.  It is for

these reason that a figure between Dr. Peterson's No Increasing estimate ($8.2 billion)

and his Increasing estimate ($11.1 billion) is reasonable and in keeping with the purposes

of 11 U.S.C § 502(c).

In consideration of the all submissions of the parties, the testimony in the

courtroom, and the relevant law, the Court, pursuant to 11 U.S.C. § 502(c), estimates

Turner & Newall's total liability for asbestos-related personal injury or death, both

pending and future claims, in the United States at $9 billion, and in the United Kingdom

at £229 million.  An accompanying Order follows.


<u>/S/ Joseph H. Rodriguez</u>
JOSEPH H. RODRIGUEZ
United States District Judge


Dated: September 13, 2005

-64-