IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>USG CORPORATION, *et al.*,<br><br>        Debtors. | :   Chapter 11<br>    Case No. 01-2094 (JKF)<br>:   Jointly Administered<br><br>: <br><br>: |
| USG CORPORATION, *et al.*,<br><br>        Movant,<br><br>        v.<br><br>OFFICIAL COMMITTEE OF ASBESTOS<br>PERSONAL INJURY CLAIMANTS,<br>OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS, OFFICIAL<br>COMMITTEE OF ASBESTOS PROPERTY<br>DAMAGE CLAIMANTS, LEGAL<br>REPRESENTATIVE FOR FUTURE<br>CLAIMANTS, AND STATUTORY<br>COMMITTEE OF EQUITY SECURITY<br>HOLDERS,<br><br>        Respondents. | : <br><br>: <br><br>:   Civil Action No. 04-1559 (JFC)<br>:   Civil Action No. 04-1560 (JFC)<br><br>: <br><br>: <br><br>: <br><br>: <br><br>: <br><br>: |

**FUTURES REPRESENTATIVE'S OPPOSITION TO DEBTORS' MOTION FOR
APPROVAL OF SAMPLING PLAN AND CLAIMANT QUESTIONNAIRE**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 2

ARGUMENT ............................................................................................................................ 5

I. THE DEBTORS' SAMPLING PLAN AND CLAIMANT QUESTIONNAIRE ARE
AN AN ATTEMPT TO CIRCUMVENT THE COURT'S STATEMENTS AT
THE JUNE 13  CONFERENCE THAT IT WOULD NOT MAKE UNIVERSAL
RULINGS ON ISSUES CONCERNING THE CHARACTERISTICS OF SO-
CALLED "VALID" CLAIMS ............................................................................................ 5

II. THE DEBTORS' CONTEMPLATED USE OF THEIR PROPOSED SAMPLING
AND CLAIMANT QUESTIONNAIRE WOULD VIOLATE CLAIMANTS'
DUE PROCESS RIGHTS ................................................................................................ 8

III. THE DEBTORS' PROPOSED SAMPLING PLAN IS METHODOLOGICALLY
FLAWED AND CANNOT RELIABLY BE USED TO ESTIMATE CLAIMS TO
BE FILED AGAINST THE DEBTORS IN THE FUTURE ........................................... 11

    A.    **The Proposed Sample Is Not Representative of Future or
Present Claims** ...................................................................................................... 11

    B.    **There is No Reliable Basis to Determine the Claimants'
Occupations** ........................................................................................................... 13

    C.    **The Proposed Sample Sizes Are Too Small for Reliable
Estimation** .............................................................................................................. 14

    D.    **The Database and/or Other Information Used by the Debtors
to Draw the Sample Appears Different From the Databases
Provided to the Futures Representative and the ACC** ........................................ 15

IV. THE DEBTORS' PROPOSED SAMPLING PLAN IS UNDULY BURDENSOME
AND WOULD CREATE SIGNIFICANT DELAYS IN THIS PROCEEDING ............. 18

CONCLUSION ....................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arch v. American Tobacco Co.,*
    175 F.R.D. 469 (E.D. Pa. 1997)..........................................................................................10

*Basco v. Walmart Stores, Inc.,*
    216 F. Supp. 2d 592 (E.D. La. 2002)..................................................................................10

*Cimino v. Raymark Indus. Inc.,*
    151 F.3d 297 (5th Cir. 1998) ..........................................................................................9, 10

*Leverence v. PFS Corp.,*
    532 N.W.2d 735 (Wis. 1995)...............................................................................................10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | Case No. 01-2094 (JKF) |
| USG CORPORATION, *et al.*, | : Jointly Administered |
| Debtors. | : |
| | : |
| USG CORPORATION, *et al.*, | : |
| Movant, | : |
| | : |
| v. | : |
| | : |
| OFFICIAL COMMITTEE OF ASBESTOS | Civil Action No. 04-1559 (JFC) |
| PERSONAL INJURY CLAIMANTS, | : Civil Action No. 04-1560 (JFC) |
| OFFICIAL COMMITTEE OF | |
| UNSECURED CREDITORS, OFFICIAL | : |
| COMMITTEE OF ASBESTOS PROPERTY | |
| DAMAGE CLAIMANTS, LEGAL | : |
| REPRESENTATIVE FOR FUTURE | |
| CLAIMANTS, AND STATUTORY | : |
| COMMITTEE OF EQUITY SECURITY | |
| HOLDERS, | : |
| | : |
| Respondents. | |
| | : |

**FUTURES REPRESENTATIVE'S OPPOSITION TO DEBTORS' MOTION FOR
APPROVAL OF SAMPLING PLAN AND CLAIMANT QUESTIONNAIRE**

Dean M. Trafalet, the legal representative for the Debtors' future asbestos

personal injury claimants, (the "Futures Representative"), submits his opposition to the Debtors'

1

059945.1001

motion for approval of its sampling plan and claimant questionnaire (the "Motion"). The grounds for denying the Motion are as follows:[1]

## PRELIMINARY STATEMENT

The proposed sampling plan and questionnaire are simply a back-door attempt by the Debtors to revive their discredited approach of having the Court make universal rulings on the characteristics of so-called "valid" claims and then use those universal rulings to estimate entire categories of claims at zero value. Because this Court has already rejected that approach, and because the only apparent reason why Debtors wish to take such claimant discovery is to apply the results of the sampling plan to the so-called "valid" characteristics of a claim to estimate the number of present and future claimants who have or will have valid claims, there is no reason to permit the sampling plan.

Moreover, to the extent that the Debtors seek to use the results of statistical sampling to estimate certain categories of claims at zero value, the sampling plan violates the due process rights of present and future claimants by depriving them of their right to individualized jury determinations on issues of causation and damage.

The proposed sampling plan is also methodologically flawed in many respects, but until the Debtors specifically articulate the purposes for which they intend to use the sampling plan, it is not possible to fully evaluate their sampling methodology. However, to the extent that the Debtors seek to use the results of the proposed sampling plan and claimant questionnaire of present claims to make predictions about the characteristics of claims that will

---

[1]    The Futures Representative further adopts and incorporates by reference the arguments made by the Official Committee of Asbestos Personal Injury Claimants (the "ACC") in its response opposing the Debtors' motion for approval of the sampling plan and claimant questionnaire.

be filed against the Debtors in the future, the proposed sample is unreliable for that purpose because, among other things, it does not sample resolved claims and it samples stale, dated claims. The proposed sample therefore is not representative of claims that will be filed against the Debtors in the future, which future claims will be reflective of the characteristics of all claims previously filed against the Debtors, including resolved and unresolved claims.

