# EXHIBIT B

1 due respect to counsel, I said let's say it's 25 percent.

2 You've really got to be able, if you're going to do an

3 estimate, you can't just -- A, it's got to be -- it really has

4 to represent these people, in a sound statistical fashion.

5          THE COURT:  But, you know who the pre-petition claim

6 holders are.

7          MR. BERNICK:  We know who they are.

8          THE COURT:  Okay.

9          MR. BERNICK:  We know who they are, but then if you

10 wanted to use it -- if you don't take that snapshot -- and

11 here's the pre-petition people -- and say, would we be content

12 with sending out the claim -- you know, the questionnaires, or

13 whatever it is that we're going to use -- it could be

14 questionnaires, to gather information on a consistent basis,

15 same questions, et cetera, et cetera, then use for purposes of

16 the analysis.

17          Yes, we could do that if we had assurance A, they all

18 return the questionnaires and B, that they understood that

19 unless they did return the questionnaires, their claims were

20 not going to be allowed --

21          THE COURT:  Well --

22          MR. BERNICK:  -- and it's -- and --

23          THE COURT:  -- doesn't it -- I think for estimation,

24 that's not really the issue.  I mean, if I determine --

25          MR. BERNICK:  Let me just --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  If I determine what the likely claims are

2   to be filed against the trust, which the debtor would fund --

3          MR. BERNICK:  Yes.

4          THE COURT:  -- isn't that the purpose?  I need to

5   know the value of the claims that are likely to be filed

6   against the trust.

7          MR. BERNICK:  Right.

8          THE COURT:  Okay.

9          MR. BERNICK:  But the only way that you can get to

10  the trust, going forward, is to be able to have some basis of

11  saying, here's what the claim's exposure is as time goes

12  forward.

13         THE COURT:  But, it's been done by -- at least ten,

14  maybe more, in Bankruptcy Courts, without proofs of claim

15  before.

16         MR. BERNICK:  No, no, no.  Because, that's all

17  because they used --

18         THE COURT:  It's being done in Owens, right now.

19         MR. BERNICK:  That's all because they used this

20  historical extrapolation from settlement.

21         THE COURT:  Well, that's what Mr. Lockwood's going to

22  use.

23         MR. BERNICK:  I know that's what Mr. Lockwood wants.

24         THE COURT:  Okay.

25         MR. BERNICK:  And there's no question, let's just be

**J&J COURT TRANSCRIBERS, INC.**

1  very --

2        THE COURT:  Well, surely the debtor knows what it's

3  own non-settlement history is.  I mean, you've got the records

4  of the cases that you actually litigated.

5        MR. BERNICK:  No.  See that's not -- it's again, Your

6  Honor, apples and oranges.  This history is all born of a

7  process that is in the State Court tort system.

8        THE COURT:  But, those are non-judgment creditors.

9        MR. BERNICK:  What?

10        THE COURT:  These -- this creditor group,

11  pre-petition -- pre-filing creditor group that you're talking

12  about are non -- are creditors who have not yet attained

13  judgments.

14        MR. BERNICK:  I understand.  But, let me --

15        THE COURT:  Okay.  So --

16        MR. BERNICK:  Let's be concrete about it.  In a given

17  year, Grace gets 20,000 claims.

18        THE COURT:  Right.

19        MR. BERNICK:  Okay.  Notwithstanding what Mr.

20  Lockwood says, since the last, at least the last five years,

21  overwhelmingly, those claims were settled on an inventory

22  basis.  They never even make their way onto a docket.

23        THE COURT:  Okay.

24        MR. BERNICK:  Okay.  So, if Grace gets 20,000 claims,

25  it then makes arrangements with a bunch of different law firms

**J&J COURT TRANSCRIBERS, INC.**

124

1  that say, I will pay X-number of your claims, or Y-dollars of

2  your claims, if you provide me the following.

3         And what the plaintiffs are willing to agree to, as

4  part of that inventory deal, in terms of what they provide,

5  varies widely, but by and large it is minimal, and in our view,

6  totally unreliable.

7         It's not a question of being defrauded.  The better

8  word is extorted.  We didn't have any choice but to do it.

9         THE COURT:  Now, wait.  Not --

10        MR. BERNICK:  No -- I'm sorry.

11        THE COURT:  Both of you stop.

12        MR. BERNICK:  Okay.

13        THE COURT:  We're not talking fraud.  We're not

14  talking extortion.  We're talking --

15        MR. BERNICK:  That's --

16        THE COURT:  -- a business decision --

17        MR. BERNICK:  It --

18        THE COURT:  -- by an operating company, to settle a

19  claim, rather than going into litigation --

20        MR. BERNICK:  Your Honor, respectfully --

21        THE COURT:  -- end of story.

22        MR. BERNICK:  Respectfully, Your Honor, I would have

23  to tell you that that is not the reality.  Yes, it's a business

24  decision.

25        THE COURT:  They didn't agree to the settlements?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Hold on.  It is a business decision.

2          THE COURT:  They didn't agree to the settlement?

3          MR. BERNICK:  No.  No.  They agreed to the --

4          THE COURT:  Okay.  End of story.

5          MR. BERNICK:  No.  Well, I hate to push you on a

6 little bit, but I really have to.

7          There was no choice but to enter into those

8 settlements.  None whatsoever.  You can't litigate 20,000

9 claims.  You can't even litigate 1,000 claims a year.

10          THE COURT:  But, you're asking me to litigate

11 118,000.

12          MR. BERNICK:  That's because we are -- that's -- that

13 is the basic problem that we have, is that we have no choice in

14 this case, under the law, but to abandon this system.  This

15 system does not apply in this Court.  It does not.

16          And what -- the only -- what they're saying that the

17 estimate has to be is, basically take the data that resulted

18 from this system and say, that is the data that is dispositive

19 of now -- of what the claim is worth in this Court.  If Your

20 Honor rules that way, that's fine.

21          We believe that that's completely contrary to the law

22 and would have no -- it would mean that this bankruptcy is

23 meaningless.

24          There's no question but that, if you take the

25 experience in the tort system, having to pay all that we did,

1  and you extrapolate it, of course we -- we're out of money.

2  There's no question about that.

3  Why is it that we filed in the Bankruptcy Court to

4  begin with?  It was to escape the system that didn't work.  And

5  we'll be able to demonstrate that it didn't work.  Because,

6  there's no question about it.  We followed the rules, the rules

7  of evidence and the rules of discovery.

8  We don't have to be content with this process and the

9  data that results from the process, which doesn't answer the

10  questions that we have.

11  THE COURT:  But look.  Here's the problem with the

12  bar date.  Let's just assume, for a moment, that we set a bar

13  date for pre-petition asbestos creditors.  Okay?

14  MR. BERNICK:  Right.

15  THE COURT:  And you get in your -- a perfect world,

16  all 118,000 pre-petition creditors file a claim and

17  traditionally three percent of them are current Mesothelioma

18  victims, you know, another ten percent has some other form of

19  cancer, right down the statistical charts.  It all fits

20  perfectly according to everything that -- the published

21  statistics.  Just for purposes getting to this analogy.  Okay.

22  I still have a large, in your view, asymptomatic

23  base.

24  MR. BERNICK:  Right.

25  THE COURT:  It still has to be valued.  How's it

**J&J COURT TRANSCRIBERS, INC.**

127

1  going to be valued?

2  　　　　MR. BERNICK:  Well, the way that it's going to be

3  valued is that we, and now kind of getting into the filters

4  when we say, I don't think it's going to be that hard to get

5  that information, under these questionnaires.  They fill out

6  the questionnaires.  They've got to fill out questionnaires all

7  the time.

