Page 41

1    haven't they?

2        A    They have now.  At the time, I don't

3    recall whether or not they had filed their

4    bankruptcy plan.  I don't think it had been a

5    confirmed plan as of that date, and they probably

6    had not filed for bankruptcy, but I'm not certain of

7    that.

8        Q    Was Western MacArthur a prepack?

9        A    Yes.

10       Q    Prepack means that it was agreed to by a

11   group involving both creditors and the debtors

12   before the bankruptcy is filed; is that correct?

13       A    Essentially, my understanding, it's where

14   the bankruptcy plan, and the disclosure statement

15   are generated through the agreements that you

16   mentioned, and there's a solicitation of votes taken

17   all prior to the filing of the bankruptcy.  It's

18   kind of all those things.

19       Q    Go ahead.

20       A    I know you're going to ask me.  I believe

21   that all of those steps have been undertaken in

22   Western MacArthur, but I'm not absolutely certain.

23   Certainly there was a basic agreement between the

24   company and the representatives of the asbestos

25   victims in that case and a number of insurers, too,

Page 42

1   I believe.

2       Q    And that agreement involved all of the

3   stock of Western MacArthur, ending up owned by

4   trusts; is that correct?

5           MR. FINCH:  Object to form.

6           THE WITNESS:  I don't recall.

7           BY MR. MILLER:

8       Q    Pardon me?

9       A    I don't recall.  No, no, it did not, as a

10  matter of fact, it did not.  I don't think that's

11  true.

12      Q    What happened to the stock in Western

13  MacArthur?

14      A    Well, it continues as an independent

15  entity, and so at least some of the stock was not --

16  the three entities, and what's the stock ownership

17  of each of those three entities, I can't tell you,

18  but the company does exist, continues to exist and

19  operate, and it's owned independently.  And what the

20  stock arrangements were for that, I can't tell you.

21  By independently, it's not owned by the trust.

22      Q    What was the nature of your testimony in

23  the Western MacArthur matter?

24          MR. FINCH:  Which matter are you referring

25  to?  The first one?  There's two listed on here.

1          MR. MILLER:  I'm referring to the first

2    one that's first listed, then, not the in re,

3    western but the Western MacArthur versus General

4    Accident insurance that we've been talking about.

5          THE WITNESS:  There, I testified primarily

6    about the nature of asbestos litigation.  It was a

7    jury trial, and I testified about the nature of the

8    asbestos litigation, how it's carried out, and

9    Western MacArthur's participation in asbestos

10   litigation.

11         BY MR. MILLER:

12    Q     Was that a suit against insurance

13   companies to try to recover insurance money?

14    A     Well, it was an insurance recovery action.

15   I don't know whether -- who filed it, if it was a

16   deck action by the insurance companies or by Western

17   MacArthur.  But it was a litigation between Western

18   MacArthur as the insured and some of its insurance

19   companies.

20    Q     And your testimony was in support of

21   recovery from the insurance companies, entities who

22   were trying to recover from the insurance companies;

23   is that correct?

24    A     What do you mean by "in support of"?

25    Q     The entities who retained you were in the

1    position of trying to get money from the insurance

2    companies; is that correct?

3        A    I would regard that as a different

4    question than the prior one, and the answer to that

5    is yes.

6        Q    B&W asbestos creditors committee, et al.,

7    versus Bwico, et al .  I spelled that last one.  Is

8    that the nest entry?

9        A    That's correct.

10       Q    Is Bwico pronounced in some way?

11            MR. FINCH:  Bwico.

12            BY MR. MILLER:

13       Q    Mr. Finch has offered to pronounce it for

14   us.  Do you understand that's the way it's

15   pronounced?

16       A    I've heard it.  I don't know that that

17   pronunciation's ever passed my lips.

18       Q    I see.  How do you refer to that entity,

19   if you have to refer to it?

20       A    I'm not sure that I refer to it.  So I

21   don't recall having done so.

22       Q    What entity retained you in that matter?

23       A    It was the asbestos creditors committee in

24   the Babcock & Wilcox bankruptcy proceedings.

25       Q    You refer to next a Senate Judiciary

1    Committee testimony in June 2003.  Do you see that

2    entry?

3        A    Yes.

4        Q    What entity or entities paid for your time

5    in connection with that?

6        A    Well, again, it's a group of asbestos

7    trusts and asbestos creditors committees.

8        Q    And what was S.1125 going to do as you

9    recall?

10       A    Well, it was a bill -- what it was going

11   to do, it was going to collapse into chaos, but what

12   it was intended to do by its proponents -- that's

13   not fair.  What it was purported to do was to create

14   a trust fund to pay asbestos victims that would be

15   funded by asbestos trusts, by insurance companies,

16   asbestos defendants, and that would have

17   essentially -- not essentially, would have, in fact,

18   stayed and stopped any opportunity for asbestos

19   litigation of bodily injury claims.

20       Q    I take it from one of your comments, that

21   your testimony was in opposition to S.1125; is that

22   true?

23            MR. FINCH:  Objection to form.

24            THE WITNESS:  I think that's an unfair

25   characterization.

1          BY MR. MILLER:

2      Q     Well, were you testifying on facts that

3  you felt or opinions that you felt counseled against

4  the passage of S.1120 in its present form?

5      A     In its then-current form, I testified

6  about problems with the legislation, that it would

7  have the funding that was proposed in the

8  legislation would be insufficient to pay the claims

9  that were to be channeled through this national

10 fund.  So it was insufficient funded.  And it also

11 would have created a lengthy delay -- even those who

12 got paid, claimants who would get paid would, in

13 many instances, have to wait decades to get paid.

14 So I testified essentially about matters such as

15 that and offered to the committee to work with them

16 in trying to correct those problems.  But, that was

17 my testimony.  Essentially, it was it would not

18 accomplish its goals.

19     Q     In the in re, Western MacArthur entry that

20 refers to bankruptcy court, Oakland, California,

21 deposition and trial.  Do you see that?

22     A     Yes.

23     Q     What entity retained you in that matter?

24     A     I believe I was retained by the claimants'

25 committee, the asbestos claimants' committee in the

1    Western MacArthur bankruptcy.

2         Q    And Armstrong versus CCR, that's the next

3    entry; right?

