1    go up because there's an older population.

2        Q    And how do you get that conclusion?

3        A    Look at the nonmalignants, a few pages

4    earlier than where you just were.  Look for the

5    column that has nonmalignants.  It's the group

6    called "average settlement.

7        Q    By the way, are these settlements after

8    you've redistributed the unknowns according to your

9    matrix?

10        A    No.  We don't redistribute unknowns for

11    resolved claims.

12        Q    So we're looking in the nonmal, I think

13    '92 to look at again, and you're showing for the 92,

14    your computation is that for under 60 the amount is

15    4,529 versus 5,623.  Did I read that right?

16        A    Yes; that's correct.  In the prior year,

17    the pattern was reversed.

18        Q    Yes.  It seems to be reversed actually

19    in -- in the earlier years, '86 through '88, the

20    under 60 average is higher than the 81 and over

21    average; isn't that true?

22        A    That's true.

23        Q    And by '97, it happens to reverse again in

24    '97, isn't that right, that the under 60 averages is

25    higher than the over 80 average?

Page 141

1      A    Yes, but it's lower than the people in

2    their 70s or even 60s.  There, the age effect is

3    pretty flat, tending somewhat probably higher in the

4    older people with the people over 80 not having the

5    most.

6      Q    Can you explain why the average is dropped

7    down between '97 and '98 in your computation?

8      A    I think it's because in '98, there were a

9    large number of settlements for cases that weren't

10   filed previous -- that either had been recently

11   filed -- Georgine had just been overturned by the

12   Supreme Court in the middle of '97.  Over the next

13   18 months, lots of claims were filed, and I believe

14   a lot of them were settled.

15     Q    You think '98 is a bigger year?

16     A    It's certainly bigger than '97.  If you

17   turn two pages earlier, there's a lot of information

18   in this, Ralph.  That's one of the reasons it's

19   reprinted.  If you look at the table that just

20   says "settlements," these are the number of cases

21   that were settled.  Positive settlement is the

22   number that were settled with money.

23          That's probably actually the better one to

24   look at and if you look at the row '97, for year

25   '97, there were a total of 6576 nonmalignant claims

1    settled in 1997.  That's the full right-hand column,

2    6576.  The next two years, there were almost 40,000

3    claims resolved each year.  So you had a huge influx

4    of claims and a large increase in settlements in '98

5    and '99.  A lot of those were group settlements

6    settled for a low amount of money.

7        Q    What do you mean when you say there's a

8    lot of information in here?

9        A    I just gave you an illustration of that.

10   I'm sure it will be a potential opportunity for

11   cross-examination.

12             MR. MILLER:  Why don't we take a break for

13   lunch.

14             VIDEO OPERATOR:  We're off the record.

15   The time is approximately 1:18 p.m.

16             (Whereupon, at 1:18 p.m., the deposition

17   was recessed, to be reconvened at 2:00 p.m. this

18   same day.)

19

20

21

22

23

24

25

Page 143

1                      AFTERNOON SESSION          (2:04 p.m.)

2     Whereupon,

3                      MARK A. PETERSON

4     resumed the stand and, having been previously duly

5     sworn, was examined and testified further as

6     follows:

7                      VIDEO OPERATOR:  We are back on the

8     record.  The time is approximately 2:03 p.m.

9                      EXAMINATION (Continued)

10                     BY MR. MILLER:

11        Q    Dr. Peterson, do you have anything you

12    want to change or correct from the morning testimony

13    that you know of?

14        A    Nothing I can recall now, no.

15        Q    Going back to Exhibit 3 for a moment.

16        A    Exhibit 3, oh yes, the opinion.

17        Q    The new materials that we received --

18        A    That's Exhibit 2.

19        Q    I'm sorry, I misspoke.  Exhibit 2, then,

20    is what I wanted to go to.

21        A    Yes.

22        Q    Where did you get the age of the claimants

23    in this document that shows ages, the first one, I

24    guess?

25        A    I think we had it in the database.

Page 144

1    Q    Did you cross-reference any other

2  databases to get the age, or do you know?

3    A    I think it was just -- it's my

4  recollection it's just the GAF data.  If that turns

5  out -- I'll double-check and get back to you if it's

6  different.

7    Q    I don't want to mislead you.  Let me just

8  tell you that we're having trouble find the age in

9  the existing database and wonder if a

10  cross-reference was done to some other database to

11  get age.  You don't happen to know that --

12    A    I will let you know.  I believe it wasn't

13  and I asked Dan.  Dan is on his way to Florida right

14  now.  I'll ask him, and we could send you that

15  variable with some identifying thing you can link it

16  in so you can use it.

