# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


OWENS CORNING, et al.,          . Case No.  04-CV-905
                                .
                    Plaintiffs,.
          v.                    . 601 Market Street
                                . Philadelphia, PA  19106
CREDIT SUISSE FIRST BOSTON,     .
et al.,                         .
                                .
                    Defendants.. January 19, 2005
. . . . . . . . . . . . . . . . 9:59 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JOHN P. FULLAM
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

Special Counsel for            Debevoise & Plimpton, LLP
the Debtors:                   By:  ROGER E. PODESTA, ESQ.
                               919 Third Avenue
                               New York, New York  10022-3904

                               Skadden Arps
                               By:  D.J. BAKER, ESQ.
                               Four Times Square
                               New York, New York  10036

                               Skadden Arps
                               By:  MARK S. CHEHI, ESQ.
                                    DAVID R. HURST, ESQ.
                               One Rodney Square
                               P.O. Box 636
                               Wilmington, Delaware  19899


Audio Operator:                Michael Baker

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

**DIANA DOMAN TRANSCRIBING**
**P. O. Box 129**
**Gibbsboro, NJ 08026**
**Office:  (856) 435-7172**
Fax.:  (856) 435-7124
E-Mail:  Dianadoman@comcast.net

APPEARANCES (CONTINUED):

Counsel for the Debtors:       Saul Ewing LLP
                               By:  HENRY ABRAMS, ESQ.
                                    CHARLES O. MONK, ESQ.
                               100 South Charles Street
                               Baltimore, Maryland  21202-2773

                               Saul Ewing LLP
                               By:  NORMAN L. PERNICK, ESQ.
                                    J. KATE STICKLES, ESQ.
                               222 Delaware Avenue
                               P.O. Box 1266
                               Wilmington, Delaware  19899-1266

For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  FRANK J. PERCH, III, ESQ.
                               Federal Bldg., 2nd Floor
                               844 King Street
                               Wilmington, Delaware  19801

ACC Estimation Counsel:        DeHay & Elliston, LLP
                               By:  GARY D. ELLISTON, ESQ.
                               901 Main Street, Suite 3500
                               Dallas, Texas  75202-3736

                               DeHay & Elliston, LLP
                               By: R. THOMAS RADCLIFFE, ESQ.
                               36 S. Charles Street, Suite 1300
                               Baltimore, Maryland  21201

For the Official Committee     Caplin & Drysdale, Chartered
of Asbestos Claimants:         By:  ELIHU INSELBUCH, ESQ.
                               399 Park Avenue
                               New York, New York  10022-4614

                               Caplin & Drysdale, Chartered
                               By:  PETER VAN N. LOCKWOOD, ESQ.
                                    NATHAN FINCH, ESQ.
                                    RITA TOBIN, ESQ.
                               One Thomas Circle, N.W.
                               Washington, DC  20005-5802

                               Campbell & Levine, LLC
                               By:  MARK HURFORD, ESQ.
                                    MARLA ROSOFF ESKIN, ESQ.
                               800 King Street, Suite 300
                               Wilmington, Delaware  19801

APPEARANCES (Cont'd):

