# EXHIBIT H

## CCR SETTLEMENT AGREEMENT - FUTURE PLAINTIFFS

This Agreement is executed by and between the Center For Claims Resolution ("CCR"), as sole agent for its 16 member companies,[1] and ▭▭▭▭▭▭▭▭▭▭▭▭ ▭▭▭▭▭▭▭▭▭ as well as for any successor, partner, or associate of said counsel or law firms) (hereafter referred to as "Plaintiff Counsel"), for the resolution of the claims of all asbestos personal injury plaintiffs/claimants who, after the date of this Agreement, retain Plaintiff Counsel, either jointly or separately, to file claims in West Virginia alleging personal injury or death arising from the exposure of such plaintiffs/claimants or their decedents to asbestos-containing materials supplied by any current or future CCR member companies or for which such companies could be alleged to be legally responsible under any theory ("Future Plaintiffs").

1. <u>Confidentiality</u>. The terms of this Agreement shall remain confidential among the parties, their principals, and their counsel unless mutually agreed otherwise by the CCR and Plaintiff Counsel, or when necessary to comply with statutory requirements or court orders, or in an action to enforce the terms and conditions of this Agreement itself.

2. <u>Offer of Settlement to the CCR Member Companies</u>. Plaintiff Counsel agree that they will offer the opportunity to settle the claims of all Future Plaintiffs to the CCR and its current and then member companies, subject to the procedures set forth herein. Absent a change in the number of companies that are members of the CCR between the date of this Agreement and the date that these values are subject to modification under Paragraph 3

---

[1] The current member companies of the CCR are: Amchem Products, Inc.; Armstrong World Industries, Inc.; Asbestos Claims Management Corp.; CertainTeed Corp.; C.E. Thurston and Sons, Inc.; Dana Corp.; I.U. North America, Inc.; Maremont Corp.; National Service Industries, Inc.; Nosroc Corp.; Pfizer Inc.; Quigley Company, Inc.; Shook & Fletcher Insulation Co.; T&N plc; Union Carbide Corp.; United States Gypsum Company.



CONFIDENTIAL


EXHIBIT
Pp.  Exc. 25

CCRFM000380R

-2-

below, and in the event that the CCR elects to accept the offer to settle the claims of such

Future Plaintiffs, each Future Plaintiff who meets the product identification and

timeliness requirements in Appendix 2 and the medical criteria set forth in Appendix 1

shall receive the following amounts (depending on the applicable medical category):

Non-Malignant I: ▮▮▮▮▮▮▮

Non-Malignant II: ▮▮▮▮▮▮▮

Mesothelioma: ▮▮▮▮▮▮▮

Lung Cancer I: ▮▮▮▮▮▮▮

Lung Cancer II: ▮▮▮▮▮▮▮

Lung Cancer III: ▮▮▮▮▮▮▮

Other Cancer: ▮▮▮▮▮▮▮

The parties recognize that the settlement value of future mesothelioma claims may

vary substantially depending on the facts of the particular case, accordingly, the parties

agree that the CCR and Plaintiffs Counsel each may designate up to 2 mesothelioma

claims per year as extraordinary claims, and that the settled range for any mesothelioma

claim so designated shall be not less than ▮▮▮▮▮▮ nor more than ▮▮▮▮▮▮. Any dispute

as to the value of any mesothelioma claim so designated within such range shall be

resolved pursuant to the arbitration procedures provided below in paragraph 12.

3.  Modification of Settlement Amounts.  The values set forth in Paragraph 2 shall remain in

effect for the claims submitted for payment under this Agreement through January, 2003.

In the event that there is an increase or decrease in the number of companies that are

members of the CCR, and in any event, at January 1, 2003, and at three-year intervals

thereafter, the parties shall meet to determine whether any of these values should be

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CONFIDENTIAL

-3-

modified to take account of changed circumstances (including the effects of economic inflation or deflation). In the event that the parties disagree concerning any such modifications, the party seeking the modification may commence a mediation/arbitration under Paragraph 11 of this Agreement to compel the adoption of such modification. In any such mediation/arbitration, the party seeking the modification must establish by clear and convincing evidence, in light of all the attendant circumstances, that the modification is consistent with the goals and purposes of this Agreement and is necessary for its fair and efficient operation.

In addition, in the event that any current CCR member company withdraws from the CCR, or has its membership in the CCR otherwise terminated, Plaintiff Counsel and any such departing CCR member company shall meet and negotiate in good faith concerning a settlement agreement with that company governing future claims that is consistent with this Agreement.

