# EXHIBIT I

482



1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

2

3  In re: Federal Mogul Global,et al.,
        Debtors.

4

  THE OFFICIAL COMMITTEE OF       Chapter 11
5  ASBESTOS CLAIMANTS and ERIC D.  Jointly Administered
  GREEN, as the LEGAL          Bankruptcy
6  REPRESENTATIVE FOR FUTURE     No.01-10578(RTL)
  ASBESTOS CLAIMANTS,

7                       Case No. 05-00059(JHR)

8          Plaintiff,

             -vs-
9

  ASBESTOS PROPERTY DAMAGE
10 COMMITTEE,

11         Defendant.

12

13     Mitchell H. Cohen United States Courthouse
      One John F. Gerry Plaza
14     Camden, New Jersey 08101
      JUNE 16, 2005

15

16  B E F O R E:     THE HONORABLE JOSEPH H. RODRIGUEZ
                  UNITED STATES DISTRICT JUDGE

17

18

19  A P P E A R A N C E S:

20  CAMPBELL & LEVINE, LLC
  BY: MARLA R. ESKIN, ESQUIRE
21     KATHLEEN J. CAMPBELL, ESQUIRE

22      -and-

23  CAPLIN & DRYSDALE, CHARTERED
  BY: ELIHU INSELBUCH, ESQUIRE
24     NATHAN D. FINCH, ESQUIRE
     DANIELLE K. GRAHAM, ESQUIRE
25      -and-

483

1

2

3  **A P P E A R A N C E S   C O N T I N U E D:**

4  YOUNG CONAWAY STARGATT & TAYLOR, LLP
   BY:  ROLIN BISSELL, ESQUIRE
5        MARIBETH L. MINELLA, ESQUIRE

6  ATTORNEYS FOR PLAINTIFFS LEGAL REPRESENTATIVE FOR
   FUTURE ASBESTOS CLAIMANTS
7

8

9  FERRY, JOSEPH & PEARCE, P.A.
   BY: THEODORE J. TACCONELLI, ESQUIRE
   LOCAL COUNSEL TO THE OFFICIAL COMMITTEE OF ASBESTOS PROPERTY
10 DAMAGE CLAIMANTS

11

   WEIL, GOTSHAL & MANGES LLP
12 BY: MICHAEL P. KESSLER, ESQUIRE
        ADAM P. STROCHAK, ESQUIRE
13      PETER M. FRIEDMAN, ESQUIRE
        KRISTIN KING BROWN, ESQUIRE
14 ATTORNEYS FOR THE DEFENDANT OFFICIAL COMMITTEE OF ASBESTOS
   PROPERTY DAMAGE CLAIMANTS

15

16

17

18

19

20

21

22

23

24
                          Theodore M. Formaroli, CSR, CRR
25                        Official Court Reporter
                          New Jersey CSR # 433

*United States District Court*
*Camden, New Jersey*

484

```
1                W I T N E S S   I N D E X

2    WITNESS

3    MARK PETERSON

4        Continued Direct Examination    Page 486
5        Cross-Examination               Page 585

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*United States District Court*
*Camden, New Jersey*

485

```
 1                        E X H I B I T S

 2      EXHIBIT                    NUMBER                    PAGE

 3

 4

 5      PLAINTIFF EXHIBIT          P-6        PAGE 558
        PLAINTIFF EXHIBIT          P-16       PAGE 564
 6      PLAINTIFF EXHIBIT          P-7        PAGE 565
        PLAINTIFF EXHIBIT          P-4        PAGE 585
 7      DEFENDANT EXHIBIT          PD-91      PAGE 653
        DEFENDANT EXHIBIT          PD-16      PAGE 670
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*United States District Court*
*Camden, New Jersey*

Peterson - Direct - Inselbuch

1        THE COURT: Be seated, please.

2        MR. INSELBUCH: Good morning, your Honor.  May we

3  proceed?

4        THE COURT:  Yes.

5  (CONTINUED DIRECT EXAMINATION OF DR. PETERSON BY MR.

6  INSELBUCH:)

7  Q.   Good morning, Dr. Peterson.

8  A.   Good morning.

9  Q.   When we recessed yesterday, we had concluded your

10  discussion of the valuation of Turner & Newall's pending

11  claims and we will turn now to your estimation and valuation

12  of Turner & Newall's liability for future claims?

13        MR. INSELBUCH: And I would ask the Court to turn to

14  Slide 26 of Plaintiff's Exhibit 4 for identification and

15  that's where we'll begin.

16  Q.   Dr. Peterson, would you state, describe to the Court how

17  you go about evaluating Turner & Newall's liability for future

18  claims?

19  A.   Well, this is the same basis as I used to value pending

20  claims.  But here, of course, the number of future claims is

21  an uncertain and unknown number, so we have to forecast it. We

22  also need to forecast year by year for each future year

23  because we have to take into account monetary inflation and

24  the year of payment in order to discount the payments back to

25  2001 to present value, so that's the only difference.

Peterson - Direct - Inselbuch

1  Q.   How did you go about doing that?

2  A.   I made forecasts separately for each of the disease

3  categories, mesothelioma, lung cancer, other cancers and

4  nonmalignant claims.  I did not forecast the unspecified

5  category because they don't get paid anyway, so I just have

6  ignored the number that might arise and get resolved as

7  unspecified.

8          I did this by first looking at the historical

9  experience, the claim filing experience for this company, also

10  looking at the claim filing experience of other companies to

11  get an understanding of trends that were -- trends and claim

12  filings that were happening generally in asbestos litigation.

13  The Turner & Newall data gave me the information about the

14  specifics for this particular defendant.  And then I also

15  looked, of course, and took into consideration many of the

16  things that were happening in asbestos litigation that I

17  described yesterday that would have impacted not only the

18  future trend in the claim values but the future trend in the

19  filings of claims, those same matters, the bankruptcies of

20  other major defendants, the termination of the Center for

21  Claims Resolution, the increased publicity and attention

22  devoted to Turner & Newall, all of those are matters that

23  would have continued and added pressures towards increasing

24  the number of claims.  So, I looked at all those.

