Peterson - Cross - Strochak

1  but my question, sir, isn't that exactly what the process of

2  deriving the trust distribution scheduled values is all about,

3  that is, an allocation of the trust value among the different

4  constituencies of the trust, that is people who have different

5  disease categories; isn't that right?

6          MR. INSELBUCH: Object to the form.

7          MR. STROCHAK:  I don't know what the objection is,

8  your Honor, I'm sorry, I thought it was an okay question.

9          MR. INSELBUCH: I believe the question is totally

10  unintelligible.

11          THE COURT:  Do you understand the question?

12          THE WITNESS: I would agree entirely with Mr.

13  Inselbuch.  If he hadn't objected, I would have said I have no

14  idea what you are asking me.

15          THE COURT: Then I'll sustain the objection.

16  BY MR. STROCHAK:

17  Q.  Let's try again.  The process of agreeing on scheduled

18  values for the trust distribution procedures essentially is

19  one of deciding the ratios between the different disease

20  categories, of how much they will recover from the trust;

21  isn't that correct?

22  A.   In part.

23  Q.  Let's talk about the conservatism in your forecast for a

24  minute. Flip, if you could, to Slide 20.

25  A.   I have it.

Peterson - Cross - Strochak

1   Q.   This slide compares your forecasts average values to the

2   historical ones from the database, right?

3   A.   Yes.

4   Q.   And your forecast is in pink or purple on the right hand

5   side, correct?

6   A.   I have no idea what color that is, but that's close

7   enough.

8   Q.   And the actual values as taken from your report are on

9   the left hand side?

10  A.   That's correct. Three alternative ways of calculating it,

11  yes.

12  Q.   And you mentioned before that the problem of trying to

13  impute a settlement year was one that really only existed in

14  2001 because there were very little differences in the prior

15  years and that's what's graphically depicted on your Slide 20,

16  correct?

17  A.   Well, there was a little imputation prior to 2001, but

18  otherwise I agree with your statement.

19  Q.   If we put our hand over the years '97 through 2000, what

20  it looks like is that your forecast looks very much like 2001,

21  correct?

22  A.   I'm sorry, put my hand over what?

23  Q.   Well, I just did it graphically to help myself, you don't

24  have to do it.

25  A.   I just didn't hear the question.

United States District Court
Camden, New Jersey

Peterson - Cross - Strochak

1   Q.   But I covered up '97 through 2000 with my hand, and when

2   I look at that what I see is a forecast that looks very much

3   like the green bar, slightly below the green bar for 2001.

4   A.   That's correct.

5   Q.   Isn't it true, sir, that in forecasting your values there

6   what you effectively are doing is assuming a 100 percent

7   likelihood that the historical future, as I've called it, that

8   is the years 2002 forward, will look very much, a hundred

9   percent like the green bar in 2001?

10   A.   I'm sorry, could you read that question to me, please?

11   Q.   Sure. Your forecast, essentially boiled down to a

12   percentage, suggests that you are assuming a hundred percent

13   likelihood that the future will look like your calculation for

14   settlement year 2001 as represented by the green bar on the

15   graphic?

16   A.   I'm sorry, I just -- I don't understand your preface, a

17   hundred percent probability. In fact, I present sensitivity

18   analyses because there may be some error. And I've already

19   suggested to the Court that there is uncertainty in any of

20   these things, I wouldn't assert that anything I've said here

21   with regard to forecasting should be regarded as a hundred

22   percent probability, other than the liabilities will be

23   greater in the future than they have been in the past, that's

24   pretty close to a hundred percent.

25          What this shows is that what I regard as reasonable

---Peterson - Cross - Strochak---

1  forecasts of future claims for mesothelioma and lung cancer

2  compare precisely with the actual amounts of money that Turner

3  & Newall was paying in 2001 for those cases where we knew the

4  settlement year, that's what this demonstrates.  Beyond that,

5  I don't know.

6        You know, I take this really as confirmation of the

7  reasonableness, and indeed somewhat conservatism of numbers

8  that I had calculated without knowing what the green line was

9  in the first instance. It supports my forecasts, it wasn't the

10  basis for making the forecasts of value.

11  Q.  In calculating the average settlement values that I used

12  in your preferred forecasts in the Owens Corning case, you

13  didn't go through an exercise similar to the one that you did

14  here in T&N, did you?

15  A.  I don't believe that in -- I see the testimony from Owens

16  Corning here, so you'll correct me.  I don't believe that I

17  forecast that the Owens Corning settlement values were going

18  to increase in the future, but you can correct me if that was

19  an error. But Owens Corning was subject to very different

20  kinds of circumstances, it wasn't -- there wasn't the change

21  in Owens Corning's position in the asbestos liability --

22  asbestos litigation at the time of its bankruptcy like there

23  was for Turner & Newall, Owens Corning wasn't a member of CCR,

24  and again, out of conservatism there, I don't believe I had an

25  increase, but perhaps I did and just don't recall it.

*United States District Court*
*Camden, New Jersey*

————————Peterson - Cross - Strochak————————

1   Q.   Now, Owens Corning did have is the national settlement

2   program, correct?

3   A.   Yes.

4   Q.   And the national settlement program was, I believe as you

5   testified, very similar in certain ways to what was going on

6   in the CCR, correct?

7   A.   Well, there were some similarities, there was one major

8   difference, that the NSP was Owens Corning's programs based

9   upon its liability as a single defendant.  It's the best it

10  could do negotiating inventory settlements given that it was

11  the lone defendant out -- a lone defendant, not a group, and

12  it was the defendant that everyone was shooting at.  So it had

13  already arrived at the status that Turner & Newall was on its

14  way to becoming.

15       The SSP was not the individual settlement of Turner &

16  Newall, it was the product of the significant tactical

17  advantages that Turner & Newall had as a CCR member which held

18  down is the value. So yes, they were both inventory

19  settlements; yes, they were both settlement programs that

20  contain criteria for payments; but no, they were very

21  different with regard to how effectively the CCR versus Owens

22  Corning could be in holding down settlements.

23       Owens Corning didn't enjoy all of the advantages of

24  CCR membership, that's one of reasons why is the values were

25  greater.  So the program is the same, but they were carried

*United States District Court*
*Camden, New Jersey*

635

—————————— Peterson - Cross - Strochak ——————————

1   out by very different entities and that has extremely

2   important ramifications for the amount of money that, and the

3   savings that CCR members could achieve. That's highly

4   different.

5   Q.   Now, in the Owens Corning case you calculated your

6   settlement averages over a roughly four and three-quarter year

7   base period, correct?

8   A.   I think that's right.  I haven't looked at my Owens

9   Corning report since I testified, I don't believe.

10  Q.   We can show it to you. Why don't we turn to Property

11  Damage 13. It should be the first document in your binder.

12  A.   Just the first?

13  Q.   Do you recognize that is a copy of the report that you

14  filed in the Owens Corning case?

15  A.   Yes.

16  Q.   Let's turn to page nine, if you could. This is your

17  calculation of the average resolution cost for Owens Corning,

18  correct?

19  A.   It has both the average settlement and the average

20  resolution, yes.

21  Q.   And in the text of the note below the box in Table 3 it

22  indicates that you have calculated them across all claims

23  resolved that were filed after 1990 and resolved between '96

24  and 2000, right?

25  A.   Yes.

*United States District Court*
*Camden, New Jersey*

Peterson - Cross - Strochak

1  Q.  And that's your -- because Owens Corning filed for

2  bankruptcy in roughly October of 2000, you have '96, '97, '98,

3  '99, and three-quarters of 2000 for four and three-quarters

4  years, correct?

