# EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

|  |  |  |
|---|---|---|
| In Re: | § | |
| SILICA PRODUCTS LIABILITY | § | MDL Docket No. 1553 |
| LITIGATION | § | |

## ORDER NO. 29: ADDRESSING SUBJECT-MATTER JURISDICTION, EXPERT TESTIMONY AND SANCTIONS

Twenty months of pre-trial proceedings and coordinated discovery in the above-styled multidistrict litigation ("MDL") have culminated in three issues becoming ripe for decision: (1) whether federal subject-matter jurisdiction exists in this MDL's 111 cases (totaling over 10,000 individual Plaintiffs); (2) whether the doctors who diagnosed Plaintiffs with silicosis employed a sufficiently reliable methodology for their testimony to be admissible; and, (3) whether Plaintiffs' counsel should be sanctioned for submitting unreliable diagnoses and failing to fully comply with discovery orders.

The rulings contained herein are summarized as follows.

The claims of every Plaintiff in each of the 90 cases listed in "Appendix A" (attached hereto) will be REMANDED for lack of subject-matter jurisdiction. In order to allow the parties an opportunity to petition the Mississippi Supreme Court for consideration of how Mississippi's judicial system can best absorb the return of these cases, the Motion to Stay the effective date of remand will be GRANTED. The Court will STAY the effective date of the remand of the cases listed in "Appendix A" for a period of 30

days from the date of this Order, after which time remand will issue.

Kirkland v. 3M Co., S.D. Tex. Cause No. 04-639, will be sent to the Judicial Panel on Multidistrict Litigation ("Panel") with a recommendation that, for the convenience of the parties and to promote the just and efficient conduct of the case, Kirkland be remanded to the United States District Court for the Northern District of Georgia.

After the implementation of the above-stated rulings, only the 19 recently-transferred cases listed in "Appendix B," as well as Alexander v. Air Liquide America Corp., S.D. Tex. Cause No. 03-533 (originally filed in this Court), will remain in this MDL. An in-person status conference will be conducted on August 22, 2005 at 9:00 a.m., concerning the appropriate procedure for expediting jurisdictional discovery in the cases listed in "Appendix B," as well as in any later-transferred cases. As to the "Appendix B" cases, the stay of discovery entered on February 22, 2005 (see Order No. 26) will be lifted. As set out in Order No. 4, all Plaintiffs in recently-transferred actions must submit sworn Fact Sheets within 60 days from the date of transfer by the Panel (excluding the period during which discovery was stayed). (Order No. 4, ¶ 20.)

In Alexander, Plaintiffs have 30 days from the date of this Order to cure the jurisdictional allegation concerning American Optical's principal place of business. Should Plaintiffs fail to

cure the allegation within 30 days, American Optical will be dismissed without prejudice.

As to Alexander, Defendants' Motion to Exclude will be GRANTED: the testimony of Dr. Harron and the testimony of Dr. Levy (as well as their accompanying diagnoses) are inadmissible. Immediately following the August 22, 2005 status conference addressing the "Appendix B" cases, the Court will conduct an in-person status conference in Alexander, to address whether (and, if so, under what conditions) the Plaintiffs' claims may proceed.

Defendants' Motions for Sanctions will be GRANTED as to Alexander. The law firm of O'Quinn, Laminack & Pirtle ("O'Quinn") has multiplied the proceedings unreasonably and vexatiously, and will be required to satisfy personally Alexander's proportionate share (i.e., one percent) of Defendants' reasonably incurred costs, expenses and attorneys' fees for the Daubert hearings conducted on February 16-18, 2005. The Court does not yet fix the amount of this sanction. Instead, within seven days from the date of this Order, O'Quinn must file a statement with the Court either admitting or denying the Court's estimate of $825,000 as the total amount of fees, costs and expenses Defendants reasonably incurred due to the three-day Daubert hearings. Should O'Quinn deny the $825,000 figure, the Court first will allow Defendants to prove their actual fees, expenses and costs for the Daubert hearings, and then will allow O'Quinn to challenge those amounts and their reasonableness; finally, the Court will sanction O'Quinn for

<u>Alexander</u>'s proportionate share of the actual fees, expenses and costs Defendants reasonably incurred. Regardless of whether O'Quinn admits or denies the $825,000 figure, the amount of the sanction will be set in a later order.

As to all MDL cases transferred by the Panel <u>before</u> December 5, 2004 (i.e., the "Appendix A" cases, over which the Court has no subject-matter jurisdiction), the Motion to Exclude Expert Testimony, the Motions for Sanctions, and all other pending motions not otherwise addressed in this Order are reserved for consideration by the appropriate state court after remand.

As to those MDL cases transferred by the Panel <u>after</u> December 5, 2004 (i.e., the "Appendix B" cases), the Motion to Exclude Expert Testimony, the Motions for Sanctions, and all other pending motions not otherwise addressed in this Order are STAYED pending this Court's ruling on subject-matter jurisdiction.

