> a shallow breath or other technical quality abnormalities
> with the film may lead to shadows on the x-ray that may
> be misleading and thought to be abnormal.  But if the
> film is repeated with better technique, may appear more
> normal.

(Feb. 18, 2005 Trans. at 91-93.)  Similarly, Dr. Friedman testified

about the "infections and [the] host of different diseases" that

can look like silicosis on an x-ray, again highlighting the need

for a differential diagnosis.  (Feb. 18, 2005 Trans. at 229.)

Radiographic findings consistent with silicosis may be caused by

the following diseases: other pneumoconioses, such as coal worker's

pneumoconiosis, berylliosis and byssinosis; infectious diseases,

such as tuberculosis; collagen vascular diseases, such as

rheumatoid arthritis and lupus; fungal diseases, such as

histoplasmosis and coccidioidomycosis; as well as sarcoidosis.

(Feb. 16, 2005 Trans. at 101-05, 328; Feb. 18, 2005 Trans. at 91-

93, 229.)  Radiographic findings consistent with silicosis also may

be caused by certain infections, drugs and pharmaceutical

preparations, congestive heart failure, obesity or simply inferior

quality x-ray equipment or film.  (Feb. 18, 2005 Trans. at 91-93,

229.)

In order to rule out the multitude of other causes of the

radiographic findings, it is vitally important for a physician to

take a thorough occupational/exposure history and medical history.

(Feb. 16, 2005 Trans. at 101-06; Feb. 18, 2005 Trans. at 91-93,

229, 353-54.)[112]  As noted _infra_, even a travel history may be relevant: certain diseases which mimic silicosis on an x-ray are primarily found in particular geographic regions of the country or the world.  (Feb. 16, 2005 Trans. at 101-06; Feb. 17, 2005 Trans. at 43-44.)

Given the wide variety of possible causes for x-ray findings consistent with silicosis, the occupational, medical and travel histories must be directed by someone with sufficient medical training and knowledge to guide the questioning through all of the areas necessary to exclude each of the other possible causes for the findings.[113]  This is why experts in the field of occupational medicine opine that it is imperative for the diagnosing physician take at least some portion of the histories in order to make a

---

[112]  For instance, Dr. Segarra testified that "ruling out the other diseases ... can often be done by history.  The physical exam plays usually a small role in that regard.  The history is more important."  (Feb. 16, 2005 Trans. at 353-54.)

[113]  As Dr. Todd Coulter, one of Plaintiffs' diagnosing doctors, testified:
A: [T]here's more to this than meets the eye.  The history has to be expansive but it also has to be guided, if you will, by what the patient tells you. ... We ask about social history.  We ask about family history.  I ask about smoking history.  Where I live on the Gulf Coast of Mississippi I want to know about their military history.  We've got a lot of people who have traveled all over the world.  I want to know about their -- their public health history, such as, inoculations and immunizations. ...
Q: So in reviewing the ... information that the patient has given you, you then sit down with a patient and flush that out for more information that you consider important?
A: History, history, history, yes, sir.
(Feb. 17, 2005 Trans. at 43-44.)

competent differential diagnosis.  (Feb. 16, 2005 Trans. at 355,
366; Feb. 17, 2005 Trans. at 43-45; Feb. 18, 2005 Trans. at 92,
134, 244-45, 255.)

By contrast, in all of the cases diagnosed by the challenged
physicians, the medical histories, physical examinations and other
tests were either nonexistent or cursory.  The histories that did
exist were taken by  people without sufficient training (or
incentive) to know what questions to ask in order to rule out other
possible causes of the radiographic findings.

The attitude of the challenged diagnosing doctors toward this
final criterion mirrored their overall attitude toward these
diagnoses: meeting this criterion correctly simply involved more
work than they were willing to devote to the task.  Implicit in the
doctors' testimony were the questions: Can't you see how many
people we had to diagnose?  How can you possibly expect us to be
any more thorough than we were?  These are the same pleas the Court
has heard repeatedly from the lawyers throughout this MDL.  But
these doctors and Plaintiffs' lawyers are not innocent victims of
overwhelming numbers.  Hordes of Plaintiffs have not been thrust
upon them against their will.  The doctors undertook the burden of
diagnosing each of these Plaintiffs--just as the attorneys
undertook the burden of representing each one of them--and the
sheer volume of Plaintiffs does not mean that these professionals'
obligations toward each Plaintiff has been lessened.

-142-

### 5. Lawyers Practicing Medicine and Doctors Practicing Law

Dr. Friedman posited that the diagnoses were iatrogenic in nature. (Feb. 18, 2005 Trans. at 245.) "Iatrogenic" is defined as "[i]nduced in a patient by a physician's activity, manner, or therapy."[114] Whether this is true, the Court cannot say, but the Court is confident that Dr. Friedman was correct when he testified that the "epidemic" of some 10,000 cases of silicosis "is largely the result of misdiagnosis." (Feb. 18, 2005 Trans. at 246.)

Dr. Parker agreed with the following summary of the flaws in the diagnoses:

> Q: In your opinion, Doctor, is it proper methodology to, for the diagnosis of silicosis, for a B-reader to know, going in, the reason he's looking at the x-ray, he knows he's looking for silicosis, for that doctor to rely on simply a statement of the years someone worked at a job, with a job description, and no other information, to then go ahead and diagnose silicosis?
> A: I would think that would fall outside the bounds of acceptable medical practice.
> Q: Would it be proper then for, if that doctor, that B reader, doesn't do the diagnosis, but then sends his read on to someone else, another doctor, a pulmonologist like yourself, who has nothing more than the information I've described, the years that someone worked somewhere, where they worked, what their job was, and now a reading, a B-reading that's been read for the purpose of looking for silicosis, would it be proper methodology for that doctor to then conclude, to diagnose silicosis in that patient?
> A: I don't believe that's scientifically acceptable.

