that Article III's limits on federal jurisdiction are designed not only to prevent federal courts from assessing the merits of certain disputes, but also to prevent federal courts from interfering--through such assessments or otherwise--with the jurisdiction of state courts over certain cases, such as this one, that do not implicate federal interests.") (emphasis in original); In re Orthopedic 'Bone Screw' Prods. Liab. Litig., 132 F.3d 152, 157 (3d Cir. 1997) ("Where ... the district court lacked subject matter jurisdiction, it could not impose a sanction that has the effect of adjudicating the merits of the case."); but see In re Exxon Valdez, 102 F.3d 429 (9th Cir. 1996) (court later determined to be without subject-matter jurisdiction may dismiss claims pursuant to Rule 37 for a plaintiff's repeated failure to respond to any discovery request).    Instead, the final disposition of these Plaintiffs' claims must await a court of competent jurisdiction.[160]

Therefore, the claims of every Plaintiff in each of the cases listed in "Appendix A" (attached hereto) must be remanded for lack of subject-matter jurisdiction.[161]    All pending motions in those cases are stayed pending consideration by the appropriate state court.

### D.    Motion to Stay the Effective Date of Remand

---

[160]    Because of this, the Court refrains from finding as a fact that any particular Plaintiff failed to submit a Fact Sheet.

[161]    The MDL cases not listed in "Appendix A" will be discussed infra.

On March 29, 2005, during a telephonic conference, the Court solicited the parties' proposals for the best procedure for implementing the remand of the MDL cases, in the event the Court determined remand was required.  (See Order No. 27 at 5.)  In response, certain Defendants filed a motion for the Court to stay the effective date of any remand order for 30 days following its entry.  (MDL 03-1553 Docket Entry 1882, filed May 26, 2005.) Defendants seek this stay in order to petition the Mississippi Supreme Court for an order consolidating the remanded cases before a single judge.  According to Defendants, this consolidation would not only prolong the beneficial aspects of the federal MDL–efficiency, convenience and consistency––but would actually enhance those aspects because the state judge would be unhampered by jurisdictional concerns.

The Court finds this motion to be well-taken.  This Court's Order remanding the "Appendix A" cases will result in 90 cases, totaling nearly 10,000 Plaintiffs, being returned en masse to state courts in approximately 19 Mississippi counties.  It is quite possible that at least 19 more cases will follow.  (See discussion of "Appendix B" cases, infra.)  The parties should have the opportunity to petition the state's highest court for consideration of how Mississippi's judicial system can best absorb the influx of cases.  Therefore, the Court will stay the effective date of the remand of the cases listed in "Appendix A" for a period of 30 days from the date of this Order, after which time remand will issue.

**E.    Cases Transferred After December 5, 2004**

An MDL such as this is not a stagnant creature. Since the initial Conditional Transfer Order on September 4, 2003 (which sent 22 cases), the Judicial Panel on Multidistrict Litigation has issued 14 subsequent Conditional Transfer Orders, sending 95 additional cases to this Court for coordinated or consolidated pretrial proceedings. The most recent Conditional Transfer Order was filed on June 13, 2005, transferring 6 cases.

The Defendants are entitled to have an opportunity to meet their burden of proving that jurisdiction exists in the newly-transferred cases. Therefore, this Order does not remand those cases transferred so recently that the Plaintiffs were not yet required to submit Fact Sheets at the time of the February 4, 2005 deadline for Defendants to submit evidence supporting jurisdiction.[162] All actions transferred after December 5, 2004 (60 days prior to the February 4, 2005 deadline) will remain in this Court and a part of this MDL.

Therefore, after the implementation of this Order remanding the 90 cases listed in "Appendix A," only the 19 recently-transferred cases listed in "Appendix B,"[163] as well as <u>Alexander v.</u>

---

[162]  All Plaintiffs in actions transferred after January 26, 2004 were required to submit their sworn Fact Sheets within 60 days from the date of transfer by the Judicial Panel on Multidistrict Litigation.  (Order No. 4, ¶ 20.)

[163]  Three additional cases were scheduled to be transferred via Conditional Transfer Order 13, but transfer in those cases was opposed.  Therefore, those cases likely will be set for a

Air Liquide America Corp., S.D. Tex. Cause No. 03-533 (originally filed in this Court), will remain in this MDL.[164]  The Court's paramount concern with respect to the "Appendix B" cases will be determining whether federal subject-matter jurisdiction exists. An in-person status conference will be conducted on August 22, 2005 at 9:00 a.m., concerning the appropriate procedure for expediting jurisdictional discovery in the cases listed in "Appendix B," as well as in any later-transferred cases.  As to the "Appendix B" cases, the stay of discovery entered on February 22, 2005 (see Order No. 26) is hereby lifted.  As set out in Order No. 4, all Plaintiffs in recently-transferred actions must submit sworn Fact Sheets within 60 days from the date of transfer by the Panel (excluding the period during which discovery was stayed).  (Order No. 4, ¶ 20.)

**F.    Kirkland**

Kirkland v. 3M Co., S.D. Tex. Cause No. 04-639, was originally filed on January 29, 2004 in the State Court of Fulton County, Georgia.  On July 23, 2004, 3M removed the case to the United States District Court for the Northern District of Georgia, where it was assigned Cause No. 1:04-cv-2152.  3M's Notice of Removal, in

_____

hearing before the Panel.  See R. Proc. Jud. Panel Multidistrict Litig. 7.4(c)-(d).

[164] As discussed infra, another MDL case, Kirkland v. 3M Co., S.D. Tex. Cause No. 04-639, will be sent to the Judicial Panel on Multidistrict Litigation with a recommendation that it be returned to the transferor court.

contrast to the notices of removal filed in the cases listed in "Appendix A," distinctly and affirmatively alleges both the place of incorporation and principal places of business each of the Defendants. Cf. Howery v. Allstate Ins. Co., 243 F.3d 912, 919 (5th Cir. 2001) ("For diversity jurisdiction, the party asserting federal jurisdiction must 'distinctly and affirmatively allege' the citizenship of the parties.") (quoting Stafford v. Mobil Oil Corp., 945 F.2d 803, 804 (5th Cir. 1991)). Based upon these allegations and the allegations in the Complaint, the two Plaintiffs, Clark C. Kirkland and Sharon S. Kirkland (husband and wife), have a different citizenship than each of the seven Defendants. Furthermore, it is facially apparent from the Complaint that Plaintiffs claim damages in excess of $75,000. Therefore, diversity jurisdiction exists. See 28 U.S.C. § 1332(a).[165]

---

[165]   The Notice of Removal also alleges that federal subject-matter jurisdiction exists independent of diversity by virtue of federal enclave jurisdiction, see Lord v. Local Union No. 2088, 646 F.2d 1057, 1059 (5th Cir. 1981), because Mr. Kirkland claims injury from silica exposure at Fort Benning, Georgia. Since diversity jurisdiction exists, the Court need not address this issue.
   Also, it is worth noting that the removal was not timely because it was filed more than 30 days after service of the Complaint. See 28 U.S.C. § 1446(b). However, during the over three months the case was pending in the transferor court, no motion to remand was filed. (Kirkland was removed to federal court on July 23, 2004, and was transferred to this MDL via Conditional Transfer Order 10, filed November 5, 2004.) Therefore, any objection to a procedural defect in the removal has been waived. See 28 U.S.C. § 1447(c) ("A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a)."); see also Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 457-58 (5th Cir. 1998).

