US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 25

1    But it's...
2         MR. WYNER:  Ms. Simon, this is
3    Richard Wyner from Goodwin Procter.  I
4    represent the Center for Claims
5    Resolution.
6         And there is a confidentiality
7    order that has been signed by the parties
8    to this adversary proceeding and by the
9    CCR.  And it has been submitted to the
10   judge.
11        I don't believe Travelers is a
12   signatory to that confidentiality
13   agreement; and are you prepared to abide
14   by the terms of that confidentiality
15   agreement with respect to this deposition?
16        MS. SIMON:  I just joined this
17   matter, working on this matter at the
18   firm.  And I'm not -- I'm not familiar
19   with the confidentiality agreement.
20        What I can do is find out --
21   or get a copy of it, find out whether we
22   are prepared to abide by it -- which I
23   would imagine it would just be not
24   disclosing the information publicly -- and
25   then obtain a transcript of the deposition

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 26

1    if we need it.
2            MR. WYNER:  Right.
3            You cannot stay on the call
4    without agreeing to the confidentiality
5    agreement's terms.
6            MS. SIMON:  I understand that.
7            MR. WYNER:  And so, does that
8    mean you're dropping off the call or
9    you're agreeing to the terms?
10           MS. SIMON:  I'll drop off the
11   call for now, because I'm not familiar
12   with the confidentiality agreement.
13           MR. WYNER:  Right.
14           I mean, I can tell you that
15   it, you know, is a basic confidentiality
16   agreement that would limit the use of the
17   information generated during this
18   deposition to the proceeding, and prohibit
19   the disclosure to anyone who is not,
20   essentially, a party to the case or
21   retained for purposes of the case.
22           But if you're more comfortable
23   with dropping off, obviously, that is your
24   choice.
25           MS. SIMON:  Actually, I guess

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 27

1    it does make sense to not -- to the terms

2    that you just said, to not disclose this

3    material publicly that would otherwise be

4    covered by the confidentiality agreement.

5           MR. WYNER:  Okay.  Right.

6           So I'm going to assume that

7    you've agreed to those terms, at least as

8    I have described them.

9           I will e-mail you a copy of

10   the confidentiality agreement after the

11   deposition today.

12          MS. SIMON:  Thank you.

13          MR. WYNER:  And you're at

14   Bingham?

15          MS. SIMON:  Yes.

16          MR. FRIEDMAN:  And what is

17   your phone number, please?

18          MS. SIMON:  (860) 240-2835.

19          MR. FRIEDMAN:  Could you read

20   back the last question, please -- and

21   answer.

22          (Whereupon, at this time the

23   referred-to portion of the record was read

24   by the reporter.)

25   BY MR. FRIEDMAN:

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 28

1      Q    Mr. Hanlon, if you recall, would
2   plaintiffs typically name a single member of the
3   CCR, or did they more often name multiple
4   members of the CCR in their complaints?
5      A   It varied case to case, but it was
6   not uncommon for more than one member to be sued
7   in a particular case.
8      Q    If multiple members of the CCR were
9   sued, but not all were named, did CCR assume
10  responsibility for the defense for only those
11  members that were named or did it, in settlement
12  negotiations, attempt to seek settlement on
13  behalf of all members of the CCR?
14            MR. FINCH:  Object to form.
15     A    Yeah, I think you asked two
16  different questions there; but let me try and
17  answer it.
18            The Center basically defended
19  the cases that were filed.  So if companies were
20  sued, they were defended by the Center.  If they
21  weren't sued, there was no need to defend them.
22            And it only entered
23  appearances on behalf of the companies -- or had
24  its counsel enter appearances on behalf of the
25  companies that were sued.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 29

1          With respect to settlement,
2     however, under the terms of the producer
3     agreement the Center did obtain, in every case
4     that it settled, a release of all of the Center
5     members, whether they were named as defendants
6     in the particular case or not.
7          Q    Do you know if CCR had a database
8     which tracked the number of times individual
9     member companies were named as defendants in
10    lawsuits?
11         A    Yes, certainly.
12         Q    So that would show whether some
13    defendants were named more frequently than other
14    defendants?
15         A    Yes.
16         Q    But the number of settlements for
17    all companies would be the same; is that
18    correct?
19              MR. FINCH:  Object to form.
20         A    If you are counting releases, yes.
21         Q    So when CCR settled cases on behalf
22    of all members -- when it arrived at a
23    settlement number, it would then allocate
24    liability shares among the individual members;
25    is that correct?

