US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 51

1    responsibility actually was not -- among

2    producers was significantly different from the

3    producer's share?

4          A    If there is a question there, I

5    didn't get it.

6                MR. FINCH:  I object to form.

7          Q    Would you use the kind of data and

8    information that you were just referring to in

9    the study of individual claims, to make a

10   determination if relative responsibility was

11   significantly different from a participating

12   producer's share?

13                MR. FINCH:  Object to form.

14          A    Are you referring to something in

15   Section (g)?

16          Q    Yes.

17                In Subsection (g) it says that

18   there -- disposition or other data indicating

19   that for a particular category of claims, that

20   there -- that a particular producer share -- the

21   relative responsibility among -- among

22   participating producers might be significantly

23   different.

24                And I'm asking what data you

25   would have used to make a determination that it

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 52

1    was -- that a particular participating

2    producer's relative share was significantly

3    different from the original allocation?

4                MR. FINCH:  Object to form.

5        A    Well, there are all kinds of data

6    that could indicate that the existing shares may

7    not fairly reflect relative responsibility.

8                Disposition data was one

9    particular kind of data that we looked at.

10                If a particular producer was

11    disproportionately getting summary judgments,

12    for example, in a particular group of claims,

13    when the other members weren't getting summary

14    judgments in those claims -- that would be an

15    indication that the company being dismissed on

16    summary judgment did not have the same liability

17    as the members who were not getting out of those

18    cases.

19                And if the existing shares

20    didn't reflect that, then that would be a piece

21    of information that would suggest the existing

22    shares did not fairly reflect the relative

23    liability.

24                So that's just one example of

25    a type of information we would look at.

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 53

```
 1              But if we were also being
 2    advised by the counsel defending the case or by
 3    the claim staff that was negotiating a
 4    particular group of cases that Company "X,"
 5    although named in these cases, never really came
 6    up in the settlement discussions, was never
 7    identified with any product, and was never
 8    really a focus of the case, and the analysts
 9    didn't think that they were ever paid any
10    settlement sums on behalf of that company, as
11    opposed to the other companies named in the
12    case, and the existing shares didn't reflect
13    that relative difference in responsibility --
14    that would be a factor that would indicate that
15    the existing shares perhaps should be adjusted
16    to more fairly reflect what was actually
17    happening in the cases.
18              But you'd have to look at both
19    the shares and what was happening in order to
20    determine whether the shares could more fairly
21    reflect liability or not.
22        Q    Can you tell me what the role of
23    liaison counsel generally was in handling cases?
24        A    I could try.
25              "Liaison counsel" was a term
```

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3331    janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11              William Hanlon, Esquire

Page 54

1    that was simply used to refer to the network of
2    counsel retained by the CCR to defend
3    asbestos-related claims brought against the CCR
4    members around the country.
5          And basically, these were the
6    counsel that were the counsel of record entering
7    an appearance on behalf of our members as they
8    were sued in particular cases, in particular
9    regions of the country.
10          The liaison counsel generally
11    took their direction from the CCR's legal
12    department, but these liaison counsel were the
13    counsel of record in the particular cases.
14    Q    Were liaison counsel retained by the
15    CCR or by its individual members?
16    A    By the CCR.
17    Q    So would liaison counsel represent
18    all members who are named in a particular
19    complaint?
20    A    Generally, yes.
21    Q    What were their responsibilities?
22          Did they handle all pretrial
23    discovery, generally?
24    A    Let me preface this by saying that
25    we were not responsible for directing liaison

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11                William Hanlon, Esquire

Page 55

1    counsel.
2              That was the job of the
3    Center's legal department.
4              But my understanding was that
5    they generally did all the things that needed to
6    be done in the case, subject to the direction of
7    the CCR.
8              And what they did in a
9    particular case, I'm sure, turned on the
10   circumstances of the case and judgment by the
11   Center's legal staff as to what work needed to
12   be done in order to adequately protect the
13   interests of the members named as defendants in
14   those cases.
15             I'm sure that varied from case
16   to case and region to region, over time.
17        Q    Do you know, was there discovery in
18   a substantial number of cases that involved CCR
19   members?
20        A    I'm sure there was, yes.
21             It depends on what you mean by
22   "substantial," but...
23        Q    Were many cases resolved after the
24   onset of discovery?
25        A    Yes.

