US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 76

1    settlement entered into, in the first instance?

2        A    Was the settlement itself entered

3    into?

4        Q    Yes.

5        A    I believe it was signed January 15,

6    1993.

7        Q    You were involved in the Georgine

8    settlement?

9        A    I was.  That's correct.

10       Q    What was your role?

11       A    I was one of the negotiators of the

12   settlement.

13       Q    And when was Georgine -- when did

14   litigation over Georgine commence?

15       A    The complaint was filed on

16   January 15, 1993.

17       Q    Okay.  And then the Third Circuit --

18   when did the Third Circuit rule?

19       A    On what?

20       Q    On the Georgine -- on the issue that

21   was ultimately appealed to the Supreme Court on

22   Georgine.

23       A    I believe that the district court

24   issued its injunction and ruling in August of

25   1994.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 77

1           And I believe the Third
2    Circuit ruling reversing the district court
3    occurred sometime in the spring, in probably May
4    of -- well, no, let me take that back.
5           The injunction was in place
6    from August of '94 to roughly July of '97.
7           I guess the Third Circuit
8    decision, I think, was May of '96; but I'm not
9    sure about that.
10      Q    And the Supreme Court's ruling on
11   Georgine was when?
12      A    July of '97.
13      Q    Okay.
14      A    The ruling itself might have been
15   June of '97, but the -- it became effective in
16   July, I think.
17      Q    Did you note whether Georgine had
18   any impact on claims filing rate -- whether the
19   existence of the Georgine settlement, while
20   litigation was pending, had any impact on claim
21   filing rates against CCR -- whether there were
22   more claims or fewer claims filed during that
23   time?
24      A    The number of claims dropped
25   significantly as a result -- well, during the

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                June 1, 2005
In Re Federal Mogul - Chapter 11           William Hanlon, Esquire

Page 78

1    time of the Georgine injunction.
2        Q    Okay.  And --
3        A    Because there was an injunction
4    against claims being filed against the CCR
5    members.
6        Q    Okay.  And in return -- as part of
7    the injunction, were plaintiffs who had claims,
8    in effect -- if the limitations period were to
9    run, the limitations tolled during the pendency
10   of the injunction?
11       A    I believe it was under the terms of
12   the settlement, but I haven't looked at the
13   settlement for some time.
14       Q    After the injunction, claims
15   filed -- because there was no longer an
16   injunction to filing claims, I assume claims
17   then began to increase against the CCR --
18       A    Generally, what happened -- the
19   claims were filed, but against other defendants.
20           The CCR members were, in many
21   cases, being named in the cases but not served.
22   Or they were being named and served, but the
23   plaintiffs were agreeing not to prosecute the
24   action against the CCR defendants.
25           After the Georgine injunction

FINAL                    JANE ROSE REPORTING
CONFIDENTIAL        1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 79

1       was vacated, the CCR members were either brought

2       into the -- those pending cases as newly named

3       defendants; or if they were named previously,

4       they were served; or if they were named and

5       served, they were actually brought in as active

6       defendants.

7                 So, it varied from case to

8       case.

9                 But certainly, the vacation of

10      the Georgine injunction resulted in a large

11      surge of cases that had been previously filed

12      and were previously being litigated against

13      other defendants in litigation.

14                THE WITNESS:  Would this be a

15          good time for a five-minute break?

16                MR. FRIEDMAN:  Absolutely.

17                (A recess was taken from 10:28

18          a.m. until 10:41 a.m.)

19      BY MR. FRIEDMAN:

20          Q    Mr. Hanlon, turning to the issue of

21      jury trials, if you would, against CCR members

22      at all -- do you recall if plaintiffs ever

23      introduced evidence as to whether an individual

24      member of CCR knew whether the

25      asbestos-containing products it manufactures or

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11              William Hanlon, Esquire

Page 80

1    distributed was unreasonably dangerous or if
2    that was an issue that ever came up?
3        A    Sitting here, I have no specific
4    recollection of any particular jury trial in
5    which that was an issue against any particular
6    member.  I just don't have any recollection.
7        Q    Okay.
8        A    It wouldn't surprise me, but I don't
9    have any recollection.
10       Q    When there were jury verdicts, I
11   assume the jury allocated liability among the
12   defendants whom it found there was liability
13   for; is that -- do you recall?
14       A    Subject to the law of a particular
15   state, that would generally be the case.
16       Q    Do you recall whether apportionments
17   among juries -- allocation among juries was
18   relatively consistent with the allocation the
19   CCR members had come up with for themselves?
20           MR. FINCH:  Object to the
21   form, lack of foundation.
22       A    I don't think it would be relatively
23   consistent or inconsistent.
24           It was a piece of information
25   that we took into account.  So it might affect

