US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 150

1    a stand-alone basis?
2              MR. FRIEDMAN:  Object to form.
3              MR. WYNER:  And don't reveal
4        any privileged communications.
5        A    I don't know that I came to any
6    views that were not informed by confidential
7    communications.
8              So, I think I did come to have
9    some views; but I believe that those views are
10   privileged, because they're based on
11   confidential communications.
12       Q    Okay.  Did you come to have any
13   views -- actually, let me do it this way -- see
14   if I can not invade the privilege here.  This is
15   a yes or no question.
16             Did you come to have any views
17   about whether the fact that the CCR claims
18   handlers could negotiate the resolution of cases
19   against 20 defendants gave the CCR advantages in
20   negotiating settlements?
21             MR. FRIEDMAN:  Object to form.
22             THE WITNESS:  Would you read
23       that back, please.
24             (Whereupon, at this time the
25       referred-to question was read by the

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 151

1      reporter.)
2              MR. FINCH:  Let me strike that
3      question and ask a new one.
4      BY MR. FINCH:
5      Q    This is a yes or no question.
6              Did you come to a view, one
7      way or the other, whether the CCR membership
8      conferred any advantages in claims
9      negotiation --
10     A    Excuse me.  Do you mean, the CCR
11     membership conferred?
12     Q    No.
13             The question is:  Did you come
14     to a view, one way or another, whether being in
15     the CCR gave its members any advantages in
16     negotiating the resolution of asbestos claims
17     with asbestos personal injury plaintiffs?
18             MR. FRIEDMAN:  Object to form.
19     A    Yes.
20     Q    Okay.  Do you have any views on that
21     subject which would not be based solely upon
22     privileged communications?
23     A    Yes.
24     Q    Okay.
25             MR. WYNER:  I'm not going to

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware

June 1, 2005

In Re Federal Mogul - Chapter 11

William Hanlon, Esquire

Page 152

1    accept the follow-up.
2         If his view is based in part
3    on privileged communications, it's
4    privileged.
5         If he has views that are not
6    based on privileged communications, then I
7    think they're not privileged.
8    Q    Okay.  Did you ever have any
9    discussions with persons -- who are not CCR
10   members, who are not in an attorney-client
11   relationship with your law firm -- about the
12   advantages that being in the CCR conferred upon
13   CCR members in negotiating the resolution of
14   asbestos personal injury claims with plaintiffs?
15        MR. FRIEDMAN:  ...that
16   wouldn't also be covered by work product
17   privilege? to the extent that the CCR
18   would assert that privilege.
19        MR. WYNER:  Don't worry.
20   A    I don't recall.
21        I may have.  I don't recall.
22   Q    Have you ever had any conversations
23   with people at a conference, like a Mealey's
24   conference, about the benefits of CCR membership
25   on claims negotiation?

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 153

1        A    I don't recall any such discussions.

2        Q    Did you ever have any discussions

3    with any plaintiff lawyers on -- either up until

4    2001 or since then -- about what, if any,

5    advantages that CCR gave to its members in

6    negotiating settlements?

7        A    I don't know that I recall any

8    discussions about the benefits that the

9    membership obtained on the Center in that sense.

10           But certainly, the Center

11    would always try and get the benefit of the fact

12    that it was settling on behalf of a large number

13    of companies at one time, and that there would

14    be volume involved -- in terms of what was being

15    resolved.

16           So it would always use that

17    fact as a way to try and negotiate what people

18    would refer to as a "volume discount."

19           And -- you know, the bigger

20    the dollars, the more willing people are

21    prepared to compromise.

22           So in terms of an attempt to

23    negotiate, that was certainly something that was

24    often on the table and discussed with

25    plaintiffs' lawyers.

FINAL
CONFIDENTIAL

US District Court - Delaware                June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 154

1          Q    So the "volume discount" was
2    something that was often discussed with
3    plaintiffs' lawyers in the settlement
4    negotiations?
5          A    It was discussed, yes.
6               It was an argument that was
7    made:  "You should give us a discount,
8    because..."
9          Q    And -- "You should give us a
10   discount, because you're able to settle with 20
11   defendants at once instead of retail, one by
12   one"?
13         A    Perhaps.
14         Q    And do you think that that lowered
15   the price of the settlements?
16              MR. WYNER:  If you have your
17         own opinion that's not based on
18         attorney-client privilege.
19         A    I don't know that I can answer that
20   without invading that privilege.
21         Q    Okay.  But the "volume discount"
22   phenomenon was something that was certainly
23   discussed with plaintiffs' lawyers?
24         A    Yes.
25              MR. FINCH:  I'm almost done.

