126

—Hanly - Cross - Friedman—

1  Q.  It's in the papers that the debtor submitted to the

2  Court.  There's a citation to it but the debtors put it in

3  their papers.

4  A.  I can't disagree with the statement.  I just don't

5  recall -- frankly, I don't recall this portion of the

6  submission.

7  Q.  Well, this submission generally, and feel free to take a

8  look at it if you like, is about the asbestos litigation, it's

9  entitled, as you'll see on Page 17, the Tort System Has Proven

10 Incapable of Efficiently Resolving Litigation Arising From

11 Asbestos-related Illness.

12 A.  Yes.

13 Q.  Did you participate in the drafting of this section?

14 A.  I frankly don't recall.  I certainly, obviously,

15 recognize that I signed it or put my name on it, I don't

16 recall whether I drafted this section or not.

17 Q.  Would you agree aggregation has increased the pressure to

18 settle claims brought by individuals when they have suffered

19 no injury or do not have current significant impairment?

20 A.  That was a phenomenon which occurred from time to time.

21 Q.  And another way that the debtors described the tort

22 system was that unimpaired claimants were often compensated on

23 the same basis as the impaired because the tort system had

24 encouraged the parasitic fusion of strong and weak cases.

25 A.  Well, it certainly says that.  I don't recall -- I

United States District Court
Camden, New Jersey

—————Hanly - Cross - Friedman—————

1 frankly don't recall expressing that thought or writing this

2 at the time.

3 Q.  But the debtors weren't trying to mislead the Court when

4 they put that in that statement?

5 A.  I certainly don't think so.

6 Q.  Now, the next page, it says on the top line, at least in

7 part, as a result of the aggregation of large numbers of

8 impaired and so-called unimpaired claims, the tort system has

9 encouraged additional filings.

10 A.  Yes.

11 Q.  Is that something also that you agreed with?

12 A.  I frankly don't recall whether I agreed or disagreed with

13 it at the time.  But again, as I said, I acknowledge that I

14 reviewed this and my name is on it.

15 Q.  At the top of the next paragraph it refers to mass

16 screening programs which have fostered huge numbers of claims

17 by those who are unimpaired.  Were you familiar with mass

18 screenings, sir?

19 A.  Yes.

20 Q.  Sure.  And did they, in fact, foster huge numbers of

21 claims by those who were are unimpaired?

22 A.  They generated huge numbers of claims, many of those

23 claims were impaired claims.

24 Q.  But they also fostered huge numbers of claims by those

25 who were unimpaired, is that right?

——————Hanly - Cross - Friedman——————

1  A.   That's certainly what this says.  And I'm not contesting

2  or arguing that it doesn't reflect the position we took on

3  behalf of the debtor at the time.

4  Q.   And that was a position that the debtors believed, is

5  that right, when they submitted it to the Court?

6  A.   I suspect that they did.

7  Q.   Did you ever tell the debtors that this brief wasn't in

8  good faith or was inaccurate?

9  A.   No.

10  Q.   If you look at Page 22 -- I'm sorry.  000100022.

11  A.   Just give me one second, sir.

12  Q.   That's actually the next page.

13  A.   Right.

14  Q.   And in there you also see that even a prominent

15  plaintiff's attorney acknowledged in the early 1990's that

16  there were gross abuses of our system, we have lawyers who

17  have absolutely no ethical concerns for their own clients that

18  they represent.  We have untrammeled screenings of marginally

19  exposed people and the dumping of tens of thousands of cases

20  in the court system which is chronic and should be stopped.

21  Is that something debtors also believed in 2001?

22  A.   I can't say whether the debtors believed that or not.  I

23  recognize it reflects statements that Mr. Motley, one of the

24  prominent plaintiff's attorneys, made at a talk he gave in the

25  early '90's.

129

Hanly - Cross - Friedman

1  Q.  And as cited in the brief, the debtors submitted it to

2  the bankruptcy court?

