Crichton - Direct - Bissell

1  thing, they would negotiate with the claimant's solicitors and

2  come back to me and say this is the position, what do you

3  think?

4  Q.   And you had the authority to tell them it was okay to

5  settle or not at a certain amount?

6  A.   Yes.

7  Q.   And that's been since 1994 or thereabouts?

8  A.   Yes.  I mean, there would be exceptions if there were

9  very unusual cases or something that involved a large amount

10 of money, or something that was setting a precedent, then

11 clearly I would work with my then boss, who was then called

12 Group Legal Advisor.

13 Q.   And as Asbestos Claims Manager, have you monitored any

14 trials for Turner & Newall in the U. K.?

15 A.   Yes.

16 Q.   About how many?

17 A.   It's difficult to say, we don't go to trial that often.

18 No more than 20.

19 Q.   Okay. And of those 20 or 30 you monitored, how many did

20 you attend?

21 A.   I would attend almost all of those.

22 Q.   And why would you attend those trials?

23 A.   It's important, because we go to trial so very rarely, it

24 is actually important to see how it is running. It is also

25 important because at any particular point there might be

————Crichton - Direct - Bissell————

1   settlement negotiations.  If I'm not there, then counsel

2   instructor or the solicitor has got to ring me at the office

3   and put me in the picture and ask if they can settle.  If you

4   are there, you can see how the trial is turning out and you

5   can make more informed decision.

6   Q.    So, I think you mentioned that T&N went to trial rarely

7   in the U. K.?

8   A.    Yes.

9   Q.    Why was that the company policy?

10   A.    Because for the vast majority of the U. K. claims there

11   is really no defense.

12   Q.    Okay. I'd like to talk a little bit about T&N's approach

13   to asbestos litigation. Now that we've discussed your history

14   at T&N, from your work at T&N over the last 20 years are you

15   familiar with the history of T&N's asbestos litigation in the

16   U. K.?

17   A.    Yes.

18   Q.    Through your work at T&N over the last 20 years, have you

19   become familiar with T&N's asbestos-containing products and

20   its operations that give rise to claims?

21   A.    Yes.

22   Q.    How?

23   A.    Well, if you are investigating a claim, you need to look

24   at -- you need to look at the documents, you need to read

25   statements.  You soon find out what the business was about

*United States District Court*
*Camden, New Jersey*

Crichton - Direct - Bissell

1   when you are involved in litigation on a day-to-day basis.

2   Q.   And you've been doing that for 20 years?

3   A.   Well, I've not been doing that for 20 years, no, but I've

4   certainly been looking at it in more detail since 1994.

5   Q.   What type of people in the U. K. bring claims against T&N

6   for asbestos-related diseases?

7   A.   They are almost all ex-employees or employees.

8   Q.   You just told us it's almost all, can you put a

9   percentage on that number or can you put a percentage on that

10  idea?

11  A.   It's -- up until a point in the mid nineties, I would say

12  it was probably about at least 90 percent of the claims were

13  from employees or ex-employees, and then we began to get

14  subrogation claims, which they started to take-off, so that

15  skewed it to a certain extent.  By that state it was probably

16  more like 75 percent.

17  Q.   Who other than T&N employees pursue asbestos claims

18  against T&N in the U. K.?

19  A.   There are a number of different elements.  There are

20  those that we call household exposure claims where one of our

21  employees has taken his overalls home and say the wife or one

22  of the children has developed an asbestos-related disease from

23  shaking the overalls, or whatever. There are a number that

24  arise from environmental exposure where the people lived,

25  usually as children, in the vicinity of one of our particular

*United States District Court*
*Camden, New Jersey*

—————Crichton - Direct - Bissell—————

1  factories.

2      There are a number of claims that come from people

3  who were employed to come into factories say on shutdown to do

4  painting or electrical work or the like who probably had to

5  brush down girders, and that sort of thing. There are claims

6  from maybe lorry drivers who used to come to the premises to

7  pick up goods and to distribute them. Let me see. And then

8  there are subrogation claims, but that's really claims by

9  insurance companies against T&N, not by individuals

10  themselves.

11  Q.  Okay.  The subrogation claims, do they arise out of

12  specific industries that used T&N products?

13  A.  They arise out of specific activities of Newell's

14  employees, they arise from Newell's employees or J. W.

15  Roberts' employees, another subsidiary, who applied lagging in

16  shipyards, in power stations and railways.

