# EXHIBIT U

Case 1:04-cv-01559-JFC    Document 49-11    Filed 09/19/2005    Page 1 of 12

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| OWENS CORNING, *et al.* | : | Case Nos. 00-3837 (JKF) |
| | : | (Jointly Administered) |
| Debtors. | : | Rel. Docket Nos. 12520, 12850 & 12852 |

**OBJECTION AND RESPONSE OF THE OFFICIAL
COMMITTEE OF ASBESTOS CLAIMANTS TO THE MOTION
OF CSFB, AS AGENT, TO ESTABLISH PROCEDURES TO OBTAIN
A SAMPLE OF MEDICAL RECORDS, INCLUDING X-RAYS, FROM
ASBESTOS PERSONAL INJURY CLAIMANTS ASSERTING
NONMALIGNANT CLAIMS AGAINST THE DEBTORS AND TO MODIFY
TO THE COURT'S AUGUST 19, 2004 SCHEDULING ORDER**

The Official Committee of Asbestos Claimants ("**ACC**") files this Objection and Response to the Motion seeking the entry of an Order establishing procedures to obtain a sample of medical records from asbestos personal injury claimants and to modify the Court's August 19, 2004 scheduling Order (Dkt. No. 12850) (the "**CSFB Motion**"). For the reasons stated below, the CSFB Motion is without merit and the Court should deny the motion in its entirety.

## INTRODUCTION

Having failed in their attempt to impose an asbestos claims bar date prior to estimation of the Debtors' asbestos liability, the creditors holding bank debt (the "**Bank Debt Holders**") are seeking yet another opportunity to ask this Court to engage in what amounts to a one-by-one examination of non-malignant claims prior to estimation. In its August 19, 2004 scheduling Order (the "**Scheduling Order**"), the Court made clear that estimation at the January 2005 hearing is to be based upon the settlement history of Owens Corning as enlightened by expert testimony. Strategically timed to coincide with the filing of the expert reports on October 15, 2004, the Bank Debt Holders again seek to

{D0026917:1}DOC# 227783 v1 - 10/18/2004

delay the estimation process. Under the terms of the Bank Debt Holders' proposed "random" sample of non-malignant asbestos personal injury claimants from Owens Corning's claims data base (the "**Random Sample**"), the Bank Debt Holders would further frustrate and delay the estimation process *at a minimum* another 191 days.[1] CSFB Motion at 30-32.

While the Bank Debt Holders would prefer to carve out what in their view are "invalid" non-malignant claims, the proper basis for calculating the value of Owens Corning's personal injury asbestos liability is its entire settlement history.[2] The settlement history records Owens Corning's difficult experience litigating non-malignant asbestos claims and its preference for settlement over litigation. In this regard, Owens Corning opted to pay relatively low values (*i.e.*, a few thousand dollars per claim) to settle what it viewed as weaker non-malignant claims and somewhat more to settle what it viewed as stronger non-malignant claims. There is nothing unusual about such a litigation strategy and it blinks reality to suggest either that cases fall into only black and white boxes or that a trial on the merits will not follow if a case is not settled. This

---

[1] For a calculation of the 191 days, see the Objection and Response of James J. McMonagle, Legal Representative for Future Claimants, to the CSFB Motion at 2-3.

[2] Moreover, the Bank Debt Holders would have the Court believe that the percentage of non-malignant claims brought against Owens Corning is equally proportionate to the percentage of dollars paid to such claimants. Such an assertion flies in the face of reality. For most asbestos defendants, while non-malignant claims account for up to 90% of the total number of total asbestos personal injury claims, over half of the dollars are paid to claimants with mesothelioma, lung cancer, and other cancers. Owens Corning is no different. The estimation experts for the ACC and the Debtor agree that well over 50% of the total dollars Owens Corning will spend to resolve all asbestos personal injury claims will be paid to cancer claimants. See Mark A. Peterson, Owens Corning and Fibreboard Projected Liabilities for Asbestos Personal Injury Claims As of October 2000, at 28-29 (Dkt. No. 12992) (the "**Peterson Report**"); Thomas E. Vasquez, Forecast of Future Asbestos Claims and Indemnity" Owens Corning and Fibreboard, at 26 (attached as Exhibit A to the CSFB Motion) (the "**Vasquez Report**").

strategy allowed Owens Corning to avoid the legal and economic risks of litigating a non-malignant claim to judgment. Eliminating what the Bank Debt Holders would define as weaker non-malignant claims from the calculation of Owens Corning's asbestos personal injury liability is a blatant disregard for the fact that in settling such claims Owens Corning made a rational legal/economic decision that the cost of settling each such claim for a few thousand dollars was far cheaper than the exposure it faced by rolling the dice and going to trial. The claims resolution history reflects this.