The Debtors' proposed sample of present claims also seeks to draw conclusions about the characteristics of present and future claims against the Debtors by dividing the sample into two 500-claimant subgroups of claimants whose primary or secondary occupations were or were not in the construction industry. However, the database of information provided to the Futures Representative by the Debtors does not contain adequate information to make a determination of even primary occupation for about one-half of the claimants, and, even as to those claimants for which occupational history is provided, it does not indicate a secondary occupation. As a result, the decisions of how to treat the substantial group of unknowns and how to classify a claimant's "secondary" occupation may turn on subjective determinations, which could introduce further bias into the sample.

Next, the proposed sampling sizes are too small for reliable estimation and contain unacceptably high error rates if the results are used to answer any question about more than one characteristic of the claimants.

Further, notwithstanding the Debtors' most recent assertion that they have produced to the Futures Representative and the other parties all of the databases in the same configuration and with the detail they received from the CCR, the only database that the Futures Representative has received from the Debtors is "as of March 2002" and it contains higher numbers of present claims (178,307) then the approximately 150,000 present claims referred to

3

by the Debtors in their Motion. Debtors have not explained why the database and/or the information they are relying upon from which they intend to draw the sample has a substantially different number of open, pending claims than the database they provided to the Futures Representative. Until there is agreement that a specific database is accurate, it makes little sense to allow sampling.

Finally, the Debtors' proposed sampling project would cause significant delay, resulting not only from the time it would take to gather the information and supporting medical and legal records from 1,000 people along with any depositions previously taken of claimants that were provided in response to the request for records in the questionnaire, but also from the time required to computerize and analyze the records and testimony elicited in response to the Debtors' questionnaire. Once all of the questionnaires have been answered and all of the records and testimony have been produced, as set forth in the attached declaration of Dr. B. Thomas Florence dated September 19, 2005 (the "Florence Decl."), it would take a team of 20 people more than six months to perform the necessary tasks of combining the questionnaire data and supporting data of all 1,000 claims into a database that could be analyzed. In addition, assuming that the Debtors are trying to use the data from the sample to define certain characteristics of the claimants, it would take the experts an additional eight to ten weeks to review, analyze and summarize the data after it has been coded.

DB01:1854937.1

059945.1001

**ARGUMENT**

**I.**

**THE DEBTORS' SAMPLING PLAN AND CLAIMANT QUESTIONNAIRE ARE AN ATTEMPT TO CIRCUMVENT THE COURT'S STATEMENTS AT THE JUNE 13 CONFERENCE THAT IT WOULD NOT MAKE UNIVERSAL RULINGS ON ISSUES CONCERNING THE CHARACTERISTICS OF SO-CALLED "VALID" CLAIMS**

In its briefs to the Court in connection with ACC/Futures Representative's request to take discovery in advance of a hearing for a selection of the choice of methodology for asbestos personal injury estimation, the Debtors made it clear that they intended to test the substantive merits of claims of personal injury asbestos claims by having experts testify as to five specific issues, and then to ask the Court to make conclusive universal rulings as to the characteristics of a so-called "valid" claim. The Debtors asserted that experts should testify as to (1) whether chrysotile asbestos causes mesothelioma; (2) whether lung cancer without asbestosis can be asbestos-related; (3) whether asbestos causes other cancers; (4) whether "unimpaired" claimants have compensable injury; and (5) what level of exposure must a claimant demonstrate to establish that the Debtors' products were a "substantial factor" in causing injury. *See* Debtors' Response to the Joint Statement of the ACC/FCR at 12-14. The Debtors then asserted that they would conduct discovery of a statistically significant number of pending claims and ask the Court "to draw mathematically reliable conclusions as to the characteristics of all of Debtors' present claimants." *Id.* at 13. The Debtors further asserted that the Court "should estimate at zero those claims where it is likely that there is not sufficient exposure or physical impairment to establish a valid claim." *Id.* at 14. Finally, the Debtors stated that they would present testimony from economic and statistical experts who would apply the Court's rulings on the characteristics of "valid" claims to estimate the number and amount of present and future claims.

5

At the June 13th conference, the Court did not accept the Debtors' suggestion that the Court make universal rulings regarding the so-called "valid" characteristics of claims and then apply those rulings to estimate the number and value of present and future claims:

> THE COURT: . . . I don't envision that, as a result of the estimation process, I would be making findings as to the state of the particular art today with respect to whether a defense is absolutely meritorious or not. It's something to be weighed. Tr. at 32.[2]

> THE COURT: I don't envision that I could do what the Debtors said -- do what the Debtors said I should do, which is take on a global issue such as a defense that a particular kind of claim has zero merit. . . When you have disputes like that of fact, that's something that may have to go to each individual jury, to see whether they agree or disagree; and eventually you come to some state-by-state resolution. . . . But I don't think I can make that type of finding globally in this case. Tr. at 33-34.

> THE COURT: I'm not putting words in their mouth. I'm saying the way I see this going, it's not going to be a simple -- these substantive -- these defenses have substantive merit, and therefore we're going to value certain claims at nothing because no claimant is going to be able to come in there. Tr. at 44.

> THE COURT: [T]he best that I can do, because I'm not making an individual decision on a single case, the best that I can do is try to evaluate the quality of that, looking at the various jurisdictions, and come up with an estimation of how I think it might play out. . . . What you need to do -- I'm not making declaratory judgments. I'm not going to make new law in this case; that is, going to say, oh, gee, Judge Conti has now decided for the rest of the world that this defense is absolutely right. . . . Everyone has to have a right to a hearing on that in their particular case. Tr. at 62-63.

The Debtors' proposed sampling plan and claimant questionnaire is simply the tail wagging the dog. There is no reason for the Court to permit the sampling plan when the only purpose of such discovery is to support Debtors' now discredited approach of having the Court make universal rulings on the characteristics of so-called "valid" claims and then have the results of the claimant discovery used to determine how many of the present and/or future claims meet the characteristics of such "valid" claims. Moreover, even assuming that the Court permits

---

[2]    Excerpts of the transcript of the June 13, 2005 conference are collectively attached as Exhibit A hereto.

expert testimony on the issue of the characteristics of "valid" claims under the approach suggested by the Debtors, the Debtors do not need any claimant discovery to enable their experts to testify as to those five specific issues.

For example, the only specific question that the Debtors actually say they intend to answer with the results of the sampling project is to calculate "what proportion of those claimants have exposures [to asbestos] above 5 fibers/cc-year." Motion at 5. But that question cannot be answered by the results of the sampling project because the claimants do not have that specific information. Thus, the Debtors' questionnaire and the records they seek cannot accomplish the one specific purpose that Debtors provide. Florence Decl. ¶ 17.

In any event, the results that the Debtors seek to obtain from the sampling plan and claimant questionnaire would not be relevant to the Debtors's actual experience in the tort system. The Debtors settled most of the claims that were brought against them, and the settlement agreements did not require any of the claimants to submit any evidence of the amount of asbestos fibers that the claimant was exposed to, let alone asbestos exposure greater than 5 fibers/cc-year.