8  　　　　THE COURT:  Okay.  But, let --

9  　　　　MR. BERNICK:  Let's assume that --

10  　　　　THE COURT:  Let's stick to the subject.

11  　　　　MR. BERNICK:  -- that we got all that.  Okay.

12  　　　　We then have to break out the questions.  We're going

13  to have questions just like the questions that were asked of

14  the PD claimants.  Tell me what particular product you were

15  exposed to and where you were exposed to it?  A lot of these

16  people won't be able to do that appropriately.

17  　　　　And they won't be able to identify -- they get washed

18  out right away.  They won't even -- they shouldn't even be

19  making claims at all.

20  　　　　A huge number of people, we believe, will be wiped

21  out because the medical data that we would ask to be submitted,

22  to support their claim, doesn't meet the basic requirements

23  that are set forth in the medical screening procedures

24  themselves.

25  　　　　Now, to give you an example, all those non-malignant

**J&J COURT TRANSCRIBERS, INC.**

128

1  claims, they rely on "B" Readers.  "B" Readers that are hired

2  by the plaintiffs --

3          THE COURT:  Okay.  But, this process that you're

4  talking about, essentially requires what I said earlier, an

5  omnibus objection to claim procedures, whereby I am actually

6  going to be determining the allowance.  Not necessarily the

7  value, but the allowance of each specific claim.

8          Then, we get this database of existing pre-petition

9  claims.  That exact database, however, is not Grace's entire

10 pre-petition history, to show what, going forward, the likely

11 future claims against the debtor will be.  It may set the value

12 that Grace has to put in to satisfy --

13         MR. BERNICK:  Well, I'm --

14         THE COURT:  -- existing claims.

15         MR. BERNICK:  I'm -- we're on the seventh --

16         THE COURT:  So, it's irrelevant to the estimation

17 process.

18         MR. BERNICK:  No.  That's how you get there.  The

19 only way to be able to extrapolate to the future is to have a

20 baseline from which you extrapolate.

21         THE COURT:  You do have a baseline.  You've got a

22 20-year history.

23         MR. BERNICK:  No, no.  But, the -- you've got a

24 baseline, but the baseline includes a lot of stuff that's not

25 useable in this Court, for purposes of the projection.

**J&J COURT TRANSCRIBERS, INC.**

129

1          But, Your Honor, let's -- like you would --

2          THE COURT:  You know the reason I think it may be

3 useful, Mr. Bernick?  It has nothing to do with the rules of

4 evidence, it has to do with the practicality of a plan

5 confirmation process.

6          The reality is that some of these people will have

7 claims -- in the tort system, will have claims that will

8 sustain a judgment.  I mean, it's happened in the past.

9          MR. BERNICK:  Right.

10          THE COURT:  So, it likely will happen in the future,

11 if you ever get back into the tort system.

12          MR. BERNICK:  Your Honor, hear me --

13          THE COURT:  And so the settlement numbers that the

14 debtor, in it's business judgment, whether it views that it was

15 extorted into that process or not, set some parameters within

16 which people who have similar claims in the future may realize

17 that they're not going to be able to get much higher of a

18 distribution through the trust, because that's all the debtor

19 was willing to pay before the bankruptcy hit.

20          MR. BERNICK:  I completely agree with that.  I mean,

21 that's why the sequence is, I think, is exactly as I indicated.

22 The issue is not whether there's any -- it's not whether

23 there's no relevance to this.  There is some relevance.

24          But, the issue is, at what point do you apply it.

25 And what we're saying is, that under the rules, you apply these

**J&J COURT TRANSCRIBERS, INC.**

130

1 filters to end up with a population that's a subset of the

2 population that historically has been claiming against the

3 company.

4        Figure out, then, how many people will be added to it

5 in the future.  Maybe you can use an epidemiological curve.

6 Maybe you can use past trends.  But, you're working with a

7 smaller population, whose claims do not have a fundamental

8 legal problem.

9        And that's a very, very important thing to do, is to

10 get to that point.  That's the whole reason that we want the

11 questionnaires, is to end up with that sub-population.

12        How then do we value each of those claims?  I think

13 that there probably is relevance from past history, in terms of

14 how you value those claims, those individual claims.

15        How do you move going forward?  You're going to have

16 to do some kind of extrapolation.  We don't quarrel with that.

17 What we quarrel with is that, for purposes of establishing the

18 liability, that the rules that apply to liability get thrown

19 out the door.  They can't be thrown out the door.

20        The whole purpose of the bar date is to get

21 information on a claim form, and the information on the claim

22 form then to sort out the wheat from the chaff of people who

23 may in fact have a claim.

24        We're not saying there aren't people that have

25 claims.  There are people that got Mesothelioma from exposure

**J&J COURT TRANSCRIBERS, INC.**

131

1 to Grace asbestos.  There are people who got asbestosis.  There

2 are people that got lung cancer.  What we're trying to do is

3 find out who they are and what subset of the population they

4 are.

5         You then have a -- isolated them, and you've got to

6 do it in a representative and sound way, and get the data in a

7 sound fashion.  You then can go forward to extrapolate, in the

8 future, how many people are going to be coming into the system

9 and you can also develop values on the basis of prior

10 settlement experience.

11         The only way that -- the only reason that Mr.

12 Lockwood and I disagree is that he wants to include, in this

13 process, this big -- from here, of people who made it through

14 the system before, because it was what it was.

15         Whereas, what we're saying is, no.  Now the rules

16 have to apply, we've got to do a filter to find out the real

17 claimants.

18         That is why, incidentally, we provided in the plan

19 this class of people.  These are the class of people that we

20 expect to pay.  These are the people who we want to fund.  The

21 way that we differentiate these folks from these folks is

22 through the questionnaires.

23         THE COURT:  Well --

24         MR. BERNICK:  So, we're going to estimate.  We're

25 going to estimate using the models.  You know, there are things

**J&J COURT TRANSCRIBERS, INC.**

132

1 that can be done.

2 But, by and large, the big difference is that we

3 don't want to pay people that we're not legally obliged to pay,

4 because of the fact that -- have to pay them simply because

5 they would have gotten paid before. That is the problem that

6 we have to solve in this case.

7 THE COURT: Well, Mr. Lockwood, it seems to me that I

8 can sort of compromise between these two approaches and get to

9 a legitimate estimation hearing.

10 It seems to me that if the debtor thinks that it has

11 some value to do a questionnaire, and you know, the form of

12 discovery, I think, is somewhat within the discretion of the

13 Court and we could treat it as though it's a series of

14 interrogatories.

15 It's not going to be any 50 pages, I assure you.

16 But, coming down to a reasonable type of questionnaire to get

17 some information, so that the debtor's experts can decide what

18 the debtor thinks is a proper valuation, it may have relevance

19 to the committee. The committee may choose to use it for

20 different purposes, I don't know. But, I'm not sure that it

21 hurts to get that step done.

22 But, I do agree with you, that the appropriate way to

23 do this is through a battle of experts. So, whatever spin the

24 experts put on the questionnaire, maybe they'll be the same

25 spin. Maybe it won't be the same spin. I don't know. But, I

**J&J COURT TRANSCRIBERS, INC.**

133

1 think that should be an expert analysis function that goes

2 forward.

3           MR. LOCKWOOD:  Well, we can certainly try and work

4 with the debtor on the questionnaire, in terms of -- to sample

5 118,000 people, you don't need to have 118,000 questionnaires.

6 I mean, Mr. Bernick has been tossing around statistical

7 references for extrapolating things, and you don't need 100

8 percent of the presents, to extrapolate to the futures.

9           You need whatever the experts would tell you would be

10 a sufficient sample to get -- have it be representative --

11           THE COURT:  Well, maybe --

12           MR. LOCKWOOD:  -- but the one thing I --

13           THE COURT:  I'm not sure it hurts to send it out to

14 all 118,000.

15           MR. LOCKWOOD:  Well, it depends --

16           THE COURT:  In fact --

17           MR. LOCKWOOD:  -- on what the sanctions are for not

18 responding to it.