4         A    Let me add one thing to your last

5    question.  I'm sorry.  I testified essentially on

6    behalf of both the claimants' committee and Western

7    MacArthur -- MacArthur, and Western Insulation as

8    well, but I was essentially retained by the

9    committee.  And I do see Armstrong versus CCR, yes.

10        Q    CCR stands for Center for Claims

11   Resolution?

12        A    Yes.

13        Q    What entity retained you in that matter?

14        A    I don't recall much about that.

15             MR. FINCH:  Would you like me to clarify

16   that?

17             MR. MILLER:  Sure.

18             MR. FINCH:  Dr. Peterson is the consultant

19   and expert for the asbestos personal injury

20   claimants committee in the Armstrong bankruptcy.

21   The litigation referred to there was between

22   Armstrong and the Center for Claims Resolution, and

23   I honestly do not recall whether the asbestos

24   claimants committee was a party to that litigation

25   or not.

Page 48

1           Sitting here, I can't recall.

2    Dr. Peterson was retained expert for the ACC.  I

3    don't know if Armstrong joined the ACC in that

4    litigation or not.  I just know that he provided

5    expert opinions relating to Armstrong's liability at

6    various points in time that Armstrong would then use

7    in its litigation against the CCR.  That litigation

8    was settled shortly before it was supposed to go to

9    trial.

10           BY MR. MILLER:

11    Q    Did that help, Dr. Peterson?

12    A    Not much.  I don't even recall having been

13    deposed in that case.  Blissfully, that one slipped

14    from my memory bank.

15    Q    Is it safe to assume that you are not

16    retained by the CCR?

17    A    Well, I'd be happy to be retained by the

18    CCR, but in that case, I don't believe I was

19    retained by the CCR.

20    Q    In re, Armstrong World Industries

21    bankruptcy, Delaware, that's the next entry;

22    correct?

23    A    Yes, it is.

24    Q    What entity retained you in that matter?

25    A    It's the asbestos personal injury

1    claimants that Mr. Finch just referred to.

2         Q     The next entry --

3         A     And I think I testified both on behalf

4    then and the futures representative in the Armstrong

5    case is my recollection.

6         Q     When we've used the term "futures

7    representative," we're referring to the futures

8    representative for asbestos personal injury

9    claimants is the full name usually; right?

10        A     Sometimes, they represent other -- led,

11   for example, in some cases, but in Armstrong I

12   believe it was solely asbestos claims.

13        Q     I'm sorry.  Sometimes they represent who?

14        A     Other categories of claimants as well.

15   I've seen that happen, but not in Armstrong.

16        Q     The next entry is in re, Babcock & Wilcox

17   company; is that correct?

18        A     Yes.

19        Q     What entity retained you in that?

20        A     The asbestos claimants committee in that

21   bankruptcy.

22        Q     The next entry is in re, Oglebay Norton.

23   Do you see that?

24        A     Yes.

25        Q     What entity retained you in that matter?

Page 50

1      A     That was an unofficial committee of
2   asbestos claimants in that bankruptcy.  That's it.
3      Q     The next entry is in re, Owens Corning
4   that we've talked about a little bit; is that
5   correct?
6            MR. FINCH:  Object to form.
7            MR. MILLER:  Let me state it again.
8            BY MR. MILLER:
9      Q     The next entry is in re, Corning, in re,
10  Owens Corning; right?
11     A     Yes, it is.
12     Q     We've talked about that a little bit
13  already; is that true?
14     A     I did, yes.
15     Q     What entity or entities retained you in
16  that matter?
17     A     There was the asbestos claimants committee
18  in the Owens Corning bankruptcy, and I think I
19  testified both on their behalf and on behalf of the
20  futures representative in that case.
21     Q     The final entry on your page is in re,
22  American Capital Equipment, LLC, and Skinner Engine
23  Company; is that correct?
24     A     Yes.
25     Q     Does that involve asbestos?

Page 51

1        A     Yes.

2        Q     What entity retained you in that matter?

3        A     I think I was engaged by the company in

4    that case, by Skinner Engine.  But again, it's a --

5    it is a litigation between the company -- jointly

6    between the company and the plaintiffs' lawyers,

7    primarily involving, I guess, the insurance company.

8    So there's a common interest between the claimants

9    and the company.  But I think that the retention's

10   by the company.

11       Q     Were you also retained by an asbestos

12   claimants committee in that matter, if you know?

13       A     I don't believe so, just my recollection,

14   because my work has been primarily with the

15   insurance council, who works for the company.  But

16   the specifics of that engagement, how my testimony

17   was offered, I just -- presently, it's vague to me.

18       Q     On this page, would you indicate which of

19   these matters you worked with lawyers from Caplin &

20   Drysdale on?

21       A     What do you mean "worked with"?

22       Q     Where the primary law firm that worked

23   with you with regard to your testimony or that

24   presented your testimony was a lawyer from Caplin &

25   Drysdale.

Page 52

1      A     My testimony was presented by lawyers from

2   Caplin & Drysdale, working from the bottom up, in

3   the Owens Corning case, the Armstrong World

4   Industries bankruptcy.  I simply can't recall in the

5   Armstrong versus CCR.  I don't believe it was Caplin

6   Drysdale, but actually, I just don't recall.

7           The Bwicko case -- in Bwico -- there, I

8   said it -- that was Caplin & Drysdale.  The Sealed

9   Air, Grace Sealed Air case.  That's it.

10     Q     Who retained you in Federal Mogul, what

11  entity?

12     A     That was -- well, my testimony was -- who

13  retained me was the asbestos retainment committee.

14     Q     That was where you worked for Caplin &

15  Drysdale?

16     A     Yes.

17     Q     That wasn't on the list, I understand.

18  That wasn't in my prior question.  As of the date

19  that this list was prepared in January of 2005, is

20  it true that most, if not all, of your contested

21  estimations testimony have been for asbestos

22  claimants?

23     A     Could you read that question back, please?

24     Q     Yes.  As of January 2005, wasn't it true

25  that most, if not all, of your contested asbestos

Page 53

1    estimations testimony had been for asbestos

2    claimants?