17    Q    We'd appreciate that.

18    A    Sure.

19    Q    Did you in any part of your work in this

20  part of the case cross-reference the Manville

21  database for any purpose?

22    A    I don't believe so.

23    Q    It is possible, of course, to use Social

24  Security numbers from, say, the GAF database and go

25  out and get information on those same Social

Page 145

1    Security numbers in something like the Manville

2    database; is that correct?

3        A    One can do that.

4        Q    And in this case, you were actually

5    working with a CCR database in most instances; isn't

6    that true?

7        A    It was a database created by CCR, yes.

8        Q    Was there a separate GAF database on the

9    CCR data that you had to work with in this matter?

10       A    There was another database that was

11   provided, I believe, that was attached to one of the

12   earlier filings in this case, court filings, and it

13   was a CCR.  It had data not only about the amount

14   paid by GAF, but also by CCR as a whole.

15       Q    And did you understand that that was

16   generated by GAF as opposed to by CCR?

17       A    My understanding is these are all CCR

18   databases, both of them, but they were provided by

19   GAF.  And beyond that, I don't know.  It's my

20   understanding that the GAF -- that the CCR data is

21   confidential.  We were surprised and delighted to

22   get it.

23       Q    Did you -- why were you surprised and

24   delighted to get it?

25       A    Well, because we didn't otherwise have

Page 146

1    data on CCR payment amounts.  They had been kept

2    confidential.

3        Q    Why did you decide to break these age

4    groupings down at 60, 70, 80, as opposed to, for

5    example, 60 to 65, 66 to 70, 71 to 75, and so on?

6        A    If you disaggregated it further, you'd

7    begin to run into small amounts of data, and you

8    would get not only small amounts of data, but you'd

9    get more variability, and patterns might be harder

10   to look at.

11       Q    Why did you look at 0 to 60 as opposed to,

12   say, 0 to 55, 55 to 65, 65 to 74, and so on?

13       A    These were approximately decades, and 0 to

14   60 was just -- 0 to 60 is effectively 50 to 60,

15   because there are very few people that are less than

16   50.  But both top and bottom categories are

17   open-ended.  There aren't many people beyond the

18   10-year period at the top or bottom.

19       Q    Did you perform any regression analyses in

20   connection with your work on -- reflected in Exhibit

21   2?

22       A    No.  We just -- these are just -- no.

23       Q    Did you perform any regression analyses

24   with regard to anything you did in your report in

25   this case?

1    A    We might have done some early preliminary

2    regressions.  I seem to recall we did.  But we

3    haven't reported on any.

4    Q    Did you use the results of any of your

5    regression analyses in your report?

6    A    No.

7    Q    Why didn't you do regression analysis to

8    see if age was statistically significant?

9    A    As you saw, the data are frequently

10   nonlinear.  So a linear regression analysis wouldn't

11   necessarily capture what the trend is.  Secondly, we

12   just did this on a quick basis prior to the

13   deposition.  And third, both our report and

14   Dr. Martin's report reported the data in the

15   cross-tabular version that we have here.

16   Q    Do you recall in the Owens Corning work

17   that he did, that Tom Vasquez ran regressions to try

18   to determine whether their age was significant or

19   not?

20   A    He did run some regressions, yes.

21   Q    Do you recall that he determined some of

22   the break points were not at even ages?

23   A    I don't know how you determine that in any

24   reliable manner.

25   Q    Pardon me?

1      A     I don't know how you determine that in any

2   reliable manner.  There's another reason we didn't

3   run the regressions, because these are skewed

4   distributions.

5      Q     What is a skewed distribution mean as

6   you've used it in that answer?

7      A     It's not symmetrical around the median or

8   the mean.  It tends to go far off in the direction

9   of high values, and the regression analysis isn't

10  particularly appropriate when your underlying data

11  does not have -- it moves significantly away from a

12  normal distribution, just because of the nature of

13  regression analysis and correlation analysis.  So in

14  order to correct for that, you would need to

15  essentially transform your data to get a more normal

16  database.  Usually -- we've done this -- we haven't

17  done this in asbestos cases, but we've done it in

18  other kinds of data analysis.  When you transform

19  it, you then lose the impact of the most extreme

20  large verdicts.

21          And to some degree, I think that's what's

22  happening in meso.  The reason that meso has a

23  pattern is it's not representative of the general

24  pattern of settlements for meso but a reflection of

25  a few large cases.  We've seen in other cases that

Page 149

1    the -- that the consistently, the medians, the 50

2    percentile, are higher at one age even for

3    mesothelioma.