| | |
|---|---|
| Legal Representative to Claimants: | The Law Office of James J. Future McMonagle<br>By:  JAMES J. McMONAGLE, ESQ.<br>24 Walnut Street<br>Chagrin Falls, Ohio  44022 |
| Counsel for Future Representative: | Kaye Scholer LLP<br>By:  MICHAEL J. CRAMES, ESQ.<br>425 Park Avenue<br>New York, New York  10022 |
| Counsel for Future Representative: | Young Conaway Stargatt & Taylor, LLP<br>By:  JAMES L. PATTON, JR., ESQ.<br>     EDWIN J. HARRON, ESQ.<br>     SHARON M. ZEIG, ESQ.<br>1000 West Street, 17th Floor<br>Wilmington, Delaware  19899-0391 |
| Counsel for Credit Suisse First Boston: | Landis Rath & Cobb LLP<br>By:  ADAM G. LANDIS, ESQ.<br>     RICHARD S. COBB, ESQ.<br>     REBECCA BUTCHER, ESQ.<br>919 Market Street, Suite 600<br>Wilmington, Delaware  19810 |
| Counsel for Credit Suisse First Boston: | Kramer Levin Naftalis & Frankel LLP<br>By:  KENNETH H. ECKSTEIN, ESQ.<br>     ELLEN NADLER, ESQ.<br>     JEFFREY S. TRACHTMAN, ESQ.<br>919 Third Avenue<br>New York, New York  10022 |
| Counsel for Credit Suisse First Boston: | Weil, Gotshal & Manges, LLP<br>By:  RICHARD A. ROTHMAN, ESQ.<br>     MARTIN J. BIENENSTOCK, ESQ.<br>     ADAM STROCHAK, ESQ.<br>     PETER M. FRIEDMAN, ESQ.<br>767 Fifth Avenue<br>New York, New York  10153 For |
| Counsel for Credit Suisse First Boston: | The Law Office of Ralph Miller<br>By:  RALPH MILLER, ESQ.<br>100 Crescent Court, Suite 1300<br>Dallas, Texas  75201-6980 |

APPEARANCES (Cont'd):

Counsel for Credit Suisse          Weil Gotshal & Manges, LLP
First Boston:                      By:  DAVID A. HICKERSON, ESQ.
                                   1501 K Street, Suite 100
                                   Washington, DC  20005

Counsel for Unsecured             Davis Polk & Wardwell
Creditors' Committee:             By:  STEPHEN H. CASE, ESQ.
                                   450 Lexington Avenue
                                   New York, New York  10017

Counsel for the Unsecured         Morris, Nichols, Arsht & Tunnell
Creditors' Committee:             By:  ERIC D. SCHWARTZ, ESQ.
                                   1201 N. Market Street
                                   P.O.  Box 1347
                                   Wilmington, Delaware  19899-1347

Counsel for the Bondholders/      Anderson Kill & Olick, P.C.
Trade Creditors:                  By:  J. ANDREW RAHL, JR., ESQ.
                                   1251 Avenue of the Americas
                                   New York, New York  10020

Special Counsel for the           Monzack and Monaco, PA
Bondholders/Trade Creditors:      By:  FRANCIS A. MONACO, JR., ESQ.
                                   400 Commerce Center
                                   1201 Orange Street
                                   Wilmington, Delaware  19899

Counsel for Bondholders:          Strook & Strook & Lavan
                                   By:  LEWIS KRUGER, ESQ.
                                        KENNETH PASQUALE, ESQ.
                                   1809 Maiden Lane
                                   New York, New York  10038-4982

Counsel for Bondholders:          Duane Morris LLP
                                   By:  CHRISTOPHER M. WINTER, ESQ.
                                        RICHARD RILEY, ESQ.
                                   1100 N. Market Street
                                   Suite 1200
                                   Wilmington, Delaware  19801

Counsel for Century               White & Williams, LLP
Indemnity:                        By:  LINDA M. CARMICHAEL, ESQ.
                                   824 N. Market St., Suite 902
                                   Wilmington, Delaware  19899-0709

APPEARANCES (Cont'd):

Counsel for Century
Indemnity:

O'Melveny & Myers, LLP
By:  TANCRED V. SCHIAVONI, ESQ.
     GERALD A. STEIN, ESQ.
     ROBERT WINTER, ESQ.
Time Square Tower
7 Times Square
New York, New York  10036

Counsel for Kensington
International Ltd.,
Springfield Associates LLC
& Angelo Gordon & Co. L.P.:

Stutman, Treister & Glatt
By:  ISAAC M. PACHULSKI, ESQ.
     K. JOHN SHAFER, ESQ.
1901 Avenue of the Stars
12th Flor
Los Angeles, California  90067

Counsel for Kensington
International Ltd.,
Springfield Associates LLC
& Angelo Gordon & Co. L.P.:

Potter, Anderson & Corroon LLP
By:  DAVID J. BALDWIN, ESQ.
     LAURIE SELBER SILVERSTEIN,
     ESQ.
Hercules Plaza
1313 N. Market Street
Wilmington, Delaware  19899-0951