4.    <u>Payment of Claims; Establishment of QSF</u>.  Plaintiff Counsel further agree that, although they agree to offer the CCR the opportunity to settle the claims of all Future Plaintiffs, they will submit such claims to the CCR for settlement every six months beginning in May, 2001. The CCR shall pay to Plaintiff Counsel the amount due for claims that have qualified for payment in May and November of each year, with the amount for the qualifying claims submitted in May, 2001 to be paid in May, 2002, and the amount due for qualifying claims in later six (6) month periods due to Plaintiff Counsel one (1) year after the date that the claims are submitted for payment. The maximum number of claims submitted in each six month period shall not exceed 200 claims. In addition, in the event that the disease mix for the claims of Future Plaintiffs covered by this Agreement over





CONFIDENTIAL

CCRFM000382 R

-4-

any two-year period is substantially different than the alleged disease mix of the Present Plaintiffs whose claims are subject to settlement under the separate settlement agreement executed this day between the CCR and Plaintiff Counsel, the parties agree to meet to determine whether these case flow caps and payment dates should be adjusted.

The CCR shall be responsible for collecting from each CCR member company and/or its insurer each member company's share of such payments, as well as other costs required to administer this Agreement. It is understood that the CCR intends to retain such amounts in a "qualified settlement fund" (as such term is defined in 26 CFR§ 1.468B-1(c)), and Plaintiff Counsel will cooperate with the CCR in obtaining appropriate court order(s) approving the establishment of such fund as required under such regulations.

5.   Additional Compensation if Future Plaintiff Develops Non-Malignant I Condition.  In the event that a Future Plaintiff who receives compensation under this Agreement for a Non-Malignant II condition develops a condition that meets the criteria described in the Non-Malignant I category in Appendix 1 during the pendency of this Agreement, then that Plaintiff may seek additional compensation equal to the value for the Non-Malignant I category defined in Paragraph 2 of this Agreement, minus the amount that has been paid to the Plaintiff for the Non-Malignant II condition pursuant to this Agreement. No such claim for additional compensation under this provision may be made until one (1) year after that Future Plaintiff is paid for his/her Non-Malignant II condition in accordance with Paragraph 2 of this Agreement.

6.   Additional Compensation if Future Plaintiff Develops Cancer.  In the event that a Future Plaintiff who receives compensation under this Agreement for a Non-Malignant condition





CONFIDENTIAL

CCRFM000383 R

-5-

(I or II) develops an asbestos-related malignancy that meets the criteria described in the Mesothelioma, Lung Cancer, or Other Cancer categories in Appendix 1 during the pendency of this Agreement, then that Future Plaintiff may seek additional compensation equal to the value for the appropriate asbestos-related malignancy defined in Paragraph 2 of this Agreement, minus the amount that has been paid to the Future Plaintiff for the Non-Malignant condition (I and/or II) pursuant to this Agreement. No such claim for additional compensation under this provision may be made until one (1) year after the Future Plaintiff is paid for his/her Non-Malignant condition (I and/or II) in accordance with Paragraph 2 of this Agreement.

7.    Claims Settled. Any payment made under this Agreement for a Non-Malignant condition (I or II) or for an asbestos-related malignancy shall include payment for all claims for asbestos-related personal injury that each Future Plaintiff could make for such condition, including but not limited to, loss of support, services, consortium, companionship, society and other valuable services, rendered by a spouse, family member or close companion, however such claims are denominated, including without limitation, wrongful death or survival actions. Spouses and representatives with such claims shall be bound by this Agreement and shall execute all necessary settlement documentation to effectuate its terms. However, the parties do not intend to discharge any claim which the spouse or children of a Future Plaintiff may have for any asbestos-related illness that they may personally develop.

8.    Inadvertent Errors. The parties to this Agreement recognize that because of the large number of claims resolved pursuant to the Agreement, inadvertent errors may occur in the Future Plaintiffs' submissions to, and processing by, the CCR. To the extent such



CONFIDENTIAL

CCRFM0003842



-6-

inadvertent errors occur, the CCR and Plaintiff Counsel agree to work together to correct

the problem and to resolve the case in an appropriate manner under the Agreement.