25          And I also looked at what was happening with regard

Peterson - Direct - Inselbuch

1  to claim filings against other defendants in 2002, three and

2  four because this provides me with information, a sanity check

3  really is what I'm doing. So, I looked at all those.  But I

4  started with a claims data base of claim filings, which is

5  shown on the next slide here.

6  Q.  Can you describe to the Court what Slide 27 and Slide 28

7  are?

8  A.  They're both drawn from the Turner & Newall asbestos

9  claims database. Slide 27 represents the number of claims

10  filed in each year. There are several different variables to

11  speak to when a claim is filed in the Center for Claims

12  Resolution data, which is the predominant source of

13  information.  One was the date of filing, which is meant to be

14  the date a complaint was filed.  The second is the date the

15  claim was received by the Center for Claims Resolution on

16  behalf of Turner & Newall.  The third is the service date.

17      And we took the earliest of those three dates and

18  used that as the basis for calculating when claims were filed

19  against Turner & Newall. In part because there was a -- the

20  Georgine class action that was described in Mr. Hanly's

21  testimony, this disrupted claim filings.  As he commented,

22  there was a stay in claims during that period in time, so

23  claims were not being received by Turner & Newall or other CCR

24  members, but they were being filed, they were being filed

25  against other co-defendants, and so on, so we used that in

──────Peterson - Direct - Inselbuch──────

1   order to smooth out and get a better representation of when

2   these claims were arising.

3         If you'll note on Figure 27, there are of the 381,000

4   claims that were filed, 36,800 of them did not have a

5   specified disease, and so the difference between Tables 27 and

6   28 is we allocated imputed diseases for most, but not all, of

7   these unspecified diseases because over time Turner & Newall

8   would learn about what the disease was.  And as I described

9   yesterday, we used the actual experience that Turner & Newall

10  had in determining diseases from claims that were unspecified

11  and used that as a basis to spread these across the other

12  disease categories, but we kept 10,565 claims in the

13  unspecified disease category, again, as I described yesterday,

14  representing our expectation of the numbers of claims both

15  pending and future that would be resolved without payment in

16  this unspecified disease category.

17        I should also note that the total claims, 381,000, in

18  both of these slides is the actual number of claims through

19  2001.  It's only nine months.  But we show here annualized

20  filing rate for 2001 what would have been the total number of

21  claims received in 2001 if during the last three months claims

22  came in at the same rate that they did for the first 9 months.

23  And that's a step that just makes it easier to do the -- to

24  represent what the actual trends in claim filings here were

25  and it gets involved in my calculation of historic claim

————Peterson - Direct - Inselbuch————

1  filing rates.

2  Q.   Starting with the historic filings as reallocated as

3  you've shown on Table or Slide 28, what did you next do to

4  estimate the future number of claims that Turner & Newall

5  would see?

6  A.   Well, I mean, I examined this data, first of all, which

7  confirmed that, indeed, trends were going up with regard to

8  claim filings.  And in the most recent year, 2001, there was a

9  particular spike in nonmalignant claims.

10        The next steps with regard to forecasting are

11  described on Slide 29. Essentially, we used -- we started

12  forecasting the mesothelioma lung cancer and other cancer

13  incidents.  We have good data about what is the expected

14  incidence of those diseases in the population of persons who

15  are exposed to asbestos, how many mesotheliomas will occur in

16  the exposed population year by year.  The same for lung cancer

17  and other cancer. I'll provide more description of that in a

18  moment.

19        But we then, having that good and confirmed medical

20  research forecasting incidence both in the past and the

21  future, the number of deaths from each of those cancers

22  resulting from asbestos exposures, we compared those past --

23  in past years we compared the number of occurrences of

24  mesothelioma in a year to the number of claims filed against

25  Turner & Newall in that same year. The number of occurrences

491

Peterson - Direct - Inselbuch

1   represent the potential, how many claims might have been filed

2   against this company.  The actual claims, of course, represent

3   the actual experience of filings.  And so by comparing the

4   two, by dividing the number of claims by the incidence, we can

5   calculate a rate of claiming.  And that rate of claiming was

6   first called the propensity to sue in some of the earliest

7   work using this method in the early nineteen-eighties, and so

8   we've continued to use that term.

9            I can then, having determined what the past

10  propensity to sue is, I both look at the present levels, what

11  was the rate of claiming at the time that Turner & Newall

12  entered bankruptcy, as well as what were the trends in that

13  because you need those, both parameters are important.  We

14  would expect that the claiming in the future would be at

15  about -- begin at about the rate we've seen in the most recent

16  time, but to the degree that that has been increasing or

17  decreasing, it's -- the first kind of assumption is, well, it

18  will probably continue in the past trends that we've seen.

19  That's an assumption that I made, that's an assumption that

20  two of the other three experts that have provided opinions in

21  this case also made.

22           To forecast nonmalignant claims, we don't have they

23  same epidemiological information about the occurrences of

24  cancers. There is no similar peer reviewed epidemiological

25  study like the one I use for cancers that provides that

492

Peterson - Direct - Inselbuch

1    information of occurrences of nonmalignant diseases.  To

2    forecast nonmalignant diseases, I've used what's become the

3    standard method I think among most forecasters, I looked at

4    what's been the historic relationship between the number of

5    nonmalignant claims filed annually against Turner to the

6    number of cancer claims.  And we observed that's a fairly

7    stable relationship and we assume that stability will continue

8    in the future.  So essentially, just like I hang values for

9    other disease off the mesothelioma values I described

10   yesterday, here I hang the forecast of nonmalignant claims off

11   of the forecast for cancer claims, again looking at the

12   historic relationship between those, as I did in the values,

13   to forecast the future.

14   Q.   With that by way of background, can you describe to the

15   Court how you began?

16   A.   Well, to further examine what was the history, I looked

17   at the empirical data on past experience graphing it, which is

18   shown on Figure 30, and that demonstrates that for each of

19   these cancers, there was considerable increase in the number

20   of cancer claims in the last two years preceding the

21   bankruptcy.  So this leads to the expectation -- and I

22   understand somewhat why that happens.  As I described

23   yesterday, the bankruptcies by other defendants contributed to

24   filings against Turner & Newall in 2000/2001 until it itself

25   filed for bankruptcy, as well as for cancers, the increased

————Peterson - Direct - Inselbuch————

1    advertising.