5  A.  Yes.

6  Q.  Let's go back to your report in Exhibit 2 in this case.

7  A.  Plaintiff's Exhibit 2?

8  Q.  Yes, please.

9  A.  Next time you cross-examine me, could you give me two

10  different binders.

11  Q.  We'll try and divide them up over the weekend. And back

12  to page ten for the tables.

13  A.  Page ten?

14  Q.  That's right.

15  A.  I have that.

16  Q.  You have set up here comparisons to various other

17  companies, all at this point in bankruptcy, correct?

18  A.  Yes.

19  Q.  And you contend that this data shows certain trends; is

20  that right?

21  A.  It does for some diseases, not all.

22  Q.  I believe you told me, or I believe actually your report

23  says that these data illustrate general pressures on asbestos

24  defendants to increase settlement values; is that correct?

25  A.  They give some indication of that, yes, particularly,

*United States District Court*
*Camden, New Jersey*

637

—————————————Peterson - Cross - Strochak—————————————

1    that's particularly true for the cancer, certainly.

2    Q.   That's taken right from the text of your report below the

3    tables?

4    A.   Yes.

5    Q.   And it is your view that in fact there were general

6    pressures on asbestos defendants to increase payments; is that

7    right?

8    A.   I think that's probably -- for the cancer claims,

9    certainly; the pressures were less general for the

10   nonmalignant claims because in some cases they increased, some

11   they didn't.  But the data speak for themselves.

12   Q.   Now, you've chosen these four companies because they were

13   ones that were available to you, you had the data in your

14   office, right?

15   A.   Yes.

16   Q.   And I take it you came to -- you came to have that data

17   because you were consultant to asbestos creditors committees

18   in these various bankruptcy cases; is that right?

19   A.   Not entirely.

20   Q.   How did you get it?

21   A.   Well, I'm a consultant to Porter-Hayden, I'm engaged by

22   the defendant Porter-Hayden and for the -- and I've been

23   engaged by Owens Corning as an expert too, and I can't recall

24   if I got this data from Owens Corning.  I may have received

25   this data originally as a consultant to Owens Corning.  But

*United States District Court*
*Camden, New Jersey*

—————Peterson - Cross - Strochak—————

1   Turner & Newall, AWI and B&W, I'm engaged as expert for

2   claimant committees in each of those three cases. I'm engaged

3   in lots of other cases, but these are the only three cases

4   where I'm permitted by the confidentiality agreements to

5   provide this data to others, plus, of course, Turner & Newall,

6   which is this case, or where the data have been already made

7   public, as in the B&W case.

8   Q.   Now, there actually are some other data that you had

9   available at the time you did your report, aren't there?

10  A.   I don't think there is any public data like this that I

11  can recall. There is data from distributors, some of which is

12  presented on Table 2 of my report, on the next page of my

13  report, I don't think there are other ones. Essentially, these

14  are the four -- well, there may have been a defendant listed

15  in Owens Corning that isn't here, I'm just not sure whether

16  Porter-Hayden -- I think Porter-Hayden was in the Owens

17  Corning report.

18  Q.   At the time you prepared your report in this case, you

19  actually had data on two other Turner & Newall subsidiaries,

20  didn't you?

21  A.   I did have data on them, yes.

22  Q.   Why don't you turn to Plaintiff's Exhibit 14 in your

23  binder. Excuse me, it's Property Damage Exhibit 14, I'm sorry.

24          THE COURT:  Is that the supplemental report?

25          MR. STROCHAK:  No, your Honor, this is Property

Peterson - Cross - Strochak

1   Damage Exhibit 14, it's a file memorandum dated October 25,

2   2002 that I believe Mr. Inselbuch might have identified but

3   not offered in the direct testimony.

4   Q.   Are you with me, Dr. Peterson?

5   A.   I have PD-14.

6   Q.   This is a memorandum to the file from Mr. Inselbuch and

7   his colleagues that I believe you testified in your direct

8   included a variety of information that you had prepared

9   representing a preliminary -- actually, I think it's called a

10  very preliminary analysis of Federal-Mogul asbestos

11  liabilities, correct?

12  A.   Yes.

13  Q.   Turn, if you would, to page 14.

14  A.   I have that.

15  Q.   Page 14, Table 1 reflects claim filing information on the

16  Flexitallic subsidiary of Federal-Mogul, correct?

17  A.   Yes.

18  Q.   It also reports in Table 3 below settlement averages for

19  paid claims for Flexitallic, correct?

20  A.   Yes.

21  Q.   And the settlement averages for mesothelioma for

22  Flexitallic are actually flat or declining for mesothelioma,

23  correct?

24  A.   That's correct for this particular company who settled

25  very few claims. Their data do show that, yes.  I don't show

─────Peterson - Cross - Strochak─────

1   here the NS, or I think I actually sent to Mr. Inselbuch the

2   NS, the numbers of settlements in each year for Flexitallic.

3   Flexitallic, as you can see, only the receive altogether

4   47,000 claims.  And I don't have the number of pending claims.

5   I don't know, there is some peculiar here.

6   Q.  Well, let me just stop you there.  Let's go back to Table

7   1.

8   A.  Let me look at something, please.  Give me a moment, if

9   you don't mind.

10         Oh, okay.  I beg your pardon.  Okay, please.

11   Q.  Let's go back to Table 1 on page 14.

12   A.  Yes.

13   Q.  The total filings for each year are reported in the far

14   right hand column, correct?

15   A.  That's right.

16   Q.  So, what it actually shows is not a total of 47,000

17   claims in the five-year period, what it shows is 47,503 claims

18   for which of the file year was unknown, correct?

19   A.  Yeah, I misread that, yes. And indeed, if you look on the

20   next page at page 15, Table 4, it shows there were 155,000

21   pending claims. So, clearly -- and the average rate of claim

22   filing in this period was substantial.  So I correct myself,

23   thank you.  There were actually a substantial number of

24   claims.

25         There is another issue with regard to Flexitallic

*United States District Court*
*Camden, New Jersey*

641

——————Peterson - Cross - Strochak——————

1   having to do win the nature of its product and the kinds of

2   claims that were brought against it that effect settlement

3   values which is very different from Turner & Newall.

4   Q.   That's right.  But in any event, in terms of claim

5   filings, Flexitallic is a company that was getting between 36

6   and 53,000 claims a year between the years '97 and 2001,

7   correct?

8   A.   That's right.

9   Q.   And your preliminary forecast for Flexitallic was

10  reported, I believe, on page 15, right?

11  A.   Page 16, actually.

12  Q.   Well, let's go to 15 first. You've got Table 6,

13  Flexitallic forecasts, number of future claims, and you've got

14  in the total column there north of a million future claims for

15  Flexitallic, right?

16  A.   This calculation shows that, but this calculation suffers

17  from the same infirmity that I testified to and was asked

18  about these analyses from Mr. Inselbuch.  These are very

19  preliminary and based on the database it has proven to be

20  incorrect.

21  Q.   That's right, you got supplemental data later on and that

22  got worked into your next memorandum, right?

23  A.   Well, it supplemented and corrected data, yes.

24  Q.   Let's just stick with the preliminary though for a

25  second.  On page 16, as you indicated, your forecast for



*United States District Court*
*Camden, New Jersey*

1  pending and future claims for Flexitallic, you come up with a

2  value of 1.4 billion dollars, right?

3  A.   Yes, in this analysis. With this data, that's correct.

4  Q.   Let's go back to page ten, if we could. That's data for

5  the Ferodo subsidiary of Federal-Mogul, correct?

6  A.   That's correct.

7  Q.   And again on page 11, Table 3, Ferodo's settlement

8  averages are reported?