## Table of Contents

I.  Background . . . . . . . . . . . . . . . . . . . . . . . . 7
    A.  Silica and Silicosis . . . . . . . . . . . . . . . . 7
    B.  MDL 1553 . . . . . . . . . . . . . . . . . . . . . . 15
II. Daubert Hearings/Court Depositions . . . . . . . . . . . 30
    A.  Need for the Daubert Hearings . . . . . . . . . . . 30
        1.  Dr. Martindale's Deposition . . . . . . . . . . 32
        2.  December Hearings . . . . . . . . . . . . . . . 38
            a.  December 2 Telephonic Conference . . . . 38
            b.  December 17 Status Conference . . . . . . 39
        3.  Dr. Hilbun's & Dr. Cooper's Depositions . . . 45
    B.  Medically-Accepted Method for Diagnosing
        Silicosis . . . . . . . . . . . . . . . . . . . . . 49
    C.  Comparison to Asbestosis . . . . . . . . . . . . . 60
    D.  Screening Companies . . . . . . . . . . . . . . . . 63
    E.  Dr. Ray Harron . . . . . . . . . . . . . . . . . . 80
    F.  Dr. Andrew Harron . . . . . . . . . . . . . . . . . 91
    G.  Dr. Ballard . . . . . . . . . . . . . . . . . . . . 92
    H.  Dr. Levy . . . . . . . . . . . . . . . . . . . . . 96
    I.  Dr. Coulter . . . . . . . . . . . . . . . . . . . . 107
    J.  Dr. Oaks . . . . . . . . . . . . . . . . . . . . . 113
    K.  Daubert Analysis . . . . . . . . . . . . . . . . . 116
        1.  Legal Standard . . . . . . . . . . . . . . . . 117
        2.  Criterion 1: Sufficient Exposure . . . . . . . 121
        3.  Criterion 2: Radiographic Findings . . . . . . 128
        4.  Criterion 3: Differential Diagnosis . . . . . 137
        5.  Lawyers Practicing Medicine and
            Doctors Practicing Law . . . . . . . . . . . . 143
        6.  Effects of Mass Over-Diagnosing . . . . . . . 151
        7.  Alexander Ruling . . . . . . . . . . . . . . . 153
    L.  Independent Medical Advisors/Technical
        Advisory Panel . . . . . . . . . . . . . . . . . . 161
    M.  Kirkland Deposition . . . . . . . . . . . . . . . . 164
III. Subject-Matter Jurisdiction . . . . . . . . . . . . . . 169
    A.  Priority of Subject-Matter Jurisdiction . . . . . . 169
    B.  Removal . . . . . . . . . . . . . . . . . . . . . . 171
    C.  Diversity Jurisdiction . . . . . . . . . . . . . . 171
        1.  Amount in Controversy . . . . . . . . . . . . 172
        2.  Complete Diversity . . . . . . . . . . . . . . 175
            a.  Improper Joinder . . . . . . . . . . . . 177
                i.  Joinder of Plaintiffs . . . . . . . 184
                ii. Joinder of Defendants by Each
                    Individual Plaintiff . . . . . . . . 193
            b.  Procedural Issues . . . . . . . . . . . . 197
            c.  Analysis . . . . . . . . . . . . . . . . 200

      D.   Motion to Stay the Effective Date of Remand . . . . 215
      E.   Cases Transferred After December 5, 2004 . . . . . 217
      F.   <u>Kirkland</u> . . . . . . . . . . . . . . . . . . . 218
      G.   <u>Alexander</u> . . . . . . . . . . . . . . . . . . . 222
IV.  Sanctions . . . . . . . . . . . . . . . . . . . . . . . 225
      A.   In the Absence of Subject-Matter Jurisdiction . . . 227
      B.   <u>Alexander</u> . . . . . . . . . . . . . . . . . . . 232
V.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . 246

## I.   Background

### A.   Silica and Silicosis[1]

The mineral that lies at the heart of this litigation--silica--appears benign at first glance.  Silica, also known as silicon dioxide, is the second most common mineral in the earth's crust and is the primary ingredient of sand and 95 percent of the earth's rocks.  But if sand or rocks are chipped, cut, drilled or ground, respirable-sized particles of silica may be produced, and the mineral becomes potentially dangerous.  Inhaled silica particles may be trapped in the lungs, causing areas of swelling and scarring.  Over time, these swollen areas can grow larger, breathing can become increasingly difficult, and eventually, the lungs may fail completely, resulting in death.  This disease is called "silicosis."

Silicosis is classified into three types: chronic/classic, accelerated and acute.  Chronic or classic silicosis, the most common form, typically requires at least 15-20 years of moderate to low exposure of respirable silica.  Accelerated silicosis can occur after 5-10 years of high exposure.  Acute silicosis occurs after a few months or as long as two years of exposure to extremely high concentrations of respirable silica.  The symptoms associated with

---

[1]  Unless otherwise noted, the background information on silica and silicosis contained herein was gathered from the websites of the Centers for Disease Control (www.cdc.gov & www.cdc.gov/niosh/) and the World Health Organization (www.who.int).

silicosis include shortness of breath, fatigue, chest pain, weight loss, fever and/or respiratory failure.

The only effective treatment for silicosis is a lung transplant. (Feb. 18, 2005 Trans. at 308.)  Otherwise, the disease is incurable, progressive, and irreversible.  Because people with silicosis have a high risk of developing tuberculosis ("TB"), they should undergo frequent TB tests and in some cases may be prescribed a TB medication as a prophylactic measure.  (Feb. 18, 2005 Trans. at 308-09.)  Silicosis also can lead to cancer and autoimmune disease, so silicotics should be frequently tested for those associated diseases.  In addition, a silicotic who has difficulty breathing may be treated with drug therapy to keep the airways open and free of mucus.  A silicotic should also receive any available pneumonia vaccines and should be encouraged to cease smoking.  (Feb. 18, 2005 Trans. at 308.)  And, of course, anyone with silicosis should avoid further exposure to respirable silica, to prevent the disease from worsening.