(Feb. 18, 2005 Trans. at 94.) Similarly, Dr. Friedman summarized the problems as follows:

---

[114] See http://dictionary.reference.com/search?q=iatrogenic.

> I don't think the diagnoses are reliable. ... [I]n Texas,
> we have a saying, all hat and no horse. And I think that
> they said they used certain diagnoses, but they didn't go
> beyond the three criteria to really provide the data for
> the occupational history. I don't know that they fully
> excluded other more probable causes, from what I've seen.
> And I don't even want to talk about the x-rays....

(Feb. 18, 2005 Trans. at 260-61; see also Feb. 18, 2005 Trans. at 264.) Dr. Friedman further testified: "[T]he tragedy is that I don't know that the diagnoses are reliable ... because of the methodology." (Feb. 18, 2005 Trans. at 313.) The Court has been left with no choice but to agree.

A review of all of the submitted Fact Sheets is telling. In the approximately 9,083 Fact Sheets submitted in this MDL as of the date of the Daubert hearings, approximately 8,000 treating doctors are named. (Feb. 18, 2005 Trans. at 257.) But when it comes to the doctors who diagnosed these Plaintiffs with silicosis, 12 names appear. (Feb. 18, 2005 Trans. at 259.) Twelve doctors diagnosed all 9,083 Plaintiffs. This small cadre of non-treating physicians, financially beholden to lawyers and screening companies rather than to patients, managed to notice a disease missed by approximately 8,000 other physicians—most of whom had the significant advantage of speaking to, examining, and treating the Plaintiffs.

One possible explanation is the fact that in every case involving a screening company, the diagnoses were essentially manufactured on an assembly line. The steps in the diagnosing process were divided among a number of different people, not all of whom were qualified and none of whom assumed overall responsibility

-144-

and oversight for the entire process.  Thus, in many cases, a
different person performed each of the following steps: taking the
occupational history, performing the physical exam, reading the x-
ray, analyzing the pulmonary function tests, taking the medical
history, and finally, making a diagnosis.  The people performing
the steps were so compartmentalized that often they did not know
the others' identities, let alone whether they were qualified and
were performing their assigned tasks correctly.  Hence, for
example, Dr. Levy issued 1,389 diagnoses for Plaintiffs he had
never met, by relying totally on cursory work and exposure
"histories" taken by untrained receptionists he had never met (and
whom he was deluded into believing were physicians who spent 90
minutes with each Plaintiff), B-read reports by doctors he had
never met (and without even glancing at the x-rays), and cursory
"physicals" and "medical histories" performed by other doctors he
had never met.  Most stunningly, this assembly line structure
allowed Dr. Martindale to reconcile his acquiescence in false
diagnosing language.  Dr. Martindale testified:

> [M]y interpretation of the whole process was that a
> physician was taking a good occupational history, a
> medical history, performing a physical exam, and either
> he or someone else was overseeing the pulmonary function
> tests, and there was an interpretation of the chest x-ray
> at the time all of this was done, and these patients were
> screened for people who appeared as if they had clinical
> diagnoses of asbestosis or silicosis and the chest x-ray
> supported that diagnosis.

(Martindale Dep. at 65-66; see also id. at 102 ("I assumed that the
physician who did the physical, did the history, took the

-145-

occupational exposure would be making the diagnosis.").)  Because
he believed some other physician had taken all of the proper
diagnosing steps, he apparently felt he would cause no harm if he
failed to do so himself.  Repeatedly, the diagnosing doctors
testified as to their blind (and, as it happens, unfounded) faith
that other physicians had taken the necessary steps to legitimize
their diagnoses.  By dividing the diagnosing process among multiple
people, most of whom had no medical training and none of whom had
full knowledge of the entire process, no one was able to take full
responsibility over the accuracy of the process.  This is assembly
line diagnosing.   And it is an ingenious method of grossly
inflating the number of positive diagnoses.

It is important to emphasize that this discussion and this
Order should not be taken as a criticism of the right of impaired
individuals to seek redress through the courts.  This process not
only benefits the impaired individual, but also benefits those who
otherwise would have been impaired in the future had the
defendant's alleged wrongful behavior gone unchecked.  What the
Court is criticizing is the idea that when doctors step into a
courtroom, they can abandon the methodology they practice in the
clinic.  Dr. Friedman, who devotes a substantial amount of time
consulting and testifying for plaintiffs, testified that there
should be no distinction between a medical diagnosis and a "legal
diagnosis." (Feb. 18, 2005 Trans. at 283.)  He testified:

-146-

> Q. [W]hen you're hired by a law firm to render an opinion, do you consider yourself to be the treating physician of that patient?
> A. I do. I consider myself to have the same level of responsibility as -- no matter how the patient is sent to me. If I can give you one or two quick examples. There's a patient who's here in the MDL, Mr. Gatlin, has acute silicosis. I personally not only talked to his doctor but attempted to arrange for his lung transplant. So I've gotten involved. And there are many, I'd say a couple of times, at least a couple of times a month, we'll pick up cardiac arrhythmias, PVC's, we'll do an EKG for free, call their family doctor. I had a fellow two weeks ago that I would not let go back home to, up to north Texas. I made him stop at Scott & White clinic in Bryan/College Station on the way because he had cardiac arrhythmias and he wanted to at least go there because I think his family lived there. So I do not consider myself their treating doctor, to the extent that I don't look to them for payment. I treat them as though they were any other patient on whom I was doing a consultation.