Having found that subject-matter jurisdiction exists, the next issue is whether, in light of the remand of the majority of cases in this MDL, the Court should retain Kirkland or recommend that it be remanded to the transferor court (i.e., the U.S. District Court for the Northern District of Georgia).

The power to remand a case to the transferor court lies solely with the Judicial Panel on Multidistrict Litigation. See 28 U.S.C. § 1407(a) ("Each action ... transferred [by the Panel] shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred....") (emphasis added); In re Roberts, 178 F.3d 181, 183 (3d Cir. 1999). In determining whether to issue a suggestion for remand to the Panel, a transferor court should be guided by the standards for remand employed by the Panel. See In re Bridgestone/Firestone, Inc., 128 F. Supp. 2d 1196, 1197 (S.D. Ind. 2001). "The exercise of that discretion [to remand] generally turns on the question of whether the case will benefit from further coordinated proceedings as part of the MDL." Id. (citing In re Air Crash Disaster, 461 F. Supp. 671, 672-73 (J.P.M.L. 1978)). Remand is inappropriate, for example, when continued consolidation will "eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary." In re Heritage Bonds Litig., 217 F. Supp. 2d 1369, 1370 (J.P.M.L. 2002) (citing 28 U.S.C. § 1407). By contrast, the Panel has discretion to remand when everything that remains to be done is case-specific.

See In re Patenaude, 210 F.3d 135, 145 (3d Cir. 2000); In re Bridgestone/Firestone, Inc., 128 F. Supp. 2d at 1197.

In Kirkland, the remaining issues are different than those in every other case remaining in this MDL. All of the cases listed in "Appendix B" are at a stage in which subject-matter jurisdiction has yet to be determined--and is in significant doubt. The Court's "first inquiry" in those cases must be the issue of jurisdiction. Smallwood, 385 F.3d at 576. The only other case associated with this MDL, Alexander (discussed infra), involves 100 Plaintiffs whose experts have been struck on Daubert grounds. In Kirkland, by contrast, there is no issue concerning federal jurisdiction, or whether Mr. Kirkland is injured (he is scheduled to have a lung transplant). Instead, the issues in Kirkland involve whether Plaintiffs' sole remaining attorney may withdraw, whether Plaintiffs' claims are barred on statute-of-limitations grounds, and whether certain prior statements by Mr. Kirkland bar his claim against 3M.[166] Also, Plaintiffs' sole remaining attorney, Scott Monge (a Georgia lawyer who seeks to withdraw from the case), has complained of the imposition of prosecuting the case in Texas. Should Mr. Monge be permitted to withdraw, Plaintiffs, both Georgia residents, would be left to proceed pro se. Requiring pro se litigants to prosecute a case in a court over a thousand miles from

---

[166] No Defendant has yet filed a motion addressing the statute-of-limitations issue or the issue of the whether 3M should be dismissed. As noted supra, Plaintiffs' previous attorney, Mr. Martin, filed a motion to dismiss 3M, apparently against the wishes of Mr. Kirkland.

their residence would be a significant imposition, and seemingly a needless one considering how case-specific the remaining issues are.

Therefore, because the Court believes remand will serve the convenience of the parties and will promote the just and efficient conduct of the case, the Court will recommend to the Judicial Panel on Multidistrict Litigation that <u>Kirkland</u> be remanded to the United States District Court for the Northern District of Georgia, where it was assigned Cause No. 1:04-cv-2152.   The Court refrains from ruling on the pending motions, reserving them for consideration by the transferor court, should the case be remanded.

### G.   **Alexander**

<u>Alexander v. Air Liquide America Corp.</u>, S.D. Tex. Cause No. 03-533, was originally filed in this Court.   The 100 Plaintiffs allege--and the 41 Defendants do not dispute--that this Court has diversity jurisdiction over this action.

However, in conducting its own review of federal subject-matter jurisdiction,[167] the Court found that the jurisdictional allegations in the Complaint were deficient.   Specifically, the principal places of business of most of the corporate Defendants had not been alleged.

---

[167]   "[F]ederal courts are duty-bound to examine the basis of subject matter jurisdiction <u>sua sponte</u>."   <u>Union Planters Bank Nat'l Ass'n v. Salih</u>, 369 F.3d 457, 460 (5th Cir. 2004); <u>see also</u> Fed. R. Civ. P. 12(h)(3).

As set out below, "[w]hen jurisdiction depends on citizenship, citizenship should be distinctly and affirmatively alleged." Stafford v. Mobil Oil Corp., 945 F.2d 803, 804 (5th Cir. 1991) (quotation omitted); see also Howery v. Allstate Ins. Co., 243 F.3d 912, 919 (5th Cir. 2001) (same). "For diversity jurisdiction purposes, a corporation is a citizen of the state in which it was incorporated and the state in which it has its principal place of business." Stafford, 945 F.2d at 805 (quoting Getty Oil Corp. v. Ins. Co. N. Am., 841 F.2d 1254, 1258 (5th Cir. 1988) (citing 28 U.S.C. § 1332(c)). As in Stafford, the Alexander "Plaintiffs have stated facts alleging only one of these two possible states of corporate citizenship with respect to each defendant, which is not enough to establish diversity jurisdiction." Stafford, 945 F.2d at 805.

In contrast to the "Appendix A" cases, because the parties have not questioned the subject-matter jurisdiction of this Court in this case, the defective jurisdictional allegations could be cured pursuant to 28 U.S.C. § 1653.[168] See Stafford, 945 F.2d at 806 ("[A] party shall be allowed to amend its complaint in order to make a complete statement of the basis for federal diversity jurisdiction where diversity jurisdiction was not questioned by the parties and there is no suggestion in the record that it does not

_____

[168] Section 1653 states that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. § 1653.