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 30

```
1        A    The Center didn't arrive at a
2   number.  It negotiated a settlement.
3        Q    Okay.  When it negotiated a
4   settlement, would it then allocate the total sum
5   of the settlement to its members pursuant to the
6   producer agreement?
7        A    Yes.
8        Q    Okay.  And you referred to before
9   that "Attachment A" to the producer agreement
10  described the allocation methodology?
11       A    Yes.
12       Q    And that's on page -22 of the
13  document I gave you; is that correct?
14       A    Of this particular version --
15  actually, it doesn't say page "22."  It says
16  page 1.
17       Q    I'm sorry.  Does yours not say at
18  the bottom "CCRFM-" --
19       A    Oh, "CCR-22" -- I'm sorry.
20            Yeah.
21       Q    Okay.  And that's the allocation
22  methodology that you were describing?
23       A    Yes.  As it says right at the
24  beginning of "Attachment A":
25            "All Liability Payments,
```

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 31

1    Allocated Expenses, and Unallocated Expenses

2    shall be apportioned among Participating

3    Producers based on the individual Participating

4    Producer shares established as provided in this

5    Section..."

6              And then there was a Section A

7    that talked about the initial producer shares.

8              And then subsequently there's

9    a Section B, I believe, which describes the

10   process by which those initial shares were

11   subject to adjustment.

12      Q    So for the initial allocations under

13   Section A, those allocations were based on a

14   number of occupational groupings -- is that

15   correct? -- at least in part, on the

16   occupational grouping of claimants?

17      A    At least in part.

18      Q    And the other factors were the

19   historical costs per closed claim for members of

20   the CCR; is that correct?

21              MR. FINCH:  Object to form.

22      A    I'm not sure I can accept that

23   simple a --

24      Q    Well, can you describe for me the

25   method by which allocation in Section A was

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 32

```
 1    reached for individual members of the CCR?
 2               MR. FINCH:  At what point in
 3         time?
 4               MR. FRIEDMAN:  Well, it's my
 5         understanding that Attachment A is as of
 6         the date of 1991.
 7    BY MR. FRIEDMAN:
 8         Q     And Attachment B would deal with
 9    adjustments to that -- to the initial numbers;
10    is that correct?
11         A     As I said in the beginning, the
12    producer agreement was amended from time to
13    time.
14               You have handed me a version
15    that shows the producer agreement itself was
16    amended as of February 1, 1994.  But this
17    Attachment A was amended effective December 1,
18    1991.
19               And there was a very
20    substantial amendment to Attachment A, effective
21    December 1, 1991, which effectively adjusted the
22    sharing formula from a generic sharing formula,
23    as it was then known, in which every member
24    basically had a share allocated to it in every
25    case, whether it was named as a defendant in the
```

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 33

1    case or not -- to what became known as a "named

2    only" sharing formula, where in most situations

3    the sharing formula worked to allocate a share

4    to a company only in the cases in which it was

5    named, and not to companies that were not named

6    as defendants in the case.

7              So if you're asking me to

8    describe the way it worked under this 1991

9    Attachment A, it would be a different

10   explanation than if you were asking me to give

11   you the explanation with respect to Attachment A

12   as of 1988.

13       Q    So the 1991 version -- which is the

14   version you have in front of it -- you refer to

15   as having a "named only" provision; is that

16   correct?