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 56

1        Q    Okay.  Do you have any recollection
2    of the kinds of documents that plaintiffs sought
3    in discovery from defendants?
4        A    I have no specific recollection.
5             I mean -- the discovery in
6    these cases has become pretty standardized over
7    time, so that they generally sought from our
8    members the same sort of documents that are
9    sought from all defendants in asbestos
10   litigation.
11       Q    And what kind of documents would
12   those have been?
13       A    Documents regarding sales, regarding
14   warnings, regarding health and safety -- all
15   sorts of documents.
16       Q    CCR never took a position that it
17   wouldn't settle cases if plaintiffs had already
18   served discovery requests, did it?
19       A    Not to my knowledge.
20       Q    Did CCR produce documents, or did
21   its liaison counsel go to the individual members
22   and ask them to produce the documents
23   themselves?
24       A    I think it probably varied over
25   time.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 57

1          You know, the productions were
2    made individually by counsel on behalf of
3    particular members.
4          But I'm sure in some cases,
5    over time, if the documents had already been
6    produced to the Center or to those counsel, they
7    didn't need to go back to the member again to
8    get the documents afresh if they already had
9    them.
10    Q    Do you recall if plaintiffs served
11    interrogatories on individual members of the
12    CCR?
13    A    I'm sure they did.
14    Q    Do you remember if there were
15    depositions sometimes taken of representatives
16    of individual defendants?
17    A    I don't recall any specifically, but
18    I'm sure there were.
19    Q    Do you have any recollection of any
20    policy by CCR that it wouldn't settle cases if,
21    you know, discovery had advanced to a certain
22    stage -- depositions had been taken or
23    interrogatories had been served?
24    A    No, I don't.
25    Q    Okay.  Plaintiffs sometimes would

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 58

1    seek documents as to the type of

2    asbestos-containing products that individual

3    defendants had manufactured; is that correct?

4        A    I assume so.

5            I didn't handle the discovery,

6    so I can't say that I actually know that for a

7    fact.  But, I assume so.

8        Q    Okay.  And do you know whether -- if

9    you know -- whether there were requests seeking

10   warnings, when warnings were placed on products

11   of individual members?

12       A    I'm sure there were.

13           I mean, this litigation has

14   been going on for decades.

15           Many jurisdictions have

16   standard discovery requests that have to be

17   served on the defendants.

18           They're all the same, and they

19   all ask for that sort of information.  So I'm

20   sure they were.

21       Q    To your knowledge, did plaintiffs

22   ever go to trial against individual members of

23   the CCR?

24       A    On occasion, yes.

25       Q    Do you recall approximately how

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 59

1    often?
2       A    I don't know how to answer that
3    question.
4       Q    Do you have any recollection of
5    trials against individual -- can you tell me
6    whether you remember specific instances where
7    there were trials against individual members of
8    the CCR?
9       A    Yes.
10      Q    Can you tell me what trials you
11   recall? -- and when they were, if you remember.
12      A    Oh, I don't know that I can give you
13   particular dates.
14           You know -- over time, you
15   know, the Center was faced with the question, in
16   particular cases, of going to trial or settling,
17   based on the demands of the plaintiffs and their
18   assessment of the case.
19           And on a number of occasions
20   on behalf of particular members in particular
21   cases, they would make the decision either to
22   start trial or, in some cases, take the trial to
23   verdict.
24           I recall, you know, that those
25   results were tracked.  We'd looked at that

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 60

1     information.
2          I know there was a significant
3     trial in the Cosey case in Mississippi that was
4     sort of towards the end of the Center's handling
5     of cases on behalf of all the members,
6     collectively.
7          There were cases in Texas.
8          I remember one significant
9     case, where U.S.G. went to verdict towards the
10    end.
11         But I don't -- we did not
12    handle the individual cases.  So I'm not as
13    familiar with that as I am with other CCR
14    matters.
15         Our information -- our
16    experience with that came in connection with the
17    share-adjustment process.
18         So we would generally come
19    behind, after the fact, and look at that
20    information, and see whether it had any bearing
21    on our assessment of the producer shares.
22    Q     So trial verdicts would actually be
23    reflected in the information that was factored
24    into decisions about allocation of shares?
25    A     It could be.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 61

1        Q    All right.

2        A    Verdicts, as well as the information

3    produced in the case that led to the verdict --

4    sure.

5        Q    So did CCR actually -- did CCR

6    liaison counsel participate in trials against

7    individual defendant members, or did defendants

8    actually use their own attorneys to defend --

9    in -- at trial itself?

10       A    I guess the question is, what do you

11   mean by "their own attorneys"?

12            These attorneys were

13   representing individual members.

14       Q    Did defendants individually retain

15   their own counsel at trial?