FINAL                           JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 81

1     the share-adjustment process in terms of it
2     being a useful piece of data; but on a relative
3     basis, the number of jury trials and verdicts
4     was relatively infrequent compared to the vast
5     number of cases that were settled, and often the
6     subject of the particular circumstances of a
7     case and the vagaries of the jury system.
8              So while it was a piece of
9     relevant information, I don't think you could
10    ever really make a useful judgment as would be
11    consistent or not consistent with the sharing
12    process.
13       Q    Mr. Hanlon, if I use the term
14    "unimpaired plaintiff" -- was that -- well, was
15    the term "unimpaired plaintiff" a term that was
16    used at CCR sometimes?
17       A    Yes.
18       Q    Do you have a recollection of what
19    that term was meant to reflect?
20       A    Just what it says.
21       Q    Would that be a plaintiff who had an
22    x-ray which a plaintiff's expert submitted
23    showed some radiographic evidence of asbestos
24    exposure, but without a PFT showing lung
25    impairment?

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 82

1              MR. FINCH:  Object to form.
2        A    I think, generally, it was
3    understood to be a reference to plaintiffs who
4    had some kind of marker of asbestos exposure but
5    were not actually physically impaired, whether
6    the physical impairment level was measured by
7    PFTs or something else.
8        Q    Okay.  Do you know whether
9    unimpaired claimants, using that definition,
10   made up an increasing percentage of claimants
11   against CCR members over time?
12       A    I hesitate because I -- I think the
13   issue of unimpaired plaintiffs was always a
14   significant issue.
15              And I don't know that it was
16   an increasing issue or whether the focus of
17   concern simply increased over time, even though
18   the numbers remained relatively constant.
19              My recollection is that there
20   were -- you know, going back to the early '90s,
21   indeed, that was what led to the negotiations
22   that led, eventually, to the transfer of all the
23   cases in the federal system to an MDL court and
24   ultimately to settlement discussions of global
25   settlement of all defendants and of all

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 83

1    plaintiffs, out of which the Georgine settlement
2    came.
3         So I think the -- you know, if
4    there were concerns about increasing number of
5    mass numbers of unimpaired plaintiffs, it goes
6    back to the '80s and early '90s.
7              I'm not sure it became any
8    worse in the mid- to late '90s.
9              So it all depends on what
10   point in time, and I don't have a specific
11   recollection of how the numbers worked, what the
12   perceptions were at particular points in time.
13   Q    Do you recall what happened -- from
14   your experience with CCR, do you recall what
15   happened to cases that were in the federal --
16   unimpaired claimants whose cases were in the
17   federal system?
18   A    I don't know that anything happened
19   to a particular class of unimpaired plaintiffs.
20             But generally, Judge Wiener
21   implemented a case management program that
22   focused on the more serious cases.
23             And I think it's fair to say
24   that, by and large, it was only the more serious
25   cases that were remanded back to courts for

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11               William Hanlon, Esquire

Page 84

1    trial.
2         Q    Do you know if plaintiffs were
3    generally aware of the "named only" provision
4    for CCR allocation purposes -- plaintiffs'
5    lawyers?
6         A    I don't know that.
7         Q    If plaintiffs were named --
8         A    By "plaintiffs," I take it you mean
9    "plaintiffs' counsel" --
10        Q    I mean "plaintiffs' counsel."
11        A    Right.
12        Q    Do you know whether, if the
13   plaintiffs' bar -- if an individual plaintiff
14   named more CCR members in a complaint, would
15   that have an impact on the amount of
16   compensation that claimant would receive?
17        A    Well, not without more -- no, it
18   shouldn't have, and it wouldn't -- we worked
19   hard to make sure that there were not abuses of
20   our "named only" sharing formula.
21             And the Center did not pay
22   anything based simply on the number of namings.
23        Q    Are you familiar with the term
24   "inventory settlement"?
25             Is that a term that you would

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL            1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 85

1    ever use --
2        A    Yes.
3        Q    -- the CCR?
4            Can you describe what an
5    "inventory settlement" is?
6        A    Generally, it referred to a
7    settlement of all or virtually all of the claims
8    represented or being the inventory of a
9    particular plaintiff's counsel.
10        Q    Would you say that inventory
11    settlements were used throughout CCR's
12    existence, or were they used more towards the
13    latter -- towards, let's say, the period 1998 to
14    2001?
15        A    There were certainly inventory
16    settlements with particular plaintiffs' counsel
17    that were entered into throughout the life of
18    the CCR, I'd say.
19        Q    Can you say whether they were used
20    with more frequency -- post Georgine than in the
21    time pre Georgine?
22        A    I'm not sure I could answer that.
23            There was a particular
24    settlement program known as the "SSP" settlement
25    program in the late '90s, after the Georgine

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 86

1    injunction was lifted, that resulted in a very

2    substantial number of inventory settlements.