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 155

1            If you give me five minutes, I

2     can probably shorten up.

3            THE WITNESS:  Okay.

4            (Whereupon, Hanlon Deposition

5     Exhibits Nos. 5 and 6 were marked for

6     identification.)

7     BY MR. FINCH:

8        Q    Mr. Hanlon, there should be two

9     documents -- Mr. Hanlon, there should be

10    Exhibits 5 and 6 in front of you?

11       A    Yes, there are.

12       Q    Can you identify Exhibit 5 for me,

13    please.

14       A    Exhibit 5 appears to be a copy of a

15    settlement agreement between the CCR and Perry

16    Weitz, of the law firm of Weitz & Luxenberg,

17    with a date of September 25, 1998.

18       Q    Do you know if this was a Strategic

19    Settlement Program agreement or an earlier group

20    settlement agreement?

21       A    It was an earlier group settlement

22    agreement.

23       Q    Okay.  Put that one aside.

24            What is Hanlon Deposition

25    Exhibit 6?

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 156

1      A    This appears to be what it states --
2    a "Processing & Verification Procedures Manual"
3    from the CCR, dated July 1993.
4      Q    Could you turn to page -122 of this
5    document?
6      A    On whose number?
7      Q    Your Bates number, "CCRFM000122."
8      A    Yes.
9      Q    Actually, before I ask that...
10           What was the purpose of this
11   "Processing & Verification Procedures Manual"?
12     A    I don't know.
13           I can speculate, as well as
14   you can, that it is what it says it was -- that
15   it was a procedures manual used at the CCR for
16   the purpose of processing and verifying claims.
17           But I'm not familiar with the
18   document.
19     Q    Okay.  Maybe you might be familiar
20   with -- I don't think he asked this:
21           I take it you don't know, one
22   way or the other, from personal knowledge
23   whether or not the claims analysts followed the
24   procedures in this manual for purposes of
25   entering information into CCR's record keeping

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 157

1    databases; but did you suspect that they

2    probably did?

3        A    I haven't even reviewed this to see

4    whether it applies to data processors as opposed

5    to claims analysts.

6            I'm confident that the CCR had

7    certain procedures in place for both of those

8    areas, and that the claims analysts followed the

9    procedures they were supposed to comply with and

10    the data input people followed the procedures

11    they were supposed to comply with.

12            I'm just not familiar with

13    what this document is.

14        Q    Okay.  So to the extent I want to

15    know what -- whether these -- what these

16    procedures are, whether they were followed,

17    you're not the person to talk to; correct?

18        A    I don't know what you mean by "these

19    procedures" -- but, yeah, I suppose that's

20    correct.

21            I mean, there are obviously

22    things in here that look familiar to me, even

23    though I haven't seen this document.

24        Q    Okay.

25        A    I mean -- I shouldn't say

US District Court - Delaware                      June 1, 2005
In Re Federal Mogul - Chapter 11            William Hanlon, Esquire

Page 158

1    "obviously."
2                There are things in here that
3    look familiar to me, even though I'm not
4    familiar with this document.
5                So, I'm not saying I don't
6    have any information about things that are
7    addressed in this document.  I'm just saying,
8    I'm not familiar with the document itself -- if
9    that helps.
10        Q    Turn to page -122.
11        A    Yes.
12        Q    Do you have an understanding of what
13    the "Dynamic Categories" are that are referenced
14    on this page?
15        A    I do.
16        Q    What is that?
17        A    These are the categories that were
18    tracked by the CCR pursuant to the terms of the
19    Attachment A that I described earlier.
20                And basically, these are
21    categories that were tracked for share
22    purposes -- because in the four traditional
23    occupational categories, I mentioned both the
24    occupational categories that were then grouped
25    into four occupation groupings.