3  A.  Absolutely.

4  Q.  If you look a little further down in the last partial

5  paragraph on that page, it also says a large number of claims

6  are generated based on questionable diagnostic techniques.

7  A.  Yes.

8  Q.  Was that consistent with your experience?

9  A.  There certainly were -- as we spoke about on direct

10  examination, there certainly were diagnosing physicians who I

11  don't think anyone had great regard for their diagnostic

12  abilities and as to whom cases where they were the diagnosing

13  physician were resolved for small dollars because of that very

14  reason.

15  Q.  Do you remember was there a Dr. Ray Harron who was among

16  the doctors with a bad reputation?

17  A.  Yes, sir, certainly.

18  Q.  Do you remember whether Dr. Harron was one of the most

19  prolific B Readers out there?

20  A.  I remember that.  I remember certainly knowing about that

21  at the time, yeah.

22  Q.  You do you remember a Dr. Ballard also being a very

23  prolific B Reader?

24  A.  Is he from Texas?

25  Q.  He's from Mississippi.

——————Hanly - Cross - Friedman——————

1   A.   Ah, yes, I do.

2   Q.   And did he also have a reputation for over reading?

3   A.   I recall Dr. Herron's reputation, I don't specifically

4   recall Dr. Ballard's.

5   Q.   Do you recall whether there were PFT laboratories that

6   were known for submitting doctored results on their tests?

7   A.   I know that there were allegations of such of

8   laboratories and I know that Owens-Corning sued a whole bunch

9   of those folks, but beyond that I don't have any knowledge.

10  Q.   Do you know that Owens-Corning settled that case and

11  received money as a result of that settlement?

12  A.   I don't know that, no, sir.

13  Q.   Sir, if you'd look at page 00100023.

14  A.   Yes, sir.

15  Q.   In the last full paragraph above B.

16  A.   Yes.

17  Q.   And so the debtors wrote here:  In summary, despite the

18  fact that any meaningful workplace exposure to asbestos long

19  ago ceased, the flow of cases continues unabated.  The sheer

20  numbers of asbestos cases has led to several distortions of

21  traditional process for resolving tort claims?

22  A.   Yes.

23  Q.   Do you also recall that was the debtors's position in

24  2001?

25  A.   I don't, but certainly clearly on the face of it, it was

*United States District Court*
*Camden, New Jersey*

Hanly - Cross - Friedman

1  the debtor's position as reflected in the filing of this

2  brief.

3  Q.  You talked about the scorched earth tactics of

4  Owens-Corning Fiberglass before.

5  A.  Yes, sir.

6  Q.  But after 1998 Owens-Corning actually adopted a more

7  conciliatory strategy, isn't that right?

8  A.  Yes, they had something call the NSP.

9  Q.  And that was pretty simple her to the T&N CCR/SSP

10  settlement agreement?

11  A.  Yeah.  Well, yes.

12  Q.  Program?

13  A.  Yes, that's right.  CCR tried to emulate the NSP program

14  at least initially.

15  Q.  And they, OC, used inventory settlements that were at

16  least similar to the SSP settlements?

17  A.  Correct.

18  Q.  Ands Owens-Corning went bankrupt two years after the

19  inventory settlements program began; isn't that right?

20  A.  Yeah, they went into bankruptcy I believe in 2000.

21  Q.  I have one more question about Exhibit Number 10.

22  A.  Yes.

23  Q.  If you look on page 00100031.

24  A.  Right.

25  Q.  And if you look above Section 4, the second to last

——————————Hanly - Cross - Friedman——————————

1  sentence starts with "thus?"

2  A.  Yes.

3  Q.  And it says thus, by year-end 2000 the debtor's annual

4  expenditure to deal with the asbestos problem had climbed to

5  350 million dollars.  Is that correct to your knowledge?

6  A.  Yes.

7  Q.  And the debtors were on track to duplicate the

8  $350 million in annual expenditures in 2001, isn't that also

9  right?

10  A.  Well, that's what this says, but I don't recall

11  participating in this particular sentence.