17  Q.  Are there any U. S. or, excuse me, are there any U. K.

18  claimants that bring products liability claims against T&N?

19  A.  Yes, we do have a relatively small number of those.

20  Q.  Okay. Who brings those products liability claims in

21  general?

22  A.  In general, it would be perhaps someone who was employed

23  by a small builder where they've used one of the building

24  products for roofing, something of that sort where they've

25  been sawing into it.

Crichton - Direct - Bissell

1   Q.   Do you have any knowledge concerning the types of

2   asbestos-related diseases these claimants allege when they

3   bring a claim against Turner & Newall in the U. K.?

4   A.   Do you mean the different asbestos-related diseases?

5   Q.   Yes.

6   A.   Yes.

7   Q.   And what's your understanding of what those different

8   diseases are?  Just what are the names of those diseases that

9   you see claims for?

10  A.   Mesothelioma, lung cancer, asbestos-related lung cancer,

11  asbestosis, pleural thickening, pleural plaque.

12  Q.   Typically how does T&N first learn about a claim against

13  it?

14  A.   Typically it's a letter before action and it would be a

15  letter received from the claimant's solicitor just putting you

16  on notice.

17  Q.   When T&N received, I think you called it a letter before

18  action, how would it typically react?

19  A.   I would receive the letter.  We have extremely good

20  employment records, so if it were in respect of an employee

21  claim, we would retrieve the employment records.  At that

22  point I would write to whichever outside counsel I decided was

23  going to handle the claim on our behalf, send them a copy of

24  the letter received, together with copies of employment record

25  cards.

United States District Court
Camden, New Jersey

Crichton - Direct - Bissell

1   Q.   Would T&N attempt to settle the claim after receiving a

2   letter before action?

3   A.   Not itself, no, it would always use outside counsel to do

4   the negotiating.

5   Q.   Okay.  After outside counsel was retained and an

6   investigation was done, would T&N attempt to settle claims?

7   A.   Well, once the relevant information was there, yes, such

8   as medical reports, then yes, it was always a policy to try

9   and settle the claims as quickly as possible.

10  Q.   I'm sorry, I didn't hear the --

11  A.   It was always T&N's policy to settle claims as quickly as

12  possible.

13  Q.   And why was that T&N's policy?

14  A.   Well, probably because it's cheaper, really.  The quicker

15  you settle a claim, the less you are paying out to both your

16  own counsel and to the claimant's counsel.

17  Q.   What would T&N do if settlement negotiations broke down

18  after the letter before action, what would happen next?

19  A.   Well, the claimant would probably issue proceedings.  I

20  mean, it might issue proceedings anyway for a variety of

21  reasons, they might have issued proceedings because there was

22  a limitation problem or maybe the claimant was about to die,

23  so they would issue proceedings at that stage.  But if they

24  couldn't come to any agreed negotiation, then they would issue

25  proceedings at that stage.

Crichton - Direct - Bissell

1  Q.   And how would the legal proceedings start?

2  A.   It would depend on the potential value of the claim. If

3  it were under a certain amount, I'm not sure what the

4  current -- it would probably be in the county court.  Over a

5  certain amount, it would be in the High Court.

6  Q.   And how does one start an action in either of these

7  courts, how does a claimant start an action in either one of

8  these courts?

9  A.   Well, they fill in appropriate forms and lodge them with

10  the court.

11  Q.   And what happens next?

12  A.   And then it would be served on T&N or more likely on the

13  actual employee subsidiary.

14  Q.   In the U. K. are claimants required to provide any

15  details of their claim in the complaint against T&N?

16  A.   Yes.

17  Q.   What sort of details would they provide?

18  A.   They would provide a full background of when they were

19  born, whether they are married, whether they've got children;

20  they would go through their occupational history, they would

21  probably go through whatever symptoms they've got and when

22  they were diagnosed, and possibly how long after they were

23  diagnosed, if there were such a -- if they had some serious

24  complaint which meant that they could no longer, say, carry

25  out the work, they would have to describe what happened then.

─Crichton - Direct - Bissell─

1  Q.  Would they typically include a medical report?

2  A.  The medical report would now be served with the

3  particulars of claim, yes.

4  Q.  Okay.  You just mentioned something called a particulars

5  of claim. Could you tell us what that is, generally?

6  A.  Well, that would be the document where they'd set out

7  what I've just described.