In any event, the Random Sample of x-rays will prove nothing that the settlement history does not already reflect. At the end of the exercise, all a "study" of a "random" sample of 1,000 claimants' x-rays would prove is that the Bank Debt Holders' doctors dispute the presence of disease for most of those claims. Such disputes are resolved in our legal system on an individual case-by-case basis and a jury decides which of the competing expert witness opinions are correct. Owens Corning of course disputed the presence of disease in the vast majority of non-malignant claims that it paid money to settle. When it and the claimant's lawyer viewed the claim as having a greater likelihood of success if taken to trial (such as where the claimant had stronger x-ray evidence or pulmonary function tests showing measurable declines in lung function), the amount paid in settlement tended to be higher than that for the "average" non-malignant claim. When Owens Corning and the claimant's lawyer viewed the claim as having a lower likelihood of success (such as when Owens Corning had doubts about the reliability of the plaintiff's medical evidence or medical experts) the case tended to resolve for much less money than the "average" non-malignant claim or in a significant percentage of the time for no money at all.

As its inside and outside defense lawyers will testify, Owens Corning paid settlements to resolve asbestos personal injury claims only when the plaintiff could provide sufficient evidence of product identification and asbestos related disease such that in defense counsels' view the case was likely to survive a motion for summary judgment and present a significant economic risk to Owens Corning if it took the case to verdict. See Rule 26(a)(2) Statement of Bruce G. Tucker (Dkt. No. 12994) (Owens Corning's long-time national outside defense counsel); Rule 26(a)(2) Statement of Clyde M. Leff (Dkt. No. 12993) (in house counsel in charge of asbestos litigation at the time the National Settlement Program was initiated). In making its decisions about whether or not to settle asbestos claims, Owens Corning considered the quality and reliability of the medical evidence supporting the plaintiff's claim and took this into account in deciding how much to offer in settlement. Id. Owens Corning's balancing of its chances of success versus the economic risks of going to trial is typical behavior for any defendant facing litigation risk (and not just in asbestos cases) and this reality is reflected in the entire claims resolution history. The idea that the Bank Debt Holders will prove through their so-called Random Sample something that Owens Corning did not already know and take into account in its decision to settle or try cases is pure sophistry.

The ACC submits that the CSFB Motion must be denied for the following reasons: (1) Owens Corning's settlement history must be considered in its entirety to accurately reflect Owens Corning's liability; (2) the Bank Debt Holders' proposed Random Sample as a basis for challenging non-malignant claims ignores the medically-authoritative 2004 American Thoracic Society standards for the Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos ("**2004 ATS Standards**")

(attached as **Exhibit A**), which require neither impairment nor a 1/0 x-ray for diagnoses of non-malignant asbestos-related diseases; (3) by drawing only from pending unsettled cases, the Random Sample would be biased and fail to accurately represent the universe of non-malignant claims filed against Owens Corning; (4) the CSFB Motion is an unfair attempt to re-litigate the parameters of the estimation process; and (5) the CSFB Motion is procedurally flawed and based on erroneous assumptions.

## ARGUMENT

### I. Owens Corning's Decision To Settle Weaker Claims Reflects A Calculated Decision To Avoid The Risk Of Trial; Thus, It Is Necessary to Consider Owens Corning's Settlement History In Its Entirety.

Unlike many defendants, Owens Corning actually tried several hundred non-malignant claims to verdict. Presumably the cases it chose to try were the ones its lawyers thought were most winnable. Overall, the trial results were disastrous for the company. Of all the asbestos cases tried by Owens Corning to verdict, 62 percent were non-malignant claims. Vasquez Report, at 19 (attached as Exhibit A to the CSFB Motion). Owens Corning won a number of these non-malignant claims; however, those that were lost typically returned significant verdicts and resulted in Owens Corning having to pay hundreds of millions in compensatory and punitive damages in the aggregate. Id. Indeed, Owens Corning paid an average of over $250,000 in damages for each non-malignant case tried to verdict. Id.; see also, Peterson Report, at 70 (Dkt. No. 12992) (average verdict in non-malignant cases of $272,465 in year 2000 dollars).

In light of this experience, Owens Corning opted to avoid the legal and economic risks of trial and settle the vast majority of its non-malignant claims. To this end, Owens Corning's settlement strategy for non-malignant claims necessarily included payment of

both strong and weak claims – albeit weaker non-malignant claims were paid at significantly lower values than stronger non-malignant claims.[3] The tradeoff between settlement and litigation is reflected in Owens Corning's settlement history and the fact that many of the non-malignant claims filed against Owens Corning were supported by disputed x-ray evidence and, in many instances, no pulmonary function tests at all. Although the Bank Debt Holders call this a "a history riddled with fraud," it is in fact the legitimate consequence of avoiding trial by settling the vast majority of non-malignant claims in proportion to the strength of each claim.  CSFB Motion at 7.