Thus, the only purpose for such sampling is to try to get in the back door what the Debtors are not likely to be able to get in the front door: which is to have their experts testify as to what level of asbestos exposure is necessary to establish that the Debtors' products were a substantial factor in causing the plaintiff's injury, have the court make a universal ruling as to the level of exposure to the Debtors' products that is required to assert a "valid" claim against the Debtors and then exclude from the estimate all claims which do not have that characteristic.

Moreover, even if the Debtors' experts were permitted to testify about the level of exposure necessary to establish that the Debtors' products were a substantial factor in causing a

plaintiff's injury, the Debtors' experts do not need the results of the sampling to proffer such testimony.

**II.**

**THE DEBTORS' CONTEMPLATED USE OF THEIR PROPOSED
SAMPLING AND CLAIMANT QUESTIONNAIRE WOULD
VIOLATE CLAIMANTS' DUE PROCESS RIGHTS**

The Debtors' briefs regarding the need for discovery in anticipation of the selection of the appropriate estimation methodology make it clear that the sampling plan and claimant questionnaires will provide the necessary factual support for the Court to make universal rulings on the so-called "valid" characteristics of asbestos claims, and then, based on the results of the sampling plan, determine how many of the present open claims are "valid." Presumably, Debtors would then use these results to make predictions about the number and value of future asbestos claims. At the June 13th conference, the Court recognized that the effect of such universal rulings by the Court as to the characteristics of "valid" claims would deprive claimants of their due process rights:

THE COURT: Can I just stop you right there before you move off that position. I think the problem, at least as I see it, with the due process argument is that if you want to estimate certain groups of claims at zero, that is a death knell for those claimants; and it's one thing if you say I'm going to set aside a fund of X number of dollars, and some claimants may or may not, you know, be able to recover under that; but if you are going to have this so-called, you know, class that's unimpaired because they have no claims, you know, then they -- because there's no value to their claims, you're in effect depriving them of that due process. Where do they go?[3]

---

[3]    The Court further stated: "what would trouble me in terms of due process isn't that, you know, in estimating you're going to say some claims are just in the past, you throw out some claims, maybe there should be more, a percentage of the claims; but if you're taking a whole category and saying these, as a category, having nothing to attribute to them, and when you look at that in proportion in terms of the number of claimants and maybe how they have been handled in the past, if that proportionate is going to swamp the class, you might get into the due process issues if indeed this Court is wrong in its determination as to what the actual would be versus the estimate." Tr. at 29-30.

8

MR. NEAL: They can still go -- they can still go and assert the claim and try to prove that despite the estimation of zero --

THE COURT: Where's the money to pay them?

MR. NEAL: The money is in the trust; and if there's ultimately insufficient money in the trust, that is no different than if there's ultimately insufficient money in the coffers of a solvent Defendant in a piece of litigation. Tr. at 18.

The suggestion by Debtors' counsel that the claimants could later try their claims against a section 524(g) trust anyway makes no sense. For example, if the Court were to make a universal ruling that chrysotile asbestos does not cause mesothelioma, it is difficult to understand how the Court could approve the trust distribution procedures of a section 524(g) trust that permitted payments to claimants with mesothelioma who were exposed to only chrysotile asbestos. The Court was correct in stating that to accept the Debtors' approach would be deciding the individual claims of claimants.

The Debtors' proposed sampling plan and the extrapolation of results from that plan to exclude claimants who do not meet the so-called "valid" characteristics of a claim would plainly deprive such claimants of their due process rights to have their individual claims adjudicated by a jury. *Cimino v. Raymark Indus. Inc.* 151 F.3d 297 (5th Cir. 1998), is on point. *Cimino* was a consolidated class action of some 3,031 personal injury and wrongful death damage suits against several manufacturers of asbestos-containing insulation products and some of their suppliers. The trial plan consisted of three phases, the second of which was designed to address asbestos exposure by having a jury determine which jobs at 22 sample job sites involved exposure to which defendants' asbestos products for a period of sufficient length to cause injury, harm, or disease. *Id.* at 302-03. In the third phase, two juries determined for 160 sample cases whether the plaintiffs suffered from an asbestos-related disease and, if so, what damages they

9

incurred. The results of the 160 sample cases were extrapolated, in their respective disease categories, to the 2,128 remaining cases. *Id.* at 303.

The trial court held that due process was satisfied because an expert statistician had testified that the sampling techniques utilized by the district court to extrapolate the defendants' liability could produce a result that would be valid to a 99% confidence level. The Fifth Circuit reversed, holding that the Seventh Amendment and Texas law required an individual jury determination of causation and damage for each plaintiff. *Id.* at 319. *See also Basco v. Walmart Stores, Inc.*, 216 F. Supp. 2d 592, 604 (E.D. La. 2002) ("[P]laintiffs' reliance on a representational method to determine damages . . . would deprive defendants of their right to have a jury determine liability and damages as to each plaintiff."); *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 493 (E.D. Pa. 1997) (extrapolation is per se impermissible); *Leverence v. PFS Corp.*, 532 N.W.2d 735, 739-41 (Wis. 1995) (same).

While *Cimino* involved extrapolation from bellwether trials to resolve mass actions, the same due process concerns are present here. Debtors propose to use statistical sampling, based on universal rulings as to the so-called "valid" characteristics of a claim, to allow the Court to estimate at zero value the claims of future asbestos victims who do not have the characteristics of a so-called "valid" claim. For the same reasons that the *Cimino* Court held that bellwether trials of a sample of claimants violated the due process rights of other claimants to have individualized jury determinations of causation and damage, Debtors' proposed sampling plan, as implemented, would violate claimants' due process rights by categorically disallowing certain claims as having no value, thereby depriving those claimants of an individualized jury determination of their claims.

## III.

## THE DEBTORS' PROPOSED SAMPLING PLAN IS METHODOLOGICALLY FLAWED AND CANNOT RELIABLY BE USED TO ESTIMATE CLAIMS TO BE FILED AGAINST THE DEBTORS IN THE FUTURE

It is beyond dispute that the validity of a sampling technique cannot properly be evaluated unless one knows the purpose for which the results will be used. Florence Decl. ¶ 5. In their Motion, the Debtors, however, say almost nothing concerning the specific purposes for which they intend to use the results and, until they do so, it is not possible to evaluate fully their proposed sampling methodology. Florence Decl. ¶ 5.[4] While Debtors suggest that the sampling plan will "enable the Court to draw conclusions regarding the proportions of valid and invalid asbestos personal injury claims at issue"(*see* Motion at 3), the proposed sampling cannot do this with respect to either future or present claims for, among other things, the reasons stated below.