19           THE COURT:  Well, if there's a bar date, it'll be a

20 --

21           MR. LOCKWOOD:  Well, that's --

22           THE COURT:  -- disallowance of claim.

23           MR. LOCKWOOD:  -- the point.

24           THE COURT:  I mean --

25           MR. LOCKWOOD:  So, then you're basically putting us

**J&J COURT TRANSCRIBERS, INC.**

134

1  in an allowance disallowance position.

2          And let me just address something on Mr. Bernick's

3  chart, if I might, Your Honor, so that we understand exactly

4  what's going on here.

5          THE COURT:  Well, there may be another way to do it,

6  Mr. Lockwood, without requiring a bar date.

7          MR. LOCKWOOD:  I can't find it.

8          THE COURT:  It -- I take it that most of the 118,000

9  are represented by counsel.

10         MR. LOCKWOOD:  I assume so, and --

11         THE COURT:  And it seems to me that what we can do,

12 perhaps, is get each counsel to contact each client and make

13 sure that, in fact, that client understands that whatever the

14 estimation numbers are, will be binding on them.

15         And if they choose to file their own questionnaire,

16 fine.  And if they don't, fine.  But, there will have to be

17 some representative sample.

18         Experts can probably predict what that number has to

19 be.  And if we don't get it, then I will do some sort of an

20 order that imposes a bar date.

21         But, it seems to me that if the attorneys are willing

22 to go back to their clients and file something that says my

23 client understands that there is going to be an estimation

24 hearing and that they will be bound, maybe I don't need a bar

25 date.

**J&J COURT TRANSCRIBERS, INC.**

135

1          MR. LOCKWOOD:  Well, let me --

2          MR. BERNICK:  Anyway that we can get reliable

3 information, is fine.  But, we're real skeptical of the idea

4 that you can just rely upon the claimant.  There has to be

5 something issuing from this Court that does create a need for

6 them to respond.  If you have dropout from this process, then

7 it starts to create bias issues.

8          THE COURT:  Oh.  All right.  We -- I think we can

9 handle that issue, because I may not be able to impose

10 something directly on the claimant.

11          But, as I indicated about the 2019 Statements, I have

12 lots of counsel who are currently subject, as officers to this

13 Court, to my orders.  So, I think I can deal through counsel,

14 if need be.

15          MR. LOCKWOOD:  Your Honor --

16                         (Pause)

17          MR. LOCKWOOD:  Your Honor, we should be clear about

18 what the debtor wants this estimation process to entail, from

19 the debtor's side.

20          This thing over -- this line over here, liability

21 filters, with the boxes.  The debtor, without ever actually

22 presenting this to Your Honor for resolution, asserts that

23 there are various legal defenses which they will be able to

24 assert for -- across the board on cases, which will reduce the

25 number to Mr. Bernick's 25 percent.

**J&J COURT TRANSCRIBERS, INC.**

136

1          Some of those legal defenses we could actually tee

2  up, even in advance of an estimation hearing.  For example, the

3  proposition that in this estimation process the Bankruptcy

4  Court could determine that people that didn't have a certain

5  level of impairment did not have a State Law right to payment,

6  for example.

7          Because, what Mr. Bernick really is trying to do

8  here, at the end of the day, in violation frankly, of <u>SGL</u>

9  <u>Carbon</u>, is to use this bankruptcy case as a mechanism for

10  trying to litigate his way out of a problem that he was unable

11  to --

12          THE COURT:  No.

13          MR. LOCKWOOD:  -- litigate his way out of in the

14  torts.

15          THE COURT:  No.  Let's stop.  All I'm trying to get

16  to is an estimation process.  It seems to me that experts may

17  disagree about the appropriate methodology to use.  That will

18  be a <u>Daubert</u> issue.

19          I can determine whether the methodology was

20  appropriate in a simple -- well, I don't know that the --

21          MR. LOCKWOOD:  In --

22          THE COURT:  -- evidence will be simple, but a motion

23  will be simple with respect to <u>Daubert</u>.  We can deal with all

24  that down the road.

25          But, getting the information, at the outset, seems to

**J&J COURT TRANSCRIBERS, INC.**

137

1  me to be a legitimate --

2       MR. LOCKWOOD:  <u>Daubert</u> doesn't speak to the

3  qualifications of an expert who would take a large number of

4  claims, whether it's 118,000, or 10,000 --

5       THE COURT:  No.  It speaks to the methodology.

6       MR. LOCKWOOD:  -- (indiscernible) who would review

7  those claims and tell a Court which ones were legally and

8  factually valid.

9       THE COURT:  Right.  And so you'll argue that you

10 can't --

11      MR. LOCKWOOD:  There is no <u>Daubert</u> expert of that

12 sort.  I mean, that's not --

13      THE COURT:  Well, we'll see.

14      MR. LOCKWOOD:  Because, it's a matter of law.

15      THE COURT:  Well --

16      MR. LOCKWOOD:  Typically speaking, he --

17      MR. BERNICK:  With respect, I think that we're

18 talking a little bit at cross purposes.

19      We are not going to have experts who will opine as to

20 legal issues.  You and I will argue legal issues to the Court.

21 We're not going to have an expert say, gee, in Alabama you can

22 recover for exposure.  What we would do is we would argue the

23 legal issues, but the experts would translate our arguments

24 into what claims, or what groups of claims are picked up by the

25 arguments.

**J&J COURT TRANSCRIBERS, INC.**

1          A second thing, the <u>Daubert</u> dimension of this, you

2 give the example of, you know, who's impaired, you know, what

3 does impairment mean under State Law.  That's one dimension of

4 this, but that's not the principal dimension that will animate

5 this process.

6          The <u>Daubert</u> issue goes to the reliability of the

7 methodology that was used in gathering medical information.  In

8 exactly the same fashion as before Judge Newsome, we litigated,

9 on <u>Daubert</u> grounds, whether dust sampling was an appropriate

10 methodology, and that methodology had been used for all of the

11 property claims, and he found it was not an appropriate

12 methodology.

13          We're going to litigate on <u>Daubert</u> grounds whether

14 the mass screening is an appropriate methodology, under the ILO

15 standards themselves --

16          THE COURT:  Well, okay.  We're going to get to that

17 issue when we get there, for today.

18          MR. BERNICK:  Yes.

19          THE COURT:  Because, I'm ready to move past this.

20 So, finish your remarks --

21          MR. LOCKWOOD:  Well --

22          THE COURT:  -- Mr. Lockwood.

23          MR. LOCKWOOD:  The point I'm trying to make is that,

24 for example, on this methodology, in the State tort system, no

25 State has adopted the ATS Standards for determining what is

**J&J COURT TRANSCRIBERS, INC.**

139

1 impairment.

2       No State has adopted the proposition that some kind

3 of "B" Reader isn't a good enough kind of "B" Reader.  They

4 cite statistics that the plaintiffs have got favored "B" Reader

5 doctors, that some other experts of theirs think over read, by

6 orders of magnitude, x-rays favorable to plaintiffs.

7       That sort of issue is decided when that expert is

8 tendered to testify in a particular case and the opposing

9 expert is tendered to testify, and the two experts testify.

10       All these doctors, for example, that they criticize

11 and that they say we need to have a bankruptcy proceeding to

12 deal with, number one, those doctors were first identified as

13 issues in Manville, in the mid-1990's, and not one of them, to

14 my knowledge, has been yet disqualified, from a Federal or a

15 State --

16       THE COURT:  But --

17       MR. LOCKWOOD:  -- Court --

18       THE COURT:  But, regardless --

19       MR. LOCKWOOD:  -- on the grounds that they don't meet

20 Daubert.

21       THE COURT:  But, regardless, the information that the

22 debtor wants, I think, is appropriate for an expert to take a

23 look at.