3              MR. FINCH:  Object to form; compound.

4              THE WITNESS:  I don't -- I'm not sure

5    that's true.  I haven't sat down and added them up.

6              BY MR. MILLER:

7        Q    Do you recall giving testimony to that

8    effect in the Owens Corning trial?

9        A    I don't recall that.  This list suggests

10   that that may not be true.

11             MR. FINCH:  Ralph, when is a good time to

12   take a break?

13             MR. MILLER:  Let me finish this, and then

14   we'll take a break.

15             MR. FINCH:  All right.

16             BY MR. MILLER:

17       Q    Dr. Peterson, you do recall giving trial

18   testimony in the Owens Corning matter in Judge

19   Fullum's court, January 17, 2004, don't you?

20       A    Yes.

21       Q    I'm going to show you the trial -- I'm

22   sorry.  It says 2004, but it's wrong.  It is 2005.

23   I misspoke.  Actually, the transcript is misdated,

24   but we all agree it was 2005, I think.

25             MR. FINCH:  Yes, we do.

Page 54

1              THE WITNESS:  Yes.

2              BY MR. MILLER:

3         Q    I'm going to direct your attention to page

4    95, and I want to direct your attention specifically

5    to lines 17 through 19 to see if that refreshes your

6    recollection that at the time, you had indicated

7    that most, if not all, of your contested estimations

8    testimony had been for asbestos claimants.

9         A    This doesn't refresh my recollection, but

10   I assume that this is a correct representation of

11   testimony.

12             MR. FINCH:  I would ask that for under the

13   rule of completeness, the question on page 96, line

14   6, and the answer to that be read into the record.

15   Dr. Peterson, can you, please, turn to the next page

16   in your trial testimony and read into the record the

17   question beginning at line 6 and the answer to that

18   question?

19             THE WITNESS:  You want me to read the

20   question and answer?

21             MR. FINCH:  Read the question and answer

22   into the record, please.

23             MR. MILLER:  Let me suggest this, if we

24   can.  I object to you doing optional completeness

25   when I haven't finished the testimony about this

1    particular document.  So I'll let you do that, but

2    I'm going to ask him to read the whole question and

3    answer on page 95.  If you want him to read some

4    more, you can, but that will put it in context.

5    Will that be all right with you?

6              MR. FINCH:  That's fine.  Read the

7    question and answer on page 95 and under the rule of

8    completeness, I would ask that the question and

9    answer be read on page 96.

10             MR. MILLER:  I'll do that to.

11             BY MR. MILLER:

12        Q    On line 95, line 12, you were asked "you

13   wouldn't really call yourself a neutral expert who

14   had testified regularly for both sides in contested

15   valuation cases, would you?"

16             Would you read your answer there between

17   lines 15 and 20 there please, slowly?

18        A    My answer was "I regard myself as a

19   neutral expert having worked for all parties and

20   that I apply the same methods and try and be -- use

21   the same approaches in all the work I do.  I think

22   that most of my, if not all of my, contested

23   estimations testimony has been for asbestos

24   claimants.  I have done other testimony as to -- for

25   other parties."

Page 56

1    MR. FINCH:  Now, Dr. Peterson, could you

2    turn to the next page and read --

3    MR. MILLER:  Wait a minute.  Let's go

4    ahead and read all the way through.

5    BY MR. MILLER:

6    Q    The next question on line 21 was "my

7    question is simple, sir.  You have not testified

8    regularly for both sides in contested valuation

9    cases, have you?"

10    And your answer on line 24 was?

11    A    "That is correct."

12    Q    The next question on the next page, "in

13    fact, over the past seven or eight years, at the

14    least you've been a regular witness for the

15    claimant's committee in federal bankruptcy

16    proceedings?"

17    And your answer was?

18    A    "I've testified a number of times.  I

19    don't know what you mean by regular witness."

20    Q    Then the next question was, which

21    Mr. Finch wanted to have read, "well, you testified

22    over 20 times, haven't you, for claimant's

23    committees?"

24    And your answer was "I think that's across

25    all engagements.  I have also testified for

Page 57

1    insurance companies in estimations, contested

2    estimations.  I have also testified for trusts in

3    contested estimations.  So it's not exclusively for

4    claimant's committees."

5           The next question, "Dr. Peterson, you

6    testified over 20 times on behalf of claimant's

7    committees in bankruptcy proceedings, haven't you?"

8           And your answer was?

9       A    "I don't recall the count of it.  I think

10   I said I've testified over 20 times, and that

11   includes a variety of different defendants.  How

12   many --"

13      Q    And the Court interrupted and said "most

14   of them, most of them were for plaintiffs; right?"

15          And your answer on line 19 was?

16      A    "Well; certainly, certainly."

17          MR. MILLER:  This would be a good time to

18   take a break if you'd like to.

19          MR. FINCH:  Okay.

20          VIDEO OPERATOR:  We're off the record.

21   The time is approximately 10:28 a.m.

22          (Recess.)

23          VIDEO OPERATOR:  We are back on the

24   record.  The time is approximately 10:54 a.m.  This

25   is the beginning of tape number 2.

1          BY MR. MILLER:

2          Q    Mr. Peterson, looking back at tab 2 of

3    your expert testimony for the last four years --

4          A    I have it.

5          Q    -- would you indicated if there are any of

6    these matters in which you were first retained by an

7    asbestos creditors committee and then retained by

8    the company?

9          A    I may have been in Western MacArthur.  I

10   just don't recall the timing, Western MacArthur

11   versus General Accident, Fuller Austin.

12         Q    Fuller Austin, you were first retained by

13   the asbestos claimants' committee?

14         A    In the prepack discussion, yes, National

15   Gypsum, Lippe, the McKeene litigation.

16         Q    And you indicate -- have you finished,

17   sir?

18         A    No.

19         Q    Okay.  Thank you.

20         A    Whatever the role in Armstrong was,

21   Armstrong versus CCR.

22         Q    I'm sorry.  Could you clarify that answer?

23   Whatever the role that was, you were first retained

24   by the ACC?