4              So regression is not -- it's somewhat

5    misleading.  It was misleading.  What made me think

6    of this was when I was thinking of Doctor Vasquez's

7    analysis.  Regression analysis wasn't an appropriate

8    analysis there, and I don't think it's an

9    appropriate one here.

10       Q    Why don't you go back to your answer where

11   you directed our attention to a group of years that

12   you said were not representative because, as I

13   recall, claims filings were down, in part, because

14   the plaintiffs' lawyers were concentrating on the

15   Manville filings.  Do you remember that answer?

16       A    I didn't say what you said.

17       Q    That's not a very good summary.  That's

18   one of the advantages to having the text now.  Can

19   you identify for us that chart again so we can talk

20   about it where you've pointed out a group of years

21   that you said were not representative?

22       A    g3 is the document, the two-page document

23   that's the beginning in Exhibit 2, has g3 in the

24   upper left-hand corner.  It's page 2 of 2.

25       Q    I don't have a g3, I don't think, do I?

1    A    If you give it to me, I'll find it for

2  you.

3    Q    Thank you.

4    A    Actually, it's the second page.

5    Q    I see.  g3 is in the upper left-hand

6  corner; right?

7    A    Yes, that's correct.

8    Q    It has 8/08/05 as a date?

9    A    Yes; that's correct.

10    Q    And we were looking at the -- I guess we

11  were looking at the nonmal column, the nonmal

12  disease.

13    A    Yes.

14    Q    And looking at the column marked zero, you

15  were saying that you thought '88 and '89 were the

16  diagnosis year filings were down because of what?

17  Could you repeat that for us again?

18    A    It isn't the filings are down, but there's

19  a lower percentage of claims for the period of

20  essentially 88 through 90 where it's the lowest.

21  The percent of claims, nonmalignant claims filed in

22  years '88 through '90 were lower than any other

23  period of time.  And indeed, the period of time from

24  '87 to '91 were lower than any other period of time.

25    Q    When did the CCR begin to operate?

Page 151

1    A    CCR began in 1988, '88, yes.

2    Q    Did you do any analysis to figure out

3    whether the creation of the CCR might have affected

4    these rates?

5    A    Could have. Let me think about that a

6    moment. Could have, because during the -- although

7    it was three years that they were going down, I

8    think it probably had something to do with

9    priorities of activity on the part of the

10    plaintiffs' lawyers. Remember, the filings of

11    claims are a function of the activities of

12    plaintiffs' law firms primarily, and especially many

13    for nonmalignant claims, which may get filed at

14    different times with different defendants. Each law

15    firm has a limited capacity of paralegal talent to

16    do work. So they have to choose who they're going

17    to send their claims to.

18        In this period of time, one, you had

19    Manville coming out where it was important to get

20    early in the FIFO queue. And, second, you had this

21    new CCR being formed where there probably wasn't as

22    much urgency to get filed with CCR because it's

23    going to take them some time to get up and running.

24        So if you're a plaintiffs' lawyer and you

25    have limited resources and it's important to get as

1  far ahead in the line in Manville as you could,

2  you'd send your claims to Manville, not to CCR.

3      Q    First of all, have you done any analysis

4  to support that conclusion?

5      A    There's a whole lot of conclusions in that

6  statement.  Which one are you talking about?

7      Q    Well, first of all, to support the

8  conclusion that you think that limited capacity in

9  the plaintiffs' law firms is the explanation for

10 this lower percentage of filing the same year of

11 diagnosis.

12          MR. FINCH:  Object to form.

13          THE WITNESS:  First of all, I know there's

14 a limited capacity of law firms.  I've talked with

15 paralegals, and I've talked with law firms again and

16 again over the 20-some years of my work in asbestos

17 litigation.  I've undertaken data collection

18 processes with plaintiffs' law firms.  So I

19 understand their limits.

20          Secondly, I understand that plaintiffs'

21 law firms will tend to focus and direct their cases

22 to particular companies.  I've seen that again as a

23 researcher, and I've seen it as a trustee, and I've

24 seen it as a director of trust services.