## I N D E X

|  | PAGE |
|---|---|
| **WITNESSES FOR CSFB** | |
| LESTER BRICKMAN | |
| Direct Examination by Mr. Hickerson | 14 |
| | |
| FREDERICK C. DUNBAR | |
| Direct Examination by Mr. Miller | 34 |

| **EXHIBITS** | | ID. | EVD. |
|---|---|---|---|
| Ex. 6 | Report by Dr. Friedman | | 9 |
| Ex. 86 - | | | |
| Ex. 106 | Documents | | 9 |
| Ex. 206 | Document | | 9 |
| Ex. 149 | Expert Report | | 11 |
| Ex. 150 | Supplemental Report | | 11 |
| Ex. 289 | Table – NERA Forecast | | 37 |
| Ex. 290 | Document | | 37 |
| Ex. 294 | Document | | 37 |

7

1       THE CLERK:  Court is now in session.

2       THE COURT:  Good morning, everybody.

3       COUNSEL:  Good morning, Your Honor.

4       THE COURT:  Be seated, please.  Try to stay warm.

5  Somebody have any more evidence to present?

6       MR. HICKERSON:  Yes, Your Honor.  Good morning.

7  David Hickerson for CSFB.  Our next witness is Dr. Gary

8  Friedman.  As we discussed on Monday we have prepared a short

9  29-minute excerpt from his deposition.  I've conferred with

10  counsel for the debtors.  They have prepared also a 29-minute

11  excerpt to show, as a cross, as it were, and I'd propose, with

12  the Court's permission --

13       THE COURT:  So, that's a total of 58 minutes?

14       MR. HICKERSON:  58 minutes.  Yes, Your Honor.

15       THE COURT:  Fire away.

16       (Video deposition of Dr. Gary Friedman played)

17       MR. HICKERSON:  Pass the witness.

18       MS. HOGAN:  Mary Beth Hogan for the debtors.  We

19  would now like to present the plan proponents' counter

20  designations of Dr. Friedman's depositions.

21       THE COURT:  And if you would like to, why don't you

22  do that?

23       (Video deposition of Dr. Gary Friedman played)

24       MR. HICKERSON:  Your Honor, the parties have prepared

25  designations for Dr. Friedman's deposition transcript, and I'd

8

1   like to hand them up now.

2             THE COURT:  Of what I just listened to?

3             MR. HICKERSON:  Your Honor, this is actually

4   designations from the entire transcript.  What you saw were

5   excerpts from what each party had designated.  This is the

6   entire transcript with each party's complete designations.

7             THE COURT:  What I'm trying to find out is, is there

8   anything in here that I need to read other than what I've just

9   heard?

10            MR. HICKERSON:  Well, Your Honor, from our point of

11  view we selected what we thought were the most important parts.

12  We would still like to present the entire designation to the

13  Court for your use --

14            THE COURT:  Okay.  In other words, the designation

15  goes beyond what I heard?

16            MR. HICKERSON:  That's correct, Your Honor.

17            THE COURT:  Thank you.

18            MR. HICKERSON:  In addition, Your Honor, I would like

19  to hand up and move into Evidence certain exhibits that were

20  identified by Dr. Friedman --

21            THE COURT:  Go right ahead.

22            MR. HICKERSON:  -- at his deposition.  These are

23  Exhibit Number 6, which was Dr. Friedman's report --

24            THE COURT:  Right.

25            MR. HICKERSON:  Exhibits 86 through 106 are documents

9

1  that were identified by Dr. Friedman during his deposition, and

2  Exhibit 203, as a page from the appendices to his report which

3  identifies the doctors in the report.  I'd like to move all

4  those into Evidence.

5          THE COURT:  They will be received.

6          MR. HICKERSON:  One point with respect to those

7  exhibits, Your Honor, is that we have previously marked for

8  Identification as had the plan proponents certain of those

9  exhibits which contained highly confidential designations

10 because they contain names and social security numbers.  The

11 versions we've handed up have redacted out those names and

12 social security numbers.