9.    <u>Recommendation by Plaintiff Counsel; Nonparticipating Future Plaintiffs</u>.  Plaintiff

Counsel have, for many years, represented plaintiffs in connection with their personal

injury claims for asbestos-related disease, and are highly experienced in the asbestos

litigation.  Plaintiff Counsel have carefully reviewed the provisions of this Agreement

and have concluded that it is in the best interests of their future clients, is in compliance

with the laws and rules of the State of West Virginia governing the professional and

ethical responsibility of counsel, and represents the fairest and most efficient method of

compensating their future clients for the injuries received.  Accordingly, Plaintiff Counsel

have determined, and hereby agree, subject to client approval and the exercise of their

independent and professional judgment as to the circumstances of individual Future

Plaintiffs, that they shall strongly recommend settlement under the terms of this

Agreement to any Future Plaintiff who meets the compensation criteria under this

Agreement; and further that they shall strongly recommend to any Future Plaintiff who

does not meet the medical criteria attached hereto as Appendix I that such Future

Plaintiff refrain from filing or pursuing any claims for compensation for an asbestos-

related disease or condition against the current or then member companies of the CCR.

Plaintiff Counsel have carefully reviewed these criteria and believe them to be fair and

reasonable.  Plaintiff Counsel believe that virtually all of their clients will accept their

recommendations.  In consideration for the agreement of Plaintiff Counsel to make these

recommendations, the current CCR member companies agree to toll the statute of

limitations as to any such Future Plaintiff who accepts these recommendations and whose



CONFIDENTIAL

CCRFM000385R

-7-

claim is not barred by the statute of limitations or other timeliness doctrines of the applicable jurisdiction at the time that the Future Plaintiff first seeks representation by Plaintiff Counsel for an asbestos-related personal injury claim.

Beginning on March 1, 2001, Plaintiff Counsel shall provide written notice to the CCR, on or before March 1st and October 1st of each year, of the identity of any Future Plaintiffs who decline to participate in the settlement (hereinafter "Nonparticipating Plaintiffs"). If (5%) 10 or more Future Plaintiffs become Nonparticipating Plaintiffs in a given year, the CCR may, in its sole discretion, elect to terminate this Agreement, in which case all obligations of and payments due by the CCR under the Agreement shall cease immediately and all settlement funds that have not, at that time, been paid to Future Plaintiffs under this Agreement shall be refunded to the CCR. The CCR shall provide Plaintiffs Counsel with written notice of their decision to so terminate the Agreement within thirty (30) business days of their receipt from Plaintiffs' Counsel of the notice of the total number and identities of any Nonparticipating Plaintiffs in a given year.

10.   Mediation/Settlement Conference for Claims by Nonparticipating Plaintiffs. Unless the Agreement is lawfully terminated, Plaintiff Counsel, and any partner or associate or successor or affiliate of Plaintiffs' Counsel, may not represent at trial, or have any financial interest in the claim of any Plaintiff who does not meet the criteria for compensation in Appendix 2 to this Agreement (hereinafter "Nonqualifying Plaintiffs"), or of any Nonparticipating Plaintiff (as defined in Paragraph 9 above), against any of the current or then CCR member companies unless that Plaintiff's claim is first submitted to mediation before a mutually-agreeable mediator. Such mediation shall commence no earlier than the date on which such Plaintiff's claim would have been paid under



CONFIDENTIAL

-8-

Paragraph 4 of this Agreement. If mediation does not resolve the case, either party may request a settlement conference before the Court or a Special Master appointed by the Court to which the case is assigned, which conference shall be scheduled at the convenience of the Court or Special Master. If these efforts to resolve the case unsuccessful, the claim shall be set for trial at a date to be determined by the Court; provided, however, that the parties shall not request or prosecute any trial of such claim until at least six (6) months after the settlement conference, unless otherwise ordered by the Court having jurisdiction over such claim. In the event that, at the request of Plaintiff Counsel, a claim of a Nonqualifying Plaintiff or a Nonparticipating Plaintiff is brought to trial against one or more then CCR member companies by Plaintiff Counsel or any of their successors, partners, or associates before the expiration of the six (6) month period following the last settlement conference specified above, the CCR may, in its sole discretion, elect to terminate the Agreement, in which case all obligations of and payments due by the CCR under the Agreement shall cease immediately, and any settlement funds not yet paid to Future Plaintiffs under this Agreement shall be returned to the CCR. The CCR shall provide Plaintiff Counsel with written notice of their decision to so terminate the Agreement within ten (10) business days of commencement of such a trial.