2         I didn't describe that yesterday, but one of the

3    things that's happened in recent years is the plaintiffs'

4    lawyers have substantially increased their advertising to gain

5    representation of asbestos-related cancer victims and in

6    particular on the internet. That's a very widely used

7    advertising means now that, frankly, didn't exist ten years

8    ago. In fact, if you log on to Google, you Google the word

9    "mesothelioma," almost all the hits you see are references to

10   plaintiffs' lawyers who are paid to be called up by the Google

11   search.  That's how Google makes its money.  And that's, I

12   think, a powerful and effective way for them to get claims, as

13   well as the fact that there are whole new law firms springing

14   up that just concentrate on cancer claims.  So, those are

15   trends that effect all defendants, and that's what's going on

16   here.

17         I want to make one comment about the spike that

18   occurred in the mid nineteen-eighties. That occurred because

19   of the entrance of Turner & Newall in the Center for Claims

20   Resolution and in the Asbestos Claims Facility. According to

21   the procedures that obtained at that time in both of those

22   organizations, all of the members of those organizations

23   shared liability whether or not they were named defendants, as

24   Mr. Hanly described that changed, he described in the later

25   years each member of the Center for Claims Resolution is only

Peterson - Direct - Inselbuch

1   responsible for claims in which it was a named defendant.

2   Early on they didn't have that rule, everyone contributed to

3   every claim.

4        So as a result, at that point in time, Turner &

5   Newall essentially accepted and got liabilities for claims of

6   all members, including claims that had been filed in the past

7   before those entities are formed, so that's why you see the

8   spike in the mid eighties.  But ignoring that trend, that

9   artificial -- ignoring that artificial spike in the early

10  eighties, there is clearly a sharp increase in the number of

11  filings, particularly in most recent years.

12       And so then I took those trends and compared them

13  with the epidemiological forecasts.

14  Q.  And from where do you get the epidemiological forecast?

15  A.  There is only one peer reviewed medical study that

16  provides the kind of information necessary to do this

17  forecasting, it's a study by Doctors Nicholson, Perkel and

18  Selikoff, who are the primary researchers really in this area

19  working at Mount Sinai.  Dr. Selikoff is the dean of this

20  work.  And in 1981 and then in 1982, they published a report

21  in which they looked at all of the workers, counted all

22  workers that are working in the major asbestos-exposed

23  industries, made estimates of the relative amount of asbestos

24  fibers that they were exposed to, looked at turnover in the

25  labor populations in each of those industries, and then

—————————Peterson - Direct - Inselbuch—————————

1   applied rates of development of medical disease, of cancers,

2   in order to forecast future claims.

3        And the results of that work is shown on Exhibit 31

4   where they forecast for all years from 1970 through the year

5   2030 the number of persons who would die each year from

6   asbestos-related lung cancer and asbestos-related meso or

7   another cancer, again the three categories of interest,

8   cancers that I need for forecasting claims. This is both the

9   only peer reviewed study of this nature and also it's the most

10  widely used epidemiological study both in litigation and

11  within the medical community, and also it's been confirmed

12  impressively, I'll show that in a moment.  Again these are

13  forecasts.  It's like my forecasts are scientific predictions,

14  these are forecasts of their scientific predictions.  And

15  we've been able to test how -- and they were made in 1982, so

16  we've had 20 years to see how good these are.

17        MR. INSELBUCH:  The Nicholson article to which Dr.

18  Peterson referred is already in evidence, your Honor, it's

19  Plaintiff's Exhibit 5, and it was admitted during the

20  testimony of Dr. Welch.

21  BY MR. INSELBUCH:

22  Q.  Would you describe to the Court what Slide 31 shows?

23  A.  These show the annual deaths from asbestos-related lung

24  cancers for each of these years, which is the blue dotted line

25  for asbestos-related Mesotheliomas.  Indeed, mesothelioma --

496

—————Peterson - Direct - Inselbuch—————

1   the only known cause of mesothelioma is asbestos exposure.

2   And the green dotted line is annual deaths from asbestos

3   exposure for a series of cancers that are related to the

4   gastrointestinal track, from the larynx down to the colon, all

5   of which there is evidence of, although to some degree

6   contested in, as Dr. Welch testified, all of which there's

7   evidence suggesting and indicating that those are caused by

8   exposure to asbestos.  And, indeed, the researchers at Mt.

9   Sinai believed and believe today, in my most recent

10  conversations with them, that those diseases can be caused by

11  asbestos exposure.

12  Q.   You told the Court that there was a way over the 20 years

13  to see whether the Nicholson projections were proved out in

14  the real world.

15  A.   Yes.

16  Q.   How did you go about doing that?

17  A.   This was discussed during Dr. Welch's testimony, that the

18  National Cancer Institute Surveillance of Epidemiology and End

19  Results provides data estimates really of the annual number of

20  deaths for every kind of cancer.  Essentially, the SEER

21  program monitors the occurrences and results of cancer in 13

22  locations, 13 sites around the country, the State of Iowa is a

23  site, Los Angeles, Long Beach is a site, Honolulu is a site.

24  There are 13 around the country that are chosen to be

25  reasonably representative of the demographics of the nation as

Peterson - Direct - Inselbuch

1   a whole.  And they count the number of people that get and die

2   from each of the asbestos -- from each kind of cancer

3   irrespective of asbestos exposures, they count all cancers.

4        One of the cancers they count is the mesothelioma.  And

5   so from those 13 sites, you can estimate what's the total

6   occurrence, the total deaths of mesothelioma in the country as

7   a whole.  And by using the rates from the 13 sites, to

8   multiply them to the country as a whole, essentially adjusting

9   for ages of each of these groups, and so that provides an

10  estimate for every cancer.  But mesothelioma, one, is relevant

11  here because we can't make a comparison between Nicholson's

12  projections and the SEER counts for lung cancer, for example,

13  because lung cancer is caused by other matters and other

14  toxins than asbestos, primarily smoking.  So there will be

15  many more lung cancer deaths in this country than Nicholson

16  forecasts for that are asbestos-related, but for mesothelioma

17  the only known cause is asbestos.