9  A.   Yes.

10  Q.   And again it looks like with the exception of 2001 a

11  slight increasing trend on mesothelioma; is that right?

12  A.   Yes.

13  Q.   And then a decreasing or flat trend for the other

14  disease, correct?

15  A.   Well, these data are so sparse with so few claims in here

16  that they really don't permit meaningful trends. I haven't

17  provided or Mr. Inselbuch didn't provide the numbers of cases

18  that -- Ferodo settled virtually no claims in the early period

19  here.  And, indeed, when I was asked to do TDP forecasts for

20  Ferodo and Flexitallic, I didn't have sufficient data to make

21  forecasts for those companies because of the nature of their

22  liabilities and their resolution.  But the table is as you

23  say, yes.

24  Q.   Let's just flip to Page 12 for a second. Your preliminary

25  forecasts reported in Table 6 you forecasted 370,271 claims;

—————————Peterson - Cross - Strochak—————————

1   is that correct?

2   A.   It's a very preliminary report, yes.

3   Q.   And your liability calculation in Table 8, all in,

4   pending and futures, was 376 million, is that right?

5   A.   This very preliminary estimate is that number.   These are

6   not numbers that I would have presented in court.

7              MR. STROCHAK:  Your Honor, we offer PD Exhibit 14.

8              MR. INSELBUCH: No objection.

9              THE COURT:  14 is in evidence.

10             MR. STROCHAK:  Your Honor, this would probably be a

11  good spot for a short break.

12             THE COURT:  All right, we'll take a recess.

13             (Short recess).

14             DEPUTY CLERK:  All rise.

15             THE COURT:  You may be seated.

16  BY MR. STROCHAK:

17  Q.   Dr. Peterson, before the break, I believe you said

18  something to the effect that Flexitallic and Ferodo were both

19  relatively small players in the asbestos litigation arena.   Is

20  that a fair characterization?

21  A.   They had -- they're different.  They're different from

22  each other, they're different from Turner & Newall.

23       Ferodo is a friction product defendant, didn't have

24  many claims like most friction product defendants.  Settled

25  relatively few claims and its exposures primarily for

*United States District Court*
*Camden, New Jersey*

644

—————————Peterson - Cross - Strochak—————————

1   mesothelioma and not other diseases.

2        Flexitallic got lots of claims because Flexitallic's

3   product, which was a disk type gasket, was brightly colored

4   and brightly labeled and it was ubiquitous and very easily

5   identified so lots of people sued Flexitallic.  But the

6   product, at least according to Flexitallic and the Hanly firm,

7   almost never releases asbestos.  So it's a case -- it's a

8   defendant that got lots of claims because of product

9   identification but there's a serious causation problem with

10  regard to the product.

11       But Flexitallic got lots of claims.  Ferodo didn't get

12  so many.  But neither one of them is a defendant like any of

13  the others that are on that list.  To have included them would

14  have been misleading to the Court because their experiences

15  are just not representative of the kind of past experience or

16  like the future experience for Turner & Newall.  Thank you for

17  the opportunity to clarify that.

18  Q.   But a company like Flexitallic, nonetheless, might have

19  significantly north of a billion dollar in future asbestos

20  liabilities in your calculation at present value, correct?

21  A.   If you get sued often enough and you -- you know, some

22  people can maintain those cases.  And in the hands of a really

23  good plaintiff's lawyer, I think Flexitallic's defense is

24  pretty good.  But ordinarily they're not particularly strong

25  cases so the plaintiff's lawyers will settle quite cheaply.

1  But a million claims with a billion dollars worth of liability

2  is not a lot of money on average per claim.

3  Q.   Both Flexitallic and Ferodo were members of CCR along

4  with Turner & Newall, correct?

5  A.   Yes, they were.

6  Q.   And Both Flexitallic and Ferodo, you characterized them

7  in a deposition having small, relatively small payment

8  percentage in CCR as compared to the other members, is that

9  right?

10 A.   I don't remember testifying to that.  I could well have

11 done so.  I don't remember what their specific percentages

12 were.  I was perhaps inferring, as I would sit here today and

13 infer, that they had small payment shares.

14 Q.   In any event, it's your view that other members of the

15 CCR and, in particular, members that you might have listed in

16 your report at Page 10, would be more comparable to T&N than

17 Flexitallic and Ferodo, is that right?

18 A.   More, yes.

19 Q.   Well, that's why you used those examples, right, you were

20 trying to illustrate companies that may show trends that might

21 be useful in interpreting what was going to happen to T&N,

22 correct?

23 A.   Not entirely.  I mean, I think I described in the report

24 that I included Porter Hayden and I later presented

25 information about California distributors, not because I



646

————Peterson - Cross - Strochak————

1  regarded those companies as being comparable to Turner &
2  Newall, indeed, they're secondary or teriary defendants
3  whereas Turner & Newall was right up front after CCR would be
4  the kind of spotlight defendant, those companies historically
5  were in the background.  And I included Porter Hayden to
6  indicate that even among companies that were in the
7  background, they were secondary defendants with the
8  bankruptcies and the other events occurring in 2001, companies
9  like that or distributors were having to pay far more money,
10 companies that didn't have nearly the exposure or lack of
11 quantum of damages as Turner & Newall would.  So I would not
12 tell the Court, and I didn't, and I think in my report I
13 mention that I did not believe they were precisely comparable,
14 but I put them in there to show, my God, if this is happening
15 to these small companies with limited liability, what's going
16 to happen to a company like Turner & Newall that's so
17 prominent.
18 Q.   Now, in your deposition I recall that you cited
19 Armstrong, U.S. Gypsum, National Gypsum, and GAF as companies
20 with larger shares within the CCR, is that correct?
21 A.   Well, they were larger than Flexitallic and Ferodo.
22 Some, but not all of them, were larger than Turner & Newall.
23 And if I testified to that, I was mistaken, certainly GAF was.
24 Q.   Now, T&N in its history had about 380,000 or so claims,
25 correct?

*United States District Court*
*Camden, New Jersey*

647

Peterson - Cross - Strochak

1   A.   Something like that.

2   Q.   And I believe you told me in your deposition that you

3   thought that that was, that T&N was a relatively obscure

4   defendant, is that right?

5   A.   CCR obscured its prominence.  I don't think that Turner &

6   Newall was ever terribly obscure because lots of people knew

7   about Cape Mining and about some of the history of this

8   defendant.  But it was more obscure than it would have been

9   then if it hadn't been a member, hadn't been a member of CCR.

10  Q.   Let me direct you to your report, Plaintiff's 2 in

11  evidence, and to Page 4.  I apologize you have to lift that

12  heavy binder again?

13          MR. FINCH:   Which page, Adam?

14          MR. STROCHAK: Page 4.

15          THE WITNESS:  Plaintiff's 2, Page 4.  I have that.

16  BY MR. STROCHAK:

17  Q.   And at the last sentence before Subheading 4, about three

18  quarters of the way down the page, it says that, this is your

19  report, T&N was able to maintain relative obscurity as a small

20  member among the 20 companies in CCR.

21  A.   Yes.

22  Q.   That's your view, right?

23  A.   Yes.

24  Q.   Now, Mr. Hanly testified earlier, I recall, that he

25  thought T&N's payment percentage was in the 20 to 30 percent

—————Peterson - Cross - Strochak—————

1  range.   Is that your understanding?

2  A.   I need to clarify or remind you of what he said.   He said

3  that after the other defendants, GAF and National Gypsum had

4  left the CCR, its membership went to around 20 percent.   While

5  they were members, its membership percentage was about 11

6  percent.