Silicosis is one of the oldest recognized occupational diseases, with cases recorded as far back as the 16th century.  In the early 1930's, the Tennessee Valley Authority built the "Hawk's Nest Tunnel" through Gauley Mountain in West Virginia to build a hydroelectric facility.  In order to accomplish this, the workers drilled though one mile of almost pure silica.  Five thousand people worked on this project; no safety precautions were taken to prevent respirable-silica exposure.  Approximately 1,200 workers

-8-

developed silicosis, and approximately 400-600 of these workers perished from the disease. This is known as the "Hawk's Nest incident," and it is considered America's worst industrial disaster.[2]

But despite the fact that the dangers of respirable silica have been known for many years, more than a million U.S. workers continue to be exposed to respirable silica. Exposure is most prevalent in occupations such as abrasive blasting (i.e., "sandblasting"), mining, quarrying, and rock drilling.

This continued exposure is tragic, because while silicosis is incurable, it is also 100 percent preventable. There are well-known steps employers, workers, and/or government regulators could take to drastically reduce worker exposure to respirable silica. Indeed, the use of crystalline silica was banned in abrasive blasting operations in Great Britain in 1950 and in other European nations in 1966. In the United States, in 1974, NIOSH recommended that silica sand be prohibited for use as an abrasive blasting material in favor of less hazardous substances.[3] While this

_____

[2] See generally Martin Cherniak, THE HAWK'S NEST INCIDENT: AMERICA'S WORST INDUSTRIAL DISASTER (Yale Univ. Press 1986).

[3] NIOSH has studied several abrasive agents that might be used as substitutes for silica sand during sandblasting. Some of the abrasives studied are steel grit, specular hematite, nickel slag, copper slag, crushed glass, garnet, staurolite, olivine, and coal slag. Most of these abrasives work as well as silica sand and cost about the same or even less. However, the use of a substitute may have other adverse effects. See generally http://www.cdc.gov/elcosh/docs/d0100/d000048/d000048.html.

recommendation was not adopted, beginning in the 1970's, OSHA implemented regulations requiring the use of respirators, as well as other measures designed to reduce workers' exposure to respirable silica.  In 2001, OSHA reported:

> Although OSHA currently has a permissible exposure limit for crystalline silica ..., more than 30 percent of OSHA-collected silica samples from 1982 through 1991 exceeded this limit.  Additionally recent studies suggest that the current OSHA standard is insufficient to protect against silicosis.

66 Fed. Reg. 25724, 25727 (May 14, 2001).  Steps employers and workers can take to prevent exposure include engineering controls, such as ventilation systems, automated equipment operated from an enclosed booth, and "wet methods" (e.g., while cutting masonry or concrete, using water to prevent silica dust clouds), as well as the proper use of appropriate respirators.

Yet, while even a single silicosis death is one death too many, progress is being made.  The Centers for Disease Control ("CDC") has found that the number of U.S. workers exposed to silica dust has declined steadily from 1970 to 2002.  Correspondingly, silicosis deaths have also steadily declined.[4]  The National Institute for Occupational Safety and Health ("NIOSH"), in its most recent estimates, reports that deaths attributable to silicosis in the United States have declined steadily each year from 1,157

---

[4]  The CDC estimates that this decline in silicosis mortality is due to (1) the loss of jobs in heavy industry, and (2) dust limits in the U.S., which have been increased steadily for approximately thirty years.  (Feb. 18, 2005 Trans. at 226.)

deaths in 1968 to 187 deaths in 1999. According to NIOSH, the state with the highest silicosis mortality rate is West Virginia, with an age-adjusted mortality rate of 4.74 deaths per million population over the 10-year period from 1990-1999.[5] Mississippi ranks 43rd in the United States, with an age-adjusted silicosis mortality rate of 0.64 deaths per million, equating to 1.3 silicosis deaths per year.[6]

A recent peer-reviewed study of the incidence of silicosis in Michigan found that from 1987 to 1996, the ratio of the number of living to deceased silicosis cases was 6.44.[7] Applying this ratio to NIOSH's silicosis mortality statistics between 1990 and 1999 (during which time Mississippi had 13 silicosis deaths), one would anticipate approximately eight new silicosis cases per year in

_____

[5] See www.cdc.gov/niosh/docs/2003-111/pdfs/2003-111d.pdf.

[6] See id.; Feb. 18, 2005 Trans. at 228. Alabama ranks 19th, with an age-adjusted mortality rate of 1.20 deaths per million, and Texas ranks 33rd, with an age-adjusted mortality rate of 0.83 deaths per million. See www.cdc.gov/niosh/docs/2003-111/pdfs/2003-111d.pdf.

[7] (Feb. 18, 2005 Trans. at 229.) The researchers compared the number of silicosis deaths on death certificates with the number of silicosis cases reported by doctors, hospitals and worker's compensation agencies in Michigan. (Feb. 18, 2005 Trans. at 231.) In Michigan, silicosis is "reportable", meaning that any diagnosis must be reported to the appropriate agency by law. (By contrast, silicosis is not a reportable disease in Mississippi.)
According to occupational medicine expert Dr. Gary Friedman, some experts feel the 6.44 multiplier is too high. (Feb. 18, 2005 Trans. at 231.) The issue is whether the multiplier accurately compensates for the likelihood that silicosis cases are sometimes missed or misdiagnosed by physicians. (Feb. 18, 2005 Trans. at 118.)

Mississippi. Applying the 6.44 multiplier to the 1999 U.S. mortality rate, one would anticipate approximately 1,204 new silicosis cases per year throughout the entire United States.