(Feb. 18, 2005 Trans. at 283-84.)

By contrast, most of the diagnosing doctors emphasized that they did not consider the people being screened to be patients. As stated by Dr. Harron: "These people are not patients; it's a different situation." (Feb. 16, 2005 Trans. at 264.) Of course, the doctors need not have been so explicit--it is readily apparent from their actions that they did not consider the Plaintiffs to be their patients.

It is also readily apparent that the failure of the challenged doctors to observe the same standards for a "legal diagnosis" as they do for a "medical diagnosis" renders their diagnoses in this litigation inadmissible under Rule 702. As both the Supreme Court and the Fifth Circuit have directed: "The district court's

-147-

responsibility 'is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Skidmore v. Precision Printing & Pkg., Inc., 188 F.3d 606, 618 (5th Cir. 1999) (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999)).

If nothing else, this MDL illustrates the mess that results when lawyers practice medicine and doctors practice law.  In almost all of these cases, one vital requirement for the diagnosis of silicosis--the taking of occupational histories--was performed absent medical oversight by the lawyers or their agents or contractors.  More generally, the lawyers determined first what disease they would search for and then what criteria would be used for diagnosing that disease.  The lawyers controlled what information reached the diagnosing physicians, stymying the physician's normal ability to ask targeted follow-up questions and perform follow-up exams.[115]  The lawyers also controlled what information reached the patients, stymying the patient's normal ability to learn from a medical professional details about their diagnosis, their prognosis, and what, if any, follow-up care they should receive.  Indeed, a lawyer from the Plaintiffs' firm of Barton & Williams summarized the problem most succinctly when he argued that the doctors' B-reads of his clients are attorney work

_____

[115]  This is not to say that the challenged physicians did not willingly abdicate their role in the usual physician-patient relationship.

product.[116]  (Feb. 18, 2005 Trans. at 9-11.)  In the majority of cases, these diagnoses are more the creation of lawyers than of doctors.

Conversely, virtually all of the challenged diagnosing doctors seemed to be under the impression they were practicing law rather than medicine.  They referred to the Plaintiffs as "clients" rather than "patients", and they utilized shockingly relaxed standards of diagnosing that they would never have employed on themselves, their families or their patients in their clinical practices.  Almost uniformly, they phrased their diagnoses with the legal incantation "reasonable degree of medical certainty" or "reasonable degree of medical probability."  Dr. Harron summarized it best: "[I]t's a legal standard and not a real diagnosis."[117]  (Feb. 16, 2005 Trans. at 268.)  And, finally, despite diagnosing a serious and completely preventable disease at unprecedented rates, not a single doctor even bothered to lift a telephone and notify any governmental agency, union, employer, hospital or even media outlet, all of whom conceivably could have taken steps to ensure recognition of

---

[116]  The attorney was arguing that he should not be required to place in the MDL document depository the silicosis B-reads of his non-MDL state-court clients.  (Feb. 18, 2005 Trans. at 9-11.)

[117]  The Court is mindful of the following advice, stated in a different context by the court in Holbrook v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 785 (3d Cir. 1996):  "We have not required that when medical experts give their opinion, they recite the talismanic phrase that their opinion is given to 'a reasonable degree of medical certainty,' because care must be taken to see that the incantation does not become a semantic trap...."

-149-

currently-undiagnosed silicosis cases and to prevent future cases from developing.  One can imagine the outcry that would have resulted had these doctors kept silent after diagnosing thousands of new cases of avian flu or mad-cow disease.  Had these doctors been acting as doctors--and had they genuinely believed their diagnoses were legitimate--they would have taken this simple and humane step.

Instead, these diagnoses were about litigation rather than health care.  And yet this statement, while true, overestimates the motives of the people who engineered them.  The word "litigation" implies (or should imply) the search for truth and the quest for justice.  But it is apparent that truth and justice had very little to do with these diagnoses--otherwise more effort would have been devoted to ensuring they were accurate.  Instead, these diagnoses were driven by neither health nor justice: they were manufactured for money.  The record does not reveal who originally devised this scheme, but it is clear that the lawyers, doctors and screening companies were all willing participants.  And if the lawyers turned a blind eye to the mechanics of the scheme, each lawyer had to know that Mississippi was not experiencing the worst outbreak of silicosis in recorded history.  Each lawyer had to know that he or she was filing at least some claims that falsely alleged silicosis. The fact that some claims are likely legitimate, and the fact that the lawyers could not precisely identify which claims were false,

cannot absolve them of responsibility for these mass misdiagnoses which they have dumped into the judicial system.

### 6.   Effects of Mass Over-Diagnosing

Many of the effects of the mass misdiagnoses are obvious, but they nonetheless should be noted.  Limited judicial resources are consumed weeding out meritless claims, costing the judiciary, costing other litigants whose suits are delayed, and ultimately costing the public, who pays for a judicial system that is supposed to move with some degree of speed and efficiency.

Defendant companies pay significant costs litigating meritless claims.  And what harms these companies also harms the companies' shareholders, current employees, and ability to create jobs in the future.

And, potentially, every meritless claim that is settled takes money away from Plaintiffs whose claims have merit.  And not only are those with meritorious claims denied just compensation, they are potentially denied full and meaningful access to the courts. As is apparent simply by a reading of this Order, it is difficult for a court to devote attention to a single case when it is part of a wave of 10,000 other cases--many of which are meritless.

Then there is the toll taken on the misdiagnosed Plaintiffs. If these Plaintiffs truly have abnormal x-rays, then the radiographic findings may be caused by a number of conditions other than silicosis.  And when the diagnosing doctors fail to exclude

these other conditions, it leaves the Plaintiffs at risk of having treatable conditions go undiagnosed and untreated.