-223-

in fact exist.") (citing <u>Leigh v. Nat'l Aeronautics & Space Admin.</u>, 860 F.2d 652, 653 (5th Cir. 1988)).

Therefore, on May 16, 2005, the Court ordered Plaintiffs, as the parties seeking to invoke the federal jurisdiction in this case,[169] to amend their jurisdictional allegations.  On May 24, 2005, Plaintiffs filed their First Amended Complaint, distinctly and affirmatively alleging both the place of incorporation and the principal places of business of 40 of the 41 Defendants.  With respect to the 41st Defendant, American Optical Corporation ("American Optical"), Plaintiffs state: "Plaintiff has been unable to locate this Defendant[']s principal place of business at the time of this filing." (Pls.' First Am. Compl., Docket Entry 119, at 11.)

Once again, since the parties have not questioned federal subject-matter jurisdiction in this case, this jurisdictional allegation concerning American Optical's principal place of business may be cured pursuant to 28 U.S.C. § 1653.  Plaintiffs have 30 days from the date of this Order to learn through discovery or otherwise the principal place of business of American Optical and again amend the Complaint to adequately allege jurisdiction.[170]

_____

[169]  "The burden of proving that complete diversity exists rests upon the party who seeks to invoke the court's diversity jurisdiction." <u>Stafford</u>, 945 F.2d at 804 (quoting <u>Getty Oil</u>, 841 F.2d at 1259).

[170]  It is worth noting that in the Notice of Removal in <u>Kirkland</u>, 3M alleges that American Optical's principal place of business is in Connecticut.  (<u>See</u> <u>Kirkland v. 3M</u>, S.D. Tex. Cause

Should Plaintiffs again fail to adequately allege jurisdiction within 30 days, American Optical will be dismissed without prejudice.

As discussed above, the Motion to Exclude the expert testimony of Dr. Harron and Dr. Levy on <u>Daubert</u> grounds has been granted. Immediately following the August 22, 2005 status conference addressing the "Appendix B" cases, the Court will conduct an in-person status conference in <u>Alexander</u>, to address whether (and, if so, under what conditions) the Plaintiffs' claims may proceed.

**IV.  Sanctions**

On February 4, 2005, Defendants accompanied their submissions on subject-matter jurisdiction with requests for sanctions, arguing that "Plaintiffs affirmatively, and repeatedly, misled Defendants and the Court with respect to whether they had diagnoses in hand to support their claims." (Certain Defs.' Br. on Juris., MDL 03-1553 Docket Entry 1583, at 35; <u>see also</u> 3M Co.'s Br. Regarding Subject Matter Juris., MDL 03-1553 Docket Entry 1585, at 17.)  Defendants explained that they expected "the record being developed in connection with the 'Daubert' hearings will provide further proof that plaintiffs engaged in conduct amounting to fraud." (Certain Defs.' Br. on Juris., MDL 03-1553 Docket Entry 1583, at 35.)

At the conclusion of the <u>Daubert</u> hearings, the Court allowed Defendants until February 23, 2005 to supplement their request for

---

No. 04-639, Notice of Removal, Docket Entry 1, ¶ 15.)

sanctions, allowed Plaintiffs until March 10, 2005 to respond, and set a sanctions hearing for March 14, 2005. (Order No. 26 ¶ 2.)

In their supplemental briefing, Defendants specified that they seek monetary sanctions pursuant to Federal Rules of Civil Procedure 11, 16, 26 and 37, 28 U.S.C. § 1927, and the Court's inherent authority.[171] They argued that "[t]he Court should sanction plaintiffs for knowingly submitting and advocating bogus diagnoses." (Supplemental Mot. Sanctions, MDL 03-1553 Docket Entry 1678 at 4.) They further argued that Plaintiffs had violated a number of the Court's orders, including those requiring the submission of fully completed Fact Sheets and those requiring disclosure of Plaintiffs' previous asbestosis claims/diagnoses.

At the March 14 sanctions hearing, Defendants reiterated their arguments, while Plaintiffs argued that: (1) the Court did not have subject-matter jurisdiction and thus did not have the authority to award sanctions; and, (2) Plaintiffs attempted in good faith to fully comply with the Court's orders.

Because the Defendants' briefing was long on argument and short on evidence, the Court ordered Defendants to supplement their motions with additional evidence, and provided for Plaintiffs to

---

[171] Specifically, 39 Defendants moved for sanctions pursuant to Rules 16 and 37, § 1927 and the Court's inherent authority, while 3M moved for sanctions pursuant to Rules 11 and 37, § 1927 and the Court's inherent authority. (Supplemental Mot. Sanctions, MDL 03-1553 Docket Entry 1678; Mot. 3M Co. Sanctions, MDL 03-1553 Docket Entry 1679.) Numerous additional Defendants joined in each motion.

have an opportunity to respond.  (Order No. 27 ¶¶ 1-2.)  On March
29, 2005, the Court conducted a telephone conference with the
parties, during which the Defendants stated that the Plaintiffs had
recently produced a large volume of additional documents responsive
to the Court's previous discovery orders.  In order to allow the
Defendants time to process these documents, the parties jointly
requested that any order on jurisdiction, <u>Daubert</u>, and/or sanctions
not be issued until late-May or June.

**A.    In the Absence of Subject-Matter Jurisdiction**

As discussed above, Defendants have not met their burden of
establishing that the Court possesses subject-matter jurisdiction
over any of the cases listed in "Appendix A."  Therefore, prior to
addressing whether sanctions are warranted, the Court must consider
whether it has the ability to levy sanctions at all.

Many times, the Fifth Circuit has stated flatly, "[u]nless a
federal court possesses subject matter jurisdiction over a dispute,
... any order it makes (other than an order of dismissal or remand)
is void."  <u>Dahiya v. Talmidge Int'l, Ltd.</u>, 371 F.3d 207, 210 (5th
Cir. 2004); <u>see also, e.g.</u>, <u>John G. & Marie Stella Kennedy Mem'l
Found. v. Mauro</u>, 21 F.3d 667, 674 (5th Cir. 1994) (same); <u>Shirley
v. Maxicare Tex. Inc.</u>, 921 F.2d 565, 568 (5th Cir. 1991) (same); <u>see
also</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94
(1998) ("Without jurisdiction the court cannot proceed at all in
any cause.") (quoting <u>Ex parte McCardle</u>, 7 Wall. 506, 514, 19 L.
Ed. 264 (1868)); <u>Howery v. Allstate Ins. Co.</u>, 243 F.3d 912, 916 n.6

(5th Cir. 2001) ("Where a federal court proceeds in a matter without first establishing that the dispute is within the province of controversies assigned to it by the Constitution and statute, the federal tribunal poaches upon the territory of a coordinate judicial system, and its decisions, opinions, and orders are of no effect.") (quotation omitted).  However, the situation is not as straightforward as these quotes might indicate.