17       A    It creates a "named only" sharing

18   arrangement for most cases.  That's what I said.

19       Q    Okay.  And "named only" means

20   that -- well, can you describe what "named only"

21   means?

22       A    As I said, under the "named only"

23   sharing arrangement, a company was only

24   allocated to share in the cases in which it was

25   named as a defendant and was not allocated to

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 34

1    share in cases in which it was not named as a
2    defendant.
3        Q    Did CCR sometimes settle claims,
4    where -- before a plaintiff had actually named
5    any specific defendants, but rather had retained
6    law firms -- but not actually filed a complaint
7    yet?
8        A    Would you repeat that question.
9        Q    Did CCR settle claims sometimes,
10   where someone had not yet -- with plaintiffs who
11   had not yet initiated complaints, but had
12   retained attorneys?
13       A    Well, I think on occasion it did,
14   but -- but, rarely.
15       Q    Okay.  So in essence, all or almost
16   all of settlements were with plaintiffs who had
17   actually filed claims against at least one
18   member defendant?
19       A    Yes; in most cases that was
20   certainly the case.
21           There was a complaint on file,
22   and individual members were either named and/or
23   served as defendants in the case.
24       Q    So if a defendant was not -- an
25   individual member was not named as a defendant,

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 35

1    it would not make a contribution to a specific

2    settlement?

3        A    It would not be allocated a share by

4    the CCR of the settlement payment -- yes.

5        Q    Okay.  Were there other changes

6    between the 19- -- substantial changes between

7    the 1988 allocation formula and the 1991

8    allocation formula?

9        A    I do not believe there were any

10    changes to Attachment A between October 1988 and

11    December 1, 1991.

12        Q    Okay.  And what changes besides the

13    one you described before were there in the 1991

14    settlement -- I'm sorry, allocation

15    methodology -- from what had occurred previously

16    or had been set forth previously?

17        A    I think that was the fundamental

18    change that occurred.

19            I don't recall any other

20    particular changes occurring to Attachment A at

21    the time -- although, it's more than a decade

22    ago.  So I could be forgetting something.

23        Q    Can you describe the other -- the

24    components of an individual member's liability

25    share that the CCR used to allocate liability?

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 36

1       A    I'm not sure I can.  I'm not sure

2    what you mean by the "components" of the share.

3       Q    Well, how did you determine how to

4    allocate to an individual CCR member what their

5    percentage of a particular settlement would be?

6       A    Well, I didn't do the allocation.

7       Q    Um-hum.  Okay.  How did CCR do that?

8       A    Pursuant to the -- Attachment A.

9       Q    Can you generally describe it for

10   me?

11      A    I can try.  But as you can see, it's

12   a pretty complicated document.

13           As I recall, basically what

14   Attachment A did was to provide that claims

15   would be classified according to occupational

16   categories.

17           And then those occupational

18   categories would be grouped into four basic

19   occupational groupings, which are listed on

20   page 2 of Attachment A as:  shipyard, insulator,

21   construction, and all others.

22           For each of those occupational

23   groupings, each of the CCR members would be

24   assigned an average cost per closed claim or

25   what became known as a "named only" occupational

FINAL
CONFIDENTIAL

US District Court - Delaware                                June 1, 2005
In Re Federal Mogul - Chapter 11                    William Hanlon, Esquire

Page 37

1     average.

2          Q    Okay.

3          A    And those "named only" averages or

4     average cost per closed claim numbers were based

5     on historical settlements entered into by each

6     member before that member became a member of the

7     ACF.

8               But, those were averages that

9     were subject to adjustment through the share

10    adjustment process that is set out in Attachment

11    A.

12              But basically, in any

13    particular case, the "named only" share

14    allocation was based on each member's "named

15    only" average in that occupational category.

16              And in a particular case, the

17    shares were based on the simple math of taking

18    the "named only" averages for each of the

19    members named as a defendant in the settled

20    claim.

21              And for each member, their

22    share was their "named only" average over the

23    sum of the "named only" averages for all of the

24    members in the case.