16       A    Not to participate in the trial, is

17   my understanding.

18            There was a -- a -- the Center

19   had the complete authority to handle the case

20   and made decisions with respect to the case,

21   including the decision about how to try it,

22   whether to try it, whether to settle it.

23            It did so in consultation with

24   the members.  And often, it also did so in

25   consultation with counsel hired by the members

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 62

1     to observe and watch out for the members'
2     interests with respect to a particular trial.
3                   There was a period of time in
4     which a member's own counsel were referred to as
5     "special counsel" or "punitive damage counsel."
6                   And there actually was a
7     provision in the producer agreement under which
8     the cost of special counsel or punitive damage
9     counsel could be shared among the members, even
10    though those counsel were retained directly by
11    the individual members.
12                  But my recollection, my
13    understanding is that they did not generally
14    participate in the trials, so much as assist the
15    CCR-retained counsel who were representing the
16    members in those trials.
17        Q     Do you recall if punitive damages
18    were frequently sought against individual
19    members of the CCR or in complaints?
20        A     I don't know what you mean by
21    "frequently."
22                  I'm sure that many of the
23    complaints allege them.
24                  How many times they were
25    actually sought and pursued, I'm not sure.

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 63

1          Q    Do you remember if there were
2     instances where they were actually pursued at
3     trial -- against members of CCR?
4          A    I do not recall any particular
5     situations in which punitive damages awards were
6     made.
7               And I don't have any
8     recollection, sitting here, of any specific
9     cases where that was an issue, separate and
10    apart from the general liability issue.
11              But I'm aware that, you know,
12    virtually every complaint contained an
13    allegation -- attempt.
14         Q    Do you recall whether they were
15    awarded in the Cosey case, against any members
16    of the CCR?
17         A    I don't recall a punitive damage
18    award in Cosey, but I could be mistaken.
19         Q    Were you involved at all in the
20    settlements -- in settlement negotiations with
21    individual law firms?
22         A    Occasionally.
23         Q    Were you aware of factors which led
24    to settlement -- which led to the aggregate
25    settlement values of -- in agreements with

FINAL                        JANE ROSE REPORTING
CONFIDENTIAL           1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 64

1     various law firms?
2               MR. FINCH:  Object to the
3     form.  I'm not sure what you mean by that.
4        Q     Okay.  Were you aware of the factors
5     which led to settlement values per -- based on
6     individual claims or in what we'll refer to as
7     "inventory settlements at law firms"?
8        A     To some extent.
9        Q     When you say jurisdiction where a
10    plaintiff's lawsuit was brought had an impact on
11    the value of a settlement --
12       A     Yes.
13       Q     -- can you tell me, were there
14    specific jurisdictions that had higher values --
15    higher claimed values associated with them?
16       A     Yes.
17       Q     Could you tell me what they were?
18       A     Well, it runs the spectrum.
19               But, you know, certainly,
20    jurisdictions that come to mind that had
21    historically higher values than average would
22    have included Mississippi, Texas, Madison
23    County --
24       Q     Is that "Madison County, Illinois"?
25       A     Illinois.

FINAL                         JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 65

1              -- California, New York --
2    among others.
3        Q    Were there specific factors about
4    those jurisdictions that you can point to that
5    led to higher settlement values?
6        A    There are a variety of factors.
7              It could have turned, in part,
8    on the ability or reputation of plaintiffs'
9    counsel.
10             It could have turned, in part,
11   on the nature of the forum and the historical
12   reputation of that forum for generating large
13   verdicts on behalf of plaintiffs, as opposed to
14   defendants.
15             So, some forums were perceived
16   as much more "plaintiff friendly" than
17   "defendant friendly" with respect to asbestos
18   litigation.
19       Q    Did you find that, let's say, for
20   example, even within Mississippi there were
21   counties that were, let's say, worse from the
22   defendant's standpoint than other counties?
23       A    I don't know that I found that; but
24   I understood that that was a perception held by
25   counsel in Mississippi and by CCR staff, yes.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware

In Re Federal Mogul - Chapter 11

June 1, 2005

William Hanlon, Esquire

Page 66

1      Q    Do you know if they also believed

2    that -- in essence, that Mississippi procedure

3    allowed for a large number of claims to be

4    aggregated in certain counties within the state,

5    irrespective of whether a plaintiff could show

6    that they were injured in that county or lived

7    in that county?

8      A    Certainly, at a point in time that

9    was a very significant concern for the asbestos

10   defendants, yes.