3         But I don't recall how that

4    total number of inventory settlements that were

5    implemented as part of that program compares to

6    the previous inventory settlements entered into.

7         And so, there were a

8    significant number of inventory settlements

9    entered into in connection with Georgine back in

10   the '93-'94 period.

11   Q    Can you explain to me what the use

12   of the Strategic Settlement Program, the

13   "SSP" -- what was that?

14   A    I just did.

15        It was a particular settlement

16   program that the Center entered into following

17   the lifting of the Georgine injunction -- in

18   part, to address the large numbers of cases that

19   were then facing the members.

20        And they were, generally,

21   inventory settlements with particular

22   plaintiffs' counsel that attempted to resolve

23   all or virtually all of the cases represented by

24   those counsel -- on certain terms, including

25   payment over time and, generally, ceratin

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 87

1    medical criteria that would define the levels of
2    compensation for the claimants represented by
3    their plaintiffs' counsel.
4        Q    Would you say that the CCR was able
5    to reach agreement with many of the plaintiffs'
6    firms which had the largest inventory of claims?
7        A    It did reach agreements with a
8    number of plaintiffs' counsel representing a
9    significant number of claimants, but it also
10   failed to reach agreement with a number of
11   significant plaintiffs' counsel who represented
12   a large number of claimants.
13       Q    When it failed to reach agreement,
14   did those cases generally -- through an SSP
15   agreement -- were those cases settled in other
16   ways or did those cases go to trial, generally?
17       A    I think, generally, the number of
18   cases that actually went to trial remained a
19   relatively small percentage.
20              But I'm sure the Center did
21   both.
22              It settled those cases
23   individually or in smaller groups; and from time
24   to time, it also began -- occasionally went to
25   verdict and trials.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 88

1      Q     Was there a component of the SSP
2    that sought to resolve future claims?
3      A     Yes.
4      Q     Can you tell me about that, please?
5      A     Generally, I can.  I'd have to look
6    at the particular agreements.
7            But generally, in connection
8    with the inventory agreements that were entered
9    into as part of the SSP program, the Center
10   sought, as a condition of the settlement, a
11   commitment on the part of the plaintiffs'
12   counsel to recommend to his future clients that
13   they settle their cases with the CCR on
14   comparable terms to the terms that were
15   negotiated for the present claimants represented
16   by that counsel.
17     Q     Was there a period of time over
18   which these future -- you know, over which the
19   future claims were supposed to be resolved?
20           Was it, you know, claims going
21   up to 2002? 2003? 2004?  Do you recall what the
22   duration was?
23     A     I think these agreements -- you
24   know, they were negotiated separately with each
25   plaintiffs' counsel.  And so, they varied by

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 89

1   each plaintiffs' counsel.

2        But generally, part of the

3   negotiation was to negotiate with that

4   plaintiffs' counsel a certain case flow with

5   respect to his future claims over time, so that

6   the Center would have some predictability with

7   respect to that particular plaintiffs' counsel

8   as to the total amount of dollars that it would

9   be paying in settlement to that plaintiffs'

10  counsel for its claims -- or at least some cap

11  on the volume of dollars it would be paying in

12  settlement to that plaintiffs' counsel.

13      Q    Do you know, were the values for

14  future claims substantially greater than for

15  pending claims?

16      A    I don't believe they were, no.

17      Q    Did CCR believe that, in fact,

18  plaintiffs would recommend to their future

19  clients that they enter into these kinds of

20  settlements?

21      A    I don't know what you mean by --

22  "plaintiffs," generally?  I mean, some did and

23  some didn't.