Page 159

1          And the occupational
2     categories you see at the top of this page, from
3     "SHIPYARD" down to "Railroad," are the
4     occupational categories that were grouped into
5     the four occupational groupings of "Shipyard,"
6     "Insulator," "Construction," "All Other," for
7     purposes of allocating shares in those
8     categories.
9          The "Special Claim Categiries"
10    that's listed at the bottom of the page reflect
11    the special claim categories that had been
12    created pursuant to share recommendations
13    approved by the membership through this point in
14    time, July 1993.
15          And they represented
16    categories that had separate sharing
17    arrangements for claims falling into categories
18    defined as "Rubber," "Steel," etc.
19          And for the most part, these
20    were -- I mean "Rubber" and "Steel" were created
21    as special claim categories by the original
22    producer agreement.
23          But oil fieldworker claims,
24    claims out of the Conwed Plant in Minnesota,
25    certain Canadian claims, Knox Glass Plant

US District Court - Delaware

In Re Federal Mogul - Chapter 11

June 1, 2005

William Hanlon, Esquire

Page 160

1    claims, Dental claims, Sparrows Point Steel

2    claims, Virginia Shipyard claims, Union Carbide

3    Singelton claims and LaClede Steel claims were

4    claims that were -- that otherwise would have

5    fallen into one of the four occupation groupings

6    or into "Rubber" or "Steel" -- but instead,

7    subject to the share adjustments, were pulled

8    out and treated as separate categories of claims

9    with separate sharing arrangements.

10       Q    Okay.  On the next page, there is

11   something entitled "LISTING OF JOBSITE & DYNAMIC

12   CATEGORIES."

13            Do you have an understanding

14   as to what this refers to and why the CCR --

15            Let me ask it in two

16   questions.

17            Do you have any understanding

18   of what this refers to?

19       A    I did once, and I have some

20   recollection of it; but it's subject to the

21   vagaries of time.

22            But basically, for processing

23   purposes, the Center staff, subject to our

24   overall supervision created a classification

25   category that took job site information and

FINAL

CONFIDENTIAL

JANE ROSE REPORTING

1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 161

1     basically upstreamed that into dynamic category
2     information.
3             So for share-allocation
4     purposes, they would identify all of the
5     possible job sites that the Center had
6     experience with and determine, as a general
7     matter, what -- other things being equal,
8     without additional information or something that
9     would trump the process that would otherwise
10    apply, this was the default process that would
11    work a bank job site worker into the other
12    category or an automobile industry worker into
13    the manufacturing category for the purpose of
14    classifying claims for share category purposes.
15        Q     And then, would this information,
16    this dynamic category and the job site
17    classification, be used -- I notice
18    "Classifacation" is misspelled --
19            But leaving that aside, would
20    this job site classification and dynamic
21    category information be used later on in the
22    share-allocation process in some way?
23        A     Well, I don't know about "later on."
24    It was used day to day.
25            If a dry-cleaner worker had a

FINAL
CONFIDENTIAL

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11              William Hanlon, Esquire

Page 162

1      claim and it was settled, and the claim was
2      input so that the job site was "Dry Cleaner,"
3      then under this logic tree, the dynamic category
4      for the dry cleaner would be "Other."
5                  And under the occupational
6      grouping in the producer agreement, the "Other"
7      would fall into the "All Other" occupational
8      grouping.
9                  So, that claim would be billed
10     out under that category, using the shares for
11     that category.
12                 And that would, you know,
13     obviously result in a different sharing
14     arrangement than if the worker had worked at the
15     naval supply center -- in which case his claim
16     would have been put into the dynamic category of
17     "Shipyard," which would have led to it falling
18     into the occupational grouping of "Shipyard,"
19     which had an entirely different set of shares.
20        Q    Turning your attention to pages -169
21     through -173 of Hanlon Deposition Exhibit 6...
22        A    Yes.
23        Q    Why don't you take a moment to
24     review those five pages, and I'll have some
25     questions for you about them.

FINAL
CONFIDENTIAL

US District Court - Delaware                                    June 1, 2005
In Re Federal Mogul - Chapter 11                        William Hanlon, Esquire

---

Page 163

1              (Witness perusing.)

2       A    Okay.

3       Q    Based on your --

4              First of all, have you ever

5    seen pages -169 through -173 before today?

6       A    I don't believe so.

7       Q    Based on your general knowledge of

8    how the CCR claims processing staff operated, do

9    the steps set forth on page -169, as described

10   in more detail on the next four pages,

11   accurately describe how a claims analyst would

12   go about verifying the information submitted by

13   the plaintiffs for purposes of settlement of

14   asbestos personal injury claims?

15      A    They are consistent with the

16   understanding of the process that I had.

17             MR. FINCH:  That's all the

18   questions that I have.