12  Q.  But you don't have any reason to believe the debtors were

13  trying to mislead the court by saying that?

14  A.  No, certainly not.  I think that's what they thought at

15  the time.

16      MR. FRIEDMAN:  Your Honor, I'd move for the admission

17  of Exhibit 10 into evidence.

18      MR. FINCH:  Your Honor, I object, this is not an

19  admission of the Asbestos Claimants Committee or the FCR, it's

20  hearsay.  It's offered by a party that's not even a

21  participant to these proceedings.  He can use it to

22  cross-examine Mr. Hanly for impeachment purposes, but it

23  doesn't come into evidence.

24      MR. FRIEDMAN:  Your Honor, I would say that first of

25  all the notion that the debtors are not a party to this

133

———————————Hanly - Cross - Friedman———————————

1   proceeding I think elevates form over function.  The debtors

2   are proponents of the plan of reorganization, that expressly

3   incorporates the estimate that's being put forward by these

4   plaintiffs.  So to somehow suggest that they're not, you know,

5   in effect parties in interest and really parties to this

6   litigation I think is not accurate.

7        Additionally, I think that under the residual

8   exception, this certainly indicates -- this document certainly

9   has indicia of reliability, it was submitted to a Bankruptcy

10  Court, there was no attempt to be misleading in it and it

11  states the -- it states the essentially impressions of the

12  debtors as to what the asbestos liability system looked like

13  in 2001 and what had caused it to be there, which is really at

14  the very essence of this case.

15       MR. FINCH: Your Honor, it's not binding on the

16  Asbestos Claimants Committee or the Future Claimants

17  Representative, it's not an admission.  I don't believe that

18  statements that are full -- a brief that is full of citations

19  to newspaper articles and bar review articles by Lester

20  Brickman has the type of indicia of liability that the

21  catchall exception relates to. And it is inadmissible as to

22  the ACC and the FCR, and the caption of this case is ACC/FCR

23  plaintiffs versus Property Damage Committee, the debtors are

24  not a party to this proceeding.

25       THE COURT:  I'm going to sustain the objection on

*United States District Court*
*Camden, New Jersey*

———————————Hanly - Cross - Friedman———————————

1   this basis. To the extent that this document was used, it's

2   not a document that is from the ACC, it was used essentially

3   for the purpose of impeachment, I would assume, and many of

4   the statements that are contained in the document are

5   citations from other cases, that I again assume were used for

6   the purpose of advocacy and not direct statements made by this

7   witness.  Only to the extent that he acknowledged that it was

8   his statement, he agreed with the statement or participated in

9   the construction of the statement, beyond that, we're more in

10  the realm of hearsay.

11      And frankly, with respect to the statements that are

12  made within an advocacy brief, I can't tell clearly whether

13  they're damming the legal profession or the medical

14  profession.  So I think what we have to do is take it for what

15  was utilized for, and to the extent that it's legitimate

16  impeachment it could be utilized for that purpose, but not as

17  a document to be admitted in evidence.

18      MR. FRIEDMAN:  Your Honor, I would just note that it

19  is styled as an informational brief rather than an advocacy

20  piece for purposes of use in the Bankruptcy Court.

21      THE COURT:  Well, see, what I'm trying to do is make

22  a distinction between -- and I'll be very frank with you.  If

23  I were to accept every exaggerated statement made in a brief

24  that's given to me in the form of advocacy, I'd be finding bad

25  faith in maybe 80 percent of the cases that I hear. So, I will

——————Hanly - Cross - Friedman——————

1   take it at face value for whatever merit it had for the

2   purpose of impeachment, which is its proper use, to the extent

3   it was acknowledged confirm by the witness, but not as a

4   document to be admitted into evidence.

5        MR. FRIEDMAN:  Thank you, your Honor.  May I have a

6   moment to just confer with my colleagues before hopefully

7   wrapping up my examination?

8        THE COURT:  Yes you may.

9        (Short pause)

10       MR. FRIEDMAN:  Your Honor, if I can request a

11  five-minute recess so I may just confer outside of the Court

12  with my colleagues before wrapping up.