8  Q.  Okay. And within the particulars of claim would there be

9  a loss schedule?

10  A.  There might be, but there might not be at that stage.

11  Q.  Okay. And what is a loss schedule?

12  A.  A loss -- you did say a loss schedule, didn't you?

13  Q.  Yes, a loss schedule.  I'm sorry, I said a loss schedule,

14  I meant a loss schedule.

15  A.  Yes.  That would be them setting out the schedule of

16  losses, really, you know, how much they lost by way of perhaps

17  earnings or pension or how much they've expended in special

18  equipment, all those certain matters.

19  Q.  And after the particulars are served and the case is

20  started, would there typically be any discovery?

21  A.  Yes.

22  Q.  Okay.  And what type of discovery would typically go on

23  in the U. K. in these types of claims?

24  A.  Well, first of all, you have to serve a list of

25  documents, which each side has to provide a list of what they

*United States District Court*
*Camden, New Jersey*

—Crichton - Direct - Bissell—

1   believe to be relevant documents.  So we would supply a list,

2   a computer generated list. And then typically they would ask

3   for, probably not all of them because it can be quite long

4   now, we're got computer generated one, they would go through

5   and ask -- actually, I've gotten less and less because they

6   were the same documents going out each time, really, so over a

7   period of time they've really got everything that they needed.

8   Q.   Would there be any depositions in the U. K.?

9   A.   No. No.

10  Q.   Who is the finder of fact in asbestos claims that are

11  tried in the U. K.?

12  A.   The judge.

13  Q.   Both for issues of liability and damages?

14  A.   Yes.

15  Q.   In the U. K. in general what did the asbestos personal

16  injury claimants against T&N need to establish to show they're

17  entitled to compensation for their claims?

18  A.   Well, they need to establish that they have got an

19  asbestos-related disease and that they were exposed to

20  asbestos dust through the action of T&N and others either as

21  an employee or through some other way, through the fault of

22  T&N.

23  Q.   What would they need to show in terms of damages?

24  A.   With damages, I mean, there are two elements, as Mr.

25  Hanly described, there are the general damages which reflect

Crichton - Direct - Bissell

1    pain and suffering, and then there are the special damages

2    which -- well, there may not be any, but then there might be

3    quite substantial.  There may be loss of earnings and all the

4    many things that are mentioned before, a loss of pension.

5    Many things.

6    Q.    In practice was it difficult for a T&N employee or

7    ex-employee to show that T&N breached a duty towards it?

8    A.    No.

9    Q.    Why not?

10   A.    Because, as I said before, the vast majority of employee

11   claims and the vast majority of our employees up to a

12   particular period were involved in some way or another in

13   either manufacturing asbestos goods or applying asbestos goods

14   and we had to clearly exposed those employees negligently.

15   Q.    Okay. And what's the source, what's the theory of that

16   negligence as you understood it in the U. K.? Is there any

17   duty that T&N owed to its employees?

18   A.    Well, there is and there is a nondelegable duty that an

19   employer would have to take care of its employees.

20   Q.    Was there any duty to provide a reasonably safe work

21   environment?

22   A.    Yes.

23   Q.    And was that the theory that most of the employee claims

24   were brought under?

25   A.    Yes.

*United States District Court*
*Camden, New Jersey*

Crichton - Direct - Bissell

1  Q.  Would plaintiff needs to show the same elements of breach

2  of duty, causation and harm to prevail in a products liability

3  claim in the U. K.?

4  A.  Yes.

5  Q.  Now, you mentioned general damages and special damages

6  briefly before, but I want to make sure I understood your

7  answer. For cases that went to trial in the U. K., can you

8  describe generally what types of special damages claimants

9  would seek?

10  A.  Special damages they would seek would be loss of

11  earnings, which is often quite a large element.  The loss of

12  services, they may no longer be able to do the gardening or

13  the decorating, that sort of thing.  They may have to buy

14  special equipment.  They may have to have their property

15  adapted if they can no longer go up stairs.  There can be --

16  there can be many elements to a special damage claim.

17  Q.  Were there any special damages if the claimant was dead?

18  A.  Yes.

19  Q.  What?

20  A.  Yes, on top of the special damages, there's a bereavement

21  award and funeral expenses, of course.

22  Q.  Could U. K. claimants recover punitive damages?

23  A.  No.

24  Q.  Were claimants entitled to their attorneys' fees if T&N

25  lost at trial?