At best, all a "study" of a "random" sample of 1,000 claimants' x-rays would prove is that the Bank Debt Holders' doctors would dispute the quality of the evidence or the presence of disease for most of the claims.  Disputes between doctors over the proper interpretation of an x-ray are unavoidable even outside of the litigation setting.  In litigation, these disputes are normally resolved on an individual case-by-case basis and a jury decides the outcome.  See, e.g., Cimino v. Raymark Indus., Inc., 151 F.3d 297, 316 (5th Cir. 1998) (Court held there is no process for collective determination of individual cases that is consistent with constitutional and statutory standards of due process and jury trial rights.)  The Bank Debt Holders cannot have it both ways.  Estimation must be based either on estimating the value of all claims (both weak and strong) using the low settlement values – conversely, if only what the Bank Debt Holders view as "valid" claims (*i.e.*, the strongest claims) are allowed to be included in the estimation, the value of these "valid" claims must be based on the far higher verdict averages.  Clearly the

---

[3]  This was true for cancer claims as well.  Not only were there medical issues that may be disputed case by case (*e.g.*, whether a claimant's lung cancer was caused by asbestos exposure or something else) but also proof of exposure to a product resulting in liability for Owens Corning.

Bank Debt Holders – like Owens Corning – have no interest in paying jury verdict averages for each "valid" non-malignant claim. Therefore, in order to fully account for Owens Corning's repeated decisions to resolve non-malignant claims for relatively low amounts rather than expose the company to the legal and economic risks involved in challenging such claims at trial, estimation must be based on Owens Corning's entire settlement history and not the select results of the Random Sample. See In re Eagle-Picher Indus., 189 B.R. 681, 690-91 (Bankr. S.D. Ohio 1995) (Court sets forth the general criteria upon which estimation should be based, including the claims history of the particular company whose liability is being estimated). What the Bank Claimants seek to do is eliminate what they view as weak or "invalid" claims and then base the estimation of the remaining claims on average settlement values which include the settlement for claims they would reject. This is neither logical nor permissible.

## II. The 2004 American Thoracic Society Standards Do Not Require Functional Impairment Or A 1/0 X-Ray For The Diagnosis Of Non-Malignant Asbestos-Related Diseases.

The pejorative terms "invalid" and "unimpaired" are callously tossed about by the Bank Debt Holders who ignore the very real damage an asbestos victim can suffer to his lungs before it is measurable on an x-ray or lung function test. See, e.g., CSFB Motion at 2 fn. 3, 21. The 2004 ATS Standards, which are intended to provide medical personnel with guidelines for diagnosing and treating non-malignant asbestos-related diseases, acknowledge asbestos non-malignant diseases can cause real harm without measurable functional impairment. 2004 ATS Standards at 691 (attached hereto as **Exhibit A**). Specifically, the 2004 ATS Standards state:

> Demonstration of functional impairment is not required for diagnosis of nonmalignant asbestos-related disease, but

{D0026917:1} 7

> where present should be documented as part of the complete evaluation.

Id. (emphasis added).

The 2004 ATS Standards also permit a diagnosis of asbestosis even with a 0/1 or normal x-ray. 2004 ATS Standards at 696. The 2004 ATS Standards report that, among individuals with asbestosis confirmed by pathology (*i.e.*, actually taking a tissue sample of the lung), 15-20 percent had no radiographic (x-ray) evidence of parenchymal fibrosis. Id. Similarly, the 2004 ATS Standards report that studies of large cohorts have shown a significant reduction in lung function attributable to pleural plaques, averaging about 5 percent of Forced Vital Capacity (FVC), even when there is no radiographic evidence of asbestosis. Id. at 705. The Bank Debt Holders' insistence that non-malignant claims without measurable functional impairment or positive x-ray findings are "invalid" claims ignores the diagnosis guidelines set forth in the 2004 ATS Standards and should not be allowed to prejudice the estimation process.