### A.    The Proposed Sample Is Not Representative of Future or Present Claims

The Debtors seek to take discovery of what they say is a "statistically representative sample of 1000 of the approximately 150,000 present claimants." Motion at 1. To the extent that the Debtors propose to use the results of this discovery to make "predictions" about "the proportions of valid and invalid asbestos personal injury claims" that can be applied to asbestos claims that will be filed against the Debtors in the future (Motion at 3), the proposed sample is not representative of the future claims that will be asserted against the Debtors and therefore cannot be reliably used to estimate claims to be filed against the Debtors in the future for two fundamental reasons.

---

[4]    The proposed sampling project will not answer the one specific purpose given by the Debtors, to calculate "what proportion of [the] claimants have exposures [to asbestos] above five fibers/cc-year" (*see* Motion at 5) for the reasons discussed in Point I *supra* at p. 7.

11

First, the proposed universe of claimants from which Debtors seek to draw a sample is a population of approximately 150,000 present claimants whose claims were open and pending as of the Debtors' filing of their Petition on June 25, 2001 (the "Petition Date"). It is axiomatic that a sample is representative only of the population from which it is drawn. By definition, a database that contains only pending unresolved claims filed prior to the Petition Date does not contain data about any claims that have been resolved through settlement, verdict or dismissal in the past. Florence Decl. ¶ 8. For example, if hypothetically, 50,000 claims were filed between January 2000 and the Petition Date, and if 25,000 of those claims were resolved, a sample of only the 25,000 remaining unresolved claims would not be representative of the total 50,000 claims that were filed prior to the Petition Date. Florence Decl. ¶ 8.

The characteristics of the claims that were unresolved may be entirely different from the characteristics of the claims that were resolved. The Debtors chose which cases to resolve and which to leave open, presumably based on some differences in the characteristics between the two groups. Florence Decl. ¶ 9. For example, the unresolved claims may be claims filed by specific law firms or filed in specific jurisdictions. Similarly, the resolved claims may be claims that the Debtors chose to resolve because there was strong medical and/or product exposure evidence or conversely, according to Debtors, claims which had weaker medical and/or product exposure evidence but could be resolved at attractive values to the Debtors. At most, this universe of claims is representative only of the claims that the Debtors chose not to resolve or could not resolve on satisfactory terms. Such a sample of unresolved claims is not a valid basis to draw conclusions about the characteristics of the claims that will be filed against the Debtors in the future because those future claims will be reflective of the characteristics of all

12

claims previously filed against the Debtors, including resolved and claims that remain unresolved. Florence Decl. ¶ 9.

Second, many of the present claims against the Debtors have been pending for years. For example, in the database provided to the Futures Representative's claim evaluation expert, more than 17% of the open claims (30,369 of 178,307) were submitted prior to 1998, more than three years before the Debtors filed for bankruptcy. *See* Exhibit B to the Florence Declaration. The fact that more than 17% of these claims have been pending for years further indicates that the characteristics of these claims may be unrepresentative of the claims that would be asserted against the Debtors in the future. Florence Decl. ¶ 10. In general, unless there are significant changes in data trends, recently filed claims are likely to be the best estimate of the types and average resolution values of claims that an asbestos manufacturer would expect to see in the future, because they represent those claims closest in time and thus capture the debtors' most recent experience in the tort system. Florence Decl. ¶ 11. But the Debtors' sample will include claims that were filed more than three years before the Petition Date. Accordingly, the characteristics of those claims are unlikely to be representative of the claims to be filed against the Debtors in the future. Florence Decl. ¶ 11.

### B.    There is No Reliable Basis to Determine the Claimants' Occupations

The Debtors' proposed sampling plan is also fundamentally flawed because it seeks to divide its sample of claimants into subgroups of those claimants whose primary or secondary occupation was in construction and those claimants whose primary or secondary occupation was not in construction, but lacks adequate data to make such classifications or requires subjective determinations to make such classifications, all of which introduces bias into the sampling process.

13

The Debtors' motion states (at 3-4) that "the 1000 claimants will be chosen from two 500-claimant sub groups: (1) claimants whose primary or secondary occupations were in the construction industry and (2) claimants whose primary or secondary occupations were not in construction." The Debtors propose to determine which claimants should be assigned to which group based on occupation and industry information contained "in the database of the records of the Center for Claims Resolution" ("CCR"). Motion at 4 n.2. But the CCR database lacks information regarding occupation for almost half of the claimants (86,362 of the 178,307 claimants), categorizing those claimants as having an "unknown" occupation. Florence Decl. ¶ 13. The Debtors' proposed sampling methodology does not state what they intend to do with the 48% of the pending claims as to which occupation is unknown. This raises a strong potential for bias which cannot be addressed until the Debtors state how they intend to treat these unknowns. Florence Decl. ¶ 13.

Moreover, even where the CCR database does contain the occupational history of certain claimants, it does not indicate what a claimant's "secondary" occupation was. Florence Decl. ¶ 14. The CCR database indicates a primary occupation but provides no indication of secondary occupation. All other occupations are therefore merely assumed to be non-primary. Florence Decl. ¶ 14. Approximately 25% of the open claims have multiple occupations and would need to be analyzed to determine the relevant "secondary" or non-primary occupation. Therefore, the decision of how to classify a claimant's secondary occupation would be a subjective determination made by the person involved in drawing the sample, which could further introduce bias into the sample. Florence Decl. ¶ 14.

C.     **The Proposed Sample Sizes Are Too Small for Reliable Estimation**

The Debtors propose that the two 500-claimant sub-groups "will be further stratified according to the claimants' alleged injury, with 100 claimants randomly chosen from

14

each of the following categories: mesothelioma, lung cancer, other cancers, non-malignant asbestos disease, and alleged injury unknown." Motion at 4. Thus, the sample will consist of ten groups of 100 claimants each. The Debtors assert that the information drawn from this sample will allow the asbestos exposure in the overall claimant population to be estimated with an error rate of +/-7%. Motion at 5.

While the margin of error for answering any single question about the overall claimant population based on information obtained from the proposed sample may be +/-7%, answering any question about a characteristic of the claimants in relation to some other characteristic would produce a substantially larger error rate. Florence Decl. ¶ 16. If for each such compound question the answer would be true for 50 claimants in each sub-category and untrue for the other 50 claimants, then if one wanted to know how many of the 100 non-malignant asbestos claimants meet two specific criteria, the sample size is no longer 100 but 50 (with the accompanying inherent increase in the size of the error margin). Florence Decl. ¶ 16. Thus, the margin for error stated in the Motion is correct only if the results of the sampling project will be used for the limited purpose of answering simple questions. Otherwise, a much larger sample would be required to obtain answers with a reasonable margin of error. Florence Decl. ¶ 16.

**D.    The Database and/or Other Information Used by the Debtors to Draw the Sample Appears Different From the Databases Provided to the Futures Representative and the ACC**

As of the date of this response, the parties in this matter have not agreed upon a single database of the Debtors' asbestos personal injury claims to be used in the estimation proceeding, despite the fact that the Debtors' proposed sampling methodology is predicated on drawing a sample from what the Debtors' characterize as approximately 150,000 present claims

15

in the Debtors' asbestos personal injury database. Declaration of Andrew A. Kress dated September 19, 2005 ("Kress Decl.") ¶ 1.