24       Whether I'm going to consider it, what value I'll

25 place on it, whether it meets Daubert or not, I think is an

**J&J COURT TRANSCRIBERS, INC.**

140

1   issue down the road.

2         What the debtor intends to do seems to me, in an

3   estimation process, to be calculated to lead the relevant

4   admissible evidence.  And for a discovery on an estimation

5   process, that's all I need.

6         I am going to direct you two, you and Mr. Bernick,

7   Mr. Lockwood, to work out some mechanism, by which, if we don't

8   have a bar date, because I'm -- for other purposes, I don't

9   really see the need for a bar date.  I'm not sure I see the

10  need for one here.

11        But, I do need to make sure that we have some handle

12  on whatever the appropriate sampling of the questionnaires to

13  go out and get returned is, that we will have a legitimate

14  across the board sample, number one.

15        And number two, that counsel for all of the present

16  claimants understands that this estimation process is going

17  forward, so if they want to submit that kind of questionnaire

18  and have their own client's medical information included in it,

19  they have the opportunity to do that, because they will be

20  bound by the outcome of the estimation hearing.

21        So, that, I think, is what we need to do.

22        MR. LOCKWOOD:  Okay.  But -- let me just say one

23  thing about this questionnaire process, Your Honor.  Actually,

24  two.

25        First, one of the problems with 118,000, is timing.

**J&J COURT TRANSCRIBERS, INC.**

141

1 While Mr. Bernick facilely suggested these law firms, if they

2 file lawsuits, have at their fingertips the information

3 necessary to answer a questionnaire, that's simply not

4 necessarily true.  You're not required --

5         THE COURT:  Look, the trusts have been able to do it,

6 and the pre -- have been able to do it --

7         MR. LOCKWOOD:  The question is --

8         THE COURT:  -- within a matter of --

9         MR. LOCKWOOD:  Yes.  The question is time.

10        THE COURT:  -- several months.

11        MR. LOCKWOOD:  How much time?

12        THE COURT:  Okay.

13        MR. LOCKWOOD:  Because --

14        THE COURT:  Well, I think you two can --

15        MR. LOCKWOOD:  -- you know, if you've got 10,000

16 claimants, or 5,000 claimants that you have to fill out a

17 multi-page questionnaire --

18        THE COURT:  Yes.

19        MR. LOCKWOOD:  -- for each one, that's a whole lot of

20 work and it doesn't get done over night.

21        THE COURT:  Yes.

22        MR. LOCKWOOD:  The second point has to do with what

23 the kinds of things that individual claimants know.

24        For example, product ID.  Typically speaking in tort

25 -- in the tort system of cases, you prove product ID not merely

**J&J COURT TRANSCRIBERS, INC.**

142

1 by the plaintiff's own recollection of where he worked and what

2 he worked with, but co-worker depositions, invoices from the

3 manufacturer showing product was delivered to a site where the

4 worker worked, et cetera.

5        So, if a claimant is asked, you know, exactly how do

6 you know that you were exposed to Grace asbestos and where,

7 that information might be available not through the claimant,

8 but by the lawyer, when he works up the case --

9        THE COURT:  Well, that can be --

10        MR. LOCKWOOD:  -- and gets --

11        THE COURT:  Wait.

12        MR. LOCKWOOD:  -- discovery from the debtor showing

13 where its products were shipped to.

14        THE COURT:  We're getting way ahead.  Because, it

15 seems to me that the debtor has certain information that can go

16 onto the claim form at the outset, which is, what the debtor's

17 products were, where they were delivered, and what period of

18 time they were used in specific locations.  And if a claimant

19 doesn't fit within one of those locations, that's --

20        MR. BERNICK:  And Your Honor, these are exactly the

21 kinds of issues -- I actually am looking forward to this sit

22 down session.  I only ask that we both have a martini

23 beforehand.  And please --

24        THE COURT:  Just one?

25        (Laughter)

**J&J COURT TRANSCRIBERS, INC.**

143

1          MR. BERNICK:  And don't lock the door, because I've

2 now turned 50, and I know Mr. Lockwood's over 50, and we may

3 have to use the facilities during the course of this meeting.

4                    (Laughter)

5          MR. BERNICK:  But, this is exactly the kind of thing

6 that we ought to be able to take up, in the context of that

7 conversation, rather than right now.

8          THE COURT:  All right.

9          MR. BERNICK:  For everything he says, I'm going to

10 have an answer, and it's just not worth it.

11          THE COURT:  In terms of using the facilities, why

12 don't we take a ten-minute break and do just that.

13          And then I'll come back and we'll -- I'll hear from

14 the other parties before I make final rulings on this, and --

15 after a ten-minute recess.

16                    (Recess)

17          MR. BERNICK:  Your Honor, if I could raise a -- I'm

18 sorry.

19          THE COURT:  Wait just a minute, Mr. Bernick.

20          MR. BERNICK:  Sure.

21          THE COURT:  Gentlemen, we have a substitute court

22 reporter, since the other one is at lunch.  So, when you speak,

23 would you please identify yourself --

24          MR. BERNICK:  Sure.

25          THE COURT:  -- since she will not know who you are.

**J&J COURT TRANSCRIBERS, INC.**

1 Okay.  Thank you.

2        MR. BERNICK:  I'm David Bernick and I represent the

3 debtors.

4        Your Honor, just as a preliminary matter, I have said

5 -- I've had a couple of conversations here and I know that the

6 time is shortening.  A couple things.

7        One, we spent all of our time this morning --

8        THE COURT:  Yes.

9        MR. BERNICK:  -- talking about personal injury.

10       And we're -- the debtors are very, very focused on

11 also talking about moving forward with the traditional property

12 damage claims, as well as the ZAI claims, where there has been

13 no bar date.

14       And I don't know what it is that Mr. Baena and his

15 colleagues had intended to address, but if we could make sure

16 that we also address those things that are important, in order

17 to keep those processes under way, that would be terrific.

18 Second --

19       THE COURT:  Well, I don't know we're going to get

20 through all of those issues today, so maybe we ought to figure

21 out which ones you want to focus on, because I have my doubts

22 that we'll get done with all that.

23       MR. BERNICK:  Okay.  Well, with respect to the

24 traditional property damage claims, we already have the claim

25 forms in and it's simply a question of them really moving

**J&J COURT TRANSCRIBERS, INC.**

145

1 forward to establish, I think, a -- some kind of pre-trial

2 schedule for the estimation that's associated with the

3 traditional property damage claims.

4      You know, we've made a proposal along those lines.

5 If Mr. Baena doesn't believe we should have the estimation,

6 maybe that's an issue that he can address now.

7      And then to the extent that we are going to have the

8 estimation, maybe that's something else that we can lock

9 ourselves up in a room to talk about in more detail, which is

10 the timing and substance of what we'd actually do on the

11 pre-trial basis, for the estimation.

12      For ZAI, the big issue is establishing a bar date, so

13 we can find out -- what that claimant population is.

14      THE COURT:  Well, I don't think I want to go to the

15 ZAI one yet, Mr. Bernick, and it's for this reason.  I -- I'm

16 really not yet much involved, even in the issue of the science

17 trial.

18      And I thought the whole purpose for going through the

19 science trial was to see whether or not a class proof of claim,

20 if any claim, is appropriate.  Whether a class proof of claim

21 would be the way to go, as opposed to having individual

22 claimants file.

23      So, if I set a bar date, and then notify -- I'm not

24 even sure who we'll notify, at this point in time, because I

25 haven't gotten through that evidentiary premise.

**J&J COURT TRANSCRIBERS, INC.**

146

1          But, it seems to me that that issue ought to wait

2 until at least the science trial is decided and we see A,

3 whether there is some scientific support for the fact that

4 there's property damage, at all, and B, if there is, whether it

5 should be adjudicated in a class format.