25         A    Yes.  I was working for the asbestos

Page 59

1    claimants' committee, as Mr. Finch stated, and I

2    don't know on whose behalf I was testifying in the

3    Armstrong versus CCR.  Apparently, it was on behalf

4    of the company.  So if I wasn't engaged by them, if

5    I wasn't retained by them, but since they pay

6    everybody in a bankruptcy, it doesn't make much

7    difference, I guess.  I think that's it.

8         Q    So any matter on this list in which you

9    were retained by a company and you had no work for

10   the asbestos claimants' committee in that same

11   matter?

12        A    On this list?

13        Q    Yes, sir.

14        A    I think the Skinner Engine is that.

15        Q    Any others?

16        A    I think that's the only one.

17        Q    What year was Skinner Engine?

18        A    2005.

19        Q    You've given a deposition in that matter;

20   is that right?

21        A    Yes.  I just -- yes.

22        Q    About what percentage of your time in 2005

23   has been spent on the Skinner Engine case, would you

24   estimate?

25        A    Oh, not much.  It's just some analyses and

Page 60

1   a trip to -- actually, I think the deposition was in

2   Los Angeles.  It's a relatively modest engagement.

3        Q     That would be under 10 percent of your

4   time?

5        A     Certainly, yes.

6        Q     Under 5 percent?

7        A     I don't know.

8        Q     Perhaps between 5 and 10 percent?

9        A     I don't know.

10       Q     As you look at this list, do you recall

11  how many of these matters where you did asbestos

12  estimation, another expert was retained by someone

13  other than a future claims representative?

14       A     On the list on page 1?

15       Q     Yeah.  Would you tell us which of these

16  matters there was an expert retained by some entity

17  on asbestos estimation other than you or an expert

18  retained by future claims representative by personal

19  injury claimants?

20       A     Well, Fuller Austin, National Gypsum,

21  Lippe, Grace, Western MacArthur, B&W Asbestos

22  creditors committee, Bwico, the Western MacArthur

23  bankruptcy.  I don't know that there was one in the

24  insurance litigation.  Sitting here, I don't know

25  one way or the other.  I don't know one way or the

1    other about Armstrong versus CCR.  Armstrong

2    confirmation hearing was.  Babcock & Wilcox, there

3    was, the bankruptcy deposition at trial.  Oglebay

4    Norton there was.  Owens Corning, there was, and I

5    don't know whether or not there is one in Skinner

6    Engine.

7         Q    Let's take those in reverse order.  In

8    Owens Corning, you gave an estimate for asbestos

9    liabilities; is that true?

10        A    I gave a range of estimates of asbestos

11    liabilities for both Owens Corning and for Fiber

12    board.

13        Q    You had a preferred estimate for Owens

14    Corning; isn't that true?

15        A    I think that's correct.

16        Q    As you had your best estimate?

17        A    I think that's correct.

18        Q    In Owens Corning, your best estimate for

19    asbestos liability was higher than any of the other

20    expert estimates for asbestos liability; isn't that

21    true?

22        A    Yes.

23        Q    In Oglebay Norton, did you have an

24    estimate for asbestos liabilities?

25        A    No.

Page 62

1    Q    What was your issue there?

2    A    I was testifying in rebuttal to the

3    testimony by Dr. Vasquez, who was the expert for

4    Oglebay Norton, the debtor, and about -- primarily

5    that.

6    Q    You did not prepare an estimate in Oglebay

7    Norton, then?

8    A    That's correct.

9    Q    What was the nature of your rebuttal

10   testimony about Dr. Vasquez's estimate?  Let me

11   rephrase that question.

12        Did you express any opinion as to whether

13   the estimate of Dr. Vasquez, in your view, was too

14   low or too high?

15        MR. FINCH:  Object to form.

16        THE WITNESS:  I recall testifying that you

17   couldn't make an estimate based upon the information

18   that he used -- I recall that -- and that his

19   estimate was, I thought, flawed in a number of

20   respects.  And I don't recall whether I said it was

21   too low or too high.

22   Q    Babcock & Wilcox, did you give an estimate

23   of asbestos liability?

24   A    In the bankruptcy case, yes.

25   Q    Did any other expert give an estimate of

1    asbestos liability in that case?

2        A    Yes.

3        Q    Who?

4        A    It was Dr. Bates, Charles Bates.

5        Q    He's someone who used to work in the past

6    with Dr. Vasquez; right?

7        A    Yes.

8        Q    Did you have a preferred estimate or

9    recommended estimate to Babcock & Wilcox within your

10   range?

11       A    I don't recall.

12       Q    Do you recall if your estimate was higher

13   than the estimate of Dr. Bates in Babcock & Wilcox?

14       A    I believe -- I don't recall what

15   Dr. Bates's testimony was in that case.  So I cannot

16   answer that question.  I just don't recall.

17       Q    You started to say "I believe."  Do you

18   think your estimate was higher or lower?

19       A    I stated my answer.

20       Q    In Armstrong, did you give an estimate of

21   asbestos -- the Armstrong confirmation, that is, did

22   you give an estimate of asbestos liability?

23       A    Yes.

24       Q    Was there another expert that gave an

25   estimate of asbestos liability?

1      A    Dr. Chambers testified there.  I think the

2  primary nature of her testimony was about her

3  certainty that the asbestos litigation --

4  legislation, excuse me, the asbestos legislation was

5  going to be adopted soon, and I don't recall whether

6  or not she made an estimate in that case.  I don't

7  recall.

8      Q    The Armstrong versus CCR matter, I think

9  you said you don't recall enough to know whether you

10  gave an estimate or not?

11      A    I don't recall that case, no.

12      Q    In the Bwico part of B&W, was there an

13  estimate of liability?

14      A    Yes.

15      Q    Was someone else giving an estimate of

16  asbestos liability in that matter?

17      A    I believe so.

18      Q    Who?

19      A    Dr. Dunbar, Fred Dunbar.

20      Q    Was your estimate higher than Dr. Dunbar's

21  in that matter?

22      A    I don't know that he did.  He testified

23  that the estimate of the company, the company made

24  was reasonable, and sitting here, I don't recall

25  whether or not he made an estimate in that case.  I

1     think maybe he did not.

2          Q     Did the company make an estimate in that

3     case?