25          BY MR. MILLER:

Page 153

1    Q    I think that's a little facetious.  I
2    think someone sent me a note and said do you think
3    if the lawyers came back from the beach, they would
4    have more resources, based upon one of your earlier
5    answers.  I will withdraw that question.
6    A    They're tight with money.  Let's put it
7    that way.
8    Q    Legal assistants are one of the important
9    resources in plaintiffs' law firms in asbestos
10   litigation; isn't that true?
11   A    Sure.
12   Q    A lot of work can be done by legal
13   assistants to gather data and prepare materials;
14   correct?
15   A    Of course.
16   Q    If there was a significant economic
17   incentive to go ahead and increase capacity from an
18   economic standpoint, wouldn't it make sense for the
19   law firms to add temporary capacity and get things
20   done, rather than defer for a number of years
21   payments for their clients and for their own fees?
22   A    Not necessarily.
23   Q    Why not?
24   A    Well, you can't hire temporary capacity.
25   There isn't a paralegal on the shelf service.

1     Q    Sure there is.

2     A    No, there isn't.  To get someone familiar

3    with the kinds of exposures and medical records and

4    processes in your office, you can't just go and hire

5    these people on a temporary basis, and they wouldn't

6    want to do so anyway because there are matters of

7    confidences in these cases.

8     Q    Do you know how many temporary legal

9    services there are in the country?

10    A    I have no idea.

11    Q    So what is your analytic basis -- can you

12   point to any documents anywhere to say that the 24.7

13   number in 1988 on page g3, 2 of 2, has something to

14   do with limited capacity of the plaintiffs' law

15   firms?

16    A    The document or the data that show the

17   results.  These are anomalous years.  For whatever

18   reason, they don't represent a general practice for

19   which '92 and '93 are abnormal.  It's those earlier

20   years that are abnormal, which is precisely the

21   opposite of Dr. Martin's conclusions.

22    Q    How many of the earlier years are

23   abnormal?  Everything from 1980 through 1987?

24         MR. FINCH:  Object to form.

25         THE WITNESS:  You can look at the data

Page 155

1    yourself.

2              BY MR. MILLER:

3         Q    Well, no, actually, I can't, Dr. Peterson.

4    That's the whole point, is that we're trying to

5    figure out how you look at the data.  So I'm trying

6    to ask you my question.  Let me restate it again.

7    Are you saying that the years from 1980 through 1987

8    are all anomalous -- I'm sorry -- yes, yes.  Let me

9    start over.  How many of the years prior to 1992 are

10   you saying are anomalous?

11        A    I'm saying that the four years, really the

12   five years preceding 1992 represent the lowest

13   percent of claims that were filed in the year, in

14   the same year in which they were diagnosed.  In

15   every other year, it was greater than that.

16        Q    Those would be the most recent years if

17   someone were looking at the data as of 1993,

18   however; is that correct?

19        A    No.

20        Q    Well, '92, where there was a step-up in

21   '93, would be in the most recent years, and then if

22   you went back five years, for example, you go back

23   to 1989; right?

24        A    The most recent years are 1992 and 1993.

25        Q    My question wasn't very good.  Let me try

1    again.  If one had gone back five years and were

2    just looking at this column marked zero, you would

3    see the years '89, '90, '91, '92, and '93?  That

4    would be the five years of data available if it were

5    contemporaneous data as of 1993; right?  As of 1994,

6    early 1994?

7         A    Could you read that question, please?

8         Q    Let me do it again.  I garbled it up.  In

9    early 1994, assuming you had complete data for 1993,

10   the five preceding years would be '93, '92, '91,

11   '90, and '89; true?

12        A    Yes.

13        Q    And if one were looking at these data, one

14   would see 24.2 for '89, 25.0 for '90, and 33.6 for

15   '91 in that five-year window; correct?

16        A    And 46.3 in '92 and 42.2 in '93.

17        Q    Right.  So that would be three years that

18   were lower and two years that were higher in that

19   five-year window; is that correct?

20        A    If you were looking at five years, you

21   would observe the numbers that are here, obviously.

22        Q    And do you know whether anyone looked at

23   these data as of 1994 and concluded, or similar

24   data, that there appeared to be some acceleration of

25   filings in '92 and '93?

Page 157

1      A      I have no idea.

2      Q      Did you conclude at any point that there

3   might be an acceleration of filings because of

4   Georgine?

5      A      Oh, I wrote that in my report.  I

6   testified earlier today to that, that there was

7   likely that there was some acceleration of filings,

8   yes.

9      Q      So --

10     A      Some.

11     Q      Have you tried to quantify how much?

12     A      You cannot quantify something like that.

13     Q      You cannot quantify?

14     A      No, because essentially, you're comparing

15  it to a hypothetical.  When would they have been

16  filed if you didn't have Georgine, and the world

17  isn't constructed that way.