13         THE COURT:  Glorious.

14         MR. HICKERSON:  Your Honor, we also have a videotape

15 of the entire designated portion, or the 30-minute version, if

16 you'd like us to provide them to you we'd be happy to do so.

17         THE COURT:  No.  Thank you.

18         MR. HICKERSON:  The next witness is Professor Lestor

19 Brickman.

20         THE COURT:  Before he starts, can somebody enlighten

21 me as to whether there were any consequences to the allegation

22 that some of the pulmonary function testing equipment wasn't

23 any good?

24         MR. HICKERSON:  Your Honor, I --

25         THE COURT:  Did any changes occur?

10

1          MR. HICKERSON:  What I know is that Dr. Friedman

2    testified at his deposition that on some occasions he worked

3    with the pulmonary function testing labs, but other than that I

4    have no information.

5          THE COURT:  No, I heard what he said.  My question

6    is, does anybody know whether anything happened as a result?

7          MR. HICKERSON:  I have no further information on

8    that.

9          THE COURT:  Okay.  Go ahead with whatever your next

10   witness is.

11         MR. INSELBUCH:  Well, Your Honor, there has been

12   evidence submitted even by Dr. Friedman, to the extent that

13   when he reported back to Owens Corning on this small sliver of

14   cases he looked at, that, for example -- what was the name of

15   the law firm?

16         UNIDENTIFIED ATTORNEY:  Foster and Sears.

17         MR. INSELBUCH:  Foster and Sear, they renegotiated

18   their contract.

19         THE COURT:  I understand that.  Yes.  But has any

20   change been made in the equipment for any other test?

21         MR. INSELBUCH:  I don't know.

22         THE COURT:  Okay.  You had a witness somewhere

23   floating about?

24         MS. HOGAN:  David, before you start I would just

25   direct the Court's attention.  There's an exhibit in the

1  Dr. Friedman binder which is a -- I'll get the number for you.

2  I'll tell your clerk.  I don't have it handy.  But it's a long

3  explanation that he provided of his -- what you heard about

4  briefly about the mechanics of a PFT machine, and it had to do

5  with the Williams and Bailey law firm.  And he worked -- we

6  actually worked with Williams and Baily law firm to correct

7  that problem with the machinery company.

8           THE COURT:  Was it a problem that tended to cause

9  over-reading or under-reading of the test?  Does anybody know?

10          MS. HOGAN:  I actually don't know whether it was

11 over-reading or under-reading.

12          THE COURT:  Has the witness been sworn?

13          COURT OFFICER:  Please raise your right hand.

14            LESTER BRICKMAN, CSFB WITNESS, SWORN

15          COURT OFFICER:  Please state and spell your name for

16 the record.

17          MR. BRICKMAN:  My name is Lester Brickman, L-e-s-t-e-

18 r, B-r-i-c-k-m-a-n.

19          MR. HICKERSON:  Your Honor, I'd like to hand up some

20 exhibits that we may use with the witness.

21          THE COURT:  I was afraid of that.  Thank you.

22          MR. HICKERSON:  Your Honor, Professor Brickman's

23 expert report is at Tab 149, and his supplemental report as

24 Exhibit 150.  His C.V. is attached at the end of Exhibit 149.

25          THE COURT:  All of that will be received.

12

1      MR. FLYNN:  Your Honor?  With respect to this

2  particular witness, the plan proponents do have specific

3  objections both to the admission of his report and to his

4  intended testimony.  If I may address the Court briefly?

5      THE CLERK:  Counsel, could you identify yourself for

6  the record?

7      MR. LYNN:  My name is Michael Lynn, for the future

8  claims representative.

9      THE COURT:  Well, we won't receive the whole report

10  without hearing your objections at some point.

11      MR. LYNN:  Would you like to hear it now?

12      THE COURT:  Never ask me what I would like.

13              (Laughter)

14      THE COURT:  I would like you all to go away, but --

15              (Laughter)

16      THE COURT:  Yes.  Go ahead.  Tell us what the problem

17  is.