11.  CCR Member Company Funding Obligations. Payments to Plaintiff Counsel by the CCR under Paragraph 2 of this Agreement shall be funded by the CCR member companies in accordance with the terms of the Producer Agreement Concerning Center For Claims Resolution (as amended, effective February 1, 1994) and each CCR member company shall be liable under this Agreement only for its individual share of such payments as



CONFIDENTIAL

CCRFM000387R

-9-

determined under that Producer Agreement. In the event that any one of the CCR member companies fails to make payment of its share of any payment pursuant to Paragraph 2 when such payment has become due in accordance with all of the terms of this Agreement (a "default"), Plaintiff Counsel shall have, with respect to any and all Future Plaintiffs whose claims have not been paid in full by the CCR due to the default by that CCR member company, the option as to the defaulting CCR member company of (i) bringing suit to enforce that member company's obligations under this Agreement, or (ii) declaring this Agreement terminated as to that member company and pursuing their claims for asbestos-related bodily injury against that member company in the tort system. Plaintiffs that opt to bring suit in the tort system shall have one year from the date of their written notice of termination of this Agreement as to the defaulting CCR member company to file their claims against that company in the tort system, unless the applicable law provides for a longer period of time. Plaintiff Counsel, Future Plaintiffs, the CCR, and the non-defaulting CCR member companies shall remain bound by the terms of this Settlement Agreement.

12.    <u>Mediation/Arbitration</u>. The parties will make good faith efforts to resolve any disputes which may arise while carrying out the terms and conditions of this Agreement. If the parties are unable to resolve a dispute, the issue shall be referred to a mutually agreeable mediator for resolution. If the parties are unable to mutually agree upon a mediator, then each party shall select a representative, and the two representatives shall select a mediator. The costs of the mediation (including the mediator's fees and expenses) shall be split equally between the parties (with each party to bear its own attorneys' fees and other expenses), unless determined otherwise by the mediator as part of his/her decision



-10-

in the case. If mediation fails to resolve the dispute, the issue shall be referred to a mutually agreeable independent attorney arbitrator for binding resolution. If the parties are unable to mutually agree upon an arbitrator, any party may apply to the American Arbitration Association to nominate a list consisting of an odd number (but at least seven) of independent attorney arbitrators. The parties shall thereupon select the arbitrator by alternatively striking the name of an arbitrator nominee from the list (with the party making the application exercising the first strike) until only one name remains, which individual shall serve as the arbitrator. The decision of the arbitrator shall be final and binding upon the parties. The costs of the arbitration (including the arbitrator's fees and expenses) shall be split equally between the parties (with each party to bear its own attorneys' fees and other expenses), unless determined otherwise by the arbitrator(s) as part of his or her decision in the case.

13. <u>Severability Clause</u>. The parties agree that, in the event a court or other tribunal determines that any provision of this Agreement is invalid, unethical, or unenforceable, the CCR shall have the option to declare this Agreement null and void in its entirety, in which case all obligations of and payments due by the CCR under the Agreement shall cease; or, alternatively, the CCR shall have the option to allow the Agreement to continue, in which case the provision that has been held to be invalid, unethical, or unenforceable shall be deemed to have been modified automatically to conform to the requirements for validity and enforceability as determined by such court or tribunal, or, if that provision cannot be so modified, shall be deemed deleted from this Agreement as though it had never been included; provided further that, in either case, the remaining



CONFIDENTIAL

CCRFM000389 R

-11-

provisions of this Agreement that are unrelated to such modifications and deletions shall

remain in full force and effect.

14.  Entire Understanding.  This Agreement constitutes the entire understanding between the

parties concerning the subject matter contained herein.  No modification of any provision

of this Agreement shall be valid unless set forth in writing and signed by all parties.

15.  Termination.  This Agreement will remain in effect unless and until terminated by written

agreement of all parties.


AGREED TO AND ACCEPTED THIS _17 TH_ DAY OF _May_, 2000.

Michael F. Rooney
Chief Operating Officer
Center for Claims Resolution
(As Agent for the CCR Member
Companies Identified in Footnote 1)

CONFIDENTIAL                                   CCRFM000390 R

APPENDIX 1

MEDICAL CRITERIA

i.    Genera1 Provisions

For purposes of this Appendix, the following terms shall have the meanings set forth

below. Terms used in the singular shall be deemed to include the plural, and vice versa.

1.    "Board-certified Pathologist" shall mean a physician currently licensed to practice

medicine in the District of Columbia or in one or more U.S. states or territories

and who holds primary certification in anatomic pathology, or combined anatomic

and clinical pathology, from the American Board of Pathology, and whose

professional practice includes the field of pathology and involves regular

evaluation of pathological materials obtained from surgical and post-mortem

specimens.

2.    "Board-certified Internist" shall mean a physician currently licensed to practice

medicine in the District of Columbia or in one or more U.S. states or territories

and who is currently certified by the American Board of Internal Medicine in

internal medicine.