18       So you can compare that and see how well Nicholson's

19  forecasts of annual Mesotheliomas death compare to the

20  estimates that were derived from SEER.  And that's shown on

21  Table 32 where the red line is the forecast and the blue line

22  is the SEER count.  And this is a standard way to test

23  projections.  You would look at, to the degree you can look

24  into the future, the data for the period of time of the

25  projection you compare it with counts.  And the test is how

——— Peterson - Direct - Inselbuch ———

1   well does the forecast essentially fit within the range.  And

2   you're going to get a range of numbers for any data, like

3   SEER.  How well does it seem to kind of hit the midpoint over

4   time?  Is it a good estimate?  Does it provide a good general

5   estimate of the trends you see?

6       You could tell the difference between forecasts, which

7   are smooth lines, and data, which are always bouncy or

8   irregular.  Data is messy, it has discontinuities to it in

9   part because there's a certain randomness to the occurrence of

10  Mesotheliomas in part because its just based on 13 sites which

11  will project -- and if we count the country as a whole so

12  there probably will be smoother data.  And here we've seen

13  that, as in the year 1982 when the forecasts were made, this

14  is an impressive confirmation of the forecasts.  Forecasts

15  aren't particularly good 20 years out, but here Nicholson's

16  forecast is almost dead on in the midpoint of these, of the

17  data, the best data that we have available over time.

18      Let me make a couple of comments about that.  In recent

19  years, the last couple years the SEER count is a bit lower,

20  but you can't draw any conclusions from that.  And to

21  illustrate that, if you look around just before 1990, the SEER

22  counts were, again, lower for a series of years compared to

23  Nicholson.  Some people were asserting at that point in time

24  that Nicholson had overestimated the mesothelioma deaths based

25  on the experience in those several years.  Well, as you can

Peterson - Direct - Inselbuch

1    see, this demonstrates that, no, he nailed it, he hit it very

2    well.  And so you can't draw conclusions from a year or two of

3    experience.  You can't draw conclusions from the fact that in

4    1993 or something the point was higher, the SEER count was

5    higher, that's just randomness in the data, what's important

6    is the general pattern.

7    Q.    Starting then with the Nicholson projections, did you

8    then consider the propensity to sue Turner & Newall for cancer

9    claims?

10   A.    Yes.  And Figure 13 illustrates what that calculation is.

11   Q.    You said 13.

12   A.    33.  Excuse me.

13   Q.    Sorry.

14   A.    This just takes both of these curves, the claim filings

15   against Turner & Newall for mesothelioma and the Nicholson

16   forecasts for mesothelioma, from the period 1990 through 2001.

17   Over that period of time, the forecast of mesothelioma deaths

18   was increasing but slowly.  The number of mesothelioma claims

19   against Nicholson -- against Turner & Newall were increasing

20   over that period of time but remained perhaps 40 percent of

21   the mesothelioma deaths.  So Turner & Newall, even in the most

22   recent years, was getting a relatively small portion.  The

23   Manville Trust experience in the most recent years, it's

24   getting 90 percent of the forecasts of mesothelioma deaths,

25   deaths that Nicholson has.  So there's room for increase here.

—Peterson - Direct - Inselbuch—

1    Let me also comment, this calculation, this is how I

2  calculate propensities to sue, I divide the blue line in

3  2000/2001 by the red line.  The red line represents deaths.

4  Blue line represents claims.  One or two other forecasters

5  have made, commented on the fact that those are two different

6  metrics.  It doesn't make any difference that one is deaths

7  and one is claims because among the deaths that occur for all

8  of the asbestos-related cancers, the most deaths occur in the

9  year of filing.  And if you look at how many deaths occurred

10  before and after, it's relatively close.  There are about as

11  many before as after.  Typically, there are somewhat more

12  deaths that occur before than after, but it differs somewhat

13  from disease to disease.  So if you total up all the deaths

14  across all the years, you end up with effectively the same

15  number of -- and just count deaths, you get the same number

16  of -- the number as claim filings because they're centered and

17  relatively symmetrical around the year of filing.

18    And I've tested this.  I've tested this in other cases.

19  I've looked at this again and again in order to make sure that

20  there isn't some bias that occurs by using these methods.

21  I've tested it in this case and I've provided some discussion

22  of this in my rebuttal report in this case.  If one wants, you

23  can convert the Nicholson filings, Nicholson deaths to claim

24  filings based upon the experience what's the relationship

25  between the distribution of deaths compared to distribution of

501

————Peterson - Direct - Inselbuch————

1    filings.  You can convert the Nicholson filings into claims

2    filings and you get almost exactly the same forecast.

3         Unfortunately, you can't simply count the deaths that

4    occur within the claims filed against Turner & Newall for a

5    couple reasons.  One is that there are some people that have

6    already filed claims for mesothelioma against Turner & Newall

7    as of 2001 that had not yet died.  Some people die after they

8    file claims.  If you use a death year rather than a filing

9    year, you're excluding some claims and you're lowering your

10   forecast.  Conversely, there are people who died before

11   October 2001 from mesothelioma, many people who would have

12   subsequently filed a lawsuit against Turner & Newall but were

13   barred because of the filing of the bankruptcy and the stay.

14   So those are deaths that already occurred and they would need

15   to be considered in trying to do a calculation if you're using

16   death for the filing year.  But we don't know who those

17   persons are because they have not come forward, they have not

18   filed claims, they cannot be included in the database.  So you

19   can't really do an effective forecast of comparing the deaths

20   as are recorded in Turner & Newall's database with the deaths

21   that are recorded by Nicholson.  So it produces it produces a

22   low bias unless you try and estimate how many people who have

23   already died will file claims in the future but if you do

24   that, then you have to make a forecast which becomes an

25   assumption for your forecast and it becomes a circular

─────Peterson - Direct - Inselbuch─────

1   exercise.  So for that reason, there's no reason to be

2   concerned about the difference between, ones called filing

3   year, one is called death year, it doesn't make any difference

4   if we had converted either of these things, you get the same

5   results.