7  Q.   And when did they leave?

8  A.   '99, 2000.

9  Q.   Now --

10 A.   That actually may have been a percentage after other

11 people left, too, because others left prior to Turner & Newall

12 going into bankruptcy.

13 Q.   So notwithstanding that, it had a share of between 20 and

14 30 percent in CCR in the last years of CCR's existence, you

15 believe that the company was able to maintain obscurity and

16 hide itself from the plaintiff's bar essentially, is that

17 right?

18 A.   That isn't what I said.   And your question misstates both

19 my testimony and the facts.

20 Q.   Is it your view, sir, that notwithstanding T&N's 20 to 30

21 percent share of CCR's liability in the last years of CCR's

22 existence, that it was able to shield itself from the eyes of

23 the plaintiff's bar and not attract attention as a defendant?

24 A.   I think that by the end of the CCR, probably more

25 attention was being focused on T&N, more likely because of the

—————————Peterson - Cross - Strochak—————————

1   Tweedale book and because people were beginning to anticipate

2   and recognize that CCR was going to break up and here was a

3   plum that was about ready to fall from the tree.  But the CCR

4   existed for 14 years, 13 years, and for all but one of those

5   years this is a company that had about a 10th of the

6   liability.  And if you look at the quote that you've

7   highlighted, I was talking about relative obscurity.  It was

8   more obscure than it would have been if it hadn't been at CCR

9   and that's what I identified several questions ago.

10  Q.   That's correct.  Because you testified on direct there

11  are no secrets in asbestos litigation I think was the colorful

12  way that you put, it is that correct?

13  A.   I don't remember that testimony.

14  Q.   Dr. Peterson, do you recall that T&N was a board member

15  of the CCR?

16  A.   Yes.

17  Q.   And that was commonly known among the plaintiff's bar, to

18  the best of your knowledge?

19  A.   I have no idea.

20  Q.   That wasn't something that you spoke about in the

21  conversations that you may have had over the years with

22  various plaintiff's lawyers you testified about in your

23  direct?

24  A.   I can't recall that ever being the subject of

25  conversation, no.

Peterson - Cross - Strochak

1  Q.   Let me ask you, who were, if T&N was not a CCR member

2  with a significant percentage share, who were the members that

3  had larger percentage shares?

4  A.   Well, we know that AWI, GAF, Keene all had higher shares,

5  Mr. Hanly testified to that.  But the point is CCR as a whole

6  provided some measure of hiding for every member.

7  Q.   You mentioned GAF.  GAF is another defendant that you had

8  some data for at the time that you prepared your report in

9  this case in November of 2002, correct?

10  A.   I had data.  I don't recall the confidentiality issues

11  with regard to it.

12  Q.   Would you consider GAF to be a fairly high profile

13  defendant?

14  A.   A lot of people would hate GAF.  Yes, it's probably

15  fairly high, yeah.

16  Q.   Very similar to the way, I believe, you may have

17  testified in the Owens Corning case, that Owens Corning was a

18  hated defendant in many ways when it was pursuing a very

19  aggressive litigation strategy, is that correct?

20  A.   It's a bit different, but Owens Corning was certainly a

21  high profile defendant.

22  Q.   Why is GAF so hated?

23  A.   Just because of the tactics of its leadership.

24        MR. STROCHAK: Excuse me, Judge, just one second.

25  BY MR. STROCHAK:

*United States District Court*
*Camden, New Jersey*

—————Peterson - Cross - Strochak—————

1  Q.   Let me turn you, if I could, to Property Damage Exhibit

2  91 in your binder.  Do you recognize Exhibit 91 as a

3  supplemental affidavit that you filed in the bankruptcy of G-1

4  Holdings?

5  A.   Yes.

6  Q.   And you signed it, looks to me like, on the last page,

7  the 9th of January, 2003?

8  A.   Yes.

9  Q.   You were and are a consultant to asbestos claimants

10  committee and in the G-1 Holdings bankruptcy, correct?

11  A.   Yes.

12  Q.   And G-1 Holdings is the current name of what used to be

13  GAF Corporation, right?

14  A.   The corporate relationship I'm not sure, I think there's

15  some, but certainly they have similar liabilities.

16  Q.   It's actually in the caption on the first page.  It's

17  captioned G-1 Holdings, Inc. formally known as GAF

18  Corporation.

19  A.   Thank you.

20  Q.   Let me direct you to Page 51.  Does that refresh your

21  recollection at all looking at the table on Page 51 that at

22  least as of January 2003, which was substantially before the

23  time you filed your report in T&N, that you actually did have

24  data on GAF?

25  A.   It refreshes my recollection that I did have data and

United States District Court
Camden, New Jersey

—————Peterson - Cross - Strochak—————

1   clearly this data had become public with this affidavit.  I

2   had no data for 2000 and 2001, which were the most important

3   years.

4   Q.   So looking at the GAF column, the first table there in

5   the middle of the page, is Trends and Average mesothelioma

6   Settlements.  And in '99 you reported that GAF's average

7   mesothelioma settlement was $61,917, correct?

8   A.   Yes.

9   Q.   And you also report in the next column to the left what

10  looks to me to be an aggregate figure for all of CCR, is that

11  correct?

12  A.   That was a database that we got from GAF that they kindly

13  attached to one of their pleadings in the bankruptcy, and I

14  believe that's the total liability for CCR in that year.

15  Q.   So CCR's total liability average settlement value for

16  mesothelioma claims in 1999 was $253,750, right?

17  A.   That was our understanding of it.  But I haven't looked

18  at this database in a long time, I have to look at it again.

19  That was our understanding.

20  Q.   That's what you reported to the Court when you filed this

21  affidavit, correct?

22  A.   Certainly.

23  Q.   You didn't have any reason to doubt it at the time?

24  A.   That was our understanding.

25  Q.   And the following tables report the average values for

—Peterson - Cross - Strochak—

1  lung cancer, correct?

2  A.  Yes.

3  Q.  And then it goes on for other cancer claims on Page 52,

4  correct?

5  A.  Yes.

6  Q.  And, finally, non-malignant claims on the last page on

7  52?

8  A.  Yes.

9       MR. STROCHAK: Your Honor, we offer PD Exhibit 91.

10       MR. INSELBUCH: No objection.

11       THE COURT:  PD 91 is in evidence

12  (DEFENDANT EXHIBIT PD-91 WAS RECEIVED IN EVIDENCE.)

13  BY MR. STROCHAK:

14  Q.  Let me turn, if I could, Dr. Peterson, to some of the

15  other estimates that you've prepared in this case.  And by

16  other estimates, I mean estimates other than the ones that

17  you've testified about today in your direct testimony and

18  yesterday.

19       You did a very preliminary estimate in October 2002,

20  which is reflected in Property Damage Exhibit 14, correct?

21  A.  I did prepare that, and I actually testified about that

22  yesterday.

23  Q.  Right.  You've told us that it was preliminary, which I

24  understand.  And let's just turn to the section that talks

25  about T&N.  In calculating T&N's settlement average for its

—————Peterson - Cross - Strochak—————

1  paid claims, you didn't use the same type of methodology that

2  you used in your base case estimate here today, correct?

3  A.  Sir, could you either repeat that or have it read back?

4  Q.  Sure.  You didn't use the methodology -- let me start

5  again.

6      The methodology you used in your base case estimate

7  that you testified about today is the one where you hang the

8  values for the other diseases on the mesothelioma value,

9  correct?