This information provides the backdrop for the issue of immediate concern to this Court: silicosis lawsuits, especially in Mississippi. In 2000, approximately 40 Plaintiffs filed silicosis claims in Mississippi courts. In 2001, approximately 76 Plaintiffs filed silicosis claims in Mississippi courts. These numbers are considerably higher than what one might expect given the Michigan study, but they are not outside the realm of what an epidemiologist would say is possible in Mississippi.[8]

However, in 2002, the number of new Mississippi silicosis claims skyrocketed to approximately 10,642. In 2003 and 2004, the number of new silicosis claims in Mississippi continued to be shockingly high, at 7,228 claims in 2003 and 2,609 claims in 2004. By way of comparison, in 2002, on average, more silicosis claims were filed per day in Mississippi courts than had been filed for the entire year only two years earlier. And during 2002-2004, the 20,479 new silicosis claims in Mississippi are over five times

_____

[8] Dr. Howard William Ory, an epidemiologist who worked for the CDC for 23 years, estimated that based on data from NIOSH's silicosis surveillance system (which actively solicits case reports from pulmonary and occupational medicine physicians and "B-readers" (discussed infra)) and from the Michigan study (referenced supra), there would be between 36 and 73 cases of silicosis diagnosed in Mississippi per year. (Ory Aff. at 3 (attached to MDL 03-1553 Docket Entry 1145).)

greater than the total number of silicosis cases one would expect over the same period in the entire United States.

This explosion in the number of silicosis claims in Mississippi suggests a silicosis epidemic 20 times worse than the Hawk's Nest incident. Indeed, these claims suggest perhaps the worst industrial disaster in recorded world history.

And yet, these claims do not look anything like what one would expect from an industrial disaster. One would expect an industrial disaster to look like the Hawk's Nest incident: presenting cases of acute silicosis (with relatively brief incubation periods), emanating from a single worksite or geographic area with an extremely high concentration of silica. To the contrary, virtually all of these silicosis claims are for chronic or classic silicosis (with incubation periods in excess of 15 years). The claims do not involve a single worksite or area, but instead represent hundreds of worksites scattered throughout the state of Mississippi, a state whose silicosis mortality rate is among the lowest in the nation.[9]

_____

[9] According to the CDC, Mississippi's silicosis mortality rate ranks 43rd out of the 50 states. See www.cdc.gov/niosh/docs/2003-111/pdfs/2003-111d.pdf. Outside of Mississippi, the majority of the remainder of Plaintiffs in this MDL reside in Alabama (which ranks 19th in silicosis mortality), Texas (which ranks 33rd), and Kentucky (which ranks 14th). The states with the highest silicosis mortality rates (West Virginia, Vermont, Colorado, Pennsylvania and New Mexico being the top five) are not represented. According to the most recent statistics from the CDC's Morbidity and Mortality Weekly Report, during the years of 1968-2002, "[b]y county, the greatest age-adjusted [silicosis] mortality rates were clustered in western states, northeastern states, and north Atlantic states." http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5416a2.htm.

Moreover, given the sheer volume of claims--each supported by a silicosis diagnosis from a physician--one would expect the CDC or NIOSH to be involved, examining and responding to this enormous epidemic.  One would expect local health departments and physician groups to be mobilized.  One would expect a flurry of articles and attention from the media, such as what occurred in 2003 with SARS.[10]

But none of these things have happened.  There has been no response from OSHA, the CDC, NIOSH or the American Medical Association to this sudden, unprecedented onslaught of silicosis cases.  By contrast, the CDC and NIOSH issued an outbreak alert in 1988 for 10 cases of silicosis in Ector County, Texas, and for a single death from acute silicosis in Ohio in 1992.  (Feb. 18, 2005 Trans. at 234.)  The OSHA field office in Jackson, Mississippi has had no reports of any silica problems in recent years and has had no requests for any silica-related investigations.  (Feb. 18, 2005 Trans. at 237.)  Officials from the Mississippi State Department of Health, the Mississippi Medical Association, the Mississippi Board of Licensure, and the University of Mississippi Medical School all were unaware of any increase in silicosis cases in Mississippi. (Feb. 18, 2005 Trans. at 237-41.)  Likewise, Mississippi's apparent silicosis epidemic has been greeted with silence by the media, the public, Congress and the scientific communities.

---

[10]  There has been 27 SARS cases in the United States, 251 in Canada, and approximately 8,000 worldwide, mostly in Asia. (Feb. 18, 2005 Trans. at 235.)

In short, this appears to be a phantom epidemic, unnoticed by everyone other than those enmeshed in the legal system: the defendants, who have already spent millions of dollars defending these suits; the plaintiffs, who have been told that they are suffering from an incurable, irreversible and potentially fatal disease; and the courts, who must determine whether they are being faced with the effects of an industrial disaster of unprecedented proportion--or something else entirely.

**B.    MDL**

Over 10,000 of the silicosis claims recently filed in Mississippi (as well as claims filed in Kentucky, Texas and Missouri) are now pending in the above-styled MDL.  The MDL began on September 4, 2003, when the Judicial Panel on Multidistrict Litigation centralized 22 actions into this Court pursuant to 28 U.S.C. § 1407, for coordinated or consolidated pretrial proceedings.[11]  See In re Silica Prods. Liab. Litig., 280 F. Supp.

---

[11]  Title 28 U.S.C. § 1407, the MDL statute, provides in relevant part:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings.  Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.  Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated....