In the case of the Plaintiffs who are healthy, at least some of them can be expected to have taken their diagnoses seriously. They can be expected to have reported the diagnoses when applying for health insurance and life insurance--potentially resulting in higher premiums or even the denial of coverage altogether. They can be expected to report the diagnoses to their employers and to the Social Security Administration. And they can be expected to report the diagnoses of this incurable disease to their families and friends.

These people have been told that they have a life-threatening condition: but they are not told by a doctor; they are told by a lawyer--apparently in most cases through the mail. In most cases, they never saw the doctor who diagnosed them. And in most cases, they never had the opportunity to ask the diagnosing doctor questions about the diagnosis and what it means. When dealing with this MDL and its 10,000 Plaintiffs, it is easy to forget that "statistics are human beings with the tears wiped off." (Feb. 18, 2005 Trans. at 252 (quoting Dr. Irving Selikoff).) But it should not be forgotten that a misdiagnosis potentially imposes an emotional cost on the Plaintiff and the Plaintiff's family that no court can calculate.

These misdiagnoses also risk exacting an equally unquantifiable yet equally real cost to society. Dr. Parker testified:

> I feel passionately about the recognition and prevention of occupational lung disease. I mean, I have committed most of my professional life to that, as well as looking for therapies for pulmonary diseases. But to be looking for disease in people who may have no symptoms is not doing the individual any good, nor is it doing society any good.

(Feb. 18, 2005 Trans. at 86.) He further testified, "[a] purported diagnosis in someone who doesn't have this disease ... detract[s] from the person who has the serious and life-threatening disease." (Feb. 18, 2005 Trans. at 87.) Not only does a false diagnosis detract from the person who has silicosis, but it potentially harms future silicosis prevention. There is a risk that governmental entities, employers and the public will learn of this bevy of misdiagnoses and fail to take the steps that need to be taken to further prevent worker exposure to respirable silica. It is evident from the testimony before this Court, as well as studies by NIOSH and others, that silicosis is a continuing tragedy in our country. Those suffering the effects of the disease do not need an inflated number of claims to lend gravitas to their situation. Their tragedy stands on its own.

### 7.  <u>Alexander</u> Ruling

The Court has addressed the testimony it has received regarding <u>all</u> of the diagnoses by <u>all</u> of the challenged doctors in

this MDL,[118] despite the fact that--as discussed _infra_--the Court has ultimately found that the Defendants have failed to meet their burden of establishing that the Court has subject-matter jurisdiction over the vast majority of these cases. Hence, the Court cannot issue a ruling on the admissibility of the testimony related to a majority of these diagnoses pursuant to Rule 702 and _Daubert_. _See_ _Dahiya v. Talmidge Int'l, Ltd._, 371 F.3d 207, 210 (5th Cir. 2004) ("Unless a federal court possesses subject matter jurisdiction over a dispute, ... any order it makes (other than an order of dismissal or remand) is void.") (citations omitted); _Howery v. Allstate Ins. Co._, 243 F.3d 912, 916 n.6 (5th Cir. 2001) (citing _Kokkonen v. Guardian Life Ins. Co. of Am._, 511 U.S. 375, 377 (1994)). In spite of this, the Court has included its findings concerning all of the testimony it received, in hopes that the state courts that ultimately must shepherd these cases to their conclusion will not have to re-hear _Daubert_-type challenges to these doctors and their diagnoses.[119]

---

[118]  The challenged doctors are: Dr. Ballard, Dr. Cooper, Dr. Coulter, Dr. Andrew Harron, Dr. Ray Harron, Dr. Hilbun, Dr. Levy, Dr. Martindale, and Dr. Oaks.

[119]  The Mississippi Supreme Court has adopted the Federal Rule 702/_Daubert_ standard for determining the admissibility of expert testimony. _See_ _Mississippi Transp. Comm'n v. McLemore_, 863 So. 2d 31, 39 (Miss. 2003) ("[T]his Court today adopts the federal standards and applies our amended Rule 702 for assessing the reliability and admissibility of expert testimony."). Hence, the legal standards discussed herein should be applicable in Mississippi state courts.

As discussed _infra_, the Court does possess subject-matter jurisdiction over one MDL case, _Alexander v. Air Liquide Corp._, Cause No. 03-533. Therefore, the Court has the authority to rule on Defendants' motions to exclude Plaintiffs' diagnosing experts in that case.

_Alexander_, which was originally filed in this Court, has 100 Plaintiffs. All but one of the Plaintiffs submitted a silicosis diagnosis from Dr. Ray Harron, while seven Plaintiffs submitted a silicosis diagnosis from Dr. Levy.[120]

As discussed above, both doctors relied upon occupational/exposure histories and medical histories which fail to even merit the title, "history", let alone meet the generally-accepted scientific methodology for diagnosing silicosis. (_See, e.g._, Feb. 18, 2005 Trans. at 261 (Dr. Friedman: "I'm not sure I would consider [what Dr. Levy relied upon] any occupational history at all.").) And, as even Dr. Harron conceded, "[i]f [the history is] not reliable ... then I have to retract the diagnosis." (Feb. 16, 2005 Trans. at 282-83.) As discussed above, the reliance of both doctors on inadequate and unreliable histories renders the entire diagnosis and accompanying testimony inadmissible. _See_ _Curtis v. M&S Petroleum, Inc._, 174 F.3d 661, 670-71 (5th Cir. 1999) ("Under _Daubert_, any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether

_____

[120] Six of the Plaintiffs submitted diagnoses from both Dr. Harron and Dr. Levy.

-155-

the step completely changes a reliable methodology or merely misapplies that methodology.") (quotation omitted).