In Willy v. Coastal Corp., 503 U.S. 131 (1992), the Supreme Court held that a district court may impose Rule 11 sanctions in a case in which the court is later determined to be without subject-matter jurisdiction.  Specifically, the district court awarded Rule 11 sanctions in the form of $19,000 in attorney's fees for the plaintiffs' counsel's filing of "a 1,200-page, unindexed, unnumbered pile of materials" with the district court and "reliance on a non-existent Federal Rule of Evidence."  Id. at 133.  In so holding, the Willy Court distinguished another case wherein the Supreme Court held that a district court's civil contempt order cannot stand if the court did not have subject-matter jurisdiction.  See id. at 138 (distinguishing U.S. Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72 (1988) (reversing a district court's award of fees for two nonparty witnesses' failure to comply with a district court subpoena)).  The Court explained the difference between the situation in Catholic Conference and that in Willy:

-228-

> Given that civil contempt is designed to coerce
> compliance with the court's decree, it is logical that
> the order itself should fall with a showing that the
> court was without authority to enter the decree. The
> interest in having rules of procedure obeyed, by
> contrast, does not disappear upon a subsequent
> determination that the court was without subject-matter
> jurisdiction. Courts do make mistakes; in cases such as
> <u>Catholic Conference</u> it may be possible immediately to
> seek relief in an appellate tribunal. But where such an
> immediate appeal is not authorized, there is no
> constitutional infirmity under Article III in requiring
> those practicing before the courts to conduct themselves
> in compliance with the applicable procedural rules in the
> interim, and to allow the courts to impose Rule 11
> sanctions in the event of their failure to do so.

<u>Id.</u> at 139. The Court further explained that permitting a court to

impose Rule 11 sanctions in the absence of subject-matter

jurisdiction "implicates no constitutional concern because it does

not signify a district court's assessment of the legal merits of

the complaint." <u>Id.</u> at 138 (quotation omitted). The lesson from

<u>Willy</u> is that a district court which is later determined to be

without subject-matter jurisdiction may sanction a party for

violating Rule 11, but may not sanction a party to coerce

compliance with a court order.

However, there are two characteristics of these MDL cases

which distinguish them from <u>Willy</u>. First, in <u>Willy</u>, the court

issuing sanctions did so under the belief--later determined to be

mistaken--that it had subject-matter jurisdiction over the action.

<u>See id.</u> at 137 ("A final determination of lack of subject-matter

jurisdiction of a case in a federal court ... does not

automatically wipe out all proceedings had in the district court at

a time when the district court operated under the misapprehension that it had jurisdiction."); see also In re Exxon Valdez, 102 F.3d 429, 431 (9th Cir. 1996) (same). Here, by contrast, this Court has determined that it lacks subject-matter jurisdiction over all of the MDL cases transferred by the Panel prior to December 5, 2004. This Court is under no misapprehension that it has jurisdiction.

Also, Willy dealt only with a district court's ability to levy Rule 11 sanctions. In these MDL cases, by contrast, Rule 11 sanctions are not available because 3M[172] failed to comply with Rule 11's procedural "safe harbor" requirements.[173] And even had 3M complied with the procedural requirements, the basis for the motion--filing claims based on fraudulent diagnoses--cannot be the

_____

[172] Only 3M moves for sanctions pursuant to Rule 11. The other Defendants move for sanctions on other grounds.

[173] Rule 11 provides, in relevant part:
A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.
Fed. R. Civ. P. 11(c)(1)(A). This is known as the "safe harbor" provision, and it contemplates service of the Rule 11 motion at least 21 days prior to filing the motion with the court in order to give the parties at whom the motion is directed an opportunity to withdraw or correct the offending contention. See Elliott v. Tilton, 64 F.3d 213, 216 (5th Cir. 1995). "The plain language of the rule indicates that this notice and opportunity prior to filing is mandatory." Id. In Elliott, the Fifth Circuit held that when the moving party fails to comply with this "safe harbor" provision, a Rule 11 sanction cannot be upheld. See id.

subject of Federal Rule 11 sanctions because the claims were filed
in state court.[174]   Therefore, with Rule 11 unavailable to the
"Appendix A" cases, Defendants are only left with their alternate
grounds for the sanctions motions.  But Defendants have pointed to
no Supreme Court or Fifth Circuit authority indicating that any of
these alternate grounds may support sanctions in the absence of
subject-matter jurisdiction.  And here, as noted above, there is
the added fact that the Court would be attempting to issue
sanctions knowing it has no subject-matter jurisdiction.

        In short, in the absence of specific authority to the
contrary, the Court will not deviate from the admonition that
"[u]nless a federal court possesses subject matter jurisdiction
over a dispute, ... any order it makes (other than an order of
dismissal or remand) is void."  Dahiya, 371 F.3d at 210.

        Therefore, as to all MDL cases transferred by the Panel before
December 5, 2004 (i.e., the "Appendix A" cases), the motions for
sanctions are reserved for consideration by the appropriate state

---

        [174] "Rule 11 does not apply to conduct in state court prior
to removal."  Foval v. First Nat'l Bank of Commerce, 841 F.2d
126, 130 (5th Cir. 1988).  Hence, Rule 11 sanctions "cannot apply
to the petition [a plaintiff] filed in state court that
thereafter was removed."  Edwards v. Gen. Motors Corp., 153 F.3d
242, 245 (5th Cir. 1998).  "Moreover, rule 11 does not impart a
continuing duty, but requires only that each filing comply with
its terms as of the time the paper is signed.  Consequently, [a
plaintiff] cannot be sanctioned simply for her failure to
withdraw pleadings filed in state court that would have violated
rule 11 had they been filed in federal court."  Id. (citing
Thomas v. Capital Sec. Servs., Inc., 836 F.2d 866, 874 (5th Cir.
1988) (en banc)).

court after remand.  As to those MDL cases transferred by the Panel _after_ December 5, 2004 (i.e., the "Appendix B" cases), the motions for sanctions are STAYED pending this Court's ruling on subject-matter jurisdiction.

### B.   **Alexander**

As discussed above, the Court is not constrained by a lack of subject-matter jurisdiction in Alexander v. Air Liquide America Corp., S.D. Tex. Cause No. 03-533.  Yet, even with jurisdiction, Rule 11 sanctions are inappropriate because Rule 11's procedural prerequisites have not been satisfied in this case.[175]  This does not mean, however, that sanctions are not warranted.  In addition to Rule 11, Defendants have moved for sanctions pursuant to 28 U.S.C. § 1927.