25         Q    Section B of that document permits

FINAL                        JANE ROSE REPORTING
CONFIDENTIAL            1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 38

1    the future adjustment for participating producer

2    shares; is that correct?

3       A    Yes.

4       Q    Were some adjustments made when

5    additional members joined the CCR after December

6    of 1991?

7       A    I don't believe any additional

8    members joined the CCR after December 1, 1991.

9       Q    Okay.  So Section B's intent and

10    purpose was to provide for the possibility of

11    adjustments made among and between different

12    members of the -- among the existing members of

13    the CCR; is that correct?

14       A    I'm not sure what you mean by

15    "among" the members.

16           It provided a process by which

17    the members, themselves, could adjust the shares

18    that were initially agreed to in Attachment A.

19    And it set out that process.

20           And basically, it called for a

21    recommendation by us, as special counsel, which

22    was a nonbinding recommendation with respect to

23    adjustments that were made -- adjustment

24    recommendations that could be made by us, as

25    special counsel, or by individual members.

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 39

1           And then there was a voting
2    procedure, which is set out here.
3           And I don't recall it
4    specifically.  But basically, it required, as
5    set forth in B(2)(a), that an adjustment, to
6    become effective, required an affirmative vote
7    of producers representing at least 50 percent of
8    the combined dollar contributions by all
9    producers to the Center for all purposes during
10   the preceding calendar year, and at least 40
11   percent of the number of producers per capita.
12       Q    Were there frequently adjustments
13   over the course of the life of the CCR?
14       A    There were a significant number.
15           I don't know about
16   "frequently" -- but, you know, something, I
17   think -- I think we had 40, 50 different share
18   recommendations that were voted on over the life
19   of the Center, or something like that.
20       Q    Do you recall whether there were
21   adjustments to T&N's share under Section B?
22       A    I'm sure there were.
23           I mean, in some cases what
24   were adjusted were the "named only" occupational
25   averages.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 40

1            And any adjustment in any
2    member's average would affect the averages -- I
3    mean, the settlement averages of all the
4    members.
5            So, you know, it was a zero
6    sum gain.
7            You had to get 100 percent
8    shares.  So if you increased one or decreased
9    one, it had some impact on the rest of the
10   members.
11       Q    What would the basis be for making
12   adjustments to the claim?
13       A    Well, the basic standard was that
14   adjustments should only be made to achieve a
15   sharing arrangement that would more fairly
16   reflect the relative liability of the members in
17   the claim subject to that particular share.
18            So our standard, both in
19   making recommendations for share adjustments or
20   in opining on recommendations that were made by
21   other members, was whether the proposed shares
22   would more fairly reflect relative liability
23   than the existing shares for the liability
24   subject to those shares.
25       Q    Did CCR use -- well, was the data

FINAL                        JANE ROSE REPORTING
CONFIDENTIAL          1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 41

1    CCR collected used to determine -- used to

2    assist in the determination of whether liability

3    shares were accurately being reflected by the

4    allocation shares?

5            MR. FINCH:  Object to form.

6       A    Yes.  I believe the data the Center

7    collected was used to assist in the

8    share-adjustment process.

9       Q    The data collection is -- it looks

10   like it's laid out on page 15 of this agreement,

11   starting on page 15, Subsection (b).

12           And so --

13      A    Page 15 of Attachment A, yes.

14      Q    Yes.  CCRFM -36.

15           So the CCR collected data, all

16   of the type of data in Section (c); is that

17   correct?

18           I'm sorry, Section (b).

19      A    I haven't looked at it in a while;

20   but it certainly did track the filing date of

21   the claim; the occupational category of the

22   claim, based on the occupation of the person

23   whose exposure gave rise to the claim; the

24   disease category; dates of exposure.

25           I don't believe the database

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 42

1    necessarily tracked the circumstances of

2    exposure, but the Center did have information

3    with respect to the circumstances of exposure.