11     Q    Are you aware of any changes in the

12   law -- of Mississippi law which affected that

13   concern over the last year?

14     A    Yes.  I understand there was a

15   significant Supreme Court decision that has

16   radically changed the litigation landscape in

17   Mississippi.

18     Q    Were there also counties in Texas

19   that you were aware of that were, let's say,

20   worse than other counties, from a defendant's

21   standpoint -- or that CCR staff and defense

22   counsel believed were worse than others?

23     A    I'm sure there were.

24          I don't have a specific

25   recollection, sitting here, of which ones they

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                June 1, 2005
In Re Federal Mogul - Chapter 11           William Hanlon, Esquire

Page 67

1    thought were the more or less favorable.

2            But I know there were views

3    that some were worse jurisdictions than others,

4    yes.

5        Q    Are you aware of any reforms in

6    Texas law which have alleviated defense

7    concerns?

8            MR. FINCH:  Object to form,

9    lack of foundation.

10    A    I'm aware --

11            I'm sorry.

12            MR. WYNER:  Hold on.

13            I sort of object to lines of

14    questioning that don't have to do with the

15    CCR.

16            I don't understand what

17    you're -- I mean, are you using him as an

18    expert witness for non-CCR-related

19    matters?

20            MR. FRIEDMAN:  No.  I'm asking

21    him about concerns that CCR had.

22            THE WITNESS:  No; that wasn't

23    the question you asked.

24            MR. FRIEDMAN:  And

25    whether you're aware --

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 68

1          THE WITNESS:  You asked me if
2    I was aware today, and you didn't ask
3    anything about the CCR.
4          MR. FRIEDMAN:  I'm sorry.  I
5    was asking whether CCR and its defense
6    counsel had concerns about
7    jurisdictions -- counties in Texas.
8          MR. WYNER:  You asked that
9    question.  That question was answered.
10         THE WITNESS:  Okay.  Then you
11   asked whether I was aware of changes in
12   the law in Mississippi or Texas.
13         And those questions, I don't
14   think, referenced the CCR at all.  It had
15   to do with my awareness.
16         MR. FRIEDMAN:  Yeah, my second
17   question was certainly about --
18         MR. FINCH:  Well, I object to
19   that on, A, lack of foundation grounds
20   and, B, that it calls for expert
21   testimony.
22         And Mr. Hanlon might be an
23   expert in some matters.  He's not
24   designated as one in this case.
25         THE WITNESS:  I just want to

FINAL                         JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 69

1    be clear as to what your questions are and
2    what I'm answering.
3         And I did not understand you
4    to be asking anything about the CCR when
5    you asked me about my awareness of changes
6    in the law in Mississippi or Texas.
7  BY MR. FRIEDMAN:
8       Q    Okay.  Do you recall whether there
9  were concerns, either by the CCR staff or the
10  defense bar, that plaintiffs with less severe
11  diseases could consolidate their cases with
12  plaintiffs who had more severe diseases, and
13  that that might increase the value of the claims
14  of plaintiffs with less severe diseases?
15      A    I'm not sure I understand the
16  question.
17      Q    Were you aware of any concerns among
18  the CCR staff or defense counsel that the
19  consolidation of a plaintiff with a claim --
20  with a less severe disease claim, which could be
21  consolidated with a claim of a plaintiff with a
22  more severe disease, could increase the value of
23  the claimant with the less severe disease,
24  essentially by association with the plaintiff in
25  more severe disease?

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 70

```
1              MR. FINCH:  Object to form.
2        A    I'm aware that those issues were the
3    subject of discussion and concern, and from time
4    to time, as were the general issue of
5    consolidations.
6              And in particular instances,
7    there were concerns that the purpose of the
8    consolidation was to somehow leverage the strong
9    claim in order to increase the value of the
10   weaker claims.
11             In other situations, though,
12   there could be a concern about whether the
13   stronger claim standing alone would become a
14   more valuable claim than it would be if it was
15   part of a consolidation.
16             So it was a general issue of
17   concern; but the facts and circumstances could
18   vary from time to time, jurisdiction to
19   jurisdiction, plaintiffs' counsel to plaintiffs'
20   counsel, court to court.
21       Q    Do you know if consolidation of
22   claims was a factor -- the number of claims
23   consolidated together would have been a factor
24   in a decision whether or not to settle a case?
25       A    I believe it could have been.
```