24      Q    Did CCR believe that the plaintiffs'

25  firms were, in fact, going to recommend to their

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 90

1    clients that they enter into terms in accordance
2    with the provisions about future plaintiffs?
3        A    I'm not -- I'm struggling, because
4    I'm not sure exactly what you mean by the "CCR"
5    or by "belief."
6            But if you're talking about
7    the -- the Center staff were negotiating these
8    settlements, I believe that, generally, yes,
9    they believed that the plaintiffs' counsel would
10    recommend these settlements to their future
11    clients.
12        Q    Were the future provisions an
13    important part of the SSP settlements?
14        A    Yes, they were.
15        Q    Did plaintiff counsel represent
16    that, in fact, they intended to recommend to
17    their clients that they enter into the
18    agreements -- you know, the future provisions
19    regarding the agreements?
20        A    Those that signed these agreements
21    did, I believe so, yes.
22        Q    Did you essentially see that as
23    setting a market for the price of future -- the
24    value of future claims, at least in terms for
25    the duration of the agreements?

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 91

1           MR. FINCH:  Objection; form.
2      A    No -- I don't know what you mean by
3    "market."
4           If you mean market across the
5    country or something, no.
6      Q    But for the particular firm with
7    which you were settling cases --
8      A    I don't know what you mean by
9    "market."
10          The agreements speak for
11   themselves.  You have them.
12          They basically were an offer
13   to settle cases represented by that plaintiffs'
14   counsel for particular dollars at particular
15   disease levels, based on medical criteria -- the
16   disease levels, the number of cases, and the
17   medical criteria negotiated.
18          And they were agreed to on
19   behalf of the present claimants.
20          And the plaintiffs' counsel
21   agreed to recommend the same terms to its future
22   claimants.
23          And -- you know, each deal
24   speaks for itself.
25          MR. FRIEDMAN:  I'd like to

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11              William Hanlon, Esquire

Page 92

1       show you what has been marked as
2       "Confidential," CCRFM000269.
3               I just note -- it's stamped
4       "Confidential"; but obviously, this
5       document is confidential, provided to us
6       by the CCR.  So we will treat it as --
7               MR. WYNER:  Are you marking
8       this?
9               MR. FRIEDMAN:  Yes.  We'll
10      mark it as Exhibit 2.
11              (Whereupon, Hanlon Deposition
12      Exhibit No. 2 was marked for
13      identification.)
14      BY MR. FRIEDMAN:
15      Q     Mr. Hanlon, if you would take a look
16      at this document -- it says "CCR Settlement
17      Agreement" and indicates that it's between
18      Peter T. Nicholl and Joseph Rice, Esquire, on
19      the one hand, and the Center for Claims
20      Resolution as sole agent for its 16 member
21      companies.
22              Do you recall ever having seen
23      this document before?
24      A     Yes.
25      Q     And do you recall whether this was

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware                      June 1, 2005
In Re Federal Mogul - Chapter 11            William Hanlon, Esquire

Page 93

1      part of the SSP -- this agreement was entered

2    into as part of the SSP?

3          A    Do I recall that, or was it?

4          Q    Was it.

5          A    I believe it was.

6          Q    Okay.  On page 3 there are -- and it

7    says:  "Pending reconciliation, the Present

8    Plaintiffs that are subject to this Agreement

9    consist of the following disease mix..."

10                And it lists the number of

11    plaintiffs claiming each disease mix.

12                Would "Non-Malignant II"

13    generally accord with CCR's understanding of

14    what an "unimpaired plaintiff" was?

15          A    I'm not sure that I can say yes to

16    that.

17                Generally, what was negotiated

18    was medical criteria that would distinguish two

19    levels of non-malignant claims.

20                And there were negotiations

21    over those criteria.

22                And I'm sure that if the

23    Center was free to write the criteria on its

24    own, it would have written much stricter

25    criteria.  But it had to negotiate an agreement

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 94

1    with the plaintiffs.

2            So it was an agreed set of

3    criteria to distinguish between two kinds of

4    non-malignant claims.

5            But I don't think that, you

6    know, the criteria in any particular agreement

7    represented the Center's view as to what was

8    unimpaired or not unimpaired.

9        Q    Does looking on page -000294, which

10    the Bates number, under Roman numeral III...

11            So for "Non-Malignant II," a

12    plaintiff had to have an x-ray reading of 1/0 or

13    higher on the ILO scale and --

14            MR. FINCH:  "...or bilateral

15        pleural plaques or bilateral pleural

16        thickening..."