19             I pass the witness.

20             MR. FRIEDMAN:  Does anybody

21   else have questions for Mr. Hanlon?

22             (No response.)

23             MR. FRIEDMAN:  I have a few.

24   FURTHER EXAMINATION BY COUNSEL FOR THE OFFICIAL

25      COMMITTEE OF THE ASBESTOS PROPERTY DAMAGE

---

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 164

1          CLAIMANTS:
2    BY MR. FRIEDMAN:
3          Q    On page -170 of the exhibit you were
4    just shown, it lays out some medical
5    verification criteria.
6               Do you know, did CCR consult
7    with physicians or retain physicians to review
8    medical evidence that was submitted by
9    plaintiffs' counsel?
10         A    I don't know.
11         Q    Okay.  Do you know, did the CCR ever
12   have a chief medical officer or some other
13   physician that it had hired -- that it
14   retained -- to audit evidence submitted by
15   plaintiffs' attorneys in support of plaintiffs'
16   claims?
17         A    I don't believe the Center ever had
18   a "chief medical officer," no.
19         Q    Do you know, did it ever retain a
20   physician or a group of physicians to audit
21   documents submitted -- x-rays or PFTs submitted
22   to it by plaintiffs' counsel?
23         A    I don't know.
24              MR. FINCH:  Object to form.
25         Q    I think, before, we were --

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                      June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 165

1     Plaintiffs' Exhibit -- I'm sorry -- Hanlon

2     Exhibit 2, which is an agreement regarding --

3     I'm sorry, Document 3 -- I apologize -- which is

4     "CCR Settlement Agreement - Future Plaintiffs."

5          A    Yes.

6          Q    At the bottom of what is listed as

7     "CCRFM000392" and at the top of -393, it says:

8               "The CCR shall not be obliged,

9     for purposes of this Agreement, to accept

10    diagnostic reports or x-ray readings from any of

11    the following physicians..."

12              And it lists three physicians:

13    Larry Mitchell, Dr. Ray Harron, and Dr. Kuebler

14    -- Dr. Richard Kuebler.

15              Sir, is it your understanding

16    that, under this agreement, for future claims,

17    the CCR did not need to accept claims for

18    payment that were supported by medical evidence

19    submitted by those physicians; is that correct?

20         A    That appears to be what it said.

21              MR. FRIEDMAN:  Okay.  I'd just

22    like to show you what I've marked as

23    Hanlon Exhibit -- are we up to 8? -- 8 --

24              MR. FINCH:  We're up to 7.

25              MR. WYNER:  7.

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 166

1          MR. FRIEDMAN:  We're up to 7?
2          Okay; 7.
3          (Whereupon, Hanlon Deposition
4     Exhibit No. 7 was marked for
5     identification.)
6  BY MR. FRIEDMAN:
7     Q     Sir, this appears to be a CCR
8  settlement agreement for present claims, signed
9  with the same law firm that the future claims
10 agreement that we were just looking to was
11 signed with -- correct? -- "Harvit & Schwartz"?
12     A     Is that a question?
13     Q     I'm just -- is that your
14 understanding of what this document would be --
15 or what the document is?
16     A     It appears to be -- I don't know if
17 I have an understanding, though -- it seems to
18 be with the same law firm.
19     Q     If you look on page -375 -- Bates
20 number -- under 6 -- it says, the last sentence:
21          "The CCR shall not be obliged,
22 for purposes of this Agreement, to accept
23 diagnostic reports or x-ray readings from either
24 of the following physicians:  Dr. Larry Mitchell
25 or Dr. Richard S. Kuebler"?

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 167

1      A    Yes.
2      Q    Do you know why Dr. Harron would
3   have been excluded from submitting evidence for
4   present claims -- I'm sorry -- for future
5   claims, but not for present claims?
6      A    No.
7      Q    On the issue of data that was used
8   in considering for potential for reallocation of
9   liability shares --
10     A    I don't know what that means,
11  potential reallocation of liability shares.
12     Q    On the issue of the data that was
13  used to consider whether or not reallocation of
14  liability shares was appropriate --
15     A    Are you talking about adjustment of
16  shares?
17     Q    Adjustment of liability shares,
18  yes -- adjustment of liability shares.
19          -- do you know what the lag
20  time between the receipt of data was and its use
21  in considering whether or not an adjustment was
22  appropriate?
23     A    It varied.
24          We had the ability to make
25  recommendations for share adjustments on very