13       THE COURT:  Yes, you may.  Just let us know when you

14  are ready to come back.

15       MR. FRIEDMAN: Thank you, your Honor.

16       THE COURT:  And consider this our afternoon recess.

17       MR. FRIEDMAN:  Thank you, your Honor.

18       MR. FINCH: Thank you, your Honor.

19       (Short recess)

20       THE COURT:  You may be seated.

21  BY MR. FRIEDMAN:

22  Q.   Mr. Hanly, historically you've done asbestos personal

23  injury and property defense work; is that right?

24  A.   Yes, sir.

25  Q.   Your firm just signed a strategic alliance with what I

Hanly - Cross - Friedman

1  describe as the leading asbestos law firm in the country, is

2  that also right?

3  A.   We have a joint venture agreement, yes, sir.

4  Q.   And I believe you testified that you had no specific

5  recollection of any mesothelioma settlements after Hoskins, is

6  that right?

7  A.   I don't have a specific recollection.

8  Q.   You testified on direct about increases in values of

9  mesothelioma cases from 80,000 to $130,000?

10  A.   Yes.

11  Q.   Do you recall what the basis for that information was?

12  A.   Yes. There is some sort of a summary chart that I saw

13  that I believe comes from the database that reflects those

14  increases in average cost.

15  Q.   Do you recall who prepared that chart?

16  A.   No, I don't.

17  Q.   Now, I understand you said that punitive damage were not

18  allocated in settlements?

19  A.   Yes, sir.

20  Q.   Is it your view that plaintiffs' lawyers do not

21  considerate the threat punitive damages -- the risk of

22  punitive damages being awarded in making settlements demands?

23       MR. FINCH: Objection.  What was in the minds of the

24  Plaintiffs' lawyers, unless they expressed it to him was --

25       THE COURT:  I'll sustain the objection.

*United States District Court*
*Camden, New Jersey*

Hanly - Cross - Friedman

1  BY MR. FRIEDMAN:

2  Q.  Did you believe the plaintiffs' lawyers took the threat

3  of punitive damages into their settlements demands?

4          MR. FINCH: Objection.  Same objection, your Honor.

5          THE COURT:  Sustained.  I would imagine if he's

6  involved in the litigation, the discussion for settlement

7  would have raised the concept of punitive damages.  To the

8  extent it was raised to him specifically, I think he could

9  answer that.

10          THE WITNESS: It may have occasionally been expressed

11  to me, Mr. Friedman, by plaintiffs' lawyers but not on any

12  sort of regular basis.

13  BY MR. FRIEDMAN:

14  Q.  Consistent with your duty as an attorney for a publicly

15  traded company in trying to minimize this liability, didn't

16  you take the risk of big punitive damages into account in any

17  way when deciding cases?

18  A.  Deciding whether to settle cases?

19  Q.  Yes.

20  A.  Sure.

21  Q.  And the amount for which would you agree to settle a

22  case?

23  A.  No, it didn't really factor into the amount, sir, it

24  factored into the question of whether the risk was going to be

25  taken to try the case or not.

*United States District Court*
*Camden, New Jersey*

————— Hanly - Cross - Friedman —————

1  Q.  Now, you also said on direct that verdicts were one

2  factor that you considered in pricing cases; is that right?

3  A.  Yes, sir.

4  Q.  Was that just verdicts for T&N or is that verdicts in

5  general that were being returned?

6  A.  Verdicts in general.

7  Q.  And there were other defendants who were having punitive

8  damages imposed against them, weren't there?

9  A.  Yes, sir.

10       MR. FRIEDMAN:  I have nothing further, your Honor.

11       THE COURT:  Thank you. Any redirect?

12       MR. FINCH: Brief redirect, your Honor.

13       THE COURT: Yes.

14  (REDIRECT EXAMINATION OF MR. HANLY BY MR. FINCH:)

15  Q.  Mr. Hanly, did Turner & Newall ever pay a settlement to

16  an asbestos plaintiff who alleged that they were exposed to

17  asbestos but who had not yet been diagnosed with an

18  asbestos-related disease?