*Camden, New Jersey*

——— Crichton - Direct - Bissell ———

1  A.  Yes.

2  Q.  We talked a little bit about how these cases get tried,

3  now I'd like to talk a little bit more about how they got

4  settled. What percentage of T&N's claims were settled as

5  opposed to tried in the U. K.?

6  A.  The overwhelming majority, 90, 95 percent, I would say.

7  Q.  What sort of information did T&N require from claimants

8  before it would settle with them?

9  A.  Well, it would require medical evidence.

10 Q.  Did it require any proof of exposure?

11 A.  Well, yes, but if they had been employees, I mean if I

12 look at an employment record card and I see someone has been

13 employed for us, then that's all I need to know, frankly.

14 Q.  Let's talk a little bit more about exposure to make sure

15 I understand your answer. For the employees the exposure was

16 something that T&N would normally not contest because the

17 records showed it, is that --

18 A.  Yes, it's -- really, there is no defense to it. They were

19 our employees, they were exposed to asbestos just in our

20 employment and they've developed an asbestos-related disease.

21 Q.  Did T&N require any evidence concerning air quality at

22 its workplaces before it would settle?

23 A.  Generally speaking, no.  I can only actually recall once

24 when that became an issue.

25 Q.  How did T&N handle exposure evidence in settlement for

———— Crichton - Direct - Bissell ————

1   claims by nonemployees?

2   A.   It could be more than one way.  It was very often by way

3   of a witness statement, either the claimant or, if he were

4   dead or couldn't recall, a colleague of his would make a

5   statement to the effect that says he recalled working

6   alongside Joe Blokes who drove in regularly into a particular

7   factory where they loaded goods which caused a lot of dust to

8   be thrown up into the air, that sort of thing.  It would

9   usually be witness statements. But also because we've got

10  quite a lot of documents, there might be times when I could

11  corroborate that from our own documents if, say, a particular

12  contractor came on the site regularly.

13  Q.   So it was not a hotly contested issue?

14  A.   It could be -- sometimes, sometimes it would be because

15  sometimes I think the claimant's solicitor were just flying a

16  kite because we are big, where they didn't really know perhaps

17  where their client had been exposed, but -- so they would, you

18  know, try to see if we've got any evidence to support that.

19  But on the whole, it -- they are not capable of being

20  contested.

21  Q.   What about exposure in product liability claims, what

22  sort of information would T&N require before settling a

23  products liability claim?

24  A.   Well, again, generally speaking, by way of witness

25  evidence where they will actually name the product.  There are

─────Crichton - Direct - Bissell─────

 1  some quite well known products that T&N companies produced.

 2  And as I said before, if it was jointer or someone like that,

 3  they would sometimes remember quite clearly. If they say that

 4  they were sawing through a recognized T&N product, then that

 5  is sufficient.

 6  Q.   Under what theory would products liability claimants

 7  bring claims against T&N?

 8  A.   Well, I think it was mainly a sort of failure of duty to

 9  warn.

10  Q.   What type of medical evidence did Turner & Newall require

11  for plaintiff to come forward with before it would settle with

12  the U. K. claimant?

13  A.   Well, we would always receive a report from a recognized

14  consultant who specialized in asbestos diseases.

15  Q.   Did the plaintiff have to provide x-rays?

16  A.   Well, I think x-rays would be provided probably to the

17  consultant, they didn't provide x-rays to us.  But if there

18  were any relevant x-rays, they would be referred to in the

19  consultant's report.

20  Q.   What about pulmonary function test scores, were they

21  required before Turner & Newall would settle a claim?

22  A.   Yes, the medical reports would always contain the results

23  of pulmonary function tests.

24  Q.   I want to talk a little bit about medical evidence that

25  T&N would require before it would settle a lung cancer claim.

—————Crichton - Direct - Bissell—————

1  Would T&N require a showing of underlying asbestosis before

2  paying a lung cancer claim?

3  A.   Mostly, yes.

4  Q.   Are there some instances in which it would not?

5  A.   Well, it's always based on medical evidence. If the

6  medical evidence produced is such that it states that

7  notwithstanding the fact that there is no asbestosis there,

8  nevertheless it's believed by the consultant that lung cancer

9  is caused by the asbestos exposure, then we would probably

10 have to accept that. Generally speaking, in those cases there

11 has been sufficient exposure to have caused asbestosis even if

12 the claimant has not actually developed it.