### III. The Random Sample Proposed By The Bank Debt Holders Would Be Biased and Unrepresentative.

The Random Sample proposed by the Bank Debt Holders seeks medical records only from those individuals with pre-petition claims against Owens Corning that had not been settled as of the Petition Date. See CSFB Motion at 31 n. 20. Such a sample does not accurately represent all non-malignant claims filed again Owens Corning. For any given group of claims filed at the same time, some would be settled more quickly than others. Like many defendants, Owens Corning often chose to settle non-malignant claims more quickly when it regarded the evidence supporting such claims as being stronger and less subject to dispute. Indeed, when Owens Corning first began to implement its National Settlement Program after it became apparent that its aggressive

trial strategy was a disaster, it entered into global settlement agreements earlier with those law firms it regarded as representing a more dangerous mix of cases. Likewise, Owens Corning was less likely to settle quickly those pre-petition claims it regarded as representing weaker claims. The latter claims, which remained unsettled when Owens Corning filed for bankruptcy, represent the exclusive category from which the Bank Debt Holders propose taking their Random Sample. CSFB Motion at 31 n. 20. Not surprisingly, the results from the sample proposed by the Bank Debt Holders will inevitably result in a non-representative sample of asbestos claimants.

### IV. The Bank Debt Holders Should Not Be Permitted A Second Bite At The Apple.

The Bank Debt Holders seek yet another bite of the apple to impose the estimation procedures they previously argued in their bar date motions. Just as the Bank Debt Holders sought to impose a bar date in order to "examine the bona fides of asbestos claims that would dilute the commercial creditors' claims," the Bank Debt Holders now seek to use the Random Sample to achieve the same end. See Motion of the Official Committee of Unsecured Creditors for Order Establishing a Bar Date for Filing Proofs of Claim for Asbestos Claims and the Content Thereof, at ¶¶ 9-11, 16-18, 20, 23-24 (Dkt. No. 7767); Memorandum of Law of Credit Suisse First Boston, as Agent, in Support of Joinder and Supplement to Motion of the Official Committee of Unsecured Creditors for Order Establishing a Bar Date for Filing Proofs of Claim for Asbestos Claims and the Content Thereof Pursuant to Bankruptcy Rule 3003(c)(3), at 2, 5, 7-9, 12-13 (Dkt. No. 12246). Specifically, the crux of the CSFB Motion is to "cleanse the [Debtor's settlement history] data of improprieties" and to prevent payment of asbestos personal injury claims "at the expense of other creditors." CSFB Motion at 2, 6.

{D0026917:1} 9

This Court, however, has decided to hold an asbestos personal injury estimation hearing without first setting a bar date. In the Scheduling Order that resolved the bar date issue, the Court made a preliminary determination that the estimation process in this case will be based upon "the data now available…in light of the expert testimony at the scheduled hearing." In re Owens Corning, Case No. 00-3837 (JKF) (Bankr. D. Del.) (August 19, 2004). In the Scheduling Order, the Court stated that *if* additional information is necessary, such information will be considered *after* the scheduled hearing on January 13, 2005. Id. (emphasis added). Not to be thwarted by the Court's failure to follow their suggested approach to estimation, the Bank Debt Holders now seek another chance for the Court to revisit the estimation process. The Bank Debt Holders have in fact chewed the proverbial apple to the core and should not be allowed yet another opportunity to have the estimation hearing delayed by at least six months.

### V.  The CSFB Motion Is Procedurally Flawed And Based On Erroneous Assumptions.

The Bank Debt Holders request that after they complete their Random Sample of 1,000 claimants, the resulting sample list would be served on "all parties." CSFB Motion at 30. It is not clear from this description upon whom the Bank Debt Holders actually intend to serve the list and seek the x-rays. At this juncture, only the ACC is a "party" to the estimation proceeding, not all of the individual claimants or their law firms. To the extent that the Bank Debt Holders contemplate serving the Random Sample list on the ACC as the equivalent of subpoenaing records from the plaintiff law firms that represent individual claimants, their entire approach is procedurally defective. It is well-established that the creditors committee is not the same entity as the creditors whose interests it represents. See, e.g., Colliers on Bankruptcy, ¶ 1303.05 (15th ed. 2002);

Quality Beverages Co., 181 B.R. 887, 894 (Bankr. S.D. Tex. 1995). Moreover, the ACC does not have possession, custody, or control over the documents such as x-rays or medical records of the individual asbestos claimants.

The Bank Debt Holders also appear to assume that the law firms representing the individual asbestos claimants would have their clients' x-rays and complete medical documentation perpetually in their files at all stages of litigation. This may often not be the case particularly for those cases not yet prepared for trial.

## CONCLUSION

For the reasons stated above, the Court should deny the CSFB Motion.

Dated: October 18, 2004                    CAMPBELL & LEVINE, LLC

/s/ Mark T. Hurford
Marla R. Eskin (I.D. #2989)
Mark T. Hurford (I.D. #3229)
800 North King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900

--and--

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue
New York, NY 10022-4614
(212) 319-7125

--and--

CAPLIN & DRYSDALE, CHARTERED
Peter Van N. Lockwood
Nathan D. Finch
One Thomas Circle, N.W.
Washington, D.C. 20005
(202) 862-5000

Counsel to the Official Committee
of Asbestos Claimants