In fact there appear to be different databases, only one of which has been provided by the Debtors to the Futures Representative's claim evaluation expert and each of the databases reflect a substantially different number of present claims. The database provided to the Futures Representative's claims evaluation expert by the Debtors in July 2002 (database was "as of March 2002") shows approximately 178,307 pending open claims as of the Petition Date (*see* Exhibit B to the Florence Declaration)[5] and the database provided by the Debtors to the ACC's claims evaluation expert (which database was "as of October 2001") shows approximately 143,000 pending open claims as of the Petition Date. Kress Decl." ¶ 2.

Counsel for the Futures Representative has advised Debtors' counsel that the database provided to the Futures Representative's claims evaluation expert was different from the database provided to the ACC's claim evaluation expert, and, based on the Debtors' prior submissions in connection with the September 2004 mediation sessions, was apparently different from whatever information the Debtors were relying upon. Kress Decl. ¶¶ 3-4. In addition, counsel for the Futures Representative has advised Debtors' counsel that the databases provided to the ACC and the Futures Representative differed in terms of the number of open claims as of the Petition Date and settlement values. Kress Decl. ¶ 5.[6]

---

[5]    The database of 178,307 claims provided by the Debtors to the Futures Representative's claims evaluation expert excludes duplicate Georgine claims and 27,192 claims designated as "Common Claims." The Common Claims are claims filed during the approximate six month time period prior to the Petition Date and do not include information about whether the claims were settled, open and pending or dismissed. Florence Decl. ¶ 18 n.2.

[6]    At the conclusion of the June 13th conference, Futures Representative's counsel again reminded the Debtors of the need to reconcile the different databases. On June 20 and
(continued...)

16

059945.1001

On September 14, 2005, the Futures Representative's claim evaluation expert was provided by Debtors' counsel with databases "as of January, 2002" and "as of May, 2002." Florence Decl. ¶ 19.  However, the "as of January, 2002" and "as of May, 2002" databases contain information only regarding "bundled" claims, *i.e.*, claims that were filed and/or settled prior to the dissolution of the CCR, but do not contain information regarding "unbundled" claims, *i.e*, claims that were filed against USG and/or settled after the demise of the CCR. Florence Decl. ¶ 19.

Notwithstanding the Debtors' most recent assertion (made September 16) that they have produced to the Futures Representative and the other parties all of the databases in the same configuration and with the detail they received from the CCR, the only database that the Futures Representative has received from the Debtors is "as of March, 2002" and, as described above, it contains higher numbers of present claims (178,307) then the approximately 150,000 present claims referred to by the Debtors in their Motion.  Debtors have not explained why the database and/or other information from which they intend to draw the sample has a substantially different number of open, pending claims than the database they provided to the Futures Representative.  Thus, as of the date of this response, the Futures Representative's claims

---

June 27, Futures Representatives' counsel informed Debtors' counsel of some of the differences in the databases.  Kress Decl. ¶ 5.  On July 26, 2005, counsel for the Debtors agreed that they would ask Navigant Consulting (the entity engaged by the Debtors and/or the CCR since early 2002 to maintain the database) to produce a database "as of March, 2002" and "as of June, 2002," both in standard CCR format. Kress Decl. ¶ 7.  The "as of March, 2002" database previously provided to the Futures Representatives' expert was not in CCR format. On August 2 and 3, 2005, Debtors' counsel advised that while they could produce a database "as of June, 2002" in CCR format, they could not retrieve the database "as of March 2002" because that database had not been saved.  Kress Decl. ¶ 8 and Exhs. C and D.  On August 5, 2005, Futures Representative's counsel requested that its expert be provided with databases in CCR format "as of January, 2002" and "as of May, 2002."  Kress Decl. ¶ 8 and Exh. E.

17

evaluation expert still does not know what database and/or other information the Debtors are relying upon when they speak of approximately 150,000 present claims. Florence Decl. ¶ 20.[7] Nor is he able to determine whether the 150,000 present claims that the Debtors' motion refers to includes only open, pending claims or also includes Settled But Not Documented Claims. In addition, until complete databases "as of January, 2002" and "as of May, 2002" are provided and the Futures Representative's claims evaluation expert is provided with the database and/or other information the Debtors are relying upon, he is not in a position to compare the databases in order to ascertain the differences among them and the reasons for such differences. Florence Decl. ¶ 20. Until there is agreement that a specific database is accurate and properly reflects the universe of open pending claims, it makes little sense to begin a sampling project of such claims.

## IV.

## THE DEBTORS' PROPOSED SAMPLING PLAN IS UNDULY BURDENSOME AND WOULD CREATE SIGNIFICANT DELAYS IN THIS PROCEEDING

At the June 13th conference, this Court made it clear that any discovery was subject to the guiding principle that if it would unduly delay the estimation hearing, the discovery should not be taken. Tr. at 76 ("I would be inclined to grant it as long as it's, you know, not going to be something that is so humongous that it will take a year to do; then you have to ask is it really worth it?"). Here, the Debtors' proposed sampling project would cause significant delay. That delay would result not only from the time it would take to gather the information and supporting medical and legal records from 1,000 people along with any depositions previously taken of claimants that were provided in response to the request for

---

[7]    By letter dated September 19, 2005, counsel for the Futures Representative requested Debtors to provide a list of what databases were provided to the parties, including the Debtors, and when such databases were provided. Kress Decl. ¶ 11 and Ex. I.

records in the questionnaire, but also from the time required to computerize and analyze the records and testimony elicited in response to the Debtors' questionnaire. Florence Decl. ¶ 21.

Assuming that RUST Consulting, the data management firm retained by the Debtors, would tabulate the answers to the questionnaires but that the parties would be responsible for coding and computerizing all of the records and deposition testimony produced by claimants, the end result would be a computer file with the questionnaire responses and images or hard copies of the supporting materials. Florence Decl. ¶ 22. The parties' experts and their staff would be responsible for extracting the relevant information from the accompany records (medical records, interrogatories, depositions, Proofs of Claim, etc.), coding and computerizing the information for analysis, and combining the questionnaire data with the supporting data to construct a database that could be analyzed. Florence Decl. ¶ 22.