6          MR. BERNICK:  Yes.  Here's the problem.  And the

7 reason that we're so focused on this is that right now, if Your

8 Honor's focused on, you know, what does it take to get to a

9 consensual plan until we have a claimant population, we have no

10 clue.

11          They will say that there are a million people, a

12 million homes out there.  We'll say there's 100,000.  And

13 you've got an order of magnitude difference, just in what the

14 size of the claimant population is.

15          We may find out that when it comes to people who are

16 going to step forward and actually make a claim that there are

17 very, very few of them.  We think that that's exactly what's

18 going to happen.

19          But, until you fix the population -- the number of

20 claimants, it is almost impossible to talk about ZAI, unless

21 Your Honor rules, that from a scientific point of view, the

22 claims are going nowhere.

23          Instead of -- we thought about this and we said,

24 well, why don't we ask that the Court rule on that issue and

25 then we can go ahead, if we don't prevail, or if we prevail in

**J&J COURT TRANSCRIBERS, INC.**

147

1 part, to then craft a bar date in the claim form.  And the

2 problem then is that more time passes before we find out who is

3 a claimant.

4        So, what we thought we would do is ask for the bar

5 date, but instead of having a detailed claim form like we were

6 asking for before, we have a much simpler claim form that

7 doesn't pose, in a sense, the risk of people going up and being

8 required to scoop out stuff from their attic.  So, we at least

9 would get a claimant population.

10        We then would delay sending out the questionnaire,

11 until Your Honor determined what you wanted to do, in terms of

12 getting information from people and the like, what you thought

13 the science trial was going to yield.

14        But, at least that way we're not holding off on

15 advancing the cause, to find out this critical piece.  We're

16 going to need to know, at the end of the day, who the people

17 are who are making a claim to begin with.  Even if there's a --

18 if a class certified, we wouldn't know how to resolve that

19 class, or we wouldn't know how to resolve the case, until we

20 knew who was actually going to make a claim.

21        So, we really need to know who's going to make a

22 claim.  So, that's exactly what we've done, is we've asked for

23 a bar date, we've watered down the claim form, and it's very,

24 very urgent, from our point of view, that we get this critical

25 piece of data put in place.  Because, otherwise, I don't know

**J&J COURT TRANSCRIBERS, INC.**

148

1 how we resolve the ZAI claim consensually.

2      THE COURT:  Well, I don't know how, until we get the

3 notice out -- I thought the purpose for the science trial was

4 to find out whether there was sufficient scientific evidence

5 that there is actually going to be some form of property damage

6 and, therefore, to craft a claim form around that outcome.

7      MR. BERNICK:  Yes.

8      THE COURT:  I don't know how you craft a claim form

9 until that issue's determined, unless you want to say, assume,

10 for -- without deciding right now, that there is damage to your

11 home if you were subject to ZAI, then file a claim.

12      MR. BERNICK:  Well -- and most claim forms -- and I

13 think this is -- I believe -- I know this is accurate.  Most

14 claim forms -- most notices don't -- are neutral.  And they're

15 required to be neutral.

16      You -- it simply says, do you have this product in

17 your house and if you do, are you making a claim for it.  And

18 they're not required to know the nature of the claim, or

19 anything.  They're just told, you know, if you have a claim,

20 here it is.

21      We might even be able to craft something that says,

22 it is claimed that this product does X, or Y, or Z, and

23 provided that it's not argumentative, it's simply informational

24 well, that's something else that -- there's no reason why we

25 can't work that out.

**J&J COURT TRANSCRIBERS, INC.**

149

1          But, the criticality of being able to find out who's
2 going to make a claim is so overwhelming here, because of the
3 inability to know what the population is that we're dealing
4 with, that we think it's -- is that critical.

5          That we're -- we prepared -- be prepared to spend the
6 time to craft the notice.  We just want to get it out the door
7 in a way that enables us to move forward and identify the
8 population.  If you do it by way of class, then you're
9 guaranteed to delay understanding that critical piece of
10 information until later.  It's really the cart before the
11 horse.

12          Let's find -- even in the <u>First</u> -- there's a New
13 Jersey case, <u>First Interregional Equity</u> or something like that,
14 where they ultimately decided to use a claim form that was done
15 in the context of having established a bar date -- a class
16 claim form, then you establish a bar date, and having the
17 people come in.  And at least there they knew that there were
18 2,000 people who actually made a claim.

19          So, you know, that's the kind of information that we
20 need.  But, maybe if that could be addressed.

21          Second point is I had a brief conversation with Mr.
22 Lockwood about, you know, where are things really going on
23 Monday, and the like, and I suppose if we don't finish this
24 afternoon, talking about just the things that we've talked
25 about, that'll spill over.

**J&J COURT TRANSCRIBERS, INC.**

150

1          But, beyond that the two things that were up for

2    Monday were the exclusivity issue and then also the

3    confirmation procedures.  And I think that we at least don't

4    see an urgency, right now, to resolve the confirmation

5    procedures.

6          With respect to exclusivity, I think there's only

7    been one objection, which comes from my dear friends over here

8    representing the futures representative.  I don't know that it

9    makes sense, if we finish other things, to bring everybody back

10   on Monday for that, as an in-person hearing.

11          Although, obviously, we're prepared to come back if

12   that makes sense.

13          THE COURT:  Well --

14          MR. BERNICK:  And all that really means is that if we

15   can vote --

16          THE COURT:  I don't think we need to get to the

17   confirmation procedures.  I'm having enough trouble getting to

18   the disclosure statement procedures, so --

19                    (Laughter)

20          MR. BERNICK:  Right.

21          THE COURT:  -- let's knock them down one at a time.

22          So, the confirmation procedures, at this point, I

23   think, can be deferred.

24          If you want to talk about the objection to

25   exclusivity, today, I've read the stuff, I'll hear it, if

**J&J COURT TRANSCRIBERS, INC.**

151

1 that's what you want to do.  But, I really do think it would be

2 a good idea for me to let you folks out early, although I

3 understand they're now saying that this four to eight inches

4 here, and twelve in Philadelphia, may not start until early in

5 the morning.  But, it seems to be a moving --

6           MR. BERNICK:  Well, I think we still want to get out

7 --

8                         (Laughter)

9           MR. BERNICK:  We still want to get out of here.

10                        (Laughter)

11          THE COURT:  You don't want to stay and see the

12 Steeler game here?

13          MR. BERNICK:  I didn't listen to the weather.

14                        (Laughter)

15          THE COURT:  That's what I mean.

16          MR. BERNICK:  But, let's -- on this -- there's some

17 options.  I think we just have to stay on course and I think

18 that if we can focus on those two groups of people, that would

19 be terrific.

20          THE COURT:  All right.  Mr. Kruger?

21          MR. KRUGER:  Lewis Kruger, for the Official Unsecured

22 Creditor's Committee.  Your Honor, while this morning Mr.

23 Bernick and Mr. Lockwood appeared to dominate the conversation

24 about bar dates, and questionnaires, and the like, the reality

25 of it is that our clients, our commercial creditors are the

152

1 ones who'll be most impacted by what may be the end result of

2 an estimation process here.

3       We find that we're obliged to file proofs of claim in

4 this Court.  We have to demonstrate that W. R. Grace owes us

5 money, either for money loaned, for goods and services pursuant

6 to contracts, or otherwise.  We need to identify why they owe

7 us that money, how much they owe us, and the like.

8       It doesn't strike me as inappropriate for there to be

9 a bar date for those who claim any claim against W. R. Grace,

10 and it doesn't strike me as inappropriate for them, to me, to

11 demonstrate why they believe they have a claim compensable by

12 W. R. Grace.

13       That's not to say that ultimately the Court will

14 determine what is indeed an appropriate level of information

15 for them to provide, or whether or not the claims they assert

16 are indeed compensable.  But, it seems to me, as a threshold

17 matter, particularly since all creditors are entitled to object

18 to other creditor claims, that we have a standard to maintain,

19 which is that there ought to be a bar date, there ought to be

20 information provided, there ought to be questionnaires.