4          A     It didn't make a contemporaneous estimate.

5     It had estimated values -- it had a limited estimate

6     for a short period of years at the time of the

7     transaction.

8          Q     Was it your opinion that the limited

9     estimate for a short period of years was lower than

10    your estimate in that case?

11         A     It, in fact, was lower.

12         Q     And in Grace, did you give an estimate of

13    asbestos liability?

14         A     Yes.

15         Q     Did another expert give an estimate?

16         A     I don't recall.

17         Q     In Lippe, did you give an estimate of

18    asbestos liability?

19         A     Yes.

20         Q     Did another expert give an estimate also?

21         A     I don't recall.

22         Q     Within the last four years, did you give

23    an estimate in National Gypsum?

24         A     I'm not sure that was in the last four

25    years.  By now, it may not have been.  Sitting here,

1    I can't tell you.

2        Q    Federal Mogul, did you give an estimate of

3    asbestos liability?

4        A    Yes.

5        Q    Did someone else give an estimate?

6        A    Yes.

7        Q    Who else gave an estimate in that case?

8        A    Dr. Robin Cantor, C-a-n-t-o-r.

9        Q    Was your estimate or Dr. Cantor's estimate

10   higher in that matter?

11       A    I had quite a range of estimates, but I

12   think they generally were higher, maybe all were

13   higher than hers.

14       Q    Fuller Austin, did you give estimates of

15   asbestos liability in any of your testimony?

16       A    Yes.

17       Q    Did other experts give estimates?

18       A    Yes.

19       Q    Who else gave estimates in Fuller Austin?

20       A    Dr. Tom Florence and, and I think there

21   was an estimate provided by an epidemiologist who

22   was retained by the insurance companies.  I just

23   can't remember his name.

24       Q    I assume your estimate was higher than the

25   epidemiologist retained by the insurance companies;

1   is that true?

2       A    Yes -- well, I'm not sure quite what the

3   nature of his testimony was.  Testimony, I don't

4   think I was sure, but his testimony was unusual.

5       Q    Who retained Dr. Florence?

6       A    Fuller Austin insulation company and the

7   Fuller Austin trust.

8       Q    Was he essentially retained by the same

9   parties who retained you?

10      A    Yes.

11          MR. FINCH:  Off the record.

12          VIDEO OPERATOR:  We're off the record.

13  The time is approximately 11:10 a.m.

14          (Discussion off the record.)

15          VIDEO OPERATOR:  We are back on the

16  record.  The time is approximately 11:10 a.m.

17          BY MR. MILLER:

18      Q    Other than Federal Mogul, have you given

19  any asbestos estimation testimony in the last four

20  years that is not reflected on this list?

21      A    Well, there was just JT Thorpe I mentioned

22  previously.  That was last month.

23      Q    Was there another expert who gave an

24  asbestos estimate in that case?

25      A    Yes.

1    Q    Who?

2    A    Doctor Chambers, Patricia Chambers.

3    Q    Who had retained Dr. Chambers?

4    A    Some of the companies that insured the

5    liabilities of JT Thorpe.

6    Q    Was your estimate higher than the estimate

7    of Dr. Chambers?

8    A    Yes.

9    Q    Any other estimates that you recall giving

10   in the last four years on asbestos liability by way

11   of testimony that we haven't talked about in the

12   last -- since the break?

13   A    We went over the list, the list earlier

14   this morning.  I think that was everything I

15   mentioned.

16   Q    Just a moment.  I'm looking at my notes on

17   that.  Your testimony with the Senate Judiciary

18   committee in 2005, you didn't give an estimate of

19   asbestos liability for the entire system, did you,

20   or did you? .  That's a bad question.  Let me start

21   over.  Did you provide any estimates of asbestos

22   liability in your Senate testimony?

23   A    I testified to the cost of the

24   compensation called for by the then-current version

25   of the bill, but used the prior estimates that were

1   done by the Congressional budget office as the basis

2   for that.  But I did not testify about the

3   liabilities in tort litigation for any particular

4   asbestos defendant or for any group of asbestos

5   defendants.

6       Q    Let me change subjects and talk a little

7   bit about the Georgine case.  If you look at page 1

8   of your report, I think you'll see about the third

9   sentence says "by January 31, 1994, GAF had entered

10  into a class action settlement as a member of

11  defendant consortium called the Center for Claims

12  Resolution that would have restricted GAF's

13  liability with respect to future claimants by

14  limiting annual flows of cases and the money that

15  would be paid for future cases."

16           Do you see that reference?

17      A    Yes.

18      Q    That say reference to what is commonly

19  called a Georgine case; is that correct?

20      A    Yes.

21      Q    There's also what's called the Ahern case?

22      A    Yes.  It's a different case, yes.

23      Q    Just so we're clear, when we talk about

24  Georgine, we are talking about that case; is that

25  right?

Page 70

1    A    That would be my understanding, the CCR

2  class action but not the Ahern class action.

3    Q    Right.  And you are familiar with fact

4  that there was a stipulation of settlement between

5  the class of claimants and defendants who were

6  represented by the center of claims resolution which

7  was also amended in the Georgine matter?

8    A    It was a class of future claimants, yes.

9    Q    All right.  But if we refer to the terms

10  of the Georgine settlement, will that be a good

11  shorthand for the stipulation of settlement between

12  the class of claimants and the defendants?

13    A    I understand your usage of the term.

14    Q    In your report in exhibit 1, you were

15  estimating asbestos liabilities as of January 1994;

16  is that right?

17    A    I was estimating the GAF's liabilities,

18  tort liabilities for asbestos bodily injury claims

19  effectively from January 31, 1994, but I used

20  January 1 for convenience.

21    Q    Both January 1 and January 31 are both

22  1994?

23    A    That's correct.

24    Q    So if we refer to as of January 1994, will

25  that be reasonably clear when we're talking about a

Page 71

1    point of time for something with as much range of

2    variation as asbestos estimates?

3        A    Yes.

4        Q    How did you take into account the effects

5    of the Georgine settlement in the analysis of GAF's

6    asbestos liability that you performed as of January

7    1994?