18     Q      Which way is the world not constructed?

19  That you can't compare to events that didn't occur?

20     A      You can't observe something that didn't

21  occur.  You can't count it.  You can make inferences

22  and estimates, but you can't count it.

23     Q      You have from time to time seen what you

24  would characterize as surges in some of the data; is

25  that true?

Page 158

1      A    The only time I recall having testified

2   about that was in Fibreboard.

3      Q    What did you testify about it in

4   Fibreboard, as you recall?

5      A    You may regret asking this question.  In

6   Fibreboard, I testified about a surge, a permanent

7   acceleration, a temporary acceleration, a number of

8   time-relevant events that happened with the --

9   essentially, the reaching of settlements between

10  Fibreboard and its insurance companies and the

11  settlement of lots of the pending claims prior to

12  filing of the Ahern class action, and the surge was

13  meant to describe the claims that were -- that would

14  not have otherwise been filed but were filed because

15  of those two events, the insurance settlement and

16  the negotiation of the several pending claims by

17  Fibreboard.

18      Q    And that was an analysis where you looked,

19  for example, at certain law firms that had a history

20  of filing claims and new law firms that showed up

21  that did not have a history of filing claims; is

22  that correct?

23      A    In that case, that's what it is, yes.

24      Q    And you concluded that there were some new

25  filings that you would disregard because they seemed

Page 159

1    to be a part of the surge; is that correct?

2        A    I don't recall that I disregarded them,

3    but I didn't regard them as being claims that would

4    likely be a basis for forecasting future claims.

5        Q    You didn't think they were a long-term

6    trend?

7        A    Barring some recurrence of something else

8    like this, I think that's probably a fair

9    description.  They were predominantly maritime legal

10   claims.

11       Q    That's what's sometimes known as the

12   Jacques law firm?

13       A    Yes.

14       Q    Did you do a sensitivity analysis where

15   you disregarded the nonmalignant filing rates in '92

16   and '93 in this engagement involving GAF?

17       A    I didn't think it was appropriate to do

18   so, so I didn't do so.

19       Q    Did you do an analysis in this engagement

20   where you used some sort of average filing rate from

21   1980 through 1993 rather than using the '92-'93

22   filing rates?

23       A    I can't answer that question.

24       Q    Why not?

25       A    Because you've given me -- you've not

Page 160

1    given me -- your "rather" is not accurate.

2         Q    Let's drop the "rather."  Did you do any

3    analysis where you used an average rate of filing

4    for the nonmalignants that started in 1980 and went

5    through 1993

6         A    No.

7         Q    What different time periods did you look

8    at for filing rates in your analysis in this case?

9         A    For nonmalignant claims or for all claims?

10        Q    Why don't you do both answers, please,

11   nonmalignants and then all claims.

12        A    I think we looked at -- excuse me a

13   minute.  We have two sections in the report where we

14   used derived claims, section 6 and section 7.  I

15   think in section 7, we used the period 1996 through

16   1998, and in section 6, we used 1990 to '94.  I

17   think we also looked at just the last -- I'm sorry,

18   1990 through 1993.  I think we also looked at, but

19   I'm not certain, the period '92 and '93 by

20   themselves, and then the period '88 through '93.

21   They didn't give much different results for cancers.

22             For nonmalignants, I think we might have

23   looked at the periods -- I think we used the same

24   periods and examined them for nonmalignants in each

25   of the cases.  What we reported is what I described

Page 161

1    at the beginning of this answer.

2        Q    Where did you summarize what you looked at

3    for nonmalignants in your report, please, sir?  You

4    seem to be looking at a page.  I want to make sure

5    we're all looking at the same page.

6        A    Sure.  On page 29, the first paragraph.

7    Two-thirds of the way through the paragraph, "in the

8    GAF forecasts, I calculated the nonmalignant

9    multiplier with the same four-year base period, 1990

10   to 1999. " And then for -- and then in the next

11   paragraph, the first two sentences describes the

12   nonmalignant multiplier, calculating different

13   periods.  That paragraph addresses that issue.  So

14   using the period '90 to '93, we had 7.8 nonmalignant

15   claims for every cancer filing.

16            If we used '92 to '93 we would have had a

17   nonmalignant multiplier of 9.2.  If we used the

18   period '98 to 1991, we would have had a nonmalignant

19   multiplier of 6.5.  So you can determine what would

20   be the number of nonmalignant claims just by making

21   adjustments, either 9.2 divided by 7.8 would be the

22   number of nonmalignant claims if we used only the

23   last two years as the basis for our forecast.  6.5

24   divided by 7.8 would be the number if you used '98

25   through -- 1988 through 1991 as the basis for

Page 162

1    calculating the nonmalignant multiplier.