18      MR. LYNN:  Thank you, Your Honor.  Your Honor,

19  Professor Brickman is intending to testify as an expert on

20  American law.  He's intending to testify about judicial

21  decisions concerning asbestos litigation, various procedural

22  methods used by State and Federal Courts to manage their

23  dockets, tort reform legislation in Ohio, Texas, Mississippi,

24  and Illinois.  There's no such thing as an expert on American

25  law.  Your Honor is the only legal expert in this proceeding.

13

1  Professor Brickman's report and testimony also does not offer

2  the Court anything that it couldn't get from reading the bank's

3  pretrial brief.

4       THE COURT:  That has been true of virtually every bit

5  of evidence that I've heard in this hearing.  And I tried to

6  point out to counsel at the very beginning that they could

7  simply get all this -- make all this record by -- then I would

8  be interested in hearing their -- reading their briefs and

9  hearing their arguments, but no, we have to belabor this.

10      MR. LYNN:  Your Honor, significantly, in October of

11  2003, in another asbestos bankruptcy case, the Bankruptcy Judge

12  in that case ruled that Professor Brickman could not testify on

13  the meaning of various provisions of the Bankruptcy Code, on

14  case law, and on the substance of legislative history.  We have

15  a copy of that decision, if I could hand it up to you?

16      THE COURT:  I don't really care.  Objection is

17  overruled.  We'll hear anything they want to present.

18      MR. LYNN:  Thank you, Your Honor.

19      THE COURT:  Okay.  Thank you.  I will take it as a

20  form of an oral version of a brief to the extent that it

21  discusses law.  Go ahead.

22      MR. HICKERSON:  Your Honor, we will try to be very

23  brief.  At this point I would move Exhibits 149 and 150 into

24  Evidence.

25      THE COURT:  I just received them.  For whatever they

Brickman - Direct                    14

1    are worth we can argument about later.

2           MR. HICKERSON:  Your Honor, if I could just -- I will

3    just briefly summarize Professor Brickman's experience from his

4    C.V.  He's a Professor of Law at Cardoza University.  He's

5    published a number of articles on asbestos litigation.  He's

6    been -- he's provided scholarships in this area over the past

7    15 years.  He's testified before the United States Congress.

8    He's testified before the Ohio State Senate.

9           THE COURT:  Do you think testifying before Congress

10   is a big recommendation?

11          MR. HICKERSON:  I'm sorry.  Maybe -- if you'd like me

12   to inquire of the witness I'd be happy to do so.

13          THE COURT:  Everybody who testifies before Congress

14   is to be believed, I gather.  I assume it's all in his --

15          MR. HICKERSON:  Yes, it is, Your Honor.

16          THE COURT:  I have it, and let's hear what he has to

17   say.

18          MR. HICKERSON:  Okay.

19                      DIRECT EXAMINATION

20   BY MR. HICKERSON:

21   Q    Professor Brickman, can you briefly describe for the Court

22   what you've done in your research on the topic of asbestos

23   litigation?

24   A    Yes.  I've devoted 14 years, approximately, to a systemic

25   study of asbestos litigation.  In the course of that study I

Brickman - Direct                    15

1  have read case decisions.  I have read Appellate opinions.  I

2  have read deposition testimony, transcripts, trial transcripts.

3  I've attended some trials.  I have inquired of -- I have

4  attended conferences.  I have participated as an invited member

5  of conferences to speak at the conferences dealing with

6  asbestos litigation.  As noted, I've been invited by

7  Congressional staff to testify before hearings of the Congress

8  on asbestos litigation issues.  I have been invited to

9  conferences where I've delivered talks based upon research I've

10  done.  I've published four articles to this point on asbestos

11  litigation.  I have a fifth that is in the process of

12  completion on ethical issues raised by asbestos litigation.