3.    "Board-certified Pulmonary Specialist" shall mean a physician currently licensed

to practice medicine in the District of Columbia or in one or more U.S. states or

territories and who is currently certified by the American Board of Internal

Medicine in the sub-specialty of pulmonary disease.



CONFIDENTIAL                                     CCRFM000391 R

- 2 -

4.    "Board-certified Oncologist" shall mean a physician currently licensed to practice medicine in the District of Columbia or in one or more U.S. states or territories and who is currently certified by the American Board of Internal Medicine in the subspecialty of medical oncology.

5.    "Certified B-reader" shall mean an individual who has successfully completed the x-ray interpretation course sponsored by the National Institute of Occupational Safety and Health (NIOSH), and passed the NIOSH examination for certification as B-reader, and whose NIOSH certification is up to date at the time of his or her interpretation of the x-rays.

6.    "ILO Grade" shall mean the radiology ratings for the presence of lung changes by chest x-ray as established from time to time by the International Labour Office (ILO), and as set forth in "Guidelines for the Use of ILO International Classification of Radiographs of Pneumoconioses" (1980).

7.    "Chest x-rays" shall mean chest radiographs taken in at least two views (Posterior-Anterior and Lateral), and graded quality 1 or 2 for reading according to the criteria established by the ILO.  Notwithstanding the foregoing, in cases in which no quality 1 or 2 radiographs are available, radiographs of poorer quality shall not be automatically rejected but shall be evaluated for acceptability on a case-by-case basis.  The CCR shall have the right to examine all chest x-rays for which reports, including B-reader reports, are submitted to it.  The CCR shall not be obliged, for purposes of this Agreement, to accept diagnostic reports or x-ray

CONFIDENTIAL

CCRFM000392R

- 3 -

readings from any of the following physicians: Dr. Larry Mitchell, Dr. Ray

Harron, Dr. Richard Kuebler.

8.      "Pulmonary Function Testing" shall mean spirometry [forced vital capacity

("FVC"), the ratio of forced expiratory volume exhaled in one second over forced

vital capacity ("FEV-1/FVC"), and vital capacity ("VC")], lung volume [total

lung capacity ("TLC")], and diffusing capacity ("DLCO") testing that is in

material compliance with the quality criteria established by the American

Thoracic Society ("ATS") and is performed on equipment which is in material

compliance with ATS standards for technical quality and calibration, all as set

forth in 20 C.F.R. 718.103 and Appendix B thereto or in the ATS guidelines in

144 American Review of Respiratory Disease 1202-18 (1991), and 152 American

Review of Respiratory and Critical Care Medicine 1107-36 (1995).  Pulmonary

Function Testing shall be deemed not to be in material compliance with ATS

Standards if it fails to meet the requirements set forth in Attachment A hereto.

The CCR may examine all back-up data (including, without limitation, flow

volume loops and spirographs) pertaining to Pulmonary Function Testing of a

Plaintiff to ensure that these quality criteria and standards have been satisfied.

9.      "Predicted Values" for spirometry and lung volumes shall be those published by

Morris, Clinical Pulmonary Function Testing, 2d Edition, Intermountain Thoracic

Society (1984), or by Crapo, et al., "Reference Spirometric Values Using

Techniques and Equipment That Meet ATS Recommendations," 123 American

Review of Respiratory Diseases 659-64 (1981), or others that are substantially





CONFIDENTIAL

CCRFM0003932

- 4 -

equivalent. "Predicted Values" for diffusing capacity shall be those published by Miller, et al., 127 American Review of Respiratory Disease 270-77 (1983), or others that are substantially equivalent. Predicted Values for any Pulmonary Function Testing shall be adjusted for race, ethnic origin, age, gender, height or other relevant factors, as appropriate.

10. "Basilar Crackles," sometimes called "rales," shall mean those sounds described in American Thoracic Society, "The Diagnosis of Nonmalignant Diseases Related to Asbestos," 134 American Review of Respiratory Disease 363, 366 (1986), and shall be observed in accordance with the criteria set forth therein.

11. "Latency Period" shall mean the period from the date of the Exposed Person's first significant exposure to asbestos or an asbestos-containing product to the date of manifestation of the condition claimed.

12. "Manifestation" shall mean either the date of the actual diagnosis of the condition claimed, or the date upon which the clinical records and available tests indicate that the condition could reasonably have been diagnosed by a competent physician.

2.   Non-Malignant I

In the Non-Malignant I category, a Plaintiff must meet the requirements in subsection (a) and either subsection (b), (c), or (d).

(a)   Latency Period. A Latency Period of at least twelve (12) years.