6   Q.   Having compared these two curves and having explained

7   that the propensity to sue you would measure in each year by

8   dividing one by the other, what were the next steps you took

9   in forecasting the future for Turner & Newall?

10  A.   Well, the next step is to estimate what would be the

11  future propensity to sue.  Because as we've seen, Nicholson

12  makes forecasts of asbestos-related mesothelioma, lung cancer,

13  and other cancers up to the year 2030.  There are other

14  forecasts that are made.  The most notable one was done by

15  KPMG Peat Marwick in the National Gypsum bankruptcy in 1992

16  that applied the Nicholson method and they've made some

17  changes in it.  It's a reasonable forecast.  The SEER data as

18  well, they forecast to the year 2050.  So we can use the KPMG,

19  the trends in the KPMG forecast to extend Nicholson out

20  further years.  Nicholson just cut off his forecast in 2030

21  because, for whatever reason, but he cut it off when there was

22  still a substantial number of deaths, for instance, cancer.

23  So there would be -- and Nicholson acknowledge there would be

24  deaths in future years and we extend that out.

25          MR. STROCHAK: I'm having difficulty hearing the

503

Peterson - Direct - Inselbuch

1  witness.

2       THE WITNESS:  I'll try to speak up.

3       So what we do for each future year, we now forecast up

4  to the year 2040.  We have a medical epidemiological forecast

5  of the number of people who will die for each of the cancers,

6  we've calculated historic propensities to sue and trends of

7  propensities to sue.  So they then -- and that's reflected on

8  the top calculation in number of claims divided by incidence

9  is propensity to sue.  To project into the future, we now take

10 our calculation of the propensity to sue, multiply it by the

11 incidence in order to estimate what will be the number of

12 claims occurring in the future years.  So, essentially, it's

13 just reversing the calculation given that we know the

14 incidence of diseases and now we have an estimate of the -- we

15 have a calculation of the past claiming rate and we're going

16 to estimate it two different ways as I'll describe.  The

17 future, we can calculate what it's likely rate of claim will

18 be in the future, both the Turner & Newall past experience as

19 well as the trends that are going on.

20 Q.  Could you describe to the Court how you went about then

21 projecting the propensity to sue for Turner & Newall for the

22 future?

23 A.  Well, we made two alternative calculations of the future

24 propensity to sue and they're illustrated on Table 35, Graphic

25 35.  There are four lines -- there are five actually.  The red

United States District Court
Camden, New Jersey

————Peterson - Direct - Inselbuch————

1   line is the Nicholson incidence forecast extended to 2040, as

2   I described.  The blue line proceeding the -- the vertical

3   line in the black simply represents the timing of the

4   bankruptcy.  And for that the blue line is the number of

5   mesothelioma claims filed annually against Turner & Newall.

6   We have two alternative forecasts.  The green line represents

7   what would be the future number of claims filed against Turner

8   & Newall simply based upon the 2000 and 2001 propensities to

9   sue against Turner & Newall with no increase -- no decrease in

10  the propensities to sue in the 21 months prior to the

11  bankruptcy.  The purple line is an increase in propensity to

12  sue where we forecast that the rate of claiming against Turner

13  & Newall would continue on as it has in the past years for a

14  longer period of time.  And that -- so we gradually increased

15  the propensities to sue from the year 2002 through 2005, I

16  believe it is, or 2006, and then at that point we then just

17  leave the propensity to sue alone.  And the claims begin to

18  drop off under both of those two forecasts simply because of

19  mesothelioma incidence figures are going down.

20        And we increase -- the increase in the propensity to

21  sue is based upon, one, the fact that this has been happening

22  against Turner & Newall prior to its bankruptcy, even before

23  the 2000 and 2001 filings had occurred, bankruptcy filings had

24  occurred that affected claiming against them.  It's based upon

25  the assumption that once Turner & Newall had left the CCR,

———Peterson - Direct - Inselbuch———

1    we'd get many more claims because it lost the protection, the

2    low visibility the Center For Claims Resolution provided, it

3    would get more claims because now it's really the target

4    defendant because of its terrible corporate history in a world

5    in which all of the other asbestos defendants were in

6    bankruptcy.  So plaintiffs lawyers would begin to look more

7    and more to Turner & Newall to compensate and make up for the

8    loss of compensation.  So for all these reasons, it's my

9    preference, and I think it's more likely probability, that the

10   propensity to sue would increase.

11        Now, will the increase by precisely the number, the

12   rate I've got here?  No, of course not.  I mean, the one thing

13   I can assure you is I will not be precisely right in my

14   forecast.  Forecasting is a process of error.  So it may go up

15   faster or slower than this.  And, indeed, if we look at what's

16   happening to other defendants at this point in time in 2003,

17   2004, other defendants who were in the CCR and left, it

18   suggests that I've underestimated the rate of increase.  But I

19   think between the two of those, the increase in propensity to

20   sue is more plausible.  So I present both to the Court, and I

21   provide forecasts using both models so that the Court can, if

22   the Court doesn't agree with my assumptions, you will know

23   what I would forecast to be the future liability assuming that

24   the rates of claim in the past were the same.

25   Q.   You told the Court that you looked at data from periods



——Peterson - Direct - Inselbuch——

1    after 2000 and 2001 from other sources to provide essentially

2    a sanity check for your assumption or conclusion that the

3    propensity to sue would increase.  Can you describe for the

4    Court what those sources were?

5    A.    Well, I have stated, for some other defendants who remain

6    in bankruptcy, remain in the tort litigation and filed

7    bankruptcy subsequent to 2001, and I have data, I looked at

8    liability, which showed increases in the claims filed against

9    them, none of those defendants are particularly similar to

10   Turner & Newall.  I've data from the asbestos trust, primarily

11   the Manville trust for their claim experience, and I've also

12   looked at -- I tried to obtain information from the financial

13   reports of former CCR members.  And only one of which provides

14   the kind of data that's useful is Union Carbide.