10  A.  Well, overall the methods are basically the same, there

11  are a couple of differences.  Probably the most significant

12  one is that for this estimate for Turner & Newall the

13  preliminary estimate here I, although warning Mr. Inselbuch

14  and his colleagues that Turner & Newall's settlement averages

15  were going to increase after it left CCR, I made no effort to

16  estimate what they would be.  So the method that -- the

17  methods I'm using for estimating liability in this case are

18  predicated on the assumption that Turner & Newall would have

19  to pay more to resolve asbestos claims after leaving CCR.  But

20  I didn't make that assumption here, so it's a different basis

21  for calculation.  Yes, that's very different.

22  Q.  In fact, in calculating the claim values, you used 1998

23  through 2001 base period, is that right?

24  A.  I don't recall.

25  Q.  Dr. Peterson, what epidemiological model did you use to

*United States District Court*
*Camden, New Jersey*

--- Peterson - Cross - Strochak ---

1  project the number of future claims in this preliminary

2  calculation that you did in October 2002?

3  A.   Well, it says on Page 3 I used the Nicholson forecast.   I

4  don't recall it.

5  Q.   Says on Page 3 that your projections are based on William

6  Nicholson's projection.   It doesn't actually say that you used

7  the Nicholson forecast numbers, does it?

8  A.   I believe that this is language that Mr. Inselbuch wrote,

9  so I don't know -- I could have used the phrase based on.

10  Q.   So it must be right?

11  A.   No, just may be stated differently than I would have

12  stated it.

13  Q.   Let me turn you, if I could, to Property Damage Exhibit

14  15.   This is your February 19, 2004 memoranda to Mr. Inselbuch

15  and Ms. Davis at the Caplin & Drysdale firm, correct?

16  A.   Yes.

17  Q.   And in Exhibit 15, the February 2004 memorandum, you

18  indicate that you have updated your earlier forecasts.   And I

19  believe you're referring to the ones done in Exhibit 14, is

20  that right?   I'll direct to you Page 1, Exhibit 15, at the top

21  where it says, in October 2002 we provided the committee with

22  forecasts of liabilities.   I'll skip a little bit.   For Turner

23  & Newall claims, et cetera, et cetera.   And then it goes on to

24  say, we revisit our earlier forecast based on updated data and

25  improvements, correct?

*United States District Court*
*Camden, New Jersey*

———Peterson - Cross - Strochak———

1    A.    Right.

2    Q.    And what you're referring to, the October 2002 forecasts

3    are the ones that are summarized in Exhibit 14?

4    A.    That are excerpted there, yes.

5    Q.    Let me direct you toward the bottom of that Page 1 on

6    Exhibit 15.  It says Subheading Changes To Forecast.  Then

7    it's got five numbered paragraphs below which I believe

8    summarize the changes you've made to your forecast, correct?

9    A.    Yes.

10    Q.    Now, on Page 2 of Exhibit 15, point four, excuse me,

11    point three you talk about the Nicholson epidemiological

12    model?

13    A.    Yes.

14    Q.    And based on its superior accuracy in forecasting

15    mesothelioma deaths in the U.S., we now use the Nicholson,

16    Perkel and Selikoff 1982 epidemiological forecast rather than

17    the forecast by KPMG that was used in our October 2002 report

18    to the committee.

19    A.    I see that.

20    Q.    And that's, in fact, what you did in the updated February

21    2004, you switched to the Nicholson epidemiological forecast,

22    correct?

23    A.    Sitting here now I don't recall.  These are inconsistent

24    documents.  It's possible.  Because sometime in this period we

25    obtained the U.S. census data for the year 2000 and the new

657

—————Peterson - Cross - Strochak—————

1   census data provided us with an opportunity to fit the SEER

2   data more effective by -- because you forecast, you use SEER

3   data to estimate the population estimates based on rates of

4   mesothelioma by age groups.  And the most recent age group

5   data we have prior to receiving the 2000 census was 1990,

6   which was becoming increasingly inaccurate in forecasting

7   actually age distribution of Americans by the end of that

8   decade, the population's aging.  And so at 2000 we were better

9   able to fit the age data and estimate national rates of

10  mesothelioma from the SEER estimates.  When we got that data,

11  as it says here, there was a clear Superiority of the

12  Nicholson model than KPMG.  When we're using the 1990 data,

13  which was out of date and not very good population estimates,

14  at that point in time it looked like the Nicholson/KPMG were

15  probably comparably accurate, maybe KPMG is superior.  At some

16  point around this time we learned that with the most recent

17  data, Nicholson was superior.  That's why I use it now and I

18  apparently used it in this memorandum.  I'm not certain which

19  I used in 2002, I don't have a direct recollection of that

20  sitting here.

21  Q.   Now, as you testified, I know you did a sensitivity

22  analysis in this case using the KPMG epidemiology, and, in

23  fact, you have used that as your base epidemiological forecast

24  in the past, right?

25  A.   Prior to having received the year 2000 census, we used

*United States District Court*
*Camden, New Jersey*

—————Peterson - Cross - Strochak—————

1    KPMG, that's right.  We don't use it now because turns out

2    it's not as good as I just described.

3    Q.    And you're aware, sir, that various other forecasters

4    are, in fact, still using the KPMG model, is that right?

5    A.    Yes, but I'm not responsible for them.

6    Q.    I understand.  Now you mentioned in your direct testimony

7    that the court in the Owens Corning case had credited the

8    testimony of two experts, Dr. Vasquez and Dr. Rabinovitz,

9    correct?

10   A.    Those were the two numbers that the court used in order

11   to come up with the court's estimate, yes.

12   Q.    Dr. Vasquez formerly was with KPMG, correct?

13   A.    Yes.

14   Q.    Dr. Vaquez was formerly with KPMG, correct?

15   A.    Yes, the KPMG epidemiological model is his.

16   Q.    He developed them when he was at KPMG?

17   A.    He and his colleagues, yes.

18   Q.    And do you recall that they were actually developed in

19   consultation with Dr. Nicholson at Mount Sinai?

20   A.    I've heard him say that, I have no reason to know one way

21   or another if that's accurate. Bill Nicholson was an extremely

22   generous man and a lot of people asserted a collegiality with

23   him that I simply know is not the case.

24   Q.    And Dr. Vaquez in the Owens Corning case based his

25   projection on the KPMG epidemiological forecast?

659

Peterson - Cross - Strochak

1   A.   He prefers his own forecast, yes.

2   Q.   And Dr. Rabinovitz also utilized the KPMG model; is that

3   right?

4   A.   I don't recall.

5   Q.   Let's flip back, if we could, to Exhibit 14 and in

6   particular to page eight of the memorandum.

7   A.   I have that.

8   Q.   Here you report in Table 5 your estimate of liability for

9   pending claims and the total is $708,000,000; is that correct?

10  A.   That's what that represents, yes.

11  Q.   And that is a value that is discounted to present value,

12  correct?

13  A.   I don't know.

14  Q.   Excuse me, that's pending, so you wouldn't have to

15  discount the pending, would you?

16  A.   We do here, I don't recall if I did there.

17  Q.   And then dropping down to Table 6, you have your forecast

18  number of future claims and my forecasting a told number of

19  claims of a million 351 thousand, correct?

20  A.   Based -- at that time, based on that database for this

21  very preliminary forecast, that was the number, yes.

22  Q.   Let me drop you down to the paragraph below that, the

23  paragraph that begins Table 7 below. In the second sentence it

24  says the estimated liabilities for future claims.

25  A.   I'm sorry, where are you on page -- what page, eight?

United States District Court
Camden, New Jersey

―――――Peterson - Cross - Strochak―――――

1    Q.   The bottom of page eight.

2    A.   Okay.

3    Q.   The paragraph at the very bottom that begins Table 7.

4    A.   Yes.

5    Q.   Second sentence.

6    A.   I see it.

7    Q.   The estimated liabilities for future claims for T&N are

8    based on percent paid rates and the average settlement amounts

9    for the year 1998, it should be years 1998 through 2001.