2d 1381 (J.P.M.L. 2003). Since that time, 85 additional actions have been conditionally transferred to this MDL.[12] Cumulatively, these cases involve over 10,000 individual Plaintiffs, each alleging injuries from silica exposure caused by over 250 corporate Defendants.[13]

The majority of Plaintiffs are individuals who were at one point employed as sandblasters, foundry workers, or in other trades which required them to work in an environment that exposed them to silica dust. Plaintiffs have sued Defendants who made a product which contains silica, made a product used to protect workers from exposure to silica, and/or made a product used to work with silica. Plaintiffs assert the following causes of action under state law: negligence, gross negligence, breach of warranty, products liability, premises liability, civil conspiracy, and fraud. Plaintiffs seek compensatory and punitive damages.

_____

28 U.S.C. § 1407(a).

[12] An additional action in this MDL was originally filed in this Court, Alexander v. Air Liquide America Corp., S.D. Tex. Cause No. 03-533.

[13] The exact numbers of Plaintiffs and Defendants change on an almost daily basis. This is because claims are either subtracted from this MDL (usually via unopposed motions to dismiss occasioned by settlement or agreement of the parties) or added to this MDL (via conditional transfer orders from the Judicial Panel on Multidistrict Litigation).

One-hundred-seven of the 111 cases in this MDL were originally filed in Mississippi state court.[14] The vast majority of Plaintiffs in the MDL cases are citizens of Mississippi, Alabama and Texas, although the Plaintiffs also include a scattering of residents of other states (Arkansas, California, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Michigan, Missouri, North Carolina, Ohio, Tennessee, and West Virginia). The number of Plaintiffs in the cases range from 1 to 4,280. The number of Defendants in the cases range from 6 to 134, all corporations, some of which are incorporated in, or have their principal place of business in, Mississippi.[15]

---

[14] The four current MDL cases filed outside of Mississippi are: Alexander v. Air Liquide America Corp., S.D. Tex. Cause No. 03-533 (filed originally in this Court on the basis of diversity jurisdiction); Kirkland v. 3M, S.D. Tex. Cause No. 04-639 (filed originally in Georgia state court and subsequently removed to the Northern District of Georgia, where it was assigned cause number 1:04-2152); Covey v. Union Pacific R.R., S.D. Tex. Cause No. 05-93 (filed originally in Missouri state court and removed to the Eastern District of Missouri, where it was assigned cause number 4:03-1686); and, Adams v. Pulmosan Safety Equip. Corp., S.D. Tex. Cause No. 05-183 (filed originally in Kentucky state court and removed to the Western District of Kentucky, where it was assigned cause number 5:04-123).

[15] In many cases, the number of Defendants bear no apparent relationship to the number of Plaintiffs. Instead, the number of Defendants (and the identity of the Defendants) seem to be contingent on the identity of the Plaintiffs' law firms rather than the identity of the Plaintiffs. For instance, O'Quinn, Laminack & Pirtle is Plaintiffs' counsel in 18 MDL cases, 16 of which are brought against the same 73 Defendants, despite the fact that the Plaintiffs in those 16 cases range in number from 9 to 410. Likewise, Campbell, Cherry, Harrison, Davis & Dove is Plaintiffs' counsel in two MDL cases, one with 247 Plaintiffs and one with 4,280 Plaintiffs, but both against the same 134 Defendants.

Defendants removed each of the 104 Mississippi cases to federal court, alleging diversity jurisdiction.[16] The removing Defendants asserted that while complete diversity did not exist on the face of the Complaints, in each case, the Plaintiffs had been improperly joined because no two Plaintiffs had similar exposure histories to silica. Defendants argued that in deciding jurisdiction, the Court should sever each Plaintiff's claim and focus solely on the citizenship of the specific Defendants who allegedly caused that Plaintiff's specific injury. Defendants argued that once this is done, some Plaintiffs' claims would be remanded to state court, but the vast majority of severed claims would be within the diversity jurisdiction of federal court. At the time of removal, Defendants provided no proof for its assertions; they merely asserted "[o]n information and belief, few, if any, plaintiffs were exposed to the Mississippi Defendants' products. Therefore, the Mississippi Defendants were fraudulently

---

[16] At the time of removal, Defendants also argued that federal bankruptcy jurisdiction existed due to the fact that some Plaintiffs had filed bankruptcy. Defendants asserted that "[s]ome or all of the claims in this action are core proceedings or are related to the above-referenced bankruptcy cases, and are within the Court's original jurisdiction." (See, e.g., Notice of Removal, Sullivan v. Aearo, 03-369, ¶ 12.) Defendants did not specify which Plaintiffs had filed for bankruptcy protection or when, instead stating in the removal notices that "defendants cannot without remand-related discovery identify every plaintiff with a bankruptcy case." (Id. ¶ 10.) However, this argument was quickly abandoned by Defendants and has not been reasserted. Since the removing party bears the burden of showing that removal was proper, see Manguno v. Prudential Prop. & Cas. Ins. Co., 276 F.3d 720, 723 (5th Cir. 2002), and since Defendants have failed to even attempt to make this showing, the Court will not dwell on the issue of bankruptcy jurisdiction.

-18-

joined as to [the] overwhelming majority of plaintiffs." (See, e.g., Notice of Removal, Sullivan v. Aearo, S.D. Tex. Cause No. 03-369, ¶ 6.)  The notices of removal also alleged that, "[a]lthough the complaint is silent, it is facially apparent that the amount in controversy exceeds $75,000, exclusive of costs."  (Id. ¶ 8.)