With respect to Dr. Harron, he simply ignored the third criterion for diagnosing silicosis (i.e., the absence of any good reason to believe that the positive radiographic findings are the result of some other condition). (Feb. 16, 2005 Trans. at 324-25.) As set out above, this "technique" of diagnosing silicosis without even attempting to rule out the myriad of other causes of radiographic findings consistent with silicosis is not generally accepted in the relevant scientific community. Cf. Pipitone v. Biomatrix, Inc., 288 F.3d 239, 246 (5th Cir. 2002) (noting in the context of a Daubert ruling that a physician's "elimination of various alternative causes ... were based on generally accepted diagnostic principles related to these conditions").

Perhaps even more stunning was Dr. Harron's reliance on largely untrained secretarial staff to "translate [the ILO form he completed] into English" (Feb. 16, 2005 Trans. at 289-90), "prepare [his] reports, stamp [his] name on them and send those reports out without [him] editing or reviewing them" (Feb. 16, 2005 Trans. at 285-87). Dr. Harron did not read, review or even see any of the 99 diagnosing reports in Alexander bearing his name. This "distressing" and "disgraceful" procedure does not remotely resemble reasonable medical practice. (Feb. 16, 2005 Trans. at 365; Feb. 18, 2005 Trans. at 249, 265.) Not only is this "technique" not generally accepted in the scientific community, but

-156-

it is utterly lacking in any "standards controlling the technique's operation." <u>U.S. v. Hicks</u>, 389 F.3d 514, 525 (5th Cir. 2004) (among the reliability factors are "the existence and maintenance of standards controlling the technique's operation; and ... whether the technique has been generally accepted in the scientific community") (citing <u>Daubert</u>, 509 U.S. at 593-94).

Moreover, as recounted above, the sheer volume of Dr. Harron's asbestosis/silicosis reversals (i.e., reading an x-ray as consistent with asbestosis for asbestos litigation and then reading the same individual's x-ray as consistent with silicosis for silica litigation), simply cannot be explained as intra-reader variability. (Feb. 17, 2005 Trans. at 15.) Instead, it can only be explained as a product of bias--that is, of Dr. Harron finding evidence of the disease he was currently being paid to find.

And with respect to Dr. Levy, based on his average rate of diagnosing in this MDL, Dr. Levy performed all of his work on all the seven diagnoses he issued in <u>Alexander</u> in less than 30 minutes--which is less than half the time a normal expert in the field of occupational medicine would spend issuing a single diagnosis. (Feb. 16, 2005 Trans. at 366; Feb. 18, 2005 Trans. at 253.) Dr. Levy based his diagnoses entirely upon the cursory "histories" in Plaintiffs' Fact Sheets (taken by lawyers or untrained clerks) and upon the unreliable B-reads performed by Dr. Harron or Dr. Ballard. He never examined the Plaintiffs or took a

history from them.[121]  And given the extremely limited and biased information he had available to him, he had no reliable way to rule out alternative causes for the radiographic findings.  From the Plaintiffs' lawyers' point-of-view, it appears Dr. Levy's primary purpose was to provide a veneer of glossy credentials over a patently unreliable collection of materials (i.e., cursory histories and biased B-reads).

The flaws in Dr. Levy's diagnoses here are similar to those noted by the court in Castellow v. Chevron USA, 97 F. Supp. 2d 780 (S.D. Tex. 2000).  In Castellow, the court granted a motion to exclude Dr. Levy's testimony on Daubert grounds because his opinion on the medical cause of plaintiff's illness was founded almost entirely upon the flawed report of another doctor.  See id. at 794, 798 ("Dr. Levy stressed that Dr. Rose's calculations were very important to him in forming his opinion about the quantitative exposure to which the deceased had been subject.... Dr. Levy acknowledged that if Dr. Rose's calculations were inaccurate, so that Mr. Castellow was never, in fact, exposed to benzene at the levels calculated, then he could not offer an opinion as to causation.") (excluding Dr. Levy's opinion along with other experts because, inter alia, "the result driven methodology ... is rife with error and speculation").

---

[121]  Dr. Levy explained: "I don't know anything about the screening that the plaintiffs had.  I recognize that people had the B-readings and so forth.  I'm not familiar with what actually took place."  (Feb. 16, 2005 Trans. at 148.)

-158-

As set out above, two of Plaintiffs' diagnosing doctors in other MDL cases, Dr. Segarra and Dr. Coulter, testified that they would not employ the methodology employed by Dr. Levy in these cases. (Feb. 16, 2005 Trans. at 365; Feb. 17, 2005 Trans. at 64.) And Dr. Friedman testified as follows:

> Dr. Levy made his diagnoses in about three-and-a-half minutes, never talked to a patient, never looked at an x-ray, never ... talked to a treating physician, [and] may have only looked at a few medical records in cases that he linked. And in 72 hours, reviewed something in the range of 1200 cases, and [in] 800 ... diagnosed life-threatening illness. ... Dr. Levy ... relied on the product identification part of the work history. I don't even think it was a full work history. I mean, ... it came nowhere near meeting what his own methodology was that he spelled out. And I have both the Third and Fourth Edition of his textbooks. And in no way does it relate to that methodology.

(Feb. 18, 2005 Trans. at 250-51.)  Indeed, the gulf between the methodology Dr. Levy employed for this litigation and the methodology Dr. Levy advocates in his academic work starkly contravenes the Supreme Court's requirement that "an expert ... employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).[122]

---

[122] Another area where Dr. Levy fails to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," Kumho Tire, 526 U.S. at 152, is illustrated by the following exchange:
DR. LEVY:  Here's a gentleman like many other people who have both silicosis and asbestosis. ...
Q:  If he had both, why didn't you diagnose him with both?
DR. LEVY:  My job was not to make diagnoses of asbestosis.