Section 1927 provides that "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  "[S]anctions under § 1927 must

---

[175] As noted above, Defendants failed to comply with the "safe harbor" requirement of Rule 11(c)(1)(A).  Rule 11 also provides for the imposition of sanctions sua sponte by a court. This provision contains no "safe harbor" requirement, but it requires, prior to the imposition of sanctions, the court to "enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto."  Fed. R. Civ. P. 11(c)(1)(B); see also Elliott v. Tilton, 64 F.3d 213, 216 (5th Cir. 1995).  The Court has entered no such show cause order in this case.

be predicated on actions that are both "unreasonable" and "vexatious." Edwards v. Gen. Motors Corp., 153 F.3d 242, 246 (5th Cir. 1998) (emphasis in original) (citing Travelers Ins. Co. v. St. Jude Hosp., Inc., 38 F.3d 1414, 1416-17 (5th Cir. 1994)). "This requires that there be evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court." Id. (citing Travelers Ins. Co., 38 F.3d at 1416-17; Baulch v. Johns, 70 F.3d 813, 817 (5th Cir. 1995)); see also Mercury Air Group, Inc. v. Mansour, 237 F.3d 542, 549 (5th Cir. 2001) (same). Under § 1927, "attorneys have been held accountable for decisions that reflect a reckless indifference to the merits of a claim." Coghlan v. Starkey, 852 F.2d 806, 814 (5th Cir. 1988) (quoting Reliance Ins. Co. v. Sweeney Corp., 792 F.2d 1137, 1139 (D.C. Cir. 1986)). "Because of the punitive nature of § 1927 sanctions, and in order not to chill legitimate advocacy, the provision must be strictly construed." Edwards, 153 F.3d at 246 (citing Travelers Ins. Co., 38 F.3d at 1416-17). However, the decision whether to impose § 1927 sanctions is discretionary with this Court. See id.

Alexander was filed by the law firm of O'Quinn, Laminack & Pirtle, L.L.P. ("O'Quinn"), a firm based in Houston, Texas.[176] O'Quinn represents over 2,000 Plaintiffs in this MDL. As discussed

---

[176] The Watts Law Firm also signed the Alexander Complaint, but Defendants do not seek sanctions against that firm because it has acted only as local, or "liaison", counsel. (Supplemental Mot. Sanctions, MDL 03-1553 Docket Entry 1678, at 1; see also Mar. 14, 2005 Sanctions Hearing Trans. at 16.) Therefore, the Court only considers whether O'Quinn's conduct warrants sanctions.

above in reference to the <u>Daubert</u> ruling, 99 of the 100 Plaintiffs in <u>Alexander</u> submitted a silicosis diagnosis from Dr. Ray Harron, while seven <u>Alexander</u> Plaintiffs submitted a silicosis diagnosis from Dr. Levy.[177]

As an initial matter, it should have been apparent to O'Quinn in late-2003, as it was preparing to file a case with 100 Plaintiffs, all Mississippi or Alabama residents, that it was medically implausible for the Plaintiffs' silicosis diagnoses to have been accurate. Using the statistics from the CDC cited at the outset of this Order, one would expect a total of approximately 33 new silicosis cases per year in Alabama and Mississippi combined. When considering the fact that O'Quinn not only filed the 100-Plaintiff <u>Alexander</u> case, but also was in the process of filing silicosis cases for over 1,900 other Plaintiffs (almost all of whom were Mississippi or Alabama residents), then the implausibility should have been even more starkly apparent. Of course, O'Quinn also knew about the existence of the MDL (hence the reason <u>Alexander</u> was filed originally in this Court), which eventually grew to over 10,000 Plaintiffs, the majority of whom are Mississippi or Alabama residents. At this point, medical implausibility had become a virtual impossibility.[178] Thus, even at

---

[177] Six of the Plaintiffs submitted diagnoses from both Dr. Harron and Dr. Levy.

[178] Adding to the facially-implausible nature of these diagnoses is that fact that by mid-2004, O'Quinn knew about the large number of MDL Plaintiffs who had previously been diagnosed with asbestosis. (Order No. 12 ¶ 14; O'Quinn's Resp. Opp'n

the time of <u>Alexander</u>'s filing, O'Quinn exhibited a "reckless disregard of the duty owed to the court." <u>Edwards</u>, 153 F.3d at 246 (citation omitted); <u>see also</u> <u>Coghlan</u>, 852 F.2d at 814 (under § 1927, "attorneys have been held accountable for decisions that reflect a reckless indifference to the merits of a claim") (quotation omitted).

Even if O'Quinn cannot be charged with knowledge of silicosis statistics at the time of the filing of their claims, they certainly can be charged with such knowledge when Defendants raised the issue in their briefing in this MDL. For instance, on November 11, 2004, 3M presented evidence showing that it is "scientifically virtually impossible" for all of the MDL Plaintiffs to have silicosis. (Mot. Appointment Technical Advisory Panel, MDL 03-1553 Docket Entry 1145, at 6 & Ex. C.)

As detailed above, on October 29, 2004, Defendants deposed Dr. Martindale, which revealed that his 3,617 "diagnoses" were not diagnoses at all. It also revealed that Dr. Martindale had been told by N&M that "another physician had done a physical and history -- occupational history, medical history -- had supervised some PFTs and had evaluated the chest x-rays." (Dr. Martindale Dep. at 23-24.) As detailed above, this was false.

_____

Defs.' Mots. Sanctions, MDL 03-1553 Docket Entry 1775, at 13-14.) All told, over half of O'Quinn's 2,000 MDL Plaintiffs previously filed asbestosis claims. (Defs.' Steering Committee's Resp. PTO 27, MDL 03-1553 Docket Entry 1826, Ex. B.2.)

Despite this testimony (and despite the additional testimony of Dr. Hilbun and Dr. Cooper, described above), which Defendants trumpeted to the Court (so O'Quinn cannot claim to be ignorant of it), Plaintiffs opposed the motion to exclude their experts, opposed the use of independent experts to test the diagnoses, and instead insinuated (apparently with no factual basis) that Defendants had illicitly "flipped" Dr. Martindale and stated that they were "willing, ready, and able to bring the rest of these [diagnosing doctors] here ... to show their stripes." (Dec. 17, 2004 Status Conference Trans. at 18-20, 23, 39, 45.)