4            It certainly tracked who was

5    named as a defendant or a third-party defendant.

6            It certainly tracked

7    plaintiffs' counsel; disposition date; type of

8    disposition; if there was a judgment, which

9    producers were held liable; the amounts paid or

10   owed by the Center's liability payments; and

11   additional other types of information.

12           So, yes, basically that's

13   correct.

14       Q    What kind of other information, if

15   you recall, would be collected?

16       A    Well, there was no particular

17   limitation on the sort of information that could

18   be deemed relevant.

19           It had to do with the evidence

20   that gave rise to the claims of liability.

21           And in basic terms, our focus

22   was on the strength of the product

23   identification as to each particular member and

24   the nature of the claim against each particular

25   member.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware                     June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 43

1              In addition to the information
2      that was provided in the complaint and through
3      discovery in the case, we would from time to
4      time, as special counsel, meet with and
5      interview the liaison counsel that were actually
6      defending the claim and the Center claims
7      analysts who were responsible for negotiating
8      settlements on behalf of the members, to -- and
9      the individual members themselves -- to get
10     their views on the strength or weakness of
11     particular claims against each member, based on
12     occupation, based on product identification,
13     based on any other factor that was relevant to
14     the case.
15         Q    Was the potential for plaintiffs to
16     recover punitive damages against a particular
17     defendant part of the strength of a case?
18         A    I don't think so.
19              I mean, we focused on the
20     product identification issues and the causation
21     issues.
22              We did not give any particular
23     weight to punitive damages in our share of
24     adjustment recommendations.
25         Q    Were punitive damages an issue that

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL          1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 44

1    mostly individual counsel would deal with for a
2    specific member?
3        A    I'm not sure I understand the
4    question.
5        Q    Well, I'll strike the question.
6    I'll move on to a different section.
7            And this information that was
8    collected was reported after the individual
9    members on a monthly basis; is that correct?
10       A    Not all of the information I was
11   discussing, no.
12       Q    But most of the data gathered under
13   Section B would be reported after the members?
14           MR. FINCH:  Object to form.
15   Mischaracterized what he said.
16       A    The Center routinely reported
17   certain claims information to the members.
18           I don't know what particular
19   information you're referring to.  We'd have to
20   go through it bit by bit.
21           And I don't recall whether it
22   was reported monthly or quarterly or on some
23   other basis.
24           But certainly -- you know,
25   certain kinds of claims data were routinely

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 45

1    reported to the members.
2        Q     Did that include number of claims
3    against specific defendants -- let's say, on a
4    monthly basis?
5        A     My recollection is that -- I don't
6    know whether it was monthly or not -- but my
7    recollection is that the members certainly did
8    receive information about the number of new
9    claims that were reported as to each member.
10            But I do not believe that the
11   Center routinely provided to the membership
12   information about the individual number of
13   claims asserted against another member.
14            My recollection is that,
15   generally, each member was told the total number
16   of claims that it was named in and, I think,
17   what percentage that was of the total number of
18   claims brought against all members.
19       Q     Well, do you know what kind of
20   information about other members was provided to
21   each member individually in order for them to
22   determine whether or not an allocation share of
23   the specific member was appropriate or not?
24       A     Yes, I have some knowledge of it.
25       Q     Can you tell me what knowledge that

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 46

1    would have been?

2         A    Well, it varied over time.

3              In the early years, each

4    member's share was treated by each of the

5    members as confidential.

6              I think that was a holdover

7    from the Asbestos Claims Facility days, where

8    the shares were considered confidential.

9              But over time as members began

10   to appreciate the share-adjustment process and

11   realized that it was a zero sum gain, there was

12   focus on the facts with respect to other

13   members, in order that the members could make a

14   judgment as to the adjustment process, because

15   they couldn't really make that on a "before"

16   basis without having some information about the

17   case.

18             In the early adjustments, the

19   adjustments tended to focus on discrete groups

20   of claims that were broken out into what were

21   called in the producer agreement "special claim

22   categories."