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 71

1          But without the particulars, I
2    can't answer that question very well.
3        Q    Do you recall any concerns among the
4    defense bar or CCR with the use of evidence
5    generated through "mass screenings"?
6              When I use that term, are you
7    familiar with what I mean?
8        A    I know what "mass screenings" are.
9        Q    Okay.  So were you aware of whether
10    within the CCR and the staff and its liaison
11    counsel -- whether there were concerns about the
12    use of mass screened evidence in litigation?
13        A    Yes, I believe there were.
14        Q    What were those?  Can you tell me
15    what those concerns were?
16        A    Well, generally, that the mass
17    screenings were set up and established in a way
18    to do just that -- to screen mass numbers of
19    cases in a way that was designed to generate
20    diagnoses of asbestos-related disease that were
21    unfounded, and not based on reliable evidence or
22    testing, and generating bogus claims.
23        Q    Do you recall whether CCR tracked
24    claims by the B-reader who had submitted a
25    reading on an x-ray?

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 72

```
1          A    I don't know what you mean by
2     "tracked."
3               That was certainly a relevant
4     piece of information.  I was aware of that
5     information in particular cases.
6               I do not believe that there
7     was a field on the database that tracked that
8     information.
9          Q    Do you know, did CCR have -- were
10    there specific positions that CCR was aware of
11    who were submitting a particularly high volume
12    of claims -- submitting evidence to support a
13    high volume of claims?
14         A    I'm sure there were.
15         Q    Do you recall who any of those
16    physicians were?
17         A    The one name that sticks out in my
18    head is "Ray Harron" as a doctor whose diagnoses
19    were the subject of specific negotiation in
20    certain settlement agreements where his
21    diagnoses would not be considered acceptable for
22    qualification purposes of particular claims.
23              I know there were some others
24    subject of CCR negotiations, but that was not
25    something that I was particularly responsible
```

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 73

1    for.
2         Q    Were Dr. Kuebler and Dr. Mitchell,
3    do those names --
4         A    Those names sound familiar.
5              They could have been the
6    doctors that are identified in the settlement
7    agreements I was referring to.
8         Q    Do you recall what the specific
9    concerns of Dr. Harron were?
10        A    Not the specific concerns.
11             Just generally that, you know,
12   his -- I don't even know if he was a B-reader or
13   some other sort of medical doctor -- but
14   generally, there was a concern that his
15   diagnoses were unfounded and not reliable and
16   not a basis for qualifying a claim as
17   asbestos-related.
18        Q    Did CCR also acquire a submission of
19   pulmonary function tests for certain -- to
20   qualify for certain disease category
21   compensation?
22        A    Not always, no.
23        Q    But for some categories, did it
24   require the submission of a PFT test?
25        A    In certain settlement agreements, it

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11                William Hanlon, Esquire

Page 74

1    would establish PFT criteria for certain levels

2    of compensation.

3           The tort system did not

4    generally require PFT tests.  It was -- that was

5    an asbestos-related disease.

6           It was an issue of contention

7    through the years, and the Georgine class action

8    settlement was an effort on the part of the CCR

9    defendants to establish that as part of a

10   settlement structure that would govern all

11   cases, just because it was not a requirement of

12   proving an asbestos-related case in the tort

13   system.

14          But from time to time in

15   particular settlements, it did reach agreement

16   with plaintiffs' counsel or with plaintiffs that

17   levels of compensation or the ability to qualify

18   for compensation would turn on a plaintiff's

19   meeting certain pulmonary function tests.

20      Q    Do you recall if there were concerns

21   about specific PFT administrators and the

22   quality of evidence they were submitting?

23      A    I believe that was a concern.  I

24   don't have any specific recollections of any

25   particular individuals.

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 75

```
 1              But I believe that the
 2    methodology of the testing was a concern from
 3    time to time, yes.
 4         Q    Are you aware of whether any
 5    settlement agreement CCR actually excluded PFT
 6    administrators from submitting evidence in
 7    future cases or current cases?
 8         A    I'm not specifically aware, sitting
 9    here; but it wouldn't surprise me if it were so.
10         Q    Would it surprise you if they did
11    not, if CCR did not?
12         A    Not necessarily, because of the
13    function of the negotiations.
14              So, no, I don't know that I'd
15    be surprised either way.
16         Q    You mentioned a moment ago the
17    "Georgine" settlement.
18              Can you tell me:  During the
19    period when Georgine was pending, "sub judice,"
20    were plaintiffs' claims told, in essence, if
21    they did not file their claims, were they
22    entitled to a tolling period while that case was
23    under -- while that case was pending?
24         A    I don't understand your question.
25         Q    What year was the Georgine
```

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net