17        Q    -- or bilateral pleural plaques, or

18    both --

19            "...together with medical

20    evidence showing that the Plaintiff's

21    non-malignant condition is causally related to

22    asbestos exposure.  These Plaintiffs do not,

23    however, have to meet the Pulmonary Function

24    Testing requirements..." that are defined

25    elsewhere.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11                William Hanlon, Esquire

Page 95

1          So is that -- just so I
2    understand, does that differ from what you were
3    describing before as your understanding of
4    "unimpaired"?
5               MR. FINCH:  Object to form.
6        A    I don't understand your question.
7        Q    Okay.  I had asked you before how
8    you defined -- what the general definition of --
9    if I used the term "unimpaired plaintiff" --
10       A    I think you asked me for my
11   understanding of it.
12       Q    Okay.
13       A    I don't have a definition, but I
14   gave you my understanding of it.
15       Q    Okay.
16       A    If you're asking me whether these
17   criteria define it, my answer is similar to the
18   answer I just gave you -- that I -- what these
19   criteria were meant to do was to at least
20   provide some criteria for impairment.
21             But whether these particular
22   criteria define "impaired" versus "unimpaired"
23   in the mind of the CCR or the mind of the
24   plaintiffs' counsel is something you'd have to
25   ask them.

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 96

1          This was a negotiated
2     document; and the Center would always push for
3     more strict criteria, and the plaintiff would
4     always push for less criteria.
5          Q    You know, were the medical standards
6     consistent throughout the agreement to the SSP,
7     in your recollection, or were they subject to
8     different standards in different cases?
9          A    I'm not -- I was not directly
10    responsible for the criteria or for negotiating
11    the criteria.
12              I would suspect that they were
13    generally consistent across the SSP agreement.
14              I would suspect that there
15    were some differences between the SSP criteria
16    and the Georgine criteria.
17              But again, I'm not an expert
18    on the criteria.  And they were, in each case,
19    the subject of negotiations.
20              So there could be changes,
21    even across the SSP agreement.
22          Q    On page -281, Section 14 -- is this
23    one of the sections that deals with the
24    resolution of future claims?
25          A    It appears to be, yes.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 97

1         Q     And in paragraph 15, it indicates
2    that -- the settlement values are blocked out.
3                And then at the end of
4    paragraph 15, it indicates that if there was an
5    increase or decrease in the number of companies,
6    members of the CCR, that values might be
7    negotiated.
8         A     "Re-negotiated."
9         Q     "Re-negotiated."
10               And the basis for that would
11   be a diminution -- essentially, if there were --
12   if a member who had an allocation percentage
13   left, the renegotiation would be intended to
14   reflect claim values that, in turn, reflected
15   the departure of a particular company; is that
16   correct?
17               MR. FINCH:  Object to form.
18        A     I think so.
19               I mean, generally, the idea
20   was that if the CCR added new members, that the
21   settlement numbers should be renegotiated to
22   reflect any additional liability presented by
23   that new member.
24               By the same token, if the
25   Center lost one or more members during this

FINAL                       JANE ROSE REPORTING
CONFIDENTIAL           1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 98

1    period of time and the original number reflected
2    some liability attributable to that particular
3    member who left, that the number should be
4    renegotiated to reflect the absence of that
5    member, so that the CCR should pay less.
6              And it's not trying to get
7    that member released.  But there would be issues
8    about whether -- if that member left because of
9    bankruptcy or for some other reason, whether the
10   value of the claim against the remaining members
11   really changed or not.
12             And that's why these things
13   are subject to renegotiation.
14       Q    And then it says -- separately, with
15   any current member that is not then a member
16   company, on compensation amounts for these
17   medical categories that fairly reflect the
18   increase or decrease in the membership of the
19   CCR.
20             So, was it part of the
21   negotiations that if a company left the CCR they
22   would still be able to resolve future claims,
23   based on the terms of these agreements?
24       A    I think that varied by agreement.
25             But this agreement appears to

FINAL                        JANE ROSE REPORTING
CONFIDENTIAL            1-800-825-3311   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 99

1    be one where the companies on whose behalf it
2    was negotiated did retain some right, pursuant
3    to this provision, to resolve future claims with
4    this counsel, subject to this provision, even if
5    they subsequently left the CCR.
6        Q    Do you remember if that was
7    frequently a part of SSP agreements, that
8    individual members would be able to negotiate
9    future agreements, essentially, under the same
10   or similar terms to the SSPs?
11       A    I don't remember how frequent that
12   was.
13           I remember it was an issue
14   that came up.
15           And because of concerns on the
16   part of some members that they not lose the
17   benefit of these agreements with respect to
18   future claims in the event they left the center,
19   an effort was made in particular circumstances
20   to try and negotiate a provision like this.
21           But I don't have a better
22   recollection of it than that.
23       Q    Okay.  Do you recall the issue of
24   extraordinary claims under the SSP?
25       A    I just saw the reference to

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net