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 168

1    short notice.
2            And indeed, the procedures
3    allow for the creation of special claim
4    categories, under which the interim share --
5    sharing formula that would apply to those
6    special claim categories for an interim period
7    would itself be subject to retroactive
8    adjustment back to the date the special claim
9    category was established.
10            And what would often happen
11    would be:  If a new group of claims was
12    identified for which there was a sufficient
13    reason to believe that the existing shares might
14    not fairly reflect relative liability for those
15    claims because they were different than the
16    historical claims, we could make a
17    recommendation.
18            The producers could approve a
19    special claim category which, for some period,
20    would have the same shares it would otherwise
21    have.
22            But as information was
23    obtained about those claims, we would review
24    that information, make judgments about it, make
25    a recommendation for a retroactive adjustment of

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware

In Re Federal Mogul - Chapter 11

June 1, 2005

William Hanlon, Esquire

Page 169

1　the shares for those claims that would be

2　retroactive back to the date the claim category

3　was established.

4　　　Q　Okay.

5　　　A　So in some -- I guess what I'm

6　trying to say is:

7　　　　　In some cases we could make

8　adjustments without any information, simply

9　based on the prospect that we would be getting

10　additional meaningful, relevant information that

11　would potentially justify a different sharing

12　arrangement than would otherwise apply.

13　　　Q　Okay.  And in addition to those

14　instances, were you able -- was the CCR able to

15　use the data it retained -- obtained -- in close

16　to realtime, in order to determine whether --

17　whether the allocation levels were reflecting

18　the data that was received?

19　　　　　MR. FINCH:  Could I hear that

20　back, please.

21　　　　　COURT REPORTER:  I need you to

22　repeat the last part of that, "...in

23　realtime, whether the..."

24　　　　　MR. FRIEDMAN:  -- whether the

25　staff and -- or whether the special

FINAL
CONFIDENTIAL

JANE ROSE REPORTING

1-800-825-3341　janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 170

1    counsel was able to use data in close to
2    realtime or realtime -- I'll strike the
3    question, I guess.
4        Could you read back
5    Mr. Hanlon's answer to the previous
6    question.  I might need to ask the
7    question again.
8        (Whereupon, at this time the
9    referred-to answer was read by the
10   reporter.)
11       MR. FRIEDMAN:  Could you then
12   go back to the question I asked.
13       (Whereupon, at this time the
14   referred-to question was read by the
15   reporter.)
16       MR. FINCH:  Object to form
17   about the realtime.
18       MR. FRIEDMAN:  All right.
19       (Counsel confer.)
20   BY MR. FRIEDMAN:
21    Q    Mr. Hanlon, on Hanlon Exhibit 2 -- I
22   had asked you earlier some questions about
23   negotiations that might occur between a
24   plaintiffs' firm and a member of CCR, who had
25   departed the CCR, on value of future claims.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 171

1        A    I don't mean to be technical, but I
2    think you asked me about the provision --
3        Q    The provision, yes.
4        A    -- not about negotiations.
5        Q    Okay.  And I understood you to
6    answer to Mr. Finch that your understanding of
7    that provision was that no -- that it did not
8    bind either a plaintiff firm or a specific
9    member -- former member of CCR to a particular
10    dollar value for future claims.
11            Is that a correct -- am I
12    correct in my understanding?
13        A    Yeah.
14        Q    Okay.  Did that provision
15    essentially require negotiation about
16    compensation levels, which would have reflected
17    a member -- a former member's share of liability
18    in the CCR?
19            MR. FINCH:  Objection; lack of
20    foundation.  It calls for speculation.
21            THE WITNESS:  Could you repeat
22    the question.
23            (Whereupon, at this time the
24    referred-to question was read by the
25    reporter.)