19  A.  Not to my knowledge.

20  Q.  What is your understanding of the word "unimpaired?"

21  A.  In the context of asbestos litigation, unimpaired means a

22  claimant who may exhibit signs of injury on x-ray or at

23  autopsy on pathology, but who in his or her lifetime doesn't

24  exhibit any decrease in lung function or the like.

25  Q.  Any decrease as measured by some kind of particularized

Hanly - Cross - Friedman

1  lung function test?

2  A.   Yes, what's called spirometry or pulmonary function test.

3  Q.   Do almost all of the nonmalignant claimants allege in

4  their complaints that they're sick or have a disease as a

5  result of exposure to asbestos?

6  A.   Every plaintiff's complaint alleges a disease, whether

7  they're a malignant claim, a nonmalignant claim or a so-called

8  unimpaired claim.

9  Q.   And do nonmalignant claimants routinely testify to juries

10  about how having a nonmalignant disease like asbestosis

11  affects them even though they don't have pulmonary function

12  test scores that show a decline?

13  A.   Sure.  That testimony is typically that they suffer from

14  shortness of breath or other similar lung related maladies.

15  Q.   And that type of testimony is frequently admitted in

16  asbestos personal injury cases?

17  A.   Yes, it is.

18  Q.   You said that you didn't have any specific recollection

19  of a specific mesothelioma settlement post-Hoskins, but you do

20  have a recollection of the trend for the mesothelioma

21  settlement values in 2001 as compared to the years before?

22  A.   Yes.  I mean, we were very cognizant when we left the CCR

23  within a couple of months that the prices of mesothelioma

24  cases were rising substantially.

25  Q.   There was a discussion of problematic jurisdictions for

————Hanly - Cross - Friedman————

1  Turner & Newall. Was New York City a problematic jurisdiction

2  for Turner & Newall?

3  A.   Very much so.

4  Q.   What about Northern California?

5  A.   Very much so.

6  Q.   There was a discussion of this Hercules policy.  Let me

7  just see if I understand this.  The first 500 hundred million

8  pounds was self-insured, Turner & Newall had that liable, the

9  insurance didn't pay it; is that right?

10  A.   That's my understanding of the policy.

11  Q.   And then the next 690 million pounds would be paid by the

12  insurers for the claims that reached that level of retention?

13  A.   If they didn't deny coverage.

14  Q.   If they didn't deny coverage.  And there is a coverage

15  dispute relating to that right now, is that correct?

16  A.   Correct.

17  Q.   And above the 690 million pounds retention, who had the

18  liability then?

19  A.   Turner & Newall.

20  Q.   How is it you were able to win the Chase property damage

21  case in the face of Turner & Newell's corporate documents when

22  it had no real defense on liability in the personal injury

23  cases?

24  A.   Because Chase had its own cache of documents that

25  completely undercut its claims in the case.

————————Hanly - Cross - Friedman————————

1  Q.  I'd like to turn your attention to Defendant's Exhibit 71

2  and specifically to one of the references that Mr. Friedman

3  directed you to on page 710004.

4  A.  Yes, sir.

5  Q.  Could you read the quote from the Turner & Newall

6  document at the end of the second paragraph where it begins we

7  have over the years been able?

8  A.  Yeah. We have over the years been able to talk our way

9  out of claims or compromise for comparatively small amounts,"

10 Lyman quoted the lawyer for the defendant then known as Turner

11 & Newall, "but we have always recognized that at some stage

12 solicitors of experience would recognize there is no real

13 defense to these claims and take us to trial.

14 Q.  Had that started to happen in 2001 when Turner & Newall

15 reverted to being a stand alone defendant?

16 A.  Yes.

17      MR. FINCH: Your Honor, I have nothing further.

18      THE COURT:  Any recross of those points?

19      MR. FRIEDMAN:  No, your Honor.

20      THE COURT:  All right. Thank you, Mr. Hanly, you are

21 excused.