13 Q.   How did T&N determine how much to pay in settlement for

14 these different diseases?

15 A.   Well, there are guidelines and ranges within -- that are

16 recognized within -- the general damages element, obviously,

17 reflects pain and suffering.  So the longer the period and the

18 longer the pain and suffering, the larger amount those general

19 damages are going to be.  If it's through a plaque case where

20 there is a question mark as to whether there is any damage at

21 all, then it's going to be a relatively small amount.

22 Q.   You mentioned some guidelines, what's the source of those

23 guidelines?

24 A.   They are the JSB guidelines, general -- I don't remember

25 what it stands for now, but it's -- they are guidelines that

Crichton - Direct - Bissell

1    are testified to in court and they're reviewed periodically by

2    courts.  And it's to give brackets, it's not to give

3    absolutes, it's to give brackets within which general damages

4    should be settled at.

5    Q.   Okay. And you use those guidelines?

6    A.   Judicial Studies Guidelines.  Judicial Studies Boards.

7    Q.   And you used those Judicial Study Board guidelines in

8    doing your work; is that correct?

9    A.   I wouldn't, I wouldn't do it myself, the lawyers that I'd

10   instructed would do.  But it's not just those, it's precedent

11   as well and probably more, actually.  They would look at

12   similar cases with a similar length of pain and suffering,

13   similar age group, that sort of thing, to determine what was

14   the relevant amount.

15   Q.   Now, I think you mentioned earlier that T&N did not take

16   many cases to trial and that it was more costly.  How did T&N

17   do at trial, at the trials you attended?

18   A.   How did we -- how did we -- sorry?

19   Q.   How did Turner & Newall do at trial?

20   A.   Not very well.

21   Q.   How did the awards tend to come out compared to

22   settlement values?

23   A.   They were always higher than negotiated settlements.

24   Q.   How did the experiences that Turner & Newall had at trial

25   affect its decisions about settlement?

—————Crichton - Direct - Bissell—————

1   A.  Well, it obviously made Turner reluctant to go to trial

2   unless absolutely necessary because you ended up paying more

3   in costs and more by way of damages and setting yet another

4   precedent.

5   Q.  Has T&N settled products liability claims?

6   A.  Not very many, a handful.

7   Q.  Who was -- since you've been the asbestos claims

8   administrator, who's been the primary asbestos personal injury

9   defendant in the U. K.?

10  A.  Well, probably the T&N subsidiary Newell's Insulation

11  Company.

12  Q.  Does Newell's, being the primary defendant, have any

13  effect on T&N's ability to defend its asbestos liabilities in

14  the U. K.?

15  A.  I think just the knowledge T&N was such a big player over

16  such a long period of time just makes any of the T&N

17  subsidiaries -- just make T&N vulnerable really.  We cannot

18  get away from the fact that we were going since 1920.  And I

19  have been involved in a lot of asbestos litigation, we cannot

20  claim that we didn't know as perhaps some of the smaller

21  defendants might be able to do.

22  Q.  Has T&N sought to reduce its liability by pursuing claims

23  of contribution against other defendants?

24  A.  To the extent that you can.  I mean, sometimes a claimant

25  will only choose to go, as I said, against one defendant.

*United States District Court*
*Camden, New Jersey*

Crichton - Direct - Bissell

1   It's one of the things you look at, actually, when the claim

2   comes in and the employment list goes out, because quite often

3   it will list the companies they worked for.   In those

4   circumstances we had kind of a quid pro quo arrangements

5   whereby we will request a voluntary contribution as we have

6   been requested ourselves in the past.

7   Q.   Based on your experience, have you noticed any trends in

8   asbestos personal injury claims filed against T&N in the two

9   years preceding the commencement of insolvency proceedings in

10  2001?

11  A.   Only to the extent that they were increasing and that the

12  proportions were changing in respect to the kind of claims.

13  As I said, a number of subrogation claims were coming through.

14        MR. BISSELL:   Could I have just a minute, your Honor,

15  to confer with my colleagues?   I think I'm very close to being

16  done.

17        THE COURT:   Yes.

18  BY MR. BISSELL:

19  Q.   Going to what we were discussing near the end about how

20  T&N shared liabilities with other asbestos defendants, can you

21  describe how liability was allocated between T&N and other

22  defendants when a claimant was exposed to asbestos from more

23  than one source?