The tasks required by the parties' experts' and their staff would include (i) testing, identifying and resolving inconsistencies in the RUST/questionnaire data; (ii) re-coding and cleaning the RUST data (e.g. open-ended questions, text fields); (iii) matching the RUST data with other data sources (e.g., the Manville Trust) to fill holes in the data; (iv) designing medical records coding (with physicians and records advisors); (v) designing interrogatory, deposition and bankruptcy and Trust Proof of Claim coding (with attorneys); (vi) drafting written coding rules; (vii) pre-testing coding procedures; (viii) finalizing all coding rules; (ix) coding all medical records/reports/tests (test results, x-rays, office visits and diagnoses, surgery records, medications, medical histories, etc.); (x) coding all interrogatories and depositions (injured parties and co-workers); (xi) coding all bankruptcy and Trust Proof of Claim filings; (xii) computerizing data coding; (xiii) quality control checking (validation) of all coded data;

19

(xiv) combining data sets into an analytic database for analysis and (xv) preparing code-book and database structure documentation. Florence Decl. ¶ 23.

A fair estimate of the time required to complete these activities (which does not include the time required for claimants to answer the questionnaires and produce supporting records) would be more than 20 hours per claim. Florence Decl. ¶ 23. Assuming all sampled claimants provided the requested information and that 20 people could be identified and sufficiently trained to perform these tasks, it would require more than six months from the time the sampled claimants provided the requested information to compile and code the data of all 1,000 claimant files into an analytic database. Florence Decl. ¶ 24. In addition, it also may be necessary to gather additional evidence relevant to the claimant files. Florence Decl. ¶ 24.

As noted above, until the Debtors disclose the purpose for which they are using the sample, it is difficult to estimate how long the analysis of the database would take. If the Debtors are trying to use the data from the sample claimants to determine, among other things, (i) if lung cancer claimants have underlying asbestosis; (ii) if non-cancer claimants have x-ray readings of 1/1 or above; (iii) if claimants have been exposed to asbestos products of other manufacturers, and the percentage of that exposure; (iv) if claimants have received payments from other asbestos manufacturers and trusts, and (v) the length of exposure to the Debtors' products, then it would take an additional eight to ten weeks to review, analyze and summarize the data after it has been coded. Florence Decl. ¶ 25.

Notably, in the *Owens Corning* case, when a group of bank creditors proposed a more limited sampling plan of obtaining x-rays and other medical records from a sample of 1,000 claimants, the bank creditors themselves acknowledged in pleadings filed with the Court that the proposed approach would take at least six months to complete if there were no objections

to sampling or to the production of supporting documents by claimants (*see* In re Owens

Corning, Memorandum and Order dated November 22, 2004, attached as Exhibit B) whereas the

Debtor estimated that the proposed approach would take a year to complete.  Plainly, the

Debtors' proposed sampling process which seeks answers to a questionnaire and supporting

medical and legal records will be "humongous," will take close to a year to complete, unduly

delaying the proceedings, and, in any event, has no demonstrable relevance to the estimation

hearing.  The Debtors' proposal thus runs afoul of this Court's guiding principle that no

discovery should be authorized where it will unduly delay the proceeding and is not worth it, and

accordingly, the Court should not permit such burdensome claimant discovery.

21

## CONCLUSION

For all of the foregoing reasons, the Debtors' Motion for Approval of the

Sampling Plan and Claimant Questionnaire should be denied in all respects.

Dated:  September 19, 2005

> Respectfully submitted,
> YOUNG CONAWAY STARGATT &
> TAYLOR, LLP
>
>
> _____
> James L. Patton (DE No. 2202)
> Edwin J. Harron (DE No. 3396)
> Sharon Zieg (DE No. 4196)
> Sean Greecher (DE No. 4484)
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19899-0391
> (302) 571-6600
>
> Local Counsel for the Futures Representative
>
> KAYE SCHOLER LLP
> Jane W. Parver
> Andrew A. Kress
> Michael A. Lynn
> 425 Park Avenue
> New York, New York 10022
> (212) 836-8000
>
> Counsel for the Futures Representative

DB01:1854937.1                                                              059945.1001

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:  USG Corporation,              Chapter 11
a Delaware corporation,
et al.,                              Civil Action No. 01-2094
                    Debtor.


\*   \*   \*   \*   \*

      Transcript of proceedings held on Friday, June 13,
2005, United States District Court, Pittsburgh, Pennsylvania,
before Joy Flowers Conti, District Judge.


IN-COURT APPEARANCES:

For the Debtor:                      DAVID HEIMAN, Esq.
                                     STEPHEN C.NEAL, Esq.
                                     SCOTT DEVEREAUX, Esq.
For the Unsecured
Creditors Committee:                 KEN PASQUALE, Esq.

For the Equity Committee:            DAVID HICKERSON, Esq.
                                     RALPH MILLER, Esq.
For the Asbestos Property
Damage Claimants Committee:          ALLYN DANZELSEN, Esq.

For the Future Claimants:            SEAN GREECHER, Esq.

For the Asbestos Claimants
Committee:                           PETER LOCKWOOD, Esq.

For the SAC:                         ELIZABETH MAGNER, Esq.

For Dean Trafelet:                   ANDREW KRESS, Esq.
                                     JANE PARVER, Esq.

VARIOUS APPEARANCES BY TELEPHONE

Court Reporter:                      Shirley Ann Hall, RDR, CRR
                                     1029 U.S. Courthouse
                                     Pittsburgh, PA 15219
                                     (412) 765-0408


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

2

```
 1                    P R O C E E D I N G S
 2                      *   *   *   *   *
 3           (In open court.)
 4           THE COURT:  This is a hearing on at least two
 5   matters that have been filed in the USG Corporation bankruptcy
 6   case in terms of matters that have been withdrawn to the
 7   District Court, and the numbers here are 041159 and 041560.
 8   The Court has received a listing of the parties present.  Does
 9   this listing also include those who are participating by
10   phone?
11           MR. NEAL:  Your Honor, Stephen Neal.  I don't think
12   it does.
13           THE COURT:  What I would propose to do is to make
14   this an exhibit and attach it as part of our record; and so to
15   make it complete in terms of all of those who are
16   participating today, I'm going to ask those on the telephone
17   line to please identify yourself and the party that you are
18   representing.
19           (Whereupon, various appearances were made known by
20   telephone.)
21           THE COURT:  I just want to proceed with some of the
22   matters that are not contentious, and that may also a affect
23   the need for some of the individuals to stay on the line,
24   particularly those from CCR.
25           First of all, there's been a motion and order for
```

18

1    made by the Court, --

2              THE COURT:  Can I just stop you right there before

3    you move off that position.

4              I think the problem, at least as I see it, with the

5    due process argument is that if you want to estimate certain

6    groups of claims at zero, that is a death knell for those

7    claimants; and it's one thing if you say I'm going to set

8    aside a fund of X number of dollars, and some claimants may or

9    may not, you know, be able to recover under that; but if you

10   are going to have this so-called, you know, class that's

11   unimpaired because they have no claims, you know, then they --

12   because there's no value to their claims, you're in effect

13   depriving them of that due process.  Where do they go?