21       People should not really be able to -- sort of lie

22 back in the weeds and say, some estimation process will take

23 care of me.

24       We're entitled to know who are the creditors, who are

25 the claimants, what is the nature of their claim, and why they

**J&J COURT TRANSCRIBERS, INC.**

153

1 believe that they have some compensable injury which needs to

2 be compensated by W. R. Grace.

3 　　　　THE COURT: Okay. Well, I appreciate that view

4 point. It does seem to me, however, that 524 really does not

5 require proofs of claim to be filed by tort claimants. And I

6 think there is some reason for that.

7 　　　　Number one, not everyone knows that they have an

8 existing claim, at the time. That's why they can be put into a

9 future demand category. And number two, it doesn't necessarily

10 make sense to look at an estimation process for purposes of

11 allowance of the claim, in the pre-confirmation phase, at least

12 if there's a consensual plan.

13 　　　　It seems to me that we can work out some kind of

14 compromise that still provides the information that you are

15 requesting, which I think is legitimate, i.e. who are the tort

16 claims, who -- or at least in global terms, who are the tort

17 claimants, who will be coming forward at a level that the

18 debtor is going to have to recognize in the trust, and what

19 does that do to the underlying unsecured creditor distribution.

20 　　　　I think, at this stage, to get a plan on the table,

21 that's really all I need. Now, to get through confirmation, I

22 don't know, maybe something more will be needed. But, I think

23 at this stage, if we can at least estimate those numbers, we'll

24 get a lot closer toward a consensual plan from all groups. So

25 --

**J&J COURT TRANSCRIBERS, INC.**

154

1          MR. KRUGER:  Maybe.

2          THE COURT:  -- I want to move forward on the

3    estimation side.  I'm not saying that at some point I don't

4    think a bar date might be appropriate, I'm just not sure we

5    need it here, now.

6          MR. KRUGER:  But, for those who certainly believe

7    they had claims prior to the commencement of the Grace

8    proceeding, now more than three years ago, since that, I don't

9    understand any reason why they should not be obliged to file

10   claims.

11         THE COURT:  Well --

12         MR. KRUGER:  They did assert a claim.  Why are they

13   not entitled to file a claim, like everybody else does?

14         And I don't know that it makes a difference that

15   you're a tort claimant.  There's nothing special about being a

16   tort claimant.  You're just another kind of creditor of this

17   estate.  And other creditors are entitled to look at your

18   claim, and have a view as to whether or not that claim is an

19   appropriate one to be compensated by Grace.

20         THE COURT:  Well, I'm not sure that's the case,

21   because of the fact that the claims are channeled to the trust

22   and once the trust is --

23         MR. KRUGER:  Futures may be.

24         THE COURT:  Well, the -- the presents can be too.

25         MR. KRUGER:  Possibly.

**J&J COURT TRANSCRIBERS, INC.**

155

1          THE COURT:  And to the extent that the presents are

2    channeled to the trust, they essentially waive the claim

3    against the debtor's estate, in favor of what the trust is

4    going to pay them.

5          MR. KRUGER:  Well, but that -- but, Your Honor,

6    that's an illusion.  Those funds come from the debtor's estate,

7    so therefore creditors -- other creditors are entitled to look

8    to see --

9          THE COURT:  I don't --

10          MR. KRUGER:  -- whether the funds that are going into

11    that trust are appropriate.

12          THE COURT:  I don't think the Court's view that as an

13    illusion.  I think they view it as a statutory requirement

14    under 524.

15          But, I agree with you with your ultimate conclusion,

16    which is creditors have the right to determine whether the

17    distributions are fair and reasonable with -- coming either

18    from the -- that the debtor would put into the trust, on the

19    one hand, versus what the debtor would be paying to other

20    creditors whose claims don't go into the trust, on the other.

21          But, I think the first piece of that is the

22    estimation process.

23          MR. KRUGER:  And a questionnaire of some kind.

24          THE COURT:  Well, yes.  I'm -- I think the

25    questionnaire's a good idea, but it's not going to be 50 pages.

**J&J COURT TRANSCRIBERS, INC.**

156

1          MR. KRUGER:  Okay.  That may be.

2          THE COURT:  In fact, it's probably not going to be

3  ten pages, so --

4                          (Laughter)

5          UNIDENTIFIED MALE ATTORNEY:  How long was Mr. Baena's

6  questionnaire?

7          THE COURT:  I don't know.

8          MR. BAENA:  How long was my question?

9          UNIDENTIFIED MALE ATTORNEY:  Yes.

10         UNIDENTIFIED MALE ATTORNEY:  Your questionnaire.

11         UNIDENTIFIED MALE ATTORNEY:  Your questionnaire.

12         UNIDENTIFIED MALE ATTORNEY:  How many pages?

13         MR. BAENA:  It was very long.

14                          (Laughter)

15         MR. BAENA:  And most of it was unnecessary.

16                          (Laughter)

17         THE COURT:  Okay.  You --

18         MR. BAENA:  I think it was six or seven pages.

19         THE COURT:  But, does anybody -- before I turn to the

20  issue of the property damage and the ZAI, does anybody else

21  wish to be heard on the nature of the personal injury

22  estimation hearing?  Mr. Baena?

23         MR. BAENA:  Judge, the only thing I would say in that

24  regard is, and I think Mr. Kruger alluded to it in respect to

25  his constituency -- forgive me, Scott Baena, on behalf of the

**J&J COURT TRANSCRIBERS, INC.**

157

1 Property Damage Committee -- is that, for at least two reasons,

2 we believe we need to be involved in this process that defines

3 the contours of the estimation.

4       The first is, I think it's always amusing to be in

5 the same room with Mr. Lockwood and Mr. Bernick, particularly

6 when there's no Judge imposing any form of good conduct upon

7 them --

8       UNIDENTIFIED MALE ATTORNEY:  I'm going to delegate

9 that job to somebody else in my firm.

10                    (Laughter)

11       MR. BAENA:  And secondly, of course, as Mr. Kruger

12 alludes to, the value of those claims has a profound affect --

13       THE COURT:  Yes.

14       MR. BAENA:  -- on every constituency, and we're all

15 going to be involved in -- on one side or the other, of that

16 process.

17       So, I'm not asking to be locked in the same room, but

18 I am asking that we have a point of entry --

19       THE COURT:  Oh, sure.

20       MR. BAENA:   -- before the hearing, so it's not a

21 fete accompli.

22       THE COURT:  Oh, I didn't mean to suggest that it

23 wouldn't be circulated to everybody else for comments, Mr.

24 Baena.

25       But, I think that the two critical groups who will --

**J&J COURT TRANSCRIBERS, INC.**

158

1 who will likely be presenting evidence, I mean, maybe others

2 will too, but the likely two groups that will be presenting

3 evidence -- or three, possibly, will be the debtor, the

4 asbestos committee, and the futures rep.

5       And yes, if anybody else who's a recognized

6 committee, you know, has some issue, you're entitled to be

7 heard, and I'd certainly hear it, and, yes, I would agree that

8 your -- you have to participate at some level in the process,

9 setting up that estimation process.

10       But, I think the lion's share of the work should come

11 from Mr. Bernick, Mr. Lockwood, and somebody representing the

12 futures rep, because I think they will be taking the lead.

13       Am I incorrect?  Does somebody else expect, at this

14 point, to be presenting major substantive evidence, at the

15 estimation hearing, on the personal injury tort liability and

16 numbers.  Okay.

17       So, yes, I expect the three of -- I didn't address

18 the futures rep, because they've been over there very silent,

19 but actually, I do include the futures rep in that process.  I

20 think the three of them need to take that -- to start that,

21 getting an order together, and then circulate it to everyone,

22 before it's presented to me.