8        A    Could you read that question back?

9        Q    I'll do it again.  How did you take into

10   account the effects of the Georgine settlement, if

11   you did, in your analysis of GAF's future asbestos

12   liabilities as of January 1994?

13       A    By that, you mean the -- what we described

14   earlier, the particular stipulation of settlement as

15   amended?  Is that what you're referring to.

16       Q    I mean the stipulation of settlement and

17   the entire Georgine proceeding, whether you thought

18   that was going to affect future asbestos liabilities

19   and, if so, what you did about it?

20       A    Using the broader description that you

21   just stated, I think the whole proceedings and

22   negotiations and everything about it would tend to

23   increase the number of future claims that I would

24   expect to have been filed in tort against GAF,

25   although I did not incorporate an increased

Page 72

1   propensity to sue assumption in my forecast, at

2   least in the first section, in section 6 of my

3   report.  I think that's the primary way I considered

4   it.  The settlement was a settlement.  It wasn't

5   reported to be a settlement of future claims.  It

6   wasn't a tort liability.  It wasn't -- whatever

7   rights people had under that settlement were

8   contractual rights.

9        Q    What was the significance of that answer

10  you just gave?  What difference does it make whether

11  it's contractual rights or not for your estimate

12  purposes?

13       A    Well, it would have -- for the most part,

14  it would have taken the liability out of tort and

15  put it into contract.

16       Q    So are you saying that contractual

17  replacement of tort liability is something you

18  disregarded in your analysis?

19       A    I was estimating the tort liability.

20       Q    When tort liability becomes a settlement,

21  it is converted into a form of contractual

22  liability, isn't it?

23       A    Yes.

24       Q    I'm trying to understand.  Are you saying

25  there might be additional asbestos liabilities under

Page 73

1    Georgine but they're outside your scope of work

2    because you consider them contractual instead of

3    tort?  I think you're not saying that.

4        A    It's one -- I did not make forecasts of

5    liabilities under Georgine.

6        Q    Did you reduce in any way your forecast

7    based on some probability that Georgine might limit

8    future liability?

9        A    As of January 1994, it didn't limit

10   liability.  So it was as of that point in time, it

11   wasn't something that was binding on anybody and

12   didn't constitute -- I'll leave it at that.

13       Q    Do you know when Georgine was initially

14   filed?

15       A    I think it was filed in January '94.  It

16   was about that time.

17       Q    It was filed in January '93.

18       A    I'm sorry.

19       Q    Does that seem right maybe?

20       A    Yes, yes.  I beg your pardon.

21       Q    Had the District Court preliminarily

22   approved the settlement as of January '94?

23       A    I think that's correct.

24       Q    Had any court rejected the settlement as

25   of January '94?

Page 74

1      A      No other court had heard it.  It was on

2   appeal.  It was being contested.  It was a nonfinal

3   judgment.

4      Q      Are you sure that it was on appeal in

5   January of 1994.

6      A      If it hadn't been, it was going to be

7   appealed.  I don't know when notice of appeal was

8   filed.

9      Q      Do you know when the fairness hearing

10  occurred?

11     A      Sitting here right now, I don't recall.

12     Q      You didn't adjust your estimate based on a

13  possibility that the Georgine settlement would go

14  into effect, did you?

15     A      I didn't do a probabilistic statement.  At

16  this point in time, it was not a legal status of the

17  Georgine settlement wasn't something that affected

18  the rights of present claims future claimants or GAF

19  other than there was a stay in the proceeding, so

20  people couldn't file claims at the time, but it

21  wasn't the final adjudication or determination of

22  rights or a determination of the values or

23  eligibility of claims that the point in time.

24     Q      Let me strike everything after the

25  statement that you did not do a probabilistic

Page 75

1    estimate as nonresponsive.

2         As of January 1994, would you agree there

3    was some probability that the Georgine settlement

4    would be approved and would come into effect?  And

5    by "probability," I mean a percentage, not

6    necessarily over 50 percent.

7    A    There was some probability that it would

8    be effectuated and reach final resolution, yes.

9    Q    Would you agree there was a significant

10   chance as of January 1994 that Georgine terms of

11   settlement would be substantially approved?

12        MR. FINCH:  Object to form.

13        THE WITNESS:  I don't know what you mean

14   by "significant chance."

15        BY MR. MILLER:

16   Q    Greater than, say, 25 percent?

17   A    I haven't attempted to quantify.

18   Q    You wouldn't say that the probability of

19   Georgine going into effect as of January 1994 was 0

20   percent, would you?

21   A    I think it was not 0 percent in January of

22   '94.  I would agree with that, that it would be

23   approved on appeal.

24   Q    Do you know which plaintiff law firms you

25   were involved in the Georgine settlement?

Page 76

1          A     I know the primary firms that were

2     involved in the -- there were class counsel, I

3     believe, and those who were opposing it.

4          Q     Do you know which firms were in support of

5     the Georgine settlement?  Can you give us the major

6     ones that you recall?

7          A     The primary ones were -- was Gene Locks'

8     firm, Greitzer & Locks, and then I guess it was Ness

9     Motley at the time, N-e-s-s Motley.

10         Q     Do you know whether the Center for Claims

11    Resolution began to process claims under the terms

12    of the Georgine settlement after the fairness

13    hearing?

14         A     It's my understanding that they did.

15         Q     But again, you're not sure when the

16    fairness hearing was; right?

17         A     Sitting here right now, I don't recall.

18         Q     Would you agree that the probability that

19    the Georgine settlement was going to be approved

20    went up after the fairness hearing, and it was

21    approved by the District Court?

22         A     No.

23         Q     Why not?

24         A     I think that the expectation of most

25    people is it probably would have been -- well,

1    perhaps.   I guess perhaps is probably a better

2    answer.

3         Q    Perhaps the probability of approval went

4    up after the district judge had approved it at the

5    fairness hearing?  Is that what you're saying?  Is

6    that what the "perhaps" means?