2              In section 7, I think we used the same

3    period as with the cancers, but let me confirm.    I

4    believe we used '96 to '98 in section 7.

5         Q    Where are you looking at?

6         A    That's page 41.

7         Q    And where on page 41?

8         A    The bottom of page 41, I think, but let

9    me -- it describes 1966 to 1968.  Let me verify

10   that's the period we used.

11             MR. FINCH:  Did you mean to say 1996 to

12   1998?

13             THE WITNESS:  Yes, I'm tripping over

14   numbers.  1996 to 1998.  I believe that's what we

15   used, although I don't think it says it here.   That

16   is the period we used for cancers, though.

17             BY MR. MILLER:

18        Q    Let's go back to page 29 for a moment.

19        A    Sure.

20        Q    The paragraph to which you were referring,

21   which I guess is the second paragraph on the page --

22   I'm not clear on whether that first one is a partial

23   paragraph or not.

24        A    It's a full paragraph.

25        Q    Okay.  There is a sentence in the middle,

1   and let's see if I can read this right.  "In effect,

2   this calculation assumes that, of the increase in

3   GAF's nonmalignancy claim filings during 1992 and

4   1993, about half represents the transitory effects

5   of the Georgine negotiations and about half

6   represents a long-term increase in filings of

7   nonmalignancy claims."

8           Did I read that right?

9       A    Yes, you did.

10      Q    What was your basis for making an

11  assumption that that was about half and half as

12  opposed to, say, one-third/two-thirds, 10 percent/90

13  percent?

14      A    I'm describing what the effect of the

15  assumptions we did.  I'm describing its effect.  I'm

16  not saying that's the proper number a priori.  But

17  we used 7.8 percent.  The inflation -- the increase

18  rate or --

19      Q    7.8 percent or 7.8 times?

20      A    7.8 times.  The actual observed ratio of

21  nonmalignant to cancer claims during this period is

22  9.2.  Prior to this period of -- prior to 1992, the

23  ratio is 6.5.  So you've got an increase of 2.7 --

24  it goes from 6.5 to 9.2.

25          So you're getting 2.7 more nonmalignant

Page 164

1   claims for each cancer claim if you use solely the

2   later period.  We don't use that.  We only use 7.8.

3   So rather than going up 2.7 additional nonmalignant

4   claims, we're only going up 1.3.  So it's half the

5   difference between those two periods of time.

6        Q     Do you have any sort of empirical analysis

7   to show why you went up any or that amount, other

8   than what's reported here?

9        A     I think there's no empirical evidence that

10  says we needed to assume there's any acceleration.

11  There's no evidence of that.  I think, though,

12  that -- my expectation is that the aversion that

13  some people have for the -- some plaintiffs' lawyers

14  and claimants have for the Georgine class action

15  would have caused people to file somewhat more

16  quickly.

17        So I think there needs to be some

18  consideration of a -- some recognition to some

19  degree that the large number of nonmalignant claims

20  filed in these two years are the result of attempts

21  to avoid being precluded in Georgine.  So you need

22  to make some adjustment for it.

23        Q     I think you recognized in 1994 that some

24  plaintiffs' lawyers didn't like the Georgine futures

25  settlement tables; isn't that true?

Page 165

1     A    I just said it again, yes.

2     Q    I'm saying but you recognized that in '94?

3     A    Yes.  I think most people did.

4     Q    You also recognized in '94 that some

5   plaintiffs' lawyers didn't like the Ahern futures

6   settlement; right?

7     A    Yes, although there were more things going

8   no Ahern than there were here, but that was a

9   consideration in Ahern.

10     Q    Pleural plaques were not compensated under

11   Georgine on a contemporary basis after the

12   settlement became effective; isn't that true?  I

13   probably didn't say that very well.

14     A    The settlement never became effective.

15     Q    Well, but the announced terms of the

16   settlement were such that a pleural plaque filed

17   after the effective date was going to be a deferred

18   payment; isn't that true?

19     A    If the Georgine class action ever

20   became -- was approved, yes, that would have been

21   one of its effects.

22     Q    But pleural plaques that were filed

23   earlier than that were going to be compensated

24   without a deferral; wasn't that true?

25     A    In many states, not all, many localities,

Page 166

1    not all.