13       I was asked early in my career, so to speak, in terms of a

14  scholar focusing on asbestos litigation by the Administrative

15  Conference of the United States, which is a federal executive

16  office agency to organize a colloquy to discuss a proposal that

17  they asked me to prepare of an administrative alternative to

18  asbestos litigation.  I organized that colloquy.  I invited the

19  leading asbestos lawyers, judges, and others to attend that

20  colloquy.  The results were published in a symposium issue of

21  the Cardoza Law Review.  Two of the articles were my own -- one

22  the actual proposal that I devised that was the subject of the

23  colloquy, the other a reflection of what information I had

24  acquired and the systemic research I had done on asbestos

25  litigation.  These are some of the activities that I have

Brickman - Direct                                16

1  engaged in over the last 14 years.  I've devoted a substantial

2  part of my academic career over the last 14 years to research

3  into asbestos litigation.

4  Q    Now, Professor, in your expert report you refer to

5  something called the entrepreneurial model.  And one aspect of

6  that you refer to as mass screenings.  Can you tell us what

7  your research on mass screenings has shown?

8  A    Yes.  In the most recent article I published, which was in

9  the Pepperdyne Law Review earlier in 2004, I reflected the

10  results of an extensive research inquiry into mass screenings.

11  I accumulated every piece of literature I could find.  Most of

12  this was in the form of deposition transcripts in various

13  personal injury cases involving asbestos where the screening

14  enterprise principals, the technicians they employed, and the B

15  Readers that were associated with them were deposed.  I looked

16  at other documents.

17      There were newspaper reports, whatever documentary

18  evidence I could put together, and I ended up writing an

19  extensive description of mass screenings.  These are screening

20  enterprises hired by plaintiff lawyers to screen so far

21  hundreds of thousands of potential litigants, starting

22  somewhere around mid-1985, with the tire workers' screenings,

23  which Judge Patrick Kelly of U.S. District Court in Kansas City

24  characterized as essentially a fraudulent process where they

25  found asbestosis, or an asbestos-related disease, in 65 percent

Brickman - Direct                    17

1  of those screened.

2       I learned that the screening models that followed

3  essentially followed the same model.  There are approximately

4  15 screening enterprises that have arisen.  They are all paid

5  by plaintiff lawyers to go out to various locations, local

6  union halls, motel parking lots.  There's a substantial amount

7  of advertising that precedes them, inviting former workers to

8  come and be screened.  The letters that go out indicate health

9  risks, also indicate potential financial benefits.

10      The screening is actually done using a mobile x-ray van,

11 that is a truck, sometimes called an exam mobile, which

12 contains x-ray equipment and x-rays are administered on an

13 assembly line basis, one every five, six, seven minutes, and

14 they might screen, depending upon the size of the truck, they

15 might screen two, three hundred workers a day.

16 Q    Has your research allowed you to draw any conclusions as

17 to approximately what percentage of all non-malignant cases

18 come from mass screenings?

19 A    Yes.  On the basis of reports and documents prepared

20 mainly by the Manville trust and David Austern in his capacity

21 as president of their -- of an arm of the trust, well in excess

22 of 90 percent of all non-malignant claims are generated by

23 screenings.

24      THE COURT:  Well, I assume that's because until --

25 unless there were screenings people wouldn't realize they had

Brickman - Direct                              18

1  an occasion to worry about anything?

2         THE WITNESS:  For most of the persons screened that's

3  correct, because these are asymptomatic persons.  They had no

4  conception of illness.  Indeed, either before or after the

5  screening, they did not have it.

6         THE COURT:  And I take it you do not think that these

7  screenings are simply an outgrowth of a very valid public

8  health concern on the part of lawyers?  They want to straighten

9  out the population?

10        THE WITNESS:  I -- in my writings I have

11 distinguished medical screenings which do provide a valuable

12 service for workers and other that are screened, and asbestos

13 screenings which have no purported health benefit.  Indeed, the

14 screening principals themselves have testified that there is no

15 health benefit.  There's no doctor-patient relationship.  They

16 do not communicate the results of the screenings to the

17 litigants that are screened.  They communicate everything to

18 the lawyer, and that they have -- they do not intend to provide

19 any health benefits.

20        THE COURT:  The lawyers don't tell their potential

21 clients what the results are?