CONFIDENTIAL

CCRFM000394R 

- 5 -

(b)  <u>Clinical Evidence of Asbestosis</u>.  A diagnosis of pulmonary asbestosis by a

Board-certified Internist or Pulmonary Specialist based on the following

minimum objective criteria:

(i)  Chest x-rays which, in the opinion of a Certified B-reader, show small

irregular opacities of ILO Grade 1/0; <u>and</u> Pulmonary Function Testing and

physical examination that show either:

(1)  FVC < 80% of Predicted Value <u>with</u> FEV-1/FVC $\geq$ 65% (actual

value) if the individual tested is at least 75 years old at the date of

testing, $\geq$ 70% (actual value) if the individual tested is at least 65

years old but less than 75 years at the date of testing, and $\geq$ 75%

(actual value) if the individual tested is less than 65 years old at the

date of testing; <u>or</u>

(2)  TLC < 80% of Predicted Value <u>with</u> either DLCO $\leq$ 76% of

Predicted Value <u>or</u> bilateral Basilar Crackles, <u>and</u> also the absence

of any probable explanation for the DLCO result or crackles

finding other than the presence of asbestos-related lung disease; <u>or</u>

(ii)  Chest x-rays which, in the opinion of a Certified B-reader, show small

irregular opacities of ILO grade 1/1 or greater; <u>and</u> Pulmonary Function

Testing that shows either:

(1)  FVC < 80% of Predicted Value <u>with</u> FEV-1/FVC $\geq$ 65% (actual

value) if the individual tested is at least 70 years old at the date of

testing, $\geq$ 70% (actual value) if the individual tested is at least 60





CONFIDENTIAL

CCRFM000395℞

- 6 -

years old but less than 70 years old at the date of testing, and $\geq$ 75% (actual value) if the individual tested is less than 60 years old at the date of testing; or

(2) TLC < 80% of Predicted Value.

(c) <u>Pathological Evidence of Asbestosis</u>. A statement by a Board-certified Pathologist that more than one representative section of lung tissue otherwise uninvolved with any other process (<u>e.g.</u>, cancer or emphysema) demonstrates a pattern of peribronchiolar or parenchymal scarring in the presence of characteristic asbestos bodies, <u>and</u> also that there is no other more likely explanation for the presence of the fibrosis.

(d) <u>Bilateral Pleural Thickening</u>. Chest x-rays demonstrating bilateral pleural thickening that (1) has not been followed by a malignancy; (2) includes the blunting of at least one costophrenic angle; and (3) is not explained by any other condition in the subject's history; <u>and</u> either:

(i) If the bilateral pleural thickening is, in the opinion of a Certified B-reader, of ILO Grade B2 or greater, then Pulmonary Function Testing that, in the opinion of a Board-certified Internist or Pulmonary Specialist shows:

(1) TLC < 75% of Predicted Value; or

(2) a VC or FVC < 75% of Predicted Value with FEV-1/FVC > 75% (actual value); <u>and in either case</u>




CONFIDENTIAL

CCRFM000396R

- 7 -

   (3)    A statement by the Board-certified Internist or Pulmonary Specialist that the asbestos-related changes are substantial contributing factors in causing the pulmonary function changes; <u>or</u>

 (ii)    If the bilateral pleural thickening is, in the opinion of a Certified B-reader, of ILO Grade C2 or greater, then Pulmonary Function Testing that, in the opinion of a Board-certified Internist or Pulmonary Specialist shows:

   (1)    FVC < 80% of Predicted Value <u>with</u> FEV-1/FVC ≥ 75% (actual value), or, if the individual tested is at least 68 years old at the time of the testing, <u>with</u> FEV-1/FVC ≥ 65% (actual value); <u>or</u>

   (2)    TLC < 80% of Predicted Value; <u>and in either case</u>

   (3)    A statement by the Board-certified Internist or Pulmonary Specialist that the asbestos-related changes are a substantial contributing factor in causing the pulmonary function changes.

3.   <u>Non-Malignant II</u>

In the Non-Malignant II Category, a Plaintiff must submit a report by a Certified B-reader showing that the Plaintiff has an x-ray reading of 1/0 or higher on the ILO scale or bilateral pleural plaques or bilateral pleural thickening, together with medical evidence showing that the Plaintiff's non-malignant condition is causally related to asbestos exposure. These Plaintiffs do not, however, have to meet the Pulmonary Function Testing requirements as defined in Section II.b or II.d of this Appendix or have pathological evidence of asbestosis as defined in Paragraph II.c of this Appendix.