15        So I looked at the annual claim files against Union

16   Carbide, which is a CCR -- it left CCR.  It continues in tort

17   litigation and it reports it's annual number of claim filings.

18   It doesn't do it by disease, but provides annual numbers of

19   claim filings across all diseases in its financial statements.

20   Q.    What did you observe there?

21   A.    Well, I observed -- first, let me know note that Union

22   Carbide had a lower share of CCR liability than Turner &

23   Newall.  We've learned that Turner & Newall was one of, held

24   one of the three board memberships of CCR, which were held by

25   the three companies with the largest liability, largest share.

*United States District Court*
*Camden, New Jersey*

507

——Peterson - Direct - Inselbuch——

1   Turner & Newall is one of, was the third largest of the CCR

2   members.  Union Carbide was not among the top three, so it was

3   a lower share of CCR.  In 2001, the year that Turner & Newall

4   filed bankruptcy, Union Carbide received 73,000 claims.

5   During the 44 months before it went into bankruptcy, Turner &

6   Newall received 9,000, which we've estimated is approximately

7   60,000 if the year had gone on.  This suggests that perhaps my

8   filling in the last three months was conservative, that Turner

9   & Newall might have received claims at a higher rate during

10   the last three months than it did before but, whatever, 60 and

11   70 thousand is fairly close.

12       When we look at the filings in 2002 and 2003 for Union

13   Carbide, in each year they received 122,000 claims.  Now, I

14   don't -- and then in 2004 they received 58,000 claims.  And I

15   understand why they got fewer claims in 2004 than they did in

16   2002 and 2003, but in all four of those years the actual

17   claims experience from Union Carbide, which had a lower share

18   of CCR than Turner & Newall did, was far in excess of my

19   forecast.  In 2002 and 2003 I'm forecasting respectively

20   40,000 and 45,000 will be filed for the sue models for Turner

21   & Newall.  So Union Carbide was getting approximately three

22   times as many claims in those three years than I forecast for

23   Turner & Newall.  In 2004, I forecast that there would be

24   51,000 claims against Turner & Newall.  Even with the

25   substantial drop off in the number of claim filings against

Peterson - Direct - Inselbuch

1   Union Carbide in 2004, it's still well above what I forecast

2   for Turner & Newall in that year.

3       So these results do two things, one they give me

4   confidence that both of my models, and particularly the

5   increasing model, do not overestimate Turner & Newall's

6   liability and they suggest, again, that, once again, my track

7   record will be relatively unsullied, that I probably

8   underestimated Turner & Newall's liability, at least for this

9   period of time.

10      MR. FRIEDMAN: Your Honor, excuse me.  I don't believe

11  that Dr. Peterson's analysis of Union Carbide was contained in

12  any of his three reports in this case.  I think what he's

13  offering is anticipatory rebuttal testimony as to what he

14  thinks Dr. Cantor might testify to.  If I'm incorrect it being

15  in reports, just tell me.

16      MR. FINCH: Is it in his reports.  He states he's

17  reviewed the Union Carbide financial statements.  And in

18  response to questions at the deposition he mentioned Union

19  Carbide and its experience post-2001 in one of his answers,

20  which I can cite the Court to if you would like.

21      MR. STROCHAK: I'll be happy to look at it when I can

22  find it in a moment.  I do think it's in the nature of

23  rebuttal, your Honor, and if your Honor would keep it in mind

24  for that.  Thank you.

25      THE COURT:  All right.

Peterson - Direct - Inselbuch

1    MR. INSELBUCH: May I proceed?

2    THE COURT:  Yes, you may.

3  BY MR. INSELBUCH:

4  Q.   You mentioned you told the Court that there was a drop

5  off in 2004 in the claims against Union Carbide.  Had Turner &

6  Newall remained in the tort system, would you have expected a

7  drop off in claims filing against Turner & Newall as well in

8  2004?

9  A.   I would have expected -- two responses to that.  Knowing

10  what I know now, yes, I would have expected in 2004 the claims

11  would have, knowing what I know now from Union Carbide, I

12  probably would have had a bigger rate of increase.  But

13  whatever level I would have forecast to 2002 and 2003 would

14  have expected -- there would have been a reduction in the

15  claims filed against Turner & Newall in 2004, but I would have

16  expected that in 2005 or 2006 there would have been a rebound

17  which would have made up many or most of the claims that

18  weren't filed in 2004.

19    It's a timing issue.  And it's a timing issue that

20  arises because of the legislation that's being considered by

21  the United States Senate.  The United States Senate began to

22  seriously consider passing legislation that would terminate

23  asbestos litigation and substitute a national fund

24  legislation.  That's still being considered.  That recently

25  passed the Senate judiciary committee.  And that's really the

──────Peterson - Direct - Inselbuch──────

1    most serious consideration of asbestos legislation I think

2    ever, certainly within the last 15 years or so.

3        The consideration and the possibility that this

4    legislation might pass had a dampening effect upon asbestos

5    litigation.  It did a number of things.  One, it reduced the

6    amount of settlements that defendants had reached.  The

7    defendants who were in tort litigation report in their

8    financial statement that they settled fewer claims in 2004,

9    paid fewer claims in 2004 and the latter part of 2003 than

10   they had in the prior couple years and paid less money in

11   indemnity payments.

12       And there were a couple reason for them doing so.  One

13   is that the share that a company would have to contribute to

14   the national fund, should the legislation pass, is based upon,

15   in part, by how much they paid in the past.  So if they paid

16   more, if they continue to pay money to these asbestos victims,

17   they may get kicked up into a higher strata of having to

18   contribute to the fund.

19       The second is that whatever settlement -- if the

20   legislation passes and those claims, and a claim is pending

21   against Union Carbide, Union Carbide would be free of

22   obligation, it wouldn't have to pay that claim.  And so -- but

23   if they paid and settled that claim in 2004, they would get no

24   reduction in what they'd have to pay in the future, so

25   essentially they're wasting money.  It's a cold way to look at

511

Peterson - Direct - Inselbuch

1   it, but from the financial perspective of the company,

2   payments that it had to make to asbestos claimants in 2003,

3   2004, this year, may be unnecessary if they're going to be

4   freed of that obligation by the fund.  And so insurance

5   companies -- the same consideration for insurance companies.