10   A.   If that answers the question you asked me earlier, yes.

11   Q.   And it goes on, it says that the estimate also assumes

12   that future values for the next five years for mesothelioma

13   and lung cancer cases will increase at the substantial rate of

14   increase observed between 1997/'98 and 2000/2001. Do you see

15   that?

16   A.   Yes.

17   Q.   Does that suggest to you that in doing this preliminary

18   forecast you, in fact, used the '98 through 2001 base period

19   in calculating your settlement averages?

20   A.   Well, the prior sentence says that, yes, that's what it

21   says.

22   Q.   That's right. And in addition to using the actual

23   settlement averages over that four year period, you then

24   stepped up the mesothelioma and lung cancer values to reflect

25   an increase; is that right?

----Peterson - Cross - Strochak----

1   A.   That's what it says, yes.

2   Q.   And you will recall that the '98 through 2001 base period

3   is the same one that Dr. Cantor uses in her base forecast in

4   this matter; is that right?

5   A.   I think that's right.

6   Q.   And then for all other diseases you step up the

7   settlement averages for your forecast by the 2.5 percent

8   inflation rate that's reported at the top of page nine, right?

9   A.   That's what we did for this analysis, yes.

10  Q.   And what you come to is an estimate for T&N's liability

11  for future claims, again present-valued to 2002 dollars it

12  appears, of 5.87 billion; is that right?

13  A.   For future claims, yes. Wait a minute.

14  Q.   When you add the pending --

15  A.   Wait a second.

16  Q.   I'm sorry.

17  A.   Yes, that's what it says.  Excuse me.

18  Q.   When you add the pending and the futures together, you

19  get the $6.585 billion number that's reported in bold and

20  underlined about a third of the way down the page on the right

21  hand side?

22  A.   I see that.

23  Q.   Now in your October 2002 memo, I shouldn't say your, it's

24  from your colleagues here, but you had some participation in

25  it, I didn't see anything reported in there about the

—————— Peterson - Cross - Strochak ——————

1  existence of Mr. Tweedale's book. Were you aware of Tweedale's

2  book in October of 2002?

3  A.   I don't believe so.

4  Q.   All right. I think that you told me in your deposition

5  that you first got the book when you visited with Mr. Hanly in

6  New York in December of 2002; is that right?

7  A.   I think that's correct.

8  Q.   And before that visit you were not even aware of the

9  existence of the book, correct?

10  A.   Yes, that's correct.

11  Q.   But you were certainly aware of the document repository,

12  the Chase documents that we heard some testimony about earlier

13  this week, correct?

14  A.   I don't know whether I was aware of that at the time or

15  not.

16  Q.   Let's turn to Exhibit 15. And if I could direct you to

17  page nine. This is the section that reports on T&N liability

18  for U. S. claims.  And just to summarize, this document and

19  the analysis here reflects a revised forecast that you did

20  based on updated claims information that you had received; is

21  that right?

22  A.   It takes the approach that we used in the October 2002

23  report and uses new data and certain technical refinements, so

24  it is -- it's not so much a revision as an attempt to do the

25  same kind of analysis that we did a year and-a-half

Peterson - Cross - Strochak

1    previously.

2    Q.    Moving down to the last paragraph on the page, it says

3    you received a more comprehensive data set. Is the data set

4    that you received prior to the preparation of Exhibit 15 the

5    same one that you used in the preparation of your November

6    report in your estimate in this case?

7    A.    Yes, this uses the same data set, the data set used in

8    2002 was incomplete.

9    Q.    And it also indicates that you had some time to discuss

10    data issues with Jean Malone at ARPC?

11    A.    Yes.

12    Q.    Could you identify for the record who Joan Malone is?

13    A.    She's the wonderful woman sitting in the jury box in the

14    back row, and she's a quantitative analyst that works for

15    ARPC, which is a company that does the kinds of -- among other

16    things, does forecasts of asbestos liabilities.

17    Q.    ARPC is the claims estimation consultant to the Futures

18    Representative in this case, correct?

19    A.    Yes, they are.

20    Q.    Let me go through, if I could, the refinements to your

21    forecasting method that are discussed beginning at the top of

22    page ten.  You went through an exercise where you were able to

23    identify and eliminate certain duplicate claims in the

24    database, right?

25    A.    Yes.

*United States District Court*
*Camden, New Jersey*

———————Peterson - Cross - Strochak———————

1  Q.   That reduced the total number of filings in the database?

2  A.   Somewhat.

3  Q.   Well, it says it took it down from 396,000 to 381,000?

4  A.   Right, we eliminated 3.9 percent, that's correct.

5  Q.   You also made some revisions with respect to filing year.

6  Could you explain what you did there?

7  A.   I haven't read this in some time, this section.  If you

8  want me to read it, I will.

9  Q.   No, if you are not familiar with it, then we can just

10  move on.

11  A.   I mean, it says what it says, I don't recall what we did.

12  Q.   Now at the bottom again it says change of epidemiological

13  model, and the portion we read before I just realized after

14  the fact related to the U. K. forecast, but this portion I

15  assume relates to the U. S. forecast, and again it repeats

16  that you have changed over to using the Nicholson forecast as

17  opposed to the KPMG model that you had used in October of

18  2002; is that right?

19  A.   Well, it says we returned to it.  Oh, that's what this

20  says.  We'd start off by using Nicholson, then as the SEER

21  data seems more consistent with KPMG, we moved to KPMG because

22  it seems more empirically sound.  But win the 2002 data we

23  then saw that, in fact, Nicholson was more empirically sound,

24  so we went back to using this, that's what this says.  It's

25  probably correct.

*United States District Court*
*Camden, New Jersey*

Peterson - Cross - Strochak

1   Q.   At the bottom of the page the last sentence indicates

2   that use of the Nicholson forecast increases the value of

3   future claims by about ten percent; is that right?

4   A.   I think that's probably right, that's consistent with the

5   sensitivity analyses I did here.  It's in the range typically

6   of seven to ten percent difference.

7   Q.   Let's skip over settled but not paid claims and talk

8   about values of claims on page 11. And the assumptions that

9   you used to calculate average settlement values in your

10  February 2004 analysis are roughly the same as those used in

11  the October 2002 analysis, correct?

12  A.   I'm sorry, the methods or the amounts?

13  Q.   No, no, the general methodology, that you used a 1998

14  through 2001 base period, correct?

15  A.   Yes, yes, I see that.

16  Q.   I direct you to the middle of the page there, the middle

17  of paragraph where it says we continue to use years '98

18  through 2001 as the base period for calculating current values

19  of claims.

20  A.   Yes.  And we go on to say use of these multi-year

21  averages is conservative because settlement amounts have been

22  increasing over this period.  These multi-year averages are

23  actually less than the amount paid by T&N to resolve

24  mesothelioma and lung cancer claims during the two most recent

25  years.

666

————Peterson - Cross - Strochak————

1    Q.   That's right. And what you do in this analysis is, as you

2    did in October of 2002, you step up the mesothelioma and lung

3    cancer values by doing a comparison to the -- by using the

4    rate of increase observed between the period '97/'98 and

5    2000/'01, right?