When the cases were initially transferred to this Court, a number of remand motions filed by Plaintiffs were pending.  More remand motions followed.

On December 12, 2003, at the outset of the first in-person conference in this MDL, the Court raised the issue of its subject-matter jurisdiction.  The Court stated its opinion that, based upon the relevant law and the submissions of the parties up to that point, it did not appear that the Court had jurisdiction over the MDL cases.  (Dec. 12, 2003 Hearing Trans. at 12-13, 18 ("I'm not closing down your jurisdictional issue.  But if I have to [decide] it right now, ... I would remand all the cases to State Court.").) The Court proposed giving the Defendants "all the discovery [they] want on fraudulent misjoinder."[17]   (Id. at 13.)   However, the Defendants asked if, prior to any discovery, they could further brief the jurisdictional issue.  (Id. at 14-15.)  The Court agreed, but also noted the benefit of coordinated discovery: "[I]f I end up remanding ... all [the cases] to State Court a year from now, you

_____

[17]  As discussed infra, fraudulent misjoinder is a doctrine relevant to a federal court's subject-matter jurisdiction--specifically, diversity jurisdiction.

will at least have had the opportunity to have one forum to do discovery, one forum to prepare your case." (Id. at 15.)

In mid-January 2004, at the direction of the Court, the parties submitted briefs on the issue of the Court's subject matter jurisdiction. Defendants proposed a process whereby the Court would apply the doctrines of "fraudulent joinder" and "fraudulent misjoinder" to scrutinize the claims of each Plaintiff in order to determine precisely against whom that Plaintiff has a legitimate claim. Only after parsing the pleadings in this way did the Defendants propose the Court look to the citizenship of the "legitimate 'plaintiff vs. defendant' groupings" in order to determine whether complete diversity exists. (Martin Materials' Separate Mem. Opposing Remand, MDL docket entry 83, at 7.) Defendants' proposed process entailed conducting "remand-related discovery" (designed to pierce the generalized complaints and determine the precise nature of each Plaintiff's claim).

Plaintiffs maintained their position that the Court lacked subject-matter jurisdiction. They further argued that if discovery was permitted, it should not be limited to jurisdictional issues.

On January 23, 2004, after the second status conference, the Court denied all pending motions to remand without prejudice to re-urge at a later date. (Order No. 4 ¶ 1.) At the request of the parties, the Court issued Paragraph 19 of Order No. 4, designed to aid the Court in determining its subject-matter jurisdiction by "develop[ing] the factual basis for the claims of each Plaintiff."

-20-

(Order  No.  4,  ¶  19.)[18]      In  compliance  with  this

---

[18]  Order No. 4 provides, in relevant part:
19.  The Parties have two weeks to create an affidavit
that can be used to develop the factual basis for the
claims of each Plaintiff.  At a minimum, the Plaintiffs
must disclose where they believe they were exposed to
silica including the date and location, state their
particularized claims against each Defendant, provide
medical release authorization, and provide IRS release
authorization.  The Parties have two weeks to agree on
a definition of "silica-related products" that will
govern the products claims in this litigation.  If an
agreement can not be reached on these matters, the
Parties are instructed to contact the Court's case
manager and a hearing will be held on Thursday,
February 5, 2004 at 8:30 a.m.
20.  Initial Disclosures must be made by April 5, 2004.
Plaintiffs must provide completed affidavits of the
factual basis of their claims.  In all later
transferred cases, Plaintiffs' affidavits must be
disclosed within 60 days from the date of transfer by
the Judicial Panel on Multidistrict Litigation.
Defendants must disclose all silica-related products
they manufactured or distributed from the year 1930
forward and include the relevant time frame of
production/distribution for each product, pursuant to
the agreed definition of "silica-related products."
(Order No. 4, ¶¶ 19-20.)
     This Court entered these Orders, as well as those discussed
infra, as an exercise of its "wide discretion" over the
management of pretrial discovery, especially when "handl[ing] the
complex issues and potential burdens on defendants and the court
in mass tort litigation."  Acuna v. Brown & Root Inc., 200 F.3d
335, 340 (5th Cir. 2000) ("[T]here are approximately one thousand
six hundred plaintiffs suing over one hundred defendants for a
range of injuries occurring over a span of up to forty years.
Neither the defendants nor the court was on notice from
plaintiffs' pleadings as to how many instances of which diseases
were being claimed as injuries or which facilities were alleged
to have caused those injuries.  It was within the court's
discretion to take steps to manage the complex and potentially
very burdensome discovery that the cases would require.") (citing
Landry v. Air Line Pilots Ass'n Int'l AFL-CIO, 901 F.2d 404, 436
(5th Cir. 1990); Fournier v. Textron, Inc., 776 F.2d 532, 534 (5th
Cir. 1985) (noting district court's authority to manage and
develop complex litigation discovery)).  In Acuna, the Fifth
Circuit affirmed the district court's dismissal of plaintiffs'
claims prior to the commencement of discovery when plaintiffs

-21-

Order, the parties agreed to the form of sworn "Fact Sheets" to be submitted by each Plaintiff and each Defendant.  The Plaintiff's Fact Sheet required each Plaintiff to submit specific information about when, where and how each Plaintiff alleged he or she was exposed to silica dust.  The Plaintiff's Fact Sheet also required detailed medical information concerning each Plaintiff's silica-related injury.  Defendant's Fact Sheet required each Defendant to provide information (including photographs) of each silica-related product that the Defendant designed, manufactured, marketed, sold, and/or distributed from 1930 to the present.  (According to Plaintiffs, this information was necessary for them to determine precisely against which Defendants each Plaintiff had a claim.) Blank examples of each Fact Sheet are attached to Order No. 6, issued February 5, 2004; six examples of completed Plaintiff's Fact Sheets are attached hereto as Exhibits 32-37.[19]

The Court did not limit discovery to the completion of the Fact Sheets, but instead allowed discovery to proceed at the discretion of the parties.  In addition, the Court established a

---

failed to obey district court's order requiring plaintiffs to submit expert affidavits that "had to specify, for each plaintiff, the injuries or illnesses suffered by the plaintiff that were caused by the alleged uranium exposure, the materials or substances causing the injury and the facility thought to be their source, the dates or circumstances and means of exposure to the injurious materials, and the scientific and medical bases for the expert's opinions."  Acuna, 200 F.3d at 338, 340.