Similarly, Dr. Harron's testimony that he was applying "a legal standard and not a real diagnosis" (Feb. 16, 2005 Trans. at 268), along with Dr. Levy's testimony that "I was not practicing medicine, ... I was providing diagnostic information in the context of medical/legal consultation" (Feb. 16, 2005 Trans. at 56-57), echo the following passage from Allen v. Pennsylvania Engineering Corp., 102 F.3d 194 (5th Cir. 1996):

> Dr. LaMontagne, in fact, inadvertently described exactly the problem this court faced in evaluating his and appellants' other expert testimony: 'This is not a scientific study. This is a legal opinion.' Pace Dr. LaMontagne, the goal of Daubert and this court's previous cases has been to bring more rigorous scientific study into the expression of legal opinions offered in court by scientific and medical professionals. In the absence of scientifically valid reasoning, methodology and evidence supporting these experts' opinions, the district court properly excluded them.

Id. at 198.

In short, Plaintiffs have failed to sustain their burden of showing that Dr. Harron's and Dr. Levy's testimony related to any of the diagnoses proffered in Alexander is sufficiently reliable to be admissible. Therefore, as to Alexander, Defendants' Motion to Exclude is GRANTED: the testimony of Dr. Harron and Dr. Levy (as

---

....
Q: Okay.
THE COURT: [Your] job is not to make diagnosis of anything other than silicosis.
DR. LEVY: Well, yes.
(Feb. 16, 2005 Trans. at 213.) In contrast to Dr. Levy's litigation reports, "[a] treating physician, of course, would have noted all potential abnormalities on the first report." Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 8 (Feb. 3, 2005).

well as their accompanying diagnoses) are inadmissible. As discussed _infra_, the Court will schedule a status conference in the _Alexander_ case, to address whether (and, if so, under what conditions) the Plaintiffs' claims will proceed.[123]

**L.     Independent Medical Advisors/Technical Advisory Panel**

During a phone conference with liaison counsel in October 2004, the Court raised the issue of appointing independent medical advisors to determine which of the Plaintiffs has a competent diagnosis. The Plaintiffs were not amenable to this proposal, and the Court was not prepared to order it in the absence of an agreement between the parties.

A month later, on November 11, 2004, a number of Defendants moved the Court to appoint a panel of B-readers under the auspices of the American College of Radiology Committee on Pneumoconiosis to review the x-rays of the Plaintiffs and the reports used to diagnose the Plaintiffs with silicosis. Under Defendants' proposal, the Court would dismiss any Plaintiff whose x-ray the panel determines is not consistent with silicosis. (_See_ MDL 03-1553 Docket Entry 1145, 1149.)

On December 14, 2004, Plaintiffs filed their objection to this motion, arguing that their diagnosing doctors utilized "the appropriate scientific methodology for determining whether an injury exists." (MDL 03-1553 Docket Entry 1295 at 7.) The

---

[123] The deadline for the designation of experts has past.

doctors, according to Plaintiffs, simply "[c]onduct[ed] such methodology on a large scale." (MDL 03-1553 Docket Entry 1295 at 7.) Therefore, Plaintiffs argued, even if an expert panel disagreed with the conclusions reached by the diagnosing doctors, this would be a difference of opinion and not a <u>Daubert</u> issue. (MDL 03-1553 Docket Entry 1295 at 12.)

In Order No. 19, the Court carried forward Defendants' motion pending the upcoming <u>Daubert</u> hearings. Notwithstanding this, in Order No. 19, the Court stated: "The parties are urged to agree on a panel of four experts for the purpose of excluding, if possible, any plaintiff that does not presently have silicosis or is not in fear of future illness as related to silicosis, and to prioritize the degree of severity of silicosis in any other plaintiff." (Order No. 19 ¶ 5.) The parties once again declined the Court's suggestion to agree on a panel.

After the ensuing depositions of Dr. Hilbun and Dr. Cooper, and after nearly two days of testimony at the February 2005 <u>Daubert</u> hearings, Mr. Davis, of Campbell Cherry (the firm representing approximately 4,256 Plaintiffs), addressed the Court:

> DAVIS: Every single plaintiff with exception of a few that people have tried to get out of this case on some basis, have a diagnosis by doctors, all of whom we believe were capable of making the diagnosis and follow the proper methodology.
> Again, I'm going to speak to my firm, but I think I can speak for everybody on the plaintiff's side. We have not committed any improper acts. I and my firm makes no apology for representing these people and for filing the cases on their behalf; however, as I said a moment ago,

-162-

as facts in a case develop, we determined it is time to
do something new or different to help our cases along.

And your Honor, what we are willing to propose or
what we are going to do -- and I think this is true for
most of the plaintiff lawyers, we are going to establish
an independent medical panel to review every one of these
X-rays to determine if this independent panel believes
that the radiographic findings support the diagnosis for
silicosis.

THE COURT:   I told you this months ago after the
Martindale fiasco that you had to come up with something
to help your clients stay in this litigation. ...
Because it's your clients that are going to suffer.

MR. DAVIS: Yes, ma'am. As you mentioned earlier today,
there are sick people in this litigation and these people
--

THE COURT:   They're not being well served by this
testimony.

MR. DAVIS: And we acknowledge that, your Honor, and what
we're saying is, with your help we'll create an
independent panel.  We'll be glad to work jointly with
Defendants, but if none of that works out, we as a group
are going to do that and we are going to be in a position
to determine which of these plaintiffs, based on this
independent medical panel deserve to have their cases
remain in this court and those that do not, deserve to be
dismissed without prejudice and without any running of
their statute of limitations so that if they subsequently
develop this disease, they are not barred by anything
that has gone on here.