At this point--at the latest--O'Quinn's continued prosecution of its claims, and continued insistence that the N&M-produced diagnoses would be proven legitimate at the Daubert hearings, crossed the rubicon established by § 1927. Stated differently, Plaintiffs' (including O'Quinn's) insistence upon the Daubert hearings multiplied the proceedings unreasonably and vexatiously.

This conclusion is supported by the active role O'Quinn played in making its Plaintiffs' diagnoses. As discussed above, the first essential step in diagnosing silicosis involves the taking of a thorough and appropriate occupational and exposure history. Unlike many of the other Plaintiffs' firms, O'Quinn did not ask the screening company (here, N&M) to take the histories; instead, O'Quinn (or a "temp service" hired by O'Quinn) took the occupational and exposure histories. (Feb. 17, 2005 Trans. at 284, 342, 400.) O'Quinn only used N&M to take x-rays and perform PFTs;

-236-

O'Quinn took responsibility for the histories and for coordinating the diagnostic process. (Feb. 17, 2005 Trans. at 342, 374.) As detailed above, both Dr. Harron and Dr. Levy relied totally upon the exposure histories provided to them by the lawyers. Dr. Levy was told that a physician had spent 90 minutes with each Plaintiff performing a detailed history and physical. (Feb. 16, 2005 Trans. at 24, 72, 76.) This was shown to be false at the Daubert hearings, and O'Quinn, at least, should have known it was false from the outset, since the lawyers or their employees had taken the histories themselves.

Of course, saying that the Plaintiffs do not have diagnoses is not to say that none of the Alexander Plaintiffs have silicosis. Perhaps a handful of them do. The point is that because the lawyers short-circuited the appropriate diagnostic process, O'Quinn--at minimum--recklessly disregarded the fact that there is no reliable basis for believing that every Plaintiff has silicosis. And this basic information regarding the nature of each Plaintiff's injuries is information O'Quinn should have known before filing their claims in this Court. See Acuna v. Brown & Root, Inc., 200 F.3d 335, 340 (5th Cir. 2000) (citing Fed. R. Civ. P. 11(b)(3)).

It is important to emphasize that this is not a normal circumstance where a plaintiff's expert is disqualified after a Daubert hearing. Simply proffering an expert who fails Daubert is not enough to warrant sanctions. But requiring a court and the defendants to undergo a Daubert hearing when the plaintiff has no

-237-

reasonable basis to believe that the expert can pass muster under Daubert can result in plaintiff's counsel being liable for the defendant's Daubert hearing fees and expenses. Cf. Edwards v. Gen. Motors Corp., 153 F.3d 242, 246-47 (5th Cir. 1998) (affirming § 1927 award for defendant's fees incurred after the date on which plaintiff's attorney knew her case was unwinnable but refused to disclose that fact to the court and to the defendant in hopes of extorting a nuisance-value settlement).

Here, O'Quinn should have realized its diagnoses were fatally unreliable based upon the statistics referenced above, as well as the Martindale, Hilbun and Cooper depositions. This is especially true because O'Quinn itself provided the inadequate occupational and exposure histories underlying the purported diagnoses. Once O'Quinn donned a lab coat and injected itself into the diagnostic process, it is reasonable to charge them with knowledge both of what is required for a medically-acceptable diagnosis,[179] and of how far their diagnoses strayed from that standard.

Moreover, the clear motivation for O'Quinn's micro-management of the diagnostic process was to inflate the number of Plaintiffs and claims in order to overwhelm the Defendants and the judicial

---

[179] Regardless, O'Quinn can be charged with knowing the accepted method for diagnosing silicosis since, prior to the Daubert hearings, Dr. Friedman testified on the subject (see generally May 17, 2004 Status Conference Transcript at 19-109), and Plaintiffs themselves cited textbooks and other materials containing that information in "Plaintiffs' Informational Brief Regarding the Diagnosis of Silicosis" (MDL 03-1553 Docket Entry 1618).

system.  This is apparently done in hopes of extracting mass nuisance-value settlements because the Defendants and the judicial system are financially incapable of examining the merits of each individual claim in the usual manner.

The Court finds that filing and then persisting in the prosecution of silicosis claims while recklessly disregarding the fact that there is no reliable basis for believing that every Plaintiff has silicosis constitutes an unreasonable multiplication of the proceedings.  When factoring in the obvious motivation-- overwhelming the system to prevent examination of each individual claim and to extract mass settlements--the behavior becomes vexatious as well.  Therefore, the Court finds that in Alexander,[180] O'Quinn has "multiplie[d] the proceedings ... unreasonably and vexatiously," and the firm will be required "to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.[181]

---

[180]  The conduct that forms the basis of O'Quinn's § 1927 liability is not confined to Alexander or to O'Quinn.  However, O'Quinn will not be insulated from liability simply because the Court does not have jurisdiction to sanction Plaintiffs' counsel in the other cases.  Instead, as discussed infra, O'Quinn will only be sanctioned for Alexander's proportionate share of "the excess costs, expenses, and attorneys' fees reasonably incurred because of [the sanctionable] conduct."  28 U.S.C. § 1927.  It will be left to the respective state courts after remand to address counsel's conduct in the remanded cases.

[181]  In making this finding, the Court--as it must--strictly construes § 1927.  See Edwards, 153 F.3d at 246.  Strictly construing the statute, the Court finds that the § 1927 liability arose at the time of the Daubert hearings.  Absent strict construction, the Court likely would find that liability arose with the filing of the Complaint.

Prior to turning to the amount of O'Quinn's sanction, the Court notes that Defendants also moved for sanctions pursuant to Federal Rules of Civil Procedure 16, 26 and 37, which allow the Court to sanction a party who fails to comply with scheduling orders, improperly certifies discovery responses, or fails to cooperate with discovery. The factual bases for sanctions grounded in those Rules have been documented and debated at length in the parties' filings in response to Order No. 27. Defendants have noted numerous instances in which Plaintiffs have failed to comply with the Court's discovery orders, some of which Plaintiffs dispute. In general, Plaintiffs' counsel, including O'Quinn, argue that they, "in good faith, made every attempt to comply with the Court's discovery orders." (O'Quinn's Resp. Opp'n Defs.' Mots. Sanctions, MDL 03-1553 Docket Entry 1775, at 12.) Implicit (and sometimes explicit) in their "good faith" arguments is that Plaintiffs' counsel did the best it could considering the large volume of Plaintiffs. For example, in the introductory section of O'Quinn's brief in opposition to the sanctions motions, O'Quinn offers a brief tutorial in the differences between "mass torts" and "traditional personal injury lawsuits":

> As with most mass torts, there are thousands of [silica] cases filed nationwide. Unlike traditional personal injury lawsuits, these [mass tort] cases are unique and prosecuted in a non-traditional--yet judicially efficient--manner. The unique nature of mass torts is especially relevant in this instance due to the fact that silica litigation has been ongoing for many years and, therefore, [has] taken on certain characteristics all its own. The fact is counsel for Plaintiffs and Defendants have been dealing with the issues currently before the

-240-

> Court for many years.  Although the 'diagnoses' issues
> that the Court is now grappling with are relatively new
> in this arena, they are issues that have successfully
> been dealt with before.