23             And with respect to those

24   special claim categories, we would carve them

25   out of the traditional occupational grouping

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 47

1    that they would otherwise be placed into.
2            And they would be subject to
3    an ad hoc or a special sharing arrangement just
4    for those claims.
5            And with respect to those
6    claims, we would often share with the members a
7    great deal of information with respect to the
8    facts pertaining to those particular claims.
9            Generally, they arose out of a
10   particular job site or were brought by a
11   particular plaintiff or were filed in a
12   particular region of the country.
13           And we would share all kinds
14   of information with respect to the strength or
15   weaknesses of those claims against each of the
16   members that were named in those claims.
17           And over time, that process
18   continued.
19           And I worry about simplifying
20   the process by trying to shorthand it into a few
21   sentences.
22           But, from time to time there
23   were adjustments to the occupational averages
24   for shipyard, insulator, all other, or the
25   construction categories.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 48

| | |
|---|---|
| 1 | And that would involve a much |
| 2 | more global assessment of the relative strength |
| 3 | and weakness of the claims against a member, as |
| 4 | compared to the other members in each of those |
| 5 | occupational groupings. |
| 6 | And information with respect |
| 7 | to the strength or weakness of claims in those |
| 8 | particular categories were shared by us with the |
| 9 | members as part of the share-adjustment process. |
| 10 | And they all -- the members |
| 11 | were also free to seek information from the |
| 12 | claim staff or liaison counsel or from the other |
| 13 | members, with respect to those matters. |
| 14 | Q    On page -39, CCR Bates stamp -39 -- |
| 15 | it looks like page 18 of Attachment A -- it |
| 16 | lists -- under Section 4 there begins a list of |
| 17 | factors about -- that would help, I guess -- |
| 18 | help the CCR staff identify whether there might |
| 19 | be a basis for adjustments to particular |
| 20 | members' shares. |
| 21 | Is that a fair |
| 22 | characterization of what that section is |
| 23 | intended to do? |
| 24 | A    No, I don't think so. |
| 25 | First of all, the staff had no |

FINAL                              JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11                 William Hanlon, Esquire

Page 49

1    role in adjusting or setting the producer
2    shares.
3         Q    Did they make recommendations?
4         A    No.  The adjustment recommendations
5    generally came from individual members
6    themselves or from Shea & Gardner as special
7    counsel.
8         Q    Okay.
9         A    The staff's job was to defend and
10   settle the claims.
11             But as established by the
12   producer agreement, they did not take any role
13   in the share-adjustment process, apart from
14   providing information to the members or to
15   special counsel.
16             As it says there, the Center
17   and special counsel would monitor the reports
18   and information obtained to identify any factors
19   or trends that tended to suggest that the
20   existing shares may not fairly reflect the
21   relative responsibility of producers for
22   settlement payments or defense costs.
23             The factors that are then
24   listed were among the factors that were looked
25   at, but they were only the listed factors.  They

FINAL                    JANE ROSE REPORTING
CONFIDENTIAL        1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 50

1    did not limit the factors.

2              And we were free, as special

3    counsel, and the members were free as members,

4    to look at any other factors that they thought

5    were relevant to the question of whether the

6    existing shares did or did not fairly reflect

7    the relative responsibility of the members, or

8    whether they should be adjusted to more fairly

9    reflect the relative responsibility of the

10   members for a particular group of claims, either

11   for a particular occupational grouping or for a

12   particular special claim category.

13        Q    In Section (g) on page 19, it

14   discusses that:  "Disposition or other data

15   indicating for a particular category of

16   claims..." -- and then there is language that

17   the relative responsibility among participating

18   producers is significantly different from what

19   is indicated by the participating producer

20   share?

21        A    Yeah.

22        Q    Would that be based on the kind of

23   information you were talking about, that -- a

24   determination that might, in fact, be the

25   case -- that there was a -- the relative