FINAL
CONFIDENTIAL

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11                William Hanlon, Esquire

Page 172

1          THE WITNESS:  Well, you have
2      to be careful about your terms.
3          It would not have reflected a
4      negotiation about what any member's actual
5      share was in the CCR.  That would have
6      been -- it would not necessarily have
7      reflected that.
8          The negotiation would be --
9      that was contemplated by that provision
10     was:  If a particular member leaves, what
11     should the fair number be for the
12     remaining members?
13         Recognizing that one of the
14     members on whose behalf you had reached
15     the settlement number has left and has not
16     gained the benefit or relief -- you should
17     pay less.
18         The Center and the plaintiffs'
19     counsel are likely to have different views
20     as to how much of the total liability
21     should be attributed to the departing
22     member.
23         One factor could be the
24     Center's view as to what that member's
25     fair share was; but the plaintiff might

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 173

1      have a very different view as to what that
2      member's fair share was.
3              It also might have the view
4      that even though that might have been the
5      fair share -- if that member was in
6      bankruptcy, that it doesn't change what
7      the total should be for the claimant,
8      since the claimant is not likely to get
9      anything from the bankrupt.
10             So, there were a whole host of
11     factors that would be the subject of that
12     negotiation.
13             And I just -- you know, the
14     share issue is one that the CCR and the
15     plaintiff would have likely had different
16     views on and different slants on.
17     BY MR. FRIEDMAN:
18     Q     For former members of the CCR that
19     were negotiating settlements under this -- under
20     Provision -- I think -- 15 of this particular
21     agreement, was it your understanding or was it
22     contemplated that that would also reflect what
23     that member's, you know, contribution to the
24     overall -- prior correction to overall CCR
25     settlements had been -- would be the basis for

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 174

1    those settlements, at least as reflected in
2    this -- in that provision?
3              MR. FINCH:  Objection to form,
4    mischaracterizes testimony, asked and
5    answered, lack of foundation, and
6    speculation.
7              MR. FRIEDMAN:  Anything else?
8              MR. FINCH:  Nope.
9              MR. WYNER:  Why don't you just
10   object to form, and then we can move on.
11             MR. FRIEDMAN:  This is my last
12   question.
13             MR. WYNER:  Okay.
14             THE WITNESS:  Could I have the
15   question?
16             (Whereupon, at this time the
17   referred-to question was read by the
18   reporter.)
19             THE WITNESS:  If I understand
20   your question correctly, my answer is that
21   I'm unaware of any actual negotiations by
22   any departing member.
23   BY MR. FRIEDMAN:
24        Q    Okay.
25        A    But my understanding as to what was

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 175

1    contemplated was that, if a member departed,
2    then that member would simply negotiate with the
3    plaintiff what its fair liability costs should
4    be for settlement of the claims, subject to the
5    settlement.
6            That member was free to use
7    the fact of its actual share, if it thought that
8    was helpful in negotiating a better settlement
9    than it could otherwise.
10           But the contemplation was not
11   that its actual share in the Center would
12   somehow be the basis for that negotiation.
13           It was a negotiation that
14   would ultimately be over what that member's
15   individual responsibility was for those claims,
16   once it was out of the Center.
17       Q    So the language in paragraph 15, for
18   example, that says "...on compensation amounts
19   for these medical categories that fairly reflect
20   the increase or decrease in the membership of
21   the CCR" is not a reference to -- to prior share
22   in -- to that member's individual prior share in
23   the CCR?
24       A    I don't think that was what was
25   contemplated by the CCR.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 176

1          But as I said, I'm sure a
2    member would feel free to use that information
3    if it thought it would be helpful to that
4    member.
5          MR. FRIEDMAN:  I have nothing
6    further.
7          (Discussion off the record.)
8          MR. WYNER:  One thing to be
9    clear, that the witness reserves the right
10   to review and sign the transcript -- does
11   not waive that right.
12         MR. FRIEDMAN:  Okay.
13         MR. FINCH:  Okay.  Before you
14   close the record, I want to go off the
15   record and have a discussion with these
16   guys.
17         And then we may or may not go
18   back on the record.  But, let's go off the
19   record now.
20         (Discussion off the record.)
21         MR. FRIEDMAN:  Mr. Hanlon,
22   would you state for the record what your
23   address is.
24         THE WITNESS:  4824 Cumberland
25   Avenue, Chevy Chase, Maryland.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11         William Hanlon, Esquire

Page 177

1          MR. FRIEDMAN:  Thank you.
2          THE WITNESS:  You're welcome.
3          MR. FINCH:  And there has been
4    some discussion off the record about the
5    process which we will follow to attempt to
6    preserve the confidentiality of these
7    documents when they are used at the
8    hearing itself.  And there will be further
9    discussions along that line.
10          That's it.
11          (Time noted:  12:57 p.m.)
12              - - -
13
14
15
16          _____
              William R. Hanlon, Esquire
17
18
19    Subscribed and sworn to before me
20    this ____ day of _____, 2005.
21
22    _____
23
24
25