22      THE WITNESS: Thank you, your Honor.

23      (Witness excused).

24      THE COURT: The plaintiff's next witness.

25      MR. INSELBUCH: Your Honor, I'd ask my colleague Mr.

*United States District Court*
*Camden, New Jersey*

142

———Crichton - Direct - Bissell———

1    Bissell to call the plaintiff's next witness.

2         MR. BISSELL:  Your Honor, plaintiffs call Andrea

3    Crichton. Ms. Crichton.

4         MR. FINCH: Your Honor, for planning purposes could

5    you inform the parties as to how late the judge intends to sit

6    today?

7         THE COURT:  Well, today and tomorrow until 4:30 only

8    because we're honoring our Chief Judge tonight up in New

9    Brunswick and we have committed to be present for that.

10   Tomorrow there is a Federal Bar commitment. Beyond that, we

11   would go beyond 4:30 to whatever point would be necessary to

12   complete whatever function is taking place.  So except for

13   these two days where I want to recess pretty much on time,

14   it's open to the circumstances of the afternoon.

15        MR. FINCH: Okay, thank you, your Honor.

16   (ANDREA CRICHTON, HAVING BEEN DULY SWORN, TESTIFIED AS

17   FOLLOWS:).

18        THE COURT:  You may be seated.

19   (DIRECT EXAMINATION OF MS. CRICHTON BY MR. BISSELL:)

20   Q.   Good afternoon, Ms. Crichton.

21   A.   Good afternoon.

22   Q.   Could you tell the Court what your current position is?

23   A.   My current position with Federal-Mogul is U. K. Asbestos

24   Claims Manager.

25   Q.   And how long have you had that position?

─────Crichton - Direct - Bissell─────

1   A.   That particular position since around 1994.

2   Q.   Before discussing your current position in detail as

3   Asbestos Claims Manager, I'd like to discuss with you your

4   history at T&N before you held that position.

5        MR. BISSELL: And I do not have a witness binder for

6   this witness, your Honor.  I have but one exhibit.  And with

7   your permission, I'd like to approach the witness and hand

8   that exhibit up.

9        THE COURT:  Yes, you may.

10       MR. BISSELL: I'm handing the witness what has been

11  presently marked as Plaintiffs' Exhibit 18, the curriculum

12  vitae of Andrea Crichton.

13  BY MR. BISSELL:

14  Q.   Ms. Crichton, you have Exhibit 18 before you.  Is this

15  your curriculum vitae?

16  A.   It is.

17  Q.   Did you prepare it?

18  A.   I did.

19  Q.   Does it show your complete employment history with some

20  description?

21  A.   Yes, it does.

22       MR. BISSELL: I'd like to offer Exhibit 18 into

23  evidence, please.

24       THE COURT:  Counsel?

25       MR. STROCHAK:  I'm sorry, your Honor, no objection.

*United States District Court*
*Camden, New Jersey*

Crichton - Direct - Bissell

1          THE COURT:  P-18 is in evidence.

2    (PLAINTIFF EXHIBIT P-18 WAS RECEIVED IN EVIDENCE).

3    BY MR. BISSELL:

4    Q.   When did you first go to work for T&N?

5    A.   In January 1985.

6    Q.   And what was your initial position there?

7    A.   I was a legal assistant.

8    Q.   And who did you work for?

9    A.   I reported to the Group Solicitor, John Atkinson.

10   Q.   What is a group solicitor, that's a term that's not --

11   A.   It would be like your general counsel.

12   Q.   What sort of work were you doing with Mr. Atkinson when

13   you first went to work at T&N?

14   A.   I think initially there were two elements to it.  I was

15   assisting in some of the more mundane aspects of the ever

16   increasing U.S. asbestos litigation, the writs coming in,

17   insuring that they would be sent out to the appropriate

18   people, and I was also carrying out an exercise to do with the

19   U. K. asbestos litigation in respect to some insurance

20   litigation that they were involved in.