24  A.   It was almost always on a time exposed basis.

25  Q.   And could you just, for those who may not be as familiar

Crichton - Cross - Strochak

1  with the time exposed basis idea, can you explain to us how

2  that works?

3  A.   Well, as a simple example, if an employee worked for us

4  for five years and worked for someone else for five years and

5  someone else for ten years, then our share would be 25 percent

6  and the others would be 25 and 50 percent respectively.

7  Q.   Okay.  Now, moving back to, I think we were talking about

8  medical evidence earlier, was there any particular pulmonary

9  test score that T&N would require before it paid on a

10  non-malignant claim?

11  A.   No.

12  Q.   So is it fair to say that T&N would pay an asbestos claim

13  if the consulting doctor rendered a diagnosis of asbestosis

14  even if the plaintiff did not have any particular decline on a

15  PFT test?

16  A.   Yes.  But clearly they would get considerably less than

17  if they were a high disability.  And in the U. K. we have a

18  system whereby claimants can opt to take provisional damages.

19  So they will take -- if you got a lesser disease, they would

20  take provisional damages now with the option to come back for

21  further damages if they're condition progresses or if they

22  develop another asbestos-related disease, a serious one.

23       MR. BISSELL:  Thank you very much.

24       THE COURT:  Mr. Strochak.

25  (CROSS-EXAMINATION OF ANDREA CRICHTON BY MR. STROCHAK:)

—Crichton - Cross - Strochak—

1  Q.   Good afternoon, Ms. Crichton.  My name is Adam Strochak.

2  I know we met a few months ago in New York when you were kind

3  enough to come over for an interview.  I take it you recall

4  that meeting?

5  A.   I do.

6  Q.   Let me start, if I could, with the database project that

7  you mentioned in your direct testimony.  I believe you said

8  that you worked on a database, an imaging project?

9  A.   Yes.

10  Q.   To create a repository of T&N corporate documents, is

11  that correct?

12  A.   Yeah, the documents were already there.  It was to

13  facilitate the supply of a list of documents.  If the

14  litigation progresses in the U. K., a list of documents will

15  have to be supplied.  It was to facilitate the supplying of

16  the list of documents and copies of the documents themselves

17  rather than endlessly going back to originals.  And some of

18  them are very, very flimsy, those original documents, too.  If

19  you keep going back and unstapling them to make photocopies,

20  it's not, obviously, very good.

21  Q.   You were able to create electronic repositories of those

22  documents?

23  A.   Yes, but not every one.  We were looking specifically for

24  documents that were relevant to U. K. asbestos litigation.

25  Q.   I see.  So the documents that were relevant to U. K.

———Crichton - Cross - Strochak———

1    asbestos litigation were different than those that might have

2    been relevant to U.S. litigation?

3    A.   No, for the most part they would -- obviously, they would

4    be very similar but there might be some specific issues that

5    were just to do with the U. K..

6    Q.   Now, you said you hired a U.S. company to do the work on

7    that project, is that right?

8    A.   Yes.

9    Q.   And that was, did I get the name right, Heathson?

10   A.   No, Peterson.

11   Q.   I take it no relation to Dr. Peterson who is the

12   testifying expert for the ACC in this case?

13   A.   I don't think so.

14   Q.   Now, what year was that project undertaken, if you

15   recall?

16   A.   I started -- I think it was December '93 when we actually

17   started the project.  It was quite a big project to do and

18   then Peterson came over.  I had a lot of temps there because

19   it meant really for every file we had, we had to take all the

20   staples out of each and every document in the file, then they

21   got to be marked up in such a way you knew it was part of a

22   bunch of documents, then every single page had a bar code, a

23   separate bar code on the bottom, so it was quite labor

24   intensive.  And when it had gone through that period, it went

25   to be microfilmed, every page went to be microfilmed.  And

—————Crichton - Cross - Strochak—————

1   then the microfilms were shipped back to Milwaukee where they

2   were -- not everything was imaged, but a lot of it was imaged,

3   and a small amount of documents were OCR, the optical

4   character recognition.  And then over in Milwaukee there were

5   a team of people there creating a database, we identified,

6   apart from the usual things like author, book organization,

7   recipient, that sort of thing, date, title, we identified a

8   number of key words that could be picked out by the people

9   over there.