14             MR. NEAL:  They can still go -- they can still go

15   and assert the claim and try to prove that despite the

16   estimation of zero --

17             THE COURT:  Where's the money to pay them?

18             MR. NEAL:  The money is in the trust; and if there's

19   ultimately insufficient money in the trust, that is no

20   different than if there's ultimately insufficient money in the

21   coffers of a solvent Defendant in a piece of litigation.  Due

22   process does not guarantee claimants either a solvent

23   Defendant -- doesn't guarantee Plaintiffs that a Defendant

24   will have a certain amount of resources available to respond.

25             The Bittner decision in the Third Circuit

29

1    be asked to estimate at zero those claims -- and I'm quoting

2    here -- which do not satisfy the set of criteria for claims

3    predicted to be valid and payable.

4         And then they would go on and present testimony from

5    economic and statistical experts who will apply the Court's

6    characteristics, rulings to --

7         THE COURT:  I have to say, though, the only thing

8    that bothered me there wasn't that there may be -- there -- as

9    I understand it, the estimation is simply an estimation.

10   You're not picking out an individual claim, saying this claim

11   is worth zero, this claim is worth a hundred thousand, this

12   claim is worth a million.  What you're doing is you're looking

13   at the scheme of claims.

14        That's why I think they phase them in in most of

15   these other cases in terms of cancers down to those that are

16   future and have showed no signs or symptomatology whatsoever,

17   and then they range in trying to figure out how you're going

18   to come up with a value there.

19        And what would trouble me in terms of due process

20   isn't that, you know, in estimating you're going to say some

21   claims are just in the past, you throw out some claims, maybe

22   there should be more, a percentage of the claims; but if

23   you're taking a whole category and saying these, as a

24   category, have nothing to attribute to them, and when you look

25   at that in proportion in terms of the number of claimants and

30

1    maybe how they have been handled in the past, if that

2    proportionate is going to swamp the class, you might get into

3    the due process issues if indeed this Court is wrong in its

4    determination as to what the actual would be versus the

5    estimate.

6         MR. LOCKWOOD:  Well, the Debtors are extraordinarily

7    fast in the way in which they characterize the estimation

8    that -- in response to Your Honor's questions earlier about

9    this zero assets.  Presumably under that approach, if they got

10   Your Honor to say, for example, that -- make a ruling, despite

11   the fact that no court, anywhere, has ever made that ruling,

12   they can't -- they have not cited one case where a court has

13   held as a matter of law that chrysotile does not cause

14   mesothelioma; they have not cited one state court that says,

15   as a matter of law, chrysotile does not cause mesothelioma;

16   they have spent 30 years in the tort system litigating

17   mesothelioma claims and settling mesothelioma claims.

18        They might have won some -- although they don't tell

19   us.  If they did, it was in front of a particular jury on

20   particular facts of a particular claimant with a particular

21   expert chosen by that Plaintiff and USG.  But they've

22   certainly lost some.  We would like to know -- the discovery

23   we've sought indeed goes to the question of just exactly on

24   your chrysotile defense, using it as an example, what sort of

25   experience do you have?

1    have individual review, you get up to $400,000, let's say; or

2    if that's not enough, you can go and have arbitration or

3    something.  The TDP would have to have say mesothelioma people

4    get nothing.  Why?  Because the Court has ruled as a matter of

5    law that nobody anywhere -- remember, you're being asked here

6    to do a global asbestos estimation.  You're not being asked,

7    as in Bittner, to estimate in lieu of trying a single creditor

8    claim.

9              THE COURT:  But I also don't think that I'm being

10    asked to make a decision here that -- or rule as a matter of

11    law that any particular defense would absolutely prevail.  I

12    don't think I'm being asked -- I think I'm just asked to

13    examine the potential defenses.

14             Now, this may be not what the Debtors envision, but

15    I think I'm being asked to evaluate the defenses and weigh

16    that evaluation in determining what the value is.  I don't

17    envision that, as a result of the estimation process, I would

18    be making findings as to the state of the particular art today

19    with respect to whether a defense is absolutely meritorious or

20    not.  It's something to be weighed.

21             MR. LOCKWOOD:  Your Honor, this is a yes or no

22    question they're presenting to you.  Either chrysotile can

23    cause mesothelioma or it can't.  There's no intermediate; it

24    can cause -- in this kind of a case or in that kind of case.

25             THE COURT:  I thought I read your brief to say that

1    there are experts on both sides.

2          MR. LOCKWOOD:  There are and they disagree.

3          THE COURT:  So I'm not going to see you folding your

4    tent and saying, you know, we absolutely agree that, you know,

5    the Debtors' experts are right.  What the Court's being asked

6    to do is look at their presentation and your presentation and

7    weigh how meritorious that defense is.  It may be -- there

8    could be a range there, and I don't have to come out and

9    say -- as I envision an estimation decision, I don't have to

10   come out and say X is absolutely right; Y is absolutely wrong.

11         I don't believe Judge Fullam in his decision came

12   out and made any specific fact findings or legal decisions to

13   justify his approach.  I think he discussed in general what

14   his concerns were, where he saw the trends going, and then

15   came up with a number.  But he didn't break down the number

16   and say:  I'm giving this much for this type of claim and this

17   much for that type of claim.  It was a general overview.

18         Now, I could be wrong in my reading of what he did,

19   but that was the sense I had.

20         MR. LOCKWOOD:  That's what Judge Fullam did, but

21   that's not what the Debtors proposed, unless they've changed

22   their proposal here this morning.

23         THE COURT:  I don't envision that I could do what

24   the Debtors said -- do what the Debtors said I should do,

25   which is take on a global issue such as a defense that a

1     particular kind of claim has zero merit.  I mean I think

2     the -- each state may have a different view; and the only way

3     I think I could deal with what the Debtor has said is if there

4     was -- there was agreement among all of the experts that that

5     was the case.

6          When you have disputes like that of fact, that's

7     something that may have to go to each individual jury, to see

8     whether they agree or disagree; and eventually you may come to

9     some state-by-state resolution.  Because of issue preclusion

10    or whatever, you might be able to use it against the Debtors

11    as the cases would proceed.  But I don't think I can make that

12    type of finding globally in this case.

13         I would be interested -- I think that's getting the

14    cart before the horse, so to speak.  Because I don't have any

15    of those expert reports before me, I don't know what the real

16    differences are, and so I can't prejudge what might be

17    presented.

18         MR. LOCKWOOD:  Your Honor, part of the problem is --

19    again, it goes back --

20         THE COURT:  This is something that I may have to

21    weigh, you know.  If they have some good arguments and you

22    have some good arguments, then I have to weigh what.  I have

23    to predict in the future what juries are going to do.  I mean

24    that's the tough part about this estimation.  It's a

25    prediction.  You can't go solely on the past because things

44

1    discovery.  I think they're going to argue it perhaps at the

2    hearing, but it's just -- it's one matter that has to be taken

3    into consideration in the global determination of how I'm

4    going to go about doing this estimation.