23       If there are areas of disagreement, I'll hear those

24 areas of disagreement.  In all probability there aren't likely

25 to be.  Okay.  Yes.  Good afternoon.

**J&J COURT TRANSCRIBERS, INC.**

159

1          MS. WARREN:  Good afternoon, Your Honor.  Mary

2  Warren, for London Market Insurers.

3          Your Honor, I wanted to draw your attention, briefly,

4  to something, before you move on to other subjects, in

5  connection with the estimation procedures, or hearing.

6          Certain insurers of Grace, in this matter, interposed

7  a limited objection to estimation motion and the case

8  management motion, on the following grounds.

9          The thrust of our objection is to make sure that

10 insurance neutrality is enforced, in connection with any

11 estimation that emerges from the proceedings that the parties

12 are going to work on together.  Likewise, if anything is

13 litigated, pursuant to the case management procedures, we want

14 to make sure that insurance neutrality is enforced in that

15 context as well.

16          The certain insurers generally support what the

17 debtors are trying to do here, in terms of their plan.

18 However, Mr. Bernick and Mr. Lockwood told you a story earlier

19 today, about the Babcock proceedings, in which the plan started

20 out as being somewhat along the lines of what the debtors are

21 proposing now.

22          Later on, that plan was withdrawn and became an

23 assignment of insurance rights plan, a purported adjudication

24 of insurance rights plan, and that was done despite the debtors

25 best intentions earlier on in the proceeding.

**J&J COURT TRANSCRIBERS, INC.**

160

1        We make no aspersions on the debtor's theories here,
2   but the same thing could happen.  And, therefore, the reason
3   why we ask now, for insurance neutrality to be enforced, is
4   because Your Honor seems to be contemplating that estimation
5   will happen early on, will help set the framework for what
6   happens later, who votes, et cetera.

7        We want to make sure that insurance neutrality
8   language is included in any estimation order, any case
9   management proceeding order --

10       THE COURT:  I don't know about that.  I don't know
11  what the issues are, at this point in time.  I don't know
12  whether the debtor's going to propose a plan that does not
13  impair insurance company rights, if in fact that's the kind of
14  plan that we get to, ultimately.

15       The one thing that <u>Combustion Engineering</u> did do, is
16  state what language has to be put in for insurance neutrality.
17  It's not an issue I ever have to look at again.  I'm going to
18  use that language, period, end of story.  So, if it's to be an
19  insurance neutral plan, that language worked, that's the
20  language we're going to use in this and every other case that
21  has an insurance neutrality plan, until the Third Circuit or
22  the Supreme Court say no.  So, okay.

23       But, I don't know what the context of the plan will
24  be yet, so if you think you have an interest in participating
25  in the estimation, then just simply join in that process.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. WARREN:  Well, Your Honor, an alternative to that

2 is to make sure that we are protected by having -- and exactly

3 what Your Honor has in mind, is what we would propose here, is

4 having that <u>Combustion Engineering</u> approved language included,

5 by order of Your Honor, in any estimation order, any case

6 management order that might emerge.

7          And Your Honor's -- is correct, the plan might

8 evolve, but from what I'm hearing, estimation might evolve

9 before the final plan is put in place.

10          THE COURT:  I have no idea how insurance neutrality

11 is somehow impacted by the estimation of the tort liability.

12          MS. WARREN:  Well, Your Honor, let's say an

13 estimation number is agreed -- let's say an aggregate number --

14          THE COURT:  Yes.

15          MS. WARREN:  -- is arrived at.  You don't know

16 whether later on, the debtor will, pursuant to a different

17 plan, assert that that creates a <u>UNR</u> kind of result against

18 insurers.

19          THE COURT:  The only way to protect yourself is to

20 join in the estimation process.  I mean, at this stage of the

21 game, that's the only thing I can tell you to do, so join in

22 the estimation process.

23          In other cases I haven't had to go through it, so I

24 haven't had to worry about binding the insurance companies.  I

25 do have to go through it in this case, so join.

**J&J COURT TRANSCRIBERS, INC.**

162

1        If you're concerned about the consequences, join in

2 the process.

3        MS. WARREN:  Your Honor, I understand what you're

4 saying, but when there's an opportunity to insert protective

5 language in an estimation order, that we know the Third Circuit

6 has already approved --

7        THE COURT:  If the other parties are willing to do

8 it, it's fine with me.  But, I don't know, at this point, that

9 there is consensus on insurance neutrality in this plan.  If

10 there is, fine.  If there isn't, join in the process.

11        I am not prejudging plan confirmation issues and

12 insurance neutrality is definitely a plan confirmation issue.

13        To the best of my recollection, it hasn't even come

14 up in this case until now.

15        MR. BERNICK:  It's very simple.  Combustion

16 Engineering was prepared to agree to insurance neutrality in

17 the case.  And the only issue was, what did neutrality mean?

18 How did you word it, what impact it would have?

19        That is not the case in this case.  We have not made

20 a commitment to be insurance neutral here.  I am -- as a

21 consequence, I would endorse what Your Honor said, which is

22 that if they want to participate, they can participate.

23        THE COURT:  If --

24        MR. BAENA:  Your Honor --

25        THE COURT:  Yes, Mr. --

**J&J COURT TRANSCRIBERS, INC.**

163

1          MR. BAENA:  If I may, Scott Baena, on behalf of the

2 property damage -- I -- by saying they can participate,

3 obviously we weren't prepared to argue this today, we wouldn't

4 concede their standing to participate, at this moment in time.

5 And I hope by your direction -- or suggestion, perhaps is a

6 better way to put it -- you're not conceding, or directing that

7 they do have.

8          THE COURT:  Mr. Baena, I haven't heard a word in this

9 case, to the best of my recollection, about insurance

10 neutrality, until this proceeding happened today.  I'm not

11 prepared to make any rulings on insurance neutrality, or

12 insurance standing.

13          MR. BAENA:  Right.

14          THE COURT:  What I'm suggesting is that if they think

15 they're going to be prejudiced, then they better take

16 appropriate steps, whatever they are, to join in the process,

17 because I'm not going to enforce an insurance neutrality

18 provision.

19          That was something that in <u>Combustion</u> was somewhat

20 agreed to, and in other cases has come up as an -- a

21 representation by the debtors that the plans were intended to

22 be insurance neutral.

23          When the debtor said that the plans are intended to

24 be insurance neutral, so that the insurers have no claims

25 against the debtor and are not entitled to vote, then I'm

**J&J COURT TRANSCRIBERS, INC.**

164

1 willing to make sure that the plan is "insurance neutral."

2        But, I don't think I have that in this case, so I'm

3 not prejudging plan issues and if you think you need to protect

4 yourself in some other way, all I'm suggesting is that you take

5 whatever steps you think you need to take.

6        MS. WARREN: Well, Your Honor, respectfully, I think

7 we're hearing exactly why it would be useful to get this

8 language in the plan early.  The debtors have just told you

9 they're not going to agree to it.  Mr. Baena has just told you

10 that we might not have standing.

11        So, we're already getting caught between a rock and a

12 hard place, and one way to enforce insurance neutrality is to

13 start enforcing it now.

14        THE COURT: But, I'm -- I'm not in a position of

15 enforcing it unless the plan says, this is going to be an

16 insurance neutral plan, in which case I will do my best to

17 write an order that makes sure that the plan is, in fact,

18 carrying out insurance neutrality.

19        But, if the debtor isn't committing not to change

20 some rights or obligations of the insurance company, I'm not

21 going to give an insurance neutral plan.  That may give you

22 voting rights that you don't have in other cases, so if that's

23 the case, exercise them.

24        But, I'm not prejudging plan issues.  I'm getting to

25 one thing and one thing only, and that's the estimation of the

**J&J COURT TRANSCRIBERS, INC.**

165

1 personal injury tort liability, period.  And possibly value,

2 not just the liability, but the value.