7         A    Because for Georgine to ultimately become

8    a judgment binding the rights of claimants, future

9    claimants, it had to go through several steps, the

10   first step of which it had to be approved in the

11   fairness hearing.  And of course, it had to be

12   approved at whatever level of appeals were going to

13   be brought against it.  To the degree that there was

14   uncertainty and some probability that the trial

15   court would not approve the fairness of the

16   settlement, then, once it was approved, you somewhat

17   reduce the uncertainty and the somewhat increase of

18   probability would eventually be passed.  I think

19   most people didn't regard that as the primary forum

20   in which the settlement would be finally resolved.

21        Q    Who are these "most people" you're

22   referring to?

23        A    Lawyers, people I talk to about Georgine

24   class action at the time.

25        Q    Who do you think those people were?

1   What's your recollection?

2        A     I remember Gene Locks, Joel Rice, Ness

3   Motley, Fred Barren, Tom Henderson.  All of them

4   knew it was going to be appealed and would be the

5   determination of an appellate court that would

6   ultimately pass on this.

7                (Phone ringing.)

8                Excuse me just a second.  My wife is ill.

9                MR. FINCH:  Off the record.

10               VIDEO OPERATOR:  We're off the record.

11   The time is approximately 11:28 a.m.

12               (Discussion off the record.)

13               VIDEO OPERATOR:  We are back on the

14   record.  The time is approximately 11:34 a.m.

15               BY MR. MILLER:

16        Q     You named a number of lawyers.  Joe Rice

17   was one of the supporters of the Georgine

18   settlement; is that right?

19        A     Yes.

20        Q     Ness Motley was a supporter?

21        A     Yes.

22        Q     Gene Locks and his firm supported the

23   settlement?

24        A     Yes.

25        Q     Would you agree that they are all zealous

,

Page 79

1    advocates for their clients?

2        A    Yes.

3        Q    You understand it was a part of their

4    professional responsibility to seek the best results

5    possible for their clients?

6        A    Yes.

7        Q    And they supported the settlements as

8    being in the best interest their clients, didn't

9    they?

10        A    That's what they represent they did, yes.

11    I think there was some -- ultimately some concern

12    about that by the appellate courts.

13        Q    You personally knew these people that

14    we've been mentioning as of that time, Joe Rice,

15    Gene Locks, and the Ness Motley firm, didn't you?

16        A    Sure.

17        Q    And you felt like they were certainly

18    doing the best they could for their clients, didn't

19    you?

20        A    They had two sets of clients.  They had

21    present claims and they were undertaking to

22    represent future claimants.  I understood what they

23    did.  There were differences in rights between how

24    the present claims and the future claims were

25    treated, which ultimately became problematic for the

1    attempt to sustain the appeal, the case on appeal.

2    I understand that.

3        Q    You are aware that the Rice firm and the

4    Locks firm and the Ness Motley firm representing the

5    plaintiffs' class did submit statements in evidence

6    to the District Court; isn't that true?

7        A    That's my understanding, although I don't

8    recall specifically what evidence was submitted.

9    Whatever I recall at the time, I didn't retain all

10   the evidence, but I believe they would have

11   submitted statements.

12       Q    And there were statements were in support

13   of the settlement terms in the Georgine settlement;

14   isn't that correct?

15       A    Well, of course.  They were the lawyers

16   that negotiated the deal.  They were advocating that

17   the district courts approve the fairness of the

18   deal.  Of course, they supported it.

19       Q    Now, your analysis in exhibit 1 is based,

20   in part, on the projection of behavior of asbestos

21   plaintiffs and their lawyers; isn't that correct?

22       A    That is a consideration in making

23   forecasts, of course.

24       Q    And you would agree that the way in which

25   plaintiffs and their lawyers view the value of their

1    claims was relevant to GAF's future exposure;

2    correct?

3         A    It's the way they valued individual

4    claims, yes, because they negotiate settlements,

5    forecasting that, and you've got a history of what

6    they've settled for in the past, as to how they

7    valued the claims in the past.  Well, it doesn't

8    directly reflect how they valued it.  They probably

9    put higher values on claims when they were settled,

10   but the settlement reflects the joint agreement

11   between those lawyers and the lawyers for GAF.

12        Q    One of the behaviors of plaintiffs'

13   lawyers that you are looking at in your estimation

14   process is how they deal with nonmalignant claims

15   that are not supported by pulmonary function tests;

16   isn't that correct?

17        A    Could you read that question?

18             (The reporter read the record as

19   requested.)

20             I don't look at that as a specific and

21   explicit subject of analysis.  There are -- I look

22   at forecasts of the numbers of nonmalignant claims

23   that have been -- the record of the number of

24   nonmalignant claims that have been filed

25   historically, the settlement amounts for those, and

Page 82

1    forecast the number of nonmalignant claims that will

2    be filed in the future.  But there really isn't

3    particularly good data to be able to disaggregate

4    those nonmalignant claims in the way that you've

5    asked.

6        Q    One of the terms that's been used is the

7    term "unimpaired."  You've heard that term used in

8    asbestos estimation proceedings, haven't you?

9        A    Yes.

10        Q    There is some debate as to what that term

11    means between the plaintiffs' claimants and asbestos

12    defendants; is that correct?

13        A    I think there's substantial uncertainty

14    about what it means and what its implications are.

15        Q    Do you agree that some nonmalignant claims

16    had higher values because they had strong evidence

17    of reduced lung function?

18        A    That's kind of a yes and no.  Yes, there

19    would have been some nonmalignant claims that had

20    extraordinarily serious conditions, and

21    particularly, if the case was tried or facing the

22    trial date, so the case was looked at individually,

23    they would have gotten higher values, yes.

24        Q    Do you recall how the Georgine settlement

25    terms dealt with pleural plaque claims?

Page 83

1          A     Generally.  I have not reviewed those

2     terms for this deposition.

3          Q     Do you recall that there was a deferment

4     mechanism for certain types of claims under the

5     Georgine settlement terms?

6          A     Well, there were some nonmalignant claims

7     that were not compensable under the terms of the

8     Georgine class action.

9          Q     What is your memory of the general

10    categories of claims that were not compensable under

11    Georgine?

12         A     I think there's several categories.  My

13    recollection is that there are some cancer claims

14    that weren't compensable if they didn't have

15    findings of underlying asbestosis or pleural disease

16    and/or didn't have certain required levels of past

17    exposure.  Among nonmalignant claims, there were

18    claims that if they did not -- again, I think there

19    was an exposure requirement and requirements of

20    certain levels of X-ray reading and/or pulmonary

21    function test readings that would cause the claims

22    to not be compensated under the Georgine deal.  The

23    document speaks for itself.  There were such cases.