2         Q     In those localities where the pleural

3    plaques were going to be compensated if they were

4    treated as pending claims, that created an economic

5    incentive for plaintiffs' lawyers to go ahead and

6    get any pleural plaque claims on file, didn't it?

7         A     If they had them in those jurisdictions,

8    that would have been prudent.  Well, it depends upon

9    what they thought was going to happen with Georgine.

10        Q     Regardless of what they thought was going

11   to happen in Georgine, to protect their clients from

12   the contingency that Georgine came in if they didn't

13   opt out, it would be prudent for them to go ahead

14   and get it on file, wouldn't it?

15        A     It would be a consideration, certainly.

16        Q     When claims are accelerated, isn't one of

17   the expected consequences that in the following

18   years, notices claims, obviously, are not there to

19   be filed, so there is often a drop that is seen

20   after an acceleration?

21        A     I agree with the first part.  If a claim

22   is filed earlier, it can't be filed later.  With

23   regard to the drop, this is just one of a number of

24   things going on at any one point in time.  So all

25   things equal, yes, you would see it, but rarely in

1    asbestos litigation are all things equal.

2        Q    What do you mean rarely are all things

3    equal?

4        A    Things are changing all the time.

5        Q    There are multiple variables that are

6    shifting, is that correct, in these -- affecting

7    some of these events?

8        A    Events are changing all the time.

9    Incentives of parties are changing over time.  Lots

10   of things are changing.  It's a dynamic litigation,

11   which is one of the reasons that you wouldn't want

12   to calculate filing rates for the period 1980

13   through 1993, because so much has changed over that

14   period of time.

15       Q    I'm going to go back to futures agreements

16   for a moment and clarify some things that we talked

17   about before.  Did you look to see what percentage

18   of the pending claims in 1994 against GAF were with

19   law firms that had a futures agreement of some kind

20   in place?

21       A    No.

22       Q    Do you have any idea as you sit here

23   whether that was 20 percent, 50 percent, 70 percent,

24   or somewhere in between those things?

25       A    There were a number of -- I take issue

Page 168

1   with the term "futures agreement." Provisions of
2   agreements that CCR reached with law firms had
3   elements in them addressing future claims. I don't
4   believe that they were generally separate
5   agreements, as I testified this morning. Lots of
6   lawyers settled their inventory of pending claims
7   with CCR prior to the stay in the Georgine
8   litigation. So that would -- I'll just leave it at
9   that.
10       Q    Let's define our term. First of all, do
11   you know if there were any stand-alone agreements
12   dealing with the future as opposed to inventory
13   settlements that included futures terms?
14       A    I don't think I know of any. There may
15   have been. I didn't look at every agreement. But
16   where I've generally seen it is in the context of a
17   broader agreement.
18       Q    Just to be sure we're all communicating
19   and a jury might understand what we're talking about
20   if we ever had to show this to them, what did you
21   mean by "inventory settlements" in your answer?
22       A    It's a negotiation that leads to a
23   settlement where a law firm will settle all or most
24   of the claims that it then represents and that are
25   then pending against a particular defendant or, in

Page 171

1    that it represents who have nonmalignant diseases

2    that while it's filing lawsuits against Owens

3    Corning and Pittsburgh Corning and a bunch of other

4    companies, it would not file lawsuits against the

5    CCR members because of some agreement it reached

6    four or five years previously.  That would be a

7    difficult, probably untenable position.

8          And finally, if they did take that

9    position and refused to do that or they told someone

10   when they were in an engagement situation that they

11   were only going to file claims against some subset

12   of defendants, most of those claims would go to

13   different law firms who would not feel -- either

14   were not parties to the agreements that have the

15   future provisions or would feel no obligation to

16   respect them.

17         And finally, I've never seen things like

18   this honored.  It's wishful thinking on the part of

19   the defendants.

20   Q     Do you believe that the plaintiffs'

21   lawyers who entered into these provisions did not

22   expect that they would ever have any effect?

23   A     I have no idea what their expectations

24   would be.

25   Q     You're not suggesting that the plaintiffs'

1    lawyers intended to disregard the agreements, are

2    you?

3        A    I have no idea what their intentions were.

4    I think their effect is that they would not be able

5    practically to do that, and if they did, the claims

6    would go elsewhere.  If someone had a claim that was

7    compensable under the law and they were told by a

8    lawyer we're not going to do this because of some

9    agreement, I mean, if I remember a potential

10   plaintiff, I'd be out the door and go next door.

11       Q    Do you think the plaintiffs in these

12   cases, in general, do or don't rely on the advice

13   they receive from the lawyers?