22        THE WITNESS:  If the results are positive, they get

23 -- a letter is sent out notifying the potential client that

24 there is a positive result.  In some cases the potential client

25 then -- well, actually, it's not a potential, it's an actual

Brickman - Direct                                    19

1  client, because before any of the screenings take place you

2  must sign a retainer agreement.  That's the beginning of the

3  process, and it's a retainer agreement with the law firm that

4  is sponsoring or paying for the screening.  When some of the

5  screen -- those screened have gotten the letters, they've gone

6  to their own doctors and said, you know, what's up?  I'm told

7  I'm sick.  And their doctors examine them and there's material

8  in the records that I examined where the doctor said, well, you

9  have -- there's nothing wrong with you.  But, in one notorious

10 case that person ended up committing suicide out of fear of the

11 consequences, even though his own doctor had told him that

12 there was nothing wrong with him.

13 Q    Now Professor, in your report you also refer to a small

14 selection of B Readers.  Can you tell me what your research has

15 shown on that?

16 A    Yes.  A comparative handful of B Readers, approximately

17 five percent of the six to seven hundred B Readers that have

18 been certified by NIOSH are regularly used by plaintiff

19 lawyers, by asbestos lawyers, to read the x-rays.  Some of the

20 x-rays are read in the exam mobiles, the B Readers are right on

21 site in the truck -- trailers.  In other cases the x-rays are

22 batched and sent to the lawyer, and then the lawyer sends them

23 to the B Reader of choice.  So, there are approximately 30, 35

24 B Readers that represent the overwhelming majority of B

25 readings done on behalf of asbestos lawyers.  The Manville

Brickman - Direct                              20

1  trust publishes the top 20 -- a list of the top 20 and the

2  percentages, and the last list I looked at for the top 20

3  indicated somewhere in excess of 60 percent had been done by

4  these top 20 B Readers.

5  Q    In your report you also speak to the administration about

6  PFT tests.  Can you tell me what materials you've reviewed in

7  that regard?

8  A    Yes.  In writing about PFT tests I've reviewed medical

9  literature.  I reviewed the AMA guides.  I reviewed, obtained a

10 copy of the handbook for PFT testing.  In addition I reviewed

11 the testimony of medical experts, such as Dr. Friedman and Dr.

12 Robert Crapo, who was retained by Owens Corning during the

13 Pitts and McNeese litigations to look at the PFT testing.  In

14 addition I read the deposition testimony of the screening

15 company principals, of the technicians that they had retained,

16 of the B Readers that were involved in some measure with the

17 screenings and with the PFT test administrations.  This is

18 mostly what I looked at in formulating first in terms of

19 accumulating data on what was going on, and in formulating an

20 opinion.

21 Q    And what has your research shown with respect to the

22 administration of PFT tests?

23 A    My research, independent of the medical reports that I

24 looked at, and some of which I did not have available at the

25 time I wrote my article, indicate that the vast majority of PFT

Brickman - Direct                    21

1  tests done by the screening enterprises that I looked at, that

2  I was able to acquire information about, did not meet ATS

3  standards.  I later in some sense confirmed my own views when I

4  saw the report by Dr. Robert Crapo, who found that ATS

5  standards had not been followed in 99.9 percent of the cases

6  that he examined, and of course Dr. Friedman's testimony which

7  just preceded mine, which I won't replicate.

8  Q    Now, you were in the courtroom when the Owens Corning

9  lawyers, Mr. Leff, Mr. Tucker, and Mr. Snyder testified?  Is

10 that right?

11 A    Yes, I was.

12 Q    And with respect to their testimony on the aggregative

13 techniques such as consolidations and mass consolidations, and

14 the other procedural devices, did you essentially agree with

15 what they had to say?

16 A    Yes.  I thought that that accorded with my understanding

17 of the role of aggregations in asbestos screenings -- in

18 asbestos claiming, rather.  I would point out one -- one -- I

19 don't know if it's a quibble or not, but I -- Judge Weinstein,

20 both in his book on mass torts and in his opinion, stated that

21 in his Court, at least, where there were consolidations and

22 there were a couple of very serious cases, such as

23 mesothelioma, and the 1/0 asbestosis cases which predominated,

24 the outcome of that kind of a consolidation was that the claims

25 of the asbestotics was augmented, that is, those claim values

Brickman - Direct                    22

1  were increased, and at the expense of the claim values of the

2  mesothelioma cases.  And he raised that in terms of an ethical

3  issue.