CONFIDENTIAL

CCRFM000397R

- 8 -

4. <u>Mesothelioma</u>

In the Mesothelioma category, a Plaintiff must meet the following minimum requirements:

    a.    A diagnosis by two Board-certified Pathologists (or one Board-certified Pathologist if that Pathologist is a member of the U.S.-Canadian Mesothelioma Reference Panel) of malignant mesothelioma with a primary site in the pleura or peritoneum that is based on appropriate tissue and that has been verified using standardized and accepted criteria of microscopic morphology, and/or a variety of appropriate staining techniques; and

    b.    Latency period of at least ten (10) years.

5. <u>Lung Cancer I</u>

In order to qualify for compensation under this Agreement as a Lung Cancer I, a Plaintiff must (a) satisfy the requirements for qualification as a Lung Cancer III below and <u>either</u> (b) provide medical documentation of the Plaintiff's status as a non-smoker for at least fifteen years prior to the date of diagnosis, <u>or</u> (c) present medical evidence meeting the requirements of Appendix 1 of either (1) an X-ray reading of 1/1 or higher on the ILO scale from a Certified B-reader acceptable to the CCR, or (2) pathological evidence of asbestosis (as defined in Section 2(c) of Appendix 1).



CONFIDENTIAL

CCRFM000398 R

- 9 -

6. <u>Lung Cancer II</u>

In order to qualify for compensation under this Agreement as a Lung Cancer II, a Plaintiff

must (a) satisfy the requirements for qualification as a Lung Cancer III below <u>and either</u>

(b) provide medical documentation of the Plaintiff's status as a non-smoker for at least

ten but less than 15 years prior to the date of diagnosis, <u>or</u> (c) present medical evidence

meeting the requirements of Appendix 1 of an X-ray reading showing bilateral pleural

plaques or bilateral pleural thickening with a B-reading of B-2 or higher from a Certified

B-reader acceptable to the CCR.

7. <u>Lung Cancer III</u>

In order to qualify for compensation under this Agreement as a Lung Cancer III, a Future

Plaintiff must present written medical confirmation from a qualified physician

establishing that the Plaintiff suffers from a primary cancer of the lung and that the

Plaintiff's concern is causally related to asbestos exposure.

8. <u>Other Cancer</u>

In the Other Cancer category, a Plaintiff must meet the following minimum requirements:

    a.    A diagnosis by a Board-certified Pathologist, Pulmonary Specialist, or

          Oncologist of primary colon-rectal, laryngeal, esophageal, or stomach

          cancer; and

    b.    A Latency Period of at least twelve (12) years; and

    c.    Evidence of a Non-Malignant I condition sufficient to meet the

          requirements of Part II above.



CONFIDENTIAL

CCRFM000399R

<u>ATTACHMENT A</u>

<u>FVC MEASUREMENTS</u>

6.     <u>ACCEPTABILITY CRITERIA</u>

      1.     The subject must perform and the report of the tests must record the values, volume-time curves, and flow-volume loops for a minimum of three acceptable trials.

      2.     For each acceptable trial, there must be a minimum exhalation time of at least 5.4 seconds (length of maximum expiratory effort), unless there is an obvious plateau in the volume-time curve display. An obvious plateau means no change in volume (0.030 liter or less) for at least one second.

      3.     For each acceptable trial, the extrapolated volume must be less than 5% of the FVC or 0.15 liter, whichever is greater.

7.     <u>REPRODUCIBILITY CRITERIA</u>

      1.     The largest FVC and second largest FVC from acceptable maneuvers must not vary more than 7% (expressed as a percentage of the largest FVC regardless of the curve on which it occurred) or 0.2 liter, whichever is greater.

      2.     The largest FEVI and second largest FEVI must not vary by more than 7% (expressed as a percentage of the largest observed FEVI regardless of the curve on which it occurred) or 0.2 liter, whichever is greater.

<u>DLCO MEASUREMENTS</u>

8.     Breath-hold time should be between 9 to 11 seconds.

9.     Inspiratory vital capacity should be at least 90% of largest previously measured vital capacity, both expressed at BTPS conditions.

10.     At least two acceptable tests must be within 10% (plus or minus) of the average DLCO value for that subject. The average of two acceptable tests that meet this requirement should be reported.