6   The insurance companies and asbestos defendants have tried not

7   to settle claims.  Now they have to settle some because trials

8   continue, of course, and they face trial pressures, but they

9   greatly reduced the amount they paid.

10       In turn, the plaintiff's bar has substantially reduced,

11   perhaps almost totally eliminated, substantially reduced their

12   efforts in obtaining new representation of asbestos

13   defendants.  They quit advertising to some degree.  They quit

14   the, what's been called the screening programs that generate

15   non-malignant claims because those are expensive propositions

16   for them.  Perhaps one thing I've learned more clearly than

17   anything else in 25 years of working in this area is there are

18   few human beings cheaper than plaintiff's lawyers.  If they

19   don't have to spend money, they won't.  Here if they spend

20   this money on advertising or recruiting claims, they're not

21   sure they'll get a return on it if the legislation passes so

22   claim filings are down.  Particularly for the non-malignant,

23   claim filings are down, claim settlements are down.

24       The one thing that may not have dropped down, and

25   there's evidence of this -- that seems not to have dropped

United States District Court
Camden, New Jersey

512

—————Peterson - Direct - Inselbuch—————

1  down is evidence of this from the Manville trust experience,

2  is that filings for Mesotheliomas and cancers actually have

3  continued to increase.  I think the reason why there's this

4  difference between an increasing number of cancer claims and a

5  reduction in the non-malignant claims is because the statutes

6  of limitations are triggered by a diagnosis of mesothelioma or

7  lung cancer that's attributed to asbestos.  So these claims

8  have to be filed whereas the non-malignant generally don't

9  arise by a particular diagnosis, and those are insidious

10  diseases that can be diagnosed at any point in time.  You're

11  getting it.  It's evolving.  It progresses.  So if these

12  claims haven't been screened or haven't been reviewed by a

13  doctor, they're less likely to have a diagnosis that's going

14  to trigger the statutes.  So I think that's why you see these

15  differences.

16      This observation, my comments about what's happened

17  that attributes to this reduction in claim filings to the

18  statute, pendency of the statute has been recognized broadly.

19  Manville trust has recognized it in their filings with Judge

20  Weinstein and Judge Lifland.

21  Q.   Then am I correct that Slide 35 in effect graphically

22  represents your projection or forecast of mesothelioma claims

23  that will be filed against Turner & Newall, actually two

24  forecasts from 2001 into 2040?

25  A.   Those are my forecasts and my forecasts I presented to

Peterson - Direct - Inselbuch

1    the Court.

2    Q.   How did you go about forecasting other malignant claims?

3    A.   It is precisely the same kind of calculation, you

4    calculate propensities to sue.  And we did the same -- and had

5    two alternative models, increase in propensity to sue we

6    forecast will occur is one model and the second model is a

7    propensity to sue will remain unchanged from the levels in

8    2000, 2001.  I could have presented those graphics and they

9    would have looked almost identical to this graphic.

10   Q.   How did you go about forecasting the projection of

11   non-malignant claims?

12   A.   I mentioned that briefly before, because there is no

13   similar epidemiological available period or epidemiological

14   study by Nicholson, we looked to historic claims experience

15   and found there was a fairly -- this is a pattern we see with

16   all defendants, that there's a fair stability in the ratio of

17   the number of cancer to non-cancer claims, which is shown on

18   Exhibit 36.  And here the red line indicates that annual

19   number of filings of non-malignant claims against Turner &

20   Newall, the blue line is the annual number of claims of

21   cancer.  These are put on different scales because there's so

22   many more non-malignant claims, you couldn't see the trend if

23   they were on the same scale.  It doesn't distort anything,

24   this is a way of looking at what the trends are.  And,

25   essentially, it's a way of kind of looking at the

514

1    non-malignant number.

2        Each point of a non-malignant curve represents about

3    nine or ten, as many claims as cancers.  When you do this, you

4    see that since 1995, even, indeed, since 1992, there's a fair

5    correspondence in the number of non-malignant to cancer claims

6    where the ratios are reflected by these different scales.

7    Prior to 1992 or so, there were relatively fewer non-malignant

8    claims.  So what's happened in the early '90's?  The number of

9    non-malignant claims relevant to cancers increased.  There

10   were -- there was an increase in the number of non-malignant

11   claims at that point in time, but then it stabilized pretty

12   much since then with the exception of 2001.  2001 there's a

13   sharp departure, there are many more non-malignant claims

14   relative to cancers filed in 2001 than there were in prior

15   years.  Because of that one -- so I used this data essentially

16   to establish the ratio.  So in each future year I have

17   calculated the number of cancers that forecast will be filed

18   against Turner & Newall in that year.

19       I then looked to the data that are represented on this

20   chart and looked at what's the past ratio of cancers to

21   non-malignant claims.  And I used that ratio, multiplied that

22   ratio times the number of cancers that I forecast in the year

23   in order to estimate the number of nonmalignants that will be

24   filed.  But in calculating that ratio, I used only the year

25   2000, there were a lot of claims filed in 2000 and I used that

515

1    year.  Typically, I would have used the last two years, 2000

2    and 2001, but the number, the relative number of non-malignant

3    claims is so much greater in 2001, I have no confidence that

4    that's going to be true in the future years.  So I calculate

5    this only on the year 2000.

6         I've done sensitivity analyses where I use both years.

7    And, indeed, I've done sensitivity analysis, alternative

8    forecasts where I calculated the ratio from 1999, 2000, and

9    2001.  But my purposes here, and the ratio for 2000 is

10   essentially representative of what was from -- every year from

11   1992 on.

12   Q.   Based upon these ratios, did you do a projection of

13   filings for non-malignant claims from 2002 to 2040 for Turner

14   & Newall?