6    A.   Yes.  The whole point of this analysis is to use the same

7    methods, same basic methods that we used in 2002, we weren't,

8    when though we had the new data, we weren't making independent

9    judgments about what's the most appropriate way to forecast

10   it.  And, indeed, in three or four places in this memorandum

11   we warn Mr. Inselbuch and Ms. David that these forecasts do

12   not represent what Turner & Newall would be paying now outside

13   of CCR.  It's not an attempt to forecast the company's

14   liability, it's an attempt to see what difference would be

15   made in the forecast because, one, we have a new database and,

16   two, we've made technical improvements.

17   Q.   Let's flip to the totals, if we could. Page 16,

18   forecasted claims.  You report 1.16 million forecasted future

19   claims in your increasing model as compared to 1.35 million in

20   the October 2002 forecast, correct?

21   A.   Yes.

22   Q.   So your number of claims has gone down by almost 200,000?

23   A.   Yeah, that represents in part the elimination of

24   duplicates.  I think there were some other technical issues

25   that resulted in that.

*United States District Court*
*Camden, New Jersey*

Peterson - Cross - Strochak

1    Q.   And when we get to the total forecast in Table 2.9 on

2    page 17, you have a forecast -- you report your forecast for

3    the pending -- the current forecast, that is the February 2004

4    forecast, for pending is 565 million; is that right?

5    A.   Yes.

6    Q.   And the future is 5.1 billion?

7    A.   That's right.

8    Q.   And you get a grand total of $5,728,000,000 all in

9    pending and futures, right?

10   A.   Yes.

11   Q.   And when that's compared to the October 2002 forecast of

12   6.5 billion, it's clear that the forecast has actually gone

13   down between October 2002 and February of 2004, correct?

14   A.   Well, given the new data and the technical improvements,

15   it reduced the forecast. I don't regard one of them as -- the

16   second as being an evolution of thought other than applying is

17   the method. Both of them are incomplete and are not an attempt

18   to forecast the company's liability after it left CCR.

19   Q.   Now, the 5.7 current forecast in February 2004, that

20   includes the -- because it's based on the Nicholson

21   projection, it's actually ten percent higher than it would

22   have been had you used the KPMG, correct?

23   A.   Approximately, according to this report, this memorandum.

24   Q.   Let's look at one more alternative forecast. If you turn

25   to Plaintiff's Exhibit 14, which is in evidence, it's your

──────Peterson - Cross - Strochak──────

1  supplemental report. And if I could turn you to page eight.

2  This is your sensitivity analysis in the middle of the page

3  there on page eight, this is your sensitivity analysis that

4  reports what your estimate would look like if you used the

5  actual 2000 and 2001 settlement averages rather than the

6  calculated trust distribution procedure derived values that

7  are part of your base case forecast, right?

8        MR. INSELBUCH: I object to that question, your Honor,

9  he's included in that question a definition that is at

10  variance with what the witness has testified.

11        MR. STROCHAK:  That's fine, your Honor, I'll withdraw

12  the TDP-derived characterization and all I'm trying to say is

13  this -- sorry.

14        THE COURT:  All right, the question is withdrawn.

15  The objection is sustained.  New question.

16        MR. STROCHAK:  Thank you, your Honor.

17  BY MR. STROCHAK:

18  Q.   The question is this sensitivity analysis in the middle

19  of the page that's reported in Table 6 is what happens when

20  you use the actual settlement averages from 2000 and 2001,

21  correct?

22  A.   This is the calculation of Turner & Newall with what the

23  average settlements were in that database for 2000/2001.

24  Q.   So everything else is held constant, that is, all the

25  methodology and assumptions in your base case estimate are

*United States District Court*
*Camden, New Jersey*

—————Peterson - Cross - Strochak—————

1  held constant and what you change is the settlement average,

2  correct.

3  A.   Well, there is two forecasts there, there is the increase

4  and no increase, but for each of them the only other change

5  was the change -- was the use of the settlements that were

6  paid by this -- excuse me, that were reached by this company

7  in 2000 and 2001 without and attempt to calculate and estimate

8  what their settlements would be on a continuing basis.

9  Q.   Yeah.  My point was just that the only variable that's

10  changed is the settlement average that you used in the

11  forecast, right?

12  A.   Yes, as I just said.

13  Q.   And in the increase column which corresponds to your

14  increasing forecast of 11.1 billion, you come up with 4.8,

15  correct?

16  A.   Yes, although -- yes, that's correct.

17  Q.   And the no increase model, and that's no increase in

18  propensities to sue and no increasing nonmalignant multiplier,

19  in that model you come up with 3.6 billion when you use the

20  actual 2000/2001 settlement averages, correct?

21  A.   Yes. And that's reported on Table 62 of the materials

22  we've reviewed previously on direct.

23  Q.   Which settlement average, which actual settlement average

24  do you use?  Do you use the 138 that we've discussed or do you

25  use the 194 that represents only those claims that actually

*United States District Court*
*Camden, New Jersey*

———————Peterson - Cross - Strochak———————

1    are marked as settled 2001 in the database?

2    A.   We don't use either of those, we use the numbers that are

3    on Table 5, shown on Table 5, the 98,000, and that was derived

4    from an average that used for -- that included all of the 2001

5    settlements, both those that were both specifically identified

6    as settling in that year, plus the imputed ones, which if you

7    looked simply at 2001 would have been 138.  But the specific

8    numbers are in Table 5.

9    Q.   So if we separated it out and using the methodology you

10   used to calculate the 2000/2001 average, if we looked only at

11   2001, it would be 138?

12   A.   For mesothelioma?

13   Q.   For mesothelioma, that's right, I'm sorry.

14   A.   Yes.

15        MR. STROCHAK:  Your Honor, I don't think I offered

16   property damage Exhibit 15, that's the February 2004

17   memorandum.  We offer that one.

18        MR. INSELBUCH: No objection.

19   (DEFENDANT EXHIBIT PD-15 WAS RECEIVED IN EVIDENCE)

20        MR. STROCHAK:  This, your Honor, is a logical

21   breaking point for me. I don't think I could finish Dr.

22   Peterson's cross today, so I would I ask to adjourn at this

23   time and resume Monday morning.

24        THE COURT:  We will recess until Monday morning at

25   9:30.

*United States District Court*
*Camden, New Jersey*

————————Peterson - Cross - Strochak————————

1          Now, let me just find out, how much more time do you

2     think we will need to devote to the completion of this case,

3     not that we're putting any pressure, just to get an idea?

4          MR. INSELBUCH: My best estimate, your Honor, is that

5     we will finish either Monday or Tuesday, but not beyond

6     Tuesday.

7          THE COURT:  For your case?

8          MR. INSELBUCH: No, I think for the entire case.

9          MR. STROCHAK:  Our case is going to be brief, your

10    Honor.  I think I have a couple of hours of cross-examination

11    for Dr. Peterson left, we will only have one witness to

12    present live testimony, that will be Dr. Cantor.  I suspect

13    her direct testimony is going to be perhaps comparable length

14    to Dr. Peterson, maybe a little bit shorter, and then the

15    cross-examination and we'll have some depositions and other

16    materials to submit that the Court can review at its

17    convenience, and then I would assume some type of closing

18    argument, if the Court would find it helpful.

19         MR. INSELBUCH: What I would suggest, actually, Dr.

20    Peterson is our last witness, although we may have rebuttal

21    depending upon what the testimony is on their case.