[19]  Certain portions of the Fact Sheets have been omitted from these Exhibits.  Specifically, the signed authorizations to release medical and financial records have been omitted, as well as all Social Security earnings statements.

method for handling discovery disputes quickly and efficiently. (Order No. 4, ¶ 21 ("Each party is ordered to bring any discovery issue to the Court's attention immediately. At first sign of a discovery problem, all parties shall make a joint telephone call to the case manager who will schedule a joint conference call with the Court that same day.").) At the same time, the Court directed the establishment of a document depository for all documents produced in these cases, as well as a website, www.mdl1553.com, to serve as the electronic bulletin board for this litigation. (Order No. 4 ¶ 17; Order No. 5A.)

Over the course of the next year, the Court conducted in-person status conferences approximately every 5-8 weeks. At these conferences, the Court addressed scores of pending motions, discovery disputes and administrative matters. The Court also repeatedly returned to the issue of its subject-matter jurisdiction. Invariably, this issue boiled down to Defendants' objections that Plaintiffs' Fact Sheets were too generalized to allow the Defendants to identify precisely which Defendant(s) each Plaintiff was alleging caused his or her injury. These objections would typically be followed by counter-objections from Plaintiffs that Defendants' deficient disclosures were hampering their efforts to develop the factual bases for their claims.[20]

---

[20] More specifically, Plaintiffs have repeatedly argued that in order to aid Plaintiffs in narrowing their claims, they need (1) photos of each silica-related product manufactured, sold or distributed by each Defendant, and (2) sales receipts showing the ultimate destinations of each Defendant's silica-related

-23-

For example, after the May 17, 2004 status conference, the
Court issued Order No. 10, which states, in part:

> 5. The Court notes that Plaintiffs' disclosures in their
> Fact Sheets appear deficient. Additionally, Plaintiffs
> challenge the adequacy of Defendants' disclosures. The
> Parties have until the next hearing to cure any
> deficiencies. The Court will address the adequacy of the
> disclosures by both sides at the next hearing.
> 6. Defendants are ordered to disclose any machines or
> products that they manufacture that produce respirable
> crystalline silica dust as previously explained in Order
> No. 6, as well as products and applications that are
> included in the list identified by National Institute for
> Occupational Safety and Health ("NIOSH") as containing
> respirable crystalline silica dust. Defendants are also
> ordered to disclose as "silica related products" any
> product that contains a Material Safety Data Sheet
> ("MSDS"), or other warning, that warns of silicosis or
> silica exposure from using the product.

(Order No. 10 ¶¶ 5-6.) After the June 28, 2004 status conference,
the Court issued Order No. 12, which provides in part:

> 12. Plaintiffs have two weeks to supplement their fact
> sheets with regards to the types of products used and any
> identifying product information. The Court finds that
> products listed on Plaintiffs' fact sheets represent
> regular use only by Plaintiffs. If a specific product
> name or identifying information is not included on the
> fact sheets then the Court finds that neither the product
> name nor identifying information is known by Plaintiffs
> at this time.
> 13. Plaintiffs have two weeks to supplement their fact
> sheets to include the names, dates, and locations of
> specific work sites where Plaintiffs allege exposure to
> silica. Once a particular work site is identified by
> relevant dates of employment, location, and types of
> products, Defendants have 30 days to produce any sales
> records for that work site encompassing the products
> described by Plaintiff.

--------------------

products.

-24-

(Order No. 12 ¶¶ 12-13.)  After the August 22, 2004 status conference, the Court issued Order No. 13, which addressed a number of deficiencies in the Defendants' disclosures of sales records and distributor lists.  (Order No. 13 ¶¶ 2-4, 8-9.)

The objections about each side's disclosures continued.  After the October 14, 2004 status conference, the Court issued Amended Order No. 14, which provides in part:

> 1.  Within 90 days after receiving Defendants' sales receipts (as ordered by the Court to be due on October 15, 2004) Plaintiffs are required to dismiss without prejudice all Defendants not identified by name in said receipts unless a Defendant's product has been specifically identified in a Plaintiff's previously filed affidavit.
> 2.  To the extent not already done, Plaintiffs are ordered thirty days from today to supplement their initial affidavits with the identity of worksites, including address and employer name, at which injuries occurred, and the date range of said exposure.
> ....
> 8.  At least 30 days prior to any Plaintiff's deposition, Plaintiffs will notify all Defendants against whom that Plaintiff has a cause of action.  All other Defendants will be dismissed without prejudice as to that Plaintiff. Failure to adequately notify the Defendants may result in sanctions against the Plaintiff of up to five hundred dollars for each Defendant who appears unnecessarily.

(Am. Order No. 14 ¶¶ 1-2, 8.)