These people don't need to be victims by having good
cases thrown out or by having cases that don't have the
appropriate radiographic readings at this time, but do at
a later date from being able to come back into the
system.  It is fair to our clients. We are content and
heartfelt --

THE COURT: How far -- what are we?  Three years into
this litigation now?  Three years into this litigation
and now you say you're going to come up with a doctor
that can actually diagnose whether they've got this or
not. ...  And I can understand if the Defendants don't
jump up and say, "We join you in this process."

MR. DAVIS: And your Honor, quite frankly, if they don't
join with us, we're going to do it anyway because we have
got to protect the ability of these clients –

....

THE COURT: I can't help but over this last day and half
think, 'Is there one member of the plaintiff's bar that

-163-

> would have gone to one of these screening companies for
> their own pulmonary problems and relied on this kind of
> diagnosis from anyone other than Dr. Segarra.'  I have to
> ask you this.  I don't want an answer, but I have to
> posit that in my mind.

(Feb. 17, 2005 Trans. at 206-09.)

On February 17, 2005, Mr. Davis made this declaration of the
Plaintiffs' intent to establish--unilaterally, if necessary--"an
independent medical panel to review every one of these X-rays to
determine if this independent panel believes that the radiographic
findings support the diagnosis for silicosis."  (Feb. 17, 2005
Trans. at 206.)  Over four months later, Plaintiffs have not
informed the Court of any steps they have taken toward establishing
this medical review panel.

**M.   Kirkland Deposition**

Other than the single Plaintiff diagnosed by Dr. Segarra,
there is only one of the 10,000 Plaintiffs whom the Court can say
with confidence is genuinely injured.[124]  His name is Clark C.
Kirkland, and just prior to undergoing a lung transplant, he
testified at the February Court depositions.[125]  Yet, despite his
being genuinely sick, despite his having two attorneys of record,

---

[124]  The Court makes no finding as to the extent of Mr.
Kirkland's injury, or whether it was caused in whole or in part
by the inhalation of silica.

[125]  Mr. Kirkland and his wife are the only Plaintiffs in
<u>Kirkland v. 3M Company</u>, cause number 04-639.

-164-

and despite his being in a courtroom full of lawyers, he had no one to represent his interests.

On December 22, 2004, Mr. Kirkland sent a letter to this Court (as well as to a United States District Judge in Atlanta, Georgia and the United States Attorney's Office in Atlanta), alleging that one of his two attorneys of record, Michael Martin, committed certain acts of misconduct. Among other things, Mr. Kirkland alleged that his attorney failed to file suit on his behalf within the statute of limitations.[126]

January 14, 2005, Defendant 3M reported to the Court that it had received a letter from Mr. Kirkland making similar allegations against Mr. Martin. In light of this, 3M argued that Mr. Kirkland had waived his attorney-client privilege, and 3M asked the Court for permission to serve discovery on Mr. Kirkland directly. 3M also asked for permission to take Mr. Kirkland's deposition at a time when the Court would be available to rule on objections.

On January 24, 2005, Mr. Kirkland's attorneys, Mr. Martin and Scott C. Monge, filed motions to withdraw as counsel for Mr. Kirkland. On January 31, 2005, the Court denied these motions, and

---

[126] Mr. Kirkland was a plaintiff in a suit filed in Georgia state court on April 11, 2003, and then voluntarily dismissed on April 17. 2003. On January 28, 2004, the same case was refiled in a different Georgia state court by Scott C. Monge as lead counsel. This subsequent action was removed to federal court and, on November 24, 2004, the case was conditionally transferred to this MDL. Mr. Kirkland alleges that he has developed silicosis as a result of exposure to silica dust while a rock driller for the U.S. Army in the 1970's. (Kirkland Dep. at 18.)

instead ordered both attorneys to appear in person for a Court-
monitored deposition of Mr. Kirkland conducted by 3M on February
16, 2005.  3M was granted permission to contact Mr. Kirkland only
to the extent necessary to arrange for the payment of his travel
expenses to the deposition.  Also, the Court noted that Mr.
Kirkland may retain additional counsel.  These rulings were made in
Order No. 23, a copy of which was sent directly to Mr. Kirkland, as
well as all counsel.

On February 10, 2005 (six days before Mr. Kirkland's scheduled
deposition with 3M), Mr. Martin filed, purportedly on behalf of Mr.
Kirkland, a motion to dismiss 3M with prejudice.  Mr. Kirkland had
sued 3M for producing an allegedly-deficient dust-protection mask.
According to the motion, in 2001 and 2002, Mr. Kirkland had made
statements indicating that he did not wear a respirator or mask
when he was exposed to silica.  Therefore, according to the motion,
3M, and another Defendant who manufactured dust-protection masks,
should be dismissed with prejudice.  Since these 2001 and 2002
statements presumably were known to Mr. Martin long before February
10, 2005, the timing of the motion seemed suspect.  (And as became
apparent at Mr. Kirkland's deposition, the motion was filed without
Mr. Kirkland's knowledge or consent.)

On February 16, 2005 (the first day of the <u>Daubert</u> hearings),
at the scheduled time of Mr. Kirkland's deposition, Mr. Martin
appeared (with counsel of his own) while Mr. Monge did not.  (On
the same date, the Court issued a written order requiring Mr. Monge

-166-

to appear on February 17, 2005 and show cause as to why he should not be held in contempt for failing to comply with the Court's order to appear for his client's deposition.) Mr. Martin's attorney first addressed the Court and asked that 3M's deposition not be permitted to go forward in light of the motion to dismiss that Mr. Martin filed on behalf of Mr. Kirkland. (Kirkland Dep. at 10.) The Court reminded counsel that the motion to dismiss had not yet been ruled upon and indicated it would allow the deposition to proceed. (Kirkland Dep. at 10.)