(O'Quinn's Resp. Opp'n Defs.' Mots. Sanctions, MDL 03-1553 Docket

Entry 1775, at 2.)  Although O'Quinn does not support its statement

with any examples of the "'diagnoses' issues" being "successfully

... dealt with," O'Quinn does explain the "dynamics and functioning

of [O'Quinn]'s silica docket," which includes over 2,000 claims in

this MDL.  (O'Quinn's Resp. Opp'n Defs.' Mots. Sanctions, MDL 03-

1553 Docket Entry 1775, at 13.)   O'Quinn then describes the

"painstaking procedures" the firm implemented to attempt to comply

with the Court's order to disclose which of its 2,000 Plaintiffs

had previously been diagnosed with asbestosis.  (O'Quinn's Resp.

Opp'n Defs.' Mots. Sanctions, MDL 03-1553 Docket Entry 1775, at 13-

15.)

   The Court does not doubt that complying with discovery orders

related to thousands of Plaintiffs can be an overwhelming

undertaking.  But the reason it is overwhelming is that Plaintiffs'

counsel, and the screening companies and physicians they employ,

have taken steps to inflate the number of silicosis claims beyond

the true number of people with silicosis.  In other words, at the

root of the unwieldy nature of this MDL, including the difficulty

in responding fully to discovery, is the fact that Plaintiffs'

counsel such as O'Quinn filed scores of claims without a reliable

basis for believing that their clients had a compensable injury,

thereby "multipl[ying] the proceedings ... unreasonably and vexatiously." 28 U.S.C. § 1927. Thus, even though the Alexander Plaintiffs may have failed to fully comply with all of the Court's discovery orders, the underlying cause of this is addressed by § 1927, and that is why § 1927 forms the basis of the Court's sanction.

In determining the amount of the § 1927 sanction, the Court considers three factors: (1) whether there is a connection between the amount of monetary sanctions imposed and the sanctionable conduct by the violating party; (2) whether the costs or expenses claimed by the aggrieved party are "reasonable," as opposed to self-imposed, mitigable, or the result of delay in seeking court intervention; and, (3) whether the sanction is the least severe sanction adequate to achieve the purpose of § 1927. See Topalian v. Ehrman, 3 F.3d 931, 936-37 (5th Cir. 1993) (citations omitted).[182] Applying these factors to this situation, the Court finds that O'Quinn should be required to pay Alexander's proportionate share of Defendants' "reasonably incurred" costs, expenses and attorneys' fees for the three-day Daubert hearings.

As discussed above, by the date of Daubert hearings, the patent unreliability of the diagnoses underlying each of the claims in Alexander (as well as most of the other cases) should have been

---

[182] The fourth factor discussed in Topalian, "that the [district] court must announce the sanctionable conduct giving rise to its [sanctions] order," Topalian, 3 F.3d at 937, has already been addressed.

readily apparent to O'Quinn (as well as the other Plaintiffs'
counsel). Yet neither O'Quinn, nor any of the other Plaintiffs'
counsel, attempted to stop the hearings or withdraw their claims or
acknowledge that they did not have legitimate diagnoses; instead,
Plaintiffs (after implying that Dr. Martindale's retractions were
caused by Defendants' malfeasance) told the Court that they
welcomed the opportunity to allow their diagnosing doctors and
screening companies "to show their stripes." (Dec. 17, 2004 Status
Conference Trans. at 23.) This forced Defendants to marshal
evidence, question Plaintiffs' doctors and screeners, and present
two experts of their own (Dr. Friedman and Dr. Parker), all
requiring Defendants to incur fees, costs and expenses.[183]
Furthermore, the Court finds that Defendants' efforts, as displayed
during the three-day hearings, were reasonably necessary to place
Plaintiffs' diagnoses in their proper light.

Defendants have not proffered an accounting of the fees, costs
and expenses they expended during the three-day Daubert hearings.
However, a large group of Defendants have stated that for the
purposes of the sanctions motions, they "will accept the Court's
estimate [made during the Daubert hearings] that the attorney costs
(including fees) of such [Daubert] proceedings amounted to
approximately $275,000 per day."[184] (Supplemental Mot. Sanctions,

---

[183] Indeed, assuming any of the Alexander Plaintiffs procure
alternate diagnoses, the Daubert process may have to be repeated.

[184] The Court's estimate of $275,000 per day was based on
the number of defense attorneys present at the hearings

MDL 03-1553 Docket Entry 1678, at 8.)    Thus, for the three-day

Daubert hearings,[185] the Court will begin with the assumption that

the total amount of fees, costs and expenses Defendants incurred

was $825,000.  The Court also operates under the assumption that

the proportionate share of the total fees, costs and expenses

attributable to Alexander--a case with 100 Plaintiffs in a 10,000-

Plaintiff MDL--is one percent (i.e., 100 divided by 10,000).

Hence, at this stage, the Court assumes that Alexander's

proportionate share of the total amount is $8,250.

However, prior to the Court issuing an order requiring O'Quinn

to pay $8,250 to Defendants pursuant to § 1927, O'Quinn should have

the opportunity to require Defendants to prove their fees, costs

and expenses, as well as challenge whether they were reasonable (as

opposed to being "self-imposed, mitigable, or the result of delay

in seeking court intervention," Topalian, 3 F.3d at 937).

---

multiplied by a "low count" of the number of hours of in-court
time at an average rate of $200 per hour.  (See Feb. 16, 2005
Trans. at 235; see also Mar. 14, 2005 Sanctions Hearing Trans. at
27-28.)
    Defendants indicate that if so ordered, they will prepare
evidence of their actual fees and expenses, "which defendants
expect will far exceed the Court's $275,000 per day estimate."
(Supplemental Mot. Sanctions, MDL 03-1553 Docket Entry 1678, at 8
n.7.)