FINAL                        JANE ROSE REPORTING
CONFIDENTIAL          1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 178

CERTIFICATE OF NOTARY PUBLIC

1

2

3

4          I, Susan Ashe, the officer before

5   whom the foregoing deposition was taken, do

6   hereby certify that the witness whose testimony

7   appears in the foregoing deposition was duly

8   sworn by me; that the testimony of said witness

9   was taken by me in stenotype and thereafter

10  reduced to typewriting under my direction; that

11  said deposition is a true record of the

12  testimony given by said witness; that I am

13  neither counsel for, related to, nor employed by

14  any of the parties of the action in which this

15  deposition was taken; and further, that I am not

16  a relative or employee of any attorney or

17  counsel employed by the parties hereto, nor

18  financially or otherwise interested in the

19  outcome of the action.

20

21

22          Notary Public in and for the

23          District of Columbia

24

25  My commission expires April 14, 2007.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 179

**A**

abide 25:13,22
ability 65:8 74:17
  167:24
able 87:4 98:22 99:8
  106:1 109:23 149:19
  154:10 169:14,14
  170:1
absence 98:4
absolute 101:13,16
Absolutely 79:16
abuses 84:19
accept 21:22 23:25
  31:22 104:22 105:7
  145:1 152:1 165:9
  165:17 166:22
acceptable 72:21
  117:19 118:1
accepted 117:15
access 134:7,9,10,12
accomplish 131:19
accord 93:13
account 80:25 127:8
  130:2 145:14 149:7
accurately 41:3
  163:11
ACF 16:1 37:7
achieve 40:14
acknowledged 22:8
acquire 73:18
acquisition 19:12 20:2
act 20:24 134:24
acting 18:20 21:13
action 74:7 78:24
  136:23 137:23
  178:14,19
active 79:5 100:6
actively 134:21
activities 18:4
actual 172:4 174:21
  175:7,11
ad 47:3
added 97:20
addition 43:1 105:16
  120:12 127:4,10
  169:13
additional 16:24 38:5
  38:7 42:11 97:22
  107:7,21 161:8
  169:10
address 86:18 176:23
addressed 158:7
add-on 147:4
adequately 55:12
adjudicating 137:17
adjust 38:17 130:12
  139:22
adjusted 14:6 32:21
  39:24 50:8 53:15
adjusting 49:1 125:18

127:8 129:7
adjustment 31:11 37:9
  37:10 38:1,23 39:5
  40:1 43:24 46:14
  49:4 129:19 167:15
  167:17,18,21 168:8
  168:25
adjustments 32:9 38:4
  38:11,23 39:12,21
  40:12,14,19 46:18
  46:19 47:23 48:19
  160:7 167:25 169:8
administer 20:18
Administered 1:5
administrative 142:12
  143:1,7
administrators 74:21
  75:6
adopted 12:7
advance 113:24
advanced 57:21
advantages 149:20,24
  150:19 151:8,15
  152:12 153:5
adversary 24:23,24
  25:8
advise 112:19,23
advised 53:2
advisor 133:18
AETNA 4:2
affect 40:2 80:25
affidavit 117:10
  119:15
affidavits 117:11
affiliated 13:13
AFFILIATES 4:1
affirmative 39:6
affirmed 137:21
afresh 57:8
agent 20:24 21:7
  22:12 92:20
aggregate 63:24 112:7
aggregated 66:4
ago 11:21 35:22 75:16
  138:25
agree 21:14 22:17
  114:3,12,14 116:22
  128:21 129:2 131:2
  139:16 141:3,21
  142:6 145:15 148:15
agreed 7:25 8:16 27:7
  38:18 91:18,21 94:2
  129:13,23 137:14
  141:5
agreed-upon 116:16
  116:17,18,19
agreeing 26:4,9 78:23
agreement 5:12,14,16
  5:20,25 9:22,25
  11:22 12:1,3 13:18