21   Q.   Okay.  When you first went to work with Mr. Atkinson, was

22   there anyone else doing this work at T&N?

23   A.   The work I was doing, no.

24   Q.   So you're the only one at the time?

25   A.   I was the only one doing that kind of work, yes.

*United States District Court*
*Camden, New Jersey*

Crichton - Direct - Bissell

1   Q.   And that changed over time, didn't it?

2   A.   Yes, it did.

3   Q.   How did it change?

4   A.   It changed in the sense that there was more work and

5   perhaps more projects came along and it was necessary to take

6   on more assistants.

7   Q.   Okay. I'd like to talk with you about some of the work

8   you and the assistants were doing. Your CV said you supervised

9   others working in this asbestos litigation. Can you describe

10  for us what your supervisory work was?

11  A.   Yeah.  There were two sort of different elements to that.

12  There were quite a number of long-term temporary assistants

13  engaged in going through the asbestos files in the repository

14  doing work on that and I didn't supervise their work until --

15  I just supervised their filling in of time sheets and the

16  hiring of them and that sort of thing. And then later on there

17  were more -- there was more direct response to me as both the

18  U. S. and the U. K. got busier. So, we would -- I would have

19  people doing this work who reported to me, and also later on

20  going through claims files for U. K. asbestos litigation where

21  they were directly responsible to me.

22  Q.   So, at first you helped put together the staff; is that

23  correct?

24  A.   Yes.

25  Q.   Okay. And then the staff over time began to report to you

*United States District Court*
*Camden, New Jersey*

————Crichton - Direct - Bissell————

1  on projects, correct?

2  A.   Yes.

3  Q.   Your CV also indicates that you regularly produced

4  reports for the Group Solicitor and again this is this period

5  1985 before you become the U. K. claims manager.  Can you

6  describe what sort of reports in general you were doing for

7  the group solicitor at that time?

8  A.   Yeah.  There were many to do within U. K. asbestos

9  litigation. When I arrived there was no database, it was all

10 done on index cards, and I had sort of took over of noting

11 when claims came in and how much it settled for, which

12 companies they were against and that sort of thing, so on a

13 monthly basis I would analyze what had happened that month and

14 prepare a report for Mr. Atkinson.

15 Q.   Okay.  And during that period was asbestos litigation for

16 T&N, Ltd. growing at all?

17 A.   Yes.

18 Q.   How would you characterize that growth?

19 A.   From being fairly steady it seemed to just take-off.

20 Q.   And you mentioned also that you worked on databases.  I'd

21 like to talk with you some more about that. Can you describe

22 what types of databases you participated in putting together?

23 A.   Yes. Initially, it was a database to record U. K. claims.

24 And about the same time we developed a database to register

25 the U. S. claims that were coming in in large numbers. We were

United States District Court
Camden, New Jersey

147

—Crichton - Direct - Bissell—

1   only doing it really as a record at that stage. Because so

2   many were coming in and it was clear that some of them were

3   duplicates and we were sending them out, and if we didn't have

4   some sort of record, it was very difficult to know what was

5   coming in and what was going on out, so it was really to do

6   that at the very beginning for the U. S.

7   Q.   So the database was to keep track of the claims?

8   A.   It was to keep track of the claim. I mean, later on we

9   got more detail and more information, but initially it was

10  just to identify -- enough information to identify that this

11  was a unique claim.

12  Q.   And over time I think you just mentioned the database

13  added different types of information. What types of

14  information for the U. K. database were added later?

15  A.   Yes, it started off originally as a PC based one, it was

16  fairly -- that was in the late eighties and it was fairly

17  basic. We went onto a main frame and added more information.

18  And then in around '95/'96, we went back to a PC based one

19  which gave us much more information and an ability to produce

20  our own reports rather than going to our IT department.

21  Q.   Okay.  And what sort of data about the claims were kept

22  on the database as it developed?