10  Q.  Okay.  Now, these documents that were put into this

11  electronic repository and imaged and OCR'd, were they the same

12  documents that were made available to Chase Manhattan in the

13  property damage litigation?

14  A.  Many of them would be, yes.

15  Q.  Are the documents still in Milwaukee, is there a set

16  still there?

17  A.  No.  I think they probably still got a set of the

18  microfilm but not the documents.

19  Q.  I see.  Now, over the years, I recognize that the Chase

20  property damage litigation is a separate matter, but over the

21  years did asbestos personal injury lawyers representing U.S.

22  claimants make arrangements to review these documents?

23  A.  Sorry, to review the Chase documents .

24  Q.  No.  I'm sorry, I wasn't clear.  To review the documents

25  that you put into the separate electronic repository that we

Crichton - Cross - Strochak

1  were discussing, the one that went to Milwaukee.

2  A.   No, not really.   No.   I mean, the occasional plaintiff's

3  lawyer came over to review the documents in the repository

4  itself but not my database of documents, no.

5  Q.   So that was not made available to plaintiffs' lawyers in

6  the United States?

7  A.   Well, I'm not -- I'm not sure what good it would have

8  done them in a sense, it was you needed to know how to bring

9  up the images, it was quite a complicated way of doing it, and

10 I'm not sure it would be the way that they would do discovery,

11 anyway.   They seemed, to my small knowledge of it, they seemed

12 to come and go through the list of the files and to pick out

13 for themselves what they wanted to see.

14 Q.   And they did, in fact, do that periodically?

15 A.   Periodically, yes.

16 Q.   You mentioned in your direct testimony the different

17 types of diseases that you see in the U. K. claims.   And if my

18 memory serves correct, you mentioned mesothelioma, right?

19 A.   Yes.

20 Q.   And lung cancer claims?

21 A.   Yes.

22 Q.   And non-malignant disease claims, asbestosis and pleural

23 disease, correct?

24 A.   Yes.

25 Q.   I didn't hear you mention, and perhaps I just missed it,

Crichton - Cross - Strochak

1  but I didn't hear you mention other types of cancers.

2  A.  No.

3  Q.  Is that a type of claim you typically do not see much of

4  in the U. K.?

5  A.  No, we don't.  I can only ever recall one claim, an

6  esophageal claim, I can just recall that one.

7  Q.  Just one in all of T&N's history?

8  A.  Yes -- well, no, not T&N's history, in the time that I

9  have been managing.

10  Q.  I see.  So that would have been about since -- well,

11  since what year?  I'm sorry.

12  A.  Yes, but I think probably since the time that, the late

13  '80's, I think, I would have known about it then because I was

14  keeping records to do with disease at that stage.

15  Q.  Now, you indicated that for the vast majority of the U.

16  K. claims, T&N really has no defense to many of those claims.

17  About what percentage of claims are resolved with no payment

18  in the U. K., if you have a sense?

19  A.  You mean that we take to trial and don't pay or just we

20  just don't for whatever reason -- a number of them just go

21  away.  A number of them are abandoned.  You know, we might

22  start a case and the claimant just goes away.  There are --

23  there have been a few -- there are a few instances where we

24  have been released by codefendants mainly because our share

25  would prove to be so small, you know, less than 1 percent or

Crichton - Cross - Strochak

1  something, it's really not worth it.

2  Q.   I see.  Now, when you say that for many of the claims

3  there was no defense, were you referring to what you called EL

4  claims, employer's liability claims?

5  A.   Yes.

6  Q.   And the reason for that is there's a fairly well

7  established record of the presence of asbestos in mills and

8  other factories where Turner & Newall and subsidiaries

9  actually made asbestos, its asbestos products, right?

10  A.   That's right.

11  Q.   Now, is that comparable in the United States?

12          MR. FINCH:  Objection.  Lack of foundation.

13          THE WITNESS:  I'm not sure I even understand your

14  question.

15          THE COURT:  She doesn't understand the question.

16          MR. STROCHAK:  I will be happy to rephrase, your

17  Honor.

18  BY MR. STROCHAK:

19  Q.   You have had some experience with U. K. claims in your

20  history with the company, is that correct?

21  A.   Well, mainly in an administrative role.

22  Q.   You have some general understanding of the types of legal

23  theories that U.S. claimants pursue?

24  A.   I wouldn't like to write about it.  I probably would have

25  heard the odd thing over the years, but I'm certainly not the