5            MR. LOCKWOOD:  Well, if that's true, and I'm not

6    sure --

7            THE COURT:  I'm not putting words in their mouth.

8    I'm saying the way I see this going, it's not going to be a

9    simple -- these substantive -- these defenses have substantive

10   merit, and therefore we're going to value certain claims at

11   nothing because no claimant is going to be able to come in

12   there -- you know, we've moved from that to saying, okay,

13   let's just take discovery overall.  Let's take the discovery

14   the ACC and the Future Claimants want.  We'll take our

15   discovery, and then we'll come to a hearing, and it will be

16   for the Court to hear everything and then make a

17   determination.

18           MR. LOCKWOOD:  Your Honor, the problem with that

19   formulation, which may well be in sort of general where the

20   Debtors have now landed, is when they say -- when you say

21   "take discovery," what kind of discovery are we talking about?

22           THE COURT:  Well, I agree, that there's going to be

23   an issue on what discovery is.  This is not going to be a

24   free-for-all.  I mean I think I'm persuaded by what the

25   Debtors have said here today and the Equity Committee and

1   not at the moment anyway predisposed to sort of give

2   declaratory judgment rulings, if you will.

3          MR. NEAL:  We didn't ask you for any, Your Honor.

4          MS. PARVER:  Mr. Neal, let me finish.

5          MR. NEAL:  You guys have been going for an hour now,

6   and I think we could certainly --

7          THE COURT:  Please sit down, please sit down.

8          Go ahead and finish.

9          MS. PARVER:  Your Honor, because we did intend to

10  brief to you, because we do feel very strongly about the

11  illegality of the Debtors' five questions -- five questions,

12  if you will, the proposals, that the Court rule up or down as

13  to, for example --

14         THE COURT:  I've already given a sense of where I am

15  coming from --

16         MS. PARVER:  Thank you, Your Honor.

17         THE COURT:  -- on that.  I don't think I can go all

18  or nothing unless everybody agrees.  If you have an issue in

19  which there is a legal expert that everybody says is

20  absolutely right on the money, when I get into the competing

21  experts, the best that I can do, because I'm not making an

22  individual decision on a single case, the best that I can do

23  is try to evaluate the quality of that, looking at the various

24  jurisdictions, and come up with an estimation of how I think

25  it might play out.  50 percent right, 50 percent wrong;

1    60 percent right, 40 percent wrong, whatever it may be; and

2    then that's what your job will be in the estimation hearing,

3    is to persuade me as to the quality of that and how it will

4    play out into the future.

5        And that's the toughest thing, I have to make a

6    prediction; but you've got to give me the information to make

7    a prediction, and you can't get away from the merits in that.

8    It's simply not the past, and I think you've conceded that,

9    that that wouldn't be the Asbestos Claimants' view.  They

10   realize things change, and you've got to deal with that in

11   some fashion.

12       What you need to do -- I'm not making declaratory

13   judgments.  I'm not going to make new law in this case; that

14   is, going to say, oh, gee, Judge Conti has now decided for the

15   rest of the world that this defense is absolutely right.  I

16   can't do that unless there's absolute agreement on it because

17   I'm not the judge in every single case.  Everybody has to have

18   a right to a hearing on that in their particular case, perhaps

19   in their jurisdiction with their law, and that's all a moving

20   target to a certain extent; and the medical treatment changes,

21   medical theories change and -- but the Defendant has -- the

22   Debtors have a right to get that to the Court's attention.

23       And if they have two experts, three experts, and you

24   have five experts -- you know, there will be some limitation

25   on the number of experts because we're not going to go on for

1    that you can disclose some of those items, but yet protect the

2    privilege and others, we'll -- I think you should sit down and

3    talk what the parameters will be.  If you can agree on that

4    and come with a consented to order, that's the best.   That

5    would be in everyone's best interest, including the Court's,

6    for efficiency and moving the case more quickly.  And that

7    would go for everything.

8         The object here would be that there's fairly broad

9    discovery; and you may not think it's absolutely pertinent,

10   but if it has any remote relevancy, I would be inclined to

11   grant it as long as it's, you know, not going to be something

12   that is so humongous that it will take a year to do; then you

13   have to ask is it really worth it?

14        So I think you need to keep those parameters in mind

15   because if you think it's something you would say, oh, it

16   shouldn't come in, maybe that's a decision that is ripe for a

17   motion in limine at some point; but they won't know what they

18   have to know, what they can move against unless they see it.

19        So bearing that approach in mind, please approach

20   the discovery in that vein, and I think it will avoid a lot of

21   fighting; and it's a bankruptcy, so everything is open

22   anyway -- or it should be in terms of access to information.

23   It's not like in many other types of circumstances.

24        So, you know, I think if you can keep in mind each

25   side is entitled to get what they believe that they need, even

# EXHIBIT B

NOV-22-2004  14:32                                                    P.02

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                              :    Chapter 11
                                    :
OWENS CORNING, et al.,              :    Case Nos. 00-3837 to 3854 (JPF)
                                    :
                    Debtors.        :

## MEMORANDUM AND ORDER

Fullam, Sr. J.                                      November 22, 2004

On August 19, 2004, I entered an order scheduling a claims estimation hearing for January 13, 2005, and directing the parties to file their respective expert reports by October 15, 2004. Credit Suisse First Boston, as agent for a group of participating banks ("CSFB"), has filed a motion to modify that scheduling order. CSFB asks the court "to establish procedures to obtain a sample of medical records, including x-rays, from asbestos personal injury claimants asserting nonmalignant claims against the debtors ...," and to postpone the January hearing until the suggested procedures have been completed -- a period of six months to a year. For several reasons, the motion will be denied.

The record already contains substantial evidence to support the notion that Owens Corning's history of dealing with asbestos claims has included payments to large numbers of claimants who actually sustained little or no harm from their exposure to Owens Corning's products. The relevant data have been available for analysis for many years. The conclusions drawn by experts have long been debated, and will be fully aired at the January hearing. In the

unlikely event that the information now available proves insufficient to enable a reasonably correct estimate of future claims, that issue, too, will be considered at the hearing in January.

It bears emphasis that the task is to determine what amount of money will be necessary, and sufficient, to cover Owens Corning's liability to claimants in the real world in which such claims will be resolved. It will then be necessary to structure a program of payments which, to the extent possible, recognizes only legitimate claims, and accords the appropriate priority to the claims of all creditors.

The bottom line is that no useful purpose would be served by further delaying matters, and running up additional legal bills, to prove what is already reasonably well known.

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| OWENS CORNING, et al., | : | Case Nos. 00-3837 to 3854 (JPF) |
| | : | |
| Debtors. | : | |

## ORDER

AND NOW, this 22nd day of November, 2004, upon consideration of the motion of CSFB, as agent, to establish procedures to obtain a sample of medical records (etc.), and the responses to that motion, IT IS ORDERED:

That the motion is DENIED.

BY THE COURT:

John P. Fullam, Sr. J.

3