3          MS. WARREN:  And we'd like to make sure that that

4 estimation does not veer into areas that I believe Your Honor

5 has opined, in other cases, that you don't want to get into.

6          My understanding is that you don't consider this a

7 proper forum to determine State Law coverage issues.

8          THE COURT:  There aren't going to be any coverage

9 issues in the estimation hearing.  The debtor may very well say

10 this is what the level of my insurance assets are, and this is

11 how I propose to use them.  I mean, that's something that may

12 happen.

13          But, in terms of State Law coverage, I'm not getting

14 into insurance issues in this hearing.  If I'm asked to in some

15 other context, I'll deal with it then, but that's not the

16 purpose of this estimation hearing.

17          MR. BERNICK:  I think in order to maybe cut to the

18 chase, I think what counsel's concerned with is that the record

19 would then be usable in connection with some subsequent

20 insurance action.  Obviously, the issue of insurance coverage

21 is not, from our point of view, going to be teed up in the

22 estimation, but the record is going to be whatever it's going

23 to be.

24          THE COURT:  It is.

25          MR. BERNICK:  And we are not agreeing that the record

**J&J COURT TRANSCRIBERS, INC.**

1 cannot later be used for whatever purpose the law dictates.

2      THE COURT:  Then, you know, if that's the case, in

3 all probability, the insurers may have standing and they may

4 participate, because there will be some prejudice to the --

5 potential -- not actual prejudice, to the insurer's rights.

6      So, all I can tell you is take whatever steps you

7 think are appropriate, but I'm not going to write insurance

8 neutrality into a plan that doesn't provide for it.

9      MS. WARREN:  Well, Your Honor, we will work with the

10 debtors to see if we can reach any agreement.  If not, you can

11 probably expect us -- to see us quite a bit.  Thank you.

12      THE COURT:  Okay.  All right.  Anybody else?  Okay.

13 Yes?

14      MR. CHEHI:  Your Honor, Mark Chehi, of Skadden Arps,

15 for Sealed Air, on this very specific point.

16      And that is it goes to the proof of claim issue

17 raised by committee counsel.  I think we have a concern, or are

18 just going to reserve rights and perhaps make a presentation to

19 the Court at a later date on, perhaps, the need for a proof of

20 claim process to ensure that we've identified all the claimants

21 and they're all getting adequate notice of the proceedings, for

22 purposes of a plan confirmation, objection, and voting, and the

23 like.

24      And that's important to us and to other parties who

25 would be protected by the 524(g) and 105 injunctions, to make

167

1   sure that they've had their opportunity, have notice of those

2   injunctions issuing, and take objection before they issue.

3           THE COURT: Okay. Well, some process is going to

4   have to be employed for that end, Mr. Chehi, and whether it's a

5   bar date, or something on the ballots, if in fact they vote, is

6   a different issue.

7           So, I'm not in the process of disallowing claims, if

8   I don't have a ballot process. I'm probably also in the

9   position of permitting votes, if I don't have some disallowance

10  of claims. So, it's something that we'll have to address

11  later.

12          MR. CHEHI: And our concern, again, is just

13  identifying the folks who are entitled to vote and have an

14  opportunity to be heard among the asbestos claimants creditor

15  group, to the extent they have -- there's not been a bar date

16  notice, it's hard to determine exactly who they all are.

17          THE COURT: It's been done in every other asbestos

18  case that's been pending in the United States since Manville,

19  so I don't think it's going to be an issue for this one.

20          MR. CHEHI: Okay. Thank you, Your Honor.

21          THE COURT: We'll figure out the notice. Thank you.

22  All right. Anybody else on the personal injury issue? Okay.

23          Then, the futures rep, the asbestos committee, and

24  the debtor, are to meet and draft a case management order for

25  estimation of personal injury actions -- personal injury

**J&J COURT TRANSCRIBERS, INC.**

168

1  matters -- and then, circulate it to all -- I'll just call them

2  parties in interest, which include the insurance companies.

3           Can we get to this issue in the February omnibus?

4  Can you folks get something together in time to circulate it

5  prior to the February omnibus, so that I can deal with it then?

6           MR. LOCKWOOD:  We can certainly strive to do that,

7  Your Honor, and I don't see any reason, right now, why we

8  couldn't succeed.

9           THE COURT:  All right.  The debtor's to put it on the

10  agenda for the February omnibus, if possible, and the March

11  omnibus at the -- at the very latest.

12           I think that should give you enough flexibility to

13  get everybody together, if it's agreed upon by all parties in

14  interest, then you can file -- put it into the appropriate

15  evidentiary -- or, pardon me, hearing binder, and give me a CNO

16  and I'll sign it, in all probability.  I obviously reserve the

17  right to make sure that I agree with the dates and can schedule

18  the hearings on my own calendar, but in all probability, I'll

19  agree to the substance of it.

20           If you can't agree, then it should go forward along

21  the normal objection process period, so that I have contested

22  matters set for that omnibus, which is why I don't know if

23  you'll make the February hearing.

24           All right.  Mr. Baena, on the property damage?

25                          (Pause)

**J&J COURT TRANSCRIBERS, INC.**

169

1          MR. BAENA:  Judge, before I get into the estimation
2 issues, if I may, I -- in -- for 200 years I think Courts
3 entered orders and people obeyed them, but in this case the
4 Court orders something and then we argue about it.

5          And about two and a half hours ago, I think you
6 ordered that asbestos claimants are going to have a right to
7 vote, under this plan.  And then we argued again, well Mr.
8 Lockwood and Mr. Bernick argued again.

9          I just want to ensure that we're past that issue,
10 nothing happened in the course of that argument that changed
11 the Court's ruling.

12          THE COURT:  Well, I don't know where we stand on the
13 issue of the right to vote.  I think what we're doing is
14 looking at an estimation hearing, and the outcome of that
15 estimation hearing will probably govern whether there is or is
16 not impairment in the financial sense, that I was getting to
17 earlier.

18          MR. BAENA:  Well, Judge, as Mr. Lockwood pointed out,
19 there are two sides of the voting issue.  We've got the 1126
20 side and, frankly, I think the issue that you just framed and
21 your discussion earlier today, really went to the 1126 issue.

22          But, then we also have the 524(g) voting issue, and I
23 don't think it's affected by any of the processes that we're
24 talking about.  And I also don't think it's really highly
25 debatable about the fact that 524(g) gives people who are going

**J&J COURT TRANSCRIBERS, INC.**

170

1 to have their claims channeled to this trust a right to vote.

2        If the Court isn't past that, I would like, before I

3 discuss estimation, to at least address those issues, if you're

4 taking the matter under advisement.

5        MR. BERNICK:  Your Honor, if -- as a point of

6 process, a -- if we are now going back to revisit those issues,

7 I'm happy to do it.  But, we are then probably not going to get

8 to any of the remaining issues.

9        Mr. Baena's clients are in a fundamentally different

10 position, with respect to impairment, than are the personal

11 injury client.  And I'm happy to take that up.

12        But, to have more than one counsel now stand up and

13 address what 524(g) means, what 1126(1) means, or (f) means, or

14 whatever it is, means, is basically going over exactly the same

15 ground.  And we think it's critical today, that we reach some

16 of these other issues.

17        THE COURT:  Well, Mr. Baena, with respect to whether

18 or not the personal injury claimants can vote, how is that

19 relevant to your constituency?

20        MR. BAENA:  Judge, we also objected to the

21 confirmability of the plan, on the grounds that it stripped all

22 asbestos claimants, be they personal injury or property damage

23 claimants, from the right to vote.  That plan doesn't

24 anticipate our vote either.

25        THE COURT:  Okay.  Well, on that issue, I think I'd

**J&J COURT TRANSCRIBERS, INC.**