24    Whatever the particular definition and

25    identification of those cases are, I, again, have

1   not reviewed it explicitly for this deposition, and

2   the record speaks for itself.

3       Q    The plaintiffs' lawyers who were

4   supporting the Georgine settlement had agreed that

5   they would support some of these adjustments that

6   you've just described; isn't that true?

7       A    They reached a settlement and had these

8   terms.  So obviously, they agreed to them.  A

9   settlement is an agreement.  That's for future

10  claims.

11      Q    At least with respect to the lawyers that

12  supported these terms, this reflected their judgment

13  that the terms were a fair approximation of what

14  they could obtain in the tort system; isn't that

15  true?

16      A    No.

17          MR. FINCH:  Object to form.

18          THE WITNESS:  I don't agree with that.

19          BY MR. MILLER:

20      Q    Why not?

21      A    This is a settlement.  It's a quid pro

22  quo.  There's benefits that the Georgine settlement

23  provides to the claimants, and there's conditions

24  upon qualifications.  So you can't look at one

25  element in isolation.

Page 85

1          They agreed to take terms that, in many

2    cases, would have prevented recovery for claims that

3    were compensable in tort under a process that would

4    presumably allow them quick and certain recovery.

5    So that that was the deal they made.  It doesn't

6    represent a recognition on their part that those

7    claims weren't compensatory.  It was just a part of

8    the deal.  They were willing to accept the

9    noncompensatory claims, some claims that would

10   otherwise be compensated.  It's a settlement.  It's

11   a give and take.

12        Q    Are you suggesting they traded off the

13   values of certain claimants' rights in order to

14   benefit other claimants?

15        A    That's one of the effects of it, yes.

16   There were other things that were traded, too, but

17   there are certain claims that wouldn't be

18   compensated.  Yes, that's the effect of it.

19        Q    Do you think that's what the lawyers

20   intended to do, to say that certain claimants would

21   get less rights so other claimants could get more

22   rights?

23        A    I don't know what their intentions were.

24   You look at these deals as a global deal.  There are

25   lots of reasons for the lawyers who supported this

Page 86

1    deal to support it.  They made a judgment that it

2    was the best thing, they thought, for asbestos

3    claimants as a whole.  That's why they were pushing

4    it.  But there were winners and there were losers

5    under this deal among claimants.

6        Q    You had done some work back in the early

7    '90s to calculate values for for present claims

8    against a CCR; isn't that true?

9        A    I don't know what you're referring to.

10       Q    Do you recall in National Gypsum, that you

11   were asked about whether payments made by the CCR,

12   under analysis by a Mrs. Murray, were close to the

13   overall average that you had calculated for present

14   claims of the CCR?

15       A    I don't recall what you're speaking about.

16       Q    Did you do any testimony related to the

17   fairness of the Georgine settlement in the Georgine

18   proceeding itself?

19       A    No.

20       Q    Did you do any testimony while the

21   Georgine settlement was under consideration about

22   whether you thought it was a fair approximation of

23   the values in the tort system or not?

24       A    I don't recall.

25       Q    Well, its true that you couldn't predict

Page 87

1  in 1994 whether the class action settlement in

2  Georgine would be successful or not?

3      A    January '94?  I think that's right.  You

4  asked me about if there were probabilities.  There

5  were probabilities associated with it.  It was a

6  matter of uncertainty.  There were significant risks

7  about it, to the deal, but it had not yet been

8  finally adjudicated by the Supreme Court.

9      Q    In your work as of 1994, had you done any

10  asbestos estimates on behalf of companies who wanted

11  an estimate outside the bankruptcy context for their

12  financial statements?

13      A    I'm sorry.  Could you -- I didn't track

14  that question.

15      Q    Yeah, let me try it again.  You know that

16  companies, in the early '90s who had asbestos

17  liabilities, were having to deal with those

18  liabilities in some way on their financial

19  statements?

20      A    Yes.

21      Q    And some experts, were, including

22  accountants, were assisting them in trying to find

23  out whether or not the right number was under FAS-5

24  or applicable standards to put on their financial

25  statements?

1       A    It does.

2       Q    Did you do any of that work as of 1994

3    where you were advising companies on how to go about

4    reserving for their asbestos liabilities outside the

5    bankruptcy context?

6       A    I don't think that I was asked to do any

7    such work, nor did such work.

8       Q    Have you ever done that sort of work?

9       A    Well, I've provided forecasts for

10   companies.  Whether they used it in their financial

11   statements or not, I can't tell you.

12      Q    Outside the bankruptcy context, have you

13   been retained by companies to do asbestos estimates?

14      A    Yes.

15      Q    When is the most recent retention that you

16   can recall?

17      A    Five years or so ago.

18      Q    Who was that?

19      A    I can't tell you.

20      Q    You can't tell me for confidentiality

21   reasons?

22      A    Yes, for confidentiality reasons, I can't

23   tell you.

24      Q    Was that, then, an estimate not made for

25   public disclosure but for counsel or something?

Page 89

1      A    I was asked by counsel to do it and was

2  told to keep the engagement confidential, both the

3  fact of the engagement and what I have done.

4      Q    Are there any estimates of liability

5  you've done for companies outside of the bankruptcy

6  context, including adversary proceedings in

7  bankruptcy, that you can disclose to us?

8      A    I've seen estimates that were ultimately

9  used in discussions of later filed bankruptcies or

10  prepackaged bankruptcies.

11      Q    Setting those aside?

12      A    I think every engagement I've had of the

13  nature about which you've asked me has been a

14  confidential engagement.

15      Q    How many of those have there been?

16      A    Three or four.

17      Q    And when was the most recent one before

18  this one about -- did you say five years ago? --

19  about five years ago?

20      A    In and around that. I mean, within a

21  period of two or three years for all of those that I

22  did.

23      Q    Have you ever been in management in a

24  corporation that had asbestos liabilities? That is,

25  you've never been an executive of a company that had