14       A    Well, they hire them.  They certainly rely

15   on them to some degree.  I don't think they would

16   generally rely upon a lawyer who says well, you've

17   got the right to sue this person, but we're not

18   going to file a lawsuit because of some private

19   agreement I have.  I don't think that that's

20   something that, if that's explained to the

21   plaintiff, that they would regard very highly.

22       Q    Do you think the lawyers entered into

23   these agreements believing that they were going to

24   harm their clients?  In the future?

25       A    Maybe they felt they weren't going to

Page 173

1  represent those claimants, so that someone else

2  would.  That's the easiest way to avoid that

3  conflict.

4       Q    You mentioned before that one of the

5  advantages perceived by the supporters of the

6  Georgine settlement was faster payment for present

7  claimants.  Do you recall that?

8       A    That was -- that was a bargained-for

9  promise which, it's my understanding, wasn't very

10  well achieved.

11       Q    Well, I think my question was whether that

12  was something that you thought that the lawyers

13  believed who were supporting the class action

14  settlement, was one of the advantages to their

15  clients, was faster payment than if they continued

16  to litigate in the tort system.

17       A    I would say that it is something they

18  bargained for and felt that CCR owed them that

19  obligation.  That raises another issue, thank you,

20  is that to the degree that CCR doesn't honor its

21  part of these contracts, that the plaintiffs'

22  lawyers, I'm sure, would have felt free to and maybe

23  even obligated not to respect these future

24  provisions.

25       Q    Well --

1      A     There would be no pro quo for the quid.

2      Q     Well, in 1994, there was no reason to

3  assume that either CCR or the plaintiffs' lawyers

4  were going to dishonor their contractual

5  commitments, was there?

6      A     I think there was reason to believe that

7  CCR couldn't honor its contractual commitments or at

8  least that its contractual commitments were going to

9  create significant backlogs of unpaid claims.

10     Q     Why is that?

11     A     Because there would be too many claims

12 filed.  They would run up against the caps, and

13 they'd have to go over to the next year and the next

14 year and the next year.  The actual claims that

15 would be filed would have exceeded the caps.  That

16 would have created -- I'm sorry.  That's Georgine.

17 That's not in the futures agreements.  I beg your

18 pardon.

19     Q     Let me ask my question again.

20     A     Thank you.

21     Q     Do you have any reason to believe as you

22 sit here today that the -- that there was a reason

23 for people looking at these futures agreements to

24 believe that the plaintiffs' lawyers did not intend

25 to honor them, first of all?

Page 175

1      A     I think that there's reason to believe

2   that the plaintiffs' lawyers would have had great

3   difficulty honoring them and that, in any event, it

4   wouldn't limit the number of claims that were filed

5   because there are always other law firms.

6      Q     Can you point to anyone other than perhaps

7   yourself who was making that prediction in 19 --

8   January of 1994 or earlier?

9      A     I don't know that anyone made a prediction

10  one way or another about it.  I have not heard -- I

11  don't recall anyone discussing that one way or the

12  other.  I think it's the reasonable expectation of

13  what would be the effect of these provisions.

14  They're not obligatory with regard to claimants.

15     Q     In 1992, in the National Gypsum

16  testimony -- let me rephrase that.

17        Do you recall when your testimony was in

18  the National Gypsum trial?

19     A     January 1993.

20     Q     Right.  In January of 1993, do you recall

21  what your assumptions were about case flows under

22  Georgine?

23     A     Under Georgine?

24     Q     Yes.

25     A     Yes.  It depended upon the forecast.

Page 176

1   There were 16 different forecasts or 32 different

2   forecasts, some enormous number of forecasts.  I

3   remember Ms. Goldstein cross-examined me about that.

4   Essentially, under the forecast that involved a flat

5   propensity to sue, that the caps were generally

6   blown.

7           Under those that had a decreasing

8   propensity to sue, the caps -- the claims finds

9   could be maintained.  These are claims filed by

10  National Gypsum.  National Gypsum represented only

11  69 percent of all the claims filed against CCR.  GAF

12  represented 91 percent of all the claims filed

13  against CCR.

14      Q    91 percent?

15      A    91 percent of all claims in the CCR named

16  GAF.

17      Q    I understand.

18      A    As opposed to 69 percent for National

19  Gypsum.

20      Q    What's the significance of that

21  observation?

22      A    It means that almost certainly, the caps

23  would have been blown but with the number of claims

24  filed against GAF.

25      Q    Did you do an analysis by occupation in