4  Q    All right.  Has your research shown that there's some

5  favored jurisdictions for plaintiffs to file asbestos cases?

6  A    Yes.  Asbestos cases are filed predominantly in 30 --

7  approximately 30 jurisdictions, or have been filed

8  traditionally in approximately 30 jurisdictions in the United

9  States.  So, even within states, for example, Mississippi,

10 which is one of the states which has had large numbers of

11 filings, there are ten or 12 counties in which -- which account

12 for the overwhelming majority of counties.  The same would be

13 true in Texas.  So, calling these jurisdictions, there are a

14 relatively small number of jurisdictions in the United States

15 which account for the overwhelming majority of asbestos

16 filings.

17          THE COURT:  Which I assume convinces everybody that

18 that's because there was an overwhelming amount of asbestos in

19 those 30 locations?

20          THE WITNESS:  No, sir.  These cases can be filed

21 virtually anywhere in the United States.  And my understanding,

22 that is, the conclusions I've reached, is that they are filed

23 in jurisdictions in which case values are higher than other

24 jurisdictions.  Indeed, most -- I believe most asbestos claims

25 are not filed in the jurisdictions in which the exposures took

1  place.

2  Q    Are you aware of any recent judicial actions in states

3  that impact on these procedural devices?

4  A    Yes.  There have been a variety of recent judicial

5  decisions and implementations that have impacted and will

6  further impact asbestos litigation.  First there are a number

7  of deferred dockets and registry devices that Courts are coming

8  up with now to deal with unimpaired claims.  Of course, in the

9  MDL proceeding Judge Weiner dismissed all of the claims

10  generated by the mass screenings subject to their being revived

11  if illness actually occurs, and with the statute of limitations

12  told.  Most recently deferred dockets for these kinds of cases

13  have been established in Seattle, Washington, in Syracuse, New

14  York, in Madison County, Illinois, and by Judge Helen Friedman

15  in New York City, who is the Judge assigned with responsibility

16  for the asbestos docket in New York City.  Judge Friedman's

17  registry or deferred docket is for all unimpaired claims.

18  Q    Are you aware of any recent judicial activity with respect

19  to the issue of forum selection in asbestos litigation?

20  A    Yes.  It has been typical in asbestos litigation to -- as

21  noted, to choose forum which are regarded as more friendly.

22  Some of the ways in which these procedural selections occur is

23  through joinder.  In some states it was permissible to -- to

24  join with one properly venued plaintiff.  Dozens, hundreds,

25  even thousands of out-of-state plaintiffs to be joined to the

Brickman - Direct                    24

1   case of that one properly venued plaintiff.  Texas allowed

2   this.  Mississippi allowed this.  Texas no longer allows this,

3   both by Court rule and by legislation.

4        In Mississippi, again by both legislation and Court rule,

5   this is no longer allowed.  In fact, in a recent Mississippi

6   Supreme Court case, <u>Harold's Auto Parts v. Mangialardi</u>, the

7   Mississippi Supreme Court referred to this process that had

8   been followed traditionally in Mississippi with regard to

9   asbestos litigation as a perversion of justice, and it said it

10  would no longer allow this.

11       In a very recent case, I believe yesterday, a Mississippi

12  Court in Jones County, where there had been 16,000 asbestos

13  cases filed that were on the docket, gave the plaintiff lawyers

14  30 days in which to produce information with regard to the

15  domicile of the plaintiffs, the injury claimed, where the

16  injury took place, and indicated that under prevailing

17  Mississippi law today he would dismiss all of the claims that

18  were out of state on forum non conveniens ground, and to the

19  extent that there were Mississippi claims, but from other

20  counties he would transfer those claims to the other counties.

21            THE COURT:  I believe that this is about the third or

22  fourth time that this information has been spread upon the

23  record.  We'll take a ten-minute recess, and I would encourage

24  you to, for heaven's sakes, stop reinventing the wheel.

25            MR. HICKERSON:  Yes, Your Honor.