11.     Measured alveolar volume must be reported.



CONFIDENTIAL

CCRFM000400R

## APPENDIX 2

### PROCEDURES FOR PROCESSING CLAIMS

1.  For each claim that is submitted for payment from a Future Plaintiff under the Settlement Agreement ("Agreement"), Plaintiff Counsel must provide to the CCR at the time of submission a completed CCR Processing Form (Appendix 3 to the Agreement) and the following documentation:

    a.  Plaintiff Counsel must supply credible evidence that the Present Plaintiff had regular occupational exposure to asbestos-containing materials for at least one year (three months in cases of mesothelioma) prior to January 1, 1976, that were manufactured, sold, marketed or distributed by one or more members of the CCR, or for which one or more CCR members bear legal liability. Such evidence may be provided in either of the following ways:

        (1)  Through demonstrated presence at an agreed-upon jobsite or jobsites during an agreed-upon exposure period. [A list of the agreed-upon jobsites and agreed-upon exposure periods will be attached as Appendix E to the Agreement.]

        (2)  Through acceptable evidence of such regular occupational exposure to one or more CCR member's asbestos-containing products by (i) an affidavit or deposition from the Present Plaintiff; (ii) affidavits or deposition testimony from co-worker(s); or (iii) other evidence acceptable to the CCR.

2.  A Future Plaintiff asserting household exposure must supply credible evidence that (1) the industrial worker (e.g., the Future Plaintiff's husband or father) who allegedly brought asbestos-contaminated clothes into the household meets the exposure requirements in Subparagraph 1(a) above; and (2) that the Future Plaintiff regularly came in contact with,





CONFIDENTIAL

CCRFM000401R

- 2 -

or inhaled asbestos dust on a frequent basis from that industrial worker's asbestos-contaminated clothing.

3.     Plaintiff Counsel must, in good faith, attempt to submit evidence concerning the Future Plaintiff's exposure to every current CCR member's asbestos-containing products to which Future Plaintiff claims exposure, or to which other evidence available to Plaintiffs' Counsel indicates that the Future Plaintiff was exposed.

4.     Plaintiff Counsel must make available to the CCR the medical documentation to demonstrate that the Future Plaintiff has contracted an asbestos-related condition that meets the criteria in Appendix 1. Each Future Plaintiff shall be obliged to seek qualification in the disease category with the highest allocated amount for which the medical evidence shows that Future Plaintiff qualifies.

5.     Plaintiff Counsel must provide documentation showing that Future Plaintiff's claim was not barred by the statute of limitations or other timeliness doctrines of the applicable jurisdiction at the time the Future Plaintiff first sought representation by Plaintiff Counsel for an asbestos-related personal injury claim.

6.     The CCR and Plaintiff Counsel agree that if appropriate documentation is not provided for any Future Plaintiff at the appropriate time, then that Future Plaintiff will be removed from the processing queue until such time as proper documentation is received.

7.     Provided that a Plaintiff has submitted all the required information and documentation listed herein, the CCR will generate and forward a Release to be executed by that Future Plaintiff or Legal Representative which fully releases the current CCR members from any future liability for all asbestos personal injury claims to the Future Plaintiff and any persons claiming by or through the Future Plaintiff for the Future Plaintiff's alleged injuries with certain exceptions, as described in Paragraph 8(a)-(c) below.



CONFIDENTIAL

CCRFM000402 R

- 3 -

8.   a.   Appendix 5 to the Agreement is an agreed-to release form which will be executed by all Plaintiffs alleging a Non-Malignant II condition. That Release shall release all claims with the exception of claims that meet the medical documentation requirements in the Non-Malignant I, Mesothelioma, Lung Cancer, and Other Cancer disease categories, as specified in Appendix 1 to the Agreement.

       b.   Appendix 6 to the Agreement is an agreed-to release form which will be executed by all Plaintiffs alleging a Non-Malignant I condition. That Release shall release all claims with the exception of claims that meet the medical documentation requirements in the Mesothelioma, Lung Cancer, or Other Cancer disease categories, as specified in Appendix 1 to the Agreement.

       c.   Appendix 7 to the Agreement is an agreed-to release form which will be executed by all Plaintiffs alleging a Mesothelioma, Lung Cancer, or Other Cancer that meets the medical documentation requirements as specified in Appendix 1 to the Agreement. This agreed-to release form shall also be utilized and executed by the Legal Representative for any deceased Plaintiffs alleging a Non-Malignant (I or II) claim.

9.   No payment will be made on any qualifying Future Plaintiff's case prior to the CCR's receipt of an executed Release prepared by the CCR for that Future Plaintiff. It is understood that any executed Release received by the CCR later than fourteen (14) days prior to that Future Plaintiff's scheduled payment will extend the payment date for that Future Plaintiff.



CONFIDENTIAL

CCRFM000403 R