15   A.   Yes, I did.  And that's shown graphically on Page 37,

16   Slide 37.  It's the top pair of lines.  Where again, before

17   the bankruptcy, the number of non-malignant claims against

18   Turner & Newall are shown as the blue line.  My forecast is

19   the purple line.  And the cancer filings are also shown here

20   as the red line.  My forecast of cancer filings is shown as

21   the green line.  This particular slide represents the forecast

22   for my increasing propensities to sue.

23        The non-malignant claims increased between 2000 and

24   2006 for two reasons.  One because the cancers have been

25   increased, so just -- the cancers increase so the

516

Peterson - Direct - Inselbuch

1  non-malignants would increase because there are multiples of

2  about, I think eight or nine to one, so they'll increase, too.

3  But also is it data that we use to derive our rates of

4  increase in the propensities to sue was drawn from experience

5  of the Manville trust and the UNR trust during the late 1990s.

6  It's a conservative estimate of the rates of increase.  And

7  they observed that this ratio for them, the ratio between

8  non-malignant and cancer claims, I call it the non-malignant

9  multiplier, the non-malignant multiplier had itself increased

10 about 11 percent in that period of time.  So I assume that

11 between 2002 and 2006, the ratio would have increased.  You

12 just multiply it times 1.11 and by 2006 it gets to that point.

13       Also, I need to point out that my forecast,

14 particularly for non-malignant claims in 2002, is well below

15 the actual experience in 2001 the actual filings, the annual

16 actual filings.  So even though I have an increasing

17 propensity to sue model here for the non-malignant claims,

18 there's only one year, 2006, when I forecast more

19 non-malignant claims will be filed against Turner & Newall

20 than they actually received in 2001.

21 Q.   Did you make an alternative forecast assuming that there

22 would be no increase in the propensity to sue for

23 non-malignant claims?

24 A.   Yes, I did.  That's Slide 38.  And that now both the

25 cancers and the non-malignant claims are at their highest in

United States District Court
Camden, New Jersey

———Peterson - Direct - Inselbuch———

1   2002 and go down progressively.  It's harder to see for the

2   green line because it's relatively flat, but it actually is

3   increased.  That's the total for all cancers.  But you can see

4   it quite sharply for the non-malignant claims.  And that

5   assumption with no increase in propensity to sue represents a

6   complete turnaround in trends for Turner & Newall claim

7   filings for non-malignant claims have been increasing steadily

8   throughout most of the 1990s, this assumption assumes they

9   would go down sharply.  It's an assumption for non-malignants

10  that's consistent with assertions by some people that the

11  environment for non-malignants may be changing.  So it's a way

12  to quantify it to the degree that there's credibility to those

13  assertions, but I have quantified it here.

14        Again, for the cancer claims, based upon the concurrent

15  experience that we're observing with other defendants, and for

16  all the reasons I've described repeatedly to the Court, I have

17  great confidence that the number of cancer claims against

18  Turner & Newall would have increased after 2001.  The number

19  of non-malignant claims I've less confidence about that, I

20  think either model is plausible, it just depends upon what

21  assumptions one makes about how the litigation environment

22  would change.  I think at least for the years 2002 and 2003,

23  that the increasing model for non-malignants is the better

24  model because it's consistent what we've seen with other

25  defendants what's going to happen after that probably both are



United States District Court
Camden, New Jersey

518

Peterson - Direct - Inselbuch

1    plausible models.

2    Q.   Did you convert these graphics to tabular form?

3    A.   Yes, I've summed my -- I've provided sums for the total

4    number of claims for each of these diseases across all future

5    years, and that's shown on Slide 39, where I totalled up year

6    by year all of the mesothelioma claims I'm forecasting.  And

7    so on for each disease for the increasing model, I forecast

8    that there will be about a million claims that would have been

9    able and would be filed against Turner & Newall from October

10   1, 2001 through future years.  Using the no increased model,

11   that suggests there would be about 770,000 future claims.  And

12   the primary difference between those is in the non-malignant

13   claims where it's about 300,000 difference a claim.  But the

14   difference is for the non-malignant, the cancer claims are

15   less.

16   Q.   Do you provide also the year by year count in your

17   projections?

18   A.   Yes, I do. Here in my report, and they're here shown as

19   Table 40, Slide 40, which shows the annual counts of claims,

20   and I note -- I would note that under the no increase,

21   remember, I've annualized, if the court will recall, I've

22   annualized the 2001 figure of the claims, which is, I believe

23   it was around 59,000 claims filed against Turner & Newall.

24   Let me turn back.

25        On Slide 28 when I annualized the 2001 filings, I

United States District Court
Camden, New Jersey

——Peterson - Direct - Inselbuch——

1   forecast -- I calculated that there were 60,000 claims that

2   would likely have been filed in 2001 had it gone all year, and

3   of that about 54,000 of those claims would be nonmalignant, so

4   that's the endpoint when they went into bankruptcy, 59

5   thousand, actually almost, really, 60,000 claims filed for the

6   year, of which 54,000 were nonmalignant claims.

7          When I compare that to my forecasts on Slide 40, my,

8   no increase model just goes way down.  It starts out at 40,000

9   claims.  So the first year out I've forecast about two-thirds

10  as many claims would have been filed against Turner & Newall

11  as were filed in 2001, so it forecasts a sharp and immediate

12  reduction in claim filings against Turner & Newall, which I

13  don't believe is, consistent with the factors that I've

14  described to the Court, that would be affecting and increasing

15  the numbers of claims against Turner & Newall.  So I think

16  that's inconsistent with what are the reasonable expectations

17  based upon what was happening in the tort litigation in 2002.

18         Even under my -- and I've forecast, calculated that

19  there were 54,000 nonmalignant filings in 2001.  With the

20  nonmalignant no increase model, its starts out of 37,000 and

21  goes down from there. If you look at the increasing model, in

22  only one year, 2006, do I forecast that future claims filings

23  would be greater than the actual experience of Turner & Newall

24  in 2001. So even though I call it an increasing model, it

25  really doesn't represent an overall increase in the claims

*United States District Court*
*Camden, New Jersey*