22         THE COURT:  Sure.

23         MR. INSELBUCH: What I would suggest, your Honor, is

24    that if we do in fact conclude on Tuesday, that we agree, or

25    if your Honor would direct us one week thereafter to

*United States District Court*
*Camden, New Jersey*

————Peterson - Cross - Strochak————

1   simultaneously file proposed findings and conclusions, and

2   perhaps reserve argument, at your Honor's discretion, until

3   after you've had an opportunity to see those findings and

4   direct us to what issues you'd like us to address.  And

5   perhaps we can do that toward the end of that week before the

6   July 4th holiday.

7        I can inform the Court that there is a hearing before

8   Justice Richards in London on July the 11th and Justice

9   Richards and all the parties in England are avidly following

10  the developments here and will want to know from us where

11  things stand and any indication your Honor might be able to

12  give us of when we might have a conclusion.

13       THE COURT:  Well, for my concern that would be an

14  excellent idea.  If we can conclude by Tuesday, then gather

15  your best judgments on findings of facts and conclusions of

16  law, then we can zero in on where we think we need greater

17  clarification and make an ultimate judgment.

18       MR. STROCHAK:  That's fine, your Honor.  I guess we

19  would also like the opportunity to submit a post trial brief

20  to put the matter in a little bit more of advocacy form than

21  in proposed findings.  We'll certainly be happy to help your

22  Honor by submitting proposed findings along with it.

23       MR. INSELBUCH:  We already filed briefs, both of us,

24  and although we could kill some more trees, I'm not sure how

25  much we could add to what we've already told you.

*United States District Court*
*Camden, New Jersey*

673

—————Peterson - Cross - Strochak—————

1          THE COURT:  Well, let's see what we're talking about.

2    If what you're saying is if you submit findings of fact and

3    conclusions of law, do you feel that you are being deprived of

4    some advocacy of your position?  I assumed that after we got

5    that and the Court had questions, advocacy would come at that

6    time, we would have an oral presentation or hearing or

7    analysis after the findings of fact and conclusions of law

8    that we've be able to look at and see how it conforms with

9    some of our preliminary thinking. Yes, that would be fine.

10          Do you think you would be deprived of advocacy if we

11   did it in that stage?

12          MR. STROCHAK:  Well, your Honor, I certain don't feel

13   deprived, your Honor has been more than gracious with time and

14   attention to this matter.  If it would be more helpful to your

15   Honor to have oral rather than written, I'm certainly happy to

16   do that.

17          THE COURT:  Oh, no, no, I'm just saying I thought

18   that's the process that we had, that we would have findings of

19   facts and conclusions of law, understanding that we would

20   reserve time for counsel to reappear to respond orally to any

21   questions the Court may have or any responses in the form of

22   advocacy you may want back and forth.

23          MR. INSELBUCH: At that point if one of the parties

24   felt that a further brief were useful and the Court thought it

25   was useful, we could prepare them and follow.

*United States District Court*
*Camden, New Jersey*

─────Peterson - Cross - Strochak─────

1          THE COURT:  I always accept advocacy, as long as it's

2   done in good faith.

3          MR. STROCHAK:  Well, I assure you everything here as

4   been done in good faith on both sides.

5          THE COURT: No, I know, I'm just making a point.

6          MR. STROCHAK:  That's fine with us, your Honor.

7          THE COURT:  I don't want deprive anyone of an

8   opportunity for advocacy, I'm just trying to see how it would

9   fit in in this process.  I think findings of fact and

10  conclusions of law, the Court gets some preliminary idea of

11  where it feels it wants to go and have an opportunity then to

12  question the parties. Now, if in that process you want to

13  submit along with your findings of fact some advocacy

14  discussion, you are free to do that.  It's up to us to make

15  sure we're concentrating on the facts that are found and how

16  we feel the law fits into that.  So, we won't deprive you of

17  that opportunity.

18         MR. STROCHAK:  That's fine, your Honor.  I don't have

19  my calendar out.  What are the dates you proposed?

20         MR. INSELBUCH: I proposed June 28th, Tuesday, for the

21  joint submission of proposed findings and conclusions, that

22  would be one week after we finish on Tuesday next week.

23         MR. STROCHAK:  I think that is probably okay.

24         THE COURT:  All right.

25         MR. INSELBUCH: And then I don't know how much time

---Peterson - Cross - Strochak---

1   your Honor would want to look at those, but just for all of us

2   who would have to prepare to travel and whatever, if you could

3   give us some date that you might want to have us here again.

4           (Short pause).

5           THE COURT:  How does the afternoon of July 14th look.

6           MR. INSELBUCH: Well, I may still be in London before

7   Justice Richards.

8           THE COURT:  When will you be back?

9           MR. INSELBUCH: I'll be back, I think, on the 14th.

10          THE COURT:  How does Thursday, July 28th sound?

11          MR. INSELBUCH: It's all right with me.

12          MR. KESSLER: Is that for oral argument, your Honor?

13          THE COURT:  Yes, because the submissions will be by

14  the 28th of June.

15          MR. STROCHAK: I was going to suggest, your Honor, if

16  we're pushing the argument out that far, perhaps you could

17  give us a little bit more time on the proposed findings.

18          THE COURT:  How much more time would you want?  July

19  5th, 12th?

20          MR. STROCHAK: Would it be acceptable to the Court

21  perhaps two weeks before the closing argument, is that enough

22  time for the Court, mid July?

23          MR. INSELBUCH: Your Honor, I'd rather not have this

24  be pushed back that far at my expense.  So I'm prepared, I

25  would be prepared to go forward and have somebody else

*United States District Court*
*Camden, New Jersey*

—————Peterson - Cross - Strochak—————

1   substitute me as an advisor in London.  I would be prepared to

2   go forward on the 14th of July.

3        THE COURT:  If you're available on the 14th, we could

4   do it.  You know, we could move a couple things around.  We

5   could do it in the morning 10:00 if that's more convenient.

6        MR. INSELBUCH: Fine.

7        MR. STROCHAK: Fine with me, your Honor.

8        THE COURT:  The only thing I would suggest in the

9   joint submission, to the extent that you could tie the

10  findings into the record so that we don't have to.

11       MR. INSELBUCH: Would it be helpful if we both

12  submitted, not only hard copy, but electronic copy?

13       THE COURT:  It would, the more the better.  And then,

14  you know, we would then be prepared for a discussion on the

15  14th of July.

16       MR. INSELBUCH: Yes, your Honor.

17       MR. STROCHAK: We're talking about joint submissions,

18  I assume you mean simultaneous submissions by both sides.  I

19  don't think we're going to agree on much.

20       MR. INSELBUCH: We might agree on the caption.

21       THE COURT:  The only thing I would leave open, and

22  not that we like to continue to kill trees, is that if you

23  feel something of a burning desire to respond to something

24  that's been said, obviously, as soon as possible after

25  receipt, to let us know where you're either confusion or

*United States District Court*
*Camden, New Jersey*

677

—Peterson - Cross - Strochak—

1  concern is with the filing so that we can have all of the

2  discussion in one place.

3         MR. INSELBUCH: Appreciate it.  One housekeeping

4  question, will the Court -- can we leave our materials here or

5  will the court be in use tomorrow.

6         THE COURT:  No, you can leave it here.

7         MR. INSELBUCH: Thank you.

8         THE COURT:  We've blocked out the time for this case

9  as far as the use of this courtroom.  We hope you have some

10 extra time to work in your office.  The amount of paper that

11 piles up when I'm down here, I feel like an absentee landlord.

12        All right.  We'll see you Monday morning at 9:30.

13                 (Proceedings Concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*Camden, New Jersey*

Peterson - Cross - Strochak

678

# C E R T I F I C A T E

I, **Theodore M. Formaroli, C.S.R.**, Official United States Court Reporter and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I do further certify that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel and that I am not financially interested in this action.

**THEODORE M. FORMAROLI, C.S.R.**
Certificate No. 433
Date: June 16, 2005

*United States District Court*
*Camden, New Jersey*