Between each status conference, the Court ruled on a multitude of motions, conducted a number of phone conferences to resolve discovery disputes, entered protective orders, and otherwise implemented a number of administrative measures designed to move these cases forward.

-25-

However, one thing that the Court did not do was enter a case management plan. The Court urged the parties to jointly construct and agree to a plan governing the discovery process. But the parties proved unwilling to agree. Instead, Plaintiffs and Defendants submitted competing proposed case management plans. Plaintiffs' proposed plan would establish four "representative worksite tracks for case-specific pretrial preparation." Each track (representing four of the larger worksites at issue) would consist of 60 Plaintiffs (20 selected by Plaintiffs, 20 selected by Defendants and 20 randomly selected by the Court). Under this plan, discovery on the 240 representative Plaintiffs would be concluded by the beginning of 2006, with the entire MDL set to conclude January 31, 2006. The Defendants objected that this provision would allow them to depose only 2.4 percent of the Plaintiffs (while Plaintiffs would have been free to depose all of the Defendants), leaving the vast majority of the discovery and pre-trial motions against Plaintiffs to be handled after the cases were returned to the transferor courts. The Defendants also objected that allowing Plaintiffs to select one-third of the representatives would create an unrepresentative sample of Plaintiffs, since the initial disclosures showed that 93 percent of Plaintiffs had minimal radiographic findings.

By contrast, the Defendants' proposed case management plan had much grander aspirations--it provided for discovery on every one of the 10,000 Plaintiffs' claims. It would accomplish this by

"staging" the discovery of the claims: a schedule would be established for discovery of each claim once a Plaintiff is selected to a monthly grouping of claims. Forty Plaintiffs would be randomly chosen for each monthly grouping, and eleven groupings would be selected each year, with no monthly grouping for December. For the first grouping of forty Plaintiffs, discovery would be completed and dispositive motions would be fully briefed on October 15, 2005. Defendants envisioned that this process would continue at a rate of 440 Plaintiffs per year until all Plaintiffs' claims had been exhausted. Thus, Defendants envisioned that discovery in this MDL would continue for over twenty years (and possibly much longer, judging by the rate at which new cases have been transferred to the MDL). While such interminable discovery might guarantee lifetime employment for defense counsel, it also calls to mind the saying that "justice delayed is justice denied."[21]

After hearing arguments on the issue, the Court declined to order that either plan be implemented. Instead, the Court made clear at the October 14 status conference that there were no orders (other than agreed protective orders) limiting discovery at all. (Am. Order No. 14 ¶ 5.) However, for the second time (the first being in May 2004), the Court ordered that the Plaintiffs who are most ill be deposed first. (Am. Order No. 14 ¶¶ 6-7; Order No. 10 ¶ 7.) To this end, Plaintiffs were ordered "to identify and

---

[21] The saying is attributed to William Gladstone. See http://bartleby.school.aol.com/73/954.html.

-27-

provide to Defendants a list of grouped Plaintiffs arranged seriatim with the highest number b-read to the lowest. Plaintiffs will identify in this list those Plaintiffs who do not have a high number b-read but whom they believe to be seriously ill with silica related disease." (Am. Order No. 14 ¶ 6.)

Finally, by the December 2004 status conference, it was clear that a decision on the issue of subject-matter jurisdiction could no longer be delayed. In Order No. 19, issued after the December 17, 2004 status conference (wherein Plaintiffs represented that all Fact Sheets had been filed), the Court ordered "[b]riefing (and any designation of evidence) on the issue of this Court's subject matter jurisdiction (as affected by recent Mississippi Supreme Court caselaw and the inability to determine what cause of action each Plaintiff has against each Defendant)." (Order No. 19 ¶ 2.) Also in Order No. 19, the Court noted that an agreement had been reached between a number of Plaintiffs and Defendants whereby the Plaintiffs who failed to specifically identify a particular Defendant's product on a Fact Sheet or product identification chart would dismiss that Defendant without prejudice, subject to the parties entering into a tolling agreement. (Order No. 19 ¶ 12.)

As directed by Order No. 19, Defendants filed their final submissions on the issue of federal jurisdiction on February 4, 2005. Two groupings of Defendants submitted briefs arguing that the Court should sever each Plaintiff's claims, then require each Plaintiff contesting jurisdiction to refile motions for remand

-28-

accompanied by complaints plead with specificity (as well as jurisdictional evidence in some cases) to support the assertion that the Court lacks jurisdiction. Another Defendant, 3M Company ("3M"), filed a motion to remand, arguing that virtually all Plaintiffs still assert claims against non-diverse Defendants, and therefore the cases should be remanded to state court. Of these submissions, only 3M supported it with evidence, submitting Plaintiffs' Fact Sheets and medical submissions. At the same time, 3M, as well as other Defendants, moved for sanctions against Plaintiffs on the grounds that the diagnoses on which these cases are based were made fraudulently.

Before addressing the remand motions, the Court conducted Daubert[22] hearings/Court depositions of the Plaintiffs' diagnosing experts and the "screening companies" that hired them. (Order No. 19 ¶ 4.) As discussed below, the Court conducted these hearings prior to deciding the issue of subject-matter jurisdiction for two reasons: (1) because they were potentially relevant to the issue of the Court's subject-matter jurisdiction, and (2) because they were warranted by Defendants' motion for sanctions, which is a matter a court without subject-matter jurisdiction may consider, see Willy

---

[22]  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Under Daubert and its progeny, the trial court makes a "preliminary assessment of whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts at issue." Id. at 592-93.