Then the Court explained to Mr. Kirkland about the meaning and consequences of waiving attorney-client privilege, and asked Mr. Kirkland if he waived the privilege with respect to Mr. Martin. (Kirkland Dep. at 11, 14.) Mr. Kirkland stated under oath that he wished to waive his attorney-client privilege with respect to Mr. Martin. (Kirkland Dep. at 11, 14.) The Court also explained that because Mr. Kirkland indicated that he has been unable to locate another attorney, the Court would not release Mr. Martin and Mr. Monge from their representation of him until at least after 3M's deposition. (Kirkland Dep. at 12.) The Court also noted that: "[Y]ou do have an attorney here that you may consult with and you may visit with your attorney as long as you need to." (Kirkland Dep. at 12.)

During the direct examination, 3M questioned Mr. Kirkland about the statements he made in 2001 and 2002 which were referenced in the motion to dismiss. (Kirkland Dep. at 28-30.) 3M also

-167-

questioned Mr. Kirkland about the date on which Mr. Kirkland
believed his illness was caused by silica exposure. Finally, 3M
questioned Mr. Kirkland about his allegations against Mr. Martin,
and the materials Mr. Kirkland produced at the deposition
(including correspondence and taped recordings of conversations
between Mr. Kirkland and Mr. Martin).[127]

    After 3M finished its questioning, Mr. Martin rose to question
his client. Of course it is understandable why Mr. Martin no
longer wished to represent Mr. Kirkland. However, Mr. Kirkland's
case was under attack by 3M, and if at all possible, Mr. Kirkland
needed representation, so Mr. Martin was not permitted to withdraw.
Despite this, Mr. Martin succumbed to the urge to torpedo his
client's case. In a contentious examination, Mr. Martin and his
client argued about whether Mr. Kirkland's statements in 2001 and
2002 precluded a suit against 3M. Then Mr. Martin attempted to
show that his client's cause of action accrued for statute of
limitations purposes in 1999--meaning that Mr. Kirkland's suit
would have been time-barred prior to Mr. Martin's engagement in
2002 and therefore any delays and/or errors Mr. Martin might have
made in filing the 2003 suit would not have caused damage. At this
point, the Court told Mr. Martin that "[u]nless you have something
that would be helpful to your client, then the deposition is

------------------------

    [127] The specifics of Mr. Kirkland's allegations are matters
for another forum.

concluded." (Kirkland Dep. at 56.)  Hearing nothing that would aid

Mr. Kirkland's case, the Court ended the deposition.

After the <u>Daubert</u> hearings, the Court granted Mr. Martin's

motion to withdraw from the case.

**III.    Subject-Matter Jurisdiction**[128]

**A.    Priority of Subject-Matter Jurisdiction**

A federal court's "first inquiry" must be whether it has

subject-matter jurisdiction. <u>Smallwood v. Ill. Cent. R.R. Co.</u>, 385

F.3d 568, 576 (5th Cir. 2004) (en banc), <u>cert. denied</u>, 125 S. Ct.

1825 (2005); <u>see also</u> <u>Union Planters Bank Nat'l Ass'n v. Salih</u>, 369

F.3d 457, 460 (5th Cir. 2004) ("[F]ederal courts are duty-bound to

---

[128] When considering the issue of federal subject-matter
jurisdiction, the Court will apply the law of the Fifth Circuit.
<u>See</u> <u>In re Temporomandibular Joint Implants Prods. Liab. Litig.</u>,
97 F.3d 1050, 1055 (8th Cir. 1996) ("When analyzing questions of
federal law, the [MDL] transferee court should apply the law of
the circuit in which it is located.") (citing <u>In re Korean Air
Lines Disaster</u>, 829 F.2d 1171, 1176 (D.C. Cir. 1987), <u>aff'd</u>, 490
U.S. 122 (1989)); <u>see also</u> <u>Murphy v. F.D.I.C.</u>, 208 F.3d 959, 965-
66 (11th Cir. 2000) (same); <u>Menowitz v. Brown</u>, 991 F. 2d 36, 40
(2d Cir. 1993) (same).  Jurisdiction is "arguably the area where
the need for uniformity in federal law is most compelling." <u>In
re StarLink Corn Prods. Liab. Litig.</u>, 211 F. Supp. 2d 1060, 1063-
64 (D.C. Ill. 2002).  "The diversity jurisdiction law of the
[MDL] transferee court should be applied because 'applying the
law of the transferor circuit could yield a situation where we
would find federal jurisdiction exists over claims from some
parts of the country, but not from others.  This is an untenable
result.'"  <u>In re Mastercard Int'l, Inc. Internet Gambling Litig.</u>
2004 WL 287344, *2 (E.D. La. Feb. 12, 2004) (quoting <u>In re
StarLink Corn Prods. Liab. Litig.</u>, 211 F. Supp. 2d at 1063-64);
<u>see also</u> <u>In re Bridgestone/Firestone, Inc., Tires Prods. Liab.
Litig.</u>, 256 F. Supp. 2d 884, 888 (S.D. Ind. 2003) (same); <u>In re
Diet Drugs Prods. Liab. Litig.</u>, 220 F. Supp. 2d 414, 423 (E.D.
Pa. 2002) ("As an MDL Court sitting within the Third Circuit, we
must apply our Court of Appeals' fraudulent joinder standard.").