    [185]  The Daubert hearings spanned February 16-18, 2005.
Defendants also ask for reimbursement for the fees they expended
for the in-person hearing on February 15, 2005.  (Supplemental
Mot. Sanctions, MDL 03-1553 Docket Entry 1678, at 8.)  However,
the February 15 hearing was a status conference which would have
occurred even had the Daubert hearings been cancelled.
Therefore, Defendants' fees for the February 15 hearing cannot be
recovered via § 1927.

-244-

Therefore, while the Court determines herein that O'Quinn should be liable for Alexander's proportionate share of Defendants' reasonable fees, expenses and costs for the Daubert hearings, the Court does not yet fix the amount of the sanction in this Order. See Travelers Ins. Co. v. St. Jude Hosp., Inc., 38 F.3d 1414, 1416 (5th Cir. 1994) (noting that a district court may award sanctions in one order, and set the amount of the award in a later order; also noting that the sanctions award only becomes appealable when "the award is reduced to a sum certain") (citing S. Travel Club, Inc. v. Carnival Air Lines, Inc., 986 F.2d 125, 131 (5th Cir. 1993)). Instead, within seven days from the date of this Order, O'Quinn must file a statement with the Court either admitting or denying the Court's estimate of $825,000 as the total amount of fees, costs and expenses Defendants reasonably incurred due to the three-day Daubert hearings.[186] Should O'Quinn deny the $825,000 figure, the Court first will allow Defendants to prove their actual fees, expenses and costs for the Daubert hearings, and then will allow O'Quinn to challenge those amounts and their reasonableness; finally, the Court will sanction O'Quinn for Alexander's proportionate share of the actual fees, expenses and costs Defendants reasonably incurred. Regardless of whether O'Quinn admits or denies the $825,000 figure, the Court will set the amount of the sanction in a later order.

_____

[186]  O'Quinn's admitting of this figure will not be construed as admitting any other finding in this Order, including whether O'Quinn should be liable for sanctions pursuant to § 1927.

It is worth noting that the amount of the sanction this Court ultimately orders (whether $8,250 or a percentage of an amount to be proven by Defendants), while not insignificant, will be substantially less than the total amount of damages--some calculable and some not--Plaintiffs' counsel have caused by their filing of thousands of claims without a reliable basis for believing that every Plaintiff has been injured.    However, the Court must confine itself to "the least severe sanction adequate to achieve the purpose of the rule under which it was imposed."  See Topalian v. Ehrman, 3 F.3d 931, 937 (5th Cir. 1993).    The Court trusts that this relatively minor sanction will nonetheless be sufficient to serve notice to counsel that truth matters in a courtroom no less than in a doctor's office.

**V.    Conclusion**

The claims of every Plaintiff in each of the 90 cases listed in "Appendix A" (attached hereto) will be REMANDED for lack of subject-matter jurisdiction.    In order to allow the parties an opportunity to petition the Mississippi Supreme Court for consideration of how Mississippi's judicial system can best absorb the return of these cases, the Motion to Stay the effective date of remand is GRANTED.    The Court hereby STAYS the effective date of the remand of the cases listed in "Appendix A" for a period of 30 days from the date of this Order, after which time remand will issue.

Kirkland v. 3M Co., S.D. Tex. Cause No. 04-639, will be sent to the Judicial Panel on Multidistrict Litigation ("Panel") with a recommendation that, for the convenience of the parties and to promote the just and efficient conduct of the case, Kirkland be remanded to the United States District Court for the Northern District of Georgia.

After the implementation of the above-stated rulings, only the 19 recently-transferred cases listed in "Appendix B," as well as Alexander v. Air Liquide America Corp., S.D. Tex. Cause No. 03-533 (originally filed in this Court), will remain in this MDL. An in-person status conference will be conducted on August 22, 2005 at 9:00 a.m., concerning the appropriate procedure for expediting jurisdictional discovery in the cases listed in "Appendix B," as well as in any later-transferred cases. As to the "Appendix B" cases, the stay of discovery entered on February 22, 2005 (see Order No. 26) is hereby lifted. As set out in Order No. 4, all Plaintiffs in recently-transferred actions must submit sworn Fact Sheets within 60 days from the date of transfer by the Panel (excluding the period during which discovery was stayed). (Order No. 4, ¶ 20.)

In Alexander, Plaintiffs have 30 days from the date of this Order to cure the jurisdictional allegation concerning American Optical's principal place of business. Should Plaintiffs fail to cure the allegation within 30 days, American Optical will be dismissed without prejudice.

-247-

As to Alexander, Defendants' Motion to Exclude is GRANTED: the testimony of Dr. Harron and the testimony of Dr. Levy (as well as their accompanying diagnoses) are inadmissible. Immediately following the August 22, 2005 status conference addressing the "Appendix B" cases, the Court will conduct an in-person status conference in Alexander, to address whether (and, if so, under what conditions) the Plaintiffs' claims may proceed.

Defendants' Motions for Sanctions will be GRANTED as to Alexander. The law firm of O'Quinn, Laminack & Pirtle ("O'Quinn") has multiplied the proceedings unreasonably and vexatiously, and will be required to satisfy personally Alexander's proportionate share (i.e., one percent) of Defendants' reasonably incurred costs, expenses and attorneys' fees for the Daubert hearings conducted on February 16-18, 2005. The Court does not yet fix the amount of this sanction. Instead, within seven days from the date of this Order, O'Quinn must file a statement with the Court either admitting or denying the Court's estimate of $825,000 as the total amount of fees, costs and expenses Defendants reasonably incurred due to the three-day Daubert hearings. Should O'Quinn deny the $825,000 figure, the Court first will allow Defendants to prove their actual fees, expenses and costs for the Daubert hearings, and then will allow O'Quinn to challenge those amounts and their reasonableness; finally, the Court will sanction O'Quinn for Alexander's proportionate share of the actual fees, expenses and costs Defendants reasonably incurred. Regardless of whether

-248-

O'Quinn admits or denies the $825,000 figure, the amount of the sanction will be set in a later order.

As to all MDL cases transferred by the Panel <u>before</u> December 5, 2004 (i.e., the "Appendix A" cases, over which the Court has no subject-matter jurisdiction), the Motion to Exclude Expert Testimony, the Motions for Sanctions, and all other pending motions not otherwise addressed in this Order are reserved for consideration by the appropriate state court after remand.

As to those MDL cases transferred by the Panel <u>after</u> December 5, 2004 (i.e., the "Appendix B" cases), the Motion to Exclude Expert Testimony, the Motions for Sanctions, and all other pending motions not otherwise addressed in this Order are STAYED pending this Court's ruling on subject-matter jurisdiction.

SIGNED and ENTERED this 30th day of June, 2005.

_____
Janis Graham Jack
United States District Judge

-249-