13:22,24 14:4 16:16
  21:12 25:13,15,19
  26:12,16 27:4,10
  29:3 30:6,9 32:12,15
  41:10 46:21 49:12
  62:7 74:15 75:5 87:5
  87:10,13,15 92:17
  93:1,8,25 94:6 96:6
  96:13,21 98:24,25
  101:1,2 103:9 105:5
  105:22,23 106:2
  108:13,17,25 109:4
  111:19,24 112:8
  115:16,17 116:12
  119:5 120:20 127:13
  129:23 130:16,17
  142:3 145:6,7,8,8
  146:4,14 147:9,17
  148:1 155:15,19,20
  155:22 159:22 162:6
  165:2,4,9,16 166:8
  166:10,22 173:21
agreements 18:5,12
  20:15 63:25 72:20
  73:7,25 87:7 88:6,8
  88:23 90:18,19,20
  90:25 91:10 98:23
  99:7,9,17 100:4,7,11
  101:7,20 103:13
  105:12 106:3 109:11
  111:23 115:15 119:8
  134:4,8 143:19
  144:3,25 145:9
agreement's 26:5
al 1:5
allegation 63:13
allege 62:23
alleviated 67:6
allocate 29:23 30:4
  33:3 35:25 36:4
  128:23 129:25 130:4
allocated 14:6 31:1
  32:24 33:24,25 35:3
  80:11 123:17
allocating 159:7
allocation 30:10,21
  31:25 35:7,8,14 36:6
  37:14 41:4 45:22
  52:3 60:24 80:17,18
  84:4 97:12 120:23
  124:3,6,15,17,20
  125:2 127:8 139:18
  169:17
allocations 31:12,13
  125:25
allow 168:3
allowed 66:3
Amchem 14:21
amended 12:4 32:12
  32:16,17

amendment 12:6
  32:20 123:1
amendments 12:10,14
  12:16 13:4
America 14:22
Americas 3:4
amount 84:15 89:8
  112:7,11 114:21
  120:8 122:11 123:22
  136:18
amounts 42:9 98:16
  111:13,18 114:11,12
  115:5 145:25 175:18
analysis 141:6
analyst 144:20 163:11
analysts 43:7 53:8
  116:10 156:23 157:5
  157:8
and/or 6:11 34:22
Angeles 4:24
answer 22:19 27:21
  28:17 59:2 71:2
  85:22 95:17,18
  102:7 147:13 154:19
  170:5,9 171:6
  174:20
answered 68:9 138:9
  142:1,7 145:4 174:5
answering 69:2
answers 18:11,1,11
anybody 18:23 163:20
apart 13:11 49:13
  63:10
apologize 165:3
appealed 76:21
appear 133:25 134:14
  135:4
appearance 54:7
appearances 28:23,24
appearing 7:14
appears 96:25 98:25
  104:12 155:14 156:1
  165:20 166:7,16
  178:7
Appendix 116:11
applicability 137:18
applies 157:4
apply 161:10 168:5
  169:12
appoint 16:25
apportioned 31:2
apportionments 80:16
appreciate 46:10
appropriate 45:23
  140:22 145:22
  167:14,22
approval 137:12
approve 168:18
approved 159:13
approving 137:22

approximately 58:25
April 178:25
areas 157:8
argue 145:20
argued 145:21,21
argument 149:12
  154:6
arising 126:24
Armstrong 14:18
  16:23 17:15 139:5
arose 47:9 126:16
arrangement 33:18,23
  40:15 47:3 162:14
  169:12
arrangements 159:17
  160:9
arrive 30:1
arrived 29:22
Arthur 3:2
asbestos 2:11,19 3:9
  7:8 15:16,22 16:6
  21:9 46:7 56:9 65:17
  66:9 81:23 82:4
  94:22 103:24 108:4
  108:8 109:11 110:9
  124:21 131:4 132:24
  133:12,13,16 134:6
  135:12 137:2 141:22
  142:19 143:3 151:16
  151:17 152:14
  163:14,25
asbestos-containing
  23:1 58:2 79:25
  108:20 109:8 117:9
  117:20,23 118:16
  120:15 125:3 127:4
  146:18 147:1
asbestos-related
  20:19,25 54:3 71:20
  73:17 74:5,12
  102:11 103:23
  108:21 109:9 110:4
  120:5 130:21,23
  131:5 137:6
Ashe 1:19 178:4
aside 155:23 161:19
asked 28:15 67:23
  68:1,8,11 69:5 95:7
  95:10 138:8 141:25
  142:7 145:3 156:20
  170:12,22 171:2
  174:4
asking 33:7,10 51:24
  67:20 68:5 69:4
  95:16 104:12,13
assert 152:18
asserted 45:13
assessing 144:22
assessment 48:2
  59:18 60:21 104:13

FINAL
CONFIDENTIAL