23  A.   In the U. K.?

24  Q.   In the U. K., yes.

25  A.   The usual things, the claimant's name, date of birth,

*United States District Court*
*Camden, New Jersey*

Crichton - Direct - Bissell

1   date of death if applicable, disease, underlying disease, date

2   claims received, the claimant's solicitor, our own solicitor,

3   which of the T&N companies would be in the most cases the

4   employer, the job description and the periods over which they

5   worked, the jurisdiction.  And then if it were a different --

6   if it were a third-party claim, there would be a little bit of

7   extra information on that, the third-party plaintiff who was

8   bringing us in.  If it was a product liability claim, it would

9   be the name of the product that was alleged the claimant was

10  exposed to. Then we also kept reserves against each of the

11  claims that were reviewed over time, so we have a reserve,

12  again, for what we thought the claim would settle for and how

13  much the cost was likely to be. There was also a field to

14  capture settlement information.

15  Q.   If could you move the mike just a little bit still, it

16  might be --

17  A.   Mr. Hanly was taller.

18  Q.   So if I understand correctly, the database, at this time

19  it's increasing in terms of its size, number of claims and its

20  increasing in terms of type of data that's kept; is that

21  correct?

22  A.   Yes, that's correct.

23  Q.   And is that something you're working on personally?

24  A.   Yes, yes.

25  Q.   Now, how was the U. K. database used to generate reports?

*United States District Court*
*Camden, New Jersey*

149

—————Crichton - Direct - Bissell—————

1   What sort of information would you use to give to the Group

2   Solicitor?

3   A.   There were standard reports done on a monthly basis, the

4   number of claims that had come in, the number of claims that

5   had settled, how much we'd spent.  It probably would be broken

6   down into the different unit companies and possibly into the

7   type of claim, either EL or PL.

8   Q.   And what does EL stand for?

9   A.   Employers liability or public liability.

10  Q.   And aside from your work on the claims database, did you

11  do any work on a document database?

12  A.   Yes.

13  Q.   What sort of work did you do on a document database?

14  A.   Well, in sort of around 1993 it became clear that because

15  a lot of our documents were already out there because of Chase

16  Manhattan and others, it became clear that we were going to

17  have to be more responsive in the U. K. to discovery requests,

18  and in order to do that, we needed to create a database, which

19  we did, along side an imaging process as well. So, I looked

20  for people who could do this for us and found Peterson's, who

21  are a U. S. company who had been involved with the CCR and

22  they had -- they did a lot of work.  I had worked with them

23  for several months in ways of -- which sections the documents

24  were going to be put on and which were going to be added, what

25  levels we were going to use.  Some of them we had the full

*United States District Court*
*Camden, New Jersey*

Crichton - Direct - Bissell

1   range, we had them imaged as well as a database, and others we

2   just had the database element of it.

3   Q.   I think you just mentioned that project was in 1995?

4   A.   No, I started that in 1993 I started that, and we'd run

5   our first list of documents from it in June 1994.

6   Q.   Okay. And before you worked on that document database,

7   did you have experience with T&N's documents about asbestos

8   liabilities before then?

9   A.   Yes, to an extent, because U. S. lawyers would come over

10  and to an extent I would perhaps help sometimes with that.

11  Q.   Okay.  Now that we've discussed your early years at

12  Turner & Newall, I'd like to discuss what you've been doing

13  the last ten years since you've become the Asbestos Claims

14  Manager for the company. Do you have any -- as Asbestos Claims

15  Manager, have you had any settlement authority for T&N?

16  A.   Yes.

17  Q.   Okay.  And could you describe the nature of that

18  authority and how you worked with the outside solicitors?

19  A.   Well, when an asbestos claim is received in the U. K. or

20  was before administration, I would immediately instruct

21  outside counsel.  We always used outside counsel and I worked

22  with them right the way through to settlement.  And at each

23  level they would come back and report to me on the progress

24  and how much they thought the claim was worth and look for

25  authority at each level to settle. So, it was sort of a joint

*United